Kevin E. Gilbert, Esq. (SBN: 209236)
kgilbert@ohhlegal.com
Christopher R. Creech, Esq. (SBN: 293037)
ccreech@ohhlegal.com
**ORBACH HUFF + HENDERSON LLP**
6210 Stoneridge Mall Road, Suite 210
Pleasanton, California 94588
Telephone:    (510) 999-7908
Facsimile:    (510) 999-7918

Attorneys for Defendants
COUNTY OF ALAMEDA, STEVEN HOLLAND, MONICA POPE,
KEITH LEEPER, ANTHONY DeSOUSA and CAMERON GALLOWAY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE,<br><br>              Plaintiffs,<br><br>v.<br><br>COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; KEITH LEEPER; ANTHONY DeSOUSA; CAMERON GALLOWAY; and DOES 1 to 50, inclusive,<br><br>              Defendants. | Case No. 20-cv-04679-WHA<br><br>**DECLARATION OF KEVIN E. GILBERT IN SUPPORT OF DEFENDANTS COUNTY OF ALAMEDA, STEVEN HOLLAND, MONICA POPE, KEITH LEEPER, ANTHONY DeSOUSA AND CAMERON GALLOWAY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>DATE:      September 9, 2021<br>TIME:      8:00 a.m.<br>DEPT:     Courtroom 12, 19th Floor<br>JUDGE:    Hon. William Alsup |

ORBACH HUFF + HENDERSON LLP

I, Kevin E. Gilbert, if called upon to testify will competently testify as follows:

1. I am an attorney at law licensed to practice before this Court. I am an attorney with the law firm of Orbach Huff + Henderson LLP, attorneys of record for Defendants COUNTY OF ALAMEDA, STEVEN HOLLAND, MONICA POPE, KEITH LEEPER, ANTHONY DeSOUSA and CAMERON GALLOWAY ("Defendants") in the above-referenced matter. I have personal knowledge of the matters set forth herein below and if called upon to testify will competently testify thereto.

2. Attached hereto as **Exhibit I**[1] is a true and correct copy of the footage captured by the body worn camera of Alameda County Deputy Shaun Eng during the incident underlying this action, which was produced to Plaintiffs on November 6, 2020, in response to Plaintiffs' Request for Production of Documents, Set One.

3. Attached hereto as **Exhibit J** is a true and correct copy of excerpts from the deposition transcript of Plaintiff Aasylei Loggervale ("Mother"), which was taken on June 25, 2021.

4. Attached hereto as **Exhibit K** is a true and correct copy of excerpts from the deposition transcript of Plaintiff Aasylei Hardge-Loggervale ("Aasylei"), which was taken on June 28, 2021.

5. Attached hereto as **Exhibit L** is a true and correct copy of excerpts from the deposition transcript of Plaintiff Aaottae Loggervale ("Aaottae"), which was taken on June 28, 2021.

6. Attached hereto as **Exhibit M** is a true and correct copy of excerpts from the deposition transcript of Defendant Deputy Steven Holland, which was taken on February 4, 2021.

7. Attached hereto as **Exhibit N** is a true and correct copy of excerpts from the deposition transcript of Defendant Deputy Monica Pope, which was taken on February 5, 2021.

///

ORBACH HUFF + HENDERSON LLP

[1] The exhibits submitted in support of Defendants' Motion for Summary Judgment are sequentially numbered throughout the respective Declarations filed concurrently herewith.

8.    Attached hereto as **Exhibit O** is a true and correct copy of excerpts from the deposition transcript of Defendant Sergeant Keith Leeper, which was taken on July 6, 2021.

9.    Attached hereto as **Exhibit P** is a true and correct copy of excerpts from Plaintiff Mother's Responses to Defendant County of Alameda's Interrogatories, Set One, emailed on December 17, 2020.  Plaintiffs have not amended or supplemented these responses throughout the course of this litigation.

10.    Attached hereto as **Exhibit Q** is a true and correct copy of excerpts from Plaintiff Aasylei's Responses to Defendant County of Alameda's Interrogatories, Set One, emailed on December 17, 2020.  Plaintiffs have not amended or supplemented these responses throughout the course of this litigation.

11.    Attached hereto as **Exhibit R** is a true and correct copy of excerpts from Plaintiff Aaottae's Responses to Defendant County of Alameda's Interrogatories, Set One, emailed on December 17, 2020.  Plaintiffs have not amended or supplemented these responses throughout the course of this litigation.

12.    Attached hereto as **Exhibit S** is a true and correct copy of excerpts from Plaintiff Mother's Responses to Defendant County of Alameda's Requests for Admission, Set One, emailed on December 17, 2020.  Plaintiffs have not amended or supplemented these responses throughout the course of this litigation.

13.    Attached hereto as **Exhibit T** is a true and correct copy of excerpts from Plaintiff Aasylei's Responses to Defendant County of Alameda's Requests for Admission, Set One, emailed on December 17, 2020.  Plaintiffs have not amended or supplemented these responses throughout the course of this litigation.

14.    Attached hereto as **Exhibit U** is a true and correct copy of excerpts from Plaintiff Aaottae's Responses to Defendant County of Alameda's Requests for Admission, Set One, emailed on December 17, 2020.  Plaintiffs have not amended or supplemented these responses throughout the course of this litigation.

///

///

ORBACH HUFF + HENDERSON LLP

ORBACH HUFF + HENDERSON LLP

15. Attached hereto as **Exhibit V** is a true and correct copy of excerpts from Plaintiff Mother's Responses to Defendant Deputy Galloway's Interrogatories, Set One, emailed on June 25, 2021. Plaintiffs have not amended or supplemented these responses throughout the course of this litigation.

16. Attached hereto as **Exhibit W** is a true and correct copy of excerpts from Plaintiff Aasylei's Responses to Defendant Deputy Galloway's Interrogatories, Set One, emailed on June 25, 2021. Plaintiffs have not amended or supplemented these responses throughout the course of this litigation.

17. Attached hereto as **Exhibit X** is a true and correct copy of excerpts from Plaintiff Aaottae's Responses to Defendant Deputy Galloway's Interrogatories, Set One, emailed on June 25, 2021. Plaintiffs have not amended or supplemented these responses throughout the course of this litigation.

18. Attached hereto as **Exhibit Y** is a true and correct copy of excerpts from Plaintiff Mother's Responses to Defendant County of Alameda's Requests for Admission, Set Two, emailed on June 25, 2021. Plaintiffs have not amended or supplemented these responses throughout the course of this litigation.

19. Attached hereto as **Exhibit Z** is a true and correct copy of Alameda County Sheriff's Office General Order Numbers 1.15, 1.19 and 5:45. To the extent Plaintiffs have identified a policy or custom at all supporting their claims against Defendant County of Alameda pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), these are the relevant policies referenced by Plaintiffs.

20. Attached hereto as **Exhibit AA** is a true and correct copy of all seven photographs Plaintiffs claim to have taken of their alleged injuries shortly after the incident underlying this action. These photographs were produced on December 28, 2020, in response to Defendant County of Alameda's Request for Production of Documents, No. 11, which requested, among other things, "all photographs … including … the claimed injuries and the alleged injuries themselves." Allegedly, Mother's wrist is shown in photograph 5, Aasylei's wrist is shown in photograph 4 and Aaottae's elbow and wrists are shown in photographs 2, 3, 6 and 7. See Ex. K

- 3 -

ORBACH HUFF + HENDERSON LLP

("Aasylei Depo Tx.") at 122:1-124:6 and Ex. L ("Aaottae Depo Tx.") at 119:18-25, 124:9-126:10.  None of the Plaintiffs could say if photograph 1 showed their wrist and none of the Plaintiffs reported sustaining the blemish shown in this photograph during the incident.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 5th day of August, 2021, in Pleasanton, California.

    _/s/ Kevin E. Gilbert_
Kevin E. Gilbert
Attorney for Defendants
COUNTY OF ALAMEDA, STEVEN HOLLAND,
MONICA POPE, KEITH LEEPER, ANTHONY
DeSOUSA and CAMERON GALLOWAY

# EXHIBIT I

**EXHIBIT I** to the Declaration of Kevin Gilbert:  A true and correct copy of the video from Deputy Shaun Eng's body worn camera for the subject incident.

Please click on the following link:



# EXHIBIT J

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE,

Plaintiffs

vs.

Case No. 20-cv-04679-WHA

COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; KEITH LEEPER; ANTHONY DESOUSA; CAMERON GALLOWAY; and DOES 1 to 50, inclusive,

Defendants.

_______________________________________/

CERTIFIED TRANSCRIPT

VIRTUAL DEPOSITION OF

AASYLEI LOGGERVALE

Friday, June 25, 2021

(Via Zoom videoconference)

REPORTED BY:

DEBRA J. SKAGGS, CSR 7857

EMERICK AND FINCH
Certified Shorthand Reporters
18 Crow Canyon Court, Suite 125
San Ramon, California 94583
emerickfinch@emerickfinch.com
(925) 831-9029 (800) 331-9029

```
 1                   REMOTE APPEARANCES

 2    FOR THE PLAINTIFFS:

 3       LAW OFFICE OF JOSEPH S. MAY
         BY: JOSEPH S. MAY, ATTORNEY AT LAW
 4       1388 Sutter Street, Suite 810
         San Francisco, California 94109
 5       (415) 781-3333 Fax: (415) 707-6600
         joseph@josephmaylaw.com
 6
         GEARINGER LAW GROUP
 7       BY:  BRIAN GEARINGER, ATTORNEY AT LAW
         740 Fourth Street
 8       Santa Rosa, California 95404
         (415) 440-3102
 9       brian@gearingerlaw.com

10
      FOR THE DEFENDANTS:
11
         ORBACH HUFF + HENDERSON LLP
12       BY: CHRISTOPHER R. CREECH, ATTORNEY AT LAW
         6210 Stoneridge Mall Road, Suite 210
13       Pleasanton, California 94588
         (510) 999-7908 Fax (510) 999-7918
14       ccreech@ohhlegal.com

15    ALSO PRESENT:

16       AASYLEI HARDGE-LOGGERVALE, Plaintiff; and
         AAOTTAE LOGGERVALE, Plaintiff.
17                         --o0o--

18

19

20

21

22

23

24

25
```

1                          INDEX

2    EXAMINATION BY:                                    PAGE

3        Mr. Creech                                        4

4    AFTERNOON SESSION:

5        Mr. Creech (Resumed)                            138

6                       --o0o--

7    DEFENDANTS' EXHIBITS:                               PAGE

8    Exhibit 300 - 1 page - Cal Veh Code Section 12951 -

9                   Possession of License               142

10   Exhibit 301 - 1 page - Cal Veh Code Section 22511.56

11                  - Presentation of identification and

12                  Evidence of Issuance of Placard or

13                  Plate to Peace Officer upon Request;

14                  Rebuttable Presumption; Confiscation

15                  and cancellation                     147

16   Exhibit 302 - 1 video - Video footage titled

17                  "Mother Handcuffed"                  217

18   Exhibit 303 - 1 video - Video footage titled "Hitting

19                  Pope with Door"                      227

20                       ---oOo---

21

22

23

24

25

1   A.        Can you repeat it again, please?

2   Q.        Sure.

3             You said that you had seen the complaint filed

4   in this action, and I wanted to know, to the best of

5   your knowledge and understanding, is everything said in

6   that complaint true and accurate?

7             MR. MAY:  Same objections -- sorry.  I just

8   had to make another record.  Same objections.

9             You can answer.

10            THE WITNESS:  Yes.

11            MR. CREECH:  Q.  Have you seen discovery

12  responses -- written documents -- given on your

13  behalf in this action?

14  A.        Yes.

15  Q.        Is everything that's said in those discovery

16  responses true and accurate to the best of your

17  knowledge and understanding?

18            MR. MAY:  Objection; compound, overbroad,

19  lacks foundation, calls for speculation.

20            THE WITNESS:  Yes.

21            MR. CREECH:  Q.  And those videos that we

22  talked about.  So the video from Deputy Pope's view,

23  the video that AAsylei took, the video that AAottae

24  took.

25            Looking through those videos, do they truly

1   and accurately reflect what you remember from the

2   incident?

3                   MR. MAY:  Objection; compound, overbroad,

4   calls for speculation, lacks foundation.

5                   THE WITNESS:  Yes.

6                   MR. CREECH:  Q.  Watching those videos,

7   did you at any time think to yourself there is

8   something that I remember from the incident that's

9   not captured in this video?

10  A.          No.

11  Q.          Have you ever filed a lawsuit other than the

12  lawsuit you filed in this action?

13  A.          No.

14                  MR. MAY:  Just ob- -- never mind.  Go ahead.

15                  MR. CREECH:  Q.  Have you ever had any

16  lawsuits filed against you?

17  A.          No.

18  Q.          Do you know of anyone who has filed a lawsuit

19  similar to this lawsuit?

20  A.          No.

21                  MR. MAY:  Objection -- sorry.

22                  Objection; vague, ambiguous.

23                  MR. CREECH:  Q.  Have you ever been

24  arrested by law enforcement?

25                  THE WITNESS:  (To Mr. Gearinger.)  Thank you.

1   A.          Yes.

2   Q.          When was that placard issued to you?

3   A.          I cannot remember the year.

4   Q.          Can you give me your best estimate?

5   A.          I want to say early 2000.  Or it could be in

6   late 1999.  I've had it for years.

7   Q.          It was issued to you after AAottae was born?

8   A.          No.  Before.  AAottae is my youngest daughter.

9   Q.          Right.

10              Was it issued -- so after whose birth was it

11  issued to you?

12  A.          I had -- it was temporary in the beginning

13  stage after my first child.  I had my first child in

14  1994.

15              But then it became blue when I had my

16  back-to-back pregnancies and had the epidural in my

17  back.  That's when my doctor filled out a form, and they

18  gave me a blue one.

19  Q.          So what's the disability that you have that

20  placard for?

21  A.          It's for my back.  I don't know the

22  terminology or what you call it for whatever category.

23  Q.          What's the back issue that you experience?

24  A.          Spasms in my back at times from the epidural.

25  Q.          How often do you get those spasms?

 1    A.        Like, every month I'm having them.  I'm just

 2    getting over an episode within this last week.

 3    Q.        So about once a month?

 4    A.        Every month.  And they can last anywhere from

 5    a week to a little bit shy of a week.  You know.  It all

 6    depends on how my -- the medicine that I take, as well

 7    as my patches when I put them on.

 8    Q.        At the time of the incident, were you

 9    suffering from any of these spasms?

10    A.        No, not at that time.

11    Q.        If someone was looking at you at the time of

12    the incident, would they be able to tell that you have

13    this disability?

14              MR. MAY:  Objection; calls for speculation,

15    lacks foundation.

16              THE WITNESS:  Do you want me to answer that?

17              MR. CREECH:  Q.  Yes, Ms. Loggervale.  You

18    do still need to answer the question.

19    A.        I would say no.

20    Q.        Do you know the number of that placard?

21    A.        Not offhand, but I have -- I do have the

22    number.  I carry my paper in my wallet that goes along

23    with my placard, just in case someone asks me for it.

24    Q.        And when you say your paper, what do you mean?

25    A.        So when you receive your placard in the mail,

Page 62

1   you also -- it's almost like a car registration form

2   that comes with it.  And you know how you put your

3   registration in your glove compartment?  Well, this

4   piece of paper, you fold up and you keep it with you at

5   all times in case you was asked to present it.

6   Q.        So when you got this placard, you got

7   information that told you you had to carry this proof of

8   issuance?

9   A.        Yes.

10  Q.        And the way that you carry that proof of

11  issuance is you carry it in your wallet?

12  A.        That is correct.

13  Q.        And you had it in your wallet, on your person

14  at the time of the incident?

15  A.        Yes, I did.

16  Q.        That information that you got with your

17  placard.  Did it also tell you that you had to provide

18  that proof of issuance to a police officer if they ask

19  for it?

20  A.        Yes.

21  Q.        Did it also tell you you had to present your

22  ID to prove who you were?

23  A.        Yes.

24  Q.        So at the time of the incident, you knew, to

25  prove that this placard was yours, you had to present

1    that proof of issuance and your ID?

2    A.          That is correct.

3    Q.          Did the information you got with the issuance

4    of that placard also give you information about where

5    and how to display it?

6    A.          Yes.

7    Q.          What did it tell you about where and how to

8    display it?

9    A.          As far as the placard itself --

10    Q.          (Nods head.)

11    A.          -- you will display it on the mirror.  I had

12    it presented so an officer or anyone -- like, let's say,

13    parking enforcement -- could see it, and your piece of

14    paper.  You carry it on you in your wallet or your glove

15    compartment.

16    Q.          And when you said "the mirror," you mean your

17    rearview mirror?

18    A.          Yes.

19    Q.          And did it also tell you you were to not

20    obstruct that placard on your rearview mirror?

21    A.          Yes.

22    Q.          But at the time of the incident, did you have

23    an air freshener hanging from the rearview mirror?

24    A.          I believe I did.

25    Q.          It was a yellow air freshener?

1   A.          Yes.

2   Q.          Where did you get that air freshener?

3   A.          From the 99 Cent Store.

4   Q.          The 99 Cent Store where?

5   A.          I don't know which location I had got it from,

6   because sometimes when I'm buying air fresheners I'll

7   buy a couple of them at the time.  You know, five or six

8   at a time.

9   Q.          So this was one of a number of air fresheners

10  you keep at your home?

11  A.          Yes.

12  Q.          So when did you put that air freshener in that

13  car?

14  A.          I don't -- I don't recall when I put it in.

15  It could have been a day before, two days before.

16  Q.          Do you know that you're not supposed to have

17  an item like an air freshener obstructing that placard?

18          MR. MAY:  Objection; calls for speculation,

19  lacks foundation, assumes facts, misstates evidence

20  and/or law.

21          Go ahead.

22          THE WITNESS:  No.

23          MR. CREECH:  Q.  If you knew that you're

24  supposed to provide your identification and proof of

25  issuance of that placard to a police officer if they

1   asked for it, why didn't you give Deputy Holland

2   your ID?

3           MR. MAY:  Objection; argumentative.

4           THE WITNESS:  He never asked me about my

5   placard.

6           MR. CREECH:  Q.  But he did ask you for

7   your ID?

8   A.          Yes.

9   Q.          And you refused to give it to him?

10  A.          Yes.

11  Q.          Even though you knew that with a placard

12  you're supposed to provide your ID if an officer asks

13  for it?

14          MR. MAY:  Objection; misstates the law,

15  misstates the evidence, misstates the testimony, loaded;

16  lacks foundation, argumentative, assumes facts.

17          THE WITNESS:  He never asked me about the

18  placard.

19          MR. CREECH:  Q.  And what I'm asking is a

20  slightly different question, which is you knew that

21  if an officer asks you for your ID, because you had

22  that placard up, you had to give them your ID; is

23  that your understanding?

24          MR. MAY:  Same objections.

25          THE WITNESS:  Yes, that is my understanding.

1    conclusion, argumentative.

2            THE WITNESS:  If he would have asked me about

3    the placard that was presented in the car, and do I have

4    an ID and the paperwork for it, I would have said yes

5    and I would have handed it to him.

6            MR. CREECH:  Q.  But when he walked up, he

7    said you're parked in a handicapped spot?

8            MR. MAY:  Objection; mis- -- Counsel, you

9    can't misrepresent -- blatantly misrepresent facts in a

10   question.  That's not fair.

11           MR. CREECH:  Q.  Let me ask the question.

12           When he walked up, did you know that you were

13   in a handicapped spot?

14   A.       Yes.

15   Q.       And you knew that you had the placard out?

16   A.       Yes.

17   Q.       And you knew he was asking you for your ID?

18   A.       He wasn't asking me about the placard, though.

19   Q.       So what I want to know is what more did Deputy

20   Holland need to say to trigger your response to provide

21   your ID?  What words were you waiting for him to say?

22           MR. MAY:  Objection; asked and answered, and

23   all the previous objections I made the first time you

24   asked the question, I'm reasserting.

25           THE WITNESS:  "I noticed you're parked in the

1    handicap zone.  Do you happen to have paperwork and your

2    ID to present to me to be parked here?"

3              MR. CREECH:  Q.  And if he didn't say

4    that, you didn't feel like you needed to give your

5    ID?

6    A.        I would have assumed he's not approaching me

7    for my placard.

8    Q.        So unless he tells you he's asking about your

9    placard, you wouldn't have provided your ID?

10             MR. MAY:  I'm sorry.  Can I hear that question

11   again or either have the court reporter read it?  I

12   don't think I heard exactly what you said.

13             MR. CREECH:  Yeah.  Can you read the question

14   back?

15             THE REPORTER:  Sure.

16             (Record read by the Reporter as follows:

17             "Q. So unless he tells you he's asking

18             about your placard, you wouldn't have

19             provided your ID?")

20             THE WITNESS:  Are you asking me a question?

21             MR. CREECH:  Q.  Yes.  That question that

22   the court reporter just read.

23   A.        Yes.

24   Q.        And if he had said, "I'm asking about your

25   placard; give me your ID," you would have provided your

1    A.        Probably a couple of days.  Because one of the

2    reasons of me going back and forth and having the rental

3    car is I have a storage unit that I would transport

4    things that I want to bring back to Las Vegas.

5    Q.        Whose name was the car rented under?

6    A.        My name.

7    Q.        Do you remember the date that you rented it?

8    A.        Not offhand, no.

9    Q.        And you have documents related to that rental?

10   A.        Yes, I do.

11   Q.        Could you pull up information that shows you

12   what day that car was rented?

13   A.        I could, but I don't -- I don't have my phone

14   or anything with me to pull that up.

15   Q.        When you rented that car from Oakland Airport,

16   was it just a coincidence that it had Nevada license

17   plates?

18   A.        Yes --

19             MR. MAY:  Objection -- sorry.

20             Objection; lacks foundation, calls for

21   speculation, vague, argumentative.

22             MR. CREECH:  Q.  Go ahead, Ms. Loggervale.

23   A.        Yes, it was.

24   Q.        Had you ever rented a car from Oakland before

25   and had it have Nevada license plates?

1   A.         I rent a rental car from the Oakland Airport

2   at around that time often, and normally they have

3   California plates.

4   Q.         Do you remember any time where you've rented a

5   car from Oakland Airport before where it had Nevada

6   license plates?

7   A.         Maybe one other time.

8   Q.         When was that?

9   A.         I cannot tell you when, but at one point I had

10  Nevada plates.  Maybe months before.

11  Q.         What makes you remember that incident?

12  A.         Because a lot of times when I'm renting rental

13  cars, I don't want out-of-state plates if it's not from

14  that state.  I would prefer to have that state because

15  people can break into rental cars a lot.

16  Q.         What were the terms of your rental agreement?

17            MR. MAY:  Objection; overbroad, compound,

18  vague, ambiguous, calls for speculation.

19            THE WITNESS:  As far as what do you mean,

20  "terms"?

21            MR. CREECH:  Q.  Do you know how long you

22  had it rented for?

23  A.         I normally rent the rental car for a week.

24  Q.         So it would be one week ending when?

25  A.         I don't have the dates in front of me to tell

1    here?"

2    Q.          Whose idea was it to get off 580 in Castro

3    Valley?

4    A.          It was my idea.

5    Q.          Why were you getting off the freeway there?

6    A.          Because I knew they were asleep, and we had

7    drove all that way, and they needed to go to the

8    restroom.

9    Q.          Where were you headed?  What address were you

10   headed to before --

11   A.          We are headed to Berkeley -- to Berkeley.

12   Q.          Where in Berkeley?

13   A.          Peralta College.

14   Q.          About how far away is Peralta College from

15   there?

16   A.          Probably 30 minutes.  I'm not quite sure of

17   the total minutes.

18   Q.          Was there any traffic on the freeway -- on 580

19   when you got off of it?

20   A.          It wasn't too congested, no.

21   Q.          You were able to drive the speed of between 65

22   and 75?

23   A.          Yes.

24   Q.          And at the time you got off 580, both of your

25   daughters were still asleep?

1    A.          Yes.

2    Q.          Do you remember how long they had been asleep

3    for?  Like, had they ever woken up during the drive?

4    A.          No.

5    Q.          Why were you asking specifically AAsylei if

6    she needed to use the bathroom?

7    A.          Because she was on her menstrual cycle.

8    Q.          At the time you woke her up and asked her

9    that, were you in the parking lot for McDonald's?

10   A.          Yes, I was.

11   Q.          And is that the McDonald's that's right off of

12   that exit in Castro Valley?

13   A.          Yes, it is.

14   Q.          And did you -- did you stop her -- did you,

15   you know, wake her up as soon as you stopped in that

16   parking lot?

17   A.          Yes, I did.

18   Q.          And what did she tell you?

19   A.          "Mom, I don't want to go to this bathroom

20   because it's" -- "a lot of times it's nasty."

21   Q.          Was she saying that just about McDonald's

22   bathrooms in general, or she had been to that McDonald's

23   bathroom before?

24   A.          She had been to that McDonald's bathroom

25   before.

 1   stopped before to use the bathroom?

 2   A.        No.

 3   Q.        So then talk to me about driving into the

 4   Starbucks parking lot.  What do you remember?

 5   A.        I just remember pulling into the parking lot,

 6   seeing that the handicap stall was available, because

 7   it's more bigger and more space because a lot of the

 8   other stalls are more tighter.  And normally I would

 9   park in handicap, but sometimes if that was taken, then

10   I would park in the -- in one of the stalls that were

11   available.

12   Q.        Do you remember, as you pulled in, how many

13   cars were in the parking lot?

14   A.        I do not recall.

15   Q.        Do you remember, you know, where the cars were

16   parked or if there were any open stalls that were not

17   the handicapped stall?

18   A.        There were probably a couple of cars.  I

19   couldn't tell you exactly what stalls they were in.

20   Q.        So when you park in the handicapped stall, is

21   AAsylei still awake?

22   A.        She had slightly dozed off.  Closed her eyes.

23   Q.        And did you tell her again, you know, "All

24   right" -- you know, "Here is the bathroom; go into

25   Starbucks"?

1    Q.         And I guess what I'm wondering about is why

2    didn't you go in, order while she used the restroom, use

3    the restroom yourself, come back?

4    A.         I didn't even -- that didn't even cross my

5    mind.  It was more like, okay, I'm here; go ahead and go

6    in there; and when she would come out, I knew I would go

7    in there.

8    Q.         So your plan was to only go into Starbucks

9    after she came back?

10   A.         Yes.

11   Q.         And you didn't wait to see if she left the

12   car?

13   A.         I didn't look to see if she exited the car,

14   no.

15   Q.         When you got into that parking lot, was

16   Starbucks open?

17   A.         Yes.

18   Q.         How do you know -- if you fell asleep, how do

19   you have an estimate for how long you were in that

20   parking lot before the officers arrived?

21   A.         I can't say for sure how long, but I know for

22   a fact it was not long, because I needed to take her to

23   school and we still had a ways to go.

24   Q.         I know, and that's, I guess, what I'm getting

25   at, is did you set an alarm?

1   them.

2           MR. MAY:  Nothing you've just told -- with all

3   respect, Counsel, nothing you just told me makes what

4   she's planning to do after San Diego potentially

5   relevant to claims, defenses, damages issues, or any

6   other issues that are in the case.

7           MR. CREECH:  Q.  After that statistics

8   class, what was the next class that AAsylei needed

9   to be back for at college?

10  A.      I could not tell you at this time.

11  Q.      Can you describe the car that you were driving

12  at the time of the incident?

13  A.      It was a four-door silver Cadillac.

14  Q.      If someone was to take a quick glance at the

15  car, would it be fair for them to describe it as a

16  silver gray, four-door sedan?

17          MR. MAY:  Objection; argumentative.

18          MR. CREECH:  Q.  And, Ms. Loggervale, what

19  was your answer?

20  A.      I assume, yes.

21  Q.      When you say "I assume," what do you mean?

22  A.      It depends on what you mean when you're using

23  "sedan."  Like, are you using it as far as a small

24  vehicle? medium vehicle? large vehicle?

25  Q.      How would you describe the size of the car

1    that you were driving at the time of the incident?

2    A.        Like, midsize.

3    Q.        So other than that sedan, it's not clear what

4    the size of it is.  Would you otherwise say it would be

5    a fair description of the car, that it was a silver

6    gray, four-door sedan?

7    A.        I still am confused with the word "sedan,"

8    because I guess I've never used that kind of terminology

9    when renting cars.  I only go from off of what I see on

10   the list.

11             (Cross-talking; inaudible.)

12   Q.        Would it be fair --

13             (Reporter clarification.)

14   A.        That's why I had said midsize.

15   Q.        Would it be fair to call the car a silver or

16   gray four-door?

17   A.        Yes.

18   Q.        So I want to just get this really clear so

19   that we have a clear record.

20             You weren't actually committing any crime to

21   the best of your knowledge at the time of the incident.

22   A.        I was not committing any crime.

23   Q.        And you hadn't committed any crime in the last

24   24 hours to the best of your knowledge?

25   A.        No, not at all.

1   A.          No.

2   Q.          Besides McDonald's and Starbucks, did you look

3   anywhere else for a bathroom?

4   A.          No.

5   Q.          So at the time that you parked in that

6   handicapped stall, describe to me your body position in

7   the car.

8   A.          I was slight- -- I put my chair back just a

9   slight bit, not a lot.   I want to say, like, if you

10  lifted up the handle and went back, I didn't go

11  completely back and I wasn't halfway back.   I just

12  probably put it down, like, one notch.   Because the way

13  I was driving, I always drive with it straight up so it

14  can help to relieve pressure on my back.

15          And once I got -- I stopped and got into the

16  parking stall, I, like, took a deep breath and go "oh,

17  okay" and put it back one notch.

18  Q.          Do you remember, as you nodded off, if you had

19  your head turned to either side?

20  A.          I don't recall what side it was turned to.

21  Q.          Do you remember when you woke up what side

22  your head was turned towards?

23  A.          No.

24  Q.          While you're driving, did you have your purse

25  at your feet?

1   A.        I don't remember that as well.

2   Q.        Do you remember anything else about her or her

3   belongings in the back seat at the time you nodded off?

4   A.        No.

5   Q.        What about AAottae in the front seat?  What

6   was she doing?

7   A.        She was asleep and leaning to the side, like,

8   leaning on the door.

9   Q.        When you say "leaning on the door" -- so

10  facing towards you?

11  A.        Yeah.

12  Q.        Did she have a blanket on?

13  A.        I don't remember.

14  Q.        Had you brought blankets with you from home on

15  this drive from Nevada?

16  A.        Whenever we travel, and it just doesn't have

17  to be in California, my daughters always bring- --

18  brings their blankets.

19  Q.        Did you bring pillows?

20  A.        No.  We don't bring pillows.

21  Q.        You said that you recognized that there is a

22  handicap stall.  Did you actually see that it had a

23  handicap sign?

24  A.        Like, on the ground?

25  Q.        No.  On the metal pole up top.  Do you

1    remember if it had one that has "Handicap Parking Only"

2    signs?

3    A.          I believe it did.  I'm more -- a lot of times

4    if you don't see that pole, you look on the ground to

5    see if that's a handicap stall.  So my eyes always go to

6    the ground first to see if that's an available stall for

7    me.

8    Q.          And you remember seeing on the ground that it

9    had all the paint markings on the ground that you're

10   used to for handicap stalls?

11   A.          Yes, I did.

12   Q.          Are there any other handicap stalls in that

13   parking lot other than that one you had parked in?

14              MR. MAY:  Calls for speculation.

15              Go ahead.

16              THE WITNESS:  I'm not sure.

17              MR. CREECH:  Q.  Do you remember any of

18   the other times that you have been there, seeing

19   another handicap stall?

20   A.          I'm not sure.

21   Q.          When you stopped in that parking lot, do you

22   remember what anyone else in the parking lot was doing?

23   A.          No.

24   Q.          As the incident progressed, do you remember at

25   all what any of the other people or cars were doing in

1    the parking lot?

2    A.          No.

3    Q.          Could you tell me how many cars were parked in

4    the parking lot during the incident?

5    A.          As far as when I drove into the parking lot?

6    Q.          At any time during the incident.

7                When you drove in, while the officers were

8    talking to you at any time, do you remember anything

9    about the number of cars in the lot?

10   A.          There could have been, like, three, four.  I

11   remember a truck or a car pulling up on the side of us

12   in another stall prior to the officer even being at the

13   window.

14   Q.          Do you remember if that car that pulled up,

15   that you remember pulling up beside you, was the same

16   car that was there when you woke up?

17   A.          Was it there before?

18   Q.          Right.

19   A.          No.

20   Q.          So the car that you remember pulling up wasn't

21   there when you woke up to the officer knocking on your

22   window?

23   A.          I'm not sure because I -- when I noticed the

24   car, it had -- it was -- the engine was on.  So I

25   couldn't tell you if it was getting ready to pull out or

1    as the crow flies, farther away from Starbucks?

2    A.          You mean as far as when you first pull into

3    the parking lot?

4    Q.          I'm just asking you literally the physical

5    distance.  Is there any other stall that's farther away

6    from Starbucks?

7    A.          I guess I'm still confused how you're asking

8    me this question.  I don't know how to answer it because

9    I'm confused.

10   Q.          Yeah.  If you were to measure from the front

11   door of Starbucks --

12   A.          Right.

13   Q.          -- to the parking stall on the lot.  Is there

14   any parking stall that is a farther distance away from

15   Starbucks?

16   A.          Probably the ones that were on the right side

17   of me.

18   Q.          You think there are stalls to your right?

19   A.          To my right or my left?

20   Q.          To your right.

21   A.          To my right, yes.  I believe there was one or

22   two other stalls, but they're not handicap stalls.

23   Q.          To your right from that stall, isn't there a

24   retaining wall?

25   A.          I don't -- I don't remember.  I don't know

1    what you mean, really, when you say "retaining wall."

2    Q.        Isn't there a cement brick wall right next to

3    you to the right?

4    A.        I can't remember.

5    Q.        When you dozed off, do you remember if you

6    were sleeping soundly?

7    A.        Like as if I was in a hard sleep?

8    Q.        Right.

9    A.        I would like to say yes, I was.

10   Q.        And when the officer -- when Deputy Holland

11   knocked on your window, did you start the car?

12   A.        I pushed the button to roll the window down.

13   So it's a push button, and normally I use a key for

14   vehicles.  So every blue moon the cars will have a push

15   button.  And so if you push it, it will -- you know, if

16   I pushed it too hard, it will start the car.  But I was

17   pushing it just to roll the window down.

18   Q.        So you pushed the button when he knocked on

19   the window, and the engine started?

20   A.        I believe it did.

21   Q.        But that wasn't your intent.  Your intent was

22   just to turn on the accessories mode to roll down the

23   window?

24   A.        That is correct.

25   Q.        Isn't it true that to be able to make the

1   car's engine turn on when you push that button, you have

2   to have your foot on the brake?

3   A.          Yes.

4   Q.          And that's the difference, actually.  If you

5   push that button without your foot on the brake, then it

6   goes into accessory mode.

7   A.          I believe, to turn on anything, you have to

8   put your feet on the brake and then push the button.

9   Q.          So you think that to turn on the accessory

10  mode, you have to have your foot on the brake?

11  A.          Yes.

12  Q.          And you actually had your foot on the brake

13  when you pushed that button?

14  A.          Yes.  Because I had to roll the window down.

15  Q.          So when the officer comes up, you push the

16  engine and it starts.  What do you two say to each other

17  after that?

18  A.          I don't remember verbatim -- (Computer audio

19  issue.)

20              (Reporter clarification.)

21  A.          I don't remember verbatim what was said, but

22  I -- I think I could have said to him first "Can I help

23  you, Officer?"

24  Q.          And then did he ask you what you were doing in

25  the area?

1   I could have said something, like, "Oh, thank you for

2   making me aware of that."  Like, I was under the

3   impression he was telling me to be careful.

4   Q.        Do you remember him at some point in time --

5   the first time asking you for your ID?

6   A.        Yes, he did ask me for that.

7   Q.        And the first time he asked you, did you

8   actually start to try to get your ID out of your purse?

9   A.        Yes, I did.

10  Q.        And then in the middle of getting your ID out

11  of your purse, did you stop and then tell him "I'm not

12  going to give you my ID"?

13  A.        Yes, I did.

14  Q.        And why did you stop in the middle of getting

15  your ID out?

16  A.        Because as I was thinking about what he was

17  asking from me, I was puzzled.  Why are you asking me

18  for my ID/driver's license when I didn't do anything?

19  Q.        What was your impression of the conversation

20  up to that point?

21            MR. MAY:  Objection; vague, ambiguous.

22            THE WITNESS:  What do you mean?

23            MR. CREECH:  Q.  I'm just saying up to the

24  point when you started asking him "Why do I have to

25  give you my ID --"

1  A.        Yes.

2  Q.        -- tell me what was your general impression of

3  the conversation up to that?

4            MR. MAY:  Objection; vague, ambiguous.

5            THE WITNESS:  Well, before he asked me for ID

6  or right after?

7            MR. CREECH:  Q.  I'm saying you started

8  going through your bag to get your ID, and what I'm

9  asking for is as you were going to go and started to

10  comply and then you thought differently, I'm asking

11  for --

12  A.        Yes.

13  Q.        -- like, before you thought differently, what

14  was your impression of the conversation?

15            MR. MAY:  Objection; vague, ambiguous.

16            THE WITNESS:  I just kind of assumed he was

17  approaching my vehicle to see -- see if I was okay or

18  warn me of something.

19            MR. CREECH:  Q.  You didn't think you were

20  under arrest?

21  A.        No.

22  Q.        You didn't think you were under investigation?

23  A.        No.

24  Q.        You didn't think you weren't free to leave?

25  A.        No.

1    or you're going to go in handcuffs"?

2    A.        I don't remember that.

3    Q.        After your daughter got out of the car, you do

4    remember Deputy Holland saying something about getting

5    back in the car; is that right?

6    A.        Yes.   That is correct.

7    Q.        And after he said that, did you tell your

8    daughter get back in the car?

9    A.        Yes.

10   Q.        But your daughter didn't get back in the car?

11   A.        No.

12   Q.        Did you repeat yourself telling her to get

13   back in the car?

14   A.        Yes.

15   Q.        How many times do you think you repeated

16   yourself?

17   A.        I'm not sure.

18   Q.        Did you think she needed to get back in the

19   car?

20   A.        Yes.

21   Q.        Other than saying "Get back in the car," did

22   you do anything to try to encourage her to get back in

23   the car?

24   A.        I tried to roll the window down so she could

25   hear me.  Because I don't know if she was able to hear

1    me or not, so I was trying to roll the window down.

2    Q.        Do you remember AAottae getting out of the

3    car?

4    A.        Yes.

5    Q.        Do you similarly remember either Deputy

6    Holland or Deputy Pope telling her to get back in the

7    car?

8    A.        I don't remember which one at whatever given

9    time they were saying it, but I did hear it.

10   Q.        But you understood after she got out of the

11   car that they were telling her to get back in the car --

12   or telling both of them to get back in the car.

13   A.        Yes.

14   Q.        Did you ever tell AAottae to get back in the

15   car?

16   A.        I don't know if I specifically said "get back

17   in the car, AAottae."  But -- no, I don't recall.

18   Q.        Did you think AAottae needed to get back in

19   the car?

20            MR. MAY:  Objection; calls for a legal

21   conclusion, calls for speculation, lacks foundation,

22   relevance.

23            THE WITNESS:  I'm not sure.

24            MR. CREECH:  Q.  Did you do anything to

25   try to get AAottae back in the car?

 1   A.        I don't remember.

 2   Q.        After AAottae got out of the car, do you

 3   remember one of the deputies saying if they didn't get

 4   back in the car, they were going to be arrested?

 5   A.        I don't know if I heard that or not.  I'm not

 6   sure.

 7   Q.        Once your two daughters were outside of the

 8   car, is it fair to say that they were yelling at the

 9   officers?

10   A.        They were upset.  I don't know what degree of

11   sound of yelling would that be.

12   Q.        Is it fair to say that they raised their

13   voices?

14   A.        They were irritated.  They were agitated.

15   Yes.

16   Q.        Do you remember any of the deputies raising

17   their voices during the incident?

18   A.        I do remember one, but I don't know the

19   gentleman's name.

20   Q.        When was that?

21   A.        When the other officer arrived on the scene.

22   Q.        When do you remember this other officer

23   raising his voice?

24   A.        I can't recall actually when it was, but I did

25   hear the officer --

 1   Q.        What was going (Cross-talking; inaudible.) --

 2   A.        -- was --

 3   Q.        What was going (Cross-talking; inaudible.) --

 4             (Reporter clarification.)

 5   Q.        Yeah, I'm sorry.  I cut you off twice there.

 6   Can you finish your answer?

 7   A.        Yes.

 8   Q.        Can you say what you were saying when I spoke

 9   over you by accident?

10   A.        You was asking me -- what was the question

11   again?  I'm sorry.

12   Q.        Do you remember what was happening when you

13   think this officer raised his voice?

14   A.        It was with AAottae.

15   Q.        Where was AAottae when this officer raised

16   their voice?

17   A.        She was by the car, and she was asking them

18   why am I being handcuffed.

19   Q.        This is your car?

20   A.        The rental car.

21   Q.        Was this before or after AAossae [sic] got

22   handcuffed?

23   A.        After.

24   Q.        And specifically when he raised his voice,

25   what are you talking about?  What happened?

1   A.         I don't recall.

2   Q.         Do you remember how loud he was?

3   A.         His voice was pretty loud and pretty stern.

4   Q.         Do you remember Deputy Holland ever raising

5   his voice?

6   A.         No.

7   Q.         Do you remember Deputy Pope ever raising her

8   voice?

9   A.         When you say raising their voice -- I don't

10  really have anything to measure the sound of how loud

11  something would be considered -- you know, a tone

12  that's -- like, my tone of raising my voice could be

13  something different than you interpreting your tone

14  raising your voice.

15  Q.         Right.  And I'm just interested in your

16  opinion.

17             Do you ever remember Deputy Pope raising her

18  voice?

19  A.         I want to say yes, but her tone probably

20  wasn't really, really loud; but there was a point where

21  she did -- her voice went one grade up from the

22  beginning when she approached the car.

23  Q.         Was any of these deputies, other than that one

24  that you said raised their voice to AAottae -- any of

25  the deputies raising their voice louder than your

1    daughter's voices?

2    A.        No, I guess.

3    Q.        Did any of the -- did Deputy Holland seem

4    agitated like your daughters were?

5    A.        No.

6    Q.        Did Deputy Pope seem agitated like your

7    daughters were?

8    A.        No.

9    Q.        Do you remember any of the deputies on scene

10   seeming agitated to you?

11   A.        I can only speak for the ones that I kind of

12   seen their demeanor.  I can't speak for all the ones

13   that came on the scene.

14   Q.        That's right.  And what I'm asking about is

15   what you saw.

16             Do you remember seeing any of the deputies on

17   scene appear agitated?

18   A.        No.

19   Q.        Other than the fact that you didn't think the

20   deputies should be treating you the way they did -- that

21   is, asking for ID and then handcuffing -- handcuffing

22   you and taking to the patrol cars -- do you think that

23   they did anything unprofessional?

24   A.        Yes.

25   Q.        What exactly?

1    A.        The way they approached us.  The way they

2    approached me at my door.

3    Q.        What about that?

4    A.        I don't think that was professional at all.

5    Q.        What about it do you think was unprofessional?

6    A.        It was like as if they already was accusing me

7    of something before I could even understand what they

8    were there for.

9    Q.        Anything else that you remember the

10   officers -- the deputies doing unprofessionally?

11   A.        No.

12   Q.        Is it fair to say that once your daughters got

13   out of the car, they were pacing around and recording?

14             MR. MAY:  Sorry.  Objection; compound.

15             Go ahead.

16             THE WITNESS:  I don't know about pacing

17   around, but they were -- AAottae was recording.

18             MR. CREECH:  Q.  And while they were

19   recording, were they walking around?

20   A.        I didn't take a look at what they were

21   actually doing while they were recording.

22   Q.        Do you remember seeing them waving their hands

23   while they were out of the car?

24   A.        I don't remember that.

25   Q.        Do you remember at some point in time that

1  third officer arriving and then Deputy Holland saying

2  that your two daughters were going to be detained?

3  A.        Yes.

4  Q.        And after he said that, do you remember trying

5  to open your car door?

6  A.        No, I never opened my car door.

7  Q.        Do you remember, after he said that, starting

8  your car again?

9  A.        I don't remember that.

10  Q.        So other than that first time you talked about

11  when you started your car.  Do you ever remember

12  starting your car again?

13  A.        I remember pushing the button to -- unknowing

14  to me it started -- to try to roll the window down.

15  Q.        And was this a second time?  Because you told

16  me that first time when Deputy Holland first walked up.

17  Did that happen a second time?

18  A.        Yes.

19  Q.        So -- and when did that second time happen?

20  What was going on?

21  A.        I was telling my daughters just calm down,

22  just calm down, everything is going to be okay.

23  Q.        I mean, after you started the car -- and that

24  second time you pushed the button.  Did it also start

25  the car?

1   A.          Yes.

2   Q.          What were you trying to do when you pushed

3   that button?

4   A.          Roll the window down.

5   Q.          Which window were you trying to roll down?

6   A.          I was trying to roll down the back window, but

7   I believe I rolled down the front window.

8   Q.          That back window you were trying to roll

9   down -- wasn't the door open?

10  A.          I don't recall.

11  Q.          Do you remember if the front door was open

12  when you tried to roll down the windows?

13  A.          I believe the front door was closed.

14  Q.          After you started the car, do you remember

15  Deputy Holland opening the door?

16  A.          Yes.

17  Q.          And do you remember him telling you he wasn't

18  going to let you start the car?

19  A.          I don't remember hearing him say that.

20  Q.          What do you remember him saying when he opened

21  the door?

22  A.          We're all detained and -- that's -- that's all

23  I can remember.  I can't remember verbatim.

24  Q.          Do you remember him telling you something like

25  "Don't start the car"?

1    A.          I don't remember that.

2    Q.          At the time when he opened the door, the car's

3    ignition was on?

4    A.          I believe it was.

5    Q.          So if you had put the car into gear, you could

6    have driven it?

7    A.          If the car is on, of course you can drive it,

8    but I had no intentions of driving the car.

9    Q.          If Deputy Holland had gotten confused and

10   thought when you were trying to open the window you

11   actually were trying to start the car to move it, do you

12   understand how he could have made that mistake?

13   A.          No.

14   Q.          You don't think that that was a reasonable

15   thing he could have thought?

16   A.          No.

17   Q.          Why?

18   A.          Because I was indicating I'm just rolling the

19   window down.

20   Q.          Why were you indicating "I'm just rolling the

21   window down"?

22   A.          So I can tell my daughters everything is going

23   to be okay; to just calm down.

24   Q.          I'm asking a different question.

25               Why did you even say that?

 1   A.        Because the engine had started.

 2   Q.        So -- and I guess that's the part where I'm

 3   getting confused on.  Did you make the connection in

 4   your head, "oh, he thinks I'm trying to start the car.

 5   I need to tell him he" -- "I'm just trying to roll down

 6   the windows"?

 7   A.        It's possible.

 8   Q.        Is there some other reason why you were

 9   telling him "I'm rolling down the windows"?

10   A.        Because the engine was on.

11   Q.        And that's what I'm basically trying to say.

12   You made the connection in your head, "he thinks I'm

13   trying to turn the car on."

14   A.        I didn't think that, but I wanted him to know

15   I'm not trying to go anywhere; I'm just rolling the

16   windows down.

17   Q.        Do you remember Deputy Holland, after he

18   opened the door, telling you to get out of the car?

19   A.        Yes.  He pulled me out of the car.

20   Q.        Before he -- well, when you say he pulled you

21   out of the car, what do you mean?

22   A.        Meaning he opened the door and just went on to

23   pull me out and put handcuffs on me.

24   Q.        Tell me physically what you remember him

25   doing?

1    A.        Reaching in -- opening the door, reaching in,

2    turning me around to handcuff me.

3    Q.        Did he grab some part of your body?

4    A.        I don't know what part he grabbed, but he

5    grabbed a part of my body to get me out of the car.

6    Q.        Do you remember him grabbing any part of your

7    body other than your wrist?

8    A.        I don't remember.

9    Q.        Ms. Loggervale, how much did you weigh at the

10   time of the incident?

11   A.        I do not remember that.

12   Q.        Can you give me your best estimate?

13   A.        I couldn't.

14   Q.        Was it more than 200 pounds?

15   A.        Slightly over, yes.

16   Q.        Do you actually remember anything about how

17   Deputy Holland was pulling you to get you out of the

18   car?  Do you remember anything physically about how he

19   was pulling you?

20   A.        No.

21   Q.        Could he have pulled you just by the wrist out

22   of the car?

23             MR. MAY:  Objection; calls for speculation.

24             THE WITNESS:  I don't know.

25             MR. MAY:  Hey, Chris.  We've been going about

1    opened your door, do you remember him telling you

2    multiple times to get out of the car?

3    A.         I don't remember.

4    Q.         Do you remember him telling you at least once

5    to get out of the car?

6    A.         Yes.

7    Q.         And right after he said that, did you get out

8    of the car?

9    A.         When he said it, he was, I believe, taking me

10   out at the same time he was informing me, "Okay.  Get

11   out the car."

12   Q.         You don't remember ever refusing to get out of

13   the car?

14   A.         I don't remember.

15   Q.         Do you remember ever pulling away from his

16   attempts to get you out of the car?

17   A.         I don't remember.

18   Q.         Do you remember ever telling him "No I won't

19   get out of the car"?

20   A.         I don't remember.

21   Q.         Do you remember ever telling him "I will get

22   out of the car" but then doing something else?

23   A.         I don't remember.

24   Q.         After you got out of the car, what happened?

25   A.         I was handcuffed.

1    Q.        Describe that handcuffing of you.   What did he

2    do?

3    A.        He turned me around and I put my hands up and

4    he handcuffed me.

5    Q.        Did you put your hands behind your back so he

6    could handcuff you?

7    A.        I don't remember.

8    Q.        Did you resist any of his attempts to get your

9    hands behind your back to handcuff you?

10   A.        No.

11   Q.        Other than putting your hands behind your back

12   to handcuff you, do you remember him physically doing

13   anything else to you outside of the car?

14   A.        No.

15   Q.        Do you remember anything else about how you

16   were handcuffed?

17   A.        I was handcuffed pretty -- pretty tight and

18   pretty harsh.

19   Q.        What do you mean by that?

20   A.        That the pressure that was put on my wrists to

21   handcuff me was painful, and the handcuffs were tight.

22   Q.        Have you ever been handcuffed before?

23   A.        Yes, I have.

24   Q.        Are you saying that this was more tight than

25   when you were handcuffed before?

 1  A.         Yes.

 2  Q.         How was it different?

 3  A.         It was a lot more harder and tighter.

 4  Q.         Did you have any injuries from those

 5  handcuffs?

 6  A.         Yes.  My wrists swelled up.

 7  Q.         Swelled up how much?

 8  A.         It was pretty tight.  I can't tell you the

 9  degree of how much it swelled, but it was swelled up

10  pretty tight and -- until they loosened it up.

11  Q.         Did you ever complain to anyone about the

12  tightness of the handcuffs?

13  A.         Yes, I did.

14  Q.         Who?

15  A.         An Asian officer.

16  Q.         When did you complain to the Asian officer?

17  A.         When they came around to the vehicle because I

18  was indicating these are -- my wrists are too tight --

19  the handcuffs are too tight on my wrists and I felt like

20  I was losing my blood circulation.

21  Q.         What did that officer do?

22  A.         Nothing.  Just -- you know -- they didn't do

23  anything.

24  Q.         Did he check your handcuffs?

25  A.         No.

 1   A.        Yes.

 2   Q.        How did you get his attention?

 3   A.        I was, like, saying "My handcuffs are tight."

 4   "My handcuffs are tight."

 5   Q.        So you were calling that out to him as he

 6   passed by?

 7   A.        I was indicating it, but he was the one I

 8   believe heard it.

 9   Q.        Did he open the door?

10   A.        I don't recall.

11   Q.        Did he talk to you?

12   A.        I believe he did talk to me.

13   Q.        Was the door open or closed while he was

14   talking to you?

15   A.        I believe it was open.

16   Q.        So is it your recollection that after you had

17   been closed in the car, you were calling out about your

18   handcuffs, and then this Asian officer opened the car

19   door and talked to you about them?

20   A.        I don't remember the quite order.  But, yes.

21   Q.        What else do you remember about that

22   interaction with him?

23   A.        I don't remember.

24   Q.        Did you see -- what if anything did you see of

25   AAottae getting handcuffed?

1   A.        I didn't see any of her getting handcuffed.

2   Q.        And what if anything did you see of AAsylei

3   getting handcuffed?

4   A.        I didn't see that either.

5   Q.        What if anything did you see of AAottae

6   getting put into a police car?

7   A.        I don't remember.

8   Q.        What if anything did you see of AAsylei

9   getting put into a police car?

10  A.        I don't remember.

11  Q.        After your daughters got out of the car and

12  were being handcuffed and put into patrol cars, do you

13  remember anything about what the officers were doing to

14  them?

15  A.        I don't remember.

16  Q.        Do you remember, after you were at the police

17  car, Deputy Holland coming over and asking you where

18  your ID was?

19  A.        Yes.

20  Q.        And did you understand why he was asking you

21  that?

22            MR. MAY:  Objection; calls for speculation.

23            Go ahead.

24            THE WITNESS:  No.

25            MR. CREECH:  Q.  Did you tell him where

1    A.        It just seemed very stern and scary.  Like,

2    "Where is your ID?"  "Where is it at?"

3    Q.        Your understanding was he wanted to know where

4    your ID was because he was going to go get it.

5    A.        Yes.

6    Q.        So by telling him where your ID was, you knew

7    he was going to go get it.

8    A.        Yes.

9    Q.        Where was your ID inside of your purse?

10   A.        It was in my black little coin purse.

11   Q.        Do you also have a yellow bag inside of your

12   purse?

13   A.        I don't remember what was all in my purse at

14   that time.

15   Q.        Do you remember about that time having a

16   little yellow bag, slightly larger than your black coin

17   purse?  It had a zipper on it?  Maybe some floral print?

18   A.        Oh, you mean my wallet.

19   Q.        Okay.  Yeah.  What -- what is -- do you

20   recognize the item that I am describing to you?

21   A.        That was my wallet.

22   Q.        You didn't have your ID in your wallet?

23   A.        No.

24   Q.        And what did you have in that wallet?

25   A.        My credit cards and money.  Probably just

1   miscellaneous paper.  Receipts.

2   Q.        Why didn't you have your ID in your wallet?

3   A.        At that time, I probably had put it in my coin

4   purse for when -- at times when I go out in public, I

5   don't want to carry my big purse or my wallet, so I'll

6   carry my little coin purse.  It's a wristlet kind of a

7   wallet.

8   Q.        Can you describe that coin purse for me?

9   A.        It's square.  I can't tell you how big it is

10  measurement-wise.  But I normally put my lipstick in

11  there, eyeliner, mascara.  I put probably one credit

12  card in the pouch and my ID in that pouch.

13  Q.        And by "pouch," you mean it's got a little

14  drawstring on the top; right?

15  A.        It had a zipper.

16  Q.        Let me just ask you this.

17            If someone looked in your purse, do you think

18  it would be fair for them to think your ID would be in

19  your wallet and not in this little coin purse?

20            MR. MAY:  Objection; foundation, calls for

21  speculation, assumes facts, incomplete hypothetical,

22  improper opinion testimony.

23            Go ahead.

24            THE WITNESS:  I can't say for sure, because

25  looking at both items, they're both used in a wallet

1    kind of a manner.

2            MR. CREECH:  Q.  What you're using as a

3    coin purse.  Doesn't it just look like a pouch?

4    A.        I would say no because even my wallet has a

5    wrist- -- a wristlet on it where you can -- I can just

6    carry that out like a pouch.  They both have wristlets

7    on it.

8    Q.        Right.  And that's common for female wallets,

9    right, is to have a little wristlet where you can carry

10   it on your wrist?

11   A.        Yes.

12   Q.        Do you remember what you had in that black

13   pouch at the time of the incident?

14   A.        Like, makeup and my ID.  I possibly could have

15   had a credit card in there or some, like, business

16   cards.

17   Q.        Do you remember anything else, other than that

18   wallet and the pouch that were in your purse at the time

19   of the incident?

20   A.        I do not.

21   Q.        After Deputy Holland came over and asked you

22   where your ID was, what's the next thing you remember

23   doing during the incident?

24   A.        I believe his sergeant coming and talking to

25   me.

1    Q.         In fact, it's Lieutenant DeSousa.  Does that

2    name ring a bell?

3    A.         Yes.  That is correct.

4    Q.         Okay.

5               Describe that to me.

6    A.         He came over and talked to me about the

7    situation, and to ask me about what was happening, and I

8    explained to him what had took place.

9    Q.         Do you know how long you had been in the

10   police car before Lieutenant DeSousa came over?

11   A.         I do not remember.

12   Q.         Can you estimate how long?

13   A.         I cannot.

14   Q.         Did you see Lieutenant DeSousa arrive?

15   A.         I can't say I did.

16   Q.         Do you have any idea how long Lieutenant

17   DeSousa was there before he talked to you?

18   A.         No, I do not.

19   Q.         You had asked for a supervisor to come down.

20   Was it your understanding that this was the supervisor

21   who had been ordered to come down?

22   A.         Yes.

23   Q.         So when you were talking to him, was it your

24   understanding here is the person who I asked for?

25   A.         Yes.

1    A.          Yes, he was.

2    Q.          Was he professional towards you?

3    A.          Yes, he was.

4    Q.          Did he listen to you?  What you had to say?

5    A.          He did listen.

6    Q.          Do you have any problem with how Lieutenant

7    DeSousa acted towards you?

8                MR. MAY:  I'm just going to object that it may

9    call for -- sorry.

10               I'll object that it may call for legal

11   conclusion; it may call for lay opinion; may invade

12   attorney-client privilege or work product.

13               So don't tell him -- don't say -- I'm sorry.

14               Don't tell Mr. Creech anything that Brian or I

15   have told you about our views on the case.  So just --

16   it's your own opinion he's asking for.

17               THE WITNESS:  Can you repeat the question?

18               MR. CREECH:  Q.  Do you have any problem

19   with what Lieutenant DeSousa did towards you during

20   the incident?

21               MR. MAY:  Same objections.

22               THE WITNESS:  As far as...

23               MR. CREECH:  Q.  Anything.

24               Do you have any problem with what Lieutenant

25   DeSousa did during the incident?

1    A.        Because I felt like as if he was just saying

2    that to protect his officers.

3    Q.        How is telling you that they did wrong

4    protecting his officers?

5              MR. MAY:  Objection; misstates testimony.

6              THE WITNESS:  That's how I felt.

7              MR. CREECH:  Q.  After he told you that,

8    why do you think he still wasn't understanding what

9    happened?

10   A.        I'm not quite sure what you're asking me.

11   Q.        Sure.

12             You told me that your one problem with what

13   Lieutenant DeSousa did was that he wasn't understanding

14   what you were telling him about how the incident

15   happened.

16             What I'm asking for is after he told you that

17   he wouldn't have done what his officers did.  At that

18   juncture, why do you think Lieutenant DeSousa still

19   didn't understand what you were telling him?

20   A.        Because I felt like as if he was just kind of

21   telling me that to, I don't know, maybe just make me

22   feel a certain way.

23   Q.        During that conversation did Lieutenant

24   DeSousa take off your handcuffs?

25   A.        He did take my handcuffs off.

1    Q.        And you didn't ask him to take your handcuffs

2    off?  He just took them off?

3    A.        No, I didn't ask him.  He just took them off.

4    Q.        And did he tell you he was going to release

5    you and your daughters?

6    A.        Yes, he did.

7    Q.        Did he tell you that first he needed to talk

8    to your daughters and get them calmed down?

9    A.        He did say that.

10   Q.        And is that what he did after that?

11   A.        That's what he told me he did.

12   Q.        Did you actually watch him go and walk to the

13   other patrol cars?

14   A.        I didn't pay attention to which direction he

15   went.

16   Q.        After he left you, what were you doing?

17   A.        I was just thinking, and that's it.  Just in

18   shock of what was happening.

19   Q.        Were you in the police car?

20   A.        Yes.

21   Q.        Was the door closed?

22   A.        I don't recall.

23   Q.        Did anyone tell you you have to stay here?

24   A.        I don't recall.

25   Q.        Do you remember anything happening other than

1   sitting there while Lieutenant DeSousa says he was

2   talking to your daughters?

3   A.        No.

4   Q.        After Lieutenant DeSousa left you, what's the

5   next thing you remember about the incident?

6   A.        I believe it was him that came and told me

7   that me and my daughters were free to go.

8   Q.        And that was after he left you the first time?

9   A.        When he went to go talk to my daughters, yes,

10  he came back.

11  Q.        So he told you he was going to release your

12  daughters and then he left to go talk to your daughters?

13  A.        Yes, he did.  I believe so.  I'm not accurate

14  on the order of it.

15  Q.        And after he left you, about how long was it

16  before you saw your daughters outside of the police

17  cars?

18  A.        I don't know -- not long, but I don't -- can't

19  tell you timewise.  I can't tell you that.

20  Q.        After Lieutenant DeSousa talked to you, do you

21  remember anything about what any of the officers were

22  doing or what Lieutenant DeSousa was doing?

23  A.        I can remember some of the officers trying to

24  talk and, like, huddling and kind of having a

25  discussion.

1   Q.        Anything else?

2   A.        No.

3   Q.        How did you end up leaving the area?

4   A.        Once he let me and my daughters go, we just

5   got in the car and drove away.

6   Q.        So he had already let you go when he left you.

7   And then he went to each of your daughters, let them go,

8   and then all of you left?  Is that right?

9   A.        I'm -- I believe so.  I can't remember the

10  order, like I said.  But, yeah.

11  Q.        Do you remember anything happening after he

12  talked to you, other than him going around and talking

13  to the daughters and then letting you all go?

14  A.        As far as coming back and talking to me?

15  Q.        I'm just trying to understand.

16            Suddenly after he talks to you --

17  A.        Yes.

18  Q.        -- I'm not hearing anything about what you

19  remember happening.

20            I want to know if you can just describe to me,

21  from that moment he leaves you to the time you get in

22  your car and drive away, tell me everything that you

23  remember.

24  A.        I believe he gave me his business card and

25  then -- because I asked him about a report.  I believe I

1    asked him when can I get a report of this incident.  And

2    he gave me his business card to be able to, I guess,

3    follow up on it.

4    Q.        Anything else you remember from the point

5    Lieutenant DeSousa left you to the time that you left

6    the parking lot?

7    A.        I don't remember.

8    Q.        Was there anything about your daughters

9    getting out of the patrol cars or Lieutenant DeSousa

10   talking to them?

11   A.        I don't remember.

12   Q.        Do you remember anything about you talking to

13   your daughters before you left the parking lot?

14   A.        I cannot recall -- remembering.

15   Q.        Do you remember anything else from the time

16   Lieutenant DeSousa left you to the time you drove out of

17   the parking lot?

18   A.        No.

19   Q.        You said your wrists swole up after the

20   incident?

21   A.        Yes.

22   Q.        Was it both wrists?

23   A.        It was my right wrist that swelled up the

24   most, and my left wrist was just sore.

25   Q.        But you couldn't actually see anything wrong

1   with your left wrist?

2   A.      No.   But you could --

3   Q.      It wasn't red --

4   A.      -- you could see the redness.   You could see

5   the redness, but the right wrist was more swollen.

6   Q.      How long did it take that redness on your left

7   wrist to go away?

8   A.      About a day.

9   Q.      What about the swelling on your right wrist?

10   How long did that take?

11   A.      Probably about two days.

12   Q.      Did you go see a doctor about that?

13   A.      No.   I just put ice on it.

14   Q.      How many times did you ice your wrists?

15   A.      Like, three times.

16   Q.      When did you ice your wrists?

17   A.      Shortly after, and then later on that day.

18   Q.      Any other physical injuries from the incident?

19   A.      No.

20   Q.      Any psychological treatment you got after the

21   incident because of the incident?

22   A.      No.

23   Q.      Any other injuries that you had after the

24   incident?   Sorry --

25   A.      No.

1   Q.          -- you had as a result of the incident?

2   A.          No.

3   Q.          Do you have any expenses that you incurred as

4   a result of the incident?

5   A.          No.

6   Q.          Did you miss any work?

7   A.          No.

8   Q.          Do you remember your daughters having any

9   physical injuries?

10  A.          Yes.

11  Q.          Which daughter?

12  A.          AAottae.

13  Q.          What kind of injury did she have?

14  A.          Her wrists as well.  Swollen and slightly sore

15  and red.

16  Q.          Which wrist?

17  A.          I can't tell you which one -- which one of the

18  wrists.

19  Q.          Was it only one of the wrists?

20  A.          It was both of her wrists.

21  Q.          Were they both swollen equally?

22  A.          I'm not sure.

23  Q.          Do you remember how long it took for her

24  swelling to go away?

25  A.          I do not remember.

1    Q.        Do you remember what she did to treat her

2    injuries?

3    A.        Put ice on it like me.

4    Q.        Do you remember her icing more than that day?

5    A.        I don't remember.

6    Q.        Did she go and see any medical professional?

7    A.        No, she did not.

8    Q.        Did she see any psychological provider as a

9    result of the incident?

10   A.        No, she did not.

11   Q.        Did you take any photographs of your injuries?

12   A.        Yes.

13   Q.        Did you take any photographs of AAottae's

14   injuries?

15   A.        Yes.

16   Q.        I'm going to represent to you your attorney

17   has provided photographs.  Were those the photographs

18   that you took?

19   A.        Yes.

20            MR. MAY:  Calls for -- well, I'll just object

21   belatedly.  May call for speculation as to which photos,

22   but that's fine.

23            MR. CREECH:  Q.  Ms. Loggervale, you said

24   that you saw the discovery responses given on your

25   behalf in this case.  Do you remember saying that

1    earlier?

2    A.          Yes.

3    Q.          Do you remember those discovery responses

4    including photographs?

5    A.          Yes.

6    Q.          Do you remember those -- do you remember

7    giving the photographs that you took to your attorneys?

8    A.          My daughter submitted them, yes.

9    Q.          So the photographs that we're talking about of

10   your injuries.  You provided those in discovery.

11   A.          Yes.

12   Q.          When did you take those photographs?

13   A.          The same day.

14   Q.          About how long after?

15   A.          Immediately after.

16   Q.          Where were you when you took those

17   photographs?

18   A.          We were in the car, and we got out and my

19   daughter took pictures.

20   Q.          Where did you stop to take those pictures?

21   A.          I'm not quite sure where we actually stopped

22   to take the pictures, but we did take photos.

23   Q.          How long had you been driving before you

24   stopped to take those pictures?

25   A.          It wasn't -- it wasn't long.  I don't -- I

1    don't recall how long it was, but it was -- I don't

2    know.

3    Q.        Was it, like, you drove around the block and

4    then stopped?

5    A.        I don't remember.

6    Q.        Did you get back on the freeway before you

7    stopped?

8    A.        I don't remember.

9    Q.        Do you know if it was more than five minutes

10   after the incident that you took those photographs?

11   A.        I don't remember.

12   Q.        After the incident, have you ever had any

13   other interaction with law enforcement?

14   A.        No.

15   Q.        Has your view of law enforcement changed after

16   the incident?

17   A.        A lot, yes.

18   Q.        What's changed?

19   A.        The way I feel.

20   Q.        What has changed about how you feel?

21   A.        Just nervous and, you know, scared at times

22   when I see officers, and concerned.

23   Q.        Anything else that's changed in your life

24   since the incident?

25   A.        Just the way I do a lot of stuff.  And, you

1   A.          No.

2   Q.          And you said that you have moments of sadness?

3   What do you mean by that?

4   A.          Just at times when I see police officers and

5   the feeling I get of just rethinking about what I went

6   through with that situation.

7   Q.          How often has that happened to you?

8   A.          At least every month I'm experiencing those

9   feelings of sadness.

10  Q.          How long does that last?

11  A.          I can kind of be sad for a while, and then I

12  kind of try to snap myself out of it and think of

13  something different.

14  Q.          Does it last more than five minutes?

15  A.          Yeah, it lasts more than five minutes.

16  Q.          How much more?

17  A.          It can last for about an hour or so, just kind

18  of the way I feel mentally.

19  Q.          At the time of the incident, were you keeping

20  anything embarrassing in your purse?

21  A.          No.

22  Q.          Did you have anything private in your purse?

23  A.          No.

24  Q.          What about in the car?  Did you have anything

25  embarrassing in the car?

Page 209

```
 1   A.         No.

 2   Q.         Anything private in the car?

 3   A.         No.

 4   Q.         What exactly did you have in the car at the

 5   time of the incident?

 6   A.         I had the items we packed for travel.

 7   Q.         So your luggage?

 8   A.         Yes.  Bags.

 9   Q.         Anything else that you remember having in the

10   car?

11   A.         That's what I can remember so far.  Nothing

12   else.

13   Q.         Do you remember anything that you had in the

14   trunk?

15   A.         Our luggage.

16   Q.         Do you remember there being anything other

17   than your luggage in the trunk?

18   A.         I can't recall anything.

19   Q.         Do you know of anything personal or private

20   your daughters keep in their purses?

21   A.         No.

22   Q.         Let me ask you a hypothetical question.

23              Not this case; I'm just saying generally.

24   A.         Okay.

25   Q.         If officers -- if there had been burglars in
```

```
 1    A.         I don't remember.

 2    Q.         Do you remember -- let me ask you this.

 3               Do you remember the officer stopping you from

 4    doing anything that you wanted to do during the

 5    incident?

 6    A.         I don't understand that question.

 7    Q.         Sure.

 8               Was there anything that you were trying to do

 9    during the incident that the officer stopped you from

10    doing?

11    A.         Yes.

12    Q.         What was that?

13    A.         Making the phone call.

14    Q.         How did they stop you from making that 911

15    phone call?

16    A.         By telling me to get out the car and taking

17    the phone from me.

18    Q.         And so what you're talking about is Deputy

19    Holland --

20    A.         Yes --

21    Q.         -- taking you out of the car?

22    A.         -- yes.

23    Q.         And specifically not talking about either of

24    the first two 911 calls you made.  You're talking about

25    that last phone call you were trying to make when he
```

1    took you out of the car.

2    A.        Yes.

3    Q.        Anything else that you were trying to do

4    during the incident that any of the deputies on scene

5    stopped you from doing?

6    A.        No.

7    Q.        What about for your daughters?  Did you see

8    anything that they were trying to do that any of the

9    deputies stopped them from doing?

10            MR. MAY:  Calls for speculation.

11            THE WITNESS:  I didn't even look and see what

12    was going on with them.

13            MR. CREECH:  Q.  Your daughters were

14    recording with their phones?

15    A.        Yes.

16    Q.        Did you see any of the officers try to stop

17    them from recording with their phones?

18    A.        I don't remember.

19    Q.        Did you see any of the officers reach for a

20    gun during the incident?

21    A.        No.

22    Q.        Did you see any of the officers reach for a

23    baton?

24    A.        No.

25    Q.        Did you see any of the officers reach for

1    any -- any weapon or any item they had on their duty

2    belts or person?

3    A.        No.

4    Q.        Did you see them use any weapon against you or

5    your daughters?

6    A.        No.

7    Q.        Did you see them hit you or any of your

8    daughters?

9    A.        No.

10   Q.        Did you see them use any kind of force against

11   you or your daughters?

12            MR. MAY:  Objection; calls for a legal

13   conclusion, vague, ambiguous.

14            Go ahead.

15            THE WITNESS:  No.

16            MR. CREECH:  Q.  Did you see them do

17   anything that made you think that they were going to

18   hurt you or your daughters?

19   A.        I'm not quite sure what you mean by that.

20   Q.        Sure.

21            I'm just asking, overall, did you see them do

22   anything that made you think that they were going to

23   hurt you or your daughters?

24   A.        Their demeanor to me made me start to become

25   fearful.

1   Q.        What do you mean by "rough"?  Rough

2   physically?

3   A.        It was just rough.  Appeared to look kind of

4   rough.

5   Q.        What about it looked rough?

6   A.        It was just like someone manhandling someone.

7   Q.        When you say "manhandling," what do you mean?

8   A.        With a lot of strength.  Turned her around and

9   just -- you know.  And she's a young girl.

10   Q.        Other than turning her around to handcuff her,

11   what aggressively did he do?

12   A.        The force.  Like, the demeanor of -- to me it

13   appeared to be kind of more forceful strength-wise.

14   Q.        What did the officer -- did the officer say

15   anything that made you think that they were acting with

16   a racial motivation?

17   A.        No.

18   Q.        Did the officers do anything that made you

19   think they were acting with racial motivation?

20   A.        The demeanor.  Their demeanor to me made me

21   feel that way.

22   Q.        Anything else that they said/did that made you

23   think that they were acting from a racial motivation?

24   A.        No.

25   Q.        Whose demeanor did you think showed a racial

Page 241

1   motivation?

2   A.          The officers that were there.

3   Q.          Which officers?

4   A.          The -- Holland, Leeper, and Pope.

5   Q.          Any of the other officers?

6   A.          They didn't handle us, so I can't say.

7   Q.          What about Officer Holland's demeanor made you

8   think that he was acting with racial motivation?

9   A.          His whole demeanor of when he came to the car;

10  how he presented himself.  It wasn't in, like, a

11  peaceful, friendly way; it was in, like, a stern kind of

12  way of -- to me was, you know, assuming a stereotype.

13  Q.          What made you think he was assuming a

14  stereotype?

15  A.          His demeanor.

16  Q.          And specifically about the demeanor.  What

17  made you assume that?  He was acting sternly?

18  A.          His expression, his body language...

19  Q.          Describe his expression and his body language

20  to me.

21  A.          It was -- it wasn't a very friendly

22  approaching the car at all.  It was not friendly; it was

23  not in a concerned manner, like, is it possible that,

24  you know, these individuals are okay or not.

25  Q.          Anything else about his demeanor that made you

1    think that this was racially motivated?

2    A.          That's about it.

3    Q.          I don't want just "about it"; I want

4    everything.

5    A.          That's it.

6    Q.          You said that when he walked up to the car in

7    your initial conversation, you thought that he was just

8    asking you and telling you about the burglaries as a

9    concerned officer in explaining to you what had been

10   happening in the parking lot.

11              Isn't that what you said earlier?

12   A.          That's what I interpret- -- I assumed that.

13   But it wasn't how he was -- when he talked to me, it was

14   stern.  But in my head, I interpreted it "Maybe he's

15   telling me about these burglaries" -- "what does that

16   have to do with me."

17   Q.          Can someone be stern without meaning that

18   they're having racial motivation?

19   A.          I'm not sure.

20   Q.          So what I'm trying to get down to, and to

21   understand, is I understand you think that he was stern

22   and from the beginning he thought that you might have

23   done something wrong.

24              What I want to understand is, is why from

25   there do you go to this is because of race and not

1    because of some other reason?  What makes you think

2    that?

3    A.        Because of every bit of what he was doing

4    within him being at my window.

5    Q.        And I want you to explain -- I understand what

6    you're saying is causing you to think that.  What I want

7    to know is why did those actions make you think race as

8    opposed to anything else?

9    A.        Because that's how I felt.  That's how I was

10   feeling.

11   Q.        What if he -- so what you're seeing.  If he

12   just thought you were a bad guy -- I have a criminal in

13   front of me -- why wouldn't that sternness come from I'm

14   dealing with a criminal; not I'm dealing with someone

15   who is Black?

16           MR. MAY:  Objection; argumentative, relevance.

17           THE WITNESS:  I can't answer --

18           MR. CREECH:  Q.  I'll ask this in -- a

19   more clear and direct question, because I want to

20   understand your testimony.  I'm just trying to

21   understand what you're saying.

22           What about his sternness made you think that

23   this had to do with your race and not because he thought

24   that you might have committed a crime, or were about to

25   commit a crime?

1    A.        Because of how I felt and how he was handling

2    the situation.  And if I use that to compare against

3    trying to even explain it to his sergeant, it was two

4    different demeanors.  It was a different demeanor.

5    Q.        What was different about the demeanor?

6              MR. MAY:  Asked and answered.

7              Go ahead.

8              THE WITNESS:  When -- the sergeant's demeanor

9    was -- talking to me in the beginning, it was more,

10   like, "okay, what" -- "what is going on?"  Like, he

11   wanted to hear my story -- "what happened?" -- before he

12   started telling me about the officers and what they

13   said.

14            But as far as him, he -- it was almost like as

15   if he had literally saw me breaking in the cars or

16   committing a crime, and that was his demeanor or

17   approach in handling everything of -- the stages that

18   took place with me and my daughters.

19            MR. CREECH:  Q.  What about Deputy Pope's

20   demeanor made you think that she was acting with

21   racial motivation?

22   A.        The choice of words that she was using.

23   Q.        Anything else?

24   A.        No.

25   Q.        What was her choice of words that she was

1    using that made you think that she was acting from a

2    racial motivation?

3    A.        What I told you earlier.  She indicated and

4    said, and it almost felt like as if she was trying to

5    provoke something from my daughter so it can cause a

6    situation because we weren't doing anything.

7    Q.        What you're saying is that one moment when she

8    said "I don't want to fight with you"?

9    A.        Yes.

10   Q.        Any other choice of words that she had that

11   made you think that this is from racial motivation?

12   A.        That's all I can remember.

13   Q.        How would she have phrased that statement

14   differently that would have made you think this isn't

15   from racial motivation?

16   A.        I wouldn't have used those words, but I can't

17   tell you offhand how an officer should have a correct

18   way of phrasing something.

19   Q.        What about "I don't want to fight with you"

20   makes you think that Deputy Pope was acting from racial

21   motivations?

22   A.        Are you asking me a question?

23   Q.        Yeah.  When she says "I don't want to fight

24   with you" -- what makes you think that sentence is

25   racially motivated?

1    A.        I don't even know why, like, she would say "I

2    don't want to fight with you," when there was nothing to

3    cause a situation to be fighting.

4    Q.        Then Deputy --

5    A.        I just never heard an officer use words like

6    that.  I thought -- I've never heard an officer use

7    words like that.

8    Q.        Deputy Leeper.  What about his demeanor made

9    you think that he acted with racial motivations?

10   A.        The way he was kind of, to me, manhandling my

11   daughter to put the handcuffs on.

12   Q.        Anything else?

13   A.        No.  That was it.

14   Q.        And what specifically about how he was

15   manhandling made you think this is from a racial

16   demeanor -- this is from a racial motivation as opposed

17   to something else?

18   A.        The demeanor.  The demeanor was just...

19   Q.        How would he have done that handcuffing

20   differently that would have made you think this isn't

21   from racial motivation?

22   A.        If it wasn't so aggressive; if it wasn't so,

23   like -- to me, feeling like he's coming to apprehend

24   criminals.

25   Q.        Do you think that you were treated differently

1                    CERTIFICATE OF REPORTER

2

3          I, DEBRA J. SKAGGS, hereby certify that the

4    witness in the foregoing deposition was by me duly sworn

5    to tell the truth, the whole truth, and nothing but the

6    truth in the within-entitled cause;

7

8          That said deposition was taken in shorthand by

9    me, a Certified Shorthand Reporter of the State of

10   California, and was thereafter transcribed into

11   typewriting, and that the foregoing transcript

12   constitutes a full, true, and correct report of said

13   deposition and of the proceedings which took place;

14

15         That I am a disinterested person to the said

16   action.

17

18         IN WITNESS WHEREOF, I have hereunto set my

19   hand this 22nd      day of      July          , 2021.

20

21

22   _____

23   DEBRA J. SKAGGS, CSR No. 7857

24

25              ---oOo---

# EXHIBIT K

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

AASYLEI LOGGERVALE; AASYLEI
HARDGE-LOGGERVALE; and AAOTTAE
LOGGERVALE,

       Plaintiffs

    vs.                              Case No.
                            20-cv-04679-WHA
COUNTY OF ALAMEDA; STEVEN HOLLAND;
MONICA POPE; KEITH LEEPER; ANTHONY
DESOUSA; CAMERON GALLOWAY; and
DOES 1 to 50, inclusive,

       Defendants.
_____/

VIRTUAL DEPOSITION OF

AASYLEI HARDGE-LOGGERVALE

Monday, June 28, 2021

(Via Zoom videoconference)

REPORTED BY:

DEBRA J. SKAGGS, CSR 7857

EMERICK AND FINCH
Certified Shorthand Reporters
18 Crow Canyon Court, Suite 125
San Ramon, California 94583
emerickfinch@emerickfinch.com
(925) 831-9029  (800) 331-9029

```
 1                    REMOTE APPEARANCES

 2    FOR THE PLAINTIFFS:

 3        GEARINGER LAW GROUP
          BY:  BRIAN GEARINGER, ATTORNEY AT LAW
 4        740 Fourth Street
          Santa Rosa, California 95404
 5        (415) 440-3102
          brian@gearingerlaw.com
 6
          LAW OFFICE OF JOSEPH S. MAY (Not Present)
 7        BY: JOSEPH S. MAY, ATTORNEY AT LAW
          1388 Sutter Street, Suite 810
 8        San Francisco, California 94109
          (415) 781-3333 Fax: (415) 707-6600
 9        joseph@josephmaylaw.com

10    FOR THE DEFENDANTS:

11        ORBACH HUFF + HENDERSON LLP
          BY: CHRISTOPHER R. CREECH, ATTORNEY AT LAW
12        6210 Stoneridge Mall Road, Suite 210
          Pleasanton, California 94588
13        (510) 999-7908 Fax (510) 999-7918
          ccreech@ohhlegal.com
14
      ALSO PRESENT:
15
           AAOTTAE LOGGERVALE, Plaintiff
16

17                        --o0o--

18

19

20

21

22

23

24

25
```

1                          INDEX

2    EXAMINATION BY:                                  PAGE

3        Mr. Creech                                      4

4                         --oOo--

5    DEFENDANTS' EXHIBITS:                            PAGE

6    Exhibit 304 - 1 page - 2019-2020 Academic Calendar -

7              Peralta Community College District      24

8    Exhibit 305 - 7 pages - Color Copies of photographs

9              depicting the injuries of the various

10              Plaintiffs                            120

11                       ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   hours?

2   A.        No.

3   Q.        Have you used any drugs, including

4   prescription medications, in the last 48 hours?

5   A.        No.

6   Q.        Are you used to consuming alcohol or taking

7   any kind of drug such that the absence of those things

8   in your system might affect your testimony?

9   A.        No.

10  Q.        What did you do to prepare for your deposition

11  today?

12  A.        I reviewed a few body cams with Mr. Gearinger

13  yesterday, and then also my own videos that I recorded

14  during the incident.

15  Q.        So when you say body-worn camera, what are you

16  talking about?

17  A.        The body cams of Deputy Pope, Deputy Leeper,

18  and then Deputy -- or Lieutenant DeSousa.

19  Q.        Did you review the body-worn camera footage of

20  Deputy Holland?

21  A.        I did not.

22  Q.        Have you ever seen body-worn camera footage

23  from Deputy Holland before?

24  A.        No.

25  Q.        When you say that you looked over the footage

1    from Lieutenant DeSousa, Deputy Pope, Deputy Leeper, as

2    well as your own videos -- did you look over the whole

3    videos?

4    A.        Yes.

5    Q.        And have you seen those videos before?

6    A.        No.

7    Q.        You had not seen those videos before

8    yesterday?

9    A.        No.

10             MR. GEARINGER:  That was a double negative,

11   Chris.

12             You had not seen -- her answer should have

13   been yes.  You had not seen them before.

14             THE WITNESS:  Yes.

15             Sorry.  I was confused.

16             MR. CREECH:  Q.  And to be fair, I was

17   too, and I hadn't meant to ask you for a double

18   negative.

19             Your own videos that you took.  You mean both

20   the video that you took as well as that your sister

21   took?

22   A.        Yes.

23   Q.        And you had seen those videos before?

24   A.        Yes.

25   Q.        After reviewing those videos -- both videos

1    you and your sister took, as well as Deputy Pope, Deputy

2    Leeper, and Lieutenant DeSousa's videos -- was there

3    anything that you remember from the incident that wasn't

4    captured in those videos?

5    A.        Can you please rephrase the question?

6    Q.        Sure.

7              What I'm looking for is after watching all of

8    those videos, did you at any point in time think to

9    yourself there is something I remember from the incident

10   that I didn't see happen in this video.  Did you have

11   any of those moments watching those videos?

12   A.        Yes.

13   Q.        What was it that you remember from the

14   incident that you didn't see in the videos?

15   A.        When Deputy Pope approached the car, she had

16   her flashlight flashing directly in my right eye.  But

17   in the videos you're not able to see the reflection of

18   the flashlight.  But you are able to see her take out

19   the flashlight before she approaches the car, and then

20   take the -- put the flashlight back inside of the

21   holster.

22   Q.        Anything else that you remember from the

23   incident that wasn't in those videos?

24   A.        No.

25   Q.        As far as this flashlight.  About how long do

1   on the door.  And I was laying down.  So when I woke up,

2   I woke up to a flashlight in my right eye.  And that's

3   when I recognized, oh, there is someone else here with

4   him; it's not just one officer, there is two.

5   Q.        So even though Deputy Pope had her flashlight

6   on, you could see her?

7   A.        I could not see her well.  I just knew that

8   there was a flashlight on me, and from there I was able

9   to assume that was another police officer.  Because, I

10  don't know, that's just -- I assumed that was another

11  police officer.

12  Q.        So at no point in time in those first five to

13  seven minutes could you see that there was a person

14  holding the flashlight?

15  A.        Not -- I mean, not really.  My vision was

16  slightly ajar.  I was not able to completely see, at

17  least, like, her proximity to the door or anything.

18  Because like I said, the light was shining directly in

19  my right eye.  And I had just woken up.  I was asleep

20  prior to Deputy Holland knocking on the door, so I'm

21  still trying to wake up at the same time.

22  Q.        But you understood that what you were seeing

23  was a flashlight in somebody's hand.

24  A.        Yes.

25  Q.        When did you see Deputy Holland -- sorry --

1    Deputy Pope put the flashlight down?

2    A.          I would say -- I believe it was around 45

3    seconds to a minute before I got out the car.

4    Q.          So before you got out of the car, Deputy Pope

5    had put her flashlight down?

6    A.          Yes.

7    Q.          And at that point when she put her flashlight

8    down, could you see her?

9    A.          To a certain extent.

10   Q.          What do you mean "to a certain extent"?

11   A.          My vision was still -- I still slightly was

12   not able to see her because my vision was -- like I

13   said, I was waking up, and that light had been in my eye

14   for a little minute.  So I did not -- I wasn't able to

15   completely view her proximity to the door; I just knew

16   there was somebody there.

17              And Deputy Holland was also talking to her, so

18   I knew there was -- he had to be talking to another

19   officer.

20   Q.          Other than looking at those videos, did you do

21   anything else to prepare for your deposition?

22   A.          No.

23   Q.          Did you look at any other documents, videos,

24   photographs, written documents in preparation for your

25   deposition?

1    a handicapped parking spot, and your mother did not park

2    in that handicapped parking spot?

3    A.          I don't recall.

4    Q.          What is your understanding of your mother's

5    ailment that requires her to use that placard?

6    A.          She has back muscle spasms.

7    Q.          How often have you seen those muscle spasms

8    affecting your mother?

9    A.          I don't remember.

10   Q.          Can you give me your best estimate?

11   A.          I would say, like, her muscle spasms happen

12   sporadically, so maybe -- at least, like, three times

13   out of a week she'll have lower back issues.

14   Q.          The day of the incident.  Do you remember your

15   mother putting that placard up?

16   A.          Yes.

17   Q.          When do you remember --

18   A.          Or -- I'm sorry.

19               I don't -- I don't remember seeing her put it

20   up because I was asleep.  But when I woke up, I did see

21   the handicap placard.

22   Q.          So you didn't see her put it up, but you did

23   see it up during the incident.

24   A.          Yes.  Because before the incident transpired,

25   I was asleep.

1   A.          Went to sleep.  I was exhau- --

2   Q.          You went to sleep -- I didn't mean to cut you

3   off.  Please finish your answer.

4   A.          I said I went to sleep.  I was exhausted from

5   studying a couple hours prior, so I went to sleep.

6   Q.          Your mother during her deposition said that

7   she filled up the gas in the car shortly after she left.

8              Do you remember getting to the gas station?

9   A.          I don't remember.  I was asleep, so I wouldn't

10  know.

11  Q.          Do you have any idea how quickly you fell

12  asleep?

13  A.          As soon as I got in the car, I knocked out.  I

14  was tired.  And then I just studied before I got in the

15  car, and then I knew that I would have to be well rested

16  for my exam, so.

17  Q.          Did you wake up at any time during the drive

18  before you got to Castro Valley?

19  A.          No.

20  Q.          Do you remember anything of that drive until

21  you got to Castro Valley?

22  A.          I remember my mom trying to wake me up when we

23  got to the McDonald's.  But I was still asleep.  Like, I

24  didn't get up and sit up in the chair; I was still

25  laying down in the back seat.

1    don't want to use it"?

2    A.        No.

3    Q.        So pretty much any time that you stopped at

4    that McDonald's to use the bathroom, you told her "I

5    don't want to go there"?

6    A.        Yes.

7    Q.        And when you told her those things, did she

8    drive on and find another bathroom?

9    A.        Yes.  Usually the Starbucks right over there.

10   Q.        So then keep talking me through what happens

11   after your mother starts talking to you about using that

12   McDonald's parking lot [sic].  What else do you remember

13   from there?

14   A.        I just remember me still being tired, so I

15   went back to sleep.  I was, like, still in and out of

16   consciousness [sic].  And then the next thing I remember

17   is being at Starbucks and waking up to a knock on the

18   door.

19   Q.        When your mother talked to you, did you change

20   your position in the back seat?

21   A.        I don't remember.

22   Q.        Do you remember actually arriving in the

23   Starbucks parking lot?

24   A.        No.

25   Q.        So when you woke up to the deputies in the

1    Starbucks parking lot, were you surprised that you were

2    in the Starbucks parking lot?

3    A.        Yes and no.  Because I knew that she was more

4    than likely going to go to that Starbucks for me to use

5    the restroom before we went to Peralta College.  Because

6    over there, all the restrooms are dirty over there too.

7    So I guess, yeah, we frequently stop at that Starbucks,

8    so.

9    Q.        And from there you had no problem falling back

10   asleep?

11   A.        From where?

12   Q.        From McDonald's.

13   A.        Yeah, I fell back asleep.

14   Q.        Were you sleeping soundly until you woke up to

15   the deputies in the parking lot?

16   A.        Yes.

17   Q.        So tell me what you remember waking up to?

18             MR. GEARINGER:  Objection; asked and answered.

19             Go ahead.

20             THE WITNESS:  I remember waking up to the

21   sound of a knock on the door -- on my mom's side of the

22   door.

23             And then by the time I had gotten up

24   completely to where I was, like, sitting up in the

25   position of my chair, that's when I had noticed that

1  Q.        In the year before the incident, had you ever

2  shoplifted?

3  A.        No.

4  Q.        In the year after the incident, have you

5  shoplifted?

6          MR. GEARINGER:  Objection; relevance, privacy.

7          You're getting pretty far afield, Chris.  But

8  go ahead.  The witness may answer.

9          THE WITNESS:  No.

10          MR. CREECH:  Q.  In the year before the

11  incident, had you ever committed a burglary?

12  A.        No.

13  Q.        In the year after the incident, did you commit

14  a burglary?

15  A.        No.

16  Q.        Do you have any reason to believe that your

17  mother is engaged in any kind of a crime while she

18  travels back and forth between Nevada and California?

19          MR. GEARINGER:  Objection; calls for

20  speculation, legal conclusion.

21          Go ahead.

22          THE WITNESS:  No.

23          MR. CREECH:  Q.  So take me to that moment

24  of waking up in the Starbucks parking lot.

25          You said that you heard the knock and then saw

1    the flashlight.  What's the next thing that you

2    remember?

3    A.        From there, I remember my mom's interacting

4    with Deputy Holland, and he was trying -- at first he

5    was informing her about burglaries that had been

6    happening within that area.  And then from there, it

7    somehow transitioned to him asking for her

8    identification.

9    Q.        During that part of the conversation while he

10   was asking for identification, do you remember what you

11   physically did in the back seat?

12   A.        I don't recall.

13   Q.        Do you recall sitting up?

14   A.        Yes.

15   Q.        Where did you sit up to?

16   A.        I sat up in the -- I sat up in the seat that I

17   was -- okay.  So it was the passenger -- the back seat

18   of the passenger side on the right.  Yeah.  I sat

19   upright.

20   Q.        Why did you sit up to that side as opposed to

21   the side where you had your head?

22   A.        Because that's the side that I normally sit

23   in, in the car.

24   Q.        So at the time when you woke up, did you look

25   at the clock in the car, or on your phone or any other

1    her proximity to that door, so when I opened it, I

2    didn't even think that she was in the way for me to be

3    opening the door to try to hit her.  It wasn't like that

4    at all.

5    Q.        Let's take it step by step.

6              Before you opened that door, had you looked

7    out that window and seen Deputy Pope?

8    A.        Yes and no.

9    Q.        And you -- when you say "yes and no," do you

10   mean just the times when she had her flashlight on you

11   had trouble seeing her?

12   A.        Yes.  So when -- the times that she had her

13   flashlight on, my vision was impaired.  And by the time

14   she had took her -- she had put her flashlight back in

15   the holster, it had been -- I mean, this is an

16   estimation, but no more than a minute or two before I

17   had opened that door.  So my vision was still

18   readjusting.  So I had seen a figure there, but I didn't

19   know her proximity to that door, and she was not

20   directly in front of the door.

21   Q.        How many times from when you woke up to when

22   you opened the door did you look out that window to

23   where Deputy Pope was?

24   A.        I don't recall.

25   Q.        You said that you remember taking your phone

1   A.        No.

2   Q.        You said that when you got out of the car, you

3   were going to the trunk to retrieve some feminine

4   hygiene products; is that correct?

5   A.        Yes.

6   Q.        Was your purpose in getting those products

7   because you were going to take them into Starbucks?

8   A.        Yes.  I was going to use the restroom.

9   Q.        And that's why you were going into Starbucks?

10  A.        I was also -- after I used the restroom, I was

11  also going to get me a cup of coffee as well.

12  Q.        Right.  Because Starbucks doesn't let you just

13  use the restroom; you've got to buy something, right?

14  A.        Of course.  Yeah.

15  Q.        So when you got out of the car, was that your

16  plan?  Get the feminine hygiene products from the trunk

17  and then proceed with those into Starbucks, use the

18  restroom to put those products on, and then get a

19  coffee?

20  A.        Yes.

21  Q.        Anything else that you had planned to do when

22  you got out of the car?

23  A.        No.

24  Q.        And that was the purpose of why you wanted to

25  go to the bathroom was to be able to use those feminine

1    hygiene products.

2    A.         Yes.

3    Q.         Where were you going to store those feminine

4    hygiene products on your way into Starbucks?

5    A.         I was going to put it in my back pocket or my

6    jacket.  My jacket pocket.

7    Q.         How were you going to pay for items inside the

8    Starbucks?

9    A.         I was going to bring my wallet in.

10   Q.         Did you have your wallet with you when you got

11   out of the car?

12   A.         I did not.  But I -- I got out of the car and

13   went to the trunk to retrieve the products first, and

14   then I was going to go on the other side and -- or go

15   back to the car and get my purse.  But by that time I

16   was informed I was detained.  So right after I left the

17   trunk, I stood right by the door.

18   Q.         So the purse in the back seat.  That was where

19   you had your money, your credit cards, and your ID?

20   A.         Yes.

21   Q.         Did you have anything else inside that purse

22   in the back seat?

23   A.         I don't remember.

24   Q.         Do you remember anything else about the

25   contents of that purse?

1    any other estimate you can give me for the size?

2    A.        No.

3    Q.        Do you remember when you got out of the car,

4    Deputy Holland telling you you had to get back in the

5    car?

6    A.        I don't recall.

7    Q.        You don't remember him ever saying that, after

8    you got out of the car, that you had to get back in the

9    car?

10   A.        I remember him saying that after -- after I

11   went to the trunk.

12   Q.        Do you remember him telling you at that

13   juncture, after you tried to go to the trunk, that you

14   had to get back in the car?

15   A.        I don't recall if he used those exact words; I

16   just remember him saying -- because I said "I have to

17   use the restroom."  He said "No, you're not going

18   anywhere.  You're all detained."

19   Q.        Do you remember him saying something to the

20   effect of "You're all detained; you have to get back in

21   the car"?

22   A.        When I went to the trunk, he didn't say "You

23   have to get back to the car"; he just said "You're all

24   destained."

25   Q.        I'm asking at any point in time after you got

1    Q.        And --

2    A.        And I kept -- I'm sorry.

3              I kept indicating that I had to use the

4    restroom, and they weren't listening.

5    Q.        Did you ever indicate to any of the deputies

6    on scene that the reason why you needed to use the

7    restroom was because you were on your menstrual cycle?

8    A.        No.

9    Q.        Did you ever indicate to any of the deputies

10   on scene that your pad had soaked through and you needed

11   to change it?

12   A.        No.  That's -- that's something embarrassing.

13   I wouldn't want to say that.  That's personal.

14   Q.        And the last time that you changed your pad

15   would have been before you left from Nevada?

16   A.        Yes.

17   Q.        And that's what you were using, was a pad?

18   Not a pad and a tampon or just a tampon?

19   A.        I had had just a pad on that night.  But I was

20   going to use a pad and a tampon because I knew I was

21   going to go to an exam and I was going to be there for

22   about two and a half hours, so I needed to make sure I

23   had double coverage.

24   Q.        Describe being handcuffed.

25   A.        Like, the process in which they handcuffed me

1  Q.        Would he have had to twist your wrists to put

2  them together for handcuffing?

3  A.        It was -- I don't know.  I know he probably

4  had to put my hands together, but he didn't have to

5  apply as much force as he did to my wrists when he was

6  handcuffing me.

7  Q.        How do you know?

8  A.        It wasn't -- I don't know, but it was

9  excessive.  I just know that that much force was

10 excessive.

11 Q.        Have you ever been handcuffed before?

12 A.        No.

13 Q.        How do you know physically how you have to

14 twist wrists to be able to get them handcuffed?

15 A.        I don't.  But from what I felt, it was -- it

16 was an immense amount of pain that I was in, so.  And

17 personally I didn't feel he needed to apply that much

18 pressure to my wrists if I wasn't being defiant or I

19 wasn't complying to him trying to handcuff me.

20 Q.        You said "immense amount of pain."  Rank it on

21 a scale of 1 to 10.  10 being the worst pain you've ever

22 felt.

23 A.        I would say at least a 7.

24 Q.        What's the worst pain you've ever felt?

25 A.        I don't know.

1    A.        Yes.

2    Q.        Did you have to get stitches?

3    A.        I don't recall.

4    Q.        Do you remember how long it took that injury

5    to heal?

6    A.        I don't remember.

7    Q.        When you say twisted your wrists, was that one

8    wrist or both wrists?

9    A.        One wrist.  My left wrist.

10    Q.        When you say "twisted," describe it to me.

11    Twisted how?

12    A.        He took his right hand to -- or I don't know

13    what hand it was because I was facing the vehicle.  But

14    he had taken my wrist and he had turned it in the

15    opposite direction.  So I would say maybe, like,

16    counterclockwise, I would say.  And applied -- applied

17    pressure to it.

18    Q.        And did he do that in one motion as he brought

19    your hands behind your back for handcuffing?

20    A.        He did that as he was applying the handcuffs.

21            So he -- at first when he had approached me,

22    he had used his -- he had used his hands to pull my arm

23    behind my back.  But then when he had put the handcuffs

24    on, he had twisted my wrist.

25    Q.        Got it.  So the twist happened as he had your

1    hands behind your back while he was trying to put the

2    cuff themselves on your wrist.   Is that right?

3    A.          Yes.   Yes.

4    Q.          That left hand.   Was that the hand that you

5    had your phone in?

6    A.          I believe so.

7    Q.          Do you have any idea if he needed to twist

8    your hand to get the handcuffs around your phone?

9    A.          I don't know.

10   Q.          Do you remember him telling you that to be

11   able to handcuff you, he needed you to let go of the

12   phone and then you saying no?

13   A.          I don't remember him saying those exact words,

14   that "he needed."

15   Q.          And I'm not asking for exact words; I'm just

16   saying did he say something to the effect of "I need you

17   to let go of the phone," and you refused?

18   A.          No, he did not.

19              He said "I can hold on to your phone so your

20   phone doesn't break."   He said something along those

21   lines.

22              But my phone was in no way -- I mean -- I

23   don't want to speculate, but he was able to handcuff me

24   without taking my phone.   I was able to have my phone in

25   the vehicle for a certain amount of time, so I don't

1  you?

2  A.        He did not.  But the windows were down, and I

3  was -- my voice was at a tone where he could hear me.

4  It's not like I said it once; I said it on various

5  occasions.  I said "My handcuffs are too tight; can you

6  loosen them."  "My handcuffs are too tight." So it's

7  like I said it once, and I said it at a low volume.

8          That -- my emotions were heightened during

9  that whole time.  So as you can tell from the videos,

10 that my tone was -- had escalated.  My tone was pretty

11 high.  So he could hear me.

12 Q.        Is it fair to say during the incident that you

13 were yelling at the officers at times?

14 A.        Define "yelling."

15 Q.        I mean raising your voice to a yell.

16 A.        Not throughout the whole incident.  But yes, I

17 was.

18 Q.        Did any of the deputies on scene yell at you?

19 A.        Yes.

20 Q.        Which deputy?

21 A.        Deputy Leeper.

22 Q.        When?

23 A.        When he was handcuffing me -- I don't recall

24 all of the -- I don't recall all of the occurrences, but

25 his voice was loud the majority of the time.

1    Q.          Louder than yours?

2    A.          Louder or at the same level.

3    Q.          So you said then there was an Asian officer

4    who you had complained to about your handcuffs being too

5    tight.  Was it just that one time where he made eye

6    contact with you?

7    A.          No.  He had made eye contact throughout the

8    duration of him being there talking to the other

9    deputies.

10   Q.          I'm asking a different question.

11              I'm asking how many times did you tell him

12   that your handcuffs were too tight?

13   A.          I believe at least three times.

14   Q.          And each one of those three times he made eye

15   contact with you?

16   A.          Yes.

17   Q.          When you say "too tight," how much looser did

18   they have to be where you would be okay with them?

19   A.          I don't know.  Just -- it needed to be

20   loosened because they were too tight.  They were

21   applying too much pressure on my wrist.

22   Q.          What does "too much pressure" mean?

23   A.          Too much pressure as far as it was starting to

24   feel like it was hurting my -- hurting my skin.

25   Q.          Did it actually hurt your skin?

1    A.          Yes.

2    Q.          How?

3    A.          I had some, like, red marks around my wrists

4    afterwards.

5    Q.          Did you take photographs of those red marks?

6    A.          Yes.

7    Q.          Did you take those while you were still in the

8    car after the incident?

9    A.          After they had let me out of the handcuffs?

10   Or --

11   Q.          Your mother yesterday had testified that you

12   took photographs shortly after the incident before you

13   got to your test.  Is that true?

14   A.          I believe so.

15   Q.          And those photographs that you're talking

16   about, the redness to your wrists.  You're talking about

17   those photographs?

18   A.          Yes.

19   Q.          Do those photographs truly and accurately

20   capture the redness to your wrists?

21   A.          Yes.

22   Q.          Anything other than redness?

23   A.          No.  Not from my wrist, at least.

24   Q.          Was it both of your wrists?

25   A.          Yes.

1  Q.        Was it all around the wrist?

2  A.        I don't recall, but there definitely was

3  redness in my wrist.

4  Q.        For you to have told Deputy Leeper "It's just

5  fine; now my handcuffs are okay," how much wider would

6  he have had to have made the handcuffs?

7            MR. GEARINGER:  Objection; calls for

8  speculation.

9            Go ahead.

10           THE WITNESS:  I don't know.

11           MR. CREECH:  Q.  What did --

12 A.        I don't remember.

13 Q.        What did any of the deputies have to do to

14 make you feel like the handcuffs were just fine?

15 A.        They would have had to loosen it to a certain

16 degree.  But I wouldn't -- I don't know, when they

17 handcuff people, how tight or if this was a habit or --

18 I don't know.  But I do know that my handcuffs were too

19 tight.

20 Q.        So you can't say whether or not those

21 handcuffs were standard tightness?

22 A.        I don't know.  But I know the amount of

23 pressure that I felt on my wrists, all I was asking was

24 for them to loosen it.  I wasn't trying to get out of

25 the handcuffs; that wasn't -- I was just asking them to

1    please loosen my handcuffs because they're too tight.

2    That was it.

3    Q.        What if anything did you see of your mother's

4    handcuffing?

5    A.        I don't recall seeing her handcuffed.

6    Q.        What if anything do you recall of your mother

7    being put in a patrol car?

8    A.        I don't recall.

9    Q.        What if anything do you remember of your

10   mother and what the deputies were doing with your mother

11   after she got out of the car?

12   A.        I don't remember.  I was put in the patrol car

13   first, so.

14   Q.        From the time you were in the patrol car, did

15   you see anything of what was happening to your mother or

16   your sister?

17   A.        I don't remember.

18   Q.        So I'm going to show you what's going to be

19   Exhibit 305.

20                    (Defendants' Exhibit 305 marked

21                     for identification.)

22            MR. CREECH:  Q.  So this is seven

23   photographs that I'm going to scroll down through.

24            Can you take a moment and look at them as I

25   scroll down through them?

```
 1   A.        Yes.

 2   Q.        (Scrolling through Exhibit 305.)

 3             So that's the end of the seven pages.  Did you

 4   have time to see as I scrolled down through them?

 5   A.        Yes.

 6   Q.        Do you recognize those photographs?

 7   A.        Yes.

 8   Q.        Are those the photographs that you took in the

 9   car after -- immediately after the incident?

10   A.        Yes.

11   Q.        Did any of you do anything to treat or change

12   the appearance of your injuries before these photographs

13   were taken?

14   A.        No.

15   Q.        Do these -- to the best of your knowledge and

16   recollection, do these photographs truly and accurately

17   capture any injuries -- any physical injuries that you

18   sustained, or your family members sustained, as a result

19   of the incident?

20   A.        To the best of --

21             MR. GEARINGER:  Object- -- wait.  Hang on.

22             Objection; that's a compound question.

23             Go ahead.

24             MR. CREECH:  I agree, so let me strike that

25   question and ask it clearer.
```

1          MR. CREECH:  Q.  To the best of your

2    knowledge and recollection, do these photographs

3    truly and accurately capture the injuries that your

4    family members were complaining of immediately after

5    the incident?

6    A.          To the best of my recollection, yes.

7    Q.          Can you tell me where in this set of seven

8    photographs the pictures of you are?

9                And I can scroll up from the bottom.

10               (Scrolling through Exhibit 305.)

11   A.          Can you go down?

12   Q.          Sure.

13               Do you know how many pages?  So this is

14   page 1.

15   A.          Okay.  So not that page -- not the page of

16   what I believe is the third page --

17   Q.          Uh-huh.

18   A.          -- no.  The fourth page, then.

19               Yeah.

20   Q.          What about the fifth page?  Is that a picture

21   of you?

22   A.          No.

23   Q.          Do you know who that's a picture of?

24   A.          I believe it's my mother.

25   Q.          Similarly, the sixth page.  Is that also a

1   picture of your mother?

2   A.          No.

3   Q.          And then the seventh page?

4   A.          I believe that's my sister.

5   Q.          And that's because of the nail polish?

6   A.          Yes.

7   Q.          So you believe the sixth and seventh pictures

8   are of your sister?

9   A.          Yes.

10  Q.          And the fifth page is of your mother?

11  A.          Yes.

12  Q.          And the fourth page is of you?

13  A.          Yes.

14  Q.          And then the third page.  Do you know who that

15  is?

16  A.          I believe that's my sister.

17  Q.          Based on the nails down below?

18  A.          I think so.

19  Q.          Or the ring that she's wearing?

20  A.          I think so.  I can't recall her nails or her

21  ring or those at the time, but I believe so.

22  Q.          What about the second picture?

23  A.          I don't know.

24  Q.          Do you remember either you or your sister or

25  your mother complaining about an injury to the elbow?

1    A.        I believe that could be my sister because she

2    was complaining about her elbow being scraped because

3    she was dragged through the car.

4    Q.        What about this first page?  Do you have any

5    idea who this is?

6    A.        I don't.

7    Q.        So going back to the fourth page.

8              Is this your left wrist?

9    A.        Yes.  I believe so.

10   Q.        What's the redness that you're talking about

11   in your left wrist?  Where is it in this photograph?

12   A.        I think the flash is -- it's -- I don't know

13   if I can even really see, but it's below.  It's, like,

14   near my veins.  The upper part of the wrist.

15             But the flash is -- the flash of the photo was

16   kind of blocking it.

17   Q.        So the redness was on the bottom of your

18   wrist; that is, towards the base of your palm?

19   A.        Yes.

20             Where you see this flash is at, I can't really

21   see because the flash from this -- from the picture is

22   difficult to see.

23   Q.        Your purpose in taking these photographs was

24   to document any injuries you might have sustained as a

25   result of the incident?

1    A.          Yes.

2    Q.          What were you taking these pictures with?

3    A.          My phone.

4    Q.          It was your phone in particular?

5    A.          I don't believe it -- I don't -- I don't know

6    whose phone it was.

7    Q.          But these are photographs on somebody's phone?

8    A.          Yes.

9    Q.          You could turn the flash off if you wanted to?

10   A.          I believe so, yeah.

11   Q.          You could take as many photographs as you

12   wanted?

13   A.          On the phone, I believe so.

14   Q.          So if the flash didn't capture the -- it

15   didn't capture your injury correctly, why didn't you

16   take another picture?

17   A.          I don't -- I don't remember me physically

18   taking the pictures.  It could have been my mom or my

19   sister taking the pictures, but like we had already

20   indicated, I had a statistics exam to get to.  So we

21   took the pictures and that was it.  We were trying to

22   get me to my class.

23   Q.          Describe your conversation with Lieutenant

24   DeSousa?

25                MR. GEARINGER:  Objection; calls for a

 1    A.         Yes.

 2    Q.         Did you hear your sister asking to talk to a

 3    supervisor?

 4    A.         Yes.

 5    Q.         And in your mind as you were talking to

 6    Lieutenant DeSousa, was this the supervisor that other

 7    people had asked to talk to?

 8    A.         I believe so.  He said he was a lieutenant.

 9    Q.         And so as you talked to him, were you willing

10    to talk to him as the supervisor?

11    A.         Yes.  He said he was a lieutenant, so.

12    Q.         And you asked him questions during this

13    conversation?

14    A.         Yes.

15    Q.         Did you ask him all the questions that you

16    wanted to ask him?

17    A.         Yes.

18    Q.         Now, you might not have agreed with what his

19    answers were, but did he answer all of your questions?

20    A.         Yes.

21    Q.         And did he --

22    A.         I may have -- I'm sorry.

23               I may have had other questions, but like I

24    said, the situation took place longer than it should

25    have.  We didn't -- I didn't even -- we were at

1    Starbucks.  We were there.  Like I said, we were parked.

2    I didn't understand the reasoning for that situation

3    even to escalate like that.  And as long as we were in

4    that police car, I felt it was just way too long, and I

5    had an exam to get to.  So I was just trying to wrap it

6    up, make it quick and concise because I knew I had an

7    exam to get to.

8    Q.        Did Lieutenant DeSousa ask you if you had any

9    complaints about the officers?

10   A.        I don't recall.

11   Q.        Do you remember telling him about complaints

12   you had about the officers?

13   A.        I do remember indicating to him that I had

14   told Deputy Leeper that my handcuffs were too tight and

15   he didn't want to loosen them -- at this moment I don't

16   recall anything else.

17   Q.        After you said that to Lieutenant DeSousa, did

18   he in fact loosen your handcuffs?

19   A.        No.

20   Q.        He didn't take your handcuffs off?

21   A.        No.

22   Q.        Who took your handcuffs off?

23   A.        He took my handcuffs off after our

24   conversation.

25   Q.        So after you -- as soon as you finished the

1    conversation, he took your handcuffs off?

2    A.        Yes.  And the conversation was about -- me

3    giving an estimation, I would say about ten minutes.  So

4    while I was talking to him the duration of that time, I

5    was still in handcuffs.

6    Q.        Was Lieutenant DeSousa cordial with you?

7    A.        Yes.

8    Q.        Do you have any problems with how Lieutenant

9    DeSousa acted towards you?

10   A.        Yes.

11   Q.        What?

12   A.        He was cordial, but he was still trying to

13   make -- he was still -- his demeanor was still as if he

14   was trying to be accusatory by saying, well, you can --

15   I don't want to take you to jail or you guys could have

16   been arrested.  But it's as if he was trying to

17   insinuate that we had committed a crime.

18   Q.        Anything else?

19   A.        No.

20   Q.        Do you remember when Lieutenant DeSousa

21   arrived?

22   A.        I do not.

23   Q.        Do you know how long after you were placed in

24   the patrol car Lieutenant DeSousa talked to you?

25   A.        No.

1    Q.        After he took out -- off your handcuffs, what

2    did you do?

3    A.        I went to the car, retrieved my feminine

4    products, and went to the restroom.

5    Q.        And the deputies on scene let you do that?

6    A.        Yes.

7              Or the lieutenant let me do that.  Because

8    like I had indicated to him, and I indicated to Deputy

9    Leeper and everyone else, I had to use the restroom.

10   Q.        But none of the other deputies interfered with

11   you doing that after Lieutenant DeSousa took off your

12   handcuffs?

13   A.        No.  Because the Lieutenant gave me the

14   authority to use the restroom.

15   Q.        Did you observe Lieutenant DeSousa's

16   interactions with your mother or your sister?

17   A.        No.

18   Q.        Did you see anything else -- or do you

19   remember anything else of what any of the deputies and

20   Lieutenant DeSousa were doing after you got out of the

21   patrol car?

22   A.        The deputies?

23   Q.        Or Lieutenant DeSousa.  Any of them.

24   A.        I don't remember.  After I got out of the

25   restroom, I went back in the car and I started studying.

1    Q.          Did you get any medical treatment after the

2    incident as a result of injuries you sustained during

3    the incident?

4    A.          No.

5    Q.          And I think you told me before, but how long

6    did that redness on your wrist take to go away?

7    A.          I don't remember.

8    Q.          Other than that redness on your wrist, any

9    other physical injuries?

10   A.          No.

11   Q.          Any psychological treatment after the incident

12   for injuries sustained during the incident?

13   A.          No.

14   Q.          Any expenses from -- as a result of the

15   incident?

16   A.          No.

17   Q.          What physical injuries do you remember to

18   either your mother or your sister from the incident?

19   A.          To my recollection, I remember my mom -- both

20   my mom and my sister having redness around their wrists

21   as well, and then my sister having an abrasion on her

22   elbow because they had dragged her through the police

23   car.

24   Q.          Anything else?

25   A.          Not that I remember.

1  thing you had in your purse at the time of the incident?

2  A.        Can you provide me with a definition of a

3  "private item"?

4  Q.        Sure.

5           What I'm really looking for is something where

6  if someone looked at it, it would be embarrassing or

7  would, you know, tell them something that they shouldn't

8  know about you.  You know, the kind of details that you

9  would want to keep absolutely secret.

10  A.        I can't recall at this moment all the contents

11  that I had in my purse, but...

12  Q.        Tell me one item that you had on your -- you

13  had with you at the time of the incident anywhere in the

14  car -- whether that be in your purse or in the back seat

15  or in the trunk or anywhere else -- that you considered

16  personal or private?

17  A.        My feminine products.

18  Q.        Anything else?

19  A.        Not that I can remember.

20  Q.        And if the deputies were to see those feminine

21  products, is there any way they would know it was you --

22  your products?

23  A.        I don't know.

24  Q.        Did any of the deputies say they were going to

25  hurt you?

1   you he was trying to take your phone?

2   A.          He tried to grab my phone.

3   Q.          So did he actually get his hand around it?

4   A.          I don't remember.

5   Q.          Did he pull on it?

6   A.          I don't remember.

7           I had it in my -- I had the phone in my hand,

8   and he had -- around the time that he had twisted my

9   wrist, he had said "Do you want to give me your phone,

10  because you don't want it" -- "I don't want you to break

11  it," or something along those lines.  I don't recall.

12          But in that moment, he tried to reach for my

13  phone, and that's when I said "Don't touch my phone."

14  But I didn't physically do anything to prevent him from

15  taking my phone.

16  Q.          You said he tried to reach for your phone.

17  Did he actually grab your phone?

18  A.          He put his hands around it.

19  Q.          And then did he pull on it?

20  A.          I don't remember him pulling on it.  But when

21  he was -- when he was putting me in handcuffs, my head

22  was turned around, so I was able to view him putting his

23  hands around my phone.

24  Q.          Did he -- when he put his hand around your

25  phone, did he try to take it from you?

1    A.        That's what I thought he was trying to do.  If

2    he had his hand on my phone, that was the only reasoning

3    for that.

4    Q.        What stopped him from succeeding?  Did you

5    maintain your grip?

6    A.        Yeah.  He gripped my hand with the phone in my

7    hand.  The same grip as before.

8    Q.        So you wouldn't let him take it from you.

9             MR. GEARINGER:  Objection; argumentative.

10            Go ahead.

11            THE WITNESS:  It's not that I wouldn't let him

12   take it away from me; it's that I didn't understand his

13   reasoning to take my phone.

14            MR. CREECH:  Q.  If he had tried to pull

15   that phone away from you, would you have let him

16   take it?

17            MR. GEARINGER:  Object- -- hang on.

18            Objection; hypothetical, incomplete, vague and

19   ambiguous.

20            Go ahead.

21            THE WITNESS:  I don't know.  I mean, if he

22   would have stated why.  I didn't -- I didn't -- from my

23   recollection, I didn't understand his reasoning for

24   needing to have the possession of my phone.

25            MR. CREECH:  Q.  So what I want to know is

1           MR. GEARINGER:  Hey, Chris.  Just any time in

2     the next five minutes or so.  We've been going about an

3     hour.

4           MR. CREECH:  Yeah.  My objective is actually

5     to wrap this whole deposition up in the next five

6     minutes so we can take a break before her sister's

7     deposition this afternoon.

8           MR. GEARINGER:  Perfect.

9           MR. CREECH:  So I'm hoping in the next five,

10    ten minutes absolutely tops, I'm hoping to be done by

11    12:30.

12          MR. CREECH:  Q.  What did any deputy on

13    scene do -- well, sorry.  Let's strike that.

14          What did any deputy or Lieutenant DeSousa on

15    scene say that led you to believe the incident was

16    racially motivated?

17          MR. GEARINGER:  Sorry.  Could you read back

18    that question, please?

19          (Record read by the Reporter as follows:

20          "Q. What did any deputy or Lieutenant

21          DeSousa on scene say that led you to

22          believe the incident was racially

23          motivated?")

24          MR. GEARINGER:  Thank you.

25          THE WITNESS:  I don't recall them saying

1   anything that led me to believe it was racially

2   motivated.

3           MR. CREECH:  Q.  What did any of the

4   deputies or Lieutenant DeSousa do that led you to

5   believe the incident was racially motivated?

6   A.          Deputy Holland's demeanor and also Deputy

7   Leeper's acts of aggression led me to believe that this

8   was racially motivated.

9   Q.          What about Deputy Holland's demeanor led you

10  to believe that this was racially motivated as opposed

11  to any kind of other motivation?

12  A.          His demeanor was just -- it was very hostile.

13  He was interacting with us as if we were -- treating us

14  as if we were criminals.  As if we were suspects in a

15  crime where he just physically watched us commit a

16  crime.

17          He didn't treat us as -- I just felt like he

18  didn't treat us the way that we should have been

19  treated.  We were individuals who were not doing

20  anything, just sitting in a parking lot.

21  Q.          What about his demeanor led you to exclude

22  other possible motivations they may have had other than

23  race?  For instance, a mistaken belief that you had

24  committed a crime or were about to commit a crime?

25          MR. GEARINGER:  Objection; asked and answered.

1          You may go ahead.

2          THE WITNESS:  I'm sorry.  Can you rephrase the

3     question again?

4          MR. CREECH:  Q.  Sure.

5          I had asked you what about his demeanor led

6     you to believe it was racially motivated.  Now I'm

7     asking a different question, which is, what about his

8     demeanor led you to exclude other possible motivations

9     he might have had other than race?

10          For instance, a sincere but mistaken belief

11     that you were engaged in criminal activity or about to

12     be engaged in criminal activity?

13     A.          I don't know.

14     Q.          What about Deputy Leeper?  You said something

15     about how he was physically handling you.

16          What about that physical handling led you to

17     believe it was racially motivated?

18          MR. GEARINGER:  Objection; misstates prior

19     testimony.

20          You may go ahead.

21          THE WITNESS:  His acts of -- his acts of

22     aggression when he had arrived to the scene was treating

23     us as if we were criminals or -- he was just basically

24     interacting with us as if we were criminals or that they

25     had already convicted us of a crime or tried to convict

1   us of a crime.

2           Just like when I asked him -- once again, I'm

3   trying to ask him to explain himself -- what was the

4   reason for being detained.  He's, like, "I don't know,

5   but we're trying to find that out."  "We're trying to

6   figure that out."  As if you are already coming with the

7   notion that these are criminals and I have to interact

8   with them as if they are someone who is out here

9   committing crimes.  And that was not our character at

10  all, and that's not what we were doing.

11          MR. CREECH:  Q.  What led in -- what led

12  in you calling it Deputy Leeper's -- (Inaudible.)

13          (Reporter clarification.)

14  Q.      What in Deputy Leeper's -- what you called his

15  aggression.  What led you to exclude the possibility it

16  was motivated by something other than race?

17          For instance, a sincere but mistaken belief

18  that you were engaged in a crime, or potentially about

19  to be engaged in a crime based on what he had been

20  hearing over the radio from the other deputies?

21  A.      I'm sorry.  Can you still rephrase that

22  question?  I'm still not quite understanding what you're

23  trying to ask.

24  Q.      Sure.

25          Like the last question, I'm trying to ask how

1   you excluded other potential motivations for Deputy --

2   what you call Deputy Leeper's aggression.

3              How did you exclude other possibilities for

4   Deputy Leeper's aggression?

5   A.         I don't know.  I just had a gut feeling that a

6   lot of their -- a lot of their interactions with us was

7   racially motivated -- or at least Deputy Leeper was

8   racially motivated.

9   Q.         When you say "at least Deputy Leeper," are you

10  not as sure about Deputy Holland?

11  A.         I am sure about Deputy Holland.  Definitely.

12  Q.         Equally sure about both Deputy Holland and

13  Deputy Leeper?

14  A.         Yes.

15  Q.         What race did you believe that you needed to

16  be to not be treated differently by Deputy Holland and

17  Deputy Leeper?

18             MR. GEARINGER:  Objection -- hang on.

19             Objection; calls for speculation, incomplete

20  hypothetical.

21             You may go ahead.

22             THE WITNESS:  Caucasian.

23             MR. CREECH:  Q.  What did Deputy Holland

24  or Deputy Leeper do that led you to believe

25  Caucasian was the race you needed to be not to be

1    treated differently?

2              MR. GEARINGER:  Same objections.

3              THE WITNESS:  Just like I indicated, based off

4    my gut feeling.  The way that they interacted with us I

5    feel would never -- would not have transpired if we were

6    Caucasian women.

7              They treated us as if, like I said, we were

8    criminals.  They had a very hostile demeanor, were very

9    aggressive for no reason, and I felt that they were

10   interacting with us as if, like I say, we were criminals

11   and trying to depict us as a common stereotype that's

12   perceived of African Americans in society, which is

13   completely inaccurate to my character and who I am.

14             MR. CREECH:  Q.  Did you ever talk -- did

15   you or any of your other family members, to the best

16   of your knowledge, ever talk to any of the deputies

17   again after the incident, including, for instance,

18   Lieutenant DeSousa?

19             MR. GEARINGER:  Can you just clarify the time

20   when you say "after the incident"?  I'm a little

21   unclear.

22             MR. CREECH:  Q.  Any time after the

23   incident, to the best of your knowledge have you or

24   your family heard from any of the deputies,

25   including Lieutenant DeSousa?

1                    CERTIFICATE OF REPORTER

2

3          I, DEBRA J. SKAGGS, hereby certify that the

4    witness in the foregoing deposition was by me duly sworn

5    to tell the truth, the whole truth, and nothing but the

6    truth in the within-entitled cause;

7

8          That said deposition was taken in shorthand by

9    me, a Certified Shorthand Reporter of the State of

10   California, and was thereafter transcribed into

11   typewriting, and that the foregoing transcript

12   constitutes a full, true, and correct report of said

13   deposition and of the proceedings which took place;

14

15         That I am a disinterested person to the said

16   action.

17

18         IN WITNESS WHEREOF, I have hereunto set my

19   hand this   22nd    day of      July         , 2021.

20

21

22

23         DEBRA J. SKAGGS, CSR No. 7857

24

25               ---oOo---

**EXHIBIT L**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

AASYLEI LOGGERVALE; AASYLEI
HARDGE-LOGGERVALE; and AAOTTAE
LOGGERVALE,

      Plaintiffs



    vs.

COUNTY OF ALAMEDA; STEVEN HOLLAND;
MONICA POPE; KEITH LEEPER; ANTHONY
DESOUSA; CAMERON GALLOWAY; and
DOES 1 to 50, inclusive,

      Defendants.
_____/

Case No.
20-cv-04679-WHA


VIRTUAL DEPOSITION OF

AAOTTAE LOGGERVALE

Monday, June 28, 2021

(Via Zoom videoconference)


REPORTED BY:

DEBRA J. SKAGGS, CSR 7857

EMERICK AND FINCH
Certified Shorthand Reporters
18 Crow Canyon Court, Suite 125
San Ramon, California 94583
emerickfinch@emerickfinch.com
(925) 831-9029  (800) 331-9029

```
 1                    REMOTE APPEARANCES

 2    FOR THE PLAINTIFFS:

 3       GEARINGER LAW GROUP
         BY:  BRIAN GEARINGER, ATTORNEY AT LAW
 4       740 Fourth Street
         Santa Rosa, California 95404
 5       (415) 440-3102
         brian@gearingerlaw.com
 6
         LAW OFFICE OF JOSEPH S. MAY
 7       BY: JOSEPH S. MAY, ATTORNEY AT LAW
         1388 Sutter Street, Suite 810
 8       San Francisco, California 94109
         (415) 781-3333 Fax: (415) 707-6600
 9       joseph@josephmaylaw.com

10    FOR THE DEFENDANTS:

11       ORBACH HUFF + HENDERSON LLP
         BY: CHRISTOPHER R. CREECH, ATTORNEY AT LAW
12       6210 Stoneridge Mall Road, Suite 210
         Pleasanton, California 94588
13       (510) 999-7908 Fax (510) 999-7918
         ccreech@ohhlegal.com
14
      ALSO PRESENT:
15
          AASYLEI HARDGE-LOGGERVALE, Plaintiff
16
17                        --o0o--

18

19

20

21

22

23

24

25
```

Page 3

1                           INDEX

2    EXAMINATION BY:                                    PAGE

3         Mr. Creech                                      4

4         Mr. Gearinger                                 147

5         Mr. Creech (Further examination)              147

6                          --o0o--

7    DEFENDANTS' EXHIBITS:                              PAGE

8    (Previously marked.)

9    Exhibit 305 - 7 pages - Color Copies of photographs

10                depicting the injuries of the various

11                Plaintiffs                            112

12   (Marked for Identification.)

13   Exhibit 306 - 1 video - Video footage titled

14                "AAottae Patrol Car"                  118

15                         ---o0o---

16

17

18

19

20

21

22

23

24

25

1          MR. CREECH:  Q.  Okay.

2          So when I say "discovery responses," there are

3   multiple kinds of discovery responses or questions that

4   might be asked.  There are things called

5   "interrogatories," there are things called "requests for

6   production of documents," there are things called

7   "requests for admission."

8          Are each of those three kinds of written

9   discovery that I just mentioned -- do those terms sound

10  familiar to you?

11  A.        The word "interrogatory" sounds familiar to

12  me.

13  Q.        And have you assisted in preparing responses

14  to interrogatories in this case?

15  A.        I'm not sure if I prepared responses -- yes.

16  Yes.

17  Q.        Have you seen responses to interrogatories

18  filed in this case on your behalf?

19  A.        Yes.

20  Q.        And do you know if what is said in those

21  responses were true and accurate to the best of your

22  knowledge and understanding?

23  A.        Yes.

24  Q.        The body-worn camera footage that you saw for

25  Lieutenant -- sorry -- for Lieutenant DeSousa, Deputy

1   Leeper, and Deputy Pope.  Did you watch the whole videos

2   to the best of your knowledge?

3   A.          Yes.

4   Q.          Having watched those videos, watched the video

5   that your sister took, watched the video that you

6   took -- is there anything in those videos that watching

7   them again you thought was inaccurate?

8   A.          Can you rephrase the question, please?

9   Q.          Sure.

10          What I want to know is if going through those

11  videos when you watched them, did you ever have any

12  moment in watching them where you said "something in

13  this video isn't right; it's not showing what actually

14  happened"?

15  A.          Yes.

16  Q.          When was that?

17  A.          It was in Deputy Pope's video.  She didn't

18  show -- there was no reflection showing her holding her

19  flashlight pointing towards my sister.

20  Q.          Any other part in any of these videos that you

21  saw where you thought to yourself "something is

22  inaccurate about this video"?

23  A.          No.

24  Q.          So other than the flashlight issue.  To the

25  best of your knowledge, do these videos truly and

1    accurately reflect what you remember from the incident?

2    A.        Yes.

3    Q.        Do you remember anything during the incident

4    that's not shown in those videos?

5    A.        I'm not sure.

6    Q.        So you've watched through the videos

7    completely, and what I want to know is having watched

8    through them, did you have a moment where you thought to

9    yourself "I remember something, but I don't see the

10   moment in the video where that happened"?

11   A.        No.

12   Q.        So can you, sitting here today, think of a

13   single thing that you remember from the incident that

14   wasn't shown in those videos?

15   A.        No.

16   Q.        That part about the flashlight, which I know

17   you said wasn't shown in those videos.  Tell me about

18   that.  What do you remember about Deputy Pope and her

19   flashlight?

20   A.        I remember waking up to the sound of my mom

21   talking to Holland, and briefly turning around --

22   turning to the right and seeing that there were two

23   officers, and she had the flashlight on my sister.  And

24   then I focused back on Deputy Holland and what he was

25   trying to say.

1           What's your understanding of the ailment your

2    mother has that necessitates her having that placard?

3    A.         My mom has back spasms from time to time.

4    Q.         And how often do you see your mom have those

5    back spasms?

6    A.         I would say two times a week.  I'm not quite

7    sure.  It's at random when she has them.

8    Q.         How long would you say those spasms last?

9    A.         It could last between 30 minutes to an hour.

10   It depends on how severe it is.

11   Q.         At the time of the incident, did you see when

12   your mom put that placard up on the rearview mirror?

13   A.         No.

14   Q.         Do you remember during the incident seeing

15   that placard on the rearview mirror?

16   A.         Yes.

17   Q.         When was the first time you saw that placard

18   on the rearview mirror?

19   A.         When I woke up.

20   Q.         About how long after you woke up?

21   A.         Two minutes after I woke up, I believe.

22   Q.         Why were you looking at the placard?

23   A.         Because when Deputy Holland knocked at her

24   window, I looked in the rear to see the police car

25   behind us.  It was kind of parked.  And the placard was

1    visible right there as well.

2    Q.        And you thought to yourself this might have

3    something to do with the placard?

4    A.        Yes.

5    Q.        Hanging with that placard, was there also an

6    air freshener?

7    A.        I'm not sure.  I do not remember.

8    Q.        Do you know if your mother has a habit of

9    driving with air fresheners hanging from the rearview

10   mirror?

11   A.        From time to time.

12   Q.        Does she buy bulk quantities of air fresheners

13   to use in the car?

14   A.        What was that word you said?

15   Q.        "Bulk."  Does she buy bulk quantities that's

16   not just one at a time from a gas station, but, you

17   know, a pack of multiple.

18   A.        I wouldn't say "bulk."  Maybe a pack of -- a

19   pack that comes with four in it.

20   Q.        Yeah, and let me be more specific because what

21   I want to know is, is when she buys these air

22   fresheners, does she just buy one at a gas station and

23   puts it up, or does she buy some and keep them at home

24   and then use them thereafter?

25   A.        She buys some.

1    three of you talked about going to Dubai?

2    A.        I'm not quite sure.  I don't remember.

3    Q.        Did you end up going to Dubai?

4    A.        No.

5    Q.        But that wasn't because of the incident.

6    A.        What do you mean by that?

7    Q.        Did the fact that you didn't end up going to

8    Dubai have anything to do with the incident?

9    A.        No.

10   Q.        Why did you end up not going to Dubai?

11   A.        We just -- we didn't end up going.

12   Q.        There wasn't any reason why?

13   A.        No.

14   Q.        Since the incident have you ever talked about

15   going to Dubai?

16   A.        No.

17   Q.        The night of the incident, what do you

18   remember about actually -- sorry.

19             The night before the incident, what do you

20   actually remember about leaving from Nevada?

21   A.        I remember my mom gassing up, and when she got

22   on the freeway, that's when I fell asleep.  And my

23   sister was asleep.

24   Q.        By the time you fell asleep, was your sister

25   already asleep?

1   A.          Yeah.  She was really tired.

2   Q.          Do you remember about how long into your drive

3   your sister fell asleep?

4   A.          I remember her making sure her stuff was

5   already in the car and her going to the car first.  So

6   by the time I got in the car and my mom got in the car,

7   she was already sleeping.

8   Q.          You think the car hadn't even started and she

9   was already asleep?

10  A.          No.  I'm saying she could have asked for the

11  car keys and said, "I'm ready to go; all my stuff is

12  packed"; sat in the car and waited for us, and just went

13  straight to sleep.  Because by the time I got in the

14  car, my mom locked the house door, she was asleep.

15  Q.          So you guys hadn't actually started the car

16  yet and she was already asleep.

17  A.          No.

18  Q.          When you got in the car at your home in

19  Las Vegas, Nevada, was your sister already asleep?

20  A.          Yes.  From what I remember.

21  Q.          And when you got --

22  A.          I'm not quite sure if the car was started or

23  if it wasn't.  But I know when I came to the car, she

24  was asleep.

25  Q.          Got it.

1          So you don't know if the ignition was running

2  or if the car was on, but you know, when you got to the

3  car, your sister was asleep.

4  A.        Yes.

5  Q.        And at that time your mom wasn't driving the

6  car yet?

7  A.        No.  Not from what I remember.

8  Q.        At any point in time during the drive, did you

9  remember your sister waking up?

10  A.        I wouldn't know because I was asleep the

11  entire drive.

12  Q.        So from the time you fell asleep sometime

13  after -- right after you got on the free- -- I'm sorry.

14  Let me get that clear, so strike that.

15          Did you fall asleep before or after you got on

16  the freeway?

17  A.        After we got on the freeway.

18  Q.        Do you remember how long you had been on the

19  freeway before you fell asleep?

20  A.        Maybe five to ten minutes.

21  Q.        And from that five to ten minutes after you

22  got on the freeway, you were asleep until Castro Valley?

23  A.        Yes.

24  Q.        Were you sleeping soundly; that is, did you

25  wake up at all during that drive?

1   A.          No, I didn't wake up.

2   Q.          So after falling asleep five or ten minutes

3   after you got on the freeway in Nevada, when exactly did

4   you wake up in Castro Valley?

5   A.          I woke up to my mom talking to the officer.

6   So maybe two minutes after he knocked on the window.

7   Q.          And so you have heard your mother and your

8   sister talking about going to McDonald's.  You don't

9   remember any of that.

10  A.          No.

11  Q.          And similarly, your mother and your sister

12  talked about her potentially going into Starbucks.  You

13  don't remember any of that.

14  A.          No.

15  Q.          And your sister, as far as you know -- you

16  didn't ever see her awake in the car since the time you

17  guys got to driving.

18  A.          As far as what I know, no, because I was

19  asleep.

20  Q.          So she wasn't doing anything in the back seat

21  to the best of your knowledge?

22  A.          No.

23  Q.          And you similarly don't know what route you

24  took coming out to California?

25  A.          No.

1   A.        Yes.  Before the incident, yes; after the

2   incident, no.

3   Q.        Well, I'm confused.

4             Is stopping at that Starbucks part of your

5   usual route when you come into California before the

6   incident?

7   A.        Yes.

8   Q.        Why would you always stop at that Starbucks?

9   A.        Because we knew that Castro Valley had clean

10  restrooms, and that one -- that Starbucks is closest to

11  the freeway.

12  Q.        So whenever you would drive out to the Bay

13  Area, after going to the Buttonwillow Truck Stop, you

14  would stop at that Starbucks?

15  A.        Yes.

16  Q.        And after the incident, what do you do

17  instead?

18  A.        We just try to find a restroom wherever our

19  destination is.  Closest to the destination.

20  Q.        Would it be fair to describe the car you were

21  driving in at the time of the incident as a silver

22  four-door?

23  A.        Yes.

24  Q.        Would you describe it as a sedan?

25  A.        What's a sedan?

1    A.        Yes.

2    Q.        So it was well understood before the incident

3    that you guys weren't going to the bathroom there; it

4    was too disgusting?

5    A.        Yes.

6    Q.        Do you remember what was the last time that

7    you went to that bathroom where you decided this is too

8    disgusting; I don't ever want to come back here.

9    A.        I do not know specifically.  Maybe around the

10   time we were living out there.

11   Q.        If you guys had decided not to use that

12   McDonald's bathroom ever again, do you have any idea why

13   your mom would have stopped there to use the bathroom?

14   A.        For coffee.

15   Q.        When you woke up, or any time thereafter, did

16   you see your mother having a Star- -- a McDonald's

17   coffee in the car?

18   A.        No.  I'm not sure.

19   Q.        When you woke up, what position were you in?

20   A.        I believe my chair was back -- reclined

21   backwards -- and I was laying where my face was facing

22   towards the window.

23   Q.        Had you reclined your chair backwards before

24   you fell asleep in Nevada?

25   A.        Yes.

1   the feet area.

2   Q.        As far as what you brought with you on that

3   trip, as far as you know, it was a purse and your

4   luggage?

5   A.        Yes.

6   Q.        Did you have anything personal inside of that

7   purse?

8   A.        Yes.

9   Q.        What personal item did you have inside of that

10  purse?

11  A.        Everything.

12  Q.        What does "everything" mean?  What did you

13  have inside of that purse?

14  A.        Everything inside of my purse is personal.

15  Q.        What did you have inside of your purse at the

16  time of the incident?

17  A.        My wallet, pantiliners, lip gloss, Carmex,

18  possibly earrings.  That's from what I remember.  There

19  could have been other things.

20  Q.        Inside of your wallet, what did you have in

21  your wallet?

22  A.        I don't remember exactly.  I know I had my

23  school ID on me.

24  Q.        Did you have anything else you can remember

25  inside of your wallet?

1   Q.          Did you hear Deputy Holland say she needs to

2   get back in the car?

3   A.          I'm not sure.

4   Q.          Do you remember Deputy Holland saying anything

5   to the effect of your sister needs to get back in the

6   car?

7   A.          I'm not sure.  I kept hearing him say

8   "detained," and that's about it.

9   Q.          Do you remember him saying anything like, "If

10  you don't get back in the car, you're going in handcuffs

11  and in a police car"?

12  A.          I believe so after I got out of the car.

13  Q.          Before you got out of the car, do you remember

14  him saying anything like that?

15  A.          No.

16  Q.          Before you got out of the car, do you remember

17  him saying anything like, "Last chance.  Get back in the

18  car or you're going in handcuffs"?

19  A.          No.  Not that I remember.

20  Q.          Do you remember at the time of the incident,

21  anything that the other cars in the parking lot were

22  doing?

23  A.          No.

24  Q.          At the time of the incident, do you remember

25  how many cars there were in the parking lot?

```
 1    A.        Not at all.

 2    Q.        Other than the deputies and your family, do

 3    you remember anything that anyone else was doing in the

 4    parking lot?

 5    A.        No.

 6    Q.        Describe to me what your mother is physically

 7    doing inside of the car as she's talking to Deputy

 8    Holland?

 9    A.        I remember her getting on the phone to call

10    911.

11    Q.        Do you remember anything else?

12    A.        Her telling us to record.

13    Q.        Do you remember her telling you to call Anaka?

14    A.        Yes.

15    Q.        Did you call Anaka?

16    A.        No.

17    Q.        Did your sister call Anaka?

18    A.        No.  Not that I remember.

19    Q.        Do you remember seeing anyone try to call

20    Anaka?

21    A.        No.

22    Q.        Have you talked to Anaka since this incident?

23    A.        No.

24    Q.        Do you have any reason to believe anyone tried

25    to call Anaka during -- while they're in the car?
```

1   Q.          How did you dial 911 on your phone?

2   A.          I had my hands behind my back, but my phone

3   was able to communicate with my voice.  And I said,

4   "Hey, Siri, call 911."

5   Q.          Were you able to be connected with a

6   dispatcher that first time?

7   A.          Yes.

8   Q.          And tell me about that conversation with the

9   dispatcher.  What did you two say?

10  A.          I remember -- I'm not quite sure I'm saying

11  everything, but I do remember her telling me to calm

12  down and breathe, because I was overwhelmed with tears

13  and my breathing was very fast.  She told me to calm

14  down and breathe and tell her where I was, and

15  everything.

16  Q.          And after that, what did you two talk about?

17  A.          She -- I'm not sure if she said she was

18  sending someone or if she said help was on the way.  I'm

19  not sure.  I just know then the phone was off.

20  Q.          When you say "the phone was off," did you hang

21  up?

22  A.          No, I couldn't hang up.

23  Q.          Did she hang up on you?

24  A.          Yes.

25  Q.          Did she say why she was hanging up on you?

1    they had their vest on.

2    Q.        So you didn't see any difference between the

3    builds of the officers?

4    A.        The ones that were around my car, no.

5    Q.        What ethnicity was this officer?

6    A.        Caucasian.

7    Q.        Which windows rolled up?

8    A.        Could you repeat the question?

9    Q.        Which windows rolled up?

10   A.        The back left, the back right, and I believe

11   his window.  The driver's window.

12   Q.        What about the front passenger window?

13   A.        I'm not sure if that one was already up.

14   Q.        So that second time that you called 911, how

15   did you call 911?

16   A.        I communicated my voice to my phone.

17   Q.        Did you get connected to a dispatcher?

18   A.        Yes.

19   Q.        Was that dispatcher a man or a woman?

20   A.        A woman.

21   Q.        Was it the same dispatcher as the first time?

22   A.        I'm not sure.  It possibly could have been.

23   Q.        During that conversation with that dispatcher,

24   did you tell them "I called previously"?

25   A.        Yes.

1    Q.         And did they tell you "Yes, I know"?

2    A.         Yes.

3    Q.         What else do you remember about that

4    conversation with the dispatcher?

5    A.         I'm not sure.

6    Q.         Do you remember anything that you told them?

7    A.         I remember telling her that they rolled the

8    windows up on me and it was getting hot in the car.

9    Q.         Anything else?

10   A.         My handcuffs were too tight.

11   Q.         You told the dispatcher that?

12   A.         Yes.

13   Q.         What else did you tell the dispatcher?

14   A.         I'm not sure.  That's what I remember.

15   Q.         What did the dispatcher say back to you?

16   A.         I told you that I called two to three times;

17   therefore, I'm not quite sure if during that second call

18   my phone got snatched and I couldn't finish talking.

19              So she never hung up, we were still on the

20   phone, and she told me she would stay on the line.

21   Q.         When you told her that they just rolled up the

22   windows, what did she say?

23   A.         She told me to remain calm.

24   Q.         And you called her right after they rolled up

25   the windows; is that right?

```
 1              He said "The captain is here.  I just need

 2    your name" -- I don't remember what he said, but he said

 3    "The captain is here."  And then he opened the door,

 4    like as if I could get out and talk to the captain, and

 5    snatched my phone and closed it.

 6    Q.        When you say "snatched your phone," describe

 7    that for me.

 8    A.        Meaning I was -- my head was bent down in my

 9    lap, trying to talk as closely as I could to the phone

10    so the responder could hear me.  And I looked up,

11    because he said the captain was coming.  So I thought of

12    that as hope.  Like, the situation would be over.

13              And I put my head up a little bit, and he

14    opened the door and grabbed my phone, and my hands were

15    behind my back.

16    Q.        So your hands were behind your back with your

17    phone?

18    A.        No.  My phone was on my lap.

19    Q.        But your hands were behind your back?

20    A.        Yes.

21    Q.        How did you put your phone on your lap with

22    your hands behind your back?

23    A.        I somehow maneuvered to do it.

24    Q.        How did you maneuver to do it?

25    A.        I -- my hands were behind my back and my phone
```

1   was behind my back as well, and I remember turning my

2   body to the side and just trying to use my leg to put my

3   phone between my thighs so I could bring it up to say

4   "Hey, Siri."  And I remember putting it between my

5   thighs and using my mouth to place it on my lap.

6   Q.         When he grabbed your phone, he didn't actually

7   have to pull it out of your hands; right?

8   A.         No.

9   Q.         He just took it off of your lap.

10  A.         Yes.

11  Q.         Did he damage your phone?

12  A.         Not that I remember.

13  Q.         How did you know it was Deputy Galloway?

14  A.         His name tag.  I remember him addressing --

15  I'm not sure if he addressed his name out or me glancing

16  at his badge saying "Galloway."

17  Q.         So if he didn't say -- so if he didn't say at

18  that window "Hi, my name is Deputy Galloway," then you

19  would have had to have seen his badge?

20  A.         Yes.

21  Q.         Do you remember knowing -- that moment he took

22  your phone, you knew it was Deputy Galloway?

23  A.         Yes.

24  Q.         How did you see his badge if you were looking

25  down at your phone in your lap?

1    A.         Because when he was outside and he told me --

2    and he lied to me and said the captain was there, I

3    looked up out the window, like, who is talking to me.  I

4    remember looking up and seeing his badge.

5    Q.         And in that moment you looked at his badge?

6    A.         (Nods head.)

7    Q.         We need a yes-or-no answer.

8    A.         Yes.

9    Q.         And this happens to everyone and --

10   A.         Sorry.

11   Q.         No.  I called you the wrong name.  My mistake

12   is bigger.

13              What, if anything, did you hear the deputy

14   saying before they took your phone?  Before Deputy

15   Galloway took your phone?

16              MR. GEARINGER:  Objection; asked and answered.

17              Go ahead.

18              THE WITNESS:  I remember Deputy Pope saying

19   "She has her phone" and calling for backup.  And then

20   Deputy Galloway, I believe had his notepad out, and told

21   me that he needed something from me.  My name,

22   something, to write down.  And he opened the door and

23   grabbed my phone.

24              MR. CREECH:  Q.  At the end of the

25   incident, did they give you your phone back?

1    A.        They didn't hand it to me.

2    Q.        How did you get your phone back?

3    A.        It was placed on top of the car, I believe.

4    Q.        Was it on top of the car when you got back to

5    the car?

6    A.        Yes.

7    Q.        Where was it on top of the car?

8    A.        On top of the hood.

9    Q.        The front hood?

10   A.        I mean the roof.

11   Q.        The roof.  Okay.

12             Which door on top of the roof?

13   A.        I would say more towards behind the driver's

14   seat.

15   Q.        So take me to when you got out of your car.

16   Why did you get out of your car?

17   A.        To record.

18   Q.        Why couldn't you record from inside of the

19   car?

20   A.        Because I believe Deputy Pope started to get

21   more verbal with my sister, so I wanted to see what was

22   going on outside, and I got out to record that

23   altercation.

24   Q.        So did you start recording what Deputy Pope

25   was doing with your sister when you got out?

1    out of the car, you heard Deputy Holland at least once

2    say to your sister she needs to get back in the car; is

3    that right?

4    A.      I stated that I heard him say "detained."  I'm

5    not sure if he said to get in the car.

6    Q.      Was it your understanding by the time you left

7    the car, that he wanted your sister to get back in the

8    car?

9    A.      Yes.

10   Q.      So you understood that he wanted your sister

11   back in the car.  Why did you also get out of the car?

12   A.      Because I was just recording.  I wasn't

13   committing a crime or doing anything wrong.  I was just

14   recording.  So I was confused as to why I had to get

15   back in the car as well, so I stayed outside.

16   Q.      But if Deputy Holland was trying to get people

17   back into the car, why weren't you following his

18   direction to get back in the car?

19   A.      Because I didn't do anything.

20   Q.      Even if you didn't do anything, why didn't you

21   voluntarily get back in the car when he asked you to?

22   A.      I didn't do anything.  I didn't commit a

23   crime; I didn't break into cars -- what he said.  I

24   didn't do anything.  So I stuck up for myself and used

25   my phone as a recording.

1    Q.        As your sister got out of the car, did you

2    feel the tension of the officers increase?

3              MR. GEARINGER:  Objection; calls for

4    speculation.

5              Go ahead.

6              THE WITNESS:  Could you repeat the question?

7              MR. CREECH:  Q.  Sure.

8              As you got out of the car -- sorry.

9              As your sister got out of the car, did you

10   feel the tension of the officers increase?

11   A.        No.

12   Q.        When you got out of the car, did you feel the

13   tension of the officers increase?

14   A.        Yes.

15   Q.        As your sister remained out of the car before

16   you got out of the car, did you feel the tension of the

17   officers increasing?

18   A.        Could you repeat the question?

19   Q.        Sure.

20             Before you got out of the car and while your

21   sister was already out of the car, did you feel the

22   tension of the officers increasing?

23   A.        No.

24   Q.        So if you felt the officers' tension

25   increasing when you got out of the car, why didn't you

1    Q.        Where were you standing, then, when you got

2    out of the car?

3    A.        In front of the passenger side door.

4    Q.        Did you move around at all?

5    A.        I rotated --

6              MR. GEARINGER:  Objection --

7              THE WITNESS:  -- my body.

8              MR. GEARINGER:  -- belated objection as to

9    vague.

10             Go ahead.

11             MR. CREECH:  Q.  While you were at -- go

12   ahead.

13   A.        I rotated my body, but I stood still against

14   the door.

15   Q.        While you were outside of the car, did you

16   raise your voice?

17   A.        Yes.

18   Q.        Were you talking louder than Deputy Pope?

19   A.        Possibly.  What do you mean by "louder"?

20   Q.        I mean in comparison to the level of voice

21   that Deputy Pope was talking at, were you talking in a

22   louder voice at the time that you were out of the car?

23   A.        I'm not sure.  Possibly.  Because my emotions

24   were very heightened and I was very frustrated, so I

25   possibly could have.  I'm not sure.

1           MR. GEARINGER:  Thank you.  I'm dying to use

2    the restroom.  Thank you.

3           We'll come back at 4:15, if that's okay?

4           MR. CREECH:  That's okay with me.

5           (Recess: 4:04 P.M. to 4:16 P.M.)

6           MR. CREECH:  Q.  Ms. Loggervale, during

7    the breaks we have taken in the deposition, have you

8    talked to anyone other than your attorney?

9    A.       No.

10   Q.       Through the deposition, have you sent any text

11   messages, emails, or any other communication to anyone

12   other than your attorney?

13   A.       No.

14   Q.       Have you received any communications, emails,

15   text messages, or anything else from anyone other than

16   your attorney during the deposition?

17   A.       No.

18   Q.       When we left off we were talking about you

19   being handcuffed.

20           At any point in time after Deputy Pope took

21   your left hand to the point where you were actually

22   handcuffed, did you ever feel Deputy Pope pulling for

23   your arm to put it behind your back?

24   A.       I don't remember.

25   Q.       Do you remember at any point in time trying to

Page 102

1   keep your arms in front of you as opposed to allowing

2   them to be taken behind your back?

3   A.          Possibly for a short period of time.

4   Q.          What do you mean "possibly for a short period

5   of time"?

6   A.          Maybe for 20 seconds when I asked her what

7   have I -- what crime did I commit?  What am I being

8   detained for?  And she could have had her hand on my

9   arm.

10  Q.          So you think there was a period of time during

11  the incident where you understood Deputy Pope was trying

12  to put your arm behind your back for handcuffing, but

13  you kept it in front of you as you asked questions?

14  A.          As I said earlier, I'm not sure what she

15  specifically was trying to do.

16  Q.          But you felt her trying to pull your arm

17  behind your back and you kept it in front of you?

18  A.          I'm not sure because I don't know -- it wasn't

19  forceful.  Like, meaning she didn't -- I wasn't -- she

20  just placed her arm -- her hand on my arm.

21  Q.          Describe to me anything else that Deputy Pope

22  did, other than taking your left hand, prior to Deputy

23  Leeper coming over to handcuff you?

24  A.          She put her -- explain things she did with

25  force or verbally?

1    Q.        Let's start with force.  What did she

2    physically do?

3    A.        She would put her hand -- her palm against my

4    back trying to, like, keep me towards the car, and she

5    would put her fists in my back too.

6    Q.        Anything else?

7    A.        And then she put her hand on my arm and then

8    twisted my arm back.  The left arm.

9    Q.        And was that when Deputy Leeper came back to

10   handcuff you?

11   A.        Yes.  I believe so.

12   Q.        So she took your left hand and put it behind

13   your back for handcuffing.  Did Deputy Leeper take your

14   right hand?

15   A.        I believe so.  It could have been vice versa.

16   All I remember is that I was -- one of the two took my

17   hand, and I was still able to record at the same time.

18   Q.        What do you remember physically happening as

19   you were handcuffed?

20   A.        Leading up to me going to the patrol car?

21   Q.        No.  I'm talking about while you're still at

22   your car and were handcuffed, tell me how physically you

23   became handcuffed, to the best of your memory.

24   A.        I remember Leeper walking around and

25   forcefully grabbing my arm because I was still recording

1           (Interruption in the deposition by

2           Mr. Gearinger.)

3           MR. CREECH:  Q.  What his actions made you

4     feel was that he was trying to shut you up?

5     A.        Yes.

6     Q.        You don't actually know what he was thinking

7     when he tried to handcuff you.

8     A.        No.

9     Q.        So whether or not he was actually trying to

10    shut you up, you have no idea on that.

11    A.        No.

12    Q.        You said that he used -- he was forceful in

13    putting your hand behind your back.  I still don't

14    understand what you mean by "forceful."

15    A.        He just grabbed me.

16    Q.        Did he do anything other than take that hand

17    and put it behind your back?

18    A.        He twisted it roughly.

19    Q.        What does "roughly" mean?

20    A.        For me, he was -- like, he manhandled me.  His

21    arm -- his hand was more, like, stern, rough -- I don't

22    know how to explain it, but it did hurt.

23    Q.        Have you ever been handcuffed before?

24    A.        No.

25    Q.        Do you have any idea if you were handcuffed in

1   any way other than regular handcuffing?

2   A.        Could you repeat the question?

3             MR. GEARINGER:  Objection; vague.

4             MR. CREECH:  Q.  Do you have any reason to

5   believe you were handcuffed in some way other than a

6   regular handcuffing?

7             MR. GEARINGER:  Same objection.

8             THE WITNESS:  No.  I just believe from the way

9   that I felt, it wasn't right.

10            MR. CREECH:  Q.  When Deputy Leeper tried

11  to put your hand behind your back for handcuffing,

12  did you simply try to keep your hands in front of

13  you initially?

14  A.        I'm not sure, but I remember telling him -- I

15  believe I told him to stop.  I'm not sure.

16  Q.        Do you remember saying something to the effect

17  of "You're not going to detain me"?

18  A.        Yes.

19  Q.        And that was before you kept your hands in

20  front of you?

21  A.        I believe so.

22  Q.        What if anything did you see of your mother

23  being handcuffed?

24  A.        I'm not sure.

25  Q.        What if anything did you see of your mother

1   being put in a patrol car?

2   A.          I'm not sure.

3   Q.          What if anything did you see of your sister

4   being handcuffed?

5   A.          I'm not quite sure.

6   Q.          What if anything did you see of your sister

7   being put in a patrol car?

8   A.          I'm not sure.

9   Q.          Do you remember anything about your sister or

10  your mother being handcuffed or put in a patrol car?

11          MR. GEARINGER:  Objection; compound.

12          Go ahead.

13          THE WITNESS:  Not from what I can recall.

14          MR. CREECH:  Q.  Do you remember, when

15  your sister was being handcuffed, trying to stop

16  Deputy Leeper from handcuffing her?

17  A.          I remember her saying something on the words

18  of "Don't touch my phone."

19  Q.          And after she said that, do you remember

20  reaching over to where Deputy Leeper was handcuffing

21  her?

22  A.          Yes.

23  Q.          What did you do when you reached over there?

24  A.          I put my hand on her shoulder to calm her

25  down.

1    Q.        What happened after you did that?

2    A.        I believe Deputy Pope told me to put my hand

3    down.  I'm not quite sure.

4    Q.        In that moment when she said whatever she said

5    to the effect of "put your hand down," was that also the

6    moment where she grabbed your left wrist for the first

7    time?

8    A.        I believe so.

9    Q.        What do you remember of being -- after you

10   were handcuffed, being led over to the patrol car?

11   A.        I remember either Pope or Leeper or both --

12   both of the two escorting me over there and me asking

13   them "Why am I" -- "What crime did I commit?"  "Why am I

14   being detained?"

15   Q.        Do you remember them opening the door and

16   trying to get you to sit in the patrol car?

17   A.        Yes.

18   Q.        When they opened the door and tried to get you

19   to sit in the patrol car, did you keep your feet out so

20   they couldn't close the door?

21   A.        I wouldn't say I kept my feet out so they

22   couldn't close the door; I would say I sat positioned

23   outwards, and I sat in the chair in the back of the car.

24   Q.        When you say "positioned outwards."  Were your

25   feet hanging down below the bottom deck of the car and

1    in between the side of the car and the door so it

2    couldn't close?

3    A.          Yes.

4    Q.          Did you realize that with your feet in that

5    position, the door couldn't close?

6    A.          Yes.

7    Q.          And did the deputies several times tell you to

8    put your feet in the car so they could close the door?

9    A.          I believe so.

10   Q.          And after they said several times for you to

11   put your feet in the door so they could close it, did

12   you ever put your feet voluntarily inside of the car so

13   they could close it?

14   A.          No.

15   Q.          Why not?

16   A.          Because there was no reason for me to be in

17   the back of a patrol car or handcuffed at all.  So I

18   asked them please tell me what I have done to be in this

19   situation.

20   Q.          So in keeping your feet outside of the car,

21   was it your intention to make sure they couldn't close

22   the door to the car and thereby putting you in the back

23   of a patrol car?

24              MR. GEARINGER:  Objection; asked and answered.

25              Go ahead.

1  Q.        Is it fair to say at the beginning of that

2  clip, that you keep pushing your feet outside of the

3  vehicle as the officers are trying to put your feet into

4  the vehicle?

5  A.        You could possibly say that.

6  Q.        I'm not asking possibly; I'm asking for what

7  happened.

8            Before they pulled you -- before Deputy Leeper

9  pulled you into the car, did they first try to put your

10 feet -- to grab your feet and put them into the car?

11 A.        Yes.

12 Q.        And when they did that, when they tried to

13 lift your feet and put them into the car, did you push

14 your feet back outside of the car?

15 A.        Yes.

16 Q.        And when you say in that clip "you're hurting

17 me" as they were pushing your feet into the car.  Is

18 what you're talking about them hurting you, the physical

19 act of pushing your feet into the car?

20 A.        I'm talking about Leeper's once again

21 manhandling me in his stern, heavy hand with his grip.

22 Q.        And you're talking about his grip on your leg?

23 A.        Yes.  Aggressive.

24 Q.        And you're talking about his grip on your leg

25 as you're trying -- as he was trying to push your feet

1    back into the car?

2    A.        Yes.

3    Q.        And you're talking about his grip as you were

4    trying to push your feet back out of the car?

5    A.        Yes.

6    Q.        Did you hear the part, after that exchange of

7    him trying to push you in -- your leg into the car and

8    you pushing it back, and you saying "Do you want me to

9    try to do something?"  Or words to that effect?

10   A.        Yes.

11   Q.        When you said that, what did you mean?

12   A.        I meant he was being so aggressive towards me,

13   he was trying to provoke me into doing something back

14   towards him.  But I didn't do anything back towards him.

15   Q.        So what you were saying was "Are you trying to

16   make me do violence towards you"?

17   A.        I didn't say that verbatimly [sic]; I said,

18   "Do you want me to do something to you?"  Like, what is

19   it you want to get out of me for being so aggressive.

20   Q.        Right.  And what I'm trying to understand is

21   what that something is.  When you were saying

22   "something," what was the something you meant?

23             MR. GEARINGER:  Objection; asked and answered.

24             Go ahead.

25             THE WITNESS:  I'm not sure.  Possibly be as

1    violent as -- aggressive as he was being.

2            MR. CREECH:  Q.  That part where Deputy

3    Leeper pulled you into the car.  Can you describe

4    that for me?

5    A.        I remember him walking to the other side, and

6    my feet still sitting outside the car, and him grabbing

7    my right arm and sliding me against the back of the

8    seat, and then closing the door on me.

9    Q.        So he took hold of your right arm to pull you

10   across the seat?

11   A.        Yes.

12   Q.        And you weren't bodily letting yourself be

13   moved across the seat?  He had to pull you?

14   A.        Yes.

15            MR. GEARINGER:  Objection; vague.

16            Go ahead.

17            MR. CREECH:  Q.  And the physical act of

18   him pulling on that arm.  You actually slid along

19   the seat?

20   A.        Yes.

21   Q.        Anything else you remember physically about

22   that move of pulling you along the seat?

23   A.        My left elbow was against the back seat.  And

24   when he grabbed my right arm to slide me through, it --

25   it -- it was, like, a skid mark -- a skid mark, I would

1    say, that it left on my elbow.  And it was bruised.

2    Q.      Have you ever gotten what I call a "rug burn"?

3            MR. GEARINGER:  Objection; vague.

4            Go ahead.

5            THE WITNESS:  Yes.

6            MR. CREECH:  Q.  Is that what you got on

7    your left elbow?

8    A.       I'm not sure, because it wasn't a rug burn

9    specifically.  It was, I guess, a car burn.  I've never

10   experienced that.

11   Q.       Right.  And what I mean by "rug burn" is a

12   colloquial term, just meaning a friction burn of any

13   kind.  Where you pull your skin along something and you

14   get an abrasion.

15           Is that what you got to your elbow as far as

16   you can tell?

17   A.       I believe so.

18   Q.       Anything else you can remember about that

19   moment of being pulled into a car?

20   A.       I remember hearing Pope say "Got her."

21   Q.       Anything else?

22   A.       No.

23   Q.       I'm going to show you what's been previously

24   marked as Exhibit 305.

25                       (Defendants' Exhibit 305

1   photos?

2   A.        Yes.

3   Q.        Do you recognize those photos?

4   A.        Yes.

5   Q.        Now I have been told previously that after the

6   incident and before you go to your sister's class, that

7   you all stopped in the car and took photographs of your

8   injuries.

9             Is that what these photographs are?

10  A.        Yes.

11  Q.        Do you remember stopping in the car to take

12  photographs of your injuries after the incident?

13  A.        I don't remember.

14  Q.        Do you remember who -- what camera you used to

15  take these photographs?

16  A.        I'm not sure.  It could have been mine or my

17  sister's.

18  Q.        I'm going to start from this last page, 7, and

19  I'm going to ask you, for each one, if you recognize

20  whose -- who we're seeing in the photograph.

21            For this page 7, do you recognize whose hand

22  this is?

23  A.        Yes.

24  Q.        Whose hand is it?

25  A.        Mine.

1    that first line that you showed me.

2    Q.        Got it.

3              And that's what you're talking about?

4    A.        Yes.

5    Q.        And you're saying those were darker?

6    A.        Yes.

7    Q.        How much darker?

8    A.        A little bit more red.

9    Q.        This photograph number 5.  Do you recognize

10   who's in this photograph?

11   A.        Yes.

12   Q.        Who is that?

13   A.        My mom.

14   Q.        And what is this a photograph of?

15   A.        Her wrists.

16   Q.        Does this photograph truly and accurately

17   depict your mother's wrist as you remember it after the

18   incident?

19   A.        I believe so.

20   Q.        And go up to photograph 4.  Do you recognize

21   who is in this photograph?

22   A.        Yes.

23   Q.        Who is that?

24   A.        I believe it's AAsylei.

25   Q.        Does this photograph truly and accurately

1    depict -- I guess this would be AAsylei's right hand --

2    right wrist after the incident?

3    A.          I believe so.

4    Q.          And this photograph 3.  Do you recognize whose

5    hand this is?

6    A.          Yes.

7    Q.          Whose hand is that?

8    A.          Mine.

9    Q.          Does this photograph truly and accurately

10   depict your left hand after the incident?

11   A.          Yes.

12   Q.          What were you trying to depict in this

13   photograph?

14   A.          The -- the front-of-my-wrist redness.

15   Q.          And this photograph 2.  Do you recognize

16   what's in this photograph?

17   A.          Yes.

18   Q.          Is this that abrasion you were talking about

19   to your left elbow?

20   A.          Yes.

21   Q.          Does this photograph truly and accurately

22   depict that abrasion?

23   A.          Yes.

24   Q.          And finally, this photograph number 1.  Do you

25   recognize what's in this photograph?

Page 127

1   A.          Sweating, crying -- that's about it.

2   Q.          What's the next thing that you remember any

3   officer doing during the incident?

4   A.          I remember some officers walking by the patrol

5   car just to look.

6   Q.          What else do you remember -- what's the next

7   thing that you remember any officer doing during the

8   incident?

9   A.          I'm not sure.  I remember looking out and

10  seeing them all towards our car and just forgetting

11  about me there and waiting for the lieutenant.

12  Q.          When you say "waiting for the lieutenant."

13  Before you were put in the patrol car, did you ask for a

14  supervisor to come and talk to you?

15  A.          Yes.

16  Q.          And after your patrol -- you were put in the

17  patrol car, did any officer interact with you until

18  Lieutenant DeSousa came and talked to you?  Sorry.  I

19  misspoke.  Let me try that again.

20              After Deputy Galloway took your phone, did any

21  officer interact with you until Lieutenant DeSousa came

22  and talked to you?

23  A.          No.  Not from what I remember.

24              (Mr. May signed off the Zoom call.)

25  Q.          Could you tell what any of the deputies on the

1  Q.        Right.  I understand what you're saying you

2  said.  What I want to understand is when you told her

3  where your ID was, you understood the reason why she was

4  asking was she was going to go get your ID.  I'm not

5  saying you told her she could; I'm just saying you

6  understood that what she was going to do with that

7  information was go get your ID.

8  A.        No.  I made an assumption.

9  Q.        Describe your conversation with Lieutenant

10 DeSousa to me?

11           MR. GEARINGER:  Objection; overbroad.

12           Go ahead.

13           THE WITNESS:  It was not the same as the other

14 officers.

15           MR. CREECH:  Q.  What was different?

16 A.        He came more to try to understand the

17 situation, so I would say a little understanding.

18 Q.        Did he listen to what you had to say?

19 A.        Yes.  He let me talk.

20 Q.        Did he listen to you even as you complained

21 about the officers?

22           MR. GEARINGER:  Objection; assumes facts not

23 in evidence.

24           Go ahead.

25           THE WITNESS:  What do you mean by "listen"?

1  As far as agreed with me?  Or just...

2           MR. CREECH:  Q.  No.  I'm just asking

3  while you talked to Lieutenant DeSousa, did you

4  complain about the deputies on scene?

5  A.       I believe so.  I'm not sure.

6  Q.       Did he listen to you as you said those things?

7  A.       Yes and no.

8  Q.       What do you mean by "yes and no"?

9  A.       Meaning yes, he listened to me, but as well he

10 was trying to tell me things to justify why they did

11 what they did.

12 Q.       Was he cordial?

13 A.       What do you mean by "cordial"?

14 Q.       I mean respectful in his tone.

15 A.       Yes.

16 Q.       Was he professional?

17 A.       Yes.

18 Q.       And what I want to know is he might have

19 disagreed with you, maybe might have even thought some

20 of the things the deputies did was right.  But in your

21 opinion, do you think that he heard out what you were

22 saying?

23 A.       What do you mean by heard out what I was

24 saying?

25 Q.       I mean heard what you said, understood what

1    A.        That would be all.

2    Q.        After he finished talking to you, did he take

3    your handcuffs off?

4    A.        Yes.

5    Q.        The way the conversation ended, was it you

6    telling him you didn't have anything else to talk to him

7    about?

8    A.        Yes.  And he giving -- he telling me that he

9    gave my mother his card, and we can reach out and talk

10   to him.  And I told him to please review the body

11   cameras.

12   Q.        And after he unhandcuffed you, did he let you

13   walk around outside of the police car?

14   A.        Yes.

15   Q.        After Lieutenant DeSousa unhandcuffed you and

16   stopped talking to you, did any other deputy do anything

17   towards you?

18   A.        No.

19   Q.        What did you do after you were unhandcuffed

20   and you were able to walk around?

21   A.        I believe I got my jacket -- I'm not sure --

22   and I grabbed -- I believe I asked DeSousa for my phone,

23   because they took my phone.  And he told me -- I believe

24   he asked someone, one of the officers, where they put

25   it.  And I went to the top of the roof, and I grabbed my

1    phone, and then I believe I grabbed some tissue to wipe

2    my face -- I'm not sure -- and then I took a picture of,

3    I believe, the officers left on the scene.

4    Q.        Do you still have that picture?

5    A.        I do not.

6    Q.        Did you delete that picture?

7    A.        Yes.

8    Q.        When did you delete it?

9    A.        Immediately after.

10   Q.        Why did you delete it?

11   A.        It was blurry.  My hands were so shaky from

12   the whole experience.

13   Q.        What happened next after you took that

14   photograph?

15   A.        I went back in the car.

16   Q.        By the time you went over and got your phone,

17   had your sister and your mother also been released?

18   A.        I'm not sure.  I believe he walked and they

19   were in the direction of one of the cars.  But when I

20   went to the car, no one was there.

21   Q.        After you were at the car, did your sister

22   come back to the car?

23   A.        I believe so, from using the restroom.

24   Q.        And your understanding was that she had been

25   using the restroom at Starbucks?

1    A.        Yes.  Because he told me that he'd already let

2    everyone else go.

3    Q.        Other than that abrasion to your left elbow

4    and then the redness to your wrists -- do you have any

5    other physical injuries as a result of the incident?

6    A.        No.

7    Q.        Did you seek any medical treatment for those

8    injuries?

9    A.        No.

10   Q.        Have you sought out any psychological

11   treatment?

12   A.        No.

13   Q.        Have you incurred any expenses as a result of

14   the incident?

15   A.        No.

16   Q.        Have you lost any wages?

17   A.        No.

18   Q.        Did any of the deputies say something to you

19   that told you they were going to hurt you?

20   A.        What do you mean?  Could you please rephrase

21   the question?

22   Q.        Sure.

23             Was there anything that any of the deputies

24   said during the incident that led you to believe they

25   were going to hurt you?

Page 139

1              MR. GEARINGER:  Objection; compound.

2              Go ahead.

3              THE WITNESS:  I'm not sure.

4              MR. CREECH:  Q.  Is there anything that

5    any of the deputies on scene did that led you to

6    believe they were going to hurt you or any of your

7    family members?

8              MR. GEARINGER:  Same objection.

9              THE WITNESS:  I'm not sure.

10             MR. CREECH:  Q.  During the incident, was

11   there anything that you wanted to do that the

12   deputies stopped you from doing?

13   A.        Record and call for help.

14   Q.        The recording.  How did the deputies stop you

15   from recording?

16   A.        Because my video was recording up until Leeper

17   grabbed me, meaning I'm not sure how the video stopped.

18   I'm not accusing Leeper.  It could have possibly been

19   me; I'm not sure.  And I couldn't use my hands to

20   restart a video because they were already detained by

21   that time.

22   Q.        Was there some way -- you were still holding

23   on to your phone at that time; is that right?

24   A.        Yes.

25   Q.        Is there some way for Deputy Leeper to put

1    Q.        Anything else that you were trying to do

2    during the incident -- I'm sorry.  You said call on the

3    phone.  And what you're talking about is when Deputy

4    Galloway took your phone from you while you were calling

5    911; is that right?

6    A.        Yes.

7    Q.        What if anything did the deputies do that led

8    you to believe that they were acting from racial

9    motivation?

10   A.        Everything.

11   Q.        Tell me one thing that Deputy Holland did that

12   led you to believe that he was acting from racial

13   motivation?

14   A.        Everything.

15   Q.        What about everything says race to you?

16             MR. GEARINGER:  Objection; vague.

17             Go ahead.

18             THE WITNESS:  Could you rephrase the question,

19   please?

20             MR. CREECH:  Q.  Sure.

21             You said "everything."  Everything

22   communicated to you that this was about race.

23             Tell me one thing and how it showed to you

24   that Deputy Holland was acting because of race?

25   A.        The way he -- the way he just assumed he could

1  automatically get our identification when we weren't

2  doing anything but just being parked.

3  Q.      Give me another example of something Deputy

4  Holland did that made you think he was motivated by

5  race?

6  A.      Not calling his supervisor when we asked for

7  it.

8  Q.      Why does not calling a supervisor when you

9  asked for it indicate that it's motivated by race rather

10  than something else?

11  A.      Because if I was any -- if I was specifically

12  Caucasian and I called for a higher authority, he would

13  have -- I believe he would have called them.

14  Q.      So let me get this straight.

15      When you say the deputies acted from racial

16  motivations.  Is specifically what you believe the

17  different race you needed to be, to be treated

18  differently, was Caucasian?

19  A.      Yes.

20  Q.      What about what the deputies did led you to

21  believe you needed to be Caucasian?

22  A.      Simply parking while African American in a

23  parking lot.

24  Q.      I'm asking a different question, which is,

25  what about the deputy said or did led you to believe

1    that Caucasian was the race you needed to be, to be

2    treated differently?

3              MR. GEARINGER:  Objection; asked and answered.

4              Go ahead.

5              THE WITNESS:  Simply approaching the vehicle

6    in the first place.

7              MR. CREECH:  Q.  Anything else?

8    A.        And everything else, Mr. Creech.

9    Q.        Which deputies do you believe acted from

10   racial motivations?

11   A.        The ones that handled my family.

12   Q.        Who are those?

13   A.        Deputy Holland, Deputy Leeper, Deputy Pope.

14   Q.        When you say "everything."  Was there anything

15   that Deputy Holland, Deputy Leeper, or Deputy Pope did

16   during the incident, that you believe did not show

17   racial motivations?

18   A.        Could you rephrase the question?

19   Q.        Sure.

20             Was there anything that Deputy Holland, Deputy

21   Pope, or Deputy Leeper did that you did not -- during

22   the incident, that you believe did not show racial

23   motivations?

24   A.        No.

25   Q.        So when Deputy Holland told you we're

1    contacting you because there had been burglaries in the

2    area and told you about what those burglaries were.  How

3    did that show racial motivations?

4            MR. GEARINGER:  Objection; misstates prior

5    testimony.

6            Go ahead.

7            THE WITNESS:  I'm not sure.  I just know what

8    I felt.

9            MR. CREECH:  Q.  And what you felt was

10   there was not a single thing -- nothing that they

11   did that you thought could possibly be for anything

12   other than racial motivations.  Nothing that Deputy

13   Holland, Deputy Pope, or Deputy Leeper did.

14           MR. GEARINGER:  Objection; compound.

15           Go ahead.

16           THE WITNESS:  Yes.

17           MR. CREECH:  Q.  You said you complained

18   about your handcuffs being too tight?

19   A.        Yes.

20   Q.        Who did you complain to?

21           MR. GEARINGER:  Objection; asked and answered.

22           Go ahead.

23           THE WITNESS:  Deputy Pope, Deputy Leeper, and

24   I believe Deputy [sic] DeSousa.

25           MR. CREECH:  Q.  So Deputy Pope.  When was

1    the first time you complained to Deputy Pope about

2    your handcuffs?

3    A.        I'm not quite sure.  I believe it was while

4    walking to the patrol car.

5    Q.        Did you complain to her again after that?

6    A.        Yes.

7    Q.        When?

8    A.        When she asked for my -- for me to ID myself.

9    Q.        Did you complain to her again after that?

10   A.        No.

11   Q.        What about Deputy Leeper?  When did you

12   complain to him about your handcuffs?

13   A.        I believe while walking as well, to the patrol

14   car.

15   Q.        When did you next complain to him?

16   A.        When he dragged me through the car and slammed

17   the door.

18   Q.        When did you next complain to him about your

19   handcuffs?

20   A.        I believe that was all.

21   Q.        When did you complain to Lieutenant DeSousa

22   about your handcuffs?

23   A.        I'm not sure if I complained to him or not.  I

24   do not remember.

25   Q.        How much looser did your handcuffs need to be

Page 146

1  where you wouldn't complain about them?

2          MR. GEARINGER:  Objection; asked and answered.

3  We've already gone over this, Chris.

4          MR. CREECH:  That was the -- that was AAsylei.

5  I don't think we've gone over that with AAottae.

6          MR. CREECH:  Q.  Am I wrong,

7  Ms. Loggervale?

8  A.          I'm not sure.

9          MR. GEARINGER:  I may be confused too, so I'm

10  sorry.  Just go ahead.

11          MR. CREECH:  Q.  Ms. Loggervale, how much

12  looser did your handcuffs need to be where you

13  wouldn't complain about them?

14  A.          The handcuffs needed to be off.

15  Q.          And so when you said they were too tight, your

16  complaint was they shouldn't have been on you at all.

17  A.          Yes.

18  Q.          After watching your sister's deposition and

19  your mother's deposition, did you think to yourself "I

20  need to answer one of those questions differently than

21  they did"?

22  A.          Not at all.

23  Q.          Is there any response that you gave today that

24  you prepared prior to this deposition?

25  A.          Not at all.

1                    CERTIFICATE OF REPORTER

2

3            I, DEBRA J. SKAGGS, hereby certify that the

4    witness in the foregoing deposition was by me duly sworn

5    to tell the truth, the whole truth, and nothing but the

6    truth in the within-entitled cause;

7

8            That said deposition was taken in shorthand by

9    me, a Certified Shorthand Reporter of the State of

10   California, and was thereafter transcribed into

11   typewriting, and that the foregoing transcript

12   constitutes a full, true, and correct report of said

13   deposition and of the proceedings which took place;

14

15           That I am a disinterested person to the said

16   action.

17

18           IN WITNESS WHEREOF, I have hereunto set my

19   hand this    22nd    day of        July        , 2021.

20

21

22                    _____

23            DEBRA J. SKAGGS, CSR No. 7857

24

25                    ---oOo---

# EXHIBIT M

1          UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF CALIFORNIA
2            SAN FRANCISCO DIVISION

3                   -oOo-

4   AASYLEI LOGGERVALE; AASYLEI          )
    HARDGE-LOGGERVALE; and AAOTTAE       )
5   LOGGERVALE,                          )
                                         )
6          Plaintiffs,                   )
                                         ) Case No.
7          -vs-                          ) C20-4679-WHA
                                         )
8   COUNTY OF ALAMEDA; STEVEN            )
    HOLLAND; MONICA POPE; KEITH          )
9   LEEPER; ANOTHONY DeSOUSA; and        )
    DOES 1 to 50, inclusive,            )
10                                       )
           Defendants.                   )
11

12  San Francisco, California          February 4, 2021

13

14                   -oOo-

15  CONFIDENTIAL DEPOSITION OF DEPUTY STEVEN HOLLAND
            TAKEN ON FEBRUARY 4, 2021
16                 VIA ZOOM

17                   -oOo-

18

19

20

21

22  Reported by:
    Brooke Meyer, CSR License No. 13886
23  Atkinson-Baker, a Veritext Company
    www.depo.com
24  (800)288-3376
    File No: AF0074B
25

**CERTIFIED COPY**

```
1                        INDEX

2  DEPUTY STEVEN HOLLAND                        PAGE

3         Examination by Mr. May................ 5

4

5

6     Questions Instructed Not to Answer.....8, 140, 157

7

8

9                  INDEX OF EXHIBITS

10

11   Exhibit 1: Incident Report...................28

12   Exhibit 2: April 1 Incident.................43

13   Exhibit 3: July 10 Incident.................43

14   Exhibit 4: September 18 Incident............53

15   Exhibit 5: September 19 Incident............59

16   Exhibit 6: Training Record..................166

17

18      (EXHIBITS 2-6 MARKED AS CONFIDENTIAL PURSUANT TO
           PROTECTIVE ORDER)
19

20

21

22

23

24

25
```

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4   JOSEPH F. MAY
     LAW OFFICE OF JOSEPH F. MAY
 5   1388 Sutter Street, Suite 810
     San Francisco, California 94109
 6   415-781-3333

 7   BRIAN GEARINGER
     GEARINGER LAW GROUP
 8   740 Fourth Street
     Santa Rosa, California 95404
 9   415-440-3102

10

11   FOR THE DEFENDANT:

12   KEVIN E. GILBERT
     ORBACH HUFF SUAREZ & HENDERSON, LLP
13   6210 Stoneridge Mall Road, Suite 210
     Pleasanton, California 94588
14   510-999-7908

15

16   Also Present:

17   Jemal Judkins, Videographer

18

19

20

21

22

23

24                                              10:08:02
                                                10:08:02
25
```

| | | |
|---|---|---|
| 1 | A.  Yes. | 10:20:26 |
| 2 | Q.  What year did you complete it? | 10:20:27 |
| 3 | A.  2012. | 10:20:30 |
| 4 | Q.  Did you immediately go into the law enforcement | 10:20:32 |
| 5 | field at that point? | 10:20:38 |
| 6 | A.  Yes. | 10:20:39 |
| 7 | Q.  What was the first position you held in law | 10:20:41 |
| 8 | enforcement after completing the police academy? | 10:20:45 |
| 9 | A.  I was a deputy sheriff with the Alameda County | 10:20:47 |
| 10 | Sheriff's Office. | 10:20:52 |
| 11 | Q.  When did you become a deputy sheriff? | 10:20:54 |
| 12 | A.  2012. | 10:20:58 |
| 13 | Q.  Is that your current position? | 10:20:59 |
| 14 | A.  Yes. | 10:21:06 |
| 15 | Q.  Has it been your position continuously from 2012 | 10:21:07 |
| 16 | to the present? | 10:21:13 |
| 17 | A.  Yes. | 10:21:13 |
| 18 | Q.  Do you hold any particular rank? | 10:21:15 |
| 19 | A.  I am a field training officer and a Deputy | 10:21:20 |
| 20 | Sheriff II. | 10:21:29 |
| 21 | Q.  When did you become a FTO? | 10:21:29 |
| 22 | A.  The beginning of last year. | 10:21:34 |
| 23 | Q.  Beginning of 2020? | 10:21:36 |
| 24 | A.  Yes. | 10:21:40 |
| 25 | Q.  Is Deputy Sheriff II a promotion from Deputy | 10:21:40 |

| | | |
|---|---|---|
| 1 | BY MR. MAY: | 10:25:18 |
| 2 | Q. What are the roles and responsibilities of | 10:25:18 |
| 3 | somebody assigned to patrol back in September of 2019? | 10:25:21 |
| 4 | MR. GILBERT: Overbroad. Go ahead. | 10:25:26 |
| 5 | THE WITNESS: We respond to calls for service. | 10:25:28 |
| 6 | We conduct proactive enforcement, traffic enforcement, | 10:25:30 |
| 7 | community policing, engage with the community, keep the | 10:25:36 |
| 8 | community safe. | 10:25:42 |
| 9 | BY MR. MAY: | 10:25:45 |
| 10 | Q. Have you ever been a detective with the sheriff's | 10:25:45 |
| 11 | office? | 10:25:48 |
| 12 | A. I did a short time. When I was injured, I was | 10:25:49 |
| 13 | assigned to the property crimes detectives doing desk work | 10:25:53 |
| 14 | because I couldn't go out into the field. | 10:25:59 |
| 15 | Q. What period of time were you doing property | 10:26:02 |
| 16 | crimes as a detective? | 10:26:05 |
| 17 | A. I don't recall specifically. I believe it was | 10:26:07 |
| 18 | before this incident. | 10:26:17 |
| 19 | Q. Did you have a direct supervisor back on | 10:26:19 |
| 20 | September 20, 2019? | 10:26:24 |
| 21 | A. Yes. | 10:26:28 |
| 22 | Q. Who is that person? | 10:26:29 |
| 23 | A. I don't recall the sergeants who were there that | 10:26:32 |
| 24 | day. I believe they were on overtime, if I recall. But | 10:26:40 |
| 25 | Lieutenant DeSousa was the watch commander of the station | 10:26:47 |

1  with promotions and a -- a couple of months.                    10:28:22

2      Q.  Back in September 2019, did you supervise               10:28:31

3  anybody?                                                         10:28:35

4      A.  No.                                                      10:28:35

5      Q.  September 20, 2019, did you have a partner that          10:28:40

6  day?                                                             10:28:45

7      A.  Yes.                                                     10:28:48

8      Q.  Is that Deputy Pope?                                     10:28:48

9      A.  Yes.                                                     10:28:51

10     Q.  Was Deputy Pope your regular partner in                  10:28:52

11  September of 2019?                                              10:28:58

12     A.  I don't recall.                                          10:29:02

13     Q.  Back in that timeframe, the latter half of 2019,         10:29:03

14  did you typically have one partner every day, or would          10:29:07

15  your partner switch depending on your shift?                    10:29:11

16     A.  It would depend on the time of the shift.  With          10:29:15

17  shift coverage, you can work with partners from other           10:29:20

18  beats until more staffing comes on, so it could vary.           10:29:25

19     Q.  September 20, 2019, that wasn't the first time           10:29:29

20  you partnered with Deputy Pope, right?                          10:29:34

21         MR. GILBERT:  Vague as to "partner."  Go ahead.          10:29:37

22         THE WITNESS:  Correct.  We worked together               10:29:40

23  before.                                                         10:29:43

24  BY MR. MAY:                                                     10:29:43

25     Q.  Have you worked together since?                          10:29:43

1  Q. Do you know if any of the topics included in the 10:32:29

2 briefing involved incidents at 2720 Castro Valley 10:32:36

3 Boulevard? 10:32:42

4  A. I don't recall. 10:32:42

5  Q. After the briefing, do you recall having done 10:32:43

6 anything else before the incident involving my clients? 10:32:51

7  A. I don't recall. 10:32:53

8  Q. At some point you did arrive at the parking lot 10:32:55

9 connected with 2720 Castro Valley Boulevard? 10:33:01

10  A. Yes. 10:33:05

11  Q. Why did you go there? 10:33:06

12  A. I went there to conduct the patrol check.  We had 10:33:10

13 a string of auto burglaries and related incidents in that 10:33:15

14 parking lot in the early morning hours, so I went there to 10:33:20

15 prevent any more auto burglaries from occurring. 10:33:24

16  Q. What do you mean when you say patrol check?  Does 10:33:29

17 that have a definition in your department? 10:33:32

18  A. I don't know if there's a definition per se, but 10:33:35

19 for me, when I conduct the patrol check I put out the 10:33:43

20 address over the radio.  I usually check the whole parking 10:33:47

21 lot.  I'll walk, I'll check the doors, I'll enter the 10:33:52

22 business.  I'll engage with citizens, patrons, and staff 10:33:55

23 and ask them if anything has been occurring. 10:34:00

24  Q. You were wearing a deputy sheriff's uniform at 10:34:08

25 the time, correct? 10:34:13

| | | |
|---|---|---|
| 1 | THE WITNESS:  Can you repeat the question. | 10:35:59 |
| 2 | BY MR. MAY: | 10:36:04 |
| 3 | Q.  You mentioned that you were there to do a patrol | 10:36:04 |
| 4 | check regarding a string of auto burglaries.  My question | 10:36:09 |
| 5 | is how many auto burglaries were you aware of having | 10:36:12 |
| 6 | occurred at the 2720 Castro Valley Boulevard location? | 10:36:16 |
| 7 | A.  I don't have an exact number, but there were very | 10:36:20 |
| 8 | many at that address. | 10:36:25 |
| 9 | Q.  When you say "string of auto burglaries", over | 10:36:26 |
| 10 | what time period are you describing? | 10:36:32 |
| 11 | A.  In my police report I documented the most recent; | 10:36:34 |
| 12 | however, before -- excuse me.  There's a lot more that | 10:36:39 |
| 13 | occurred at that address prior to this incident. | 10:36:49 |
| 14 | Q.  Can you think of any specific auto burglaries | 10:36:57 |
| 15 | that you were aware of when doing your patrol check that | 10:37:01 |
| 16 | were not included in your incident report? | 10:37:05 |
| 17 | A.  Yes.  There was one where we responded to an | 10:37:07 |
| 18 | armed robbery that occurred there that led to a vehicle | 10:37:19 |
| 19 | chase in Oakland, and I believe there was weapons | 10:37:23 |
| 20 | involved.  I don't recall exactly when that one occurred. | 10:37:28 |
| 21 | Q.  Any other auto burglaries in particular at that | 10:37:37 |
| 22 | 2720 Castro Valley Boulevard location that were not listed | 10:37:43 |
| 23 | in the incident report? | 10:37:49 |
| 24 | A.  I don't recall specifics at this time. | 10:37:50 |
| 25 | Q.  In the area where 2720 Castro Valley Boulevard | 10:37:56 |

| | | |
|---|---|---|
| 1 | is, is that considered a high crime area? | 10:38:08 |
| 2 | A. Yes. | 10:38:11 |
| 3 | Q. And that's relative to the rest of unincorporated | 10:38:11 |
| 4 | Alameda County? | 10:38:19 |
| 5 | MR. GILBERT: Vague. Go ahead. | 10:38:22 |
| 6 | THE WITNESS: That's difficult to answer. | 10:38:26 |
| 7 | There's many different locations that we have a larger | 10:38:27 |
| 8 | number of crimes within the unincorporated Alameda County. | 10:38:32 |
| 9 | BY MR. MAY: | 10:38:38 |
| 10 | Q. In your job doing patrol back in September 2019, | 10:38:38 |
| 11 | would your patrol take you to all the different parts of | 10:38:46 |
| 12 | Alameda County -- unincorporated Alameda County, or only | 10:38:49 |
| 13 | specific locations? | 10:38:54 |
| 14 | MR. GILBERT: Overbroad and vague. Go ahead. | 10:38:56 |
| 15 | THE WITNESS: During this time, I was assigned to | 10:38:58 |
| 16 | that sector. Sector, also known as a beat. So during my | 10:39:02 |
| 17 | shift, I could go to any part of the unincorporated | 10:39:07 |
| 18 | Alameda County depending on what calls came in. My main | 10:39:12 |
| 19 | function at this time was Castro Valley and part of San | 10:39:16 |
| 20 | Leandro. And for my beat, this was one of the locations | 10:39:20 |
| 21 | that we were seeing the highest number of property crime. | 10:39:23 |
| 22 | BY MR. MAY: | 10:39:26 |
| 23 | Q. At some point you detained my clients, the three | 10:39:26 |
| 24 | Loggervale women, correct? | 10:39:41 |
| 25 | A. Yes. | 10:39:44 |

```
 1   last question, please.                              10:42:30

 2           (Record read.)                              10:42:49

 3           THE WITNESS:  Yes.                           10:42:51

 4   BY MR. MAY:                                          10:42:52

 5       Q.  Was there reasonable suspicion to believe that  10:42:52

 6   any of them were involved in recent auto burglaries?  10:42:59

 7       A.  Yes.                                         10:43:03

 8       Q.  Was one of the reasons that you believe there was  10:43:06

 9   reasonable suspicion to detain them due to a potential  10:43:13

10   connection with the auto burglaries, the fact that at  10:43:19

11   least one of the suspects identified in those burglaries  10:43:23

12   were African American, and the plaintiffs are African  10:43:26

13   American?                                            10:43:30

14       A.  That was one factor.                         10:43:31

15       Q.  Is it accurate to say that if the plaintiffs,  10:43:34

16   meaning my clients, were White, you would not have had  10:43:38

17   reasonable suspicion to detain them for their involvement  10:43:42

18   in auto burglaries?                                  10:43:45

19           MR. GILBERT:  Incomplete hypothetical.       10:43:48

20   Speculation.  Go ahead.                              10:43:51

21           THE WITNESS:  No.  There were several other   10:43:52

22   reasons for the detention, and I believed -- it's hard to  10:43:54

23   say.  If everything else was the same except that one, I  10:44:01

24   believe I still would have investigated.             10:44:06

25   ///
```

1  BY MR. MAY:

2      Q.  Do you have my question in mind, Deputy Holland?  10:59:13

3      A.  Yes.  10:59:17

4      Q.  Do you have an answer for us?  10:59:19

5          MR. GILBERT:  Still vague.  Still compound.  Go  10:59:25

6  ahead if you can.  10:59:28

7          THE WITNESS:  The report that I notated has the  10:59:31

8  documented incidents that were reported and the timeframe  10:59:36

9  listed in the report.  10:59:40

10 BY MR. MAY:  10:59:47

11     Q.  What was your reason for listing these incidents  10:59:47

12 in your incident report?  10:59:50

13     A.  To show that there was a lot of activity  10:59:51

14 involving property crimes at that address.  11:00:01

15     Q.  Did you know about all of these incidents before  11:00:07

16 you approached the Loggervale women?  11:00:12

17     A.  I knew that there was a lot of crime occurring at  11:00:14

18 this address during this timeframe.  And the descriptions  11:00:20

19 of suspects in vehicle, I knew that information prior to  11:00:26

20 making contact on this date.  11:00:32

21     Q.  I'm going to go through each of those incidents  11:00:35

22 that you list here on page four, starting with the  11:00:39

23 April 1st, 2019 incident.  11:00:42

24         When you approached the Loggervale women, did you  11:00:47

25 know that there was this strong-arm robbery that had  11:00:51

1 occurred on April 1st, 2019 specifically?          11:00:54

2     A.  It's hard to say.  I knew -- I can't say if it's    11:01:01

3 specifically this incident.  I knew strong-arm robberies    11:01:06

4 had occurred at that location prior to the contact.    11:01:11

5     Q.  Do you know if you were involved in investigating    11:01:14

6 the April 1, 2019 incident?          11:01:17

7     A.  I may have been.  I don't recall.    11:01:21

8     Q.  In order to write down the -- or type in the    11:01:25

9 incident report number, did you have to look up this    11:01:31

10 incident when you were preparing the report regarding the    11:01:33

11 Loggervale matter?          11:01:38

12     A.  Yes.          11:01:39

13     Q.  How did you do that?          11:01:40

14     A.  Our dispatch, they're able to do a query to see    11:01:44

15 the recent activity at the location.    11:01:52

16     Q.  How did you get dispatch to do that for you?    11:01:55

17     A.  I just request them to do a previous incident    11:01:59

18 check.          11:02:04

19     Q.  Do you request it by phone, e-mail, text message,    11:02:05

20 or something else?          11:02:08

21     A.  Typically done over the radio.    11:02:09

22     Q.  Do you know when you made the request for the    11:02:13

23 other incidents, the list?          11:02:17

24     A.  At some time during this date.    11:02:22

25     Q.  What did you ask for in particular?  If you    11:02:27

1  recall.  Was it all calls for service, or calls for                    11:02:32

2  service regarding property crimes?  What do you recall?                 11:02:35

3      A.  I believe I asked for previous incidents at all                 11:02:39

4  the addresses in this little shopping center.                           11:02:46

5      Q.  Did you have a date range that you provided the                 11:02:53

6  dispatch?                                                               11:02:56

7      A.  I don't recall.  It's typically a six-month date                11:02:57

8  range, unless you ask for more.                                         11:03:03

9      Q.  It sounds like this incident involved a suspect                 11:03:08

10 who is a Black male juvenile; is that correct?                          11:03:14

11     A.  Can I take a look at the report?                                11:03:18

12     Q.  Yes.  Absolutely.                                               11:03:21

13     A.  Yes.  That is correct.                                          11:03:22

14     Q.  Did you know that the April 1st incident involved               11:03:29

15 a Black male juvenile before approaching the Loggervales?               11:03:33

16     A.  I knew that that suspect description was involved               11:03:38

17 in reported crimes.  I can't say for certain if it was                  11:03:46

18 that description on that exact incident number.                         11:03:52

19     Q.  As we're discussing this now, you don't know                    11:03:55

20 which of these exact incidents you knew about as you were               11:04:02

21 approaching the Loggervales; is that true?                              11:04:06

22     A.  I'd say I had knowledge of many incidents that                  11:04:08

23 were occurring here with suspect descriptions, vehicle                  11:04:17

24 descriptions, prior to making contact with the                         11:04:23

25 Loggervales.                                                            11:04:26

| 1 | you requested, or just the CAD log, or something else?  If | 11:06:31 |
| 2 | you recall. | 11:06:35 |
| 3 |     A.  Every time I put a request over the radio for | 11:06:36 |
| 4 | this, I ask for previous incidents here.  Dispatch goes | 11:06:45 |
| 5 | through and they'll give me the event numbers and/or | 11:06:51 |
| 6 | report numbers associated. | 11:06:56 |
| 7 |     Q.  Did they give you any other information? | 11:06:59 |
| 8 |     A.  I don't recall. | 11:07:02 |
| 9 |     Q.  Do you then, based on the event or incident | 11:07:04 |
| 10 | number, then access an incident report or CAD report? | 11:07:09 |
| 11 |         MR. GILBERT:  Overbroad.  Go ahead. | 11:07:14 |
| 12 |         THE WITNESS:  Yes. | 11:07:19 |
| 13 | BY MR. MAY: | 11:07:19 |
| 14 |     Q.  Do you know if you accessed the incident report | 11:07:19 |
| 15 | or CAD log for each of the incidents described on page | 11:07:35 |
| 16 | four of your incident report? | 11:07:39 |
| 17 |     A.  I believe I did. | 11:07:40 |
| 18 |     Q.  In deciding whether you have reasonable suspicion | 11:07:44 |
| 19 | to detain somebody, do you agree that the officer must | 11:08:01 |
| 20 | rely on what's known to him at the time the detention is | 11:08:06 |
| 21 | made rather than facts learned after the fact? | 11:08:09 |
| 22 |     A.  Can you say that one more time. | 11:08:12 |
| 23 |     Q.  Yes.  When an officer detains somebody based on | 11:08:18 |
| 24 | reasonable suspicion, that reasonable suspicion has to be | 11:08:22 |
| 25 | based on what's known at the time of the detention and not | 11:08:25 |

1  on what's learned after the detention.  Do you agree with          11:08:28

2  that statement?                                                     11:08:31

3          MR. GILBERT:  Vague.  Calls for a legal                     11:08:32

4  conclusion.  Go ahead.                                             11:08:34

5          THE WITNESS:  Yes.                                          11:08:41

6  BY MR. MAY:                                                        11:08:46

7      Q.  Was there any particular reason you didn't                  11:08:46

8  include in your report just the information that you had            11:08:49

9  at the time you decided to detain the Loggervale women?             11:08:52

10         MR. GILBERT:  Vague.  Go ahead.                             11:08:59

11         THE WITNESS:  One more time, please.                        11:09:01

12  BY MR. MAY:                                                        11:09:02

13     Q.  Yeah.  For example, you list incident numbers and           11:09:02

14  event numbers in the incident report, correct?                    11:09:06

15     A.  Yes.                                                        11:09:09

16     Q.  You didn't have those memorized by heart when you           11:09:10

17  were approaching the Loggervale vehicle, correct?                 11:09:13

18     A.  Correct.                                                    11:09:17

19     Q.  That's information that you got after you made              11:09:18

20  the decision to detain them, correct?                             11:09:20

21     A.  The information in my report, specific                      11:09:23

22  information, I verified as I compiled my police report.            11:09:26

23  The descriptions and incidents, I had knowledge of what            11:09:32

24  had occurred and been occurring at this location.                  11:09:36

25     Q.  Right.  So some of the details you did not know             11:09:40

| | | |
|---|---|---|
| 1 | A. Yes. | 11:13:21 |
| 2 | Q. Do you know if you were involved in the | 11:13:21 |
| 3 | investigation into that incident? | 11:13:27 |
| 4 | A. I don't recall. | 11:13:29 |
| 5 | Q. Do you know how much about that incident you knew | 11:13:31 |
| 6 | as you approached the Loggervale women's vehicle? | 11:13:39 |
| 7 | A. I had information on all of these incidents prior | 11:13:45 |
| 8 | to approaching the vehicle. | 11:13:54 |
| 9 | Q. Do you know what information in particular you | 11:13:57 |
| 10 | had as you were approaching the vehicle regarding the | 11:14:01 |
| 11 | July 10th incident? | 11:14:04 |
| 12 | MR. GILBERT: Vague. If you need to ask for | 11:14:18 |
| 13 | clarification, please feel free to do so. If you can | 11:14:49 |
| 14 | answer, please feel free. | 11:14:54 |
| 15 | MR. MAY: Mr. Gilbert, again, I would ask that | 11:14:57 |
| 16 | you please just state the objection. It's not appropriate | 11:14:59 |
| 17 | to interject things like "if you know", or "if you need | 11:15:01 |
| 18 | clarification, you can ask." That's specifically | 11:15:05 |
| 19 | addressed in the judge's standing order. | 11:15:09 |
| 20 | MR. GILBERT: The witness is sitting here | 11:15:11 |
| 21 | struggling with how to interpret the question. It was | 11:15:14 |
| 22 | clear that he's struggling with how to answer it because | 11:15:17 |
| 23 | it was a vague question. I directed him that if he wants | 11:15:19 |
| 24 | to ask you for clarification, he can. He does not force | 11:15:23 |
| 25 | to answer a question that he doesn't understand or that he | 11:15:27 |

| | | |
|---|---|---|
| 1 | is a good and isn't a good question.  I happen to think it | 11:16:50 |
| 2 | was a very clear question.  If the witness doesn't agree, | 11:16:52 |
| 3 | he's always allowed to ask for clarification.  He already | 11:16:56 |
| 4 | knows that. | 11:16:59 |
| 5 | MR. GILBERT:  And yet this dialogue is doing | 11:16:59 |
| 6 | nothing to move the deposition along. | 11:17:02 |
| 7 | MR. MAY:  I disagree. | 11:17:04 |
| 8 | BY MR. MAY: | |
| 9 | Q.  Deputy Holland, do you have the question in mind? | 11:17:05 |
| 10 | A.  Can you repeat it, please. | 11:17:08 |
| 11 | MR. MAY:  Can I have the court reporter please | 11:17:10 |
| 12 | read my last question. | 11:17:12 |
| 13 | (Record read.) | |
| 14 | THE WITNESS:  So I'm having difficulty answering | 11:17:45 |
| 15 | the question because we're very specific to that date and | 11:17:47 |
| 16 | time of the incident.  I had the knowledge and information | 11:17:52 |
| 17 | that there was a gray vehicle involved and a Black male | 11:17:55 |
| 18 | involved. | 11:18:02 |
| 19 | BY MR. MAY: | 11:18:06 |
| 20 | Q.  Thank you.  When's the last time you reviewed any | 11:18:06 |
| 21 | incident reports regarding auto burglaries or property | 11:18:22 |
| 22 | crimes at the 2720 Castro Valley Boulevard location prior | 11:18:25 |
| 23 | to today? | 11:18:33 |
| 24 | MR. GILBERT:  Vague.  Vague as to the use of the | 11:18:36 |
| 25 | referenced reports.  Go ahead. | 11:18:40 |

 1  incident report?                                          11:27:00

 2    A.  Yes.                                                11:27:00

 3    Q.  Can you tell from looking at what we see on the     11:27:01

 4  screen whether this is an incident report that you        11:27:06

 5  prepared regarding a July 10, 2019 incident?              11:27:09

 6    A.  Yes, it appears to be.                              11:27:12

 7    Q.  If at any time you want me to scroll up or down     11:27:16

 8  through this document in order to answer any of my        11:27:19

 9  questions, would you let me know?                         11:27:21

10    A.  Yes.                                                11:27:22

11    Q.  Does this -- looking at this first page of the      11:27:23

12  document refresh your memory about whether you were       11:27:31

13  involved in the investigation of the July 10th incident at 11:27:34

14  2720 Castro Valley Boulevard?                             11:27:37

15    A.  I would like to read the narrative of it to know    11:27:42

16  my specific role.  My name being on the top of it         11:27:46

17  indicates I should have been the one who prepared it.     11:27:49

18    Q.  I will scroll down to page four of the document     11:27:52

19  to the narrative.  Is that okay?  Can you see that?       11:27:58

20    A.  Yes.                                                11:28:01

21    Q.  Does this help you figure out if this is an         11:28:37

22  incident report you prepared regarding your involvement in 11:28:41

23  a July 10, 2019 suspected auto burglary at that Starbucks? 11:28:44

24    A.  Yes.                                                11:28:49

25    Q.  Do you remember the last time you saw this          11:28:50

1   document before today?                              11:28:52

2       A.  It would have been -- I don't recall.       11:28:56

3       Q.  Based on this document, does it appear that the   11:29:01

4   suspect in this alleged auto burglary was a Black male   11:29:05

5   driving a silver vehicle?                           11:29:12

6       A.  I have to reread it to refresh my recollection.   11:29:14

7       Q.  Let me know if you want me to move it.      11:29:22

8       A.  Yes.                                         11:29:36

9       Q.  Was there any other information that you recall   11:29:37

10  that either independently or through review of this   11:29:41

11  narrative about the suspect, other than being a Black male   11:29:43

12  with a silver vehicle?                              11:29:48

13      A.  No.                                          11:29:49

14      Q.  Do you recall, Deputy Holland, if you spoke with   11:29:50

15  any witnesses to the suspected auto burglary on July 10,   11:30:32

16  2019?                                               11:30:38

17      A.  I don't recall.                              11:30:38

18      Q.  Other than a silver vehicle, do you recall if you   11:30:43

19  ever got more information about either the year, the type   11:30:51

20  of vehicle, the make, or the model?                 11:30:55

21      A.  I did get information that it was a four-door   11:31:04

22  vehicle.                                            11:31:09

23      Q.  Are you talking specifically about the July 10th   11:31:13

24  incident?                                           11:31:16

25      A.  That's hard to say.  I don't recall.         11:31:17

1  was shattered.  I was unable to locate anything of          11:33:03

2  evidentiary value around the vehicle."                       11:33:07

3       Did that suggest to you that the silver rental          11:33:09

4  Highlander was the vehicle that was broken into?             11:33:13

5       A.  Yes.                                                11:33:27

6       Q.  I'm going to stop sharing for now.  I'm going to    11:33:27

7  direct your attention back to the incident report that's    11:33:29

8  been marked as Exhibit 1, and to the portion on page four   11:33:31

9  that discusses the July 26, 2019 incident.  Do you see      11:33:35

10 that?                                                        11:33:47

11      A.  Yes.                                                11:33:47

12      Q.  Do you know whether or not you knew about that      11:33:47

13 incident when you approached the Loggervale family's         11:33:52

14 vehicle?                                                     11:33:55

15      A.  Like I said on the last one, I had information on   11:33:55

16 all of the incidents prior to making contact.               11:34:05

17      Q.  Do you know how you obtained the information        11:34:10

18 about the July 26, 2019 auto burglary before making         11:34:13

19 contact with the Loggervales?                                11:34:18

20      A.  It's from either myself responding, my partners     11:34:19

21 responding, or morning briefings when we discuss criminal    11:34:27

22 activity in our area.                                        11:34:31

23      Q.  Based on what you put in your incident report,      11:34:33

24 does it appear that the only information you had about the   11:34:43

25 suspect was that it was a male?                              11:34:47

1       A.   Yes.                                                    11:34:47

2       Q.   Does it appear that you did not have information        11:34:51

3  about whether the suspect was in a vehicle or on foot?            11:34:55

4       A.   Yes.                                                    11:34:58

5       Q.   It says that there was no incident reports             11:35:09

6  prepared for that alleged auto burglary of July 26, 2019;        11:35:28

7  do you see that?                                                  11:35:33

8       A.   Yes.                                                    11:35:34

9       Q.   When it says "event number", that's something         11:35:35

10  that you'd see in a CAD log rather than an incident             11:35:38

11  report, correct?                                                 11:35:41

12       A.   Correct.                                               11:35:42

13       Q.   Do you have any information as to why an incident     11:35:43

14  report was not prepared regarding the alleged July 26,          11:35:48

15  2019 auto burglary?                                              11:35:52

16       A.   I don't.   Typically that would mean the person       11:35:54

17  who called did not request the police report, and/or they       11:36:00

18  did not wish to pursue a criminal complaint if the suspect      11:36:05

19  was located.                                                     11:36:10

20       Q.   If a victim doesn't want to pursue a complaint or      11:36:12

21  prosecution, does the sheriff's office still sometimes          11:36:16

22  prepare incident reports depending on what type of              11:36:22

23  incident it is?                                                  11:36:25

24            MR. GILBERT:   Overbroad.   Foundation.               11:36:25

25  Speculation.   Go ahead.                                         11:36:27

| | | |
|---|---|---|
| 1 | Q. Is an auto burglary considered a serious crime in | 11:37:43 |
| 2 | your department or in your office? | 11:37:51 |
| 3 | MR. GILBERT: Vague as to "serious crime." Go | 11:37:54 |
| 4 | ahead. | 11:37:58 |
| 5 | THE WITNESS: I'd say property crime. | 11:37:58 |
| 6 | BY MR. MAY: | 11:38:12 |
| 7 | Q. I'm going to direct your attention to the next | 11:38:12 |
| 8 | part of your report regarding the Loggervale incident that | 11:38:17 |
| 9 | reflects the September 18, 2019 suspected auto burglary. | 11:38:21 |
| 10 | Do you see that? | 11:38:26 |
| 11 | A. Yes. | 11:38:27 |
| 12 | Q. Do you know if you were the one who responded or | 11:38:27 |
| 13 | investigated that incident? | 11:38:34 |
| 14 | A. I don't. | 11:38:35 |
| 15 | Q. Based on what you wrote in your report, it | 11:38:37 |
| 16 | appears that there was no suspect information. Is that | 11:38:42 |
| 17 | your understanding? | 11:38:46 |
| 18 | A. Yes. | 11:38:47 |
| 19 | Q. Do you know whether or not you were specifically | 11:38:49 |
| 20 | aware of the September 18th auto burglary when you | 11:38:57 |
| 21 | approached the Loggervale family's vehicle? | 11:39:01 |
| 22 | A. I had information on all the incidents of the | 11:39:03 |
| 23 | descriptions that were available and the suspect vehicle | 11:39:12 |
| 24 | that was available. | 11:39:14 |
| 25 | Q. Based on what you put in your incident report | 11:39:18 |

| 1 | incident report you did not believe there was a report | 11:41:42 |
| 2 | prepared regarding the September 18th incident? | 11:41:47 |
| 3 | A.  One more time. | 11:41:50 |
| 4 | Q.  Yeah.  Your incident report, I asked you whether | 11:42:01 |
| 5 | the listing of just the event number suggested that there | 11:42:05 |
| 6 | was no incident report.  I think you said that that's | 11:42:09 |
| 7 | right.  But now it looks like there actually was an | 11:42:12 |
| 8 | incident report.  I am wondering why you didn't realize | 11:42:16 |
| 9 | that when you were preparing your report for the | 11:42:19 |
| 10 | Loggervale case? | 11:42:22 |
| 11 | MR. GILBERT:  Assumes facts.  Go ahead. | 11:42:23 |
| 12 | THE WITNESS:  I don't recall. | 11:42:25 |
| 13 | BY MR. MAY: | 11:42:27 |
| 14 | Q.  Do you know Deputy Landon Croisant? | 11:42:27 |
| 15 | A.  Yes. | 11:42:39 |
| 16 | Q.  Did you ever talk with Deputy Croisant about his | 11:42:45 |
| 17 | investigation of any burglaries or other property crimes | 11:42:49 |
| 18 | at 2720 Castro Valley Boulevard? | 11:42:52 |
| 19 | A.  Possibly.  I don't recall. | 11:42:55 |
| 20 | Q.  Do you know if you've ever seen this report | 11:42:56 |
| 21 | before today? | 11:43:09 |
| 22 | A.  I'd have to read the narrative to better answer | 11:43:12 |
| 23 | your question. | 11:43:18 |
| 24 | Q.  Do you see at least the beginning of the | 11:43:19 |
| 25 | narrative on my screen right now? | 11:43:22 |

1    A.  Yes.                                                    11:43:24

2    Q.  That's page four of the report.  Feel free to          11:43:25

3  read it.  If you want me to scroll, let me know, please.     11:43:29

4    A.  The incident seems familiar.  I don't recall if        11:44:21

5  I've ever seen this report before.                           11:44:23

6    Q.  Do you agree, based on the report, it does not         11:44:25

7  appear that any suspects were identified or described?       11:44:27

8    A.  I'd have to read it with a fine tooth comb to say      11:44:33

9  for certain.                                                 11:44:38

10    Q.  Okay.  Do you just need the narrative portion or      11:44:40

11  the entire report?                                          11:44:45

12    A.  The narrative portion.                                11:44:46

13    Q.  You want to do that?  Can I ask you to do that        11:44:49

14  now?                                                        11:44:52

15    A.  Yeah.  What was your question?                        11:44:52

16    Q.  If you can tell whether any suspects were             11:45:40

17  identified?                                                 11:45:43

18    A.  It doesn't appear that any were.                      11:45:43

19    Q.  Does it appear that the victim's car was a gray       11:45:54

20  2019 Ford Fusion?                                           11:45:56

21    A.  Yes.                                                  11:45:59

22    Q.  A Ford Fusion is a four-door sedan, right?           11:46:02

23    A.  I believe so.                                         11:46:05

24    Q.  Next, going into your incident report regarding       11:46:06

25  the Loggervale case, you have two entries for               11:46:17

1  September 19, 2019.  Do you see that?                    11:46:20

2      A.  Yes.                                             11:46:26

3      Q.  The first one was deputies responding to the    11:46:26

4  Starbucks for a suspicious vehicle.  And according to what  11:46:32

5  it says here, the vehicle was described as a silver      11:46:38

6  four-door with two Black male juveniles inside.  Do you  11:46:41

7  see that?                                                11:46:45

8      A.  Yes.                                             11:46:45

9      Q.  That's the day before the incident with the     11:46:46

10 Loggervales, right?                                      11:46:48

11     A.  Yes.                                             11:46:49

12     Q.  Did you respond to that incident?               11:46:56

13     A.  I don't recall.                                 11:47:00

14     Q.  The suspicious vehicle was listed at 7:39 a.m., 11:47:06

15 correct?                                                 11:47:13

16     A.  Yes.                                             11:47:14

17     Q.  The same day at 7:48 a.m., it says that you     11:47:14

18 responded to the Starbucks regarding an auto burglary,   11:47:20

19 right?                                                   11:47:24

20     A.  Yes.                                             11:47:24

21     Q.  Do you remember actually responding regarding   11:47:25

22 that incident?                                           11:47:28

23     A.  Yes.                                             11:47:29

24     Q.  Do you recall being told that there was a       11:47:39

25 suspicious vehicle before the burglary, which was a silver  11:47:46

| | | |
|---|---|---|
| 1 | four-door with two Black male juveniles? | 11:47:52 |
| 2 | A. Yes. | 11:47:55 |
| 3 | Q. Do you remember how you got that information? | 11:47:56 |
| 4 | A. Specifically, no. | 11:48:03 |
| 5 | Q. In preparation for today, did you review the | 11:48:10 |
| 6 | incident report for the September 19th auto burglary | 11:48:13 |
| 7 | incident? | 11:48:17 |
| 8 | A. Did I read that to prepare for today? | 11:48:17 |
| 9 | Q. Yes. | 11:48:25 |
| 10 | A. No. | 11:48:28 |
| 11 | Q. Down below, it says that you spoke to the victim | 11:48:30 |
| 12 | who stated that she observed a silver four-door vehicle in | 11:48:34 |
| 13 | the parking lot occupied by two young Black males. Do you | 11:48:38 |
| 14 | see that? | 11:48:42 |
| 15 | A. Yes. | 11:48:43 |
| 16 | Q. Do you actually remember speaking with the victim | 11:48:43 |
| 17 | of the September 19th, 2019 incident? | 11:48:46 |
| 18 | A. Vaguely, yes. | 11:48:54 |
| 19 | Q. She told you that there was a silver four-door | 11:48:55 |
| 20 | vehicle occupied by two young Black males? | 11:49:01 |
| 21 | A. Yes. | 11:49:04 |
| 22 | Q. She told you that her vehicle was soon after | 11:49:06 |
| 23 | burglarized? | 11:49:12 |
| 24 | A. Yes. | 11:49:12 |
| 25 | Q. Did she ever tell you that she observed any young | 11:49:13 |

```
1   Black males actually committing a burglary?          11:49:20
2       A.  I don't recall.                              11:49:25
3       Q.  Did you link the Ford silver four-door vehicle  11:49:29
4   with two young Black males to the suspected burglary?   11:49:34
5           MR. GILBERT:  Vague.  Go ahead.              11:49:41
6           THE WITNESS:  Can you clarify what you mean by  11:49:47
7   link?                                                11:49:49
8   BY MR. MAY:                                          11:49:51
9       Q.  Do you believe that the suspects in the burglary  11:49:51
10  were two young Black males who were in a silver four-door  11:49:56
11  vehicle?                                             11:50:01
12          MR. GILBERT:  Vague as to the reference burglary.  11:50:01
13  Go ahead.                                            11:50:05
14          THE WITNESS:  I believed they were possibly the  11:50:05
15  suspects, yes.                                       11:50:10
16  BY MR. MAY:                                          11:50:10
17      Q.  Just for clarity sake, when you say four-door in  11:50:10
18  your description, are you typically referring to a sedan,  11:50:15
19  or not necessarily?                                  11:50:18
20      A.  For better details on that, I would want to  11:50:30
21  review that report number.                           11:50:33
22      Q.  Just based on your own knowledge of how you've  11:50:36
23  prepared reports in the past, if you're referring to an  11:50:40
24  SUV, would you write four-door in a report?          11:50:44
25      A.  Possibly.                                    11:50:50
```

| | | |
|---|---|---|
| 1 | Q. What about a hatchback? Is that a four-door or a | 11:50:53 |
| 2 | five-door? | 11:50:58 |
| 3 | A. I wouldn't consider it a five-door. | 11:50:58 |
| 4 | Q. What about a pickup truck -- well, strike that. | 11:51:04 |
| 5 | Nevermind. Do you remember whether you -- strike that | 11:51:14 |
| 6 | too. Sorry. Regarding the fifth entry in your | 11:51:22 |
| 7 | report from September 19 -- | 11:51:41 |
| 8 | THE COURT REPORTER: Can you start over? I'm | 11:51:43 |
| 9 | sorry. It cut out a little bit. | |
| 10 | BY MR. MAY: | |
| 11 | Q. Where it says "suspicious vehicle" on the first | 11:51:43 |
| 12 | entry of September 19th, do you have any information as to | 11:51:45 |
| 13 | what was suspicious about the vehicle? | 11:51:50 |
| 14 | A. I believe it was possibly relating to casing. | 11:51:52 |
| 15 | Q. Anything else that you recall about that? | 11:52:05 |
| 16 | A. I want to say -- I don't recall specifically. I | 11:52:07 |
| 17 | think it involved casing. | 11:52:20 |
| 18 | Q. Do you remember whether on September 19th, 2019 | 11:52:22 |
| 19 | you spoke to any witnesses who actually observed a | 11:52:58 |
| 20 | break-in? | 11:53:02 |
| 21 | A. I don't recall. | 11:53:02 |
| 22 | MR. MAY: I'm going to mark as Exhibit 5 the | 11:53:09 |
| 23 | incident report for the September 19th, 2019 incident. | 11:53:13 |
| 24 | (Exhibit 5 was marked and attached.) | 11:53:29 |
| 25 | MR. GILBERT: Is there two incidents or three? | 11:53:29 |

1    Q.  Would it help you figure that out if you were to          11:57:48

2  review the rest of this document?                               11:57:52

3    A.  Yes.  Let's go up to the boxes with the people.          11:57:54

4    Q.  Which one?                                                11:58:05

5    A.  I don't recall the reporting party, who that is          11:58:06

6  for the suspicious vehicle call.                                11:58:22

7    Q.  Do you think that would be reflected in a CAD            11:58:24

8  report for this incident?                                       11:58:27

9    A.  Possibly, if they provided their information.           11:58:28

10   Q.  Would it have their phone number at least if they        11:58:31

11 reported it by phone?                                           11:58:34

12   A.  Only if they were willing to and provided it            11:58:36

13 themselves.                                                     11:58:40

14   Q.  Going back to the narrative.  It says the               11:58:41

15 reporting party stated there were two males seated in a        11:58:47

16 gray SUV in the parking lot.  Do you see that?                 11:58:51

17   A.  Yes.                                                      11:58:54

18   Q.  And that one of the males exited the vehicle and        11:58:54

19 looked inside of another vehicle with a flashlight.  Do        11:58:57

20 you see that?                                                   11:59:02

21   A.  Yes.                                                      11:59:02

22   Q.  Then it says, "when patrons exited Starbucks, the        11:59:03

23 male jumped back into the gray SUV."  Then it says, "the       11:59:07

24 male who exited the vehicle was wearing a red hooded            11:59:10

25 sweatshirt."  Did I read that correctly?                        11:59:15

1      A.  Yes.                                              11:59:17

2      Q.  Is that what you meant earlier when you said you  11:59:18

3  believe the suspicious activity appeared to be somebody   11:59:23

4  casing the parking lot?                                   11:59:27

5      A.  Yes.                                              11:59:28

6      Q.  What does "casing" mean to you?                   11:59:30

7      A.  Casing, it's a term where if somebody is casing, 11:59:34

8  could be either looking in the vehicles, checking out or  11:59:41

9  watching businesses, people coming and going.  They're    11:59:47

10 looking for an opportunity to commit a crime.             11:59:52

11     Q.  The description that the reporting party gave you 11:59:57

12 about somebody looking in another vehicle with a          12:00:02

13 flashlight, then jumping back into the car when people    12:00:05

14 came out of the business, that's consistent with your     12:00:07

15 understanding of what casing looks like?                  12:00:12

16     A.  Yes.                                              12:00:13

17     Q.  Do you see anywhere here where it indicates that  12:00:14

18 the reporting party said that the two males were African  12:00:20

19 American?                                                 12:00:24

20     A.  In that paragraph, no.                            12:00:24

21     Q.  Anywhere else in this report?  I'm happy to move  12:00:44

22 it around if you want.                                    12:00:50

23     A.  I don't see it anywhere else in the report.       12:00:51

24     Q.  Do you have an independent memory of the          12:01:10

25 reporting party telling you that the males who were       12:01:13

1  apparently casing the parking lot were Black?                    12:01:17

2      A.  In the report I prepared for here, it says on the       12:01:19

3  0739 hours, the suspicious vehicle call, the vehicle was        12:01:28

4  described as a silver four-door with two Black male             12:01:35

5  juveniles inside.                                               12:01:39

6      Q.  Where did you get that information?                     12:01:40

7      A.  I believe it was from the dispatch radio call.          12:01:42

8      Q.  Is that something that if you wanted to, you            12:01:49

9  would still be able to access?                                  12:01:57

10         MR. GILBERT:  Speculation.  Foundation.  Go             12:02:00

11  ahead.                                                          12:02:06

12         THE WITNESS:  If I needed to, I'm sure that I           12:02:06

13  could.  Yes.                                                    12:02:08

14  BY MR. MAY:                                                     12:02:09

15      Q.  Is it possible that you wrote that there were two      12:02:09

16  Black male juveniles because that was just an assumption       12:02:19

17  that you made?                                                 12:02:24

18      A.  No.                                                     12:02:25

19      Q.  In the incident report that we're looking at, it       12:02:28

20  says that the people who were apparently casing the            12:02:32

21  parking lot jumped into a gray SUV, while your report says     12:02:34

22  that the suspicious activity was people in a silver            12:02:38

23  four-door.  Do you see that?  Did you see those two           12:02:41

24  things?                                                         12:02:45

25      A.  Yes.                                                    12:02:45

1    Q.  Do you know which one is more likely accurate?        12:02:49

2         MR. GILBERT:  Argumentative.  Go ahead.             12:02:59

3         THE WITNESS:  Descriptions people give us vary.     12:03:02

4    Some people don't call an SUV an SUV.  They call it other  12:03:07

5    things.  It's very -- somebody said four-door and somebody  12:03:12

6    could have said SUV.                                      12:03:18

7    BY MR. MAY:                                               12:03:20

8    Q.  Okay.  In your incident report regarding the          12:03:20

9    September 19th incident, you did not say anywhere that it  12:03:25

10   was a silver four-door, did you?                          12:03:29

11   A.  You're talking about the report that's on your        12:03:31

12   screen or on my screen?                                   12:03:58

13   Q.  Yes.                                                  12:03:59

14   A.  Yeah.  I call it a silver four-door vehicle five       12:04:00

15   paragraphs down.                                          12:04:07

16   Q.  Okay.  But that's not the vehicle where people         12:04:08

17   thought they were casing the place.  That's the vehicle    12:04:11

18   observed by the actual victim, right?                      12:04:14

19   A.  Yes.                                                  12:04:16

20   Q.  In your report for the Loggervale incident,            12:04:21

21   Exhibit 1, regarding the silver four-door that was         12:04:29

22   observed by the victim, you wrote down here it was         12:04:35

23   occupied by two young Black males.  Do you see that?       12:04:39

24   A.  I'm sorry.  I'm getting a little confused.  We're      12:04:41

25   going back to the original report for this case?           12:04:48

| | | |
|---|---|---|
| 1 | told you she saw two younger individuals, but didn't | 12:06:53 |
| 2 | mention their race? | 12:06:56 |
| 3 | A.  Okay. | 12:06:57 |
| 4 | Q.  Is that accurate that in the report of the | 12:07:00 |
| 5 | September 19th incident, it does not say what the race of | 12:07:05 |
| 6 | the suspects were? | 12:07:10 |
| 7 | A.  Correct. | 12:07:12 |
| 8 | Q.  If you were told what the race of the suspect was | 12:07:13 |
| 9 | on the scene of an incident, you would likely put that | 12:07:18 |
| 10 | information in your incident report to make it complete | 12:07:22 |
| 11 | and accurate, correct? | 12:07:25 |
| 12 | MR. GILBERT:  Vague as to complete and accurate. | 12:07:27 |
| 13 | Also improperly suggests that it's a requirement to add | 12:07:35 |
| 14 | those details.  Go ahead. | 12:07:43 |
| 15 | THE WITNESS:  I'm sorry.  I need the question one | 12:07:48 |
| 16 | more time. | 12:07:51 |
| 17 | MR. MAY:  Can I have the court reporter please | 12:07:52 |
| 18 | read back my question. | 12:07:54 |
| 19 | (Record read.) | 12:07:55 |
| 20 | THE WITNESS:  Yes. | 12:08:30 |
| 21 | BY MR. MAY: | 12:08:31 |
| 22 | Q.  The fact that your incident report doesn't list | 12:08:31 |
| 23 | the race of any of the suspects on September 19th, does | 12:08:37 |
| 24 | that suggest to you that the suspect's race was not known | 12:08:40 |
| 25 | that day? | 12:08:45 |

1      A.  No, I don't recall.                                    12:08:51

2      Q.  And you don't know where you got the information       12:08:53

3  about the suspects being allegedly two young Black males;      12:08:56

4  is that right?                                                 12:09:01

5      A.  There's two incidents in this report.  When we're      12:09:01

6  on scene we do talk to many people.  It can be difficult       12:09:08

7  at times when we're investigating as people walk by, give      12:09:14

8  us tidbits of information, then they go about their            12:09:18

9  business and leave, or they don't want to be seen talking      12:09:22

10  to law enforcement and as they pass, they give us some        12:09:25

11  information.                                                   12:09:29

12      Q.  If a witness on scene gave you information about       12:09:29

13  a suspect, including the description, is that something        12:09:32

14  you would write in your incident report?                      12:09:35

15          MR. GILBERT:  Speculation.  Overbroad.  Go ahead.     12:09:38

16          THE WITNESS:  It varies.  There's times where         12:09:40

17  people walk by, say something, or I saw it, then they just    12:09:45

18  leave.  So, I don't recall.                                   12:09:49

19  BY MR. MAY:                                                   12:09:52

20      Q.  Is it possible that regarding the September 19th      12:09:52

21  incident, you just assumed that the suspects were Black?      12:09:59

22      A.  No.                                                   12:10:04

23      Q.  If the suspects in the September 19th incident        12:10:10

24  were Black, that would help you support your argument that    12:10:16

25  you have reasonable suspicion to detain my clients,          12:10:19

1  unredacted incident report that we obtained before          12:32:38
2  litigation started.  Out of an abundance of caution, I'll   12:32:42
3  keep it designated for now.                                 12:32:45
4  BY MR. MAY:
5      Q.  When did you first become aware of the             12:32:47
6  Loggervales' vehicle?                                       12:32:50
7      A.  Do you mind if I look at my report real fast?       12:32:51
8      Q.  I don't mind.  You raised a good point.  I would    12:33:01
9  like to try to get your independent memory, and if you      12:33:04
10 need to use the report to refresh your recollection about   12:33:07
11 something, then let me know before you start looking at     12:33:09
12 the report just like you did now, okay?                     12:33:13
13     A.  Okay.  I'd like to review it real fast with my      12:33:14
14 recollection.                                               12:33:19
15     Q.  That's fine, please.                                12:33:19
16     A.  The question one more time.                         12:33:41
17     Q.  When did you first become aware of the             12:33:42
18 plaintiff's vehicle in that parking lot?                    12:33:45
19     A.  Prior to 6:42 in the morning.                       12:33:47
20     Q.  When you first became aware of that vehicle, was    12:33:56
21 it parked?                                                  12:34:01
22     A.  Yes.                                                12:34:01
23     Q.  So you didn't see it pull into the spot, correct?   12:34:02
24     A.  Correct.                                            12:34:09
25     Q.  What was it that brought that vehicle to your       12:34:10

1    attention?                                              12:34:16

2         A.   My partner, Deputy Pope and I, we both        12:34:16

3    independently had seen the vehicle parked.  It had out of 12:34:24

4    state plates on it.  It was parked in a handicapped stall, 12:34:29

5    kind of in the corner of the parking lot.  Couldn't see if 12:34:33

6    there was a handicap placard displayed from the back of   12:34:38

7    the vehicle.  With all the prior events that had occurred  12:34:43

8    at that location, with all the auto break-ins and the     12:34:50

9    descriptions of me knowing a four-door silver vehicle was  12:34:56

10   possibly a suspect vehicle in some of the events.         12:34:59

11        Q.   So did you think that it was a potential that the 12:35:07

12   silver vehicle that my clients were in were connected with 12:35:11

13   some or all of the auto burglaries?                      12:35:15

14        A.   Yes.                                           12:35:18

15        Q.   Do you remember the make and model of my client's 12:35:19

16   vehicle?                                                 12:35:22

17        A.   I remember it's a silver four-door.  I have that 12:35:22

18   information in my report.                                12:35:28

19        Q.   Okay.  What about make and model?              12:35:29

20        A.   I just recall it's a silver four-door vehicle. 12:35:34

21        Q.   Did you put the make and model in the report?  12:35:37

22        A.   Yes.                                           12:35:40

23        Q.   Can you take a look at the report and tell us  12:35:41

24   what the make and model was?  And year actually, if you   12:35:44

25   have that as well.                                       12:35:49

1      A.   2019 silver Cadillac XTS.                      12:36:06

2      Q.   Before you approached my client's vehicle, was it   12:36:13

3  your understanding that any of the suspects associated     12:36:18

4  with any auto burglaries or other property crimes at the   12:36:22

5  2720 Castro Valley Boulevard location were in a Cadillac?  12:36:27

6      A.   Just that they were in a four-door silver          12:36:32

7  vehicle.                                                   12:36:39

8      Q.   So you didn't have any information that any of     12:36:39

9  the suspects were in a Cadillac XTS, correct?              12:36:43

10      A.   Correct.                                          12:36:49

11      Q.   When you first observed the vehicle, were you     12:36:50

12  able to see any of the occupants?                          12:36:55

13      A.   Just the subject in the driver's seat.            12:36:56

14      Q.   When you first observed the subject in the        12:37:02

15  driver's seat, could you tell what she was doing?          12:37:07

16      A.   I initially believed it was a Black male in the   12:37:10

17  driver's seat, and the seat was leaned back and it         12:37:14

18  appeared that they were looking towards Starbucks.         12:37:18

19      Q.   Did you see the person that you believed at that  12:37:23

20  time to be a Black male to look back and forth in          12:37:26

21  a furtive manner?                                          12:37:35

22      MR. GILBERT:  Vague as to "furtive."  Go ahead.        12:37:37

23      THE WITNESS:  It just appeared that they were          12:37:40

24  looking -- because they were parked, like, in the corner   12:37:44

25  away from Starbucks, and it appeared that they were        12:37:48

1  looking in the direction of Starbucks.                    12:37:51

2  BY MR. MAY:                                               12:37:59

3      Q.  Did you see any movement in the vehicle before   12:37:59

4  you approached it?                                        12:38:02

5      A.  No.  I don't recall.                              12:38:03

6      Q.  Was there anything suspicious about where the     12:38:09

7  vehicle was parked before you approached it?             12:38:18

8      A.  Yes.  All the other businesses were closed.       12:38:20

9  Starbucks was the only open business.  This vehicle was in 12:38:24

10 a handicap stall; however, there were many other -- closer 12:38:27

11 parking to the only open business.  I couldn't see that   12:38:32

12 there was a handicap placard displayed and the vehicle was 12:38:40

13 in a handicap stall.  The license plates being from       12:38:45

14 Nevada, the record checks show that it was a rental car.  12:38:49

15 From my training and experience, rental cars are commonly 12:38:52

16 used in the commission of crimes.                         12:38:56

17     Q.  You did a records check before you approached the 12:39:04

18 vehicle?                                                  12:39:07

19     A.  I believe so, yes.                                12:39:07

20     Q.  You dispatched the license plate?                 12:39:12

21     A.  Yes.                                              12:39:16

22     Q.  Dispatch told you it was a rental vehicle?        12:39:16

23     A.  Yes.                                              12:39:24

24     Q.  Eventually, at some point, when you spoke with    12:39:24

25 Ms. Loggervale who was in the driver's seat, she also told 12:39:27

1    you it was a rental vehicle, correct?                           12:39:30

2        A.  Yes.                                                    12:39:32

3        Q.  So in that respect, she corroborated with what          12:39:33

4    dispatch told you?                                              12:39:38

5        A.  Yes.                                                    12:39:40

6        Q.  When you first observed the vehicle and saw it          12:39:41

7    was not near one of the open businesses and that there was      12:39:44

8    no movement by the occupants, did it occur to you that          12:39:48

9    maybe the occupant was taking a short nap?                      12:39:51

10       A.  No.                                                     12:39:57

11       Q.  When people would take short naps in their car,         12:39:58

12   do they prefer, typically in your experience, to park away      12:40:02

13   from where open businesses are?                                 12:40:06

14           MR. GILBERT:  Speculation.  Go ahead.                   12:40:08

15           THE WITNESS:  So for that property, there is also       12:40:10

16   an issue of transient population and people sleeping on         12:40:14

17   and around it.  So the whole properties -- the owners have      12:40:20

18   what's called an open-ended complaint on file.  Do you          12:40:25

19   know what that is?                                              12:40:29

20   BY MR. MAY:                                                     12:40:30

21       Q.  No.  I was going to ask you about that later, but       12:40:30

22   go ahead if you want to explain it.                             12:40:33

23       A.  It's where owners of the business, they can come        12:40:34

24   down to our station and sign a form that says they will         12:40:38

25   pursue prosecution on any subjects trespassing or               12:40:42

```
 1  loitering on the property.                          12:40:47
 2      Q.  Is that something that's posted on the property  12:40:50
 3  so that the people -- so that the guests are aware of  12:40:53
 4  that?                                                12:40:58
 5      A.  Sometimes it is.                             12:40:58
 6      Q.  Didn't mean to interrupt you.  Go ahead.     12:41:06
 7      A.  A lot of times when they're posted, subjects will  12:41:11
 8  rip them off, so the owners have to replace them.    12:41:16
 9      Q.  Do you know one way or the other whether any sign  12:41:19
10  was posted about the open complaint at the time you   12:41:22
11  approached my client's vehicle?                      12:41:25
12      A.  I don't.                                     12:41:28
13      Q.  Did you believe that my clients might be      12:41:28
14  transients who were just sleeping on the property?   12:41:37
15      A.  No.                                          12:41:40
16      Q.  Is that because they were in a Cadillac?     12:41:44
17      A.  No.  That's because with all the information I  12:41:47
18  stated earlier, I believed it was related to the criminal  12:41:54
19  activity that had been occurring.                    12:41:59
20      Q.  So basically you found it suspicious that they  12:42:01
21  were parked -- among other things, I'm not saying this is  12:42:13
22  the only thing -- but one of the things you found     12:42:15
23  suspicious is that they were parked in front of closed  12:42:17
24  businesses when there were available spots in front of an  12:42:21
25  open business; is that right?                        12:42:24
```

1     A.  Yes.                                    12:42:27

2     Q.  Would you agree that parking farther up from an    12:42:27

3  open business could also be explained innocently?       12:42:33

4     A.  It's possible, yes.                      12:42:43

5     Q.  Have you ever heard of people who intentionally   12:42:44

6  park further away from where they're going so they get a  12:42:46

7  little exercise every day?                       12:42:50

8     A.  Yes.                                      12:42:51

9     Q.  Have you ever done that?                 12:42:52

10    A.  Yes.  I've parked further away before so people   12:42:58

11  don't hit my car.                             12:43:02

12    Q.  How long did you -- sorry.  How long did you    12:43:03

13  observe my client's vehicle before you approached it?   12:43:10

14    A.  Several minutes.                       12:43:14

15    Q.  Can you narrow it down any more than several    12:43:15

16  minutes?                                    12:43:19

17    A.  I can't.                              12:43:19

18    Q.  Are there any documents, like CAD logs or bodycam  12:43:22

19  footage or anything else you can think of that would allow 12:43:30

20  you to come up with the amount of time that you had     12:43:34

21  observed the vehicle before approaching it?          12:43:37

22    A.  I don't know.                         12:43:42

23    Q.  Was there anything suspicious about the fact that 12:43:49

24  it was parked in a handicap space?                12:43:52

25    A.  Well, the fact that I couldn't see a placard    12:43:55

1  displayed.                                              12:44:01

2      Q.  Do you believe your inability to see the placard  12:44:05

3  was just your vantage point?                            12:44:10

4      A.  It was early morning hours and it was dark.    12:44:12

5      Q.  Are those placards typically hung from the     12:44:16

6  rearview mirror?                                        12:44:23

7      A.  Yes, typically.                                12:44:24

8      Q.  When you were observing the car before         12:44:25

9  approaching it, could you see the rearview mirror from  12:44:28

10 where you were?                                         12:44:31

11     A.  I don't recall.                                12:44:32

12     Q.  But you believed it was suspicious that they were  12:44:34

13 in the handicap spot because you had not yet confirmed  12:44:44

14 they had the placard; is that right?                    12:44:49

15     A.  Can you ask that question differently.          12:44:51

16     Q.  You don't understand the way it was phrased; is  12:45:02

17 that fair?                                              12:45:09

18     A.  Any vehicle that's in a handicap stall, if they  12:45:09

19 don't have a placard or I can't see a placard, we will go  12:45:14

20 and inspect the placard and see if they're lawfully     12:45:19

21 allowed to be in that stall.                            12:45:23

22     Q.  Before you approached the driver compartment of  12:45:25

23 the vehicle, did you go see whether there was actually a  12:45:33

24 placard hanging from the rearview mirror?               12:45:36

25     A.  On my approach, I made a driver's side approach,  12:45:40

1  and I was initially surprised to find that there was three    12:45:47

2  people in the car.  So that diverted my attention to when    12:45:51

3  I -- I don't recall if I did see a handicap placard in the    12:45:56

4  mirror at that point or not.    12:46:01

5      Q.  At some point did you learn that there was a    12:46:03

6  handicap placard hanging from the rearview mirror?    12:46:05

7      A.  I know -- I recall a handicap placard being    12:46:09

8  discovered.  I don't recall if it was hanging from the    12:46:15

9  mirror or not.    12:46:19

10      Q.  When you reviewed portions of your bodycam to    12:46:20

11  prepare for today, did you see any footage of what    12:46:24

12  happened with the placard?    12:46:27

13      A.  I don't recall.    12:46:28

14      Q.  When you approached the vehicle, was one of your    12:46:30

15  purposes to investigate whether that placard -- sorry,    12:46:40

16  whether the vehicle was lawfully parked in a disabled    12:46:43

17  stall?    12:46:49

18      A.  Yes.    12:46:49

19      Q.  Did you in fact investigate that issue?    12:46:50

20      A.  I believe one of my partners conducted the check    12:46:54

21  of the placard.    12:47:00

22      Q.  How do you know that?    12:47:02

23      A.  I believe it was done over the air.  Over the    12:47:04

24  radio.    12:47:07

25      Q.  Was that after my clients were already detained?    12:47:08

1        A.  I don't recall exactly when it was done.          12:47:12

2        Q.  You mention that there were more spaces that were  12:47:17

3    available closer to the Starbucks; is that right?         12:47:28

4        A.  Yes.                                               12:47:30

5        Q.  Were any of those designated for disabled         12:47:30

6    parking?                                                   12:47:36

7        A.  I don't recall.                                    12:47:36

8        Q.  When you first observed my client's car, did you  12:47:41

9    believe the occupant was casing the parking lot?          12:47:59

10       A.  Yes.                                               12:48:02

11       Q.  Have you already told me all the reasons that you 12:48:03

12   believe that?                                              12:48:08

13       A.  I believe so.                                      12:48:08

14       Q.  It includes the prior incident at that location,  12:48:15

15   correct?                                                   12:48:19

16       A.  Yes.                                               12:48:20

17       Q.  And the fact that it appeared to you that she was 12:48:20

18   looking out of the window towards the rest of the parking 12:48:25

19   lot?                                                       12:48:30

20       A.  Yes.                                               12:48:30

21       Q.  And the fact that she was parked further away     12:48:30

22   from the businesses that were open?                        12:48:34

23       A.  Yes.                                               12:48:36

24       Q.  Anything else that I haven't mentioned?           12:48:38

25       A.  The fact that it was a rental vehicle.  I had     12:48:42

1    observed other patrons come and go.  I didn't see any          12:48:47

2    movement from the vehicle.                                     12:48:51

3         Q.  If you believed that the occupants of that silver     12:49:00

4    Cadillac was casing the parking lot, did you consider          12:49:05

5    whether to observe it further to see if it would do            12:49:08

6    anything that -- let me try that again.  When you              12:49:12

7    determined that the occupant of the silver vehicle was         12:49:21

8    casing the parking lot, did you consider simply observing      12:49:26

9    it for a little longer to see what would happen?               12:49:29

10        A.  That parking lot is very difficult to park, sit       12:49:34

11   back, and observe without being seen.  It had already been     12:49:41

12   there for several minutes.  I saw it.  My partner saw it       12:49:44

13   independently of me.  After I drive through the lot,           12:49:49

14   sometimes vehicles will leave.  The fact that it was still     12:49:54

15   there when I had returned, we decided to make contact.         12:49:58

16        Q.  Had you ever had discussion with any other            12:50:06

17   sheriff deputy or supervisor about setting up some kind of     12:50:09

18   stakeout in that parking lot to try to apprehend the car       12:50:14

19   burglars in the act?                                           12:50:19

20        A.  I was talking to the property crimes unit.  I did     12:50:20

21   talk to a few of the detectives of the issues we were          12:50:26

22   having over there, but nothing like that was able to take      12:50:30

23   effect or start up.                                            12:50:34

24        Q.  Was it more your goal to deter the crimes rather      12:50:37

25   than try to catch somebody in the act?                         12:50:41

1    A.  Ideally, yes.  If I can deter the crime, that is     12:50:44

2    the goal.  If I happen to catch them in the act, then     12:50:49

3    effect an arrest.  But deterring crime and keeping the     12:50:53

4    community safe is our goals as deputies.     12:50:56

5    Q.  At some point, you and Deputy Pope did approach     12:50:59

6    the silver vehicle, correct?     12:51:03

7    A.  Yes.     12:51:05

8    Q.  At the moment that you approached the vehicle     12:51:06

9    before you actually had any discussion with any occupant,     12:51:09

10   at that moment in time did you believe there was     12:51:13

11   reasonable suspicion to detain the occupants?     12:51:15

12   A.  Yes.     12:51:19

13   Q.  Based on what?     12:51:22

14       MR. GILBERT:  Asked and answered.  Go ahead.     12:51:29

15       THE WITNESS:  All the facts that we mentioned in     12:51:32

16   the last question and my reasons for the contact.  Do you     12:51:34

17   want me to go over those again?     12:51:37

18   BY MR. MAY:     12:51:39

19   Q.  No.  I think we can refer to those.  Let me ask a     12:51:39

20   slightly different question.  When you did believe there     12:51:42

21   was reasonable suspicion, what crime were you suspecting     12:51:44

22   them of having committed or being about to commit?     12:51:49

23   A.  I believe the vehicle was there casing.  It     12:51:52

24   matched the descriptions from prior reports of auto     12:51:58

25   burglaries.  So either the suspects of the past auto     12:52:03

1  burglaries were there casing, looking for the opportunity.    12:52:09

2     Q.  Do you believe that they both had committed at    12:52:16

3  least one of the previous auto burglaries?    12:52:23

4     A.  I believed it was possible.    12:52:25

5     Q.  Do you believe you had reasonable suspicion to    12:52:29

6  detain them for commission of a previous auto burglary?    12:52:32

7        MR. GILBERT:  Misstates his testimony.  Go ahead.    12:52:38

8        THE WITNESS:  I'm sorry.  One more time.    12:52:43

9  BY MR. MAY:    12:52:44

10     Q.  Do you believe that you had reasonable suspicion    12:52:44

11  to detain the occupants of the silver car based on the    12:52:46

12  commission of one of the previous auto burglaries?    12:52:51

13        MR. GILBERT:  Misstates testimony.  Go ahead.    12:52:57

14        THE WITNESS:  Yes.    12:52:59

15  BY MR. MAY:    12:53:00

16     Q.  Do you believe there was also reasonable    12:53:00

17  suspicion to detain them based on their -- based on the    12:53:02

18  fact that they were about to commit another auto burglary?    12:53:08

19     A.  I believe there was reasonable suspicion to    12:53:13

20  detain based on the totality of the circumstances.    12:53:17

21     Q.  When you say reasonable suspicion to detain,    12:53:21

22  you're talking about specific crimes that you believe they    12:53:26

23  either committed, were in the process of committing, or    12:53:29

24  were about to commit, right?    12:53:33

25     A.  Yes.    12:53:34

1    Q.  The crimes that we're talking about now are auto    12:53:35

2  burglary in particular; is that right?    12:53:41

3    A.  Other reported crime has occurred at that    12:53:43

4  address, and I -- we didn't know the relation.  For the    12:53:49

5  auto burglaries, yes, and all the criminal activity that    12:53:53

6  occurred at that location.    12:53:59

7    Q.  Are you referring to the strong-arm robbery or    12:54:03

8  something else?    12:54:06

9    A.  I'm referring to there's many reports generated    12:54:07

10  from that address with criminal activity.    12:54:11

11    Q.  More than what's listed in your incident report?    12:54:14

12    A.  It's very possible.  A lot of people -- I'll    12:54:18

13  drive through the parking lot, I'll see broken glass, and    12:54:23

14  there's no report.  Some people don't have time or don't    12:54:26

15  call in to make police reports even though they've been    12:54:31

16  victims of crime.    12:54:35

17    Q.  So when you approached the vehicle, you believed    12:54:38

18  you already had reasonable suspicion to detain them for    12:54:40

19  certain crimes, right?    12:54:45

20    A.  Yes, on top of being able to confirm there's a    12:54:48

21  handicap placard issued to someone in the vehicle.    12:54:55

22    Q.  I want to know all the crimes that you believe    12:54:59

23  you had reasonable suspicion to detain them on before    12:55:03

24  actually speaking with anybody in the car?    12:55:07

25      MR. GILBERT:  Asked and answered multiple times    12:55:10

1  property with intent to commit theft or a crime.  I had to          12:57:01

2  verify the identity of the driver as to confirm that              12:57:07

3  placard was -- belonged to her or somebody in that               12:57:15

4  vehicle.                                                         12:57:19

5       Q.  Okay.  So we covered it or is there anything           12:57:20

6  else?                                                            12:57:30

7       A.  I think we covered it.                                 12:57:35

8       Q.  As you're approaching the -- before you               12:57:37

9  approached the vehicle, did you have a discussion with           12:57:40

10 Deputy Pope about what the plan was?                             12:57:42

11      A.  Yes.                                                   12:57:45

12      Q.  What did the two of you discuss?                       12:57:49

13      A.  Going off my recollection, we believe the vehicle     12:57:53

14 was related to the string of auto burglaries.  We knew we        12:57:59

15 could confirm the handicap placard and ID of the driver,         12:58:03

16 and we wanted to identify -- because initially we thought        12:58:09

17 there was only one occupant.  We wanted to verify that --        12:58:13

18 we wanted to see if criminal activity was occurring, about       12:58:17

19 to occur, or if it wasn't.  So we said, let's go make            12:58:21

20 contact and conduct our investigation.                           12:58:26

21      Q.  Were you the lead on that call -- or not call,         12:58:29

22 sorry.  Were you the lead in that investigation?                 12:58:41

23      A.  Yes.                                                   12:58:43

24      Q.  What does that mean to be the lead?                    12:58:45

25      A.  Lead, we call it primary.  In charge of the call.      12:58:53

| | | |
|---|---|---|
| 1 | conversation. | 13:00:54 |
| 2 | Q. When you first started talking to them, is it | 13:01:01 |
| 3 | accurate that they were not being detained at that moment? | 13:01:04 |
| 4 | A. No. | 13:01:08 |
| 5 | Q. Did you say -- what's the first thing you said to | 13:01:15 |
| 6 | any of the people in the silver Cadillac to indicate they | 13:01:18 |
| 7 | were being detained? | 13:01:21 |
| 8 | A. I don't recall. | 13:01:24 |
| 9 | Q. I think you already said that the fact there were | 13:01:30 |
| 10 | multiple occupants was a surprise to you? | 13:01:40 |
| 11 | A. Yes. | 13:01:42 |
| 12 | Q. Based on that, you can't recall if you checked to | 13:01:43 |
| 13 | see if there was a handicap placard? | 13:01:46 |
| 14 | A. When I discovered that there was three occupants | 13:01:49 |
| 15 | and not just one, I was surprised -- | 13:01:58 |
| 16 | THE COURT REPORTER: You cut out on the end of | |
| 17 | your answer. | 13:02:32 |
| 18 | THE VIDEOGRAPHER: Let's go off the record at | 13:02:32 |
| 19 | 1:02 p.m. | 13:02:35 |
| 20 | (Lunch break taken.) | |
| 21 | THE VIDEOGRAPHER: Back on the record. The time | 13:45:58 |
| 22 | is 1:45 p.m. -- excuse me. 1:46 p.m. | 13:45:59 |
| 23 | BY MR. MAY: | 13:46:05 |
| 24 | Q. Alright, Deputy Holland, you ready to continue? | 13:46:05 |
| 25 | A. Yes. | 13:46:10 |

```
 1      Q.  You understand you're still under oath, right?      13:46:10
 2      A.  Yes.                                                 13:46:13
 3      Q.  When you first observed the silver car, could you   13:46:13
 4  immediately tell what race the occupant was?                13:46:20
 5      A.  Not immediately, no.                                13:46:23
 6      Q.  When did you first realize what race the occupant   13:46:39
 7  of the vehicle was?                                         13:46:44
 8      A.  I believe it's when I started the approach.         13:46:45
 9      Q.  When did you first realize that the person in the   13:46:48
10  driver's seat was a woman?                                  13:46:55
11      A.  When I made contact at the window.                  13:46:57
12      Q.  I believe you said before you made contact, you     13:47:04
13  believe you already had reasonable suspicion, correct?      13:47:07
14      A.  Yes.                                                13:47:12
15      Q.  If you -- it's sort of a hypothetical question.     13:47:12
16  I know this isn't what happened, but if the person in the   13:47:18
17  driver's seat was Caucasian, would you still have had       13:47:21
18  reasonable suspicion?                                       13:47:25
19          MR. GILBERT:  Speculation.  Incomplete              13:47:31
20  hypothetical.  Go ahead.                                    13:47:34
21          THE WITNESS:  Yes, I believe so.                    13:47:34
22  BY MR. MAY:                                                 13:47:36
23      Q.  When you first realized that the person in the      13:47:36
24  driver's seat was a woman, do you believe that you still    13:47:46
25  had reasonable suspicion at that time?                      13:47:50
```

 1      A.  Yes, because following initial contact, I          13:47:52

 2  believed the subject was a male and then I discovered it   13:47:57

 3  was a female.  If I made that same observation, it's very  13:48:02

 4  possible that the victims to the auto burglaries -- the    13:48:06

 5  same identification as I did.                              13:48:14

 6          THE COURT REPORTER:  Wouldn't make the same

 7  identification?  Your answers are breaking up a lot since

 8  we came back on the record.  I don't know why.

 9          THE VIDEOGRAPHER:  Mr. Gilbert, would you mind if

10  you logged out then logged back in just to reset the

11  audio.  It's kind of crackling since the break.

12          MR. GILBERT:  Yeah, we'll be right back in just a

13  minute.

14          THE VIDEOGRAPHER:  Mr. May, would you like to go

15  off the record while we do that?

16          MR. MAY:  Sure.

17          THE VIDEOGRAPHER:  Off the record at 1:48 p.m.     13:48:59

18          Back on the record.  The time is 1:51 p.m.         13:51:25

19          MR. MAY:  Did the court reporter need the rest of

20  that answer?  If so, can we get back the question and

21  whatever was taken down of the answer.

22          (Record Read.)                                     13:52:24

23          MR. GILBERT:  The victims of the auto something    13:52:24

24  may have made the same identification that I did.          13:52:36

25  ///

1  BY MR. MAY:

2      Q.  So you believe that because you mistook the          13:52:55

3  person in the driver's seat for a man, that maybe the        13:52:57

4  people who witnessed the previous auto burglaries or         13:53:02

5  witnessed who they thought were suspects in those cases      13:53:06

6  might have thought they saw men, but that person could       13:53:10

7  have also been a woman?                                      13:53:13

8      A.  Yes.  It's very common when we go to these calls     13:53:14

9  we get a description of a male or female and often times     13:53:19

10 who we think we're with one and it turns out to be the       13:53:22

11 other.                                                       13:53:27

12     Q.  What about when you noticed that there were two      13:53:27

13 more women in the vehicle with the person in the driver's    13:53:31

14 seat?  Did that dissipate your reasonable suspicion at       13:53:35

15 that point?                                                  13:53:39

16     A.  No.                                                  13:53:39

17     Q.  Were there any other incidents you were aware of     13:53:40

18 where suspects of auto burglaries in that parking lot were   13:53:44

19 groups of women?                                             13:53:48

20     A.  There are groups of women specifically, no.          13:53:49

21     Q.  When we're talking about reasonable suspicion,       13:53:57

22 are we talking about just the person in the driver's seat,   13:54:01

23 or do you believe you had reasonable suspicion upon          13:54:04

24 approaching the vehicle to detain all three occupants of     13:54:07

25 the vehicle?                                                 13:54:11

1    A.  So this situation was very fluent.  At different    13:54:11

2  points during this call, different things arose.    13:54:18

3    Q.  What about right before you made contact?  Right    13:54:23

4  before the driver, the woman in the driver's seat opened    13:54:27

5  her window, did you believe you had reasonable suspicion    13:54:30

6  to detain all of the occupants in the vehicle?    13:54:32

7    MR. GILBERT:  Assumes facts that he knew there    13:54:37

8  were three individuals in the car.  Go ahead.    13:54:39

9    THE WITNESS:  Like I said earlier, I was very    13:54:41

10  surprised to find that there was more people in the car    13:54:44

11  because I couldn't see during the approach.  The seats    13:54:47

12  were leaned back.  One was -- both were lying down.    13:54:50

13  BY MR. MAY:    13:54:56

14    Q.  Once you did realize there were three people in    13:54:56

15  the car, did you realize all three were women?    13:55:04

16    A.  Not right away, no, because I couldn't see.  I    13:55:08

17  believe one of them was under a blanket or under    13:55:12

18  something.    13:55:16

19    Q.  When did you first realize that all three    13:55:18

20  occupants were women?    13:55:21

21    A.  I don't recall specifically.  I believe in our    13:55:23

22  conversation the driver said she was with her daughters.    13:55:26

23    Q.  When you first approached, you knocked on the    13:55:33

24  window, correct?    13:55:38

25    A.  Yes.    13:55:38

1    Q.  Before you knocked on the window, did you notice    13:55:39

2  whether the person in the driver's seat was awake or not?    13:55:43

3    A.  I don't recall.    13:55:47

4    Q.  At any point did you observe the woman in the    13:55:49

5  driver's seat with her eyes closed?    13:55:55

6    A.  I don't recall.    13:55:57

7    Q.  When you knocked on the window, did the woman in    13:55:58

8  the driver's seat roll down the window?    13:56:04

9    A.  At some point, yes.    13:56:06

10    Q.  When you first made contact with the woman in the    13:56:11

11  driver's seat, did anything about her appearance or what    13:56:14

12  she said lead you to believe she had been taking a nap?    13:56:17

13    A.  I recall her saying that she was waiting for    13:56:21

14  Starbucks to open.    13:56:28

15    Q.  My question is a little different.  Do you    13:56:32

16  remember her saying that she was taking a nap or sleeping    13:56:36

17  or resting at any point?    13:56:39

18    A.  I don't recall.    13:56:41

19    Q.  When you knocked on the window, did the woman in    13:56:42

20  the driver's seat start the engine?    13:56:47

21    A.  I know the engine started a couple of times    13:56:49

22  during this incident.  To be specific on exactly when, I'd    13:56:55

23  have to review my report or watch the bodycam to be --    13:57:04

24  exactly when it happened.    13:57:08

25    Q.  When you first knocked on the window, did the    13:57:10

```
 1  woman in the driver's seat lower the window?          13:57:16
 2      A.  Yes.                                           13:57:19
 3      Q.  Do you recall telling her whether she should turn  13:57:19
 4  the car off at that point?                            13:57:24
 5      A.  I don't recall.                                13:57:26
 6      Q.  When you first started making contact with the  13:57:27
 7  woman in the driver's seat, were you concerned that she  13:57:31
 8  was about to put the -- that she was about to start the  13:57:34
 9  car and move it somewhere?                            13:57:38
10          MR. GILBERT:  Can you read that back, please.  13:57:43
11          (Record read.)                                13:57:43
12          MR. MAY:  Let me just rephrase it instead.  It's  13:57:44
13  probably not a great question and I don't want to have to  13:57:47
14  hear it again.                                        13:57:50
15  BY MR. MAY:
16      Q.  When you first made contact with the woman in the  13:57:51
17  driver's seat, do you remember being concerned that she  13:57:53
18  might start driving the car somewhere?               13:57:58
19      A.  That's always the concern on every stop when  13:58:01
20  someone is in the car.  So typically I always have the  13:58:04
21  drivers turn off the vehicle.                         13:58:11
22      Q.  When you say stop, is that the same as detention?  13:58:11
23      A.  It can be.                                     13:58:15
24      Q.  Did you consider this a stop of these women?  13:58:21
25      A.  Yes.                                           13:58:25
```

1     Q.  When you approached the car to make contact with        13:58:27

2  the woman in the driver's seat, do you know if Deputy Pope     13:58:32

3  was standing behind the vehicle?                                13:58:35

4     A.  I knew Deputy Pope was around the vehicle.  I           13:58:39

5  don't know exactly where she was.  The cover officer goes      13:58:46

6  to the passenger side of the vehicle.  In doing so, at         13:58:51

7  some point, had to cross from behind the vehicle to get        13:58:55

8  there.                                                          13:58:58

9     Q.  I know you don't recall if the woman in the             13:59:02

10 driver's seat was sleeping when you first approached, but      13:59:06

11 I'll ask you a hypothetical question.  If you observed         13:59:09

12 that she was sleeping when you first made contact, would       13:59:13

13 that be inconsistent with somebody who's casing a parking      13:59:16

14 lot to try to break into a car?                                13:59:19

15       MR. GILBERT:  Incomplete hypothetical.                   13:59:21

16 Speculation.  Go ahead.                                        13:59:24

17       THE WITNESS:  No, it's not, because if people are        13:59:25

18 casing parking lots, it doesn't mean that they're looking      13:59:29

19 for opportunity 100 percent of the time.                       13:59:33

20 BY MR. MAY:                                                     13:59:35

21    Q.  When you first observed the silver car and              13:59:35

22 noticed that the person in the driver's seat was looking       13:59:43

23 out the window to the side, could you tell whether that        13:59:46

24 person's eyes were opened or closed?                           13:59:50

25    A.  No.                                                      13:59:52

1      Q.  Did you ever tell Deputy Pope to be careful      13:59:58

2   because you were afraid the driver of the silver car may   14:00:01

3   drive into her?                                            14:00:05

4      A.  I don't recall.                                    14:00:06

5      Q.  When you first made contact with the woman in the  14:00:09

6   driver's seat, was she allowed to leave at that very       14:00:12

7   moment?                                                    14:00:17

8      A.  No.                                                14:00:17

9      Q.  Now during the interactions early on, you told     14:00:18

10  her that you were investigating auto break-ins, correct?   14:00:28

11     A.  Yes.                                               14:00:32

12     Q.  You told her that you had been having auto         14:00:32

13  break-ins every morning around that time, right?          14:00:39

14     A.  I don't recall exactly what I said.  But I had --  14:00:42

15  something to the effect of that there were break-ins       14:00:47

16  occurring around that time at that place.                  14:00:51

17     Q.  After a little of bit of discussion, you asked     14:00:54

18  for her driver's license, correct?                        14:01:03

19     A.  Yes.                                               14:01:06

20     Q.  Why did you do that?                               14:01:07

21     A.  Because I needed to identify her for my            14:01:08

22  investigation, and also to ensure that she had a valid     14:01:17

23  license and was allowed to be parked in that stall.        14:01:23

24     Q.  You never observed the woman in the driver's seat  14:01:26

25  actually operating the motor vehicle, did you?            14:01:30

1     A.  Just that she was in the driver's seat with the          14:01:32

2  vehicle running, so had control of the vehicle.              14:01:36

3     Q.  You never saw her actually driving it?                  14:01:38

4     A.  Correct.                                                14:01:42

5     Q.  You said you needed to ID her as part of the            14:01:43

6  investigation.  Why did you need to have her ID as part of   14:01:50

7  your investigation?                                          14:01:54

8     A.  So I could do my job and actually investigate          14:01:54

9  their role, if they were related or not related to the       14:02:00

10 auto burglaries.                                             14:02:04

11    Q.  You didn't know the name of any of the suspects        14:02:06

12 in any of those auto burglaries at 2720 Castro Valley        14:02:10

13 Road, did you?                                               14:02:16

14    A.  No.                                                    14:02:16

15    Q.  Did you -- when you asked her for her ID, did you      14:02:17

16 also ask her for proof of issuance of the disabled          14:02:23

17 placard?                                                     14:02:29

18    A.  I don't recall.                                        14:02:29

19    Q.  At any point during the encounter, did you ask         14:02:31

20 the woman in the driver's seat for proof of issuance of      14:02:34

21 that disabled placard?                                       14:02:38

22    A.  I don't recall if I did or did not.                    14:02:39

23    Q.  You don't recall one way or the other, right?          14:02:45

24    A.  Correct.                                               14:02:49

25    Q.  Have you ever cited somebody for a disabled            14:02:50

1  placard violation?                                    14:02:57

2      A.  I have cited and I've issued numerous handicap  14:02:58

3  placard violation tickets.                            14:03:05

4      Q.  In those situations where you issued citations,  14:03:07

5  did you ask for those people's ID?                    14:03:11

6      A.  Yes.                                          14:03:13

7      Q.  When you asked for their ID, did you tell them  14:03:18

8  that you needed the ID to confirm that it was a valid  14:03:22

9  placard?                                              14:03:27

10     A.  Yes.                                          14:03:28

11     Q.  In those situations where you issued citations,  14:03:28

12 did you also ask those people for proof of issuance of  14:03:32

13 their placard?                                        14:03:35

14     A.  I'm not sure what you mean by that.           14:03:36

15     Q.  When you cited people for the handicap placard  14:03:42

16 violation, what statutes did you rely on?             14:03:47

17     A.  I would have to refer to -- I would have to look  14:03:51

18 that up to get you the exact Vehicle Code section.  I  14:03:59

19 don't have them memorized.                            14:04:04

20     Q.  The Vehicle Code section that you're referring to  14:04:07

21 requires that somebody show you both their ID and proof of  14:04:11

22 issuance when you ask for both of those things, correct?  14:04:17

23     A.  I believe so, yes.                            14:04:20

24     Q.  With Ms. Loggervale, you didn't ask her for  14:04:21

25 her ID and proof of issuance, did you?                14:04:28

1    A.  I don't believe I got a chance to with how things    14:04:30

2    evolved during this call.    14:04:36

3    Q.  You never mentioned anything to Ms. Loggervale    14:04:37

4    about her disabled placard, did you?    14:04:41

5    A.  I don't recall.    14:04:44

6    Q.  Isn't it true that before you detained    14:04:45

7    Ms. Loggervale, you weren't even legitimately concerned    14:04:53

8    that she was violating any disabled placard laws?    14:04:57

9    MR. GILBERT:  Vague as to "legitimately    14:05:02

10   concerned."  Go ahead.    14:05:04

11   THE WITNESS:  There were several reasons for my    14:05:07

12   contact, and with the rapidly evolving situation, my    14:05:09

13   concern shifted toward officer safety as people started to    14:05:15

14   exit the vehicle, the vehicle turning on.  I do know that    14:05:22

15   the handicap placard -- the check of it was completed    14:05:29

16   during this call.    14:05:34

17   BY MR. MAY:    14:05:36

18   Q.  After she was in handcuffs in the police car?    14:05:36

19   A.  I don't recall exactly when it was done.    14:05:39

20   Q.  When you asked Ms. Loggervale for -- you    14:05:46

21   understand that the women in the car, their last name is    14:05:49

22   Loggervale, correct?    14:05:55

23   A.  Yes.    14:05:57

24   Q.  When I say Ms. Loggervale, is it okay if I use    14:05:57

25   that to refer to the mother only?    14:06:01

```
 1      A.  Yes.                                              14:06:04
 2      Q.  Okay.  When you asked Ms. Loggervale for her ID, 14:06:07
 3  was that still a consensual encounter?                   14:06:12
 4          MR. GILBERT:  Vague as to time.                  14:06:15
 5          MR. MAY:  Let me rephrase that.                  14:06:20
 6  BY MR. MAY:
 7      Q.  When you first asked Ms. Loggervale for her ID,  14:06:22
 8  was that at a time when you considered the encounter to be 14:06:25
 9  consensual?                                              14:06:30
10      A.  I start every call -- I try to keep it as        14:06:31
11  consensual and very calm and low key.  Upon initial     14:06:41
12  contact, I asked for her ID and she reached down like she 14:06:48
13  was going to hand it to me, and at some point decided not 14:06:53
14  to hand it to me.  The fact that she was in the handicap 14:07:00
15  stall, I had the legal authority to confirm her ID and the 14:07:05
16  handicap placard issuance.                              14:07:13
17      Q.  Did you ever say anything to Ms. Loggervale to   14:07:16
18  the effect of I need to see your ID so that I can confirm 14:07:19
19  that this is your disabled placard?                     14:07:25
20      A.  I don't recall.                                  14:07:27
21      Q.  When you asked her for her ID, did you believe   14:07:28
22  she was required to provide it?                         14:07:34
23      A.  Yes.                                            14:07:35
24      Q.  And you told her that too, right?  You told her  14:07:36
25  that she had to provide it?                             14:07:39
```

| | | |
|---|---|---|
| 1 | A. I believe I did. | 14:07:40 |
| 2 | Q. What authority is there -- whether it's a statute | 14:07:42 |
| 3 | or some other rule or law -- that would have required | 14:07:48 |
| 4 | Ms. Loggervale to show you her ID when you asked for it? | 14:07:51 |
| 5 | MR. GILBERT: Calls for a legal conclusion. Go | 14:07:56 |
| 6 | ahead. | 14:07:58 |
| 7 | THE WITNESS: I would have to look it up. I | 14:07:58 |
| 8 | don't know it off the top of my head. | 14:08:01 |
| 9 | BY MR. MAY: | 14:08:03 |
| 10 | Q. Do you know generally what that law says, even if | 14:08:03 |
| 11 | you don't know the statute number? | 14:08:10 |
| 12 | A. There's legal authority to confirm the ID and | 14:08:12 |
| 13 | handicap placard, that they match. | 14:08:18 |
| 14 | Q. That rule requires that you ask for both the ID | 14:08:23 |
| 15 | and the proof of issuance, correct? | 14:08:28 |
| 16 | MR. GILBERT: Calls for a legal conclusion. The | 14:08:31 |
| 17 | law speaks for itself. Go ahead. | 14:08:32 |
| 18 | THE WITNESS: We're getting very technical in the | 14:08:34 |
| 19 | wording of this. I would like to look it up to give you | 14:08:40 |
| 20 | the best answer. | 14:08:43 |
| 21 | BY MR. MAY: | 14:08:47 |
| 22 | Q. Okay. If I put it on my screen, would you take a | 14:08:47 |
| 23 | look at it? | 14:08:50 |
| 24 | A. Yes. | 14:08:51 |
| 25 | MR. GILBERT: Are you representing that there's | 14:08:56 |

1     A.  Yes.                                                    14:13:07

2     Q.  So it would require that the peace officer asks         14:13:10

3  for identification and evidence of issuance of the             14:13:15

4  placard?                                                       14:13:17

5          MR. GILBERT:  Vague as to "would require."  Calls      14:13:19

6  for a legal conclusion.  Go ahead.  Also impermissibly         14:13:23

7  suggests that the identification and evidence of the           14:13:33

8  issuance of the placard need to be requested at the same       14:13:36

9  time.                                                          14:13:47

10         THE WITNESS:  At first she was going to hand me         14:13:47

11  her ID, then refused to.  Then the subject started exiting    14:13:51

12  the vehicle.  Like I said earlier, I didn't have the          14:13:59

13  opportunity to check the placard at that moment.  My          14:14:04

14  concern shifted toward officer safety.                        14:14:09

15  BY MR. MAY:                                                    14:14:13

16     Q.  You're talking about the daughters exiting the         14:14:13

17  vehicle?                                                       14:14:19

18     A.  Yes.                                                    14:14:20

19     Q.  I'm going to stop sharing my screen for now.           14:14:20

20  When the daughters -- let me stop for a second.  Which        14:14:25

21  daughter was it?  The one in the front seat or the back       14:14:29

22  seat who exited first?                                         14:14:33

23     A.  I believe the daughter in the back seat.               14:14:34

24     Q.  When the daughter in the back seat exited the          14:14:37

25  vehicle, was she, at that time, detained?                     14:14:41

```
 1      A.  For officer safety, while we were conducting the        14:14:44
 2  investigation, no one was free to leave the vehicle.            14:14:48
 3      Q.  Does that mean that the daughter in the back seat       14:14:55
 4  was detained at the time she exited the vehicle?               14:14:59
 5          MR. GILBERT:  Vague as to detained.  Go ahead.          14:15:02
 6          THE WITNESS:  Yes.  On any car stop, we are             14:15:08
 7  allowed to keep all subjects inside of the vehicle for         14:15:12
 8  officer safety.                                                14:15:16
 9  BY MR. MAY:                                                    14:15:20
10      Q.  This wasn't a traffic stop though, right?              14:15:20
11      A.  Correct.  The suspicious vehicle, I believe, is        14:15:23
12  how I broadcast it.                                            14:15:29
13      Q.  When you say "stop", what you're really saying is      14:15:31
14  an encounter?                                                 14:15:35
15          MR. GILBERT:  Are you asking him to change his         14:15:43
16  testimony or were you just making a statement?  I didn't       14:15:44
17  understand if that was a question.                            14:15:48
18          MR. MAY:  I didn't understand if that was an           14:15:49
19  objection.  Sounded more like a speech.                        14:15:51
20          MR. GILBERT:  It's a question for you.                 14:15:54
21          MR. MAY:  I'm not taking questions from you right      14:15:58
22  now.                                                          14:16:00
23          MR. GILBERT:  Then the question does not need to       14:16:00
24  be answered.  So we can move on then.                          14:16:04
25  ///
```

```
 1  BY MR. MAY:                                            14:16:07
 2      Q.  Deputy Holland, when you said that you stopped  14:16:07
 3  the vehicle, is what you meant that you approached the  14:16:14
 4  vehicle and had an encounter with them?                14:16:17
 5      A.  I don't think I said I stopped the vehicle.  But  14:16:20
 6  when we approached the vehicle, tactics for officer safety  14:16:23
 7  would be similar to a vehicle stop.                    14:16:30
 8      Q.  I just wanted to clarify that.  It was not a   14:16:33
 9  vehicle stop?                                          14:16:36
10      A.  Correct.                                       14:16:37
11      Q.  Again, going back to my question about whether  14:16:38
12  the daughter in the back seat -- whether she was detained  14:16:43
13  at the moment she exited the vehicle.  I don't think I had  14:16:46
14  an answer to that.                                     14:16:50
15      A.  They were not allowed to exit the vehicle while  14:16:51
16  we were conducting the investigation.                  14:16:59
17      Q.  Did you tell them that?                        14:17:02
18      A.  I believe I did numerous times.                14:17:03
19      Q.  Before she exited the vehicle?                 14:17:06
20      A.  I remember saying that they can't exit the     14:17:09
21  vehicle, and when she did exit the vehicle, I ordered her  14:17:19
22  back into the vehicle.                                 14:17:24
23      Q.  So your best recollection is that you told her  14:17:25
24  she could not leave the vehicle before she exited it?  14:17:27
25          MR. GILBERT:  Misstates testimony.  Go ahead.  14:17:33
```

```
 1        THE WITNESS:  I believe I did, or as she was      14:17:37

 2   exiting I told her not to.  Exiting the vehicle on a   14:17:39

 3   situation like this is not something I would allow.    14:17:45

 4   BY MR. MAY:                                            14:17:51

 5      Q.  You believe you were allowed to give her a      14:17:51

 6   command because she was, at that time, detained?       14:17:55

 7      A.  Yes.                                             14:17:57

 8      Q.  You agree that you can't give somebody a command 14:18:01

 9   to stay in their vehicle if it's just a consensual     14:18:08

10   encounter, right?                                      14:18:13

11        MR. GILBERT:  Vague.  Asks for a legal            14:18:14

12   conclusion.  Go ahead.                                 14:18:19

13        THE WITNESS:  I missed that first part of your    14:18:20

14   question.                                              14:18:24

15   BY MR. MAY:                                            14:18:25

16      Q.  You would agree that you can't give somebody a  14:18:25

17   command to remain in their own vehicle if you're just  14:18:28

18   engaging in a consensual encounter with them?          14:18:32

19        MR. GILBERT:  Vague.  Calls for a legal           14:18:37

20   conclusion.                                            14:18:39

21        THE WITNESS:  I'm trying to understand the        14:18:43

22   question how you worded it.  Sorry.  Strictly on a     14:18:46

23   consensual encounter, you would be correct.            14:19:09

24   BY MR. MAY:                                            14:19:12

25      Q.  What was your reasonable suspicion for detaining 14:19:12
```

| | | |
|---|---|---|
| 1 | BY MR. MAY: | 14:22:42 |
| 2 | Q.  Yeah. | 14:22:42 |
| 3 | A.  That would be correct. | 14:22:42 |
| 4 | Q.  When you do a vehicle stop, you have to have at | 14:22:50 |
| 5 | least reasonable suspicion that a crime or Vehicle Code | 14:22:56 |
| 6 | violation occurred, right? | 14:23:00 |
| 7 | A.  There's many reasons to be able to stop a | 14:23:02 |
| 8 | vehicle. | 14:23:08 |
| 9 | Q.  Okay.  Are there any that don't involve the | 14:23:11 |
| 10 | driver having done something either illegal or in | 14:23:14 |
| 11 | violation of the Vehicle Code? | 14:23:18 |
| 12 | A.  That's a factor -- those are some reasons we can | 14:23:20 |
| 13 | do the stop.  We can also do stops based off reasonable | 14:23:31 |
| 14 | suspicion. | 14:23:35 |
| 15 | Q.  Like if you see somebody smoking a joint while | 14:23:36 |
| 16 | they're driving? | 14:23:40 |
| 17 | A.  Yes. | 14:23:41 |
| 18 | Q.  Going back to the Loggervales.  The daughter in | 14:23:41 |
| 19 | the back seat, when she exited the car, did you have any | 14:23:51 |
| 20 | reasonable suspicion that she committed a crime? | 14:24:00 |
| 21 | A.  All the facts I stated before was the reason for | 14:24:03 |
| 22 | contact.  The reasonable suspicion. | 14:24:08 |
| 23 | Q.  You believed all of the occupants -- let me | 14:24:10 |
| 24 | rephrase.  Did you believe all of the occupants in the car | 14:24:15 |
| 25 | potentially were involved in the auto burglaries? | 14:24:20 |

1    A.  Potentially, yes.                                    14:24:23

2    Q.  Or potentially casing the place to commit another    14:24:25

3  one, right?                                                 14:24:30

4    A.  Potentially, yes.                                     14:24:31

5    Q.  Would you say that based on the information you       14:24:33

6  had when you first approached the vehicle, that that was   14:24:37

7  just a hunch that these women were involved in burglaries? 14:24:39

8       MR. GILBERT:  Vague as to "hunch."  Go ahead.         14:24:45

9       THE WITNESS:  I think -- I wouldn't call it a         14:24:49

10  hunch.  I think I had an articulable set of facts that led 14:24:51

11  me to believe they were possibly related to the string of  14:24:58

12  burglaries.                                                14:25:03

13  BY MR. MAY:                                                14:25:36

14    Q.  One of the reasons you believe Ms. Loggervale was    14:25:36

15  required to give you her ID was so that you can confirm     14:25:39

16  the placard, correct?                                       14:25:43

17    A.  Yes.                                                  14:25:44

18    Q.  Did you have any other basis for believing you       14:25:45

19  were entitled to demand her ID at the moment you first     14:25:48

20  requested it from her?                                      14:25:52

21       MR. GILBERT:  Asked and answered many times.  Go      14:25:53

22  ahead.                                                     14:25:55

23       THE WITNESS:  Yes.  All the facts I stated before     14:25:55

24  for my reasonable suspicion.                               14:26:00

25  ///

1  BY MR. MAY:                                          14:26:03

2      Q.  If you had reasonable suspicion to detain    14:26:03

3  somebody, you're also allowed to demand their ID at that  14:26:07

4  point; is that your understanding?                   14:26:11

5      A.  Yes.                                          14:26:12

6      Q.  Anything other than checking the placard and  14:26:13

7  reasonable suspicion?  Meaning, was there any other  14:26:20

8  reasons you were allowed to demand the ID when you first  14:26:25

9  requested it from Ms. Loggervale other than those two  14:26:28

10 things?                                              14:26:31

11         MR. GILBERT:  Calls for a legal conclusion.  Go  14:26:32

12 ahead.                                               14:26:34

13         THE WITNESS:  I believe I've stated the reasons  14:26:34

14 I -- or the facts that -- already about reasons for the  14:26:41

15 detention and asking for ID.                         14:26:44

16 BY MR. MAY:                                          14:26:47

17     Q.  Now when she refused to give you her ID, you told  14:26:47

18 her that she was required to give it to you, correct?  14:26:53

19     A.  I believe I did, yes.                        14:26:58

20     Q.  Did you tell her why she was required to give it  14:27:00

21 to you?                                              14:27:04

22     A.  I don't recall specifically what I said.     14:27:04

23     Q.  When you detained the Loggervale women, was one  14:27:07

24 of the bases for detaining them the fact that         14:27:21

25 Ms. Loggervale refused to give you her ID?           14:27:25

| | | |
|---|---|---|
| 1 | MR. GILBERT: Vague. Compound. Go ahead. | 14:27:29 |
| 2 | THE WITNESS: I'm sorry. One more time. | 14:27:35 |
| 3 | BY MR. MAY: | 14:27:39 |
| 4 | Q. Was one of the reasons that you detained any of | 14:27:39 |
| 5 | the Loggervale women the fact that Ms. Loggervale refused | 14:27:42 |
| 6 | to give you her ID when you requested it? | 14:27:46 |
| 7 | MR. GILBERT: Still vague. Still compound. Go | 14:27:56 |
| 8 | ahead. | 14:27:58 |
| 9 | THE WITNESS: Yes. | 14:27:58 |
| 10 | BY MR. MAY: | 14:28:00 |
| 11 | Q. Is it true that the first time you told any of | 14:28:00 |
| 12 | the Loggervale women they were being detained is after one | 14:28:08 |
| 13 | of the daughters got out of the car? | 14:28:12 |
| 14 | A. I don't recall. | 14:28:14 |
| 15 | Q. Do you remember telling Ms. Loggervale after she | 14:28:16 |
| 16 | refused to give you her ID, "what you're doing now is | 14:28:26 |
| 17 | leading me to believe that you might be doing something | 14:28:30 |
| 18 | wrong"? | 14:28:34 |
| 19 | A. Sounds familiar. I don't know if that's exactly | 14:28:36 |
| 20 | what I said, but the noncompliance did heighten my | 14:28:40 |
| 21 | suspicion that criminal activity may have been afoot. | 14:28:45 |
| 22 | Q. When you were speaking with Ms. Loggervale -- let | 14:28:50 |
| 23 | me strike that. Let me start over. When the passenger in | 14:29:30 |
| 24 | the back seat got out of the vehicle, at that moment did | 14:29:33 |
| 25 | you believe that she had struck Deputy Pope with the car | 14:29:38 |

1  door?                                                      14:29:41

2      A.  I was not aware of that at that time.              14:29:43

3      Q.  When did you become aware that the daughter in    14:29:46

4  the back seat may have struck Deputy Pope with the car    14:29:51

5  door?                                                      14:29:55

6      A.  At the end of the incident.                        14:29:55

7      Q.  When you say "end of the incident", does that      14:30:00

8  mean after the women were released?                        14:30:04

9      A.  Yes.                                                14:30:07

10      Q.  What did Deputy Pope say to you about that?        14:30:07

11      A.  I don't recall specifically.  Just that she was   14:30:11

12  intentionally struck by the vehicle door.                 14:30:19

13      Q.  Deputy Pope said it was intentional?              14:30:20

14      A.  I believe so.                                      14:30:26

15      Q.  Do you remember Deputy Pope saying anything about 14:30:27

16  being struck with the car door before the women were put  14:30:31

17  into handcuffs?                                            14:30:35

18      A.  I don't recall.                                    14:30:36

19      Q.  Do you remember Deputy Pope ever calling out in   14:30:38

20  pain during the interaction with the Loggervale women?    14:30:41

21      A.  I was very -- it was a very loud situation.        14:30:44

22  There was a lot of screaming, so I couldn't hear          14:30:48

23  specifically -- there was a lot of screaming.  I couldn't 14:30:52

24  make sense of all of it.  There was a lot of people       14:30:59

25  screaming at once.                                         14:31:03

1    Q.  When Deputy Pope told you that she was                    14:31:12

2  intentionally struck with the car door by one of the           14:31:14

3  women, did it surprise you that she hadn't told you that       14:31:17

4  sooner?                                                        14:31:21

5    A.  Yes.                                                     14:31:21

6    Q.  Why is that?                                             14:31:31

7    A.  That's information that I would have liked to            14:31:32

8  have known when it occurred, but the situation was rapidly     14:31:40

9  evolving.  There's a lot of motion.  So sometimes that         14:31:44

10 kind of stuff happens.                                         14:31:53

11   Q.  Is it fair to say that because you didn't know it        14:31:54

12 until after the incident was over, you didn't base your        14:31:58

13 decision to detain any of the Loggervale women on the fact     14:32:02

14 that one of them struck Deputy Pope with the door?             14:32:05

15   A.  If I understand your question, you're asking if          14:32:08

16 her being struck by the door, if that had any part of the      14:32:31

17 detention; is that correct?                                    14:32:36

18   Q.  Any part of your reason for effecting the                14:32:38

19 detention?                                                     14:32:43

20   A.  Due to the noncompliance, exiting the vehicle, I         14:32:48

21 was observing Ms. Loggervale in the driver's seat, it was      14:32:52

22 very possible that a physical encounter occurred on that       14:32:58

23 side of the vehicle.  I didn't have the clearest view          14:33:02

24 because there was Deputy Pope, both daughters, other           14:33:05

25 deputies were arriving.  It was very possible a physical       14:33:09

1 altercation occurred, I just wasn't aware of it at that    14:33:14

2 time.    14:33:18

3     Q.  Understood.  You were the first on scene to tell    14:33:18

4 the Loggervales that they were being detained, correct?    14:33:22

5     A.  I believe so.    14:33:27

6     Q.  You said something to the effect of 'everyone in    14:33:28

7 this car is detained', correct?    14:33:31

8     A.  I believe so.    14:33:33

9     Q.  Before you said 'everyone in this car is    14:33:34

10 detained', Deputy Pope hadn't said anything -- at least    14:33:42

11 that you heard -- indicating to the women that they were    14:33:47

12 being detained?    14:33:50

13     A.  I can't speak on what Deputy Pope had said.  My    14:33:51

14 attention was on the driver and trying to get control of    14:33:55

15 the scene.    14:34:03

16     Q.  Even though you weren't focused on it, you don't    14:34:03

17 recall hearing anything from Deputy Pope that indicated to    14:34:06

18 the women that they were being detained, right?    14:34:09

19     A.  I heard Deputy Pope request additional deputies    14:34:12

20 over the radio.  I believe I instructed her to detain one,    14:34:20

21 then she said something to the account of they're not    14:34:27

22 listening or not complying, if I recall correctly.    14:34:31

23     Q.  You also instructed Deputy Leeper to detain the    14:34:34

24 daughters, correct?    14:34:41

25     A.  I believe so, yes.    14:34:42

1    Q.  You said something to the effect of 'they don't    14:34:43

2  want to listen to us, so let's go ahead and detain these    14:34:54

3  two'?    14:34:58

4    A.  I believe so.    14:34:59

5    Q.  When the daughter in the back seat opened the    14:35:00

6  door, did you hear her say something about needing to use    14:35:08

7  the restroom?    14:35:12

8    A.  I don't recall.    14:35:13

9    Q.  If she had said that she needed to use the    14:35:14

10  restroom when she first opened the door and got out of the    14:35:20

11  car, would you have allowed her to do that?    14:35:23

12    A.  No.    14:35:26

13    Q.  That's because she was detained at that point?    14:35:31

14    A.  Yes.    14:35:34

15    Q.  When the daughter in the back seat got out of the    14:35:37

16  car, she asked for the trunk to be opened for her,    14:35:41

17  correct?    14:35:46

18    A.  Yes.    14:35:46

19    Q.  You wouldn't let her get into the trunk, correct?    14:35:46

20    A.  Correct.  For officer safety.    14:35:50

21    Q.  Also because you believed you were able to give    14:35:54

22  her commands due to the fact that she was being detained    14:35:57

23  at that moment?    14:36:02

24    A.  Yes.    14:36:02

25    Q.  That it wasn't just a consensual encounter,    14:36:03

1  because in that case you would not be able to give her      14:36:08
2  commands?                                                     14:36:12
3      A.  I'm trying to answer your question to the best of    14:36:12
4  my ability.  Nobody would have been allowed to access that   14:36:34
5  vehicle.  If somebody who wasn't detained wanted to come     14:36:45
6  and access the trunk of that vehicle at that time, nobody    14:36:49
7  would have been allowed to do so.                            14:36:52
8      Q.  Do you remember telling the dispatcher during        14:37:02
9  this incident, "they're just the cell phone filming type"?   14:37:04
10     A.  I don't recall exactly what I said over the          14:37:12
11 radio.                                                        14:37:15
12     Q.  Do you remember whether any of the Loggervale        14:37:15
13 women started filming you with their cell phones?            14:37:19
14     A.  Yes.                                                  14:37:24
15     Q.  Was it just the daughters?                           14:37:24
16     A.  I believe everybody accessed their cell phone.  I    14:37:28
17 know several calls were made to 911.  Several cameras were   14:37:33
18 on record.  Who exactly was recording and who was calling    14:37:38
19 911, I can't say at which moment because I think multiple    14:37:45
20 calls and multiple filming was occurring at once.            14:37:51
21     Q.  Was there anything illegal about any of the          14:37:54
22 Loggervale women videotaping you with their cell phones?     14:37:57
23     A.  Videotaping, no.  The 911 calls, yes.                14:38:01
24     Q.  I'm going to ask you more about that in a little     14:38:05
25 bit.  Did you threaten that if the daughters didn't get      14:38:11

1  back in the car you would put them in handcuffs?                    14:38:14

2      A.  I wouldn't say threatened.  I would say directed            14:38:17

3  or ordered or explained what would happen if they didn't           14:38:22

4  comply with the orders.                                            14:38:27

5      Q.  Do you remember telling the women "sit in the car          14:38:29

6  or you're going in handcuffs.  I'm not dealing with this"?         14:38:33

7      A.  I remember saying something to that effect.  I             14:38:37

8  don't know if that's exactly what I said.                          14:38:43

9      Q.  Do you remember the daughters asking you why               14:38:56

10 they're being detained?                                            14:38:58

11     A.  I believe so, yes, and it was explained or                 14:39:01

12 attempted to be explained several times.                           14:39:09

13     Q.  Did you explain to them why they were being                14:39:11

14 detained?                                                          14:39:16

15     A.  I don't recall specifically when I spoke to each           14:39:16

16 person, but I know I explained it to Ms. Loggervale and I          14:39:25

17 believe I spoke to all the parties.                                14:39:32

18     Q.  Were you honest with the Loggervale women when             14:39:39

19 you explained to them your reasons for detaining them?             14:39:42

20     A.  Yes.                                                       14:39:45

21     Q.  Do you remember telling any of the Loggervale              14:39:46

22 women that you detained them because they wouldn't listen          14:39:53

23 to you?                                                            14:39:56

24     A.  I don't recall specifically.                              14:39:57

25     Q.  You physically removed -- you attempted to                 14:40:00

1  physically remove Ms. Loggervale from the driver's seat,    14:40:07

2  correct?    14:40:11

3      MR. GILBERT:  Vague as to "attempted to    14:40:12

4  physically remove."  Go ahead.    14:40:14

5      THE WITNESS:  At one point with everybody out of    14:40:16

6  the vehicle, her daughters, there were deputies in and    14:40:19

7  around the vehicle, I remember her starting the vehicle.    14:40:24

8  This frightened me for the safety of everybody involved    14:40:28

9  that had she moved the vehicle, she may have struck her    14:40:33

10  own daughters or deputies.  So I recall ordering her out    14:40:37

11  of the vehicle numerous times, which she did not comply.    14:40:43

12  I opened the door and then tried to get her out of the    14:40:46

13  vehicle, but she pulled away and then I let go.    14:40:53

14  BY MR. MAY:    14:40:58

15      Q.  At some point you had her in a wristlock,    14:40:58

16  correct?    14:41:03

17      A.  No, I don't believe so.    14:41:03

18      Q.  At some point did you grab her by the arm?    14:41:07

19      A.  Yes.    14:41:12

20      Q.  At some point did you lift up her shirt to search    14:41:13

21  her?    14:41:18

22      A.  Lift up her shirt?    14:41:19

23      Q.  Did you move her clothing so that you can search    14:41:23

24  her person?    14:41:27

25      A.  I don't recall.    14:41:27

1    do it properly.                                           14:43:01

2    BY MR. MAY:                                               14:43:04

3        Q.  You don't recall whether you searched            14:43:04

4    Ms. Loggervale, correct?                                 14:43:13

5        A.  I don't recall.                                   14:43:15

6        Q.  At some point you handcuffed Ms. Loggervale?     14:43:16

7        A.  Yes.                                              14:43:24

8        Q.  Behind her back, correct?                        14:43:25

9        A.  Yes.                                              14:43:28

10       Q.  And you placed her in the back seat of a patrol  14:43:30

11   car?                                                      14:43:35

12       A.  Yes.                                              14:43:36

13       Q.  Then after that you went into the driver's       14:43:38

14   compartment of the vehicle and removed the purse, correct?  14:43:47

15       A.  I went to the vehicle to retrieve her            14:43:50

16   identification where she told me where it was placed.    14:43:55

17       Q.  The first time you went to the vehicle to take   14:43:59

18   the purse, she hadn't told you anything about searching  14:44:02

19   the vehicle or where her purse was, correct?             14:44:06

20       A.  I believe I spoke to her twice, and when I didn't  14:44:08

21   find her ID the first time, she clarified and I was able 14:44:13

22   to locate it.                                            14:44:17

23       Q.  Do you believe that she gave you consent to      14:44:18

24   search the car?                                          14:44:22

25           MR. GILBERT:  Vague as to search.  Go ahead.     14:44:24

1           THE WITNESS:  I only went into the car to          14:44:27

2  retrieve an identification, not to search the vehicle.     14:44:31

3  BY MR. MAY:                                                 14:44:33

4      Q.  Do you believe that Ms. Loggervale ever gave you   14:44:33

5  consent to search for her identification?                   14:44:37

6      A.  She told me exactly where it was and I was able     14:44:40

7  to locate it.                                               14:44:45

8      Q.  She told you where her purse was?                   14:44:48

9      A.  She told me where her identification was.          14:44:50

10      Q.  That was inside of a pocketbook in her purse,      14:44:53

11  right?                                                      14:44:57

12      A.  I believe so.                                      14:44:58

13      Q.  When she told you where her identification was,    14:45:00

14  she was sitting in the back of the police car with her     14:45:03

15  hands handcuffed behind her back?                          14:45:07

16      A.  I believe that is correct.                         14:45:10

17      Q.  Is that a valid form of consent when somebody      14:45:12

18  tells you where their identification is while they're      14:45:17

19  handcuffed in a police car?                                14:45:20

20          MR. GILBERT:  Assumes facts if there was or was    14:45:22

21  not consent.  Go ahead.                                    14:45:26

22          THE WITNESS:  One more time, sir.  I'm sorry.      14:45:29

23  BY MR. MAY:                                                 14:45:32

24      Q.  I'm going to come back to that topic.  I'm going   14:45:32

25  to withdraw that question.  You didn't have a warrant to   14:45:50

1  three were identified and identities confirmed.                     15:02:02

2      Q.  Do you know what you or any of the other deputies           15:02:08

3  did once you had the names of the Loggervale women?                 15:02:12

4      A.  I conducted -- or record checks were conducted of           15:02:17

5  all three.                                                          15:02:25

6      Q.  What does that mean to conduct a records check?             15:02:26

7      A.  To see if anybody's wanted, probation, paroles,             15:02:29

8  if they're missing people.  That sort of thing.                     15:02:36

9      Q.  Did you -- how do you conduct a records check?              15:02:45

10     A.  Over the radio.                                             15:02:49

11     Q.  Do you give the dispatcher the name and the                 15:02:52

12 dispatcher comes back with some kind of information?                15:02:57

13     A.  Yes.                                                        15:03:00

14     Q.  Did you talk to the dispatcher to do a records              15:03:00

15 check on any of the three Loggervale women?                         15:03:06

16     A.  I believe so.                                               15:03:09

17     Q.  So what good would it do you if it turned out one           15:03:10

18 of the plaintiffs was wanted on probation, on parole, or            15:03:18

19 missing?                                                            15:03:21

20         MR. GILBERT:  Vague as to "what good would it do            15:03:23

21 you."  Go ahead.                                                    15:03:27

22         THE WITNESS:  So everybody we come into contact             15:03:27

23 with, if there's a detention involved, we conduct a                 15:03:39

24 records check.  If it turns out they are wanted, then we            15:03:42

25 confirm the warrants and effect an arrest based off the             15:03:46

1  warrant.  If there's probation or parole, we check the     15:03:50

2  terms of the probation or parole and make sure that        15:03:53

3  probation is being followed.  If it's a missing person, we  15:03:56

4  make sure that they're not at risk and getting them        15:04:00

5  returned to where they need to be and make sure they're    15:04:04

6  not being kidnapped.                                       15:04:07

7  BY MR. MAY:                                                15:04:10

8      Q.  Was a records check done to confirm or rule out   15:04:10

9  whether any of the women were involved in the burglaries?  15:04:14

10     A.  Yes.  That was part of it as well.                15:04:17

11     Q.  Okay.  How so?                                    15:04:19

12     A.  We come in contact with a lot of different        15:04:20

13  people.  If there's a -- if they have an arrest history   15:04:25

14  for burglary and thefts, it could make them a possible    15:04:30

15  suspect in the crimes.                                    15:04:35

16         THE COURT REPORTER:  Can we take five minutes?

17         MR. MAY:  Yes.  Let's a break.                    15:04:44

18         THE VIDEOGRAPHER:  Let's go off the record.  The  15:04:44

19  time is 3:04 p.m.                                         15:04:47

20         Back on the record.  The time is 3:18 p.m.        15:19:06

21  BY MR. MAY:                                               15:19:10

22     Q.  Deputy Holland, we were talking about doing a     15:19:10

23  records check.  Do you remember how long it took to do the 15:19:16

24  records check for the Loggervale women?                   15:19:19

25     A.  I don't.                                          15:19:21

| | | |
|---|---|---|
| 1 | Q.  Do you know how long the records check typically | 15:19:22 |
| 2 | takes based on your experience? | 15:19:27 |
| 3 | A.  It can be anywhere from a minute up to 10, | 15:19:30 |
| 4 | 15 minutes depending on how busy sheriff's radio is or | 15:19:36 |
| 5 | what they find. | 15:19:42 |
| 6 | Q.  Do you remember receiving the results of the | 15:19:43 |
| 7 | records check you did for the Loggervales? | 15:19:46 |
| 8 | A.  Vaguely. | 15:19:50 |
| 9 | Q.  Were any of them on probation or parole? | 15:19:52 |
| 10 | A.  No. | 15:19:56 |
| 11 | Q.  Did any of them have outstanding warrants? | 15:19:56 |
| 12 | A.  No. | 15:20:00 |
| 13 | Q.  Did any of them -- were any of them reported | 15:20:01 |
| 14 | missing? | 15:20:05 |
| 15 | A.  No. | 15:20:05 |
| 16 | Q.  When you got back the results of the records | 15:20:09 |
| 17 | check, is that when you decided to release them? | 15:20:14 |
| 18 | MR. GILBERT:  Assumes facts.  Go ahead. | 15:20:25 |
| 19 | MR. MAY:  I can rephrase it.  Sorry. | 15:20:32 |
| 20 | BY MR. MAY: | |
| 21 | Q.  Were you the one who decided to release them at | 15:20:33 |
| 22 | some point? | 15:20:38 |
| 23 | A.  Yes. | 15:20:38 |
| 24 | Q.  How long after you got the results of the records | 15:20:39 |
| 25 | check did you decide to release the Loggervale women? | 15:20:42 |

1    A.  I don't recall.                                        15:20:45

2    Q.  Can you give me an estimate or just have no            15:20:48

3  recollection at all?                                         15:20:52

4    A.  I don't recall.                                        15:20:54

5    Q.  After you got back the results of the records          15:21:00

6  check, did you do anything else to investigate whether the   15:21:03

7  Loggervales were involved in the auto burglaries?            15:21:05

8    A.  I remember speaking to my partners, seeing what        15:21:10

9  information they had.  Several deputies that came up         15:21:14

10  thought that they may have matched a track flyer from a     15:21:19

11  different incident that occurred in a different sector.     15:21:25

12   Q.  What's a track flyer?                                  15:21:36

13   A.  It's also referred to as an all-post bulletin,         15:21:38

14  APB.  Those get sent out pretty regularly.  We review them  15:21:44

15  to see what's going on in the area.                         15:21:50

16   Q.  Did the other deputies tell you about shoplifters      15:21:52

17  that were hitting a Big Five Sporting Goods store, I think  15:21:58

18  in San Lorenzo?                                             15:22:04

19   A.  That sounds familiar.                                  15:22:06

20   Q.  Did you know about the shoplifters in San Lorenzo      15:22:08

21  when you detained the Loggervale women?                     15:22:12

22   A.  I had heard of the incident.  I don't know if I        15:22:14

23  was -- or if I knew that prior to contact.  I don't         15:22:17

24  recall.                                                     15:22:23

25   Q.  Is it safe to say that you did not base your           15:22:24

1     A.  Yes.                                              15:26:53

2     Q.  How about outside of training purposes?    15:26:54

3     A.  I don't believe so.                     15:27:03

4     Q.  Do you agree that being placed in handcuffs by a   15:27:04

5  police officer can be an embarrassing experience for   15:27:15

6  people?                                       15:27:18

7     A.  It can be.                            15:27:19

8     Q.  Do you agree that it can be a scary experience   15:27:20

9  for people?                                15:27:24

10    A.  It can be.                          15:27:25

11    Q.  I asked you about what other investigation you  15:27:39

12  had done to determine whether the Loggervales were   15:27:42

13  involved in the auto burglaries.  Did you ever contact any  15:27:44

14  victims or witnesses of any of the prior break-ins to see  15:27:50

15  if they could potentially identify the Loggervale women as  15:27:54

16  the suspects?                            15:27:58

17    A.  I did not.                          15:27:59

18    Q.  Why not?                            15:28:01

19    A.  I write my report with the information I have and  15:28:03

20  that goes off to the detectives.              15:28:08

21    Q.  When you decided to release the Loggervale women,  15:28:12

22  did you become convinced at that point that they were not  15:28:32

23  involved in the auto break-ins?              15:28:35

24    A.  I wasn't able to confirm that they were or were  15:28:37

25  not involved.                           15:28:42

1    Q.  Do you know how long in total the Loggervale          15:28:45

2  women were in handcuffs?                                     15:28:48

3    A.  I don't recall.                                        15:28:49

4    Q.  Do you believe that you only had them held in          15:28:54

5  handcuffs for the amount of time it took you to              15:28:58

6  investigate their involvement in the burglaries?             15:29:00

7    A.  Yes.                                                   15:29:03

8    Q.  Do you remember Lieutenant DeSousa?  Is that how       15:29:07

9  you say it?                                                  15:29:13

10   A.  Yes.                                                   15:29:14

11   Q.  Do you remember him being on scene?                    15:29:14

12   A.  Yes.                                                   15:29:16

13   Q.  Did you speak with him directly while he was on        15:29:17

14  scene?                                                      15:29:21

15   A.  Yes.                                                   15:29:21

16   Q.  What did you guys talk about?                          15:29:23

17   A.  I informed him of the incident with the facts          15:29:27

18  that I had gathered and ultimately made the decision to     15:29:35

19  exercise discretion on releasing the Loggervales.           15:29:41

20   Q.  Do you remember when you were speaking with one        15:30:00

21  of the daughters in the patrol vehicle that when she said,  15:30:03

22  "has anyone called and said these three African American    15:30:09

23  women were the ones.  The Cadillac is the car.  No one has  15:30:14

24  called and said that"?  Do you recall responding, "you're   15:30:18

25  correct.  Today, nobody has called that.  You're right.     15:30:20

1    A.  Yes.                                                15:33:03

2    Q.  That's when you tell somebody that they're free     15:33:04

3  to leave, correct?                                        15:33:07

4    A.  Yes.                                                15:33:08

5    Q.  Do you agree that none of the Loggervale women      15:33:22

6  were being detained on suspicion of committing any violent 15:33:25

7  crime?                                                    15:33:30

8    A.  Depends how you would categorize violent, but      15:33:32

9  mainly property crimes.                                   15:33:40

10    Q.  I think you mentioned in the incident report that  15:33:42

11  it was significant to you that the Loggervales were in a 15:33:51

12  rental car?                                               15:33:54

13    A.  Yes.                                                15:33:55

14    Q.  That's because you believe that rental cars are    15:33:56

15  used in a large number of crimes?                         15:34:00

16    A.  From my training and experience, rental cars do    15:34:03

17  play a role with criminal activity, yes.                  15:34:10

18    Q.  What training is that specifically?  If you can    15:34:13

19  recall.                                                   15:34:16

20        MR. GILBERT:  Vague.  Go ahead.                     15:34:19

21        THE WITNESS:  I've been to a few classes where     15:34:20

22  they've discussed how they were able to catch criminals  15:34:25

23  based off rental cars.  A lot of calls -- the experience 15:34:29

24  aspect that there have been numerous calls where rental  15:34:33

25  cars were the suspect vehicle from violent crimes to     15:34:37

1  property crimes because it makes it difficult for us to            15:34:43

2  identify the drivers of the rental cars.                           15:34:48

3  BY MR. MAY:                                                        15:34:51

4      Q.  Do you recall when we went through some of the             15:34:51

5  incidents before the Loggervale incident, that some of the        15:34:57

6  victims had silver rental cars?                                    15:35:03

7      A.  Yes, as well as -- rental cars are also a target          15:35:05

8  of criminal activity.                                              15:35:12

9      Q.  When you learned that the Loggervale's vehicle            15:35:16

10 was a rental car, did you also have a concern that they           15:35:19

11 could be targeted for break-ins?                                  15:35:24

12     A.  It's possible.                                             15:35:27

13     Q.  You said it was your training and experience that        15:35:30

14 led you to believe that rental cars are more associated           15:35:36

15 with crime.  What sort of experience did you have other           15:35:40

16 than what you've already said?                                    15:35:43

17     A.  If I were to go back through every police report         15:35:44

18 I've taken with the suspect vehicle being a rental car,           15:35:54

19 there's just dozens upon dozens of rental cars being used         15:35:58

20 in the commission of crime.                                       15:36:04

21     Q.  Okay.  Did you have any information that any of          15:36:06

22 the auto burglaries at the 2720 Castro Valley Boulevard           15:36:16

23 parking lot were committed by people driving rental cars?        15:36:20

24     A.  Unfortunately, we weren't able to get a better           15:36:24

25 description other than what I've stated.                          15:36:30

1  BY MR. MAY:                                                    15:41:27

2      Q.  Do you agree that using accusatory questioning or      15:41:27

3  tone of voice can elevate a consensual encounter into a        15:41:34

4  detention?                                                     15:41:38

5          MR. GILBERT:  Objection.  Calls for a legal            15:41:38

6  conclusion.  Incomplete hypothetical.  Go ahead.               15:41:40

7          THE WITNESS:  It could.                                15:41:43

8  BY MR. MAY:                                                    15:41:44

9      Q.  Are you familiar with Vehicle Code section 12500?      15:41:44

10     A.  12500?                                                 15:42:17

11     Q.  Yeah.                                                  15:42:18

12     A.  Yes.                                                   15:42:18

13     Q.  What are the elements of that?                         15:42:19

14     A.  Specifically 12500(a)? (A)(1)?  I think 12500 by       15:42:25

15 itself isn't -- it has to deal with unlicensed driving, I      15:42:32

16 believe.                                                       15:42:44

17     Q.  Did you have reasonable suspicion to believe that      15:42:45

18 Ms. Loggervale was violating Vehicle Code section 12500?       15:42:48

19     A.  Possibly.                                              15:42:55

20     Q.  What did you base that on?                             15:42:57

21     A.  I did not know if she had a license or did not.        15:43:05

22     Q.  When you approached the Loggervale's vehicle,          15:43:16

23 were you enforcing the Vehicle Code at that time?              15:43:23

24         MR. GILBERT:  Overbroad.  Go ahead.                    15:43:27

25         THE WITNESS:  Possibly.                                15:43:34

1  BY MR. MAY:                                              15:43:43

2      Q.  How so?                                          15:43:43

3      A.  I had the investigation portion of the handicap  15:43:44

4  placard, which is covered under the Vehicle Code.       15:43:51

5      Q.  Just to be clear, when you first saw the vehicle, 15:43:57

6  you couldn't tell if it had the placard, right?         15:44:12

7      A.  Correct.                                         15:44:14

8      Q.  But you don't recall -- when you approached the  15:44:15

9  vehicle, you don't recall actually looking to see if it 15:44:18

10 was hanging from the rearview mirror; is that right?    15:44:21

11     A.  Like I stated earlier, my attention was diverted 15:44:25

12 when I discovered the numerous occupants.               15:44:30

13     Q.  Later you learned that she did have a disabled   15:44:38

14 placard?                                                15:44:42

15     A.  Yes.                                             15:44:43

16     Q.  Did you believe any of the Loggervale women      15:44:43

17 violated Penal Code section 69 in your presence?        15:44:57

18         MR. GILBERT:  Vague as to time.  Go ahead.       15:45:04

19         THE WITNESS:  At the conclusion of the incident, 15:45:07

20 there's possibly probable cause for that to have been   15:45:15

21 committed.                                              15:45:21

22 BY MR. MAY:                                              15:45:21

23     Q.  What do you mean by "at the conclusion"?         15:45:21

24     A.  At the end when I learned that Deputy Pope was   15:45:24

25 struck by the vehicle door.                             15:45:30

1    when they're approached by police officers?                   16:00:45

2         A.   Not just African Americans.  Most -- a lot of       16:00:47

3    people get nervous when dealing with law enforcement from     16:00:53

4    all cultures, ethnicities.  All walks of life get nervous.    16:00:57

5         Q.   Deputy Holland -- have you ever -- sorry.           16:01:03

6         A.   I was just going to say, even if I get pulled       16:01:10

7    over when I'm off duty, I get nervous.                        16:01:13

8         Q.   Why is that?                                        16:01:17

9         A.   Just because it's a normal reaction when dealing    16:01:18

10   with law enforcement.                                         16:01:24

11        Q.   So the fact that somebody is nervous who you've     16:01:25

12   approached, that by itself isn't enough to give you           16:01:30

13   reasonable suspicion to detain them; is that right?           16:01:33

14        A.   Is can be a factor in the totality of               16:01:36

15   circumstances.                                                16:01:40

16        Q.   Were any of the Loggervale women nervous when you   16:01:40

17   approached?                                                   16:01:45

18        A.   The initial approach, everything appeared to be     16:01:46

19   fine until Ms. Loggervale didn't want to provide her          16:01:58

20   identification.                                               16:02:02

21        Q.   My question was a little bit different.  That is    16:02:04

22   were any of the Loggervale women nervous when you             16:02:08

23   approached the vehicle?                                       16:02:11

24             MR. GILBERT:  Speculation.  Go ahead.               16:02:15

25             THE WITNESS:  I don't recall.                       16:02:18

1    the bodycam video, the total time that the women were in          16:28:54

2    handcuffs in the police car was over an hour, would that          16:28:58

3    sound right to you?                                               16:29:02

4        A.  I don't recall how long they were in the patrol          16:29:03

5    vehicles.                                                         16:29:09

6        Q.  Would an hour be an unreasonable amount of time          16:29:10

7    to hold the Loggervale women in light of what                     16:29:15

8    investigation you did?                                            16:29:19

9            MR. GILBERT:  Vague.  Calls for a legal                   16:29:22

10   conclusion.                                                       16:29:24

11           THE WITNESS:  Every circumstance is different.  I         16:29:29

12   only detain people for the necessary amount of time for me        16:29:31

13   to conclude my investigations.                                    16:29:35

14   BY MR. MAY:

15       Q.  Do you believe, in the Loggervale situation, you          16:29:37

16   only had them detained for the amount of time you needed          16:29:41

17   to do the investigation?                                          16:29:44

18       A.  Yes.                                                      16:29:46

19       Q.  Looking back on this incident involving the               16:29:47

20   Loggervale women, do you believe you handled it properly?         16:29:54

21       A.  I believe I handled it to the best of my ability          16:29:57

22   at the time of the incident with the information I had.           16:30:03

23       Q.  Looking back on the incident, would you do                16:30:05

24   anything differently?                                             16:30:08

25       A.  No.                                                       16:30:09

1 State of California,

2 County of San Francisco.

3

4          I, BROOKE MEYER, License No. 13886, a

5 Certified Shorthand Reporter of the State of California,

6 do hereby certify:

7          That the witness in the foregoing

8 deposition named was present at the time and place herein

9 specified;

10          That the said proceeding was taken before

11 me as a Certified Shorthand Reporter at the said time and

12 place and was taken down in shorthand writing by me;

13          That the said proceeding was thereafter,

14 under my direction, transcribed with the use of

15 computer-assisted transcription, and that the foregoing

16 transcript constitutes a full, true, and correct report of

17 the proceedings which then and there took place;

18          That I am a disinterested person to the

19 said action.

20          IN WITNESS WHEREOF, I have hereunto

21 subscribed my hand this 4th day of March, 2021.

22

23          Brooke Meyer, CSR #13886

24

25

# EXHIBIT N

1          UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3            SAN FRANCISCO DIVISION
4
5  AASYLEI LOGGERVALE; AASYLEI
   HARDGE-LOGGERVALE; and
6  AAOTTAE LOGGERVALE,
        Plaintiffs,
7
   V.                         CASE NO. C20-4679-WHA
8
   COUNTY OF ALAMEDA; STEVEN
9  HOLLAND; MONICA POPE; KEITH
   LEEPER; ANTHONY DeSOUSA;
10 and DOES 1 to 50, inclusive,
        Defendants.
11 _____/
12
13
14    VIDEOTAPED DEPOSITION OF MONICA GILKEY POPE
               FRIDAY, FEBRUARY 5, 2021
15                    VIA ZOOM
16
17
18
19 ATKINSON-BAKER, INC.
   800-288-3376
20 www.depo.com
21 REPORTED BY:  DEBRA L. ACEVEDO-RAMIREZ, CSR. 7692
               Arizona 50807
22
   FILE NO:  AF0074C
23
24
25

**CERTIFIED COPY**

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4   AASYLEI LOGGERVALE; AASYLEI

    HARDGE-LOGGERVALE; and

5   AAOTTAE LOGGERVALE,

         Plaintiffs,

6

    V.                        CASE NO. C20-4679-WHA

7

    COUNTY OF ALAMEDA; STEVEN

8   HOLLAND; MONICA POPE; KEITH

    LEEPER; ANTHONY DeSOUSA;

9   and DOES 1 to 50, inclusive,

         Defendants.

10  _____/

11

12        Deposition of Monica Gilkey Pope, taken on

13  behalf of the plaintiff via Zoom, commencing at

14  10:05 a.m., Friday, February 5, 2021, before

15  Debra L. Acevedo-Ramirez, CSR No. 7692, pursuant to

16  Notice.

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
 4    JOSEPH S. MAY, ESQ.
      LAW OFFICE OF JOSEPH S. MAY
 5    1388 Sutter Street, Suite 810
      San Francisco, CA 94109
 6    Tel: (415) 781-3333
      Fax: (415) 707-6600
 7    Joseph@josephmaylaw.com
 8    BRIAN GEARINGER, ESQ.
      GEARINGER LAW GROUP
 9    740 Fourth Street
      Santa Rosa, CA 95404
10    Tel: (415) 440-3102
      Brian@gearingerlaw.com
11
      FOR THE DEFENDANTS:
12
      KEVIN E. GILBERT, ESQ.
13    ORBACH HUFF SUAREZ & HENDERSON, LLP
      6210 Stoneridge Mall Rd., Ste. 210
14    Pleasanton, CA 94588
      Kgilbert@ohshlaw.com
15
      Videographer:  Jemal Judkins
16
      Also Present:  Deputy Holland
17
                     --oOo--
18
19
20
21
22
23
24
25
```

```
 1                     I N D E X
 2    WITNESS              EXAMINATION              PAGE
 3    MONICA GILKEY POPE
                          BY MR. MAY                 7
 4
 5
                          EXHIBITS
 6
      PLAINTIFF'S            DESCRIPTION            PAGE
 7
      Exhibit 7      Body-cam footage               69
 8
      Exhibit 8      Document consisting of
 9                   Two examples                   108
10
                        --o0o--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  form that was improper.  I stated my objections on

2  the record.  There was not a speaking objection

3  there.

4          MR. MAY:  Okay.  You need the question

5  read back, Deputy?                                    10:10:51

6          THE WITNESS:  Please.

7          MR. MAY:  Can I have the court reporter

8  read back my last question back?

9          (Whereupon, the record was read back by

10  the Court Reporter as follows:                       10:10:56

11          "Question.  And once you observed that

12  there were three African-American women inside the

13  vehicle, will you admit at that point you didn't

14  have reasonable suspicion to detain them?")

15          THE WITNESS:  I'm sorry.  You broke out     10:10:59

16  at the last like five words, can you repeat it?

17          (Whereupon, the record was read back by

18  the Court Reporter as follows:

19          "Question.  And once you observed that

20  there were three African-American women inside the   10:09:44

21  vehicle, will you admit at that point you didn't

22  have reasonable suspicion to detain them?")

23          THE WITNESS:  No.

24  BY MR. MAY:

25      Q.   When you approached the silver Cadillac     10:11:54

1    with Deputy Holland, that was for the purpose of

2    investigating whether the occupants of the vehicle

3    may have been connected to previous auto burglaries;

4    is that fair?

5         A.    Yes.                                          10:12:07

6         Q.    And when you approached the silver

7    Cadillac with Deputy Holland, it was not in order to

8    make a detention; is that correct?

9         A.    Not in order to make a detention.  Can

10   you -- can you ask that?  Can you just rephrase it     10:12:32

11   maybe?

12        Q.    Okay.  You did approach the vehicle with

13   Deputy Holland, correct?

14        A.    Yes.

15        Q.    And as you were approaching the vehicle,    10:12:43

16   the purpose was to investigate and not to make a

17   detention of the occupants?

18        A.    Yes.

19        Q.    At some point Deputy Holland made the

20   decision that all three women were detained,          10:13:02

21   correct?

22             MR. GILBERT:  Speculation.  Foundation.

23             Go ahead.

24             THE WITNESS:  Eventually that decision

25   was made.                                             10:13:14

```
 1   BY MR. MAY:
 2         Q.    By Deputy Holland?
 3         A.    Yes.
 4         Q.    And only by Deputy Holland or did you
 5   also make a decision to detain the women?              10:13:23
 6               MR. GILBERT:  Vague.
 7               Go ahead.
 8               THE WITNESS:  Deputy Holland was primary
 9   on this detail, and I agreed with his decision.
10   BY MR. MAY:                                            10:13:34
11         Q.    So is it fair to say you never attempted
12   to intercede in Deputy Holland's decision to make
13   detentions of the three Loggervale women?
14               MR. GILBERT:  Vague as to "intercede."
15   Overbroad.                                             10:14:00
16               Go ahead.
17               THE WITNESS:  I did not, that I'm aware
18   of.  I agreed with his decision.
19   BY MR. MAY:
20         Q.    Okay.  Do you recall any training that    10:14:10
21   you received either through POST or while at Alameda
22   County Sheriff's Office about a deputy's duty to
23   intercede if they believe that another deputy is
24   doing something improper?
25               MR. GILBERT:  Overbroad.                   10:14:26
```

1        A.      Only the parts that -- no, not really.

2        Q.      Okay.   Were you about to say the parts

3    that I showed on the screen to Deputy Holland?

4        A.      Yeah.   You guys -- you guys were

5    discussing it.   I didn't remember being there,                    10:17:00

6    though.

7        Q.      Okay.   So is it fair to say that you

8    have no recollection of whether you obtained any

9    suspect information that day?

10       A.      I do not recall.                                       10:17:10

11       Q.      And you have no recollection as you sit

12   here today about any suspect vehicles that may have

13   been described at the scene of the September 19th

14   incident?

15       A.      If there had been a suspect vehicle                    10:17:28

16   description it would have been aired over dispatch

17   radio and I would have heard that.

18       Q.      Okay.   But, right now you don't recall

19   whether that happened or whether the description

20   was, if any?                                                       10:17:49

21       A.      Oh, I believe we had multiple 459 auto

22   burglaries all around the same time and the

23   description was all very similar, I do recall that,

24   but it's just a vague recollection.   I would have

25   been assisting or responding to look for whatever                  10:18:07

1  the description was put out over the air.  I would

2  not have been a primary officer on any of those

3  calls in that beat, though.

4      Q.    You say you would not have been a

5  primary officer.  What leads you to believe that?        10:18:24

6      A.    I believe that the greater majority of

7  those calls were in Sector 3, which is not my -- my

8  area of -- my main area of responsibility.

9      Q.    What is your main area of

10 responsibility?                                           10:18:41

11          MR. GILBERT:  Vague as to time.

12          THE WITNESS:  We -- in the morning we

13 are assigned to beats or sectors.  My sector is

14 typically Sector 4.  Although we are partners, so if

15 our partner needs assistance, we will go to wherever    10:19:02

16 they are, although if it's a Sector 3 call and the

17 Sector 3 assigned deputy would be the primary

18 officer on that call and it would be the rest of us

19 would assist.

20 BY MR. MAY:                                               10:19:15

21      Q.    Is 2720 Castro Valley Boulevard Sector

22 3?

23      A.    Yes.

24      Q.    And what is Sector 4?

25      A.    It's very large.  You want the -- the      10:19:26

1  burglary?

2      A.    I have no independent recollection if --

3  if I was.

4      Q.    Okay.  The previous auto burglaries at

5  the 2720 Castro Valley Boulevard Shopping Center,        10:21:18

6  did any of the suspects that were reported to have

7  potentially been involved in any of those crimes,

8  were any of those suspects reported to be women?

9      A.    I do not recall.

10      Q.    Do you recall anything about any of the     10:21:42

11  suspects potentially tied to auto burglaries at the

12  2720 Castro Valley Boulevard location prior to the

13  Loggervale incident?

14          MR. GILBERT:  Overbroad.

15          Go ahead.                                    10:21:56

16          THE WITNESS:  I apologize.  Can you

17  start that question over from the beginning?

18          MR. MAY:  Yeah.  Can I have the court

19  reporter please read that one again?

20          (Whereupon, the record was read back by      10:22:02

21  the Court Reporter as follows:

22          "Question.  Do you recall anything about

23  any of the suspects potentially tied to auto

24  burglaries at the 2720 Castro Valley Boulevard

25  location prior to the Loggervale incident?")        10:21:50

1          THE WITNESS:  Do I recall anything about

2    the suspects involved, is that the question?

3          MR. MAY:  Yes.

4          MR. GILBERT:  Vague as to time as to

5    when she recalled it.

6          Go ahead.                                          10:22:36

7          THE WITNESS:  The descriptive parts that

8    stuck out to me were auto burglaries at the

9    Starbucks in the parking lot, early morning hours

10   and description of a silver or gray car, that was     10:22:55

11   the part I remembered probably the most.

12   BY MR. MAY:

13       Q.   Okay.  And is that what you -- do you

14   believe that that's what you were aware of as you

15   approached the Loggervales' vehicle?                   10:23:11

16       A.   Yes.

17       Q.   At the time you approached the

18   Loggervales' vehicle, do you know or did you know

19   how many auto burglaries were reported in the 2720

20   Castro Valley Boulevard vicinity?                      10:23:36

21       A.   I do not recall.  I remember there were

22   multiple.

23       Q.   Okay.  The police incident report

24   regarding the Loggervale incident, we made that

25   Exhibit 1, yesterday, and I believe that Mr. Gilbert  10:24:02

1    A.    No.

2    Q.    Did you have a partner that day?

3    A.    That sounds like a very vague question.

4    Q.    Okay.

5         MR. GILBERT:  Objection.  Vague.          10:25:52

6         MR. MAY:  Do you sometimes patrol with

7    another person in your vehicle?

8         THE WITNESS:  No.

9    BY MR. MAY:

10   Q.    Do you remember what brought you to the     10:26:14

11   2720 Castro Valley Boulevard area?

12   A.    I believe I was just driving around

13   doing patrol checks of the businesses in the early

14   morning hours like I tend to do at the beginning of

15   shift on my way to find somewhere to type a report,   10:26:42

16   I'm sure.

17   Q.    What was your shift that day if you

18   recall?

19   A.    My shift had been 0500 to 1700 hours for

20   the last couple of years.                        10:27:03

21   Q.    Okay.  Including September 2019?

22   A.    I would believe so.  I need to look at a

23   calendar to make sure for sure, but I believe that

24   was my normal shift.

25   Q.    Okay.  When you arrived at the shopping   10:27:17

1  center that includes 2720 Castro Valley Boulevard,

2  was -- was it specifically to investigate recent

3  auto burglaries in the area?

4       A.    I'm sorry.  Part of our duties are to

5  patrol check the area and make sure the area is          10:28:07

6  safe.  We have a homeless problem and we've had

7  numerous auto burglaries in that specific location,

8  so my intentions were to drive through areas where

9  people have been victimized and be a presence in

10 hopes that deter crime and make sure everything          10:28:36

11 seemed all right.

12      Q.    And at some point you noticed a four

13 door 2019 Cadillac?

14      A.    I did notice a four-door car.  I'm not

15 Car Connoiseur, so I wouldn't tell you I recognize       10:28:56

16 it immediately as a Cadillac.

17      Q.    But, it was a silver four-door car?

18      A.    Yes.

19      Q.    It was in a handicap stall?

20      A.    Yes.                                           10:29:08

21      Q.    Did it immediately seem suspicious to

22 you when you observed that vehicle?

23      A.    Yes.

24      Q.    Okay.  And tell me when you first

25 believe that it was suspicious, tell me the reasons      10:29:26

1    why.

2         A.    It was parked in a handicap stall and I

3    didn't see a handicap placard or handicap license

4    plate, and I believe it had out-of-state plates.

5         Q.    Okay.  Did you do anything to see if          10:29:43

6    there was a disabled placard hanging from the rear

7    view mirror when you first observed that car?

8         A.    I did not.  I was driving.  It -- it

9    wasn't where I could see through the windows for

10   whatever reason.  I don't know if because they were   10:30:02

11   tinted.  I didn't see it driving by.

12        Q.    Okay.  And that was suspicious to you?

13        A.    It definitely peaked my interest.

14        Q.    And, also, I think you said -- well,

15   what else was suspicious about that vehicle when you  10:30:27

16   first observed it?

17        A.    Do you want me to refer to my report?

18        Q.    If you need to.  If you don't recall and

19   you need to refresh your recollection, then yes.

20        A.    Thank you.                                   10:30:39

21             The only other thing I did document in

22   my report was it appeared there was someone in the

23   driver's seat of the vehicle.

24        Q.    And what was suspicious about that?

25        A.    As I drove by I believe the person was      10:31:20

1   somewhat leaned back in the seat based on the
2   silhouette which...
3              COURT REPORTER:  I'm sorry.  You cut
4   out.
5              MR. MAY:  We don't have any sound.          10:31:52
6              THE VIDEOGRAPHER:  Yeah.
7              Say something.
8              MR. MAY:  I was going to say, Deputy
9   Pope, if you can hear me, raise your left hand.
10             She can't hear us.                          10:32:05
11             THE VIDEOGRAPHER:  Let's go off the
12  record at 10:33 a.m.
13             (Whereupon, a break was taken.)
14             THE VIDEOGRAPHER:  Back on the record.
15  The time is 10:36 a.m.                                 10:35:10
16             MR. MAY:  Deputy Pope, I guess your last
17  answer got cut off, but I think the question had to
18  do with what else about the vehicle when you first
19  observed it was suspicious to you, and I think you
20  said something having to do with the driver seat      10:35:27
21  being somewhat leaned back; is that right?
22             THE WITNESS:  It appeared to -- there
23  appeared to be a -- someone in the driver's seat and
24  it looked like the seat was reclined.
25  BY MR. MAY:                                            10:35:39

1    Q.    Okay.  And that was suspicious to you?

2    A.    Yes.

3    Q.    Why?

4    A.    Typically early morning at Starbucks

5    people go in and out to get their coffee, and there          10:35:56

6    is no other businesses open there and due to the

7    recent crimes happening at that location, it -- all

8    of it together seemed suspicious.

9    Q.    Did you believe that potentially the

10   person was reclining in their seat, so that they          10:36:18

11   wouldn't be seen in the car?

12   A.    Possible.

13   Q.    Well, I'm trying to figure out what made

14   it suspicious they were leaning back.  Does that

15   make it more likely like they were casing the place          10:36:33

16   as far as your training and experience?

17   A.    That's a possibility.

18   Q.    Do you have experience where you have

19   investigated people who were casing parking lots and

20   they do so leaning back in their driver's seat?          10:36:46

21   A.    I have investigated many 459 autos in

22   parking lot areas and usually the information

23   provided by witnesses or victims varies.

24   Q.    Okay.  So sometimes it's reported that

25   the person casing the parking lot is leaning back in          10:37:13

1          Q.    Okay.  And I think further up in the

2     report you said that 0635 hours was when you -- when

3     this -- this whole thing started for you or maybe

4     you can clarify for me -- well, let me strike that.

5     I'm going to ask a different question.                    10:39:18

6               Do you know when you first observed the

7     silver four-door vehicle that you believe was

8     suspicious?

9          A.    I believe it may have been 0635 hours.

10         Q.    Okay.  So before sunrise?                      10:39:35

11         A.    Yes.

12         Q.    And then the sentence after that it says

13    "The sunrise was just starting to break the darkness

14    of the night."  Why did you put that in the report?

15         A.    Because it was dark and we couldn't           10:39:52

16    clearly see into the car either due to how dark it

17    was or the tinted windows.  I'm really not sure why

18    we couldn't see into the car until prior to walking

19    up to it.

20         Q.    Okay.  And the next sentence says "I          10:40:17

21    could see the outline of a body just break the level

22    of the driver window as if they were trying to

23    conceal themselves, and it appears as if the driver

24    was looking out the driver's side window."

25              Did I read that correctly?                     10:40:30

1      A.    Yes.

2      Q.    Okay.  And the outline of a body that

3  was just breaking the level of the driver window, is

4  that describing the driver somewhat reclined in the

5  seat that you discussed earlier?                              10:40:52

6      A.    Yes.

7      Q.    Okay.  And you believed that the way

8  they were doing that made it appear as if they were

9  trying to conceal themselves?

10     A.    Possibly.                                           10:41:00

11     Q.    Okay.  At that point did you believe

12  that if they were trying to conceal themselves, they

13  may have been reclined all the way, rather than just

14  part of the way?

15     A.    No.                                                 10:41:15

16     Q.    You said it appeared as if the driver

17  was looking out the driver side window.  What made

18  you write that in the report?

19     A.    That is what I believed I saw when I saw

20  the vehicle.                                                 10:41:32

21     Q.    Okay.  And was there something

22  suspicious about it appearing that the driver was

23  looking out the driver's side window?

24     A.    In itself singularly, no, but everything

25  put together, yes.                                           10:41:56

1      Q.    Okay.  Why -- why was the fact that the
2  driver appeared to be looking out the driver's side
3  window suspicious when put together with other
4  factors?
5      A.    I'm sorry.  Say that again.                    10:42:09
6      Q.    Yeah.  You said it wasn't suspicious
7  just by itself, but when combined with the other
8  things that you observed, it was suspicious.  So I'm
9  wondering if you can explain that.
10     A.    Starbucks is the only business open.          10:42:21
11 People go inside and get coffee leaving their
12 vehicles oftentimes with items of value inside
13 thinking it will be safe.  So, if we have a suspect
14 sitting in a vehicle watching people, I find that
15 suspicious.  We didn't know what we had, though.        10:42:49
16     Q.    At that point when you observed the
17 things that we just discussed, was the person inside
18 the vehicle now a suspect?
19     A.    Vague as to time.  When -- when are you
20 referring to?                                           10:43:03
21     Q.    After you observed that there was
22 somebody partly reclined in the vehicle and appeared
23 to be looking out the driver's side window, the
24 moment you observed that, that's the time I'm
25 referring to.                                           10:43:20

1    A.    I believe I put in my report and made a
2  mental note of it and continued driving.
3    Q.    Okay.  And then where did you drive when
4  you left the 2720 Castro Valley Boulevard location?
5    A.    I turned northbound on to Lake Chabot          10:43:46
6  Road.
7    Q.    And where did you go?
8    A.    I drove northbound.
9    Q.    For how long?
10    A.    I do not recall.                              10:44:03
11    Q.    Okay.  If the vehicle was -- if there
12  was something suspicious about that vehicle, why
13  didn't you decide to stay there and observe it?
14    A.    I don't know, but I didn't.  I made a
15  mental note of the vehicle and I continued driving.   10:44:43
16    Q.    Okay.  And how long were you gone before
17  you decided to return?
18    A.    Deputy Holland over radio, I believe,
19  put out information for the vehicle to run it and I
20  knew he was running the car I had just seen and I     10:45:06
21  believe at some point we -- I told him I saw it
22  also.  I just don't recall how that occurred.
23    Q.    Do you remember how long it was from the
24  time you left the parking lot at 2720 Castro Valley
25  Boulevard until the time that you heard Deputy        10:45:24

1  Holland ask for the vehicle to be run?

2      A.    I don't recall the exact amount of time.

3      Q.    Do you have an estimate?

4      A.    I don't know if I could accurately

5  provide an estimate.                                  10:45:45

6      Q.    Okay.  But, when you heard that Deputy

7  Holland was requesting a records check, you returned

8  to that parking lot?

9      A.    I did.

10     Q.    Okay.  And when you returned to the       10:45:59

11 parking lot, the vehicle was in the same parking

12 space that it had been in the first time you saw it?

13     A.    Yes.

14     Q.    Okay.  Was it light at that point or was

15 it still dark or somewhere in between?                10:46:10

16     A.    It -- it was somewhere in between.  It

17 wasn't light out initially.

18     Q.    Okay.  And when you returned, I think

19 you can look at your report.  It looks like you're

20 saying that you did not see the handicap placard and  10:46:26

21 there was no symbol on the license plate.  Is that

22 the second time that you couldn't see the handicap

23 placard?

24     A.    Correct.  I recall not being able to see

25 a handicap placard until we were right up on the      10:46:41

1    car.

2         Q.    Okay.  And when you got right up on the

3    car you did see a disable placard hanging from the

4    rear view mirror, correct?

5         A.    Yes.                                        10:46:56

6         Q.    Was there something suspicious about the

7    vehicle having a Nevada license plate?

8         A.    In and of itself, no.  Cars come from

9    Nevada.

10        Q.    Okay.  Was something suspicious about it    10:47:33

11   having a Nevada license plate when combined with

12   other factors?

13        A.    Yes.

14        Q.    Okay.  Can you explain that?

15        A.    When the -- I believe Holland did the       10:47:48

16   record check on radio with the license plate.  It

17   came back to a rental car company.

18        Q.    Okay.  And was there something

19   suspicious about it the fact that the car was

20   potentially a rental car?                              10:48:06

21        A.    Due to my training and experience our

22   suspects often are driving rental cars.

23        Q.    Do you have any specific training that

24   you received from POST or Alameda County Sheriff

25   that dealt with suspects using rental cars to commit   10:48:31

1   there, I think, is what we talked about, it says

2   that as you approached the vehicle and got closer,

3   you could see the handicap placard hanging from the

4   rear view mirror; that's accurate, right?

5       A.   Yes.                                          10:58:34

6       Q.   You also -- then, once you approached

7   the passenger side of the vehicle, then you did

8   notice that there were two passengers in the

9   vehicle, correct?

10      A.   Yes.                                          10:58:48

11      Q.   One in the front seat and one in the

12  back seat?

13      A.   Yes.

14      Q.   The next paragraph second line, it says

15  "Deputy Holland asked IP 1 to turn the vehicle off   10:59:04

16  and asked IP 1 if she had any identification."  Is

17  IP 1 the driver as far as you know?

18      A.   I believe so.

19      Q.   Okay.  And did you hear Deputy Holland

20  ask the driver to turn the vehicle off when he first 10:59:20

21  made contact?

22      A.   I believe that's what I heard.

23      Q.   When you prepared this report did you

24  review any body-cam footage prior to completing the

25  report?                                               10:59:36

1   only hear Deputy Holland.

2         Q.    Okay.  And it says that based on what

3   you heard from Deputy Holland, you believed that the

4   driver was refusing to provide any form of

5   identification.  Is that right?                          11:01:00

6         A.    Yes, based on what Deputy Holland was

7   saying.

8         Q.    Okay.  At that point in time was the

9   driver required to provide her identification to

10  Deputy Holland if he requested it?                       11:01:17

11        MR. GILBERT:  It calls for a legal

12  conclusion.

13        Go ahead.

14        THE WITNESS:  I believed she was based

15  on her being in control of the vehicle and being        11:01:30

16  parked in the handicapped spot.

17  BY MR. MAY:

18        Q.    If she wasn't in a handicap spot would

19  she still need to show her identification on

20  request?                                                 11:01:46

21        A.    If she has control of the vehicle I

22  believe she does.

23        Q.    And is that based on a statute that

24  you're aware of?

25        A.    I believe it's a Vehicle Code.              11:02:09

```
 1                (Whereupon, a break was taken.)
 2                THE VIDEOGRAPHER:  Back on the record.
 3       The time is 11:15 a.m.
 4                MR. MAY:  Okay.  Deputy Pope, I'm still
 5       looking at your supplemental narrative.  If you        11:13:46
 6       would turn your attention to the middle of the page.
 7       It's a paragraph starting with "While standing at
 8       the rear passenger door."
 9                Do you see that?
10                THE WITNESS:  Yes.                             11:13:59
11   BY MR. MAY:
12       Q.    Okay.  It says "While standing at the
13       rear passenger door IP 3 quickly and unexpectedly
14       opened the rear passenger door striking me in the
15       leg, which caught me off guard."                       11:14:10
16                Did I read that correctly?
17       A.    Yes.
18       Q.    Okay.  IP 3 is the passenger in the back
19       seat, right?
20       A.    Yes.  Yes.                                       11:14:23
21                THE VIDEOGRAPHER:  I'm getting an echo.
22                Officer Pope, if you -- maybe if you sit
23       a little closer or get the phone a little closer to
24       you, that might help.
25                MR. GILBERT:  The phone is probably 10         11:14:40
```

1  to 12 inches of her right now.

2          THE VIDEOGRAPHER:  Okay.  Because, I'm

3  not hearing an echo with you, Mr. Gilbert, but when

4  she answered, I heard a slight echo.  We'll try it.

5  I'm sorry.                                                11:14:54

6          MR. GILBERT:  She has a very soft voice.

7          THE WITNESS:  I apologize.  I will try

8  to talk louder.

9          THE VIDEOGRAPHER:  That helps.  Thank

10  you.                                                     11:15:03

11          MR. MAY:  Okay.  Let's see.  So, do you

12  believe that the passenger struck you in the leg

13  with the car door on purpose?

14          THE WITNESS:  Possibly.

15  BY MR. MAY:                                              11:15:16

16      Q.  Okay.  You don't know one way or the

17  other; is that fair?

18      A.  No.

19      Q.  No, it's not fair or...

20      A.  I -- I -- correct.  I was standing right  11:15:46

21  next to the door, and she could see me clearly

22  standing right next to her door.

23      Q.  Okay.  Did you hear the passenger say

24  "pardon me," or "excuse me," or anything like that

25  before she opened the door?                              11:16:00

```
1        A.    I don't recall.

2        Q.    Okay.  Why were you standing close

3    enough to the car that the door would strike you if

4    it was open?

5        A.    That's where we stand as a cover officer      11:16:12

6    on the passenger side of the vehicle.

7        Q.    Was it your intention to stand in a

8    place that would block any of the passengers from

9    exiting the vehicle?

10       A.    No.  I need to be able to stand where I       11:16:24

11   can see the occupants and inside the vehicle for my

12   safety and my partner's safety.

13       Q.    Okay.  Could you have done that from a

14   couple of feet more further away from the door?

15       A.    No.                                           11:16:40

16       Q.    Did the car door hitting your leg cause

17   any injury?

18       A.    No.  Momentary pain, discomfort, but no

19   long-term injury.

20       Q.    Okay.  Did you say anything when the car      11:17:00

21   door hit you in the leg?

22       A.    I did verbally say something.

23       Q.    Do you remember what?

24       A.    I don't recall.

25       Q.    Okay.  Is it true that you did not tell       11:17:12
```

1  Deputy Holland that the passenger hit you in the leg

2  with the car door until after the encounter was

3  over?

4       A.    I'm not sure.

5       Q.    Did you consider the passenger striking          11:17:32

6  you in the leg with the car door to be a battery on

7  a police officer?

8       A.    Yes.

9       Q.    Did you arrest her for battery on a

10 police officer?                                              11:17:42

11      A.    No.

12      Q.    Why not?

13      A.    It's my discretion to arrest or to not.

14      Q.    Did you watch your own body-cam video in

15 preparation for today?                                       11:17:56

16      A.    Portions.

17      Q.    Did you watch the portion where you were

18 struck in the leg with the car door?

19      A.    I don't recall.

20      Q.    When -- when the passenger in the back           11:18:13

21 seat opened the car door and struck you in the leg,

22 she then got out of the car?

23      A.    Yes.

24      Q.    And you then said she needed to use the

25 restroom?                                                    11:18:25

1     A.     Something like that, yes.

2     Q.     From your perspective was she allowed to

3  exit the car to use the restroom at that moment?

4     A.     No.

5     Q.     Why not?                                    11:18:36

6     A.     We were trying to investigate the

7  occupants -- occupant of the vehicle, because

8  initially we believed there was only one person in

9  the vehicle was at all related or involved in

10 previous crimes that had been reported.  Usually    11:19:00

11 while we investigate something if there is other

12 occupants, they don't get out of the car.

13    Q.     Okay.  Did you ever tell any of the

14 occupants that they weren't allowed to get out of

15 car before they exited?                             11:19:21

16    A.     No.  She exited very quickly.  Sorry.

17           MR. GILBERT:  I'm sorry.

18           Can you read that back please?

19           COURT REPORTER:  Read what back?

20           MR. GILBERT:  The question.               11:19:36

21           (Whereupon, the record was read back by

22 the Court Reporter as follows:

23           "Question.  Did you ever tell any of the

24 occupants that they weren't allowed to get out of

25 car before they exited?")                           11:19:21

 1          MR. GILBERT:  Before she exited or
 2    before the incident?  What is the last word?
 3          COURT REPORTER:  "Exited."
 4          MR. GILBERT:  Thank you very much.
 5          COURT REPORTER:  You're welcome.          11:20:02
 6          MR. GILBERT:  Go ahead.
 7          THE WITNESS:  I didn't expect anyone to
 8    exit the car and when she did, it was very quick and
 9    caught me off guard.
10    BY MR. MAY:                                      11:20:12
11        Q.    My question is a little bit different.
12    Did you ever tell any of the occupants they were not
13    allowed to exit the vehicle before they did so?
14        A.    I was not the primary officer
15    investigating and that was Deputy Holland.       11:20:25
16        Q.    My question is a little different than
17    that.  It is whether you told anybody in the vehicle
18    that they were not allowed to exit before any of
19    them exited.
20        A.    Prior to her exiting Deputy Holland was 11:20:40
21    the only deputy talking as far as I recall.
22        Q.    Okay.  So you did not tell anybody that
23    they were not allowed to exit before they exited?
24        A.    Before anyone exited the vehicle I don't
25    believe I was doing any talking.                 11:21:05

1  A. When we approached the car to

2 investigate we believed there was a single occupant

3 in the vehicle.

4  Q. And when you approached the car to

5 investigate, you believed the single occupant in the  11:22:51

6 vehicle had committed an auto burglary before that

7 day?

8  A. Can you reword the question?

9  Q. Did you believe that the person in the

10 silver four-door vehicle commit auto burglaries as  11:23:11

11 you were approaching the vehicle?

12  A. We believe it could be a possibility and

13 that's why we do an investigation.

14  Q. And the possibility isn't enough to have

15 reasonable suspicion, right?  11:23:28

16  A. We had multiple factors that led us to

17 the reasonable suspicion.

18  Q. A mere possibility that somebody was

19 involved in a crime is not enough to detain them,

20 right?  11:23:43

21  MR. GILBERT: Vague as to "mere

22 possibility."

23  Go ahead.

24  THE WITNESS: Reasonable suspicion is

25 about to be is part of reasonable suspicion. That's  11:23:52

1    did he grab on to her clothing, what did you

2    observe?

3         A.    From my side of the car I couldn't see

4    that.  I stayed on one side of the car and he went

5    to the other -- the back seat of the patrol car is a        11:26:35

6    hard plastic that's kind of slippery.

7         Q.    Did any of the occupants of the vehicle

8    ever ask you why they were being detained?

9         A.    I believe they did, but never allowed us

10   an explanation or allowed us to fully explain, and          11:26:55

11   they repeatedly yelled at us the same questions over

12   and over again.

13        Q.    Okay.  If they had allowed you to

14   explain would you have given them a response?

15        A.    I don't know if I would have personally.         11:27:08

16   I do know Deputy Holland would have.  He was the

17   primary on this detail.

18        Q.    Okay.  And did you hear any occupants of

19   the vehicle ask Deputy Holland why they were being

20   detained?                                                   11:27:23

21        A.    I believe that's what they were yelling

22   at us repeatedly over and over again without

23   allowing any explanation to be given.

24        Q.    Okay.  And it appeared that they were

25   not allowing Deputy Holland to give an explanation          11:27:36

1    either?

2          A.    If I recall correctly, I believe so.

3          Q.    What was your understanding of the

4    reason for detaining the woman who was in the front

5    passenger seat?                                          11:27:55

6          A.    My understanding was she is in control

7    of the vehicle and refused to provide her driver's

8    license.

9          Q.    Okay.  My question was about the woman

10   in the front passenger seat.  I want to make sure       11:28:16

11   that was clear.

12         A.    Sorry.  I misunderstood.  Say again.

13         Q.    What was your understanding of the

14   reason why the woman in the front passenger seat was

15   detained?                                                11:28:26

16         A.    Well, by the time this incident unfolded

17   incredibly fast, and I can't tell you a timeframe.

18   It just felt incredibly fast after the back seat

19   passenger was out of the car, the front seat

20   passenger was out of the car very quickly, yelling      11:28:53

21   at us and I was absolutely in fear I was going to be

22   fighting both of them if we couldn't de-escalate the

23   situation and I -- I didn't see it happening.  It

24   was probably just as important for officer safety as

25   for their safety.  I thought I was going to have to     11:29:17

1   fight them.  I thought they were going to fight me.

2        Q.    Did you detain the woman -- ultimately

3   you did detain the woman in the front passenger

4   seat, correct?

5        A.    Eventually.                                    11:29:33

6        Q.    And physically detained her, right?

7        A.    With handcuffs, yes.

8        Q.    Was that your decision or somebody

9   else's?

10        A.    We -- I guess it would have been my       11:29:45

11   decision, but also collectively it was the most

12   appropriate decision at the time I felt.

13        Q.    Do you agree that the woman in the front

14   passenger seat never struck you?

15        A.    Correct.                                    11:30:30

16        Q.    Did the woman in the front passenger

17   seat ever threaten to strike you?

18        A.    Not that I recall.

19        Q.    Did the woman in the front passenger

20   seat ever use any force on you?                        11:30:45

21        A.    Not that I recall.

22        Q.    Did the woman in the front passenger

23   seat ever threaten to use force on you?

24        A.    Not that I recall.

25        Q.    In your report I'm looking at the          11:31:11

1  page 12 of 12.  So the last page of the document,

2  fourth paragraph from the bottom, the one starting

3  with "Once all three IPs..."

4         Do you see that?

5     A.    Yes.                                    11:31:26

6     Q.    Okay.  It says "Once all three IPs were

7  individually detained, identification was located

8  for all three and their identities confirmed."

9         Did I read that correctly?

10    A.    Yes.                                    11:31:44

11    Q.    Okay.  And were you the one who located

12 any of the identifications for the three Loggervale

13 women?

14    A.    I believe I located two.

15    Q.    Okay.  And would that have been the two  11:31:59

16 daughters?

17    A.    Yes.

18    Q.    Okay.  And that required you to go into

19 the vehicle or the vehicle's trunk to locate these

20 I.D.s?                                            11:32:13

21    A.    Where they said they were?  Yes.

22    Q.    You found one -- you located one of the

23 identifications in the back seat, correct?

24    A.    I don't recall that.

25    Q.    Do you recall locating one of the       11:32:37

1    identifications in the trunk?

2        A.    Yes.

3        Q.    Okay.  And the identification that you

4    located in the trunk, did one of the women tell you

5    that that's where her identification could be found?        11:32:52

6        A.    She told me exactly where it was.

7        Q.    Okay.  What about the other

8    identification, did -- did the owner of that other

9    identification that you found tell you where it was

10   located?                                                    11:33:06

11       A.    I don't recall.

12       Q.    It says "Their identities were

13   confirmed."  If you recall from yesterday, I believe

14   Deputy Holland testified that he did a check or a

15   ran a check on the names.  Did you -- did you do          11:33:26

16   anything independently to confirm the identity of

17   the Loggervale women?

18       A.    No.  Only one person needs to do that

19   task.

20       Q.    Okay.  And I think we went over this.            11:33:40

21   I'm not going to go in too much detail, but was the

22   point of running the names to find out if there were

23   either outstanding, warrants, probation, or parole

24   or missing person report?

25       A.    Yes.                                             11:33:58

1   their tone -- their yelling was all very aggressive.

2       Q.    Okay.

3       A.    And it was very stressful.

4       Q.    Okay.  Did any of the Loggervale women

5   ever make any physical movements that you believed          11:36:56

6   indicated that they were about to cause you harm?

7       A.    Their lack of following any and all

8   instructions given to them was one of the very

9   concerning things for me.

10      Q.    Did -- let's see.  Do you know if any of         11:37:24

11  the deputies on scene ever attempted to contact any

12  witnesses from the other auto burglaries to see if

13  they can identify any of the Loggervale women as

14  potential suspects?

15      A.    I don't know.  I have no recollection of         11:37:53

16  that.

17      Q.    When you approached the silver four-door

18  vehicle on the day of the incident, was it at that

19  time your understanding that any suspects in any

20  previous auto burglaries were African-American?          11:38:26

21      A.    I believe that was a description given

22  for several of the details over radio dispatch.

23      Q.    Okay.  How many alleged auto burglaries

24  prior to the day of the Loggervale incident involved

25  African-American suspects?                                11:38:49

1     Q.   Okay.  And what -- is that an inaccurate

2  statement because your understanding is that none of

3  the Loggervale women were detained on suspicion of

4  committing auto burglaries?

5     A.   No, based on how you said the question.    11:46:03

6     Q.   Okay.  Well, let me -- let me try to

7  re-ask it, then, because I'm not sure what it was

8  about my question that -- that was inaccurate now,

9  but let me see if I can get at it a slightly

10  different way.    11:46:22

11        Do you believe -- is it your

12  understanding, rather, that any of the Loggervale

13  women were detained because they were suspected to

14  have committed any auto burglaries?

15     A.   No.    11:46:35

16     Q.   Okay.

17     A.   We were trying to investigate.

18     Q.   Okay.  Is it -- so, why were the

19  Loggervale women detained in your understanding?

20        MR. GILBERT:  Asked and answered.    11:46:52

21        Go ahead.

22        THE WITNESS:  Deputy Holland had asked

23  for the driver's identification.  She was in control

24  of the vehicle.  The passenger got out of the car

25  very quickly, hit me with the door.  The second    11:47:18

1  passenger ended up getting out of the door very
2  quickly.  It became chaotic really fast.  They were
3  keeping us from doing an investigation, and they
4  were given an opportunity to get back in the car.  I
5  believe that was the first instruction was to get        11:47:40
6  back in the car and they refused.
7  BY MR. MAY:
8       Q.    When you say "keeping us from doing an
9  investigation," what do you mean?
10      A.    Whatever is necessary to determine if       11:47:49
11 someone has a lawful business being where they are
12 or not or whatever investigation leads us.
13      Q.    What were they doing from keeping you
14 from investigating -- sorry.  Let me rephrase that.
15            What did they do to keep you from           11:48:19
16 investigating?
17      A.    Well, Deputy Holland was doing the
18 investigation.
19      Q.    What did they do to keep Deputy Holland
20 from investigating?                                      11:48:31
21      A.    Getting out of the car and yelling at us
22 and then not following any instructions one way or
23 another.  Get back in the car.  Don't get back in
24 the car.  I believe not a single instruction was
25 followed either way.                                     11:48:50

1    26 seconds.  I'm going to ask you some questions.

2              It's actually 15 minutes, 49 seconds.

3    Okay.  I'm going to go ahead and hit play.

4              (Video played.)

5              MR. MAY:  Okay.  I stopped at 16 minutes    11:51:36

6    and 26 seconds.  Were you able to see that video?

7              THE WITNESS:  Yes.

8    BY MR. MAY:

9         Q.    Were you able to hear the sound on it?

10        A.    Yes.                                        11:51:43

11        Q.    Okay.  Does that appear to be a portion

12   of your body cam from the day of the Loggervale

13   incident?

14        A.    Yes.

15        Q.    Is that something that you remember       11:51:52

16   reviewing in preparation for today?

17        A.    I don't believe I reviewed that portion

18   of the video in preparation for today.

19        Q.    Okay.  Did you observe what appeared to

20   be you opening the back door of the car behind the    11:52:05

21   driver's seat?

22        A.    Yes.

23        Q.    And did you observe what appeared to be

24   you removing a wallet from a purse that was in the

25   back seat?                                            11:52:19

1       A.    Yes.

2       Q.    And you unzipped the -- you also removed

3   a pocket book, right?

4       A.    They both looked like women's wallets to

5   me.                                                    11:52:34

6       Q.    So there were two wallets in that purse?

7       A.    That's what showed on the video.  There

8   could have been more wallets in that purse.  I don't

9   know.

10      Q.    And one of them you unzipped?            11:52:45

11      A.    Yes.

12      Q.    And removed the driver's license from

13  it?

14      A.    Or I.D., whatever it was, yes.

15      Q.    Okay.  Did you have a warrant before you   11:52:57

16  went into the back seat of the car?

17      A.    No.

18      Q.    Do you believe you needed a warrant?

19      A.    No.

20      Q.    Why not?                                 11:53:08

21            MR. GILBERT:  It calls for a legal

22  conclusion.

23            Go ahead.

24            THE WITNESS:  At that point we needed to

25  identify who we had, because they hadn't -- they       11:53:22

1    hadn't provided us.  We didn't know who we had, who

2    we were dealing with.

3    BY MR. MAY:

4         Q.    Okay.

5         A.    And as soon as -- as soon as the rear          11:53:42

6    passenger hit me with the car door I knew we would

7    be writing a report on this one way or another.

8         Q.    What about the fact that she hit you

9    with the car door indicated that you would be

10   writing a report?                                          11:53:59

11        A.    Personally it was -- I'm in full

12   uniform.  She can see me.  She knew I was there and

13   she hit me with the car door and then the incident

14   escalated, so I knew we would be writing something

15   for this incident.                                         11:54:34

16        Q.    Okay.  And what does that have to do

17   with whether you needed a warrant to go in the back

18   seat to remove the identification?

19        A.    I don't believe I needed a warrant to

20   find for identification.                                   11:54:53

21        Q.    Okay.  What led you to believe that?

22             MR. GILBERT:  Asked and answered.

23             Go ahead.

24             THE WITNESS:  At that point I believed

25   we had had -- we potentially had misdemeanors             11:55:20

1   committed in our presence -- several of them, and we

2   needed to decide how we would proceed with all --

3   all the facts that we knew at the time.

4   BY MR. MAY:

5       Q.   And that allowed you to go into the          11:55:44

6   vehicle and remove the identification without a

7   warrant?

8       A.   I believed I had that -- that right.

9       Q.   Is that something that was taught to you

10  during the POST Police Academy?                        11:55:55

11      A.   To locate I.D.s of people who possibly

12  committed crimes?

13      Q.   Sure.

14      A.   Yes.

15      Q.   Okay.  Was that also communicated to you      11:56:17

16  by the Alameda County Sheriff's Office?

17      A.   I believe I had the right to locate

18  their I.D.s.

19      Q.   And do you believe that somebody within

20  the Alameda County Sheriff's Office told you, that     11:56:38

21  you don't need a warrant to look for I.D.s under

22  that scenario?

23      A.   I don't believe I need a warrant under

24  that scenario.

25      Q.   What I'm asking is whether that's             11:56:49

1    through dispatch?

2         A.    I don't know how dispatch does it.

3         Q.    Have you ever given Sheriff's Dispatch

4    just a name to run and that then they were able to

5    run the name?                                          12:07:12

6         A.    I don't recall.

7         Q.    At some point you came to learn that the

8    17-year-old had her cell phone with her while she

9    was in the back of the police car?

10        A.    Yes.                                        12:07:29

11        Q.    And did that concern you in any way?

12        A.    I don't -- I don't -- I don't think I

13   would use the word "concern."

14        Q.    Okay.  Did you determine at some point

15   that you needed to confiscate the 17-year-old's       12:07:45

16   phone?

17        A.    I believe she was repeatedly calling

18   911, which goes to our Sheriff's Dispatch tying up

19   the emergency phone system through Sheriff's

20   Dispatch.  So it became a problem for them.  They      12:08:04

21   need to be able to take 911 calls.

22        Q.    Did Sheriff's Dispatch ever ask you to

23   take possession of the phone belonging to the

24   17-year-old daughter?

25        A.    I don't believe -- oh, sorry.  Sheriff's    12:08:19

1    Dispatch would not have given us that order,

2    however, they would have told us someone is

3    repeatedly calling them and it's tying up the 911

4    phone lines.  They made us aware of that.

5         Q.    Okay.  Sorry.  Was it your decision to        12:08:43

6    take the phone from the 17-year-old?

7         A.    I don't recall whose decision it was.

8         Q.    Did you observe one of the deputies take

9    the phone from her?

10        A.    I believe it was taken.  I don't recall      12:08:56

11   if I observed it.

12        Q.    Give me just one moment here.  Did you

13   have a warrant to take the cell phone from the

14   17-year-old Loggervale woman?

15        A.    No.                                           12:10:00

16        Q.    Do you believe that you needed a warrant

17   to take the cell phone from the 17-year-old?

18        A.    Absolutely not.

19        Q.    Why not?

20        A.    She was disrupting the 911 emergency          12:10:17

21   system.

22        Q.    Was she committing any crime?

23        A.    Repeatedly calling 911 can be a crime if

24   it's being abused.

25        Q.    What was your understanding of why she        12:10:37

1          Talk for a second.

2          THE WITNESS:  One, two, three, four.

3          MR. GILBERT:  Can you hear?

4          THE VIDEOGRAPHER:  Yeah, it's better.

5          MR. GILBERT:  I'm sorry.  Can you either          13:07:22

6     ask the question again or have it read back please?

7          MR. MAY:  Yeah, I was asking about the

8     college courses.  I didn't hear what you said about

9     where you went to college and which credits you got.

10          THE WITNESS:  I have college credits          13:07:33

11     from Laney, Merritt and College of Alameda.  It's

12     all one transcript.  I believe it's called Peralta

13     Colleges or something.

14     BY MR. MAY:

15          Q.    And I thought you said something about          13:07:45

16     Police Academy.  Were those credits related to the

17     Police Academy?

18          A.    I believe I had college credits through

19     Las Positas for the Police Academy.

20          Q.    Okay.  Did you get any degrees from          13:07:59

21     college?

22          A.    No.

23          Q.    Where did you do the Police Academy?

24          A.    Alameda County Regional Training Center.

25          Q.    And what year did you complete Police          13:08:15

1    Academy?

2         A.    2006.

3         Q.    And was your first law enforcement job

4    with Alameda County Sheriff?

5         A.    Yes.                                          13:08:28

6         Q.    Did you do any work after high school

7    and before Alameda County Sheriff's Office?

8         A.    Yes.

9         Q.    What work did you do between high school

10   and your first law enforcement job?              13:08:40

11        A.    I was a waitress and I was a secretary

12   in an office.

13        Q.    Okay.  What's your current job title?

14        A.    Deputy Sheriff 2.

15        Q.    How long have you been a Deputy Sheriff   13:08:58

16   2?

17        A.    I believe we graduate at the academy as

18   a Deputy Sheriff 1 and upon completion of probation,

19   so it's either a year and a half or two years -- I'm

20   not positive, -- we then become Sheriff Deputy 2.   13:09:16

21        Q.    Okay.  Do you have any other roles

22   within the Alameda County Sheriff's Office like

23   field training officer or SWAT or anything like

24   that?

25        A.    Probably somewhere around 2016 I was a   13:09:31

1  JPO, but that's only while we were assigned to the

2  jail, which is a jail training officer.  I don't

3  have that assignment anymore.  The only other

4  specialty training I have is I'm a member of our

5  peer support team.                                        13:09:52

6        Q.    What's that generally speaking?

7        A.    It's a small group of the deputies who

8  go to basic peer support training and we are pretty

9  much hand picked to be on this team because we help

10  our co-workers, sworn and civilians, through          13:10:22

11  probably the hardest times in their lives, whether

12  it's crime prevention, mental health issues,

13  divorce, problems with their families, we -- we help

14  people get through and find professional help, if

15  necessary, through the hardest times in their lives.   13:10:51

16        Q.    Okay.

17        A.    That's just one aspect of what we do as

18  a team.

19        Q.    Okay.  I'm going to take you back to the

20  incident when you first observed the silver          13:11:07

21  four-door vehicle, did you believe that it was

22  potentially casing the parking lot?

23        A.    I believe it was a possibility.

24        Q.    Okay.  And based on that possibility,

25  did you consider just waiving and seeing what it        13:11:22

1   1:13 p.m.

2              (Whereupon, a break was taken.)

3              THE VIDEOGRAPHER:  Okay.  Back on the

4   record.  The time is 1:15 p.m.

5              MR. MAY:  Okay.  I'll rephrase the          13:14:16

6   question.  It had to do when you believed the silver

7   four-door car was potentially casing the parking

8   lot.  At that point did you consider waiting there

9   to see if you might actually catch him doing

10  something criminal?                                    13:14:30

11             THE WITNESS:  There is not a good spot

12  to sit and wait and watch someone right at that

13  intersection, so I wouldn't have considered it

14  because I wouldn't have known where to sit.

15  BY MR. MAY:                                            13:14:45

16       Q.   Okay.  Would you have had the ability to

17  see if an undercover officer could come to the

18  location to continue staking out the -- what you

19  believe to be a suspicious vehicle?

20             MR. GILBERT:  Vague.                        13:15:00

21             THE WITNESS:  I would have never thought

22  of that as an option.  I'm sorry.

23             MR. MAY:  Okay.  The day of the incident

24  with the Loggervale family, did you have a direct

25  supervisor that day?                                   13:15:14

```
 1        Q.    Okay.  And so it's safe to assume that
 2   you were not interviewed as part of the internal
 3   affairs investigation, right?
 4        A.    Correct.
 5        Q.    Was it your understanding that some of      13:23:32
 6   the suspects that were identified in connection with
 7   the auto burglaries at 2720 Castro Valley Boulevard
 8   were African-American?
 9        A.    I believe you already asked me this
10   question.                                              13:23:49
11        Q.    If I did I apologize, but I don't
12   remember and I need to know for the next couple of
13   questions.  So if you don't mind, just telling me
14   again.
15        A.    I believe they -- that was the              13:23:57
16   description.
17        Q.    Okay.  For more than one of the
18   suspects?
19        A.    For more than one of the suspects, yes.
20        Q.    Were there some suspects in the other       13:24:09
21   burglaries who were identified by as being of any
22   other race?
23        A.    I don't recall.  I don't recall.  There
24   may have been one description with a Hispanic male,
25   but I don't recall exactly.                            13:24:29
```

1  articulable facts for this scenario?  This specific

2  scenario I would be concerned for the person's

3  welfare, and if they're fine, then that is

4  different, and they identified themselves, but I

5  think we're missing information.                    13:37:59

6  BY MR. MAY:

7      Q.   Okay.

8      A.   I don't think there is anything wrong

9  with investigating if you have other -- other

10 factors involved.  There is nothing in this         13:38:15

11 scenario.

12     Q.   When you approached the silver four-door

13 vehicle that the Loggervales were in, if you had

14 observed that they were all white, as opposed to

15 African-American, would they -- would they still    13:38:42

16 have been detained that day, do you think?

17          MR. GILBERT:  Speculation.

18          Go ahead.

19          THE WITNESS:  The color of their skin

20 didn't drive the investigation.  Deputy Holland     13:38:57

21 asked a very specific question, which was for...

22          COURT REPORTER:  I'm sorry.

23          THE WITNESS:  It's okay.  And that the

24 uncooperation or the refusal was what directed the

25 incident the way it went.  It had nothing to do with 13:39:33

1    the color of their skin.

2    BY MR. MAY:

3        Q.    The primary reason for approaching to

4    vehicle was to investigate the auto burglaries,

5    wasn't it?                                          13:39:59

6        A.    There were several factors that were --

7    which we've already listed, that were very similar

8    to the prior calls for service and it looked --

9    appeared to only have a single person in the

10   driver's seat and they were related to -- those     13:40:23

11   factors we have already described were related to

12   the prior auto burglaries.

13       Q.    Did any of the Loggervale women resist

14   arrest at any point during the incident?

15           MR. GILBERT:  Vague as to "resist           13:40:56

16   arrest."

17           Go ahead.

18           It assumes facts as well.

19           THE WITNESS:  They did not follow any

20   verbal instructions to place their hands behind     13:41:11

21   their backs.  One did pull away from me.  I did not

22   hang on to her.  I let her pull away from me.  I did

23   not want to fight her.

24   BY MR. MAY:

25       Q.    You received training both in Police      13:41:30

1  there is a certain amount of time that's too long?

2      A.    That may be a reasonable officer's

3  standard.  I don't think there is a specific

4  definition, like, a definite time.

5      Q.    Okay.  Do you believe the Loggervale          13:44:04

6  women were detained for a reasonable amount of time

7  in light of what sort of investigation needed to

8  take place?

9      A.    I do.

10      Q.    Let's see.  Did any of the Loggervale        13:44:14

11  women ever display a weapon?

12      A.    No.

13      Q.    Did you ever search any of the women?

14      A.    I don't recall searching them.

15      Q.    Did any of the Loggervale women ever          13:44:57

16  threaten to injure you or any of the other deputies

17  to your knowledge?

18      A.    Yes.

19      Q.    Okay.  Which of the Loggervale women?

20      A.    The juvenile made a comment, I believe,       13:45:07

21  to Deputy Leeper when I was standing there to the

22  effect that she might hurt him or did she want him

23  to hurt him or something to that effect.

24      Q.    Okay.  And you construed that as a

25  threat to whom?                                          13:45:28

```
1        A.      Deputy Leeper.

2        Q.      Okay.  Any other threats to injure an

3   officer made by the Loggervale women that you're

4   aware of?

5        A.      I don't recall any verbal threats from        13:45:40

6   memory.  I don't recall.

7        Q.      Other than the passenger in the back

8   seat opening her car door into your leg, did any

9   other -- was there any other act of assault or

10  battery by any of the Loggervale women at the scene?   13:46:04

11       A.      I don't recall.  I believe that was the

12  only battery that occurred on scene.

13       Q.      Okay.  How hard did she hit you with the

14  car door?

15       A.      She opened the car door very quickly         13:46:25

16  into my leg.

17       Q.      Okay.  What part of your leg did it hit?

18       A.      I don't recall.

19       Q.      Did it leave any bruising if you recall?

20       A.      No, it did not.                               13:46:39

21       Q.      You didn't need any medical treatment,

22  did you?

23       A.      No.

24       Q.      Did you ever -- did you tell any other

25  deputies at the scene that the back seat passenger     13:46:49
```

```
1   STATE OF CALIFORNIA        )

2                              )      ss.

3   COUNTY OF SAN FRANCISCO    )

4

5

6          I, DEBRA L. ACEVEDO-RAMIREZ, hereby

7   certify:

8          That I am a Certified Shorthand Reporter of

9   the State of California;

10         That in pursuance of my duties as such, I

11   attended the proceedings in the foregoing matter and

12   reported all of the proceedings and testimony taken

13   therein;

14         That the foregoing is a full, true and

15   correct transcript of my shorthand notes so taken.

16         Witness requests to read and sign.

17         Dated:  February 19, 2021

18

19

20

21

22   _____

23   DEBRA L. ACEVEDO-RAMIREZ, RPR, CSR 7692

24

25
```

**EXHIBIT O**

1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4                                    **CERTIFIED COPY**

5   AASYLEI LOGGERVALE:            )
    et al.,                        )
6                                  )
             Plaintiffs,           )
7                                  )
        vs.                        )   Case No. C20-4679-WHA
8                                  )
    COUNTY OF ALAMEDA; et al.,     )
9                                  )
             Defendants.           )
10  _____)

11

12

13

14         VIDEOTAPED ZOOM DEPOSITION OF

15               KEITH LEEPER

16          PLEASANTON, CALIFORNIA

17              JULY 6, 2021

18

19

20

21

22  ATKINSON-BAKER, A VERITEXT COMPANY
    (800) 288-3376
23  www.depo.com

24  REPORTED BY:  ROBIN L. BITTEL, CSR NO. 6419, CP, RPR

25  FILE NO.:  AF050D3

1           UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

5  AASYLEI LOGGERVALE:              )
   et al.,                          )
6                                   )
              Plaintiffs,           )
7                                   )
        vs.                         )   Case No. C20-4679-WHA
8                                   )
   COUNTY OF ALAMEDA; et al.,       )
9                                   )
              Defendants.           )
10 _____)

11

12

13

14  Videotaped Zoom Deposition of Keith Leeper, taken on

15  behalf of Plaintiffs, at Pleasanton, California,

16  commencing at 1:00 p.m. on Tuesday, July 6, 2021, before

17  Robin L. Bittel, CSR No. 6419, CP, RPR.

18

19

20

21

22

23

24

25

```
 1                A P P E A R A N C E S

 2

 3    For Plaintiffs:

 4    LAW OFFICE OF JOSEPH S. MAY
      BY:  JOSEPH S. MAY
 5    1388 Sutter Street, Suite 810
      San Francisco, California 94109
 6    Telephone:  (415) 781-3333
      Facsimile:  (415) 707-6600
 7    Email:  joseph@josephmaylaw.com

 8

      For Plaintiffs:
 9
      GEARINGER LAW GROUP
10    BY:  BRIAN GEARINGER
      740 Fourth Street
11    Santa Rosa, California 95404
      Telephone:  (415) 440-3102
12    Email:  brian@gearingerlaw.com

13

      For Defendants:
14
      ORBACH HUFF SUAREZ & HENDERSON, LLP
15    BY:  CHRISTOPHER R. CREECH
      6210 Stoneridge Mall Road, Suite 210
16    Pleasanton, California 94588
      Telephone:  (510) 999-7908
17    Email:  ccreech@ohshlaw.com

18

      Also Present:  Sarah Weiler, Videographer
19

20

21

22

23

24

25
```

1                     I N D E X

2    WITNESS:  Keith Leeper

3    EXAMINATION                                           PAGE

4           By Mr. May                                        7

5           By Mr. Creech                                    144

6

7    CONFIDENTIAL PARTIAL TRANSCRIPT:                      PAGE

8    (bound separately)                                 119-122

9                   E X H I B I T S

10

     NUMBER       DESCRIPTION              IDENTIFIED  MARKED
11

12   9            Event Register for events      16      147
                  dated 9/20/19 and Unit
13                History for events dated
                  9/20/19
14
                  Video from Officer Leeper's    51      147
15   10           body-worn camera

16   11           Video from Aasylei Hardge      92      147
                  Loggervale's cellphone
17
     12           Video from Aasylei            101      147
18                Loggervale's cellphone

19   13           Alameda County Sheriff's      111      147
                  Office General Order 1.19
20
     14           Alameda County Sheriff's      115      147
21                Office Training Bulletin
                  Bias-Based Policing
22                Number 19-05

23   15           Confidential Profile Report,  119      147
                  POST Profile Name:  Leeper,
24                Keith Alan (Marked and
                  Attached to the Confidential
25                Partial Transcript)

```
1    INSTRUCTIONS NOT TO ANSWER:
2         Page 112, Line 12
3          Page 114, Line 1
4         Page 130, Line 24
5          Page 132, Line 8
6          Page 134, Line 1
7
8
9
10    INFORMATION REQUESTED:
11              (None)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    give your best testimony today?                                    13:02:56

2        A.    No.

3        Q.    What's your current occupation?

4        A.    I am a sergeant with the Alameda County

5    Sheriff's Office.                                                   13:03:09

6        Q.    When did you become a sergeant?

7        A.    October of 2019, I think.

8        Q.    Okay.

9              You understand that we're here about an

10   incident that happened September 20th, 2019, in Castro             13:03:21

11   Valley?

12       A.    Yes.

13       Q.    And so you became a sergeant after that

14   incident?

15       A.    Yes.                                                      13:03:28

16       Q.    And prior to that, you were a deputy sheriff?

17       A.    Yes.

18       Q.    All right.

19             When did you first become a deputy sheriff with

20   the Alameda County Sheriff's Office?                               13:03:41

21       A.    In February of 2002.

22       Q.    And what position did you hold prior to that?

23       A.    Prior to that, I was a police officer with the

24   city of Livermore.

25       Q.    How long were you an officer with Livermore?            13:03:59

1   and around that time period?                          13:09:34

2       A.   Yes.

3       Q.   Do you recall arriving at Starbucks at

4   2720 Castro Valley Boulevard the morning of

5   September 20th?                                        13:09:48

6       A.   Yes.

7       Q.   And do you remember how you were advised that

8   you needed to respond to that location?

9       A.   I was in route to another call when the

10  deputies that were on scene there requested assistance,  13:10:01

11  and so I diverted my response to there.

12      Q.   What was the other call?

13      A.   It was an alarm call at a school.

14      Q.   Okay.

15           And so did it seem to you that the incident at  13:10:14

16  the Castro Valley Starbucks took precedence over the

17  alarm call at the school?

18      A.   Yes.

19      Q.   And why is that?

20      A.   Because there were officers on scene, and their  13:10:27

21  safety was possibly at risk.

22      Q.   Is that what you were told, or is that what you

23  assumed?

24      A.   When they asked for assistance, that is always

25  a possibility.                                         13:10:41

1    Q.    And there was no concern about any safety of

2  officers or others at the alarm call?                    13:10:43

3    A.    No.

4    Q.    Prior to arriving at the Starbucks, the parking

5  lot, what were you told about that incident?            13:10:57

6    A.    Just that there was a suspicious vehicle that

7  two deputies had made contact with.

8    Q.    Is that something that you were told by

9  dispatch, by the deputies or somebody else?

10   A.    I heard Deputy Holland advise over the radio    13:11:16

11 that he was making contact with a suspicious vehicle.

12   Q.    Was Deputy Holland the one who asked you to

13 respond or was it dispatch?

14   A.    I don't recall.

15   Q.    Other than the fact that he was making contact  13:11:37

16 with a suspicious vehicle, did you get any other details

17 about the nature of the encounter prior to your arrival

18 at that location?

19   A.    No.

20   Q.    Once you arrived at that location of the -- the  13:11:49

21 Starbucks parking lot, did you receive any additional

22 information about the nature of the encounter?

23   A.    No.

24   Q.    Did you have an understanding as to why

25 Deputies Holland and Pope made contact with the          13:12:06

1    Loggervale women?                                          13:12:10

2    A.   No.

3    MR. MAY:  I'm -- I'm going to mark as Exhibit 9 the

4    document that was produced -- let me see here -- Bates

5    numbers AC 18 through AC 23 which, I believe, is a CAD     13:12:31

6    log.

7         I'll go ahead and -- I'm going to email that to

8    the court reporter to have that marked as an exhibit.

9    I'll copy counsel.

10        (Deposition Exhibit 9 was introduced for             13:12:47

11   identification by the Certified Shorthand Reporter and

12   is attached hereto.)

13   MR. MAY:

14   Q.   I'm going to share my screen with you so you

15   can take a look at this with me.                           13:12:50

16        Sergeant, can you see my screen right now?

17   A.   Yes.

18   Q.   Okay.

19        Does this document --

20   MR. CREECH:  I'm going to note for the record that        13:13:01

21   right now, the way the video display is being done, the

22   video of the individuals is overlaying the document.  So

23   you can't see it fully.

24   MR. MAY:  Okay.

25        Here's what I'll do.  I'll invite either you or      13:13:12

1    Q.   Okay.                                                    13:21:46

2         I'm going to stop sharing my screen here.

3    Okay.

4         When you arrived on scene at 2720 Castro Valley

5    Boulevard, were you familiar with other crimes that had       13:21:59

6    been reported at that location prior to that day?

7    A.   Yes.

8    Q.   How many crimes?

9    A.   I don't know off the top of my head.

10        Several.                                                 13:22:13

11   Q.   Okay.

12        Were you aware of there having been any

13   suspected auto burglaries in the parking lot at

14   2720 Castro Valley Boulevard prior to your arrival on

15   September 20th, 2019?                                         13:22:26

16   A.   Yes.

17   Q.   And do you know how many?

18   A.   I need clarification what sort of time frame

19   you're talking about.

20   Q.   Six months leading up to September --                   13:22:37

21   September 20th, 2019.

22   A.   This would be -- I -- I -- I cannot speculate.

23   But I would say maybe, in the six-month period, 10,

24   maybe more.

25   Q.   Okay.                                                   13:22:59

```
 1      A.   I believe it's the September 19th incident that        13:25:11
 2  you're referring to.
 3      Q.   Okay.
 4      A.   But I did not review the report.
 5      Q.   Okay.                                                   13:25:18
 6           And you don't have any recollection of being on
 7  scene the day before the Loggervale incident; right?
 8      A.   I don't recall that incident, no.
 9      Q.   Okay.
10           When you arrived at the 2720 Castro Valley             13:25:30
11  Boulevard parking lot, did you generally understand that
12  Deputies Holland and Pope were contacting the plaintiffs
13  in connection with any prior auto burglaries?
14      A.   I did not know the reason why they were
15  contacting them.                                                13:25:51
16      Q.   Okay.
17           At some point, you came to learn the reason
18  that the plaintiffs were being contacted by the
19  deputies?
20      A.   Yes.                                                   13:25:59
21      Q.   Was it the same day?
22      A.   Yes.
23      Q.   When in relation to your arrival on scene -- so
24  how long after your arrival on scene did you learn why
25  Pope and Holland were contacting the plaintiffs?                13:26:12
```

1    A.    Once all the involved parties had been

2  detained.

3    Q.    Okay.

4         And so you were involved in assisting in

5  handcuffing two of the plaintiffs; correct?

6    A.    Correct.

7    Q.    And so when you handcuffed those two

8  plaintiffs, did you do so solely based on the

9  instruction of Deputy Holland?

10   MR. CREECH:  Objection.  Calls for speculation,

11 incomplete hypothetical.

12   THE WITNESS:  Deputy Holland requested that I detain

13 them, and also based on what I was seeing, it appeared

14 that it was necessary.

15   MR. MAY:  Okay.

16   Q.    Is it fair to say that -- that your decision to

17 place handcuffs on the plaintiffs or any of the

18 plaintiffs was not because you suspected that they were

19 involved in any auto burglaries?

20   MR. CREECH:  Objection.  Leading, vague.

21   THE WITNESS:  Not specifically, no.

22   MR. MAY:  Okay.

23   Q.    When you handcuffed the -- and my understanding

24 is you handcuffed the two younger plaintiffs, the

25 plaintiffs being the mother and her two daughters; is

13:26:16

13:26:27

13:26:41

13:26:55

13:27:08

13:27:26

1    Q.   Had you formed a suspicion that they had

2 committed any crime?                                    13:28:39

3    MR. CREECH:   Objection.   Vague as to "any crime."

4    THE WITNESS:   I detained them primarily based on

5 Deputy Holland's instruction and their behavior.        13:28:54

6    MR. MAY:

7    Q.   When you say their behavior, why don't you go

8 ahead and tell us the behavior that you're referring to

9 that led you to handcuff them?

10   A.   They were uncooperative.                         13:29:11

11   Q.   Can you be more specific?

12   A.   It appeared that Deputy Holland and Deputy Pope

13 were trying to control the situation and were

14 unsuccessful.

15   Q.   Did you make the assumption that the Loggervale   13:29:38

16 family were being -- were already detained at the time

17 that you arrived?

18   MR. CREECH:   Objection.   Vague as to "assumption"

19 and "detained," calls for legal conclusion.

20   THE WITNESS:   No, they did not appear to be detained  13:29:56

21 when I arrived.

22   MR. MAY:

23   Q.   When you arrived, did it appear that what was

24 happening between the plaintiffs and the deputies was a

25 consensual encounter?                                    13:30:09

1    MR. CREECH:  Objection.  Compound, leading,    13:31:22

2  misstates training.

3    THE WITNESS:  Yes, but your prior question, I

4  thought you meant physically detained.

5    MR. MAY:    13:31:30

6    Q.   And that's why I kept going to get

7  clarification.  I want to make sure -- I'm not trying to

8  trick you or trap you.  I just want to make sure we're

9  on the same page.

10      So --    13:31:38

11    A.   Okay.

12    Q.   So at the time that you placed the daughters --

13  well, at the time that you arrived on scene, did you

14  have an understanding as to whether the daughters would

15  reasonably understand that they were free to leave at    13:31:47

16  that moment?

17    MR. CREECH:  Objection.  Calls for legal conclusion,

18  calls for speculation.

19    THE WITNESS:  No.  Upon my arrival, my assumption

20  was that they were not free to leave.    13:31:58

21    MR. MAY:  Okay.

22    Q.   And if I recall from the video -- you can tell

23  me if your understanding was different -- but at some

24  point, Deputy Holland said to you, "Let's go ahead and

25  detain these two," referring to the daughters; is    13:32:12

1  that -- is that your understanding?                         13:32:14

2      A.  I don't remember his exact verbiage.  But, yes,

3  he instructed me to assist with their detention.

4      Q.  Okay.

5          And so if your assumption was that the             13:32:34

6  daughters were not free to leave at the moment that you

7  arrived on scene, is it fair to say your assumption is

8  also that Deputies Holland and Pope had reasonable

9  suspicion to detain the daughters at that moment?

10     MR. CREECH:  Objection.  Calls for legal conclusion,    13:32:52

11 calls for speculation.

12     THE WITNESS:  I believe that they did.

13     MR. MAY:

14     Q.  And I understand that you weren't the one to

15 form the reasonable suspicion because you weren't the     13:32:59

16 first -- the first deputy on scene.

17         But just tell me what you understood to be the

18 basis of the reasonable suspicion that you assumed

19 existed at the time.

20     MR. CREECH:  Objection.  Calls for legal conclusion,    13:33:11

21 vague.

22     THE WITNESS:  I didn't have that information at the

23 time.

24     MR. MAY:  Okay.

25     Q.  And again, just to be -- just to be clear, when    13:33:26

1  you handcuffed the daughters, at that moment you did not    13:33:28

2  have an understanding that they were being suspected of

3  having a connection to those previous auto burglaries at

4  that location; right?

5      MR. CREECH:  Objection.  Asked and answered, vague.    13:33:42

6      THE WITNESS:  No, I didn't have that information.

7      MR. MAY:

8      Q.  And that was information that you got once all

9  the women were secured in handcuffs in the rear seats of

10 patrol vehicles?                                            13:33:56

11     A.  Yes.  At that time, I was able to speak to

12 Deputy Holland and get additional information.

13     Q.  Prior to getting the information that Deputy

14 Holland had about the -- the purpose of the contact, did

15 you ever -- were you asked by any of the plaintiffs as     13:34:16

16 to why they were being detained?

17     A.  Yes.

18     Q.  And did you give them any answers to that

19 question prior to speaking with Deputy Holland about his

20 reasons for the contact?                                    13:34:27

21     A.  I told them they were being detained because

22 they were not cooperating with Deputy Holland in the

23 investigation.

24     Q.  Did you tell any of the plaintiffs that they

25 were being detained because of the similarity of suspect   13:34:45

1    vehicles or suspect -- other suspect information in          13:34:49

2    prior auto burglaries?

3        A.    At one point in time, yes.

4        Q.    And that was prior to you speaking with Deputy

5    Holland; correct?                                            13:35:02

6        A.    Yes.

7        Q.    Okay.

8              So -- so you did have some understanding that

9    prior auto burglaries did have some connection to the

10   incident in question?                                        13:35:11

11       A.    That was pure speculation and assumption on my

12   part.  I was trying to provide an answer to the subject

13   to give her the information that she was asking.

14       Q.    Okay.

15             And were you accurate when you provided her       13:35:27

16   information about the other auto burglaries?

17       A.    Yes.

18       MR. CREECH:  Objection.  Vague as to "accurate."

19       MR. MAY:

20       Q.    I'm sorry, Sergeant.  Your answer?                 13:35:36

21       A.    Yes, to my knowledge, yes.

22       Q.    And as you sit here now, do you -- do you still

23   have any knowledge about the suspects in any prior auto

24   burglaries at 2720 Castro Valley Boulevard?

25       MR. CREECH:  Objection.  Relevance.                      13:35:53

1    THE WITNESS:  I'm sorry.  One more time.                13:35:57

2         Are you asking me if I'm aware of prior auto

3    burglaries at that location?

4    MR. MAY:

5    Q.   Yes, specifically what the suspects may have       13:36:03

6    looked like or what car they may have been driving,

7    things like that.

8    A.   Yes.

9    Q.   Okay.

10        I understand that maybe you didn't read the --      13:36:15

11   the entire report from the incident of September 19th.

12        But as you sit here now, do you have an

13   understanding as to whether suspects were identified in

14   that break-in?

15   MR. CREECH:  Objection.  Lack of personal knowledge,     13:36:28

16   calls for speculation.

17   THE WITNESS:  I don't know if any suspects were ever

18   identified in that incident.

19   MR. MAY:  Okay.

20   Q.   Did -- did you understand that there was an         13:36:38

21   auto burglary on September 18th, 2019, at the

22   2720 Castro Valley Boulevard parking lot?

23   A.   I don't have specific knowledge about that, but

24   yes, that would be consistent.

25   Q.   And did you have any -- do you currently have       13:36:58

1  any information about whether any suspects were                13:37:02

2  identified in the September 18th auto burglary?

3      MR. CREECH:  Objection.  Relevance, lack of personal

4  knowledge, calls for speculation.

5      THE WITNESS:  I'm not aware of any suspects that         13:37:13

6  were identified in that incident.

7      MR. MAY:  Okay.

8      Q.   Is it your understanding that on

9  September 19th, 2019, three individuals were sitting in

10 a vehicle and then potentially later committed an auto      13:37:24

11 burglary?

12     MR. CREECH:  Objection.  Misstates evidence, calls

13 for speculation, lack of personal knowledge.

14     THE WITNESS:  That was my understanding, yes.

15     MR. MAY:                                                  13:37:40

16     Q.   And what's that understanding based on?

17     A.   Information that was provided during morning

18 musters.

19     Q.   What's morning musters?

20     A.   The briefings that we're given in the morning       13:37:55

21 before our shift about criminal activity.

22     Q.   Who gives those briefings?

23     A.   The sergeant.

24     Q.   Do you remember which sergeant it was that gave

25 you the briefing the morning of September 20th?             13:38:09

1    A.   No, I do not.                                    13:38:12

2    Q.   And to the best of your recollection, in that

3    briefing they indicated that there were three suspects

4    in the September 19th auto burglary?

5    MR. CREECH:  Objection.  Misstates evidence, calls     13:38:22

6    for speculation, lack of personal knowledge.

7    THE WITNESS:  I don't recall specifics as to which

8    incident.  There were several incidents and multiple

9    different descriptions.

10   MR. MAY:  Okay.                                        13:38:40

11   Q.   Was it your understanding that at least one

12   prior burglary at the 2720 Castro Valley Boulevard

13   location was committed by suspects who were in a group

14   of three?

15   A.   Yes.                                              13:38:50

16   Q.   Was it more than one of the incidents that had

17   three suspects or just one?

18   A.   I don't recall.

19   Q.   Do you recall there being any incidents

20   involving suspected auto burglaries at 2720 Castro      13:39:02

21   Valley Boulevard where the suspect vehicle had Nevada

22   license plates?

23   A.   No, I don't recall.

24   Q.   Did you ever tell the Loggervale women or any

25   of them that the suspects in prior auto burglaries had  13:39:14

1   Nevada license plates?                                    13:39:18

2       A.   No, I don't believe so.

3       Q.   Of all of the suspected or attempted auto

4   burglaries at the 2720 Castro Valley Boulevard location

5   in the six months leading up to the Loggervale incident,  13:39:41

6   were any of the suspects in those burglaries or

7   attempted burglaries described as women?

8       MR. CREECH:  Objection.  Calls for speculation,

9   misstates evidence.

10      THE WITNESS:  I don't recall any of them being        13:39:58

11  described as women.

12      MR. MAY:

13      Q.   Did you have any information that any suspects

14  in auto burglaries occurring at 2720 Castro Valley

15  Boulevard in the six months leading up to the subject     13:40:20

16  incident were using rental cars?

17      MR. CREECH:  Objection.  Vague, calls for

18  speculation.

19      THE WITNESS:  That specific information, no.

20      MR. MAY:                                              13:40:35

21      Q.   When you later talked with Deputy Holland after

22  the Loggervale women were handcuffed and placed in the

23  vehicles, what did he tell you about the purpose of the

24  contact, if anything?

25      A.   He just briefly described that he had seen the   13:41:10

1    vehicle in the parking lot and thought that it was                13:41:14

2    possibly associated with the criminal activity.

3        Q.   Did he give you any more information?

4        A.   No, I don't recall all the details of the

5    conversation, and it was very brief.                              13:41:28

6        Q.   Was that the only -- was the -- the -- oh, when

7    you say associated with criminal activity, are you

8    specifically referring to auto burglaries?

9        A.   It was my understanding that that was his

10   motivation for checking that particular location at that         13:41:50

11   particular time.

12       Q.   Was that his motivation for making contact with

13   the Loggervale women?

14       MR. CREECH:   Objection.   Calls for speculation, lack

15   of foundation.                                                    13:42:02

16       THE WITNESS:   What his exact motivations were, I --

17   I don't know.

18       MR. MAY:

19       Q.   Did he tell you what his purpose was in

20   contacting the Loggervale women?                                  13:42:12

21          Was -- was it just the fact that there were

22   prior auto burglaries, or did he say that he suspected

23   them of any other criminal activity?

24       MR. CREECH:   Objection.   Calls for speculation,

25   compound, lack of foundation.                                     13:42:22

1    THE WITNESS:  He just stated that the vehicle was    13:42:29

2  suspicious and he believed that it was possibly related

3  to criminal activity.

4    MR. MAY:  Okay.

5    Q.  Did Deputy Holland ever specifically tell you    13:42:36

6  he approached the Loggervale women's car to check to see

7  if the disabled placard was valid?

8    A.  No, he did not.

9    Q.  Did Deputy Holland ever tell you that he

10  approached the Loggervale women's car just to determine    13:42:48

11  if the person in the driver's seat had a valid

12  California driver's license?

13    A.  No.

14    Q.  When you arrived on scene, were both of the

15  daughters already outside of the car?    13:43:07

16    A.  Yes.

17    Q.  Did -- you know who Monica Pope is; correct?

18    A.  Yes.

19    Q.  And she was on scene that day?

20    A.  Yes.    13:43:15

21    Q.  Did Monica Pope ever tell you that any of the

22  Loggervale women struck her with a car door?

23    MR. CREECH:  Objection.  Vague as to time.

24    THE WITNESS:  Yes, I'd like clarification.

25    At what point in time are you referring?    13:43:30

```
1    MR. MAY:                                              13:43:32
2    Q.  Ever.
3    A.  After the incident, yes.
4    Q.  What did Deputy Pope tell you about being
5    struck with the car door?                             13:43:45
6    A.  She mentioned that one of the subjects had
7    opened the door suddenly and hit her with the door.
8    Q.  Did Deputy Pope tell you that she thought that
9    that was intentional?
10   A.  She did not specify.                              13:43:56
11   Q.  Did Deputy Pope tell you that she suffered any
12   injuries as a result of being hit by a car door?
13   A.  She did not indicate either way.
14   Q.  Do you know if Deputy Pope intended at any time
15   during the incident to have the plaintiffs or any of the  13:44:10
16   plaintiffs arrested for battery on a peace officer?
17   MR. CREECH:  Objection.  Calls for speculation, lack
18   of foundation, lack of personal knowledge.
19   THE WITNESS:  I'm not aware of Deputy Pope
20   attempting to charge them with anything like that.   13:44:29
21   MR. MAY:
22   Q.  When Deputy Pope told you that she was struck
23   with the car door, what was her demeanor at that time?
24   MR. CREECH:  Objection.  Vague as to "demeanor."
25   THE WITNESS:  She was surprised.                      13:44:44
```

| | | |
|---|---|---|
| 1 | THE WITNESS:  No. | 13:46:00 |
| 2 | MR. MAY: | |
| 3 | Q.  Did any of the Loggervale women ever threaten | |
| 4 | you with any physical harm? | |
| 5 | A.  Yes. | 13:46:08 |
| 6 | Q.  Okay. | |
| 7 | Explain. | |
| 8 | A.  At one point in time, one of them made a | |
| 9 | statement to the effect of "Do you want me to do | |
| 10 | something to you?" which led me to believe that she was | 13:46:18 |
| 11 | considering harming me. | |
| 12 | Q.  And what was the context in which she said that | |
| 13 | to you? | |
| 14 | A.  I was asking her to get into my car, and she | |
| 15 | was refusing. | 13:46:36 |
| 16 | Q.  You were -- were you physically placing her in | |
| 17 | the car when she made that statement? | |
| 18 | A.  I was positioning her leg inside the vehicle. | |
| 19 | Q.  None of the Loggervale women ever struck you; | |
| 20 | correct? | 13:46:58 |
| 21 | A.  No. | |
| 22 | Q.  None of the Loggervale women ever pushed you, | |
| 23 | did they? | |
| 24 | A.  No. | |
| 25 | Q.  Did any of the Loggervale women ever grab you? | 13:47:13 |

| | | |
|---|---|---|
| 1 | A. Yes. | 13:47:16 |
| 2 | Q. Okay. | |
| 3 | Can you explain? | |
| 4 | A. When I was attempting to handcuff one of them, | |
| 5 | she grabbed me by the wrists. | 13:47:23 |
| 6 | Q. Were her hands behind her back when she did | |
| 7 | that? | |
| 8 | A. Yes. | |
| 9 | Q. Were the handcuffs already on her when she did | |
| 10 | that? | 13:47:34 |
| 11 | A. No. | |
| 12 | Q. Was that in the context of her trying to stop | |
| 13 | you from taking her cellphone out of her hand? | |
| 14 | A. I -- | |
| 15 | MR. CREECH: Objection. Objection. Calls for | 13:47:41 |
| 16 | speculation, lack of foundation. | |
| 17 | THE WITNESS: I don't know her motivation for | |
| 18 | grabbing my hand. | |
| 19 | MR. MAY: | |
| 20 | Q. Did she have a cellphone in her hand at the | 13:47:52 |
| 21 | time she grabbed your wrist? | |
| 22 | A. Yes. | |
| 23 | Q. Which hand did she use to grab your wrist? | |
| 24 | A. I don't recall. | |
| 25 | Q. Did she grab all the way around your wrist with | 13:48:01 |

1    her hand?                                                    13:48:03

2        A.   I would say partially.

3        Q.   How long did she have a grip on your wrist for?

4        A.   It was only for a moment.

5        Q.   About a second or so?                              13:48:17

6        A.   Yeah, less than a second.

7        Q.   And did you feel any -- were you threatened by

8    the daughter's act of grabbing your wrist?

9        A.   Yes.

10       Q.   Did you believe she intended to cause you harm     13:48:33

11   in that moment?

12       A.   I don't know what her intentions were, but I

13   believed it was possible.

14       Q.   Did you consider that a battery on a peace

15   officer?                                                     13:48:46

16       A.   No.

17       Q.   So I'll represent to you, based on the videos I

18   saw, it appears that you first handcuffed the older

19   daughter.  Her name is Aasylei Loggervale, or she goes

20   by Aasylei Hardge Loggervale.                               13:49:03

21            Is that your understanding?

22       A.   I don't recall which name is -- corresponds to

23   which daughter.  They're very similar.

24       Q.   Okay.

25            When you put -- the first daughter that you put    13:49:21

| | | |
|---|---|---|
| 1 | into a police car in handcuffs, you let her have her | 13:49:22 |
| 2 | cellphone with her initially? | |
| 3 | MR. CREECH:  Objection.  Vague as to "let her." | |
| 4 | THE WITNESS:  Yes, I allowed her to maintain | |
| 5 | possession of her phone. | 13:49:35 |
| 6 | MR. MAY:  Okay. | |
| 7 | Q.  Did you ever take anybody's cellphone away from | |
| 8 | them during the incident? | |
| 9 | A.  No. | |
| 10 | Q.  Do you believe you would have been justified in | 13:49:49 |
| 11 | taking away any of their cellphones during the incident? | |
| 12 | A.  Yes. | |
| 13 | Q.  Okay. | |
| 14 | And do you know which one of the daughters -- | |
| 15 | which -- which one of the daughters did you feel like | 13:50:01 |
| 16 | you would have been justified in confiscating their | |
| 17 | cellphone? | |
| 18 | MR. CREECH:  Objection.  Misstates prior testimony. | |
| 19 | THE WITNESS:  The first one that I handcuffed. | |
| 20 | MR. MAY:  Okay. | 13:50:18 |
| 21 | Q.  And why do you believe you would have been | |
| 22 | justified in taking her cellphone? | |
| 23 | A.  It's an officer safety issue.  Allowing | |
| 24 | suspects to use their cellphones during a detention | |
| 25 | opens us up to risk. | 13:50:33 |

1    Q.  Can you say more?                                    13:50:37

2    A.  Subject may use the phone to call other

3  associates who may then respond to the scene to assist

4  them or harm us.

5    Q.  Has that happened, in your experience?              13:50:53

6    A.  Yes.

7    Q.  You had a situation where you had a suspect who

8  was able to use their cellphone, and they summoned more

9  associates to come to the scene?

10   A.  Yes.                                                 13:51:07

11   Q.  And did those associates try to interfere with

12  any law enforcement officers' performance of their

13  duties?

14   A.  Yes.

15   Q.  Do you -- do you remember when that incident       13:51:18

16  took place?

17   MR. CREECH:  Objection.  Misstates testimony as to

18  one incident.

19   THE WITNESS:  I don't remember exact dates, no.

20   MR. MAY:  Okay.                                         13:51:28

21   Q.  Was that while you were a deputy sheriff with

22  Alameda County Sheriff's Office?

23   A.  Yes.

24   Q.  Are you trained, at Alameda County Sheriff's

25  Office, that individuals have a First Amendment right to  13:51:39

1  record police officers when they're in public?                13:51:41

2      MR. CREECH:  Objection.  Vague as to "trained,"

3  calls for a legal conclusion.

4      THE WITNESS:  That's my understanding of the law,

5  yes.                                                           13:51:52

6      MR. MAY:

7      Q.  Was there any particular reason why you did not

8  take the daughters' cellphones from them?

9      A.  I was trying to deescalate the situation, and I

10 feared that taking her phone from her would cause her to       13:52:06

11 be increasingly angry and make the situation worse.

12     Q.  Did you consult with any other deputies on

13 scene about the decision not to take away the cellphone

14 of any of the daughters?

15     A.  No, I did not.                                         13:52:25

16     Q.  Did any of the deputies on scene ever consult

17 with you about any decision to take cellphones from any

18 of the parties involved?

19     A.  No.

20     Q.  Do -- did you come to learn that other deputies       13:52:33

21 did in fact take away the cellphones of the two

22 daughters?

23     MR. CREECH:  Misstates the evidence.  Mr. May, that

24 grossly misstates the evidence.

25     MR. MAY:  Does it?  Because I have video showing two       13:52:46

1  different deputies taking both of the daughters'                13:52:48

2  cellphones away from them.  So if you want to go off the

3  record and look at my evidence, I'll show it to you.

4      THE WITNESS:  Are you saying if -- you're asking if

5  I have any knowledge of them taking their cellphones?         13:52:58

6      MR. MAY:  Yes.

7      THE WITNESS:  Only after the incident.

8          I didn't know that they had taken them at the

9  time.

10     MR. MAY:  Okay.                                            13:53:12

11     Q.   What did you learn after the incident about the

12 taking away of any cellphones of any parties?

13     A.   One of the involved parties -- I'm not sure

14 which one -- was using her phone from the backseat of

15 the patrol car to call 911.                                   13:53:26

16     Q.   Okay.

17          And do you remember which deputy took away her

18 phone when she was trying to do that?

19     A.   No.

20     Q.   Is that okay for a deputy to take away from a        13:53:42

21 phone from somebody who's trying to call 911?

22     MR. CREECH:  Objection.  Incomplete hypothetical,

23 vague.

24     THE WITNESS:  If it's being misused, yes.

25     MR. MAY:                                                  13:53:55

1   physically detain her?                                          14:35:23

2        Is that something that's trained either in POST

3   or at the Alameda County Sheriff's Office?

4   MR. CREECH:  Objection.  Vague as to "trained" and

5   compound.                                                       14:35:34

6   THE WITNESS:  It's consistent with the way I

7   handcuff people.

8   MR. MAY:  Okay.

9        Q.   Would you call that a wrist lock?

10       A.   No.                                                   14:35:44

11       Q.   Okay.

12            Is there any term other than just handcuffing?

13       A.   No, there's no term associated with what I did.

14       Q.   Okay.

15            And was there anything unusual or different        14:35:59

16   about the way you handcuffed the Loggervale women from

17   your ordinary practice?

18       A.   No.

19       Q.   I'm going to play -- I'm going to skip ahead.

20   I'm going to play from one minute to one minute 24         14:36:19

21   seconds.

22            (Video playing.)

23   MR. MAY:  Okay.  So I stopped it at one minute 24

24   seconds.

25       Q.   You mentioned earlier that one of the daughters   14:36:58

1  grabbed your wrist. Is that something that you are able    14:37:01

2  to see in the clip I just played?

3      A.  No, I can't really see it in the clip.

4      Q.  Okay.

5          And you mentioned that you had take -- you        14:37:07

6  offered to secure her phone for her; is that right?

7      A.  Yes.

8      Q.  And what was the purpose of doing that?

9      A.  She didn't have a very good hold of her phone,

10 and I was going to be applying handcuffs. I was afraid    14:37:18

11 she was going to drop it on the ground.

12     Q.  Yeah.

13         Did you understand, at the moment that you

14 handcuffed her, that she was using that phone to either

15 audio and/or video record what was happening?            14:37:28

16     A.  I had no information that that's what she was

17 doing, but it's possible.

18     Q.  Okay.

19         Did you observe her holding her phone up as

20 though in a manner that would suggest she may be trying   14:37:41

21 to capture some audio or video footage?

22     A.  Yes.

23     Q.  Okay.

24         And when you handcuffed her with her phone in

25 her hand, that at least would have prevented her from     14:37:53

1  fully being able to capture video footage at that time;  14:37:56

2  is that right?

3      MR. CREECH:  Objection.  Vague as to "fully" and

4  calls for speculation.

5      THE WITNESS:  I don't understand the question.  14:38:09

6          Are you asking me if the process of putting

7  handcuffs on her would prevent her from pointing the

8  phone in the direction she wanted to point it?

9      MR. MAY:  Sure, yes.

10     THE WITNESS:  It would probably hinder her efforts,  14:38:19

11 yes.

12     MR. MAY:  Okay.

13     Q.   Why did you decide to put handcuffs on that

14 daughter?

15     A.   She was being uncooperative and wasn't obeying  14:38:35

16 any commands.  There were multiple subjects.  She wasn't

17 listening to what we were telling her.  So for safety

18 purposes, I decided to detain her so that I could assist

19 the other deputies with the subjects that they were

20 trying to contact.  14:38:57

21     Q.   I'm going to play it from 1:24 to 1:34.

22          (Video playing.)

23     MR. MAY:  Okay.  So I stopped it at 1:34.

24     Q.   You made some comment about this subject trying

25 to grab your hand; correct?  14:39:25

1    prior to my arrival.  I don't know what was in Deputy          14:51:53

2    Holland's mind.

3        MR. MAY:

4        Q.  Would you agree that at the moment that you

5    handcuffed the Loggervale women, you did not have              14:52:05

6    reasonable suspicion to believe that they were involved

7    in prior auto burglaries that occurred at that location?

8        MR. CREECH:  Objection.  Lack of foundation, calls

9    for speculation, calls for a legal conclusion.

10       THE WITNESS:  I believe that Deputy Holland had           14:52:22

11   reasonable suspicion to detain them.

12       MR. MAY:  Okay.

13       Q.   My question -- I guess maybe it was my fault

14   for -- for not phrasing it with the amount of precision

15   that I needed to.                                              14:52:35

16           Leaving aside the fact that Deputy Holland

17   asked you to complete the detention, based on your own

18   information that you had at the time when you handcuffed

19   the Loggervale daughters, did you have facts that would

20   lead to reasonable suspicion that they were involved in       14:52:48

21   prior auto burglaries?

22       MR. CREECH:  Objection.  Calls for a legal

23   conclusion, calls for speculation.

24       THE WITNESS:   Yes.

25       MR. MAY:  Okay.                                           14:53:05

1    Q.   What facts did you have that would suggest to    14:53:05

2    you that the Loggervale daughters were involved in prior

3    auto burglaries at the moment that you handcuffed them?

4    A.   The location of the incident, the time of the

5    day, the description of the vehicle, their uncooperative    14:53:16

6    behavior contributed to my concerns.

7    Q.   What about the description of the suspects?

8    A.   Description of suspects is -- can be vague, and

9    it's often misleading but, yes, that as well.

10   Q.   Okay.    14:53:50

11        So the location was one factor?

12   A.   Yes.

13   Q.   And you mean -- by that, do you mean the fact

14   that there had been other burglaries at that same

15   location?    14:53:59

16   A.   Yes.

17   Q.   Okay.

18        And you estimated or maybe guesstimated -- I

19   don't want to put words in your mouth.

20        You gave me a figure that said maybe you    14:54:05

21   thought there were around 10 prior burglaries in the six

22   months leading up to the incident; is that still your

23   testimony?

24   MR. CREECH:   Objection.   Misstates previous

25   testimony as to guesstimated, compound, vague.    14:54:15

1       Q.   Okay.                                                    15:06:18

2            And you believed that they -- that you could

3    detain them while you did the investigation because you

4    believed there was reasonable suspicion to do so; right?

5       MR. CREECH:  Objection.  Misstates prior testimony,          15:06:27

6    calls for a legal conclusion.

7       THE WITNESS:  Yes, I believe we had reasonable

8    suspicion to detain them.

9       MR. MAY:

10      Q.   And the reasonable suspicion was based on the           15:06:38

11   things you told me earlier, I believe; correct, or is

12   there anything else that you've thought of since then?

13      A.   Well, the reasonable suspicion for this

14   incident lies in the mind of Deputy Holland.  So I don't

15   want to speculate on what all of his suspicions were.          15:06:54

16      Q.   Why didn't you just tell the subjects that

17   Deputy Holland's the one who made the decision to detain

18   them and that they would have to find out from him what

19   the basis was, instead of telling them your own view on

20   why they were detained?                                        15:07:13

21      MR. CREECH:  Objection.  Argumentative, compound.

22      THE WITNESS:  Deputy Holland had his hands full with

23   the other subjects, and I was more motivated to get her

24   detained in the back of my car so I could focus my

25   attention somewhere else.                                      15:07:28

1  hypothetical.                                          15:30:52

2      THE WITNESS:  No specific training on that exact

3  topic, no.

4      MR. MAY:  Okay.

5      Q.   Do you have a habit or practice, in your work   15:30:57

6  doing patrol, as to what to do when a subject says they

7  need to use the restroom?

8      MR. CREECH:  Objection.  Incomplete hypothetical,

9  vague.

10     THE WITNESS:  I'm sorry.                           15:31:13

11         Can you state that question one more time,

12  please?

13     MR. MAY:  Yeah.

14     Q.   Do you have a regular practice, something that

15  you typically would do, when a subject asks you to use   15:31:17

16  the restroom during some kind of encounter?

17     MR. CREECH:  Objection.  Incomplete hypothetical,

18  vague.

19     THE WITNESS:  If it's safe and practical, I will

20  allow them to do so.                                   15:31:31

21     MR. MAY:  Okay.

22     Q.   Did you ever let either of the Loggervale women

23  use the restroom during the time of the encounter?

24     A.   No.

25     Q.   Why not?                                       15:31:41

1    A.   Because based on their behavior, I didn't think
                                                        15:31:45

2  that it was safe to remove them from the car while they

3  were still agitated and unhandcuff them.

4    Q.   There was a female deputy on scene; correct?

5    A.   Yes.                                15:31:57

6    Q.   Did you ever consider having Deputy Pope escort

7  the daughter to the restroom?

8    A.   It would have been the same situation.  Pope

9  would have been alone with her unhandcuffed and away

10  from the rest of us, and I did not feel that was safe.  15:32:11

11    Q.   Did you search any of the women for weapons?

12    A.   No.

13    Q.   Why not?

14    A.   It was a judgment call that I made at the time.

15    Q.   Is there something you could have done to try  15:32:29

16  to ensure that they didn't have weapons so that they

17  could be escorted to the restroom by Deputy Pope?

18    MR. CREECH:  Objection.  Compound.

19    THE WITNESS:  I could have done it, yes.  But

20  regardless of whether they had weapons, they could still  15:32:41

21  be dangerous even without weapons.

22    MR. MAY:

23    Q.   Are you familiar with the bathrooms at the

24  Starbucks at 2720 Castro Valley Boulevard?

25    A.   No.                                15:32:54

1  conclusion, calls for speculation.                    16:29:18

2      THE WITNESS:  No.

3      MR. MAY:

4      Q.  You agree that the Loggervale women were not

5  being detained on suspicion of any violent crime?    16:29:24

6      MR. CREECH:  Objection.  Vague, calls for a legal

7  conclusion, calls for speculation.

8      THE WITNESS:  I don't have any information that they

9  were being detained based on a violent crime.  But

10 again, I really don't know what all was going through   16:29:39

11 Deputy Holland's head at the time.

12      So since the reason for the detention was

13 purely based on his reasonable suspicion that he had

14 developed, I -- I can't speak to what all that entails.

15     MR. MAY:                                          16:29:57

16      Q.  In your experience, do people commit crimes

17 with rental cars more than other cars?

18      A.  Yes.

19      Q.  Okay.

20      Is that also something that you've been trained   16:30:07

21 on?

22      A.  Just personal experience.

23      Q.  Okay.

24      Do you also have the experience that rental

25 cars are broken into more than other cars?            16:30:14

1     A.   No, I don't really think so.                    16:30:20

2     Q.   Okay.

3          Are you aware of the fact that several of the

4     cars broken into at 2720 Castro Valley Boulevard were

5     rental cars?                                          16:30:34

6     A.   No, I wasn't aware of that.

7     Q.   Anything about the make and model of

8     Plaintiffs' car that led you to believe it was more

9     likely to have been involved in criminal activity?

10    A.   Just the fact that it was a silver four-door     16:30:49

11    vehicle, and that matched the description of several of

12    the burglaries, both at the Castro Valley locations.

13    Q.   In your experience, do people commit crimes

14    using luxury cars more than other kinds of cars?

15    MR. CREECH:  Objection.  Vague.                       16:31:06

16    THE WITNESS:  I haven't noticed that that's the

17    case, no.  It doesn't seem to have a pattern as far as

18    the luxury status of the vehicle.

19    MR. MAY:

20    Q.   You wrote a supplemental incident report for      16:31:34

21    this case; correct?

22    A.   Yes, I did.

23    Q.   And the purpose of that was what?

24    A.   To document my involvement.

25    Q.   You don't always prepare a supplemental report    16:31:48

1        REPORTER'S CERTIFICATE

2

3

4        I, ROBIN L. BITTEL, CSR No. 6419, CP, CPR,

5   Certified Shorthand Reporter, certify:

6        That the foregoing proceedings were taken remotely

7   before me at the time and place therein set forth, at

8   which time the witness was put under oath by me;

9        That the testimony of the witness, the questions

10  propounded, and all objections and statements made at

11  the time of the examination were recorded

12  stenographically by me and were thereafter transcribed;

13       That the foregoing is a true and correct transcript

14  of my shorthand notes so taken.

15       I further certify that I am not a relative or

16  employee of any attorney of the parties, nor financially

17  interested in the action.

18       I declare under penalty of perjury under the laws

19  of California that the foregoing if true and correct.

20       Dated this 19th day of July, 2021.

21

22

23

24  ROBIN L. BITTEL, CSR No. 6419, CP, RPR

25

# EXHIBIT P

1   Joseph S. May   SBN 245924
    LAW OFFICE OF JOSEPH S. MAY
2   1388 Sutter Street, Suite 810
    San Francisco, CA 94109
3   Tel: (415) 781-3333
    Fax: (415) 707-6600
4   joseph@josephmaylaw.com
5
    Brian Gearinger   SBN 146125
6   GEARINGER LAW GROUP
    740 Fourth Street
7   Santa Rosa, CA 95404
    Tel: (415) 440-3102
8   brian@gearingerlaw.com
9
    Attorneys for Plaintiffs
10  AASYLEI LOGGERVALE,
    AASYLEI HARDGE-LOGGERVALE, and
11  AAOTTAE LOGGERVALE
12
13              UNITED STATES DISTRICT COURT
14              NORTHERN DISTRICT OF CALIFORNIA
                SAN FRANCISCO-OAKLAND DIVISION
15
    AASYLEI LOGGERVALE; AASYLEI        CASE NO. C20-4679-WHA
16  HARDGE-LOGGERVALE; and
    AAOTTAE LOGGERVALE,                **PLAINTIFF AASYLEI LOGGERVALE'S**
17                                     **RESPONSES TO INTERROGATORIES**
            Plaintiffs,                **FROM DEFENDANT COUNTY OF**
18                                     **ALAMEDA, SET ONE**
19          v.
20  COUNTY OF ALAMEDA; STEVEN
    HOLLAND; MONICA POPE; KEITH        Action Filed:  July 14, 2020
21  LEEPER; ANTHONY DeSOUSA;           Trial Date:    November 29, 2021
    and DOES 1 to 50, inclusive,
22
23          Defendants.
24
25      RESPONDING PARTY:         AASYLEI LOGGERVALE
26      PROPOUNDING PARTY:        COUNTY OF ALAMEDA
27      SET NUMBER:               ONE
28
                                        1

1      Plaintiff Aasylei Loggervale responds to the first set of interrogatories propounded by

2  Defendant County of Alameda as follows:

3      Responding Party has not fully completed the investigation of the facts relating to this

4  case, has not completed discovery, and has not completed preparation for trial.

5      All of the responses contained herein are based only upon such information and

6  documents as are presently available and specifically known to Responding Party, and disclose

7  only those contentions presently known to Responding Party.

8      It is anticipated that further discovery, investigation, and legal research and analysis will

9  supply additional facts, add meaning to known facts, and establish entirely new conclusions and

10  legal contentions, all of which may lead to substantial additions to, changes in, and variations

11  from the responses set forth herein.

12      The following responses are provided without prejudice to Responding Party's right to

13  produce evidence of subsequently discovered facts which Responding Party may later recall.

14  Responding Party reserves the right to change any and all answers herein as additional facts are

15  ascertained. The responses contained herein are made in a good faith effort to supply as much

16  actual information and legal contentions as are presently known, but should in no way prejudice

17  Responding Party's right to further discovery, research and/or analysis.

18                          GENERAL OBJECTIONS

19      1.  Responding Party objects to each and every interrogatory to the extent that it seeks

20  information protected by the attorney-client privilege and/or work product doctrine. Responding

21  Party provides the following responses on the premise that the requests do not seek notes,

22  memoranda and research prepared by counsel for Responding Party or his consultants, and that

23  the requests do not seek communications between counsel for Responding Party and his clients

24  or consultants.

25      2.  Responding Party objects to each and every interrogatory to the extent that it is

26  overbroad and/or does not include a specific period of time as a reference and therefore vague,

27  ambiguous or unduly burdensome.

28  / / /

3. Discovery and investigation are continuing in this matter, and Responding Party reserves the right to amend these responses should additional responsive information be discovered or obtained.

## RESPONSE TO INTERROGATORIES

**INTERROGATORY NO. 1:**

State in detail and in chronological order how YOU allege the INCIDENT occurred.

**RESPONSE TO INTERROGATORY NO. 1:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, may call for speculation, may invade the attorney client privilege, and calls for an undue narrative. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party and her daughters drove from Nevada to California the night of September 19, 2019, arriving at Castro Valley early the morning of September 20, 2019. Responding Party parked in the parking lot at 2720 Castro Valley Blvd. to rest briefly and get coffee before finishing the trip. Responding Party and her daughters were simply sitting in the car when Alameda County Sheriff Deputies Steven Holland and Monica Pope approached the vehicle to speak with Responding Party. Deputy Holland told Responding Party that there had been break ins in the area and asked Responding Party for her ID. Responding Party declined to provide it, upon which Deputy Holland repeatedly demanded it, despite the fact that Responding Party was under no obligation to provide it. Even though the only break ins in the area that Deputy Holland was aware of potentially involved males, he decided to detain Responding Party and her daughters for refusing to cooperate with his consensual encounter, thereafter escalating the situation to a de facto arrest by holding Responding Party and her daughters in handcuffs in police cars for more than an hour. Deputies Holland, Pope and/or other deputies searched Plaintiffs' belongings, vehicle, trunk, purses and wallets. Responding Party is informed and believes and thereon alleges that the unlawful detention, arrest, and search was committed by the Defendant Deputies based on Plaintiffs' race and also as a result of Defendant County of Alameda's widespread practice of allowing racial profiling and failing to properly train its deputies on the issue of detentions, arrests, and racial profiling. Discovery is in its earliest stages

3

1  and Responding Party reserves the right to supplement this response upon discovery of
2  additional facts.

3  **INTERROGATORY NO. 2:**

4    State the name, address and telephone number of each and every person whom YOU
5  contend was either involved in or witnessed the INCIDENT.

6  **RESPONSE TO INTERROGATORY NO. 2:**

7    Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous,
8  overbroad, may call for speculation, and may seek information protected by the attorney-client
9  privilege and/or work product doctrine. Without waiving the foregoing objections, and subject
10 thereto, Responding party states: Plaintiffs (who may be contacted through counsel), Defendant
11 deputies, whose identities are known to Defendants. Responding Party does not know of another
12 individual who was "involved in or witnessed" the incident, as those terms are understood to
13 Responding Party. Discovery is in its earliest stages and Responding Party reserves the right to
14 supplement this response upon discovery of additional facts.

15 **INTERROGATORY NO. 3:**

16   Describe in detail all damages that YOU are claiming against DEFENDANTS, whether
17 individually or collectively, as a result of the INCIDENT, including without limitations any
18 physical, emotional, economical and/or property damages and the amount and nature of damages
19 claimed.

20 **RESPONSE TO INTERROGATORY NO. 3:**

21   Responding Party is claiming those damages set forth in Plaintiff's initial disclosure, to
22 wit: deprivation of civil rights, physical pain, mental suffering, emotional distress, invasion of
23 privacy, deprivation of liberty, fear, fright, shock, nervousness, anxiety, worry, inconvenience,
24 embarrassment, humiliation, and grief. As noted in the initial disclosure, Plaintiffs estimate the
25 value of such damages to be $250,000 for each Plaintiff but the decision as to the amount of
26 compensation to assign will be determined by a jury.

27 / / /
28 / / /

4

**INTERROGATORY NO. 4:**

Describe all force which YOU contend was utilized upon you during the INCIDENT, including, but not limited to, by describing who used the force, what force was used, any injury you sustained as a result of the force, and the circumstances surrounding each use of force.

**RESPONSE TO INTERROGATORY NO. 4:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, compound, and may call for a legal conclusion. Without waiving the foregoing objections, and subject thereto, Responding Party states: Defendant Holland grabbed Responding Party by the arms to try and pull her out of the driver's seat of her vehicle, then when she was out of the vehicle, pulled her arms behind her back and handcuffed her. Defendant Holland then repeatedly touched Responding Party on the arms and body, including near her waist. Defendant Holland and Deputy Eng then forced Responding Party into the back of a police vehicle, where she was held for more than an hour. Deputies Pope, Leeper, and De Sousa and potentially other deputies were integral participants in the use of force and are liable to Responding Party. Responding Party suffered pain, discomfort, and abrasions to her wrists.

**INTERROGATORY NO. 5:**

State all facts that support YOUR contention that any Defendant is liable to you for the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 5:**

Responding Party objects to this interrogatory on the grounds that it is overbroad. Without waiving the foregoing objections, and subject thereto, Responding Party states: Defendant Holland detained Responding Party for refusing to provide her identification during a consensual encounter, which is illegal and unconstitutional. He then used physical force to remove her from her vehicle and handcuff her, which is also illegal and unconstitutional. He then kept her in a police car for over an hour, which is also illegal and unconstitutional. While Responding Party was handcuffed in a police car, Defendant Holland entered Plaintiff's vehicle, opened her purse, removed a sealed case, opened the case by unzipping it, and then rifled through the contents for a considerable amount of time. Defendant Holland later returned to

5

Responding Party's vehicle, and went through her purse a second time, rifled through it, removed a wallet contained inside, opened the wallet and rummaged through it. Defendant Pope also rummaged through Plaintiff's vehicle, including in closed compartments in the passenger area and also gained access to, and rummaged through the trunk of the vehicle.

Pope, and/or other deputies (whose identities are known to Defendants) searched Responding Party's vehicle, trunk, and personal belongings without a warrant, consent, exigency, or other legal justification or excuse. That is also illegal and unconstitutional. Defendants Pope and Leeper were present during Defendant Holland's aforementioned actions, knew of the illegality and unconstitutionality of such actions, and failed to intercede to stop Defendant Holland from doing those things. Defendant De Sousa was the supervisor of the other Defendants and despite knowledge of the illegality and unconstitutionality of Defendants' actions, upon arrival at the scene, he continued to hold Responding Party in handcuffs in a police car for an appreciable amount of time. Defendant County of Alameda is liable to Responding Party (1) vicariously for state law claims under Government Code Section 815.2, (2) for failing to train its deputies on the issues of search, seizure, use of force, and racial profiling, and (3) for approving, adopting, and/or ratifying the actions of the Defendant Deputies.

**INTERROGATORY NO. 6:**

Describe any search and/or seizure of your person, place, vehicle or property during the INCIDENT that YOU contend was unlawful.

**RESPONSE TO INTERROGATORY NO. 6:**

Responding Party was seized when she was told that she was being detained by Defendant Holland. The seizure ripened into a de facto arrest when Responding Party was placed in handcuffs in a police vehicle and held there for more than an hour. Responding Party's belongings were searched, including her vehicle, its trunk, and her personal effects contained in the vehicle and trunk.

**INTERROGATORY NO. 7:**

State all facts that support YOUR contention that any search by DEFENDANTS of your person, place, vehicle or property during the INCIDENT was unreasonable.

6

**RESPONSE TO INTERROGATORY NO. 7:**

Defendants searched Plaintiffs' vehicle and belongings without a warrant, without reasonable suspicion to detain or probable cause to arrest them, without consent, and without any other legal justification. Such searches are per se unreasonable.

**INTERROGATORY NO. 8:**

State all facts that support YOUR contention that any seizure by DEFENDANTS of your person, place, vehicle or property during the INCIDENT was unreasonable.

**RESPONSE TO INTERROGATORY NO. 8:**

Defendant Holland claimed that he was investigating previous auto break-ins in the vicinity where he encountered Plaintiffs. However, none involved Black women. Thus, there was no reasonable suspicion to believe Plaintiffs were involved in those crimes. Nonetheless, Deputy Holland demanded that Responding Party provide her identification, and persisted in demanding it after Responding Party declined to provide it, thereafter informing all Plaintiffs they were being detained. Even though there remained no facts that would have tied any of the Plaintiffs to any criminal activity whatsoever, Defendants handcuffed all three Plaintiffs and placed them in police cars for more than an hour and then searched the vehicle and Plaintiffs' belongings, seizing some of their belongings, including cell phones and drivers' licenses, without any justification or legal basis.

**INTERROGATORY NO. 9:**

State all facts that support YOUR contention that any force used by DEFENDANTS upon you during the INCIDENT was unreasonable.

**RESPONSE TO INTERROGATORY NO. 9:**

Responding Party did not commit any crimes and there were no facts known to any Defendants at the time of the incident that would link Responding Party to any crimes. Further, Responding Party never did or said anything that would place any of the Defendants in reasonable fear of harm at any time. Therefore, there was no justification at all for using physical force on Responding Party. As such, any force was unreasonable and excessive. By physically removing her from the vehicle, placing handcuffs on her, and forcing her into a police car and

7

1  forcing her to remain there all constituted excessive, unreasonable, and unconstitutional uses of
2  force.

3  **INTERROGATORY NO. 10:**

4       State all facts that support YOUR contention that DEFENDANTS did not have probable
5  cause to arrest you during the INCIDENT.

6  **RESPONSE TO INTERROGATORY NO. 10:**

7       Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous,
8  overbroad, and seeks facts to prove a negative, which is difficult if not impossible. Without
9  waiving the foregoing objections, and subject thereto, Responding Party states: Responding
10 Party was sitting in a vehicle in the parking lot near 2720 Castro Valley Boulevard in Castro
11 Valley on the morning of September 20, 2019 when Defendants Holland and Pope approached
12 the vehicle. Deputy Holland claims he was aware of auto burglaries in the vicinity and was
13 investigating them at the time. However, the only information about auto burglaries in that area
14 were that they may have been committed by Black males. In one of those incidents a witness
15 indicated that there was a suspicious silver four-door vehicle in the parking lot near the time of
16 the break-in, but did not tie that vehicle directly to the crime. No reasonable police officer would
17 believe Plaintiffs – three Black women simply sitting in a silver Cadillac sedan – had any
18 connection with the auto burglaries. While Deputy Holland was permitted to initiate a consensual
19 encounter with Plaintiffs, he was not permitted to demand Responding Party's ID, and was
20 certainly not permitted to detain and arrest Responding Party for failing to show her ID. There
21 were no other crimes that Plaintiffs committed, nor any facts known to any Defendants that
22 would suggest otherwise. The arrest, detention, and search and seizure of Plaintiffs and their
23 belongings was racially motivated in that Plaintiffs are Black and some individuals suspected in
24 other alleged incidents were Black. The Fourth Amendment does not permit law enforcement
25 officials to arrest people for being Black, which is exactly what Defendants did to Plaintiff.

26 **INTERROGATORY NO. 11:**

27      State all facts that support YOUR contention that DEFENDANTS did not have
28 reasonable suspicion to detain you during the INCIDENT.

8

**RESPONSE TO INTERROGATORY NO. 11:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, and seeks facts to prove a negative, which is difficult if not impossible. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party was sitting in a vehicle in the parking lot near 2720 Castro Valley Boulevard in Castro Valley on the morning of September 20, 2019 when Defendants Holland and Pope approached the vehicle. Deputy Pope claims he was aware of auto burglaries in the vicinity and was investigating them at the time. However, the only information about auto burglaries in that area were that they may have been committed by Black males. In one of those incidents a witness indicated that there was a suspicious silver four-door vehicle in the parking lot near the time of the break-in, but did not tie that vehicle directly to the crime. No reasonable police officer would believe Plaintiffs – three Black women simply sitting in a silver Cadillac sedan – had any connection with the auto burglaries. While Deputy Holland was permitted to initiate a consensual encounter with Plaintiffs, he was not permitted to demand Responding Party's ID, and was certainly not permitted to detain and arrest Responding Party for failing to show her ID. There were no other crimes that Plaintiffs committed, nor any facts known to any Defendants that would suggest otherwise. The arrest, detention, and search and seizure off Plaintiffs and their belongings was racially motivated in that Plaintiffs are Black. The Fourth Amendment does not permit law enforcement officials to arrest people for being Black, which is exactly what Defendants did to Plaintiff.

**INTERROGATORY NO. 12:**

State all facts that support YOUR contention that DEFENDANTS were not authorized to use force against you during the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 12:**

Responding Party did not commit any crimes and there were no facts known to any Defendants at the time of the incident that would link Responding Party to any crimes. Further, Responding Party never did or said anything that would place any of the Defendants in reasonable fear of harm at any time. Therefore, there was no justification at all for using physical

9

force on Responding Party. As such, any force was unreasonable and excessive. By physically removing her from the vehicle, placing handcuffs on her, and forcing her into a police car and forcing her to remain there all constituted excessive, unreasonable, and unconstitutional uses of force.

**INTERROGATORY NO. 13:**

State all facts that support YOUR contention that DEFENDANTS acted with unlawful animus toward you, including, but not limited to, racial animus, retaliatory animus against the exercise of constitutional rights, or other discriminatory animus of any kind.

**RESPONSE TO INTERROGATORY NO. 13:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, and compound. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party was sitting in a vehicle in the parking lot near 2720 Castro Valley Boulevard in Castro Valley on the morning of September 20, 2019 when Defendants Holland and Pope approached the vehicle. Deputy Pope claims he was aware of auto burglaries in the vicinity and was investigating them at the time. However, the only information about auto burglaries in that area were that they may have been committed by Black males. In one of those incidents a witness indicated that there was a suspicious silver four-door vehicle in the parking lot near the time of the break-in, but did not tie that vehicle directly to the crime. No reasonable police officer would believe Plaintiffs – three Black women simply sitting in a silver Cadillac sedan – had any connection with the auto burglaries. The fact that Deputy Holland would detain, arrest, search, and seize the belongings of Plaintiffs based on the information he had strongly suggests that he was basing his decision on the fact that Plaintiffs were Black and/or Responding Party's exercise of her right to refuse to show her identification during a consensual encounter. While Responding Party cannot know what was in the Defendants' minds, the fact that no information supported a reasonable belief that Plaintiffs were engaged in any criminal activity is strong circumstantial evidence that Defendants acted with racial animus, malice, and retaliatory animus.

/ / /

**INTERROGATORY NO. 14:**

Identify all policies and/or customs of DEFENDANTS which YOU contend caused or contributed to the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 14:**

Defendant County of Alameda fails to train its deputies that they are not allowed to demand a person's identification during a consensual encounter. Defendant County of Alameda has insufficient training and written policies prohibiting and avoiding illegal racial profiling, racial bias, and race discrimination. Defendant County of Alameda has a widespread practice and informal policy of tolerating, approving, ratifying, and encouraging deputies to make illegal detentions and arrests without reasonable suspicions or probable cause, and based on the subject's race or other protected classification.

**INTERROGATORY NO. 15:**

State all facts which support YOUR contention that each individual Defendant is liable to you for the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 15:**

Responding Party objects to this interrogatory on the grounds that it is compound and duplicative of previous interrogatories.

**INTERROGATORY NO. 16:**

Identify all places of employment by name, address, telephone number, dates of employment and rate of pay that you have had since January 1, 2014 to the present.

**RESPONSE TO INTERROGATORY NO. 16:**

Responding Party objects to this interrogatory on the grounds that it seeks information not relevant to any claims or defenses, nor reasonably calculated to lead to the discovery of admissible evidence in that there are no wage loss claims being asserted, is burdensome, harassing, oppressive, and abusive, and seeks information protected by Responding Party's right to privacy.

/ / /

/ / /

11

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO INTERROGATORIES FROM DEF'T COUNTY OF ALAMEDA, SET ONE

**INTERROGATORY NO. 17:**

Identify all places of education (beginning with high school) by address, phone number, date of attendance and any/all degrees received by you.

**RESPONSE TO INTERROGATORY NO. 17:**

Responding Party objects to this interrogatory on the grounds that it seeks information not relevant to any claims or defenses, nor reasonably calculated to lead to the discovery of admissible evidence in that there are no wage loss claims being asserted (or any other claim that relates to Responding Party's education history), is burdensome, harassing, oppressive, and abusive, and seeks information protected by Responding Party's right to privacy.

**INTERROGATORY NO. 18:**

Identify all prior interactions between you and any law enforcement officer between January 1, 2015 to the current, including identifying the date and substance of each interaction as well as the agency of the officer(s).

**RESPONSE TO INTERROGATORY NO. 18:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, and overbroad with respect to the term "interactions," seeks information not relevant to any claims or defenses, nor reasonably calculated to lead to the discovery of admissible evidence, is burdensome, harassing, oppressive, and abusive, and seeks information protected by Responding Party's right to privacy.

**INTERROGATORY NO. 19:**

Describe your journey leading to your arrival at the location of the INCIDENT, including, but not limited to, when and where you began your journey, your intended destination(s), the purpose(s) of your journey, the time, location and circumstances related to all stops you made along the way and the time and circumstances surrounding your arrival at the location of the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 19:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, compound, overbroad, seeks information not relevant to any claims or defenses, nor reasonably

12

1 | calculated to lead to the discovery of admissible evidence, is burdensome, harassing, oppressive,
2 | and abusive, and may seek information protected by Responding Party's right to privacy.

3 | **INTERROGATORY NO. 20:**

4 | State every address – whether residential, mailing, business, or otherwise – you have had
5 | from January 1, 2014 to the present.

6 | **RESPONSE TO INTERROGATORY NO. 20:**

7 | Responding Party objects to this interrogatory on the grounds that it seeks information
8 | not relevant to any claims or defenses, nor reasonably calculated to lead to the discovery of
9 | admissible evidence, is burdensome, harassing, oppressive, and abusive, and seeks information
10 | protected by Responding Party's right to privacy.

11 | **INTERROGATORY NO. 21:**

12 | If YOU contend that at any time during the INCIDENT you were not required to provide
13 | to the DEPUTIES your identification, including but not limited to a copy of your driver's license
14 | or identification card, state the factual basis for YOUR contention.

15 | **RESPONSE TO INTERROGATORY NO. 21:**

16 | Responding Party objects to this interrogatory on the grounds that it calls for a legal
17 | conclusion. Without waiving the foregoing objection, and subject thereto, Responding Party
18 | states: Responding Party was sitting in her parked car when she was approached by Defendant
19 | Holland and asked to provide her identification. She was not stopped or pulled over for a traffic
20 | violation. She was not operating the vehicle when she was approached. At the time she was
21 | asked for the identification, the encounter with Defendant Holland was consensual and she was
22 | not at that time detained or under arrest. Defendant Holland's only stated reason for asking for
23 | Responding Party's identification was the fact that he was ostensibly investigating auto
24 | burglaries. Defendant Holland did not advise that he was asking for Responding Party's
25 | identification for any other reason.

26 | **INTERROGATORY NO. 22:**

27 | If YOU contend that you were not required by law to comply with the DEPUTIES'
28 | directives to you during the INCIDENT, state the factual basis for this contention.

13

**RESPONSE TO INTERROGATORY NO. 22:**

Responding Party objects to this interrogatory on the grounds that it calls for a legal conclusion. Without waiving the foregoing objection, and subject thereto, Responding Party states: Responding Party was sitting in her parked car when she was approached by Defendant Holland and asked to provide her identification. She was not stopped or pulled over for a traffic violation. She was not operating the vehicle when she was approached. At the time she was asked for the identification, the encounter with Defendant Holland was consensual and she was not at that time detained or under arrest. Defendant Holland's only stated reason for asking for Responding Party's identification was the fact that he was ostensibly investigating auto burglaries. Defendant Holland did not advise that he was asking for Responding Party's identification for any other reason. When Responding Party verbally protested Defendant Holland's behavior, he illegally and unconstitutionally detained and then arrested Plaintiff. Because Plaintiffs were never validly detained or arrested, they were not obligated to comply with any of the commands or orders given by any of the Defendants.

**INTERROGATORY NO. 23:**

If YOU contend that at any time during the INCIDENT you were allowed under the law to resist and/or refuse to comply with any command and/or directive given by the DEPUTIES, state the factual basis for this contention.

**RESPONSE TO INTERROGATORY NO. 23:**

Responding Party objects to this interrogatory on the grounds that it calls for a legal conclusion. Without waiving the foregoing objection, and subject thereto, Responding Party states: Responding Party was sitting in her parked car when she was approached by Defendant Holland and asked to provide her identification. She was not stopped or pulled over for a traffic violation. She was not operating the vehicle when she was approached. At the time she was asked for the identification, the encounter with Defendant Holland was consensual and she was not at that time detained or under arrest. Defendant Holland's only stated reason for asking for Responding Party's identification was the fact that he was ostensibly investigating auto burglaries. Defendant Holland did not advise that he was asking for Responding Party's

14

identification for any other reason. When Responding Party verbally protested Defendant Holland's behavior, he illegally and unconstitutionally detained and then arrested Plaintiff. Because Plaintiffs were never validly detained or arrested, they were not obligated to comply with any of the commands or orders given by any of the Defendants.

**INTERROGATORY NO. 24:**

If YOU contend that anything about your detention during the INCIDENT was unreasonable, state the factual basis for this contention.

**RESPONSE TO INTERROGATORY NO. 24:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, duplicative of numerous other interrogatories, burdensome, compound, harassing, oppressive, and abusive.

**INTERROGATORY NO. 25:**

If YOU contend that any search of your person, place, vehicle or property during the INCIDENT revealed anything that was sensitive, personal, private, confidential, privileged, embarrassing or otherwise of a nature that its revelation would cause a reasonable person offense, concern, pain or distress, state the factual basis for this contention.

**RESPONSE TO INTERROGATORY NO. 25:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, compound, calls for speculation, lacks foundation, and seeks information not relevant to any claims or defenses nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party does not know exactly what the Defendant deputies observed during their searches of the vehicle and personal belongings because Responding Party was handcuffed in a police car at the time and could not see everything that was happening. Responding Party is informed and believes and thereon alleges that one or more defendant searched Responding

/ / /

/ / /

/ / /

Party's purse and/or wallet, which are private and sensitive in and of themselves. Discovery is in its earliest stage and Responding party reserves the right to supplement this response upon discovery of additional facts.

Dated: December 17, 2020

LAW OFFICE OF JOSEPH S. MAY
and
GEARINGER LAW GROUP


*/s/ Joseph S. May*
By: JOSEPH S. MAY
Attorneys for Plaintiffs

16

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO INTERROGATORIES FROM DEF'T COUNTY OF ALAMEDA, SET ONE

**VERIFICATION**

I, Aasylei Loggervale, declare:

I am one of the Plaintiffs in this action. I am familiar with the contents of the

**PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO INTERROGATORIES**

**FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE.** The information supplied

therein by me is based on my own personal knowledge and/or other agents and/or compiled from

available documents and is therefore provided as required by law. The information contained in

the document is true, except as to that the matters which were provided by other agents or

compiled from available documents, including all contentions and opinions, and, as to those

matters, I am informed and believe that they are true

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed on December 16, 2020 at Miami, Florida.

Aasylei Loggervale

# PROOF OF SERVICE

*Loggervale, et al., v. County of Alameda, et al.*
United States District Court for the Northern District of California
Case Number C20-4679-WHA

I declare that I am a United States citizen, over eighteen and not a party to this action. My business address is 740 Fourth Street, Santa Rosa, California 95404. On the below date I served:

**PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO INTERROGATORIES TO FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE**

on the interested party or parties as indicated below, addressed as follows:

Kevin E. Gilbert, Esq. kgilbert@ohshlaw.com
Christopher R. Creech, Esq. ccreech@ohshlaw.com
Orbach Huff Suarez & Henderson, LLP
6210 Stoneridge Mall Rd., Ste. 210
Pleasanton, CA 94588
*Attorneys for Defendants*

☐ **MAIL**[1]       ☐ **CERTIFIED MAIL**[2]      ☐ **NEXT-DAY SERVICE**[3]
☐ **HAND DELIVERY**[4]   ☐ **FACSIMILE**[5]       ☒ **EMAIL**[6]

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed December 17, 2020, at Santa Rosa, California.

MIKE KECK

---

[1] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in the office's usual location for mailing with the USPS.

[2] I personally served the document(s) as mail described above, and certified it with return receipt requested.

[3] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in a regularly used drop box by an overnight delivery service.

[4] I personally sealed the document(s) in a package, addressed as indicated above. I caused such envelope to be hand-delivered by a same-day messenger service to the addressee(s) on this date.

[5] I personally faxed the document(s) addressed as indicated above. No error was reported by the sending machine. The transmission record for this facsimile complies with California Rule of Court 2003(6).

[6] I personally electronically served the document(s) to the electronic mailing address indicated above.

18

# EXHIBIT Q

Joseph S. May   SBN 245924
LAW OFFICE OF JOSEPH S. MAY
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel: (415) 781-3333
Fax: (415) 707-6600
joseph@josephmaylaw.com

Brian Gearinger   SBN 146125
GEARINGER LAW GROUP
740 Fourth Street
Santa Rosa, CA 95404
Tel: (415) 440-3102
brian@gearingerlaw.com

Attorneys for Plaintiffs
AASYLEI LOGGERVALE,
AASYLEI HARDGE-LOGGERVALE, and
AAOTTAE LOGGERVALE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; KEITH LEEPER; ANTHONY DeSOUSA; and DOES 1 to 50, inclusive, <br><br> Defendants. | CASE NO. C20-4679-WHA <br><br> **PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESPONSES TO INTERROGATORIES FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE** <br><br><br> Action Filed:  July 14, 2020 <br> Trial Date:    Not set |

RESPONDING PARTY:          AASYLEI HARDGE-LOGGERVALE

PROPOUNDING PARTY:          COUNTY OF ALAMEDA

SET NUMBER:                ONE

1

1       Plaintiff Aasylei Hardge-Loggervale responds to the first set of interrogatories

2   propounded by Defendant County of Alameda as follows:

3       Responding Party has not fully completed the investigation of the facts relating to this

4   case, has not completed discovery, and has not completed preparation for trial.

5       All of the responses contained herein are based only upon such information and

6   documents as are presently available and specifically known to Responding Party, and disclose

7   only those contentions presently known to Responding Party.

8       It is anticipated that further discovery, investigation, and legal research and analysis will

9   supply additional facts, add meaning to known facts, and establish entirely new conclusions and

10  legal contentions, all of which may lead to substantial additions to, changes in, and variations

11  from the responses set forth herein.

12      The following responses are provided without prejudice to Responding Party's right to

13  produce evidence of subsequently discovered facts which Responding Party may later recall.

14  Responding Party reserves the right to change any and all answers herein as additional facts are

15  ascertained. The responses contained herein are made in a good faith effort to supply as much

16  actual information and legal contentions as are presently known, but should in no way prejudice

17  Responding Party's right to further discovery, research and/or analysis.

18                          GENERAL OBJECTIONS

19      1.  Responding Party objects to each and every interrogatory to the extent that it seeks

20  information protected by the attorney-client privilege and/or work product doctrine. Responding

21  Party provides the following responses on the premise that the requests do not seek notes,

22  memoranda and research prepared by counsel for Responding Party or his consultants, and that

23  the requests do not seek communications between counsel for Responding Party and his clients

24  or consultants.

25      2.  Responding Party objects to each and every interrogatory to the extent that it is

26  overbroad and/or does not include a specific period of time as a reference and therefore vague,

27  ambiguous or unduly burdensome.

28  / / /

2

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESP. TO INTERROGATORIES FROM DEF'T COUNTY OF ALAMEDA, SET ONE

3.   Discovery and investigation are continuing in this matter, and Responding Party reserves the right to amend these responses should additional responsive information be discovered or obtained.

## RESPONSE TO INTERROGATORIES

**INTERROGATORY NO. 1:**

State in detail and in chronological order how YOU allege the INCIDENT occurred.

**RESPONSE TO INTERROGATORY NO. 1:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, may call for speculation, may invade the attorney client privilege, and calls for an undue narrative. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party, her mother, and her sister drove from Nevada to California the night of September 19, 2019, arriving at Castro Valley early the morning of September 20, 2019. Plaintiffs were parked in the parking lot at 2720 Castro Valley Blvd. to rest briefly and get coffee before finishing the trip. Plaintiffs were simply sitting in the car when Alameda County Sheriff Deputies Steven Holland and Monica Pope approached the vehicle to speak with Responding Party's mother. Deputy Holland told Responding Party's mother that there had been break ins in the area and asked Responding Party's mother for her ID. Responding Party's mother declined to provide it, upon which Deputy Holland repeatedly demanded it, despite the fact that Responding Party's mother was under no obligation to provide it. Even though the only break ins in the area that Deputy Holland was aware of potentially involved males, he decided to detain Responding Party's mother for refusing to cooperate with his consensual encounter, thereafter escalating the situation to a de facto arrest by holding Plaintiffs in handcuffs in police cars for more than an hour. Deputies Holland, Pope and/or other deputies searched Plaintiffs' belongings, vehicle, trunk, purses and wallets. Responding Party is informed and believes and thereon alleges that the unlawful detention, arrest, and search was committed by the Defendant Deputies based on Plaintiffs' race and also as a result of Defendant County of Alameda's widespread practice of allowing racial profiling and failing to properly train its deputies on the issue of detentions,

1    arrests, and racial profiling. Discovery is in its earliest stages and Responding Party reserves the

2    right to supplement this response upon discovery of additional facts.

3    **INTERROGATORY NO. 2:**

4      State the name, address and telephone number of each and every person whom YOU

5    contend was either involved in or witnessed the INCIDENT.

6    **RESPONSE TO INTERROGATORY NO. 2:**

7      Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous,

8    overbroad, may call for speculation, and may seek information protected by the attorney-client

9    privilege and/or work product doctrine. Without waiving the foregoing objections, and subject

10   thereto, Responding party states: Plaintiffs (who may be contacted through counsel), Defendant

11   deputies, whose identities are known to Defendants. Responding Party does not know of another

12   individual who was "involved in or witnessed" the incident, as those terms are understood to

13   Responding Party. Discovery is in its earliest stages and Responding Party reserves the right to

14   supplement this response upon discovery of additional facts.

15   **INTERROGATORY NO. 3:**

16     Describe in detail all damages that YOU are claiming against DEFENDANTS, whether

17   individually or collectively, as a result of the INCIDENT, including without limitations any

18   physical, emotional, economical and/or property damages and the amount and nature of damages

19   claimed.

20   **RESPONSE TO INTERROGATORY NO. 3:**

21     Responding Party is claiming those damages set forth in Plaintiff's initial disclosure, to

22   wit: deprivation of civil rights, physical pain, mental suffering, emotional distress, invasion of

23   privacy, deprivation of liberty, fear, fright, shock, nervousness, anxiety, worry, inconvenience,

24   embarrassment, humiliation, and grief. As noted in the initial disclosure, Plaintiffs estimate the

25   value of such damages to be $250,000 for each Plaintiff but the decision as to the amount of

26   compensation to assign will be determined by a jury.

27   / / /

28   / / /

**INTERROGATORY NO. 4:**

Describe all force which YOU contend was utilized upon you during the INCIDENT, including, but not limited to, by describing who used the force, what force was used, any injury you sustained as a result of the force, and the circumstances surrounding each use of force.

**RESPONSE TO INTERROGATORY NO. 4:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, compound, and may call for a legal conclusion. Without waiving the foregoing objections, and subject thereto, Responding Party states: Defendant Leeper grabbed Responding Party, handcuffed her, and placed her in a police vehicle. Responding Party suffered abrasions to her elbow and wrist. Responding Party had exited her vehicle so she could use the restroom, in response to which she was told she was being detained by Defendant Holland. There was absolutely no information from any source whatsoever that Responding Party was engaged in, or about to engage in, any criminal activity whatsoever. Responding Party was arrested, handcuffed, abused, and held because she was Black.

**INTERROGATORY NO. 5:**

State all facts that support YOUR contention that any Defendant is liable to you for the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 5:**

Responding Party objects to this interrogatory on the grounds that it is compound (as there are multiple defendants, claims, and theories of liability) and tremendously overbroad. Without waiving the foregoing objections, and subject thereto, Responding Party provides the following information, which is her best effort to respond to this grossly overbroad interrogatory, reserving the right to rely on facts that she may not have included due to oversight or inadvertence, noting also that virtually all of the facts surrounding the incident are already known to Defendants, since the encounter was captured on multiple body-worn cameras: Defendant Holland detained Responding Party because her mother exercised her right to refuse to cooperate with a consensual encounter and for being Black. There was absolutely no information from any source whatsoever that Responding Party was engaged in, or about to

5

engage in, any criminal activity whatsoever. Responding Party exited the vehicle she was in to use the restroom, in response to which Defendant Holland told her she was being detained. None of the defendants could explain why Responding Party was being detained. Defendant Holland made the decision to detain Responding Party and Defendant Leeper, knowing there was no reasonable suspicion of criminal activity on the part of Responding Party, carried out the detention by handcuffing and forcing Responding Party into a police vehicle. Defendant Pope also knew that Responding Party's detention was unlawful but failed to intercede to stop the detention. Eventually, Defendant De Sousa arrived on scene and, despite knowing that Plaintiffs were innocent, allowed them to remain in handcuffs in police vehicles for several additional minutes. Defendant Holland ostensibly suspected Plaintiffs of being potentially engaged in criminal behavior based entirely on the color of their skin, as even by his own admission the only auto burglaries that had been committed in the vicinity involved potential suspects who were males. In addition, Defendant Holland was clearly unhappy about a Black woman refusing to cooperate with his investigation and decided to retaliate against her for her lawful exercise of her right not to cooperate in a consensual encounter by arresting her and using force on her. Defendant Pope and potentially other deputies (whose identities are known to Defendants) searched Responding Party's purse and/or wallet without a warrant, consent, or other legal justification, thereby violating her Fourth Amendment rights and her privacy. Defendant County of Alameda is liable to Responding Party (1) vicariously for state law claims under Government Code Section 815.2, (2) for failing to train its deputies on the issues of search, seizure, use of force, and racial profiling, and (3) for approving, adopting, and/or ratifying the actions of the Defendant Deputies. The individual defendants intended to injure Responding Party and deprive her of her rights, or did so with a conscious disregard for her rights, entitling Plaintiff to punitive damages.

**INTERROGATORY NO. 6:**

Describe any search and/or seizure of your person, place, vehicle or property during the INCIDENT that YOU contend was unlawful.

/ / /

6

**RESPONSE TO INTERROGATORY NO. 6:**

Responding Party's person was seized when she was told that she was being detained (and thus not free to leave) by Defendant Holland. The seizure ripened into a de facto arrest when Responding Party was placed in handcuffs, and held in the backseat of a police car for more than an hour. Responding Party's belongings were searched by Defendants and/or other deputies, while Responding Party was in the back of the police car.

**INTERROGATORY NO. 7:**

State all facts that support YOUR contention that any search by DEFENDANTS of your person, place, vehicle or property during the INCIDENT was unreasonable.

**RESPONSE TO INTERROGATORY NO. 7:**

Defendants searched Responding Party's belongings without a warrant, without reasonable suspicion to detain or probable cause to arrest them, without consent, and without any other legal justification. Such searches are per se unreasonable.

**INTERROGATORY NO. 8:**

State all facts that support YOUR contention that any seizure by DEFENDANTS of your person, place, vehicle or property during the INCIDENT was unreasonable.

**RESPONSE TO INTERROGATORY NO. 8:**

Defendant Holland claimed that he was investigating previous auto break-ins in the vicinity where he encountered Plaintiffs. However, none of those alleged crimes involved Black women. Thus, there was no reasonable suspicion to believe Plaintiffs were involved in those crimes. Nonetheless, Deputy Holland demanded that Responding Party's mother provide her identification, and persisted in demanding it after she declined to provide it. Defendant Holland thereafter informed all Plaintiffs they were being detained. Even though there remained no facts that would have tied any of the Plaintiffs to any criminal activity whatsoever, Defendants handcuffed all three Plaintiffs and placed them in police cars for more than an hour and then searched the vehicle and Plaintiffs' belongings, seizing some of their belongings, including cell phones and drivers' licenses, without any justification or legal basis.

/ / /

7

**INTERROGATORY NO. 9:**

State all facts that support YOUR contention that any force used by DEFENDANTS upon you during the INCIDENT was unreasonable.

**RESPONSE TO INTERROGATORY NO. 9:**

Responding Party did not commit any crimes and there were no facts known to any Defendants at the time of the incident that would link Responding Party to any crimes. Further, Responding Party never did or said anything that would place any of the Defendants in reasonable fear of harm at any time. Therefore, there was no justification at all for using physical force on Responding Party. As such, any force was unreasonable and excessive. By grabbing her arms, placing handcuffs on her, and forcing her into a police car and forcing her to remain there for more than an hour all constituted excessive, unreasonable, and unconstitutional uses of force.

**INTERROGATORY NO. 10:**

State all facts that support YOUR contention that DEFENDANTS did not have probable cause to arrest you during the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 10:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, and seeks facts to prove a negative, which is difficult if not impossible. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party was sitting in a vehicle in the parking lot near 2720 Castro Valley Boulevard in Castro Valley on the morning of September 20, 2019 when Defendants Holland and Pope approached the vehicle. Deputy Holland claims he was aware of auto burglaries in the vicinity and was investigating them at the time. However, the only information about auto burglaries in that area were that they may have been committed by Black males. In one of those incidents a witness indicated that there was a suspicious silver four-door vehicle in the parking lot near the time of the break-in, but did not tie that vehicle directly to the crime. No reasonable police officer would believe Plaintiffs – three Black women simply sitting in a silver Cadillac sedan – had any connection with the auto burglaries. While Deputy Holland was permitted to initiate a consensual encounter with Plaintiffs, he was not permitted to demand that Responding Party's mother

8

provide her identification, and was certainly not permitted to detain and arrest Responding Party simply on an unfounded hunch. There were no other crimes that Plaintiffs committed, nor any facts known to any Defendants that would suggest otherwise. The arrest, detention, and search and seizure of Plaintiffs and their belongings was racially motivated in that Plaintiffs are Black and some individuals suspected in other alleged incidents were Black. The Fourth Amendment does not permit law enforcement officials to arrest people for being Black, which is exactly what Defendants did to Plaintiff.

**INTERROGATORY NO. 11:**

State all facts that support YOUR contention that DEFENDANTS did not have reasonable suspicion to detain you during the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 11:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, and seeks facts to prove a negative, which is difficult if not impossible. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party was sitting in a vehicle in the parking lot near 2720 Castro Valley Boulevard in Castro Valley on the morning of September 20, 2019 when Defendants Holland and Pope approached the vehicle. Deputy Holland claims he was aware of auto burglaries in the vicinity and was investigating them at the time. However, the only information about auto burglaries in that area were that they may have been committed by Black males. In one of those incidents a witness indicated that there was a suspicious silver four-door vehicle in the parking lot near the time of the break-in, but did not tie that vehicle directly to the crime. No reasonable police officer would believe Plaintiffs – three Black women simply sitting in a silver Cadillac sedan – had any connection with the auto burglaries. While Deputy Holland was permitted to initiate a consensual encounter with Plaintiffs, he was not permitted to demand that Responding Party's mother provide her identification, and was certainly not permitted to detain and arrest Responding Party simply on an unfounded hunch. There were no other crimes that Plaintiffs committed, nor any facts known to any Defendants that would suggest otherwise. The arrest, detention, and search and seizure of Plaintiffs and their belongings was racially motivated in that Plaintiffs are Black

9

| 1 | and some individuals suspected in other alleged incidents were Black. The Fourth Amendment |
| 2 | does not permit law enforcement officials to arrest people for being Black, which is exactly what |
| 3 | Defendants did to Plaintiff. |

**INTERROGATORY NO. 12:**

State all facts that support YOUR contention that DEFENDANTS were not authorized to use force against you during the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 12:**

Responding Party did not commit any crimes and there were no facts known to any Defendants at the time of the incident that would link Responding Party to any crimes. Further, Responding Party never did or said anything that would place any of the Defendants in reasonable fear of harm at any time. Therefore, there was no justification at all for using physical force on Responding Party. As such, any force was unreasonable and excessive. By pulling her arms behind her back, placing handcuffs on her, and forcing her into a police car and forcing her to remain there for more than an hour all constituted excessive, unreasonable, and unconstitutional uses of force.

**INTERROGATORY NO. 13:**

State all facts that support YOUR contention that DEFENDANTS acted with unlawful animus toward you, including, but not limited to, racial animus, retaliatory animus against the exercise of constitutional rights, or other discriminatory animus of any kind.

**RESPONSE TO INTERROGATORY NO. 13:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, and compound. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party was sitting in a vehicle in the parking lot near 2720 Castro Valley Boulevard in Castro Valley on the morning of September 20, 2019 when Defendants Holland and Pope approached the vehicle. Deputy Holland claims he was aware of auto burglaries in the vicinity and was investigating them at the time. However, the only information about auto burglaries in that area were that they may have been committed by Black males. In one of those incidents a witness indicated that there was a suspicious silver four-door

10

vehicle in the parking lot near the time of the break-in, but did not tie that vehicle directly to the crime. No reasonable police officer would believe Plaintiffs – three Black women simply sitting in a silver Cadillac sedan – had any connection with the auto burglaries. No reasonable police officer would believe Plaintiffs – three Black women simply sitting in a silver Cadillac sedan – had any connection with the auto burglaries. The fact that Defendants would detain, arrest, search, and seize the belongings of Plaintiffs based on the information he had strongly suggests that they were basing their actions on the fact that Plaintiffs were Black and/or Responding Party's mother's exercise of her right to refuse to show her identification during a consensual encounter. Defendants also inferably retaliated against Responding Party for refusing to cooperate in a consensual encounter and for questioning their authority; in other words, Responding Party was arrested for "contempt of cop." While Responding Party cannot know with certainty what was in the Defendants' minds, the fact that no information supported a reasonable belief that Plaintiffs were engaged in any criminal activity is strong circumstantial evidence that Defendants acted with racial animus, malice, and retaliatory animus.

**INTERROGATORY NO. 14:**

Identify all policies and/or customs of DEFENDANTS which YOU contend caused or contributed to the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 14:**

Defendant County of Alameda fails to train its deputies that they are not allowed to demand a person's identification during a consensual encounter. Defendant County of Alameda has insufficient training and written policies prohibiting and avoiding illegal racial profiling, racial bias, and race discrimination. Defendant County of Alameda has a widespread practice and informal policy of tolerating, approving, ratifying, and encouraging deputies to make illegal detentions and arrests without reasonable suspicions or probable cause, and based on the subject's race or other protected classification.

**INTERROGATORY NO. 15:**

State all facts which support YOUR contention that each individual Defendant is liable to you for the INCIDENT.

11

1 **RESPONSE TO INTERROGATORY NO. 15:**

2       Responding Party objects to this interrogatory on the grounds that it is compound and

3 duplicative of previous interrogatories. Without waiver, please see the foregoing responses.

4 **INTERROGATORY NO. 16:**

5       Identify all places of employment by name, address, telephone number, dates of

6 employment and rate of pay that you have had since January 1, 2014 to the present.

7 **RESPONSE TO INTERROGATORY NO. 16:**

8       Responding Party objects to this interrogatory on the grounds that it seeks information

9 not relevant to any claims or defenses, nor reasonably calculated to lead to the discovery of

10 admissible evidence in that there are no wage loss claims being asserted, is burdensome,

11 harassing, oppressive, and abusive, and seeks information protected by Responding Party's right

12 to privacy.

13 **INTERROGATORY NO. 17:**

14       Identify all places of education (beginning with high school) by address, phone number,

15 date of attendance and any/all degrees received by you.

16 **RESPONSE TO INTERROGATORY NO. 17:**

17       Responding Party objects to this interrogatory on the grounds that it seeks information

18 not relevant to any claims or defenses, nor reasonably calculated to lead to the discovery of

19 admissible evidence in that there are no wage loss claims being asserted (or any other claim that

20 relates to Responding Party's education history), is burdensome, harassing, oppressive, and

21 abusive, and seeks information protected by Responding Party's right to privacy.

22 **INTERROGATORY NO. 18:**

23       Identify all prior interactions between you and any law enforcement officer between

24 January 1, 2015 to the current, including identifying the date and substance of each interaction as

25 well as the agency of the officer(s).

26 **RESPONSE TO INTERROGATORY NO. 18:**

27       Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous,

28 and overbroad with respect to the term "interactions," seeks information not relevant to any

1  claims or defenses, nor reasonably calculated to lead to the discovery of admissible evidence, is

2  burdensome, harassing, oppressive, and abusive, and seeks information protected by Responding

3  Party's right to privacy.

4  **INTERROGATORY NO. 19:**

5       Describe your journey leading to your arrival at the location of the INCIDENT,

6  including, but not limited to, when and where you began your journey, your intended

7  destination(s), the purpose(s) of your journey, the time, location and circumstances related to all

8  stops you made along the way and the time and circumstances surrounding your arrival at the

9  location of the INCIDENT.

10  **RESPONSE TO INTERROGATORY NO. 19:**

11       Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous,

12  compound, overbroad, seeks information not relevant to any claims or defenses, nor reasonably

13  calculated to lead to the discovery of admissible evidence, is burdensome, harassing, oppressive,

14  and abusive, and may seek information protected by Responding Party's right to privacy.

15  **INTERROGATORY NO. 20:**

16       State every address – whether residential, mailing, business, or otherwise – you have had

17  from January 1, 2014 to the present.

18  **RESPONSE TO INTERROGATORY NO. 20:**

19       Responding Party objects to this interrogatory on the grounds that it seeks information

20  not relevant to any claims or defenses, nor reasonably calculated to lead to the discovery of

21  admissible evidence, is burdensome, harassing, oppressive, and abusive, and seeks information

22  protected by Responding Party's right to privacy.

23  **INTERROGATORY NO. 21:**

24       If YOU contend that at any time during the INCIDENT you were not required to provide

25  to the DEPUTIES your identification, including but not limited to a copy of your driver's license

26  or identification card, state the factual basis for YOUR contention.

27  / / /

28  / / /

**RESPONSE TO INTERROGATORY NO. 21:**

Responding Party objects to this interrogatory on the grounds that it calls for a legal conclusion. Without waiving the foregoing objection, and subject thereto, Responding Party states: Responding Party was not stopped or pulled over for a traffic violation. She was not operating the vehicle when she was approached. While Defendants never asked Responding Party for her identification, even if they had done so she was not required to comply because it was merely a consensual encounter and a citizen is not required to produce identification during such an interaction. After Responding Party was detained and then arrested, she still was not asked to provide identification but even if she was, she still would not be required to provide it because the detention and arrest were unlawful as explained in responses to other interrogatories.

**INTERROGATORY NO. 22:**

If YOU contend that you were not required by law to comply with the DEPUTIES' directives to you during the INCIDENT, state the factual basis for this contention.

**RESPONSE TO INTERROGATORY NO. 22:**

Responding Party objects to this interrogatory on the grounds that it calls for a legal conclusion. Without waiving the foregoing objection, and subject thereto, Responding Party states: Responding Party was a passenger in a parked vehicle when Defendant Holland initiated a consensual with Responding Party's mother, who was in the driver's seat. None of the Plaintiffs were stopped or pulled over for a traffic violation. Defendant Holland's only stated reason for initiating the encounter was that he was ostensibly investigating auto burglaries in the vicinity. At some point during the encounter, Responding Party exited the vehicle so she could use the restroom and purchase a beverage at the nearby Starbucks. When she tried to get something from the trunk, Defendant Holland stated that she was being detained. While Responding Party was told to go back inside the vehicle, she was not obligated to do so, because there was no reasonable suspicion to detain her and certainly no probable cause to arrest her.

/ / /

/ / /

/ / /

14

**INTERROGATORY NO. 23:**

If YOU contend that at any time during the INCIDENT you were allowed under the law to resist and/or refuse to comply with any command and/or directive given by the DEPUTIES, state the factual basis for this contention.

**RESPONSE TO INTERROGATORY NO. 23:**

Responding Party objects to this interrogatory on the grounds that it calls for a legal conclusion. Without waiving the foregoing objection, and subject thereto, Responding Party states: Responding Party was a passenger in a parked vehicle when Defendant Holland initiated a consensual encounter with Responding Party's mother, who was in the driver's seat. None of the Plaintiffs were stopped or pulled over for a traffic violation. Defendant Holland's only stated reason for initiating the encounter was that he was ostensibly investigating auto burglaries in the vicinity. At some point during the encounter, Responding Party exited the vehicle so she could use the restroom and purchase a beverage at the nearby Starbucks. When she tried to get something from the trunk, Defendant Holland stated that she was being detained. While Responding Party was told to go back inside the vehicle, she was not obligated to do so, because there was no reasonable suspicion to detain her and certainly no probable cause to arrest her.

**INTERROGATORY NO. 24:**

If YOU contend that anything about your detention during the INCIDENT was unreasonable, state the factual basis for this contention.

**RESPONSE TO INTERROGATORY NO. 24:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, duplicative of numerous other interrogatories, burdensome, compound, harassing, oppressive, and abusive. Without waiver, please see all of the other responses.

**INTERROGATORY NO. 25:**

If YOU contend that any search of your person, place, vehicle or property during the INCIDENT revealed anything that was sensitive, personal, private, confidential, privileged, embarrassing or otherwise of a nature that its revelation would cause a reasonable person offense, concern, pain or distress, state the factual basis for this contention.

15

**RESPONSE TO INTERROGATORY NO. 25:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, compound, calls for speculation, lacks foundation, and seeks information not relevant to any claims or defenses nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party does not know exactly what the Defendant deputies observed during their searches of the vehicle and personal belongings because Responding Party was handcuffed in a police car at the time and could not see everything that was happening. Responding Party is informed and believes and thereon alleges that one or more defendant searched Responding Party's bag and/or wallet, which are private and sensitive in and of themselves. Discovery is in its earliest stage and Responding party reserves the right to supplement this response upon discovery of additional facts.

Dated: December 17, 2020

LAW OFFICE OF JOSEPH S. MAY
and
GEARINGER LAW GROUP


*/s/ Joseph S. May*
By: JOSEPH S. MAY
Attorneys for Plaintiffs

16

1
2
3

## VERIFICATION

4

I, Aasylei Hardge-Loggervale, declare:

5

I am one of the Plaintiffs in this action. I am familiar with the contents of the

6
7

**PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESPONSES TO**

8

**INTERROGATORIES FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE.** The

9

information supplied therein by me is based on my own personal knowledge and/or other agents

10

and/or compiled from available documents and is therefore provided as required by law. The

11

information contained in the document is true, except as to that the matters which were provided

12
13

by other agents or compiled from available documents, including all contentions and opinions,

and, as to those matters, I am informed and believe that they are true

14
15

I declare under penalty of perjury that the foregoing is true and correct to the best of my

16

knowledge and belief.

17

Executed on December 16, 2020 at Miami, Florida.

18
19
20

Aasylei Hardge-Loggervale

21
22
23
24
25
26
27
28

17

1 **PROOF OF SERVICE**

2

   *Loggervale, et al., v. County of Alameda, et al.*
3   United States District Court for the Northern District of California
   Case Number C20-4679-WHA

4
   I declare that I am a United States citizen, over eighteen and not a party to this action. My
5 business address is 740 Fourth Street, Santa Rosa, California 95404. On the below date I served:

6   **PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESPONSES TO**
   **INTERROGATORIES FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE**
7

8 on the interested party or parties as indicated below, addressed as follows:

9   Kevin E. Gilbert, Esq. kgilbert@ohshlaw.com
   Christopher R. Creech, Esq. ccreech@ohshlaw.com
10   Orbach Huff Suarez & Henderson, LLP
   6210 Stoneridge Mall Rd., Ste. 210
11   Pleasanton, CA 94588
   *Attorneys for Defendants*
12

13

14
   ☐ MAIL[1]                 ☐ CERTIFIED MAIL[2]          ☐ NEXT-DAY SERVICE[3]
15   ☐ HAND DELIVERY[4]        ☐ FACSIMILE[5]               ☒ EMAIL[6]

16
   I declare under penalty of perjury under the laws of the State of California that the
17 foregoing is true and correct. Executed December 17, 2020, at Santa Rosa, California.

18
                                    _____
19                                            MIKE KECK

20

21

22
   _____

23   [1] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following
   ordinary office practice, I placed it in the office's usual location for mailing with the USPS.

24   [2] I personally served the document(s) as mail described above, and certified it with return receipt requested.

   [3] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following
25 ordinary office practice, I placed it in a regularly used drop box by an overnight delivery service.

   [4] I personally sealed the document(s) in a package, addressed as indicated above. I caused such envelope to be
26 hand-delivered by a same-day messenger service to the addressee(s) on this date.

   [5] I personally faxed the document(s) addressed as indicated above. No error was reported by the sending machine.
27 The transmission record for this facsimile complies with California Rule of Court 2003(6).

   [6] I personally electronically served the document(s) to the electronic mailing address indicated above.
28
                                    18
   Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
   PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESP. TO INTERROGATORIES FROM DEF'T COUNTY OF ALAMEDA, SET ONE

**EXHIBIT R**

Joseph S. May   SBN 245924
LAW OFFICE OF JOSEPH S. MAY
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel: (415) 781-3333
Fax: (415) 707-6600
joseph@josephmaylaw.com

Brian Gearinger   SBN 146125
GEARINGER LAW GROUP
740 Fourth Street
Santa Rosa, CA 95404
Tel: (415) 440-3102
brian@gearingerlaw.com

Attorneys for Plaintiffs
AASYLEI LOGGERVALE,
AASYLEI HARDGE-LOGGERVALE, and
AAOTTAE LOGGERVALE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; KEITH LEEPER; ANTHONY DeSOUSA; and DOES 1 to 50, inclusive, <br><br> Defendants. | CASE NO. C20-4679-WHA <br><br> **PLAINTIFF AAOTTAE LOGGERVALE'S RESPONSES TO INTERROGATORIES FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE** <br><br><br> Action Filed:  July 14, 2020 <br> Trial Date:     November 29, 2021 |

RESPONDING PARTY:              AAOTTAE LOGGERVALE

PROPOUNDING PARTY:          COUNTY OF ALAMEDA

SET NUMBER:                           ONE

1

Plaintiff Aaottae Loggervale responds to the first set of interrogatories propounded by Defendant County of Alameda as follows:

Responding Party has not fully completed the investigation of the facts relating to this case, has not completed discovery, and has not completed preparation for trial.

All of the responses contained herein are based only upon such information and documents as are presently available and specifically known to Responding Party, and disclose only those contentions presently known to Responding Party.

It is anticipated that further discovery, investigation, and legal research and analysis will supply additional facts, add meaning to known facts, and establish entirely new conclusions and legal contentions, all of which may lead to substantial additions to, changes in, and variations from the responses set forth herein.

The following responses are provided without prejudice to Responding Party's right to produce evidence of subsequently discovered facts which Responding Party may later recall. Responding Party reserves the right to change any and all answers herein as additional facts are ascertained. The responses contained herein are made in a good faith effort to supply as much actual information and legal contentions as are presently known, but should in no way prejudice Responding Party's right to further discovery, research and/or analysis.

<div align="center">GENERAL OBJECTIONS</div>

1. Responding Party objects to each and every interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or work product doctrine. Responding Party provides the following responses on the premise that the requests do not seek notes, memoranda and research prepared by counsel for Responding Party or his consultants, and that the requests do not seek communications between counsel for Responding Party and his clients or consultants.

2. Responding Party objects to each and every interrogatory to the extent that it is overbroad and/or does not include a specific period of time as a reference and therefore vague, ambiguous or unduly burdensome.

/ / /

<div align="center">2</div>

3.  Discovery and investigation are continuing in this matter, and Responding Party

reserves the right to amend these responses should additional responsive information be

discovered or obtained.

## RESPONSE TO INTERROGATORIES

### INTERROGATORY NO. 1:

State in detail and in chronological order how YOU allege the INCIDENT occurred.

### RESPONSE TO INTERROGATORY NO. 1:

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous,

overbroad, may call for speculation, may invade the attorney client privilege, and calls for an

undue narrative. Without waiving the foregoing objections, and subject thereto, Responding

Party states: Responding Party, her mother, and her sister drove from Nevada to California the

night of September 19, 2019, arriving at Castro Valley early the morning of September 20, 2019.

Plaintiffs were parked in the parking lot at 2720 Castro Valley Blvd. to rest briefly and get coffee

before finishing the trip. Plaintiffs were simply sitting in the car when Alameda County Sheriff

Deputies Steven Holland and Monica Pope approached the vehicle to speak with Responding

Party's mother. Deputy Holland told Responding Party's mother that there had been break ins in

the area and asked Responding Party's mother for her ID. Responding Party's mother declined to

provide it, upon which Deputy Holland repeatedly demanded it, despite the fact that Responding

Party's mother was under no obligation to provide it. Even though the only break ins in the area

that Deputy Holland was aware of potentially involved males, he decided to detain Responding

Party's mother for refusing to cooperate with his consensual encounter, thereafter escalating the

situation to a de facto arrest by holding Plaintiffs in handcuffs in police cars for more than an

hour. Deputies Holland, Pope and/or other deputies searched Plaintiffs' belongings, vehicle,

trunk, purses and wallets. Responding Party is informed and believes and thereon alleges that the

unlawful detention, arrest, and search was committed by the Defendant Deputies based on

Plaintiffs' race and also as a result of Defendant County of Alameda's widespread practice of

allowing racial profiling and failing to properly train its deputies on the issue of detentions,

1    arrests, and racial profiling. Discovery is in its earliest stages and Responding Party reserves the

2    right to supplement this response upon discovery of additional facts.

3    **INTERROGATORY NO. 2:**

4        State the name, address and telephone number of each and every person whom YOU

5    contend was either involved in or witnessed the INCIDENT.

6    **RESPONSE TO INTERROGATORY NO. 2:**

7        Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous,

8    overbroad, may call for speculation, and may seek information protected by the attorney-client

9    privilege and/or work product doctrine. Without waiving the foregoing objections, and subject

10    thereto, Responding Party states: Plaintiffs (who may be contacted through counsel), Defendant

11    deputies, whose identities are known to Defendants. Responding Party does not know of any

12    other individual who was "involved in or witnessed" the incident, as those terms are understood

13    to Responding Party. Discovery is in its earliest stages and Responding Party reserves the right to

14    supplement this response upon discovery of additional facts.

15    **INTERROGATORY NO. 3:**

16        Describe in detail all damages that YOU are claiming against DEFENDANTS, whether

17    individually or collectively, as a result of the INCIDENT, including without limitations any

18    physical, emotional, economical and/or property damages and the amount and nature of damages

19    claimed.

20    **RESPONSE TO INTERROGATORY NO. 3:**

21        Responding Party is claiming those damages set forth in Plaintiff's initial disclosure, to

22    wit: deprivation of civil rights, physical pain, mental suffering, emotional distress, invasion of

23    privacy, deprivation of liberty, fear, fright, shock, nervousness, anxiety, worry, inconvenience,

24    embarrassment, humiliation, and grief. As noted in the initial disclosure, Plaintiffs estimate the

25    value of such damages to be $250,000 for each Plaintiff but the decision as to the amount of

26    compensation to assign will be determined by a jury.

27    / / /

28    / / /

4

**INTERROGATORY NO. 4:**

Describe all force which YOU contend was utilized upon you during the INCIDENT, including, but not limited to, by describing who used the force, what force was used, any injury you sustained as a result of the force, and the circumstances surrounding each use of force.

**RESPONSE TO INTERROGATORY NO. 4:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, compound, and may call for a legal conclusion. Without waiving the foregoing objections, and subject thereto, Responding Party states: Defendant Pope grabbed Responding Party's arms and put them behind her back. Defendant Leeper handcuffed Responding Party and took her to a police car. Deputies Pope and Leeper physical placed Responding Party into the police vehicle, which included Defendant Leeper pulling Responding Party into the car. Responding Party refused to loosen the handcuffs, despite Responding Party's repeated complaints that she was in pain and discomfort. Responding Party suffered minor contusions and abrasions to her wrists. Responding Party had exited her vehicle while recording the deputies with her cell phone video camera, in response to which she was told she was being detained by Defendant Holland. There was absolutely no information from any source whatsoever that Responding Party was engaged in, or about to engage in, any criminal activity whatsoever. Responding Party was arrested, handcuffed, abused, and held because she was Black.

**INTERROGATORY NO. 5:**

State all facts that support YOUR contention that any Defendant is liable to you for the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 5:**

Responding Party objects to this interrogatory on the grounds that it is compound (as there are multiple defendants, claims, and theories of liability) and tremendously overbroad. Without waiving the foregoing objections, and subject thereto, Responding Party provides the following information, which is her best effort to respond to this grossly overbroad interrogatory, reserving the right to rely on facts that she may not have included due to oversight or inadvertence, noting also that virtually all of the facts surrounding the incident are already

known to Defendants, since the encounter was captured on multiple body-worn cameras:
Defendant Holland detained Responding Party because her mother exercised her right to refuse
to cooperate with a consensual encounter and for being Black. There was absolutely no
information from any source whatsoever that Responding Party was engaged in, or about to
engage in, any criminal activity whatsoever. Responding Party exited the vehicle, in response to
which Defendant Holland told her she was being detained. None of the defendants could explain
why Responding Party was being detained. Defendant Holland made the decision to detain
Responding Party and Defendants Pope and Leeper, knowing there was no reasonable suspicion
of criminal activity on the part of Responding Party, carried out the detention by handcuffing and
forcing Responding Party into a police vehicle. Other deputies, whose identities are known to
Defendants, also failed to intercede despite knowledge that the detention and arrest were
unlawful. Eventually, Defendant De Sousa arrived on scene and, despite knowing that Plaintiffs
were innocent, allowed them to remain in handcuffs in police vehicles for several additional
minutes. Defendant Holland ostensibly suspected Plaintiffs of being potentially engaged in
criminal behavior based entirely on the color of their skin, as even by his own admission the only
auto burglaries that had been committed in the vicinity involved potential suspects who were
males. In addition, Defendant Holland was clearly unhappy about a Black woman refusing to
cooperate with his investigation and decided to retaliate against her for her lawful exercise of her
right not to cooperate in a consensual encounter by arresting her and using force on her.
Defendant Pope and potentially other deputies (whose identities are known to Defendants)
searched Responding Party's bag and/or wallet without a warrant, consent, or other legal
justification, thereby violating her Fourth Amendment rights and her privacy. Defendant County
of Alameda is liable to Responding Party (1) vicariously for state law claims under Government
Code Section 815.2, (2) for failing to train its deputies on the issues of search, seizure, use of
force, and racial profiling, and (3) for approving, adopting, and/or ratifying the actions of the
Defendant Deputies. The individual defendants intended to injure Responding Party and deprive
her of her rights, or did so with a conscious disregard for her rights, entitling Plaintiff to punitive

1    damages. Discovery is in its earliest stages and Responding Party reserves the right to

2    supplement this response upon discovery of additional facts.

3    **INTERROGATORY NO. 6:**

4        Describe any search and/or seizure of your person, place, vehicle or property during the

5    INCIDENT that YOU contend was unlawful.

6    **RESPONSE TO INTERROGATORY NO. 6:**

7        Responding Party's person was seized when she was told that she was being detained

8    (and thus not free to leave) by Defendant Holland. The seizure ripened into a de facto arrest

9    when Responding Party was placed in handcuffs, and held in the backseat of a police car for

10    more than an hour. Responding Party's belongings were searched by Defendants and/or other

11    deputies, while Responding Party was in the back of the police car.

12    **INTERROGATORY NO. 7:**

13        State all facts that support YOUR contention that any search by DEFENDANTS of your

14    person, place, vehicle or property during the INCIDENT was unreasonable.

15    **RESPONSE TO INTERROGATORY NO. 7:**

16        Defendants searched Responding Party's belongings without a warrant, without

17    reasonable suspicion to detain or probable cause to arrest her, without consent, and without any

18    other legal justification. Such searches are per se unreasonable.

19    **INTERROGATORY NO. 8:**

20        State all facts that support YOUR contention that any seizure by DEFENDANTS of your

21    person, place, vehicle or property during the INCIDENT was unreasonable.

22    **RESPONSE TO INTERROGATORY NO. 8:**

23        Defendant Holland claimed that he was investigating previous auto break-ins in the

24    vicinity where he encountered Plaintiffs. However, none of those alleged crimes involved Black

25    women. Thus, there was no reasonable suspicion to believe Plaintiffs were involved in those

26    crimes. Nonetheless, Deputy Holland demanded that Responding Party's mother provide her

27    identification, and persisted in demanding it after she declined to provide it. Defendant Holland

28    thereafter informed all Plaintiffs they were being detained. Even though there remained no facts

that would have tied any of the Plaintiffs to any criminal activity whatsoever, Defendants

handcuffed all three Plaintiffs and placed them in police cars for more than an hour and then

searched the vehicle and Plaintiffs' belongings, seizing some of their belongings, including cell

phones and drivers' licenses, without any justification or legal basis.

**INTERROGATORY NO. 9:**

State all facts that support YOUR contention that any force used by DEFENDANTS

upon you during the INCIDENT was unreasonable.

**RESPONSE TO INTERROGATORY NO. 9:**

Responding Party did not commit any crimes and there were no facts known to any

Defendants at the time of the incident that would link Responding Party to any crimes. Further,

Responding Party never did or said anything that would place any of the Defendants in

reasonable fear of harm at any time. Therefore, there was no justification at all for using physical

force on Responding Party. As such, any force was unreasonable and excessive. By grabbing her

arms, placing handcuffs on her, forcing her into a police car and forcing her to remain there for

more than an hour, and refusing to loosen her handcuffs after repeated complaints of pain, all

constituted excessive, unreasonable, and unconstitutional uses of force.

**INTERROGATORY NO. 10:**

State all facts that support YOUR contention that DEFENDANTS did not have probable

cause to arrest you during the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 10:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous,

overbroad, and seeks facts to prove a negative, which is difficult if not impossible. Without

waiving the foregoing objections, and subject thereto, Responding Party states: Responding

Party was sitting in a vehicle in the parking lot near 2720 Castro Valley Boulevard in Castro

Valley on the morning of September 20, 2019 when Defendants Holland and Pope approached

the vehicle. Deputy Holland claims he was aware of auto burglaries in the vicinity and was

investigating them at the time. However, the only information about auto burglaries in that area

were that they may have been committed by Black males. In one of those incidents a witness

8

1 | indicated that there was a suspicious silver four-door vehicle in the parking lot near the time of
2 | the break-in, but did not tie that vehicle directly to the crime. No reasonable police officer would
3 | believe Plaintiffs – three Black women simply sitting in a silver Cadillac sedan – had any
4 | connection with the auto burglaries. While Defendant Holland was permitted to initiate a
5 | consensual encounter with Plaintiffs, he was not permitted to demand that Responding Party's
6 | mother provide her identification, and was certainly not permitted to detain and arrest
7 | Responding Party simply on an unfounded hunch. There were no other crimes that Plaintiffs
8 | committed, nor any facts known to any Defendants that would suggest otherwise. The arrest,
9 | detention, and search and seizure of Plaintiffs and their belongings was racially motivated in that
10 | Plaintiffs are Black and some individuals suspected in other alleged incidents were Black. The
11 | Fourth Amendment does not permit law enforcement officials to arrest people for being Black,
12 | which is exactly what Defendants did to Responding Party.

13 | **INTERROGATORY NO. 11:**

14 | State all facts that support YOUR contention that DEFENDANTS did not have
15 | reasonable suspicion to detain you during the INCIDENT.

16 | **RESPONSE TO INTERROGATORY NO. 11:**

17 | Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous,
18 | overbroad, and seeks facts to prove a negative, which is difficult if not impossible. Without
19 | waiving the foregoing objections, and subject thereto, Responding Party states: Responding
20 | Party was sitting in a vehicle in the parking lot near 2720 Castro Valley Boulevard in Castro
21 | Valley on the morning of September 20, 2019 when Defendants Holland and Pope approached
22 | the vehicle. Deputy Holland claims he was aware of auto burglaries in the vicinity and was
23 | investigating them at the time. However, the only information about auto burglaries in that area
24 | were that they may have been committed by Black males. In one of those incidents a witness
25 | indicated that there was a suspicious silver four-door vehicle in the parking lot near the time of
26 | the break-in, but did not tie that vehicle directly to the crime. No reasonable police officer would
27 | believe Plaintiffs – three Black women simply sitting in a silver Cadillac sedan – had any
28 | connection with the auto burglaries. While Deputy Holland was permitted to initiate a consensual

9

1 encounter with Plaintiffs, he was not permitted to demand that Responding Party's mother
2 provide her identification, and was certainly not permitted to detain and arrest Responding Party
3 simply on an unfounded hunch. There were no other crimes that Plaintiffs committed, nor any
4 facts known to any Defendants that would suggest otherwise. The arrest, detention, and search
5 and seizure of Plaintiffs and their belongings was racially motivated in that Plaintiffs are Black
6 and some individuals suspected in other alleged incidents were Black. The Fourth Amendment
7 does not permit law enforcement officials to arrest people for being Black, which is exactly what
8 Defendants did to Responding Party.

9 **INTERROGATORY NO. 12:**

10     State all facts that support YOUR contention that DEFENDANTS were not authorized to
11 use force against you during the INCIDENT.

12 **RESPONSE TO INTERROGATORY NO. 12:**

13     Responding Party did not commit any crimes and there were no facts known to any
14 Defendants at the time of the incident that would link Responding Party to any crimes. Further,
15 Responding Party never did or said anything that would place any of the Defendants in
16 reasonable fear of harm at any time. Therefore, there was no justification at all for using physical
17 force on Responding Party. As such, any force was unreasonable and excessive. By pulling her
18 arms behind her back, placing handcuffs on her, forcing her into a police car and forcing her to
19 remain there for more than an hour, and refusing to loosen her handcuffs after she complained of
20 pain, all constituted excessive, unreasonable, and unconstitutional uses of force.

21 **INTERROGATORY NO. 13:**

22     State all facts that support YOUR contention that DEFENDANTS acted with unlawful
23 animus toward you, including, but not limited to, racial animus, retaliatory animus against the
24 exercise of constitutional rights, or other discriminatory animus of any kind.

25 **RESPONSE TO INTERROGATORY NO. 13:**

26     Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous,
27 overbroad, and compound. Without waiving the foregoing objections, and subject thereto,
28 Responding Party states: Responding Party was sitting in a vehicle in the parking lot near 2720

10

Castro Valley Boulevard in Castro Valley on the morning of September 20, 2019 when Defendants Holland and Pope approached the vehicle. Defendant Holland claims he was aware of auto burglaries in the vicinity and was investigating them at the time. However, the only information about auto burglaries in that area were that they may have been committed by Black males. In one of those incidents a witness indicated that there was a suspicious silver four-door vehicle in the parking lot near the time of the break-in, but did not tie that vehicle directly to the crime. No reasonable police officer would believe Plaintiffs – three Black women simply sitting in a silver Cadillac sedan – had any connection with the auto burglaries. No reasonable police officer would believe Plaintiffs – three Black women simply sitting in a silver Cadillac sedan – had any connection with the auto burglaries. The fact that Defendants would detain, arrest, search, and seize the belongings of Plaintiffs based on the information he had strongly suggests that they were basing their actions on the fact that Plaintiffs were Black and/or Responding Party's mother's exercise of her right to refuse to show her identification during a consensual encounter. Defendants also inferably retaliated against Responding Party for refusing to cooperate in a consensual encounter and for questioning their authority; in other words, Responding Party was arrested for "contempt of cop." While Responding Party cannot know with certainty what was in the Defendants' minds, the fact that no information supported a reasonable belief that Plaintiffs were engaged in any criminal activity is strong circumstantial evidence that Defendants acted with racial animus, malice, and retaliatory animus.

**INTERROGATORY NO. 14:**

Identify all policies and/or customs of DEFENDANTS which YOU contend caused or contributed to the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 14:**

Defendant County of Alameda fails to train its deputies that they are not allowed to demand a person's identification during a consensual encounter. Defendant County of Alameda has insufficient training and written policies prohibiting and avoiding illegal racial profiling, racial bias, and race discrimination. Defendant County of Alameda has a widespread practice and informal policy of tolerating, approving, ratifying, and encouraging deputies to make illegal

detentions and arrests without reasonable suspicions or probable cause, and based on the subject's race or other protected classification.

**INTERROGATORY NO. 15:**

State all facts which support YOUR contention that each individual Defendant is liable to you for the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 15:**

Responding Party objects to this interrogatory on the grounds that it is compound and duplicative of previous interrogatories. Without waiver, please see the foregoing responses.

**INTERROGATORY NO. 16:**

Identify all places of employment by name, address, telephone number, dates of employment and rate of pay that you have had since January 1, 2014 to the present.

**RESPONSE TO INTERROGATORY NO. 16:**

Responding Party objects to this interrogatory on the grounds that it seeks information not relevant to any claims or defenses, nor reasonably calculated to lead to the discovery of admissible evidence in that there are no wage loss claims being asserted, is burdensome, harassing, oppressive, and abusive, and seeks information protected by Responding Party's right to privacy.

**INTERROGATORY NO. 17:**

Identify all places of education (beginning with high school) by address, phone number, date of attendance and any/all degrees received by you.

**RESPONSE TO INTERROGATORY NO. 17:**

Responding Party objects to this interrogatory on the grounds that it seeks information not relevant to any claims or defenses, nor reasonably calculated to lead to the discovery of admissible evidence in that there are no wage loss claims being asserted (or any other claim that relates to Responding Party's education history), is burdensome, harassing, oppressive, and abusive, and seeks information protected by Responding Party's right to privacy.

/ / /

/ / /

**INTERROGATORY NO. 18:**

Identify all prior interactions between you and any law enforcement officer between January 1, 2015 to the current, including identifying the date and substance of each interaction as well as the agency of the officer(s).

**RESPONSE TO INTERROGATORY NO. 18:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, and overbroad with respect to the term "interactions," seeks information not relevant to any claims or defenses, nor reasonably calculated to lead to the discovery of admissible evidence, is burdensome, harassing, oppressive, and abusive, and seeks information protected by Responding Party's right to privacy.

**INTERROGATORY NO. 19:**

Describe your journey leading to your arrival at the location of the INCIDENT, including, but not limited to, when and where you began your journey, your intended destination(s), the purpose(s) of your journey, the time, location and circumstances related to all stops you made along the way and the time and circumstances surrounding your arrival at the location of the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 19:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, compound, overbroad, seeks information not relevant to any claims or defenses, nor reasonably calculated to lead to the discovery of admissible evidence, is burdensome, harassing, oppressive, and abusive, and may seek information protected by Responding Party's right to privacy.

**INTERROGATORY NO. 20:**

State every address – whether residential, mailing, business, or otherwise – you have had from January 1, 2014 to the present.

**RESPONSE TO INTERROGATORY NO. 20:**

Responding Party objects to this interrogatory on the grounds that it seeks information not relevant to any claims or defenses, nor reasonably calculated to lead to the discovery of

1  admissible evidence, is burdensome, harassing, oppressive, and abusive, and seeks information

2  protected by Responding Party's right to privacy.

3  **INTERROGATORY NO. 21:**

4      If YOU contend that at any time during the INCIDENT you were not required to provide

5  to the DEPUTIES your identification, including but not limited to a copy of your driver's license

6  or identification card, state the factual basis for YOUR contention.

7  **RESPONSE TO INTERROGATORY NO. 21:**

8      Responding Party objects to this interrogatory on the grounds that it calls for a legal

9  conclusion. Without waiving the foregoing objection, and subject thereto, Responding Party

10  states: Responding Party was not stopped or pulled over for a traffic violation. She was not

11  operating the vehicle when she was approached. While Defendants never asked Responding

12  Party for her identification, even if they had done so she was not required to comply because it

13  was merely a consensual encounter and a citizen is not required to produce identification during

14  such an interaction. After Responding Party was detained and then arrested, she still was not

15  asked to provide identification but even if she was, she still would not be required to provide it

16  because the detention and arrest were unlawful as explained in responses to other interrogatories.

17  **INTERROGATORY NO. 22:**

18      If YOU contend that you were not required by law to comply with the DEPUTIES'

19  directives to you during the INCIDENT, state the factual basis for this contention.

20  **RESPONSE TO INTERROGATORY NO. 22:**

21      Responding Party objects to this interrogatory on the grounds that it calls for a legal

22  conclusion. Without waiving the foregoing objection, and subject thereto, Responding Party

23  states: Responding Party was a passenger in a parked vehicle when Defendant Holland initiated a

24  consensual encounter with Responding Party's mother, who was in the driver's seat. None of the

25  Plaintiffs were stopped or pulled over for a traffic violation. Defendant Holland's only stated

26  reason for initiating the encounter was that he was ostensibly investigating auto burglaries in the

27  vicinity. At some point during the encounter, Responding Party exited the vehicle and recorded

28  the deputies on her cell phone video camera. At a certain point, Defendant Holland stated that

14

1  she was being detained. While Responding Party was told to go back inside the vehicle, she was

2  not obligated to do so, because there was no reasonable suspicion to detain her and certainly no

3  probable cause to arrest her.

4  **INTERROGATORY NO. 23:**

5        If YOU contend that at any time during the INCIDENT you were allowed under the law

6  to resist and/or refuse to comply with any command and/or directive given by the DEPUTIES,

7  state the factual basis for this contention.

8  **RESPONSE TO INTERROGATORY NO. 23:**

9        Responding Party objects to this interrogatory on the grounds that it calls for a legal

10  conclusion. Without waiving the foregoing objection, and subject thereto, Responding Party

11  states: Responding Party was a passenger in a parked vehicle when Defendant Holland initiated a

12  consensual encounter with Responding Party's mother, who was in the driver's seat. None of the

13  Plaintiffs were stopped or pulled over for a traffic violation. Defendant Holland's only stated

14  reason for initiating the encounter was that he was ostensibly investigating auto burglaries in the

15  vicinity. At some point during the encounter, Responding Party exited the vehicle and recorded

16  the deputies on her cell phone video camera. At a certain point, Defendant Holland stated that

17  she was being detained. While Responding Party was told to go back inside the vehicle, she was

18  not obligated to do so, because there was no reasonable suspicion to detain her and certainly no

19  probable cause to arrest her.

20  **INTERROGATORY NO. 24:**

21        If YOU contend that anything about your detention during the INCIDENT was

22  unreasonable, state the factual basis for this contention.

23  **RESPONSE TO INTERROGATORY NO. 24:**

24        Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous,

25  overbroad, duplicative of numerous other interrogatories, burdensome, compound, harassing,

26  oppressive, and abusive. Without waiver, please see all of the other responses.

27  ///

28  ///

**INTERROGATORY NO. 25:**

If YOU contend that any search of your person, place, vehicle or property during the INCIDENT revealed anything that was sensitive, personal, private, confidential, privileged, embarrassing or otherwise of a nature that its revelation would cause a reasonable person offense, concern, pain or distress, state the factual basis for this contention.

**RESPONSE TO INTERROGATORY NO. 25:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, compound, calls for speculation, lacks foundation, and seeks information not relevant to any claims or defenses nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party does not know exactly what the Defendant deputies observed during their searches of the vehicle and personal belongings because Responding Party was handcuffed in a police car at the time and could not see everything that was happening. Responding Party is informed and believes and thereon alleges that one or more defendant searched Responding Party's bag and/or wallet, which are private and sensitive in and of themselves. Discovery is in its earliest stage and Responding party reserves the right to supplement this response upon discovery of additional facts.

Dated: December 17, 2020

LAW OFFICE OF JOSEPH S. MAY
and
GEARINGER LAW GROUP


*/s/ Joseph S. May*
By: JOSEPH S. MAY
Attorneys for Plaintiffs

16

1
2
3

## VERIFICATION

4

I, Aaottae Loggervale, declare:

5
6

I am one of the Plaintiffs in this action. I am familiar with the contents of the

7

**PLAINTIFF AAOATTAE LOGGERVALE'S RESPONSES TO INTERROGATORIES**

8

**FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE.** The information supplied

9

therein by me is based on my own personal knowledge and/or other agents and/or compiled from

10

available documents and is therefore provided as required by law. The information contained in

11

the document is true, except as to that the matters which were provided by other agents or

12

compiled from available documents, including all contentions and opinions, and, as to those

13

matters, I am informed and believe that they are true

14

I declare under penalty of perjury that the foregoing is true and correct to the best of my

15

knowledge and belief.

16

Executed on December 16, 2020 at Miami, Florida.

17
18
19
20

Aaottae Loggervale

21
22
23
24
25
26
27
28

17

# PROOF OF SERVICE

*Loggervale, et al., v. County of Alameda, et al.*
United States District Court for the Northern District of California
Case Number C20-4679-WHA

I declare that I am a United States citizen, over eighteen and not a party to this action. My business address is 740 Fourth Street, Santa Rosa, California 95404. On the below date I served:

**PLAINTIFF AAOTTAE LOGGERVALE'S RESPONSES TO INTERROGATORIES FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE**

on the interested party or parties as indicated below, addressed as follows:

Kevin E. Gilbert, Esq. kgilbert@ohshlaw.com
Christopher R. Creech, Esq. ccreech@ohshlaw.com
Orbach Huff Suarez & Henderson, LLP
6210 Stoneridge Mall Rd., Ste. 210
Pleasanton, CA 94588
*Attorneys for Defendants*

☐ **MAIL**[1] ☐ **CERTIFIED MAIL**[2] ☐ **NEXT-DAY SERVICE**[3]
☐ **HAND DELIVERY**[4] ☐ **FACSIMILE**[5] ☒ **EMAIL**[6]

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed December 17, 2020, at Santa Rosa, California.

MIKE KECK

---

[1] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in the office's usual location for mailing with the USPS.

[2] I personally served the document(s) as mail described above, and certified it with return receipt requested.

[3] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in a regularly used drop box by an overnight delivery service.

[4] I personally sealed the document(s) in a package, addressed as indicated above. I caused such envelope to be hand-delivered by a same-day messenger service to the addressee(s) on this date.

[5] I personally faxed the document(s) addressed as indicated above. No error was reported by the sending machine. The transmission record for this facsimile complies with California Rule of Court 2003(6).

[6] I personally electronically served the document(s) to the electronic mailing address indicated above

18

# EXHIBIT S

Joseph S. May   SBN 245924
LAW OFFICE OF JOSEPH S. MAY
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel: (415) 781-3333
Fax: (415) 707-6600
joseph@josephmaylaw.com

Brian Gearinger   SBN 146125
GEARINGER LAW GROUP
740 Fourth Street
Santa Rosa, CA 95404
Tel: (415) 440-3102
brian@gearingerlaw.com

Attorneys for Plaintiffs
AASYLEI LOGGERVALE,
AASYLEI HARDGE-LOGGERVALE, and
AAOTTAE LOGGERVALE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; KEITH LEEPER; ANTHONY DeSOUSA; and DOES 1 to 50, inclusive, <br><br> Defendants. | CASE NO. C20-4679-WHA <br><br> **PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO REQUESTS FOR ADMISSIONS FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE** <br><br> Action Filed:  July 14, 2020 <br> Trial Date:     November 29, 2021 |

RESPONDING PARTY:          AASYLEI LOGGERVALE

PROPOUNDING PARTY:        COUNTY OF ALAMEDA

SET NUMBER:                      ONE

1

1         3.  Discovery and investigation are continuing in this matter, and Responding Party

2    reserves the right to amend these responses should additional responsive information be

3    discovered or obtained.

4    **RESPONSE TO REQUESTS FOR ADMISSIONS**

5    **REQUEST FOR ADMISSION NO. 1:**

6         Admit that DEFENDANTS had probable cause to arrest you during the INCIDENT.

7    **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

8         Deny.

9    **REQUEST FOR ADMISSION NO. 2:**

10        Admit that DEFENDANTS had reasonable suspicion to detain you during the

11   INCIDENT.

12   **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

13        Deny.

14   **REQUEST FOR ADMISSION NO. 3:**

15        Admit that any force used by any Alameda County Sheriff's Deputies during the

16   INCIDENT was objectively reasonable.

17   **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

18        Deny.

19   **REQUEST FOR ADMISSION NO. 4:**

20        Admit that prior to being placed in handcuffs during the INCIDENT, AASYLEI

21   LOGGERVALE refused to voluntarily provide her driver's license.

22   **RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

23        Admit.

24   **REQUEST FOR ADMISSION NO. 5:**

25        Admit that prior to being placed in handcuffs during the INCIDENT, AASYLEI

26   LOGGERVALE refused to voluntarily identify herself.

27   **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

28        Admit.

3

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

Responding Party objects to this request on the grounds that it lacks foundation and calls for speculation. Without waiving the foregoing objections, and subject thereto, Responding Party states: Deny.

**REQUEST FOR ADMISSION NO. 27:**

Admit that during the INCIDENT, AASYLEI HARDGE-LOGGERVALE struck Defendant DEPUTY MONICA POPE with her car door.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Responding Party objects to this request on the grounds that it lacks foundation and calls for speculation. Without waiving the foregoing objections, and subject thereto, Responding Party states: Deny.

**REQUEST FOR ADMISSION NO. 28:**

Admit that during the INCIDENT, AASYLEI LOGGERVALE struck Defendant DEPUTY STEVEN HOLLAND with her car door.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Deny.

**REQUEST FOR ADMISSION NO. 29:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY STEVEN HOLLAND ordered AASYLEI HARDGE-LOGGERVALE multiple times to re-enter her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Admit.

**REQUEST FOR ADMISSION NO. 30:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY STEVEN HOLLAND told AASYLEI HARDGE-LOGGERVALE multiple times if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

/ / /

9

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

Admit.

**REQUEST FOR ADMISSION NO. 31:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE ordered AASYLEI HARDGE-LOGGERVALE multiple times to re-enter her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

Admit.

**REQUEST FOR ADMISSION NO. 32:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE told AASYLEI HARDGE-LOGGERVALE multiple times if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

Deny.

**REQUEST FOR ADMISSION NO. 33:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE told AASYLEI HARDGE-LOGGERVALE multiple times if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

Responding Party objects to this request on the grounds that it is duplicative of Request No. 32.

**REQUEST FOR ADMISSION NO. 34:**

Admit that during the INCIDENT, after exiting her vehicle and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, AASYLEI HARDGE-LOGGERVALE never re-entered her vehicle.

10

**RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

Admit.

**REQUEST FOR ADMISSION NO. 35:**

Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being handcuffed, Defendant DEPUTY STEVEN HOLLAND ordered AAOTTAE LOGGERVALE to re-enter her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

Admit.

**REQUEST FOR ADMISSION NO. 36:**

Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being handcuffed, Defendant DEPUTY STEVEN HOLLAND told AAOTTAE LOGGERVALE if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

Admit.

**REQUEST FOR ADMISSION NO. 37:**

Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE ordered AAOTTAE LOGGERVALE to re-enter her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

Admit.

**REQUEST FOR ADMISSION NO. 38:**

Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE told AAOTTAE LOGGERVALE multiple times if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

Deny.

/ / /

/ / /

11

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO REQ. FOR ADMISSIONS FROM DEF'T COUNTY OF ALAMEDA, SET ONE

**REQUEST FOR ADMISSION NO. 39:**

Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE told AAOTTAE LOGGERVALE if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

Admit.

**REQUEST FOR ADMISSION NO. 40:**

Admit that during the INCIDENT, after exiting her vehicle and prior to AAOTTAE LOGGERVALE being handcuffed, AAOTTAE LOGGERVALE never re-entered her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 40:**

Admit.

**REQUEST FOR ADMISSION NO. 41:**

Admit that during the INCIDENT, you had no basis to use force against the DEPUTIES.

**RESPONSE TO REQUEST FOR ADMISSION NO. 41:**

Responding Party objects to this request on the grounds that it is vague and ambiguous, calls for a legal conclusion, and assumes that she used force against Defendants, which she did not do. Without waiving the foregoing objections, and subject thereto, Responding Party states: Deny that Responding Party used force against Defendants. Deny that there was no basis to use force against Defendants.

**REQUEST FOR ADMISSION NO. 42:**

Admit that the DEPUTIES were authorized to use reasonable force against you during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 42:**

Deny.

**REQUEST FOR ADMISSION NO. 43:**

Admit that immediately prior to the INCIDENT, you had been asleep in your car since before 5:00 a.m.

///

12

**RESPONSE TO REQUEST FOR ADMISSION NO. 49:**

Deny.

**REQUEST FOR ADMISSION NO. 50:**

Admit that Defendant DEPUTY STEVEN HOLLAND did not use force against you during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 50:**

Deny.

**REQUEST FOR ADMISSION NO. 51:**

Admit that Defendant DEPUTY MONICA POPE did not use force against you during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 51:**

Admit.

**REQUEST FOR ADMISSION NO. 52:**

Admit that Defendant DEPUTY KEITH LEEPER did not use force against you during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 52:**

Admit.

**REQUEST FOR ADMISSION NO. 53:**

Admit that Defendant LIEUTENANT ANTHONY DeSOUSA did not use force against you during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 53:**

Deny.

**REQUEST FOR ADMISSION NO. 54:**

Admit that YOU do not know when Defendant LIEUTENANT ANTHONY DeSOUSA arrived on scene during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 54:**

Deny.

14

**RESPONSE TO REQUEST FOR ADMISSION NO. 59:**

Deny.

**REQUEST FOR ADMISSION NO. 60:**

Admit that within the six months prior to the INCIDENT, the suspects to several automotive burglaries in the parking lot for the Starbucks located at 2720 Castro Valley Boulevard in Castro Valley had been identified as using a silver four-door sedan.

**RESPONSE TO REQUEST FOR ADMISSION NO. 60:**

Deny.

**REQUEST FOR ADMISSION NO. 61:**

Admit that you did not comply with all of the Alameda County Sheriff's Deputies' directives to you during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 61:**

Responding Party objects to this request on the grounds that it is vague, ambiguous, assume facts (loaded), since it suggests there were more than one directive given. Without waiving the foregoing objections, and subject thereto, Responding Party states: Admit that Responding Party did not furnish her identification when Defendant Holland demanded her to do so as part of his alleged investigation into auto burglaries. Deny that Responding Party failed to comply with any other directives.

**REQUEST FOR ADMISSION NO. 62:**

Admit that the only force used against you by the DEPUTIES during the INCIDENT was to place handcuffs upon you and lead you to a patrol vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 62:**

Deny.

**REQUEST FOR ADMISSION NO. 63:**

Admit that the search of you, your belongings, or your vehicle by the DEPUTIES during the INCIDENT was lawful.

**RESPONSE TO REQUEST FOR ADMISSION NO. 63:**

Deny.

16

**REQUEST FOR ADMISSION NO. 64:**

Admit that any search of your belongings or your vehicle during the INCIDENT was limited to retrieving your identification card and/or driver's license.

**RESPONSE TO REQUEST FOR ADMISSION NO. 64:**

Deny.

**REQUEST FOR ADMISSION NO. 65:**

Admit that any search of you during the INCIDENT was limited to a pat search for weapons.

**RESPONSE TO REQUEST FOR ADMISSION NO. 65:**

Responding Party objects to this request as vague, ambiguous, and confusing. Without waiving the foregoing objections, and subject thereto, Responding Party states: Deny.

**REQUEST FOR ADMISSION NO. 66:**

Admit that during the INCIDENT, no one employed by the COUNTY made any statement that indicated they were acting from unlawful animus, including, but not limited to, racial animus, retaliatory animus against the exercise of constitutional rights, or other discriminatory animus of any kind.

**RESPONSE TO REQUEST FOR ADMISSION NO. 66:**

Deny.

**REQUEST FOR ADMISSION NO. 67:**

Admit that during the INCIDENT, you did not sustain any injury that required medical attention, including, but not limited to, treatment by a medical or psychological professional.

**RESPONSE TO REQUEST FOR ADMISSION NO. 67:**

Responding Party objects to this request on the grounds that it is vague, ambiguous, and calls for medical opinion. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party lacks sufficient information at this time to admit or deny since she is not a medical or mental health professional.

**REQUEST FOR ADMISSION NO. 68:**

Admit that during the INCIDENT, you did not sustain any injury for which you sought

17

1 treatment, including, but not limited to, treatment by a medical or psychological professional.

2 **RESPONSE TO REQUEST FOR ADMISSION NO. 68:**

3     Admit.

4 **REQUEST FOR ADMISSION NO. 69:**

5     Admit that other than the alleged emotional distress, you did not sustain any other

6 damages during the INCIDENT.

7 **RESPONSE TO REQUEST FOR ADMISSION NO. 69:**

8     Deny.

9 **REQUEST FOR ADMISSION NO. 70:**

10     Admit that you have not lost any wages as a result of the INCIDENT.

11 **RESPONSE TO REQUEST FOR ADMISSION NO. 70:**

12     Admit.

13 **REQUEST FOR ADMISSION NO. 71:**

14     Admit that you have not lost any earning capacity as a result of the INCIDENT.

15 **RESPONSE TO REQUEST FOR ADMISSION NO. 71:**

16     Admit.

17 Dated: December 17, 2020                     LAW OFFICE OF JOSEPH S. MAY
and
18                                           GEARINGER LAW GROUP

19

20                                         */s/ Joseph S. May*
21                                         By: JOSEPH S. MAY
22                                         Attorneys for Plaintiffs

23

24

25

26

27

28

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO REQ. FOR ADMISSIONS FROM DEF'T COUNTY OF ALAMEDA, SET ONE

# PROOF OF SERVICE

*Loggervale, et al., v. County of Alameda, et al.*
United States District Court for the Northern District of California
Case Number C20-4679-WHA

I declare that I am a United States citizen, over eighteen and not a party to this action. My business address is 740 Fourth Street, Santa Rosa, California 95404. On the below date I served:

**PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO REQUESTS FOR ADMISION FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE**

on the interested party or parties as indicated below, addressed as follows:

Kevin E. Gilbert, Esq. kgilbert@ohshlaw.com
Christopher R. Creech, Esq. ccreech@ohshlaw.com
Orbach Huff Suarez & Henderson, LLP
6210 Stoneridge Mall Rd., Ste. 210
Pleasanton, CA 94588
*Attorneys for Defendants*

☐ MAIL[1]                ☐ CERTIFIED MAIL[2]        ☐ NEXT-DAY SERVICE[3]
☐ HAND DELIVERY[4]       ☐ FACSIMILE[5]             ☒ EMAIL[6]

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed December 17, 2020, at Santa Rosa, California.

*[signature]*

MIKE KECK

---

[1] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in the office's usual location for mailing with the USPS.

[2] I personally served the document(s) as mail described above, and certified it with return receipt requested.

[3] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in a regularly used drop box by an overnight delivery service.

[4] I personally sealed the document(s) in a package, addressed as indicated above. I caused such envelope to be hand-delivered by a same-day messenger service to the addressee(s) on this date.

[5] I personally faxed the document(s) addressed as indicated above. No error was reported by the sending machine. The transmission record for this facsimile complies with California Rule of Court 2003(6).

[6] I personally electronically served the document(s) to the electronic mailing address indicated above.

19

# EXHIBIT T

Joseph S. May   SBN 245924
LAW OFFICE OF JOSEPH S. MAY
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel: (415) 781-3333
Fax: (415) 707-6600
joseph@josephmaylaw.com

Brian Gearinger   SBN 146125
GEARINGER LAW GROUP
740 Fourth Street
Santa Rosa, CA 95404
Tel: (415) 440-3102
brian@gearingerlaw.com

Attorneys for Plaintiffs
AASYLEI LOGGERVALE,
AASYLEI HARDGE-LOGGERVALE, and
AAOTTAE LOGGERVALE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; KEITH LEEPER; ANTHONY DeSOUSA; and DOES 1 to 50, inclusive, <br><br> Defendants. | CASE NO. C20-4679-WHA <br><br> **PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESPONSES TO REQUESTS FOR ADMISSIONS FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE** <br><br><br> Action Filed:  July 14, 2020 <br> Trial Date:    Not set |

RESPONDING PARTY:          AASYLEI HARDGE-LOGGERVALE

PROPOUNDING PARTY:         COUNTY OF ALAMEDA

SET NUMBER:                ONE

1

**REQUEST FOR ADMISSION NO. 3:**

Admit that any force used by any Alameda County Sheriff's Deputies during the INCIDENT was objectively reasonable.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Deny.

**REQUEST FOR ADMISSION NO. 4:**

Admit that prior to being placed in handcuffs during the INCIDENT, AASYLEI LOGGERVALE refused to voluntarily provide her driver's license.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Admit.

**REQUEST FOR ADMISSION NO. 5:**

Admit that prior to being placed in handcuffs during the INCIDENT, AASYLEI LOGGERVALE refused to voluntarily identify herself.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Deny.

**REQUEST FOR ADMISSION NO. 6:**

Admit that under California Vehicle Code section 12951, AASYLEI LOGGERVALE was required to provide her driver's license to the DEPUTIES during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Deny.

**REQUEST FOR ADMISSION NO. 7:**

Admit that AASYLEI LOGGERVALE violated California Vehicle Code section 12951 by refusing to provide her driver's license during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Deny.

**REQUEST FOR ADMISSION NO. 8:**

Admit that under California Vehicle Code section 22511.56, AASYLEI LOGGERVALE was required to provide identification to the DEPUTIES during the INCIDENT.

3

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

Deny.

**REQUEST FOR ADMISSION NO. 27:**

Admit that during the INCIDENT, AASYLEI HARDGE-LOGGERVALE struck Defendant DEPUTY MONICA POPE with her car door.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Deny.

**REQUEST FOR ADMISSION NO. 28:**

Admit that during the INCIDENT, AASYLEI LOGGERVALE struck Defendant DEPUTY STEVEN HOLLAND with her car door.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Deny.

**REQUEST FOR ADMISSION NO. 29:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY STEVEN HOLLAND ordered AASYLEI HARDGE-LOGGERVALE multiple times to re-enter her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Admit.

**REQUEST FOR ADMISSION NO. 30:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY STEVEN HOLLAND told AASYLEI HARDGE-LOGGERVALE multiple times if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

Admit.

/ / /

/ / /

/ / /

**REQUEST FOR ADMISSION NO. 31:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE ordered AASYLEI HARDGE-LOGGERVALE multiple times to re-enter her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

Admit.

**REQUEST FOR ADMISSION NO. 32:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE told AASYLEI HARDGE-LOGGERVALE multiple times if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

Deny.

**REQUEST FOR ADMISSION NO. 33:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE told AASYLEI HARDGE-LOGGERVALE multiple times if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

Responding Party objects to this request on the grounds that it is duplicative of Request No. 32.

**REQUEST FOR ADMISSION NO. 34:**

Admit that during the INCIDENT, after exiting her vehicle and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, AASYLEI HARDGE-LOGGERVALE never re-entered her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

Admit.

/ / /

**REQUEST FOR ADMISSION NO. 35:**

Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being handcuffed, Defendant DEPUTY STEVEN HOLLAND ordered AAOTTAE LOGGERVALE to re-enter her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

Admit.

**REQUEST FOR ADMISSION NO. 36:**

Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being handcuffed, Defendant DEPUTY STEVEN HOLLAND told AAOTTAE LOGGERVALE if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

Deny.

**REQUEST FOR ADMISSION NO. 37:**

Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE ordered AAOTTAE LOGGERVALE to re-enter her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

Admit.

**REQUEST FOR ADMISSION NO. 38:**

Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE told AAOTTAE LOGGERVALE multiple times if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

Admit.

**REQUEST FOR ADMISSION NO. 39:**

Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE told AAOTTAE LOGGERVALE if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

10

**RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

Admit.

**REQUEST FOR ADMISSION NO. 40:**

Admit that during the INCIDENT, after exiting her vehicle and prior to AAOTTAE LOGGERVALE being handcuffed, AAOTTAE LOGGERVALE never re-entered her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 40:**

Admit.

**REQUEST FOR ADMISSION NO. 41:**

Admit that during the INCIDENT, you had no basis to use force against the DEPUTIES.

**RESPONSE TO REQUEST FOR ADMISSION NO. 41:**

Deny.

**REQUEST FOR ADMISSION NO. 42:**

Admit that the DEPUTIES were authorized to use reasonable force against you during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 42:**

Deny.

**REQUEST FOR ADMISSION NO. 43:**

Admit that immediately prior to the INCIDENT, you had been asleep in your car since before 5:00 a.m.

**RESPONSE TO REQUEST FOR ADMISSION NO. 43:**

Deny.

**REQUEST FOR ADMISSION NO. 44:**

Admit that the INCIDENT was not caused in whole or in part by any DEFENDANTS' policy, practice or custom.

**RESPONSE TO REQUEST FOR ADMISSION NO. 44:**

Deny.

**REQUEST FOR ADMISSION NO. 45:**

Admit that Defendant COUNTY OF ALAMEDA is not liable to you for the INCIDENT.

11

**RESPONSE TO REQUEST FOR ADMISSION NO. 45:**

Deny.

**REQUEST FOR ADMISSION NO. 46:**

Admit that Defendant DEPUTY STEVEN HOLLAND is not liable to you for the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 46:**

Deny.

**REQUEST FOR ADMISSION NO. 47:**

Admit that Defendant DEPUTY MONICA POPE is not liable to you for the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 47:**

Deny.

**REQUEST FOR ADMISSION NO. 48:**

Admit that Defendant DEPUTY KEITH LEEPER is not liable to you for the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 48:**

Deny.

**REQUEST FOR ADMISSION NO. 49:**

Admit that Defendant LIEUTENANT ANTHONY DeSOUSA is not liable to you for the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 49:**

Deny.

**REQUEST FOR ADMISSION NO. 50:**

Admit that Defendant DEPUTY STEVEN HOLLAND did not use force against you during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 50:**

Admit.

**REQUEST FOR ADMISSION NO. 51:**

Admit that Defendant DEPUTY MONICA POPE did not use force against you during the INCIDENT.

12

**RESPONSE TO REQUEST FOR ADMISSION NO. 51:**

Deny.

**REQUEST FOR ADMISSION NO. 52:**

Admit that Defendant DEPUTY KEITH LEEPER did not use force against you during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 52:**

Deny.

**REQUEST FOR ADMISSION NO. 53:**

Admit that Defendant LIEUTENANT ANTHONY DeSOUSA did not use force against you during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 53:**

Admit.

**REQUEST FOR ADMISSION NO. 54:**

Admit that YOU do not know when Defendant LIEUTENANT ANTHONY DeSOUSA arrived on scene during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 54:**

Deny.

**REQUEST FOR ADMISSION NO. 55:**

Admit that YOU cannot estimate how long Defendant LIEUTENANT ANTHONY DeSOUSA was on scene during the INCIDENT before you were released from a police vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 55:**

Deny.

**REQUEST FOR ADMISSION NO. 56:**

Admit that YOU do not know what Defendant LIEUTENANT ANTHONY DeSOUSA was doing while on scene during the INCIDENT before you were released from a police vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 56:**

Deny.

/ / /

13

1 **REQUEST FOR ADMISSION NO. 57:**

2     Admit that within the six months preceding the INCIDENT, there had been several

3 automotive burglaries in the parking lot for the Starbucks located at 2720 Castro Valley

4 Boulevard in Castro Valley.

5 **RESPONSE TO REQUEST FOR ADMISSION NO. 57:**

6     Deny.

7 **REQUEST FOR ADMISSION NO. 58:**

8     Admit that within the six months prior to the INCIDENT, there had been several

9 automotive burglaries in the parking lot for the Starbucks located at 2720 Castro Valley

10 Boulevard in Castro Valley committed in the early hours of the morning before 9:00 a.m.

11 **RESPONSE TO REQUEST FOR ADMISSION NO. 58:**

12     Deny.

13 **REQUEST FOR ADMISSION NO. 59:**

14     Admit that within the six months prior to the INCIDENT, the suspects to several

15 automotive burglaries in the parking lot for the Starbucks located at 2720 Castro Valley

16 Boulevard in Castro Valley had been identified by witnesses as black or African American

17 individuals.

18 **RESPONSE TO REQUEST FOR ADMISSION NO. 59:**

19     Deny.

20 **REQUEST FOR ADMISSION NO. 60:**

21     Admit that within the six months prior to the INCIDENT, the suspects to several

22 automotive burglaries in the parking lot for the Starbucks located at 2720 Castro Valley

23 Boulevard in Castro Valley had been identified as using a silver four-door sedan.

24 **RESPONSE TO REQUEST FOR ADMISSION NO. 60:**

25     Deny.

26 **REQUEST FOR ADMISSION NO. 61:**

27     Admit that you did not comply with all of the Alameda County Sheriff's Deputies'

28 directives to you during the INCIDENT.

14

**RESPONSE TO REQUEST FOR ADMISSION NO. 61:**

Admit.

**REQUEST FOR ADMISSION NO. 62:**

Admit that the only force used against you by the DEPUTIES during the INCIDENT was to place handcuffs upon you and lead you to a patrol vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 62:**

Deny.

**REQUEST FOR ADMISSION NO. 63:**

Admit that the search of you, your belongings, or your vehicle by the DEPUTIES during the INCIDENT was lawful.

**RESPONSE TO REQUEST FOR ADMISSION NO. 63:**

Deny.

**REQUEST FOR ADMISSION NO. 64:**

Admit that any search of your belongings or your vehicle during the INCIDENT was limited to retrieving your identification card and/or driver's license.

**RESPONSE TO REQUEST FOR ADMISSION NO. 64:**

Deny.

**REQUEST FOR ADMISSION NO. 65:**

Admit that any search of you during the INCIDENT was limited to a pat search for weapons.

**RESPONSE TO REQUEST FOR ADMISSION NO. 65:**

Deny.

**REQUEST FOR ADMISSION NO. 66:**

Admit that during the INCIDENT, no one employed by the COUNTY made any statement that indicated they were acting from unlawful animus, including, but not limited to, racial animus, retaliatory animus against the exercise of constitutional rights, or other discriminatory animus of any kind.

/ / /

**RESPONSE TO REQUEST FOR ADMISSION NO. 66:**

Deny.

**REQUEST FOR ADMISSION NO. 67:**

Admit that during the INCIDENT, you did not sustain any injury that required medical attention, including, but not limited to, treatment by a medical or psychological professional.

**RESPONSE TO REQUEST FOR ADMISSION NO. 67:**

Responding Party objects to this request on the grounds that it is vague, ambiguous, and calls for medical opinion. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party lacks sufficient information at this time to admit or deny since she is not a medical or mental health professional.

**REQUEST FOR ADMISSION NO. 68:**

Admit that during the INCIDENT, you did not sustain any injury for which you sought treatment, including, but not limited to, treatment by a medical or psychological professional.

**RESPONSE TO REQUEST FOR ADMISSION NO. 68:**

Admit.

**REQUEST FOR ADMISSION NO. 69:**

Admit that other than the alleged emotional distress, you did not sustain any other damages during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 69:**

Deny.

**REQUEST FOR ADMISSION NO. 70:**

Admit that you have not lost any wages as a result of the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 70:**

Admit.

**REQUEST FOR ADMISSION NO. 71:**

Admit that you have not lost any earning capacity as a result of the INCIDENT.

/ / /

/ / /

16

1 | **RESPONSE TO REQUEST FOR ADMISSION NO. 71:**

2 |      Admit.

3 | Dated: December 17, 2020                         LAW OFFICE OF JOSEPH S. MAY
and
GEARINGER LAW GROUP

*/s/ Joseph S. May*
By: JOSEPH S. MAY
Attorneys for Plaintiffs

17

# PROOF OF SERVICE

*Loggervale, et al., v. County of Alameda, et al.*
United States District Court for the Northern District of California
Case Number C20-4679-WHA

I declare that I am a United States citizen, over eighteen and not a party to this action. My business address is 740 Fourth Street, Santa Rosa, California 95404. On the below date I served:

**PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESPONSES TO REQUESTS FOR ADMISSIONS FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE**

on the interested party or parties as indicated below, addressed as follows:

Kevin E. Gilbert, Esq. kgilbert@ohshlaw.com
Christopher R. Creech, Esq. ccreech@ohshlaw.com
Orbach Huff Suarez & Henderson, LLP
6210 Stoneridge Mall Rd., Ste. 210
Pleasanton, CA 94588
*Attorneys for Defendants*

☐ **MAIL**[1]          ☐ **CERTIFIED MAIL**[2]          ☐ **NEXT-DAY SERVICE**[3]
☐ **HAND DELIVERY**[4]          ☐ **FACSIMILE**[5]          ☒ **EMAIL**[6]

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed December 17, 2020, at Santa Rosa, California.

MIKE KECK

[1] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in the office's usual location for mailing with the USPS.

[2] I personally served the document(s) as mail described above, and certified it with return receipt requested.

[3] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in a regularly used drop box by an overnight delivery service.

[4] I personally sealed the document(s) in a package, addressed as indicated above. I caused such envelope to be hand-delivered by a same-day messenger service to the addressee(s) on this date.

[5] I personally faxed the document(s) addressed as indicated above. No error was reported by the sending machine. The transmission record for this facsimile complies with California Rule of Court 2003(6).

[6] I personally electronically served the document(s) to the electronic mailing address indicated above. Pursuant to Emergency Rules Related to COVID-19, Emergency Rule 12(b)(1), all counsel are required to accept electronic service of these documents.



**EXHIBIT U**

Joseph S. May   SBN 245924
LAW OFFICE OF JOSEPH S. MAY
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel: (415) 781-3333
Fax: (415) 707-6600
joseph@josephmaylaw.com

Brian Gearinger   SBN 146125
GEARINGER LAW GROUP
740 Fourth Street
Santa Rosa, CA 95404
Tel: (415) 440-3102
brian@gearingerlaw.com

Attorneys for Plaintiffs
AASYLEI LOGGERVALE,
AASYLEI HARDGE-LOGGERVALE, and
AAOTTAE LOGGERVALE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; KEITH LEEPER; ANTHONY DeSOUSA; and DOES 1 to 50, inclusive, <br><br> Defendants. | CASE NO. C20-4679-WHA <br><br> **PLAINTIFF AAOTTAE LOGGERVALE'S RESPONSES TO REQUESTS FOR ADMISSIONS FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE** <br><br><br> Action Filed:  July 14, 2020 <br> Trial Date:    Not set |

RESPONDING PARTY:          AAOTTAE LOGGERVALE

PROPOUNDING PARTY:       COUNTY OF ALAMEDA

SET NUMBER:                       ONE

1

**REQUEST FOR ADMISSION NO. 3:**

Admit that any force used by any Alameda County Sheriff's Deputies during the INCIDENT was objectively reasonable.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Deny.

**REQUEST FOR ADMISSION NO. 4:**

Admit that prior to being placed in handcuffs during the INCIDENT, AASYLEI LOGGERVALE refused to voluntarily provide her driver's license.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Admit.

**REQUEST FOR ADMISSION NO. 5:**

Admit that prior to being placed in handcuffs during the INCIDENT, AASYLEI LOGGERVALE refused to voluntarily identify herself.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Deny.

**REQUEST FOR ADMISSION NO. 6:**

Admit that under California Vehicle Code section 12951, AASYLEI LOGGERVALE was required to provide her driver's license to the DEPUTIES during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Deny.

**REQUEST FOR ADMISSION NO. 7:**

Admit that AASYLEI LOGGERVALE violated California Vehicle Code section 12951 by refusing to provide her driver's license during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Deny.

**REQUEST FOR ADMISSION NO. 8:**

Admit that under California Vehicle Code section 22511.56, AASYLEI LOGGERVALE was required to provide identification to the DEPUTIES during the INCIDENT.

**REQUEST FOR ADMISSION NO. 26:**

Admit that at least one of AAOTTAE LOGGERVALE'S calls to the 9-1-1 emergency number during the INCIDENT violated California Penal Code section 653y.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

Deny.

**REQUEST FOR ADMISSION NO. 27:**

Admit that during the INCIDENT, AASYLEI HARDGE-LOGGERVALE struck Defendant DEPUTY MONICA POPE with her car door.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Deny.

**REQUEST FOR ADMISSION NO. 28:**

Admit that during the INCIDENT, AASYLEI LOGGERVALE struck Defendant DEPUTY STEVEN HOLLAND with her car door.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Deny.

**REQUEST FOR ADMISSION NO. 29:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY STEVEN HOLLAND ordered AASYLEI HARDGE-LOGGERVALE multiple times to re-enter her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Admit.

**REQUEST FOR ADMISSION NO. 30:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY STEVEN HOLLAND told AASYLEI HARDGE-LOGGERVALE multiple times if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

//

//

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

Admit.

**REQUEST FOR ADMISSION NO. 31:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE ordered AASYLEI HARDGE-LOGGERVALE multiple times to re-enter her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

Admit.

**REQUEST FOR ADMISSION NO. 32:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE told AASYLEI HARDGE-LOGGERVALE multiple times if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

Deny.

**REQUEST FOR ADMISSION NO. 33:**

Admit that during the INCIDENT, and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE told AASYLEI HARDGE-LOGGERVALE multiple times if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

Responding Party objects to this request on the grounds that it is duplicative of Request No. 32.

**REQUEST FOR ADMISSION NO. 34:**

Admit that during the INCIDENT, after exiting her vehicle and prior to AASYLEI HARDGE-LOGGERVALE being handcuffed, AASYLEI HARDGE-LOGGERVALE never re-entered her vehicle.

/ / /

9

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

2        Admit.

3  **REQUEST FOR ADMISSION NO. 35:**

4        Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being

5  handcuffed, Defendant DEPUTY STEVEN HOLLAND ordered AAOTTAE LOGGERVALE to

6  re-enter her vehicle.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

8        Admit.

9  **REQUEST FOR ADMISSION NO. 36:**

10        Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being

11  handcuffed, Defendant DEPUTY STEVEN HOLLAND told AAOTTAE LOGGERVALE if she

12  did not re-enter her vehicle, she would be handcuffed and/or arrested.

13  **RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

14        Deny.

15  **REQUEST FOR ADMISSION NO. 37:**

16        Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being

17  handcuffed, Defendant DEPUTY MONICA POPE ordered AAOTTAE LOGGERVALE to re-

18  enter her vehicle.

19  **RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

20        Admit.

21  **REQUEST FOR ADMISSION NO. 38:**

22        Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being

23  handcuffed, Defendant DEPUTY MONICA POPE told AAOTTAE LOGGERVALE multiple

24  times if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

25  **RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

26        Admit.

27  ///

28  ///

**REQUEST FOR ADMISSION NO. 39:**

Admit that during the INCIDENT, and prior to AAOTTAE LOGGERVALE being handcuffed, Defendant DEPUTY MONICA POPE told AAOTTAE LOGGERVALE if she did not re-enter her vehicle, she would be handcuffed and/or arrested.

**RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

Admit.

**REQUEST FOR ADMISSION NO. 40:**

Admit that during the INCIDENT, after exiting her vehicle and prior to AAOTTAE LOGGERVALE being handcuffed, AAOTTAE LOGGERVALE never re-entered her vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 40:**

Admit.

**REQUEST FOR ADMISSION NO. 41:**

Admit that during the INCIDENT, you had no basis to use force against the DEPUTIES.

**RESPONSE TO REQUEST FOR ADMISSION NO. 41:**

Deny.

**REQUEST FOR ADMISSION NO. 42:**

Admit that the DEPUTIES were authorized to use reasonable force against you during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 42:**

Deny.

**REQUEST FOR ADMISSION NO. 43:**

Admit that immediately prior to the INCIDENT, you had been asleep in your car since before 5:00 a.m.

**RESPONSE TO REQUEST FOR ADMISSION NO. 43:**

Deny.

**REQUEST FOR ADMISSION NO. 44:**

Admit that the INCIDENT was not caused in whole or in part by any DEFENDANTS' policy, practice or custom.

**RESPONSE TO REQUEST FOR ADMISSION NO. 44:**

    Deny.

**REQUEST FOR ADMISSION NO. 45:**

    Admit that Defendant COUNTY OF ALAMEDA is not liable to you for the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 45:**

    Deny.

**REQUEST FOR ADMISSION NO. 46:**

    Admit that Defendant DEPUTY STEVEN HOLLAND is not liable to you for the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 46:**

    Deny.

**REQUEST FOR ADMISSION NO. 47:**

    Admit that Defendant DEPUTY MONICA POPE is not liable to you for the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 47:**

    Deny.

**REQUEST FOR ADMISSION NO. 48:**

    Admit that Defendant DEPUTY KEITH LEEPER is not liable to you for the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 48:**

    Deny.

**REQUEST FOR ADMISSION NO. 49:**

    Admit that Defendant LIEUTENANT ANTHONY DeSOUSA is not liable to you for the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 49:**

    Deny.

**REQUEST FOR ADMISSION NO. 50:**

    Admit that Defendant DEPUTY STEVEN HOLLAND did not use force against you during the INCIDENT.

/ / /

12

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 50:**

2      Admit.

3  **REQUEST FOR ADMISSION NO. 51:**

4      Admit that Defendant DEPUTY MONICA POPE did not use force against you during

5  the INCIDENT.

6  **RESPONSE TO REQUEST FOR ADMISSION NO. 51:**

7      Deny.

8  **REQUEST FOR ADMISSION NO. 52:**

9      Admit that Defendant DEPUTY KEITH LEEPER did not use force against you during

10 the INCIDENT.

11 **RESPONSE TO REQUEST FOR ADMISSION NO. 52:**

12     Deny.

13 **REQUEST FOR ADMISSION NO. 53:**

14     Admit that Defendant LIEUTENANT ANTHONY DeSOUSA did not use force against

15 you during the INCIDENT.

16 **RESPONSE TO REQUEST FOR ADMISSION NO. 53:**

17     Admit.

18 **REQUEST FOR ADMISSION NO. 54:**

19     Admit that YOU do not know when Defendant LIEUTENANT ANTHONY DeSOUSA

20 arrived on scene during the INCIDENT.

21 **RESPONSE TO REQUEST FOR ADMISSION NO. 54:**

22     Deny.

23 **REQUEST FOR ADMISSION NO. 55:**

24     Admit that YOU cannot estimate how long Defendant LIEUTENANT ANTHONY

25 DeSOUSA was on scene during the INCIDENT before you were released from a police vehicle.

26 **RESPONSE TO REQUEST FOR ADMISSION NO. 55:**

27     Deny.

28

**RESPONSE TO REQUEST FOR ADMISSION NO. 60:**

Deny.

**REQUEST FOR ADMISSION NO. 61:**

Admit that you did not comply with all of the Alameda County Sheriff's Deputies' directives to you during the INCIDENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 61:**

Admit.

**REQUEST FOR ADMISSION NO. 62:**

Admit that the only force used against you by the DEPUTIES during the INCIDENT was to place handcuffs upon you and lead you to a patrol vehicle.

**RESPONSE TO REQUEST FOR ADMISSION NO. 62:**

Deny.

**REQUEST FOR ADMISSION NO. 63:**

Admit that the search of you, your belongings, or your vehicle by the DEPUTIES during the INCIDENT was lawful.

**RESPONSE TO REQUEST FOR ADMISSION NO. 63:**

Deny.

**REQUEST FOR ADMISSION NO. 64:**

Admit that any search of your belongings or your vehicle during the INCIDENT was limited to retrieving your identification card and/or driver's license.

**RESPONSE TO REQUEST FOR ADMISSION NO. 64:**

Deny.

**REQUEST FOR ADMISSION NO. 65:**

Admit that any search of you during the INCIDENT was limited to a pat search for weapons.

**RESPONSE TO REQUEST FOR ADMISSION NO. 65:**

Deny.

/ / /

1  **REQUEST FOR ADMISSION NO. 66:**

2        Admit that during the INCIDENT, no one employed by the COUNTY made any

3  statement that indicated they were acting from unlawful animus, including, but not limited to,

4  racial animus, retaliatory animus against the exercise of constitutional rights, or other

5  discriminatory animus of any kind.

6  **RESPONSE TO REQUEST FOR ADMISSION NO. 66:**

7        Deny.

8  **REQUEST FOR ADMISSION NO. 67:**

9        Admit that during the INCIDENT, you did not sustain any injury that required medical

10  attention, including, but not limited to, treatment by a medical or psychological professional.

11  **RESPONSE TO REQUEST FOR ADMISSION NO. 67:**

12        Responding Party objects to this request on the grounds that it is vague, ambiguous, and

13  calls for medical opinion. Without waiving the foregoing objections, and subject thereto,

14  Responding Party states: Responding Party lacks sufficient information at this time to admit or

15  deny since she is not a medical or mental health professional.

16  **REQUEST FOR ADMISSION NO. 68:**

17        Admit that during the INCIDENT, you did not sustain any injury for which you sought

18  treatment, including, but not limited to, treatment by a medical or psychological professional.

19  **RESPONSE TO REQUEST FOR ADMISSION NO. 68:**

20        Admit.

21  **REQUEST FOR ADMISSION NO. 69:**

22        Admit that other than the alleged emotional distress, you did not sustain any other

23  damages during the INCIDENT.

24  **RESPONSE TO REQUEST FOR ADMISSION NO. 69:**

25        Deny.

26  **REQUEST FOR ADMISSION NO. 70:**

27        Admit that you have not lost any wages as a result of the INCIDENT.

28  / / /

1   **RESPONSE TO REQUEST FOR ADMISSION NO. 70:**

2      Admit.

3   **REQUEST FOR ADMISSION NO. 71:**

4      Admit that you have not lost any earning capacity as a result of the INCIDENT.

5   **RESPONSE TO REQUEST FOR ADMISSION NO. 71:**

6      Admit.

7   Dated: December 17, 2020           LAW OFFICE OF JOSEPH S. MAY
               and

8                          GEARINGER LAW GROUP

9

10                        */s/ Joseph S. May*

11                        By: JOSEPH S. MAY
                       Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

*Loggervale, et al., v. County of Alameda, et al.*
United States District Court for the Northern District of California
Case Number C20-4679-WHA

I declare that I am a United States citizen, over eighteen and not a party to this action. My business address is 740 Fourth Street, Santa Rosa, California 95404. On the below date I served:

**PLAINTIFF AAOTTAE LOGGERVALE'S RESPONSES TO REQUESTS FOR ADMISSIONS FROM DEFENDANT COUNTY OF ALAMEDA, SET ONE**

on the interested party or parties as indicated below, addressed as follows:

Kevin E. Gilbert, Esq. kgilbert@ohshlaw.com
Christopher R. Creech, Esq. ccreech@ohshlaw.com
Orbach Huff Suarez & Henderson, LLP
6210 Stoneridge Mall Rd., Ste. 210
Pleasanton, CA 94588
*Attorneys for Defendants*

☐ **MAIL[1]** ☐ **CERTIFIED MAIL[2]** ☐ **NEXT-DAY SERVICE[3]**
☐ **HAND DELIVERY[4]** ☐ **FACSIMILE[5]** ☒ **EMAIL[6]**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed December 17, 2020, at Santa Rosa, California.

MIKE KECK

---

[1] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in the office's usual location for mailing with the USPS.

[2] I personally served the document(s) as mail described above, and certified it with return receipt requested.

[3] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in a regularly used drop box by an overnight delivery service.

[4] I personally sealed the document(s) in a package, addressed as indicated above. I caused such envelope to be hand-delivered by a same-day messenger service to the addressee(s) on this date.

[5] I personally faxed the document(s) addressed as indicated above. No error was reported by the sending machine. The transmission record for this facsimile complies with California Rule of Court 2003(6).

[6] I personally electronically served the document(s) to the electronic mailing address indicated above

18



**EXHIBIT V**

Joseph S. May   SBN 245924
LAW OFFICE OF JOSEPH S. MAY
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel: (415) 781-3333
Fax: (415) 707-6600
joseph@josephmaylaw.com

Brian Gearinger   SBN 146125
GEARINGER LAW GROUP
740 Fourth Street
Santa Rosa, CA 95404
Tel: (415) 440-3102
brian@gearingerlaw.com

Attorneys for Plaintiffs
AASYLEI LOGGERVALE,
AASYLEI HARDGE-LOGGERVALE, and
AAOTTAE LOGGERVALE

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; KEITH LEEPER; ANTHONY DeSOUSA; and DOES 1 to 50, inclusive, <br><br> Defendants. | CASE NO. C20-4679-WHA <br><br> **PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO INTERROGATORIES FROM DEFENDANT DEPUTY CAMERON GALLOWAY, SET ONE** <br><br><br> Action Filed:  July 14, 2020 <br> Trial Date:      November 29, 2021 |

RESPONDING PARTY:        AASYLEI LOGGERVALE

PROPOUNDING PARTY:     DEPUTY CAMERON GALLOWAY

SET NUMBER:                    ONE

1

1    Plaintiff Aasylei Loggervale responds to the first set of interrogatories propounded by
2    Defendant Deputy Cameron Galloway as follows:

3    Responding Party has not fully completed the investigation of the facts relating to this
4    case, has not completed discovery, and has not completed preparation for trial.

5    All of the responses contained herein are based only upon such information and
6    documents as are presently available and specifically known to Responding Party, and disclose
7    only those contentions presently known to Responding Party.

8    It is anticipated that further discovery, investigation, and legal research and analysis will
9    supply additional facts, add meaning to known facts, and establish entirely new conclusions and
10   legal contentions, all of which may lead to substantial additions to, changes in, and variations
11   from the responses set forth herein.

12   The following responses are provided without prejudice to Responding Party's right to
13   produce evidence of subsequently discovered facts which Responding Party may later recall.
14   Responding Party reserves the right to change any and all answers herein as additional facts are
15   ascertained. The responses contained herein are made in a good faith effort to supply as much
16   actual information and legal contentions as are presently known, but should in no way prejudice
17   Responding Party's right to further discovery, research and/or analysis.

18                              GENERAL OBJECTIONS

19   1.  Responding Party objects to each and every interrogatory to the extent that it seeks
20   information protected by the attorney-client privilege and/or work product doctrine. Responding
21   Party provides the following responses on the premise that the requests do not seek notes,
22   memoranda and research prepared by counsel for Responding Party or his consultants, and that
23   the requests do not seek communications between counsel for Responding Party and his clients
24   or consultants.

25   2.  Responding Party objects to each and every interrogatory to the extent that it is
26   overbroad and/or does not include a specific period of time as a reference and therefore vague,
27   ambiguous or unduly burdensome.

28   / / /

2

1       3.  Discovery and investigation are continuing in this matter, and Responding Party

2   reserves the right to amend these responses should additional responsive information be

3   discovered or obtained.

4                         **RESPONSE TO INTERROGATORIES**

5   **INTERROGATORY NO. 1:**

6       State all facts that support YOUR contention that Defendant DEPUTY STEVEN

7   HOLLAND is liable to you for the INCIDENT.

8   **RESPONSE TO INTERROGATORY NO. 1:**

9       Responding Party objects to this interrogatory on the grounds that it is vague,

10  ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

11  information protected by the attorney-client privilege and/or work product doctrine, and

12  seeks information not relevant to any claims or defenses of the propounding party,

13  Cameron Galloway, as the interrogatory asks about the liability of Steven Holland.

14  Responding Party further objects to this interrogatory on the ground that it is duplicative

15  of Interrogatory No. 5 propounded by Defendant County of Alameda.

16  **INTERROGATORY NO. 2:**

17      State all acts, omissions or failures to act during the INCIDENT by Defendant

18  DEPUTY STEVEN HOLLAND that YOU contend caused or contributed to the injuries

19  for which you seek recourse in this litigation.

20  **RESPONSE TO INTERROGATORY NO. 2:**

21      Responding Party objects to this interrogatory on the grounds that it is vague,

22  ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

23  information protected by the attorney-client privilege and/or work product doctrine, and

24  seeks information not relevant to any claims or defenses of the propounding party,

25  Cameron Galloway, as the interrogatory asks about the liability of Steven Holland.

26  Responding Party further objects to this interrogatory on the ground that it is duplicative

27  of Interrogatory No. 5 propounded by Defendant County of Alameda.

28

**INTERROGATORY NO. 3:**

If YOU contend Defendant DEPUTY STEVEN HOLLAND should have done something different during the INCIDENT, for each moment YOU contend Defendant DEPUTY STEVEN HOLLAND should have acted differently, state what Defendant DEPUTY STEVEN HOLLAND should have done.

**RESPONSE TO INTERROGATORY NO. 3:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Steven Holland. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 4:**

If YOU contend Defendant DEPUTY STEVEN HOLLAND is liable to you for failing to prevent another person from causing you harm during the INCIDENT, for each moment YOU contend Defendant DEPUTY STEVEN HOLLAND should have acted differently, state all facts that YOU contend Defendant DEPUTY STEVEN HOLLAND knew that should have caused him to act to prevent another person from causing you harm.

**RESPONSE TO INTERROGATORY NO. 4:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Steven Holland. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

4

1  **INTERROGATORY NO. 5:**

2      State all facts that support YOUR contention that Defendant DEPUTY MONICA

3  POPE is liable to you for the INCIDENT.

4  **RESPONSE TO INTERROGATORY NO. 5:**

5      Responding Party objects to this interrogatory on the grounds that it is vague,

6  ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

7  information protected by the attorney-client privilege and/or work product doctrine, and

8  seeks information not relevant to any claims or defenses of the propounding party,

9  Cameron Galloway, as the interrogatory asks about the liability of Monica Pope.

10  Responding Party further objects to this interrogatory on the ground that it is duplicative

11  of Interrogatory No. 5 propounded by Defendant County of Alameda.

12  **INTERROGATORY NO. 6:**

13      State all acts, omissions or failures to act during the INCIDENT by Defendant

14  DEPUTY MONICA POPE that YOU contend caused or contributed to the injuries for

15  which you seek recourse in this litigation.

16  **RESPONSE TO INTERROGATORY NO. 6:**

17      Responding Party objects to this interrogatory on the grounds that it is vague,

18  ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

19  information protected by the attorney-client privilege and/or work product doctrine, and

20  seeks information not relevant to any claims or defenses of the propounding party,

21  Cameron Galloway, as the interrogatory asks about the liability of Monica Pope.

22  Responding Party further objects to this interrogatory on the ground that it is duplicative

23  of Interrogatory No. 5 propounded by Defendant County of Alameda.

24  **INTERROGATORY NO. 7:**

25      If YOU contend Defendant DEPUTY MONICA POPE should have done

26  something different during the INCIDENT, for each moment YOU contend Defendant

27  DEPUTY MONICA POPE should have acted differently, state what Defendant DEPUTY

28  MONICA POPE should have done.

**RESPONSE TO INTERROGATORY NO. 7:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Monica Pope. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 8:**

If YOU contend Defendant DEPUTY MONICA POPE is liable to you for failing to prevent another person from causing you harm during the INCIDENT, for each moment YOU contend Defendant DEPUTY MONICA POPE should have acted differently, state all facts that YOU contend Defendant DEPUTY MONICA POPE knew that should have caused her to act to prevent another person from causing you harm.

**RESPONSE TO INTERROGATORY NO. 8:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Monica Pope. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 9:**

State all facts that support YOUR contention that Defendant DEPUTY KEITH LEEPER is liable to you for the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 9:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

6

1   information protected by the attorney-client privilege and/or work product doctrine, and

2   seeks information not relevant to any claims or defenses of the propounding party,

3   Cameron Galloway, as the interrogatory asks about the liability of Keith Leeper.

4   Responding Party further objects to this interrogatory on the ground that it is duplicative

5   of Interrogatory No. 5 propounded by Defendant County of Alameda.

6   **INTERROGATORY NO. 10:**

7       State all acts, omissions or failures to act during the INCIDENT by Defendant

8   DEPUTY KEITH LEEPER that YOU contend caused or contributed to the injuries for

9   which you seek recourse in this litigation.

10  **RESPONSE TO INTERROGATORY NO. 10:**

11      Responding Party objects to this interrogatory on the grounds that it is vague,

12  ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

13  information protected by the attorney-client privilege and/or work product doctrine, and

14  seeks information not relevant to any claims or defenses of the propounding party,

15  Cameron Galloway, as the interrogatory asks about the liability of Keith Leeper.

16  Responding Party further objects to this interrogatory on the ground that it is duplicative

17  of Interrogatory No. 5 propounded by Defendant County of Alameda.

18  **INTERROGATORY NO. 11:**

19      If YOU contend Defendant DEPUTY KEITH LEEPER should have done

20  something different during the INCIDENT, for each moment YOU contend Defendant

21  DEPUTY KEITH LEEPER should have acted differently, state what Defendant

22  DEPUTY KEITH LEEPER should have done.

23  **RESPONSE TO INTERROGATORY NO. 11:**

24      Responding Party objects to this interrogatory on the grounds that it is vague,

25  ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

26  information protected by the attorney-client privilege and/or work product doctrine, and

27  seeks information not relevant to any claims or defenses of the propounding party,

28  Cameron Galloway, as the interrogatory asks about the liability of Keith Leeper.

Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 12:**

If YOU contend Defendant DEPUTY KEITH LEEPER is liable to you for failing to prevent another person from causing you harm during the INCIDENT, for each moment YOU contend Defendant DEPUTY KEITH LEEPER should have acted differently, state all facts that YOU contend Defendant DEPUTY KEITH LEEPER knew that should have caused him to act to prevent another person from causing you harm.

**RESPONSE TO INTERROGATORY NO. 12:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Keith Leeper. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 13:**

State all facts that support YOUR contention that Defendant LIEUTENANT ANTHONY DeSOUSA is liable to you for the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 13:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Anthony DeSousa. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

1 **INTERROGATORY NO. 14:**

2      State all acts, omissions or failures to act during the INCIDENT by Defendant

3 LIEUTENANT ANTHONY DeSOUSA that YOU contend caused or contributed to the

4 injuries for which you seek recourse in this litigation.

5 **RESPONSE TO INTERROGATORY NO. 14:**

6      Responding Party objects to this interrogatory on the grounds that it is vague,

7 ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

8 information protected by the attorney-client privilege and/or work product doctrine, and

9 seeks information not relevant to any claims or defenses of the propounding party,

10 Cameron Galloway, as the interrogatory asks about the liability of Anthony DeSousa.

11 Responding Party further objects to this interrogatory on the ground that it is duplicative

12 of Interrogatory No. 5 propounded by Defendant County of Alameda.

13 **INTERROGATORY NO. 15:**

14      If YOU contend Defendant LIEUTENANT ANTHONY DeSOUSA should have

15 done something different during the INCIDENT, for each moment YOU contend

16 Defendant LIEUTENANT ANTHONY DeSOUSA should have acted differently, state

17 what LIEUTENANT ANTHONY DeSOUSA should have done.

18 **RESPONSE TO INTERROGATORY NO. 15:**

19      Responding Party objects to this interrogatory on the grounds that it is vague,

20 ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

21 information protected by the attorney-client privilege and/or work product doctrine, and

22 seeks information not relevant to any claims or defenses of the propounding party,

23 Cameron Galloway, as the interrogatory asks about the liability of Anthony DeSousa.

24 Responding Party further objects to this interrogatory on the ground that it is duplicative

25 of Interrogatory No. 5 propounded by Defendant County of Alameda.

26 **INTERROGATORY NO. 16:**

27      If YOU contend LIEUTENANT ANTHONY DeSOUSA is liable to you for

28 failing to prevent another person from causing you harm during the INCIDENT, for each

moment YOU contend LIEUTENANT ANTHONY DeSOUSA should have acted
differently, state all facts that YOU contend LIEUTENANT ANTHONY DeSOUSA
knew that should have caused him to act to prevent another person from causing you
harm.

**RESPONSE TO INTERROGATORY NO. 16:**

Responding Party objects to this interrogatory on the grounds that it is vague,
ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks
information protected by the attorney-client privilege and/or work product doctrine, and
seeks information not relevant to any claims or defenses of the propounding party,
Cameron Galloway, as the interrogatory asks about the liability of Anthony DeSousa.
Responding Party further objects to this interrogatory on the ground that it is duplicative
of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 17:**

State all facts that support YOUR contention that Defendant DEPUTY
CAMERON GALLOWAY is liable to you for the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 17:**

Responding Party objects to this interrogatory on the grounds that it is vague,
ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks
information protected by the attorney-client privilege and/or work product doctrine.
Without waiving the foregoing objections, and subject thereto, Responding Party states:
Responding Party does not contend that Defendant Galloway is liable to her.

**INTERROGATORY NO. 18:**

State all acts, omissions or failures to act during the INCIDENT by Defendant
DEPUTY CAMERON GALLOWAY that YOU contend caused or contributed to the
injuries for which you seek recourse in this litigation.

**RESPONSE TO INTERROGATORY NO. 18:**

Responding Party objects to this interrogatory on the grounds that it is vague,
ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

10

1 | information protected by the attorney-client privilege and/or work product doctrine.

2 | Without waiving the foregoing objections, and subject thereto, Responding Party states:

3 | Responding Party does not contend Defendant Galloway's acts, omissions, or failures to

4 | act caused or contributed to injuries for which she seeks recourse in this litigation.

5 | **INTERROGATORY NO. 19:**

6 | If YOU contend Defendant DEPUTY CAMERON GALLOWAY should have

7 | done something different during the INCIDENT, for each moment YOU contend

8 | Defendant DEPUTY CAMERON GALLOWAY should have acted differently, state

9 | what Defendant DEPUTY CAMERON GALLOWAY should have done.

10 | **RESPONSE TO INTERROGATORY NO. 19:**

11 | Responding Party objects to this interrogatory on the grounds that it is vague,

12 | ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

13 | information protected by the attorney-client privilege and/or work product doctrine.

14 | Without waiving the foregoing objections, and subject thereto, Responding Party states:

15 | Defendant Cameron Galloway should have refrained from confiscating the cell phone of

16 | Plaintiff Aaottae Loggervale without a warrant or, if he believed there was just cause to

17 | confiscate her cell phone, he should have obtained a warrant.

18 | **INTERROGATORY NO. 20:**

19 | If YOU contend Defendant DEPUTY CAMERON GALLOWAY is liable to you

20 | for failing to prevent another person from causing you harm during the INCIDENT, for

21 | each moment YOU contend Defendant DEPUTY CAMERON GALLOWAY should

22 | have acted differently, state all facts that YOU contend Defendant DEPUTY CAMERON

23 | GALLOWAY knew that should have caused him to act to prevent another person from

24 | causing you harm.

25 | **RESPONSE TO INTERROGATORY NO. 20:**

26 | Responding Party does not contend Defendant Galloway is liable to Responding

27 | Party for failing to prevent another person from causing Responding Party harm.

28 |

**INTERROGATORY NO. 21:**

State all facts upon which YOU contend Defendant COUNTY OF ALAMEDA failed to properly screen, hire, train, instruct, monitor, supervise, evaluate, investigate, discipline and/or terminate Defendants DEPUTY STEVEN HOLLAND, DEPUTY MONICA POPE, DEPUTY KEITHER LEEPER, DEPUTY CAMERON GALLOWAY and LIEUTENANT ANTHONY DeSOUSA.

**RESPONSE TO INTERROGATORY NO. 21:**

Responding Party objects to this interrogatory on the grounds that it is compound, vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of County of Alameda. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda. Without waiving the foregoing objections, and subject thereto, Responding Party states as follows: County of Alameda trained its deputies, including Defendants, that it was permissible to detain and/or arrest civilians for purpose of investigating crimes and for their failure/refusal to cooperate in consensual encounters, even without reasonable suspicion or probable cause. This is evidenced by the fact that all deputies on scene believed it was appropriate to detain/arrest Plaintiffs to investigate and because they failed to cooperate in a consensual encounter. County of Alameda also trained its deputies that it was permissible to detain and/or arrest Black people simply because suspects in previous crimes in the vicinity were committed by other Black people, even when the suspect description(s) does not otherwise match that of the person detained/arrested. County of Alameda trained its deputies that it was permissible to search vehicles for identification even when the vehicle was not pulled over for a traffic stop, even though such a search clearly violates the Fourth Amendment and relevant State and Federal cases. County of Alameda knew of all relevant facts surrounding the detention and/or arrest of Plaintiffs, knew that the

12

1   detention, arrest, search, and use of force on Plaintiffs was unlawful, and nonetheless
2   failed to discipline, terminate, retrain, or otherwise take steps to address the unlawful
3   behavior of its deputies, including the named Defendants. Plaintiffs believe that County
4   of Alameda failed to take such action to avoid admitting that it or its deputies are liable to
5   Plaintiffs in this action. Discovery and investigation are ongoing and Plaintiffs have not
6   had the chance to depose Defendant County of Alameda, despite diligent efforts to
7   schedule the deposition. Plaintiffs reserve the right to rely on subsequently discovered
8   information.

9   **INTERROGATORY NO. 22:**

10      If YOU contend that prior to being handcuffed and placed in a patrol vehicle, you
11  or any of the other PLAINTIFFS provided any information to DEFENDANTS from
12  which your identity could be ascertained, identify all information that was provided,
13  including who it was provided to and when.

14  **RESPONSE TO INTERROGATORY NO. 22:**

15      Responding Party objects to this interrogatory on the grounds that it is vague,
16  ambiguous, confusing, burdensome, and harassing. Responding Party further objects to
17  this interrogatory to the extent that it seeks information pertaining to one of the other
18  Plaintiffs in this action. Without waiving the foregoing objections, and subject thereto,
19  Responding Party states as follows: The entire incident between all Plaintiffs and all
20  Defendants was captured on body cam video, so Responding Party is not sure what
21  information Defendants are trying to seek from this interrogatory that they do not already
22  have from the body cam footage.

23  **INTERROGATORY NO. 23:**

24      If YOU contend that during the INCIDENT, DEFENDANTS could have obtained
25  your identification without having to obtain this information from your state issued
26  driver's license or identification card, state how YOU contend DEFENDANTS should
27  have obtained your identification.

28  **RESPONSE TO INTERROGATORY NO. 23:**

13

1        Responding Party objects to this interrogatory on the grounds that it is vague,

2 ambiguous, calls for speculation, lacks foundation, confusing, burdensome, and

3 harassing, calls for a legal conclusion, and seeks information protected by the attorney-

4 client privilege and/or work product doctrine. Further, the entire incident between all

5 Plaintiffs and all Defendants was captured on body cam video, so Responding Party is

6 not sure what information Defendants are trying to seek from this interrogatory that they

7 do not already have from the body cam footage. Without waiving the foregoing

8 objections, and subject thereto, Responding Party states: Responding Party does not

9 know, and would only be guessing at, how Defendants (or any of them) could learn

10 Responding Party's identity; however, since there was no reasonable suspicion to detain,

11 nor probable cause to arrest, Responding Party; Defendants had no right to demand such

12 information.

13 **INTERROGATORY NO. 24:**

14        If YOU contend that any of the DEFENDANTS prolonged the INCIDENT past

15 the point where DEFENDANTS believed they no longer had reasonable suspicion to

16 further investigate you, state when this prolongation began, how long it lasted and what

17 each of the DEFENDANTS did after this point which YOU contend caused you injury.

18 **RESPONSE TO INTERROGATORY NO. 24:**

19        Responding Party objects to this interrogatory on the grounds that it is vague,

20 ambiguous, compound, calls for a legal conclusion, and seeks information protected by

21 the attorney-client privilege and/or work product doctrine. Without waiving the foregoing

22 objections, and subject thereto, Responding Party states: Since there was no reasonable

23 suspicion to detain, nor probable cause to arrest, Responding Party, Defendants had no

24 right to detain her for any length of time. Even if Defendants had the right to detain

25 Responding Party for failing to provide her identification (which she disputes), the

26 appropriate length of the detention would be the time it takes to issue a citation. One hour

27 in handcuffs in the back of a police car is far more time than is necessary, and far more

28 intrusive than necessary, to issue a Vehicle Code citation. Discovery and investigation are

14

1  ongoing and Plaintiffs have not had the chance to depose Defendant County of Alameda,

2  despite diligent efforts to schedule the deposition. Plaintiffs reserve the right to rely on

3  subsequently discovered information.

4  Dated: June 25, 2021                            LAW OFFICE OF JOSEPH S. MAY
                                                   and
5                                                  GEARINGER LAW GROUP

6

7
                                                   _/s/ Joseph S. May_____
8                                                  By: JOSEPH S. MAY
                                                   Attorneys for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, Aasylei Loggervale, declare:

I am one of the Plaintiffs in this action. I am familiar with the contents of the **PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO INTERROGATORIES FROM DEFENDANT DEPUTY CAMERON GALLOWAY, SET ONE**. The information supplied therein by me is based on my own personal knowledge and/or other agents and/or compiled from available documents and is therefore provided as required by law. The information contained in the document is true, except as to that the matters which were provided by other agents or compiled from available documents, including all contentions and opinions, and, as to those matters, I am informed and believe that they are true

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 25, 2021 at Santa Rosa, California.


_____
Aasylei Loggervale

# PROOF OF SERVICE

*Loggervale, et al., v. County of Alameda, et al.*
United States District Court for the Northern District of California
Case Number C20-4679-WHA

I declare that I am a United States citizen, over eighteen and not a party to this action. My business address is 740 Fourth Street, Santa Rosa, California 95404. On the below date I served:

**PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO INTERROGATORIES FROM DEFENDANT DEPUTY CAMERON GALLOWAY, SET ONE**

on the interested party or parties as indicated below, addressed as follows:

Kevin E. Gilbert, Esq. kgilbert@ohshlaw.com
Christopher R. Creech, Esq. ccreech@ohshlaw.com
Orbach Huff Suarez & Henderson, LLP
6210 Stoneridge Mall Rd., Ste. 210
Pleasanton, CA 94588
***Attorneys for Defendants***

☐ MAIL[1]  ☐ CERTIFIED MAIL[2]  ☐ NEXT-DAY SERVICE[3]
☐ HAND DELIVERY[4]  ☐ FACSIMILE[5]  ☒ EMAIL[6]

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed June 25, 2021, at Santa Rosa, California.

MIKE KECK

---

[1] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in the office's usual location for mailing with the USPS.

[2] I personally served the document(s) as mail described above, and certified it with return receipt requested.

[3] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in a regularly used drop box by an overnight delivery service.

[4] I personally sealed the document(s) in a package, addressed as indicated above. I caused such envelope to be hand-delivered by a same-day messenger service to the addressee(s) on this date.

[5] I personally faxed the document(s) addressed as indicated above. No error was reported by the sending machine. The transmission record for this facsimile complies with California Rule of Court 2003(6).

[6] I personally electronically served the document(s) to the electronic mailing address indicated above.

17



**EXHIBIT W**

Joseph S. May   SBN 245924
LAW OFFICE OF JOSEPH S. MAY
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel: (415) 781-3333
Fax: (415) 707-6600
joseph@josephmaylaw.com

Brian Gearinger   SBN 146125
GEARINGER LAW GROUP
740 Fourth Street
Santa Rosa, CA 95404
Tel: (415) 440-3102
brian@gearingerlaw.com

Attorneys for Plaintiffs
AASYLEI LOGGERVALE,
AASYLEI HARDGE-LOGGERVALE, and
AAOTTAE LOGGERVALE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; KEITH LEEPER; ANTHONY DeSOUSA; and DOES 1 to 50, inclusive, <br><br> Defendants. | CASE NO. C20-4679-WHA <br><br> **PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESPONSES TO INTERROGATORIES FROM DEFENDANT DEPUTY CAMERON GALLOWAY, SET ONE** <br><br><br> Action Filed:  July 14, 2020 <br> Trial Date:     November 29, 2021 |

RESPONDING PARTY:          AASYLEI HARDGE-LOGGERVALE

PROPOUNDING PARTY:        DEPUTY CAMERON GALLOWAY

SET NUMBER:                        ONE

1

1       Plaintiff Aasylei Hardge-Loggervale responds to the first set of interrogatories

2 propounded by Defendant Deputy Cameron Galloway as follows:

3       Responding Party has not fully completed the investigation of the facts relating to this

4 case, has not completed discovery, and has not completed preparation for trial.

5       All of the responses contained herein are based only upon such information and

6 documents as are presently available and specifically known to Responding Party, and disclose

7 only those contentions presently known to Responding Party.

8       It is anticipated that further discovery, investigation, and legal research and analysis will

9 supply additional facts, add meaning to known facts, and establish entirely new conclusions and

10 legal contentions, all of which may lead to substantial additions to, changes in, and variations

11 from the responses set forth herein.

12       The following responses are provided without prejudice to Responding Party's right to

13 produce evidence of subsequently discovered facts which Responding Party may later recall.

14 Responding Party reserves the right to change any and all answers herein as additional facts are

15 ascertained. The responses contained herein are made in a good faith effort to supply as much

16 actual information and legal contentions as are presently known, but should in no way prejudice

17 Responding Party's right to further discovery, research and/or analysis.

18 <u>GENERAL OBJECTIONS</u>

19       1.  Responding Party objects to each and every interrogatory to the extent that it seeks

20 information protected by the attorney-client privilege and/or work product doctrine. Responding

21 Party provides the following responses on the premise that the requests do not seek notes,

22 memoranda and research prepared by counsel for Responding Party or his consultants, and that

23 the requests do not seek communications between counsel for Responding Party and his clients

24 or consultants.

25       2.  Responding Party objects to each and every interrogatory to the extent that it is

26 overbroad and/or does not include a specific period of time as a reference and therefore vague,

27 ambiguous or unduly burdensome.

28 / / /

<div align="center">2</div>

1  3. Discovery and investigation are continuing in this matter, and Responding Party

2  reserves the right to amend these responses should additional responsive information be

3  discovered or obtained.

**RESPONSE TO INTERROGATORIES**

5  **INTERROGATORY NO. 1:**

6  State all facts that support YOUR contention that Defendant DEPUTY STEVEN

7  HOLLAND is liable to you for the INCIDENT.

8  **RESPONSE TO INTERROGATORY NO. 1:**

9  Responding Party objects to this interrogatory on the grounds that it is vague,

10  ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

11  information protected by the attorney-client privilege and/or work product doctrine, and

12  seeks information not relevant to any claims or defenses of the propounding party,

13  Cameron Galloway, as the interrogatory asks about the liability of Steven Holland.

14  Responding Party further objects to this interrogatory on the ground that it is duplicative

15  of Interrogatory No. 5 propounded by Defendant County of Alameda.

16  **INTERROGATORY NO. 2:**

17  State all acts, omissions or failures to act during the INCIDENT by Defendant

18  DEPUTY STEVEN HOLLAND that YOU contend caused or contributed to the injuries

19  for which you seek recourse in this litigation.

20  **RESPONSE TO INTERROGATORY NO. 2:**

21  Responding Party objects to this interrogatory on the grounds that it is vague,

22  ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

23  information protected by the attorney-client privilege and/or work product doctrine, and

24  seeks information not relevant to any claims or defenses of the propounding party,

25  Cameron Galloway, as the interrogatory asks about the liability of Steven Holland.

26  Responding Party further objects to this interrogatory on the ground that it is duplicative

27  of Interrogatory No. 5 propounded by Defendant County of Alameda.

28

3

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESP. TO INTERROGATORIES FROM DEF'T DEPUTY GALLOWAY, SET ONE

**INTERROGATORY NO. 3:**

If YOU contend Defendant DEPUTY STEVEN HOLLAND should have done something different during the INCIDENT, for each moment YOU contend Defendant DEPUTY STEVEN HOLLAND should have acted differently, state what Defendant DEPUTY STEVEN HOLLAND should have done.

**RESPONSE TO INTERROGATORY NO. 3:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Steven Holland. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 4:**

If YOU contend Defendant DEPUTY STEVEN HOLLAND is liable to you for failing to prevent another person from causing you harm during the INCIDENT, for each moment YOU contend Defendant DEPUTY STEVEN HOLLAND should have acted differently, state all facts that YOU contend Defendant DEPUTY STEVEN HOLLAND knew that should have caused him to act to prevent another person from causing you harm.

**RESPONSE TO INTERROGATORY NO. 4:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Steven Holland. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

4

**INTERROGATORY NO. 5:**

State all facts that support YOUR contention that Defendant DEPUTY MONICA POPE is liable to you for the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 5:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Monica Pope. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 6:**

State all acts, omissions or failures to act during the INCIDENT by Defendant DEPUTY MONICA POPE that YOU contend caused or contributed to the injuries for which you seek recourse in this litigation.

**RESPONSE TO INTERROGATORY NO. 6:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Monica Pope. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 7:**

If YOU contend Defendant DEPUTY MONICA POPE should have done something different during the INCIDENT, for each moment YOU contend Defendant DEPUTY MONICA POPE should have acted differently, state what Defendant DEPUTY MONICA POPE should have done.

5

1 **RESPONSE TO INTERROGATORY NO. 7:**

2      Responding Party objects to this interrogatory on the grounds that it is vague,

3 ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

4 information protected by the attorney-client privilege and/or work product doctrine, and

5 seeks information not relevant to any claims or defenses of the propounding party,

6 Cameron Galloway, as the interrogatory asks about the liability of Monica Pope.

7 Responding Party further objects to this interrogatory on the ground that it is duplicative

8 of Interrogatory No. 5 propounded by Defendant County of Alameda.

9 **INTERROGATORY NO. 8:**

10      If YOU contend Defendant DEPUTY MONICA POPE is liable to you for failing

11 to prevent another person from causing you harm during the INCIDENT, for each

12 moment YOU contend Defendant DEPUTY MONICA POPE should have acted

13 differently, state all facts that YOU contend Defendant DEPUTY MONICA POPE knew

14 that should have caused her to act to prevent another person from causing you harm.

15 **RESPONSE TO INTERROGATORY NO. 8:**

16      Responding Party objects to this interrogatory on the grounds that it is vague,

17 ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

18 information protected by the attorney-client privilege and/or work product doctrine, and

19 seeks information not relevant to any claims or defenses of the propounding party,

20 Cameron Galloway, as the interrogatory asks about the liability of Monica Pope.

21 Responding Party further objects to this interrogatory on the ground that it is duplicative

22 of Interrogatory No. 5 propounded by Defendant County of Alameda.

23 **INTERROGATORY NO. 9:**

24      State all facts that support YOUR contention that Defendant DEPUTY KEITH

25 LEEPER is liable to you for the INCIDENT.

26 **RESPONSE TO INTERROGATORY NO. 9:**

27      Responding Party objects to this interrogatory on the grounds that it is vague,

28 ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

<div align="center">6</div>

1 information protected by the attorney-client privilege and/or work product doctrine, and

2 seeks information not relevant to any claims or defenses of the propounding party,

3 Cameron Galloway, as the interrogatory asks about the liability of Keith Leeper.

4 Responding Party further objects to this interrogatory on the ground that it is duplicative

5 of Interrogatory No. 5 propounded by Defendant County of Alameda.

6 **INTERROGATORY NO. 10:**

7     State all acts, omissions or failures to act during the INCIDENT by Defendant

8 DEPUTY KEITH LEEPER that YOU contend caused or contributed to the injuries for

9 which you seek recourse in this litigation.

10 **RESPONSE TO INTERROGATORY NO. 10:**

11     Responding Party objects to this interrogatory on the grounds that it is vague,

12 ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

13 information protected by the attorney-client privilege and/or work product doctrine, and

14 seeks information not relevant to any claims or defenses of the propounding party,

15 Cameron Galloway, as the interrogatory asks about the liability of Keith Leeper.

16 Responding Party further objects to this interrogatory on the ground that it is duplicative

17 of Interrogatory No. 5 propounded by Defendant County of Alameda.

18 **INTERROGATORY NO. 11:**

19     If YOU contend Defendant DEPUTY KEITH LEEPER should have done

20 something different during the INCIDENT, for each moment YOU contend Defendant

21 DEPUTY KEITH LEEPER should have acted differently, state what Defendant

22 DEPUTY KEITH LEEPER should have done.

23 **RESPONSE TO INTERROGATORY NO. 11:**

24     Responding Party objects to this interrogatory on the grounds that it is vague,

25 ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

26 information protected by the attorney-client privilege and/or work product doctrine, and

27 seeks information not relevant to any claims or defenses of the propounding party,

28 Cameron Galloway, as the interrogatory asks about the liability of Keith Leeper.

7

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESP. TO INTERROGATORIES FROM DEF'T DEPUTY GALLOWAY, SET ONE

Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 12:**

If YOU contend Defendant DEPUTY KEITH LEEPER is liable to you for failing to prevent another person from causing you harm during the INCIDENT, for each moment YOU contend Defendant DEPUTY KEITH LEEPER should have acted differently, state all facts that YOU contend Defendant DEPUTY KEITH LEEPER knew that should have caused him to act to prevent another person from causing you harm.

**RESPONSE TO INTERROGATORY NO. 12:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Keith Leeper. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 13:**

State all facts that support YOUR contention that Defendant LIEUTENANT ANTHONY DeSOUSA is liable to you for the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 13:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Anthony DeSousa. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 14:**

State all acts, omissions or failures to act during the INCIDENT by Defendant LIEUTENANT ANTHONY DeSOUSA that YOU contend caused or contributed to the injuries for which you seek recourse in this litigation.

**RESPONSE TO INTERROGATORY NO. 14:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Anthony DeSousa. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 15:**

If YOU contend Defendant LIEUTENANT ANTHONY DeSOUSA should have done something different during the INCIDENT, for each moment YOU contend Defendant LIEUTENANT ANTHONY DeSOUSA should have acted differently, state what LIEUTENANT ANTHONY DeSOUSA should have done.

**RESPONSE TO INTERROGATORY NO. 15:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Anthony DeSousa. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 16:**

If YOU contend LIEUTENANT ANTHONY DeSOUSA is liable to you for failing to prevent another person from causing you harm during the INCIDENT, for each

9

moment YOU contend LIEUTENANT ANTHONY DeSOUSA should have acted
differently, state all facts that YOU contend LIEUTENANT ANTHONY DeSOUSA
knew that should have caused him to act to prevent another person from causing you
harm.

**RESPONSE TO INTERROGATORY NO. 16:**

Responding Party objects to this interrogatory on the grounds that it is vague,
ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks
information protected by the attorney-client privilege and/or work product doctrine, and
seeks information not relevant to any claims or defenses of the propounding party,
Cameron Galloway, as the interrogatory asks about the liability of Anthony DeSousa.
Responding Party further objects to this interrogatory on the ground that it is duplicative
of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 17:**

State all facts that support YOUR contention that Defendant DEPUTY
CAMERON GALLOWAY is liable to you for the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 17:**

Responding Party objects to this interrogatory on the grounds that it is vague,
ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks
information protected by the attorney-client privilege and/or work product doctrine.
Without waiving the foregoing objections, and subject thereto, Responding Party states:
Responding Party does not contend that Defendant Galloway is liable to her.

**INTERROGATORY NO. 18:**

State all acts, omissions or failures to act during the INCIDENT by Defendant
DEPUTY CAMERON GALLOWAY that YOU contend caused or contributed to the
injuries for which you seek recourse in this litigation.

**RESPONSE TO INTERROGATORY NO. 18:**

Responding Party objects to this interrogatory on the grounds that it is vague,
ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

10

information protected by the attorney-client privilege and/or work product doctrine. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party does not contend Defendant Galloway's acts, omissions, or failures to act caused or contributed to injuries for which she seeks recourse in this litigation.

**INTERROGATORY NO. 19:**

If YOU contend Defendant DEPUTY CAMERON GALLOWAY should have done something different during the INCIDENT, for each moment YOU contend Defendant DEPUTY CAMERON GALLOWAY should have acted differently, state what Defendant DEPUTY CAMERON GALLOWAY should have done.

**RESPONSE TO INTERROGATORY NO. 19:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine. Without waiving the foregoing objections, and subject thereto, Responding Party states: Defendant Cameron Galloway should have refrained from confiscating the cell phone of Plaintiff Aaottae Loggervale or, if he believed there was just cause to confiscate the phone, he should have obtained a warrant.

**INTERROGATORY NO. 20:**

If YOU contend Defendant DEPUTY CAMERON GALLOWAY is liable to you for failing to prevent another person from causing you harm during the INCIDENT, for each moment YOU contend Defendant DEPUTY CAMERON GALLOWAY should have acted differently, state all facts that YOU contend Defendant DEPUTY CAMERON GALLOWAY knew that should have caused him to act to prevent another person from causing you harm.

**RESPONSE TO INTERROGATORY NO. 20:**

Responding Party does not contend Defendant Galloway is liable to Responding Party for failing to prevent another person from causing Responding Party harm.

**INTERROGATORY NO. 21:**

State all facts upon which YOU contend Defendant COUNTY OF ALAMEDA failed to properly screen, hire, train, instruct, monitor, supervise, evaluate, investigate, discipline and/or terminate Defendants DEPUTY STEVEN HOLLAND, DEPUTY MONICA POPE, DEPUTY KEITHER LEEPER, DEPUTY CAMERON GALLOWAY and LIEUTENANT ANTHONY DeSOUSA.

**RESPONSE TO INTERROGATORY NO. 21:**

Responding Party objects to this interrogatory on the grounds that it is compound, vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of County of Alameda. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda. Without waiving the foregoing objections, and subject thereto, Responding Party states as follows: County of Alameda trained its deputies, including Defendants, that it was permissible to detain and/or arrest civilians for purpose of investigating crimes and for their failure/refusal to cooperate in consensual encounters, even without reasonable suspicion or probable cause. This is evidenced by the fact that all deputies on scene believed it was appropriate to detain/arrest Plaintiffs to investigate and because they failed to cooperate in a consensual encounter. County of Alameda also trained its deputies that it was permissible to detain and/or arrest Black people simply because suspects in previous crimes in the vicinity were committed by other Black people, even when the suspect description(s) does not otherwise match that of the person detained/arrested. County of Alameda trained its deputies that it was permissible to search vehicles for identification even when the vehicle was not pulled over for a traffic stop, even though such a search clearly violates the Fourth Amendment and relevant State and Federal cases. County of Alameda knew of all relevant facts surrounding the detention and/or arrest of Plaintiffs, knew that the

12

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESP. TO INTERROGATORIES FROM DEF'T DEPUTY GALLOWAY, SET ONE

1   detention, arrest, search, and use of force on Plaintiffs was unlawful, and nonetheless

2   failed to discipline, terminate, retrain, or otherwise take steps to address the unlawful

3   behavior of its deputies, including the named Defendants. Plaintiffs believe that County

4   of Alameda failed to take such action to avoid admitting that it or its deputies are liable to

5   Plaintiffs in this action. Discovery and investigation are ongoing and Plaintiffs have not

6   had the chance to depose Defendant County of Alameda, despite diligent efforts to

7   schedule the deposition. Plaintiffs reserve the right to rely on subsequently discovered

8   information.

9   **INTERROGATORY NO. 22:**

10         If YOU contend that prior to being handcuffed and placed in a patrol vehicle, you

11   or any of the other PLAINTIFFS provided any information to DEFENDANTS from

12   which your identity could be ascertained, identify all information that was provided,

13   including who it was provided to and when.

14   **RESPONSE TO INTERROGATORY NO. 22:**

15         Responding Party objects to this interrogatory on the grounds that it is vague,

16   ambiguous, confusing, burdensome, and harassing. Without waiving the foregoing

17   objections, and subject thereto, Responding Party states as follows: The entire incident

18   between all Plaintiffs and all Defendants was captured on body cam video, so

19   Responding Party is not sure what information Defendants are trying to seek from this

20   interrogatory that they do not already have from the body cam footage.

21   **INTERROGATORY NO. 23:**

22         If YOU contend that during the INCIDENT, DEFENDANTS could have obtained

23   your identification without having to obtain this information from your state issued

24   driver's license or identification card, state how YOU contend DEFENDANTS should

25   have obtained your identification.

26   **RESPONSE TO INTERROGATORY NO. 23:**

27         Responding Party objects to this interrogatory on the grounds that it is vague,

28   ambiguous, calls for speculation, lacks foundation, confusing, burdensome, and

harassing, calls for a legal conclusion, and seeks information protected by the attorney-client privilege and/or work product doctrine. Further, the incident was captured on body cam video, so Responding Party is not sure what information Defendants are trying to seek from this interrogatory that they do not already have from the body cam footage. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party does not know, and would only be guessing at, how Defendants (or any of them) could learn Responding Party's identity; however, since there was no reasonable suspicion to detain, nor probable cause to arrest, Responding Party, Defendants had no right to demand such information. Responding Party further notes that none of the Defendants ever asked for Responding Party's identity or proof of identity prior to handcuffing her and placing her in the backseat of a police car.

**INTERROGATORY NO. 24:**

If YOU contend that any of the DEFENDANTS prolonged the INCIDENT past the point where DEFENDANTS believed they no longer had reasonable suspicion to further investigate you, state when this prolongation began, how long it lasted and what each of the DEFENDANTS did after this point which YOU contend caused you injury.

**RESPONSE TO INTERROGATORY NO. 24:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, compound, calls for a legal conclusion, and seeks information protected by the attorney-client privilege and/or work product doctrine. Without waiving the foregoing objections, and subject thereto, Responding Party states: Since there was no reasonable suspicion to detain, nor probable cause to arrest, Responding Party, Defendants had no right to detain her for any length of time. The only crime that Responding Party allegedly committed was battery on a peace officer; however, the body-worn camera footage of Defendants conclusively demonstrates that no such battery occurred. Discovery and investigation are ongoing and Plaintiffs have not had the chance to depose Defendant County of Alameda, despite diligent efforts to schedule the deposition. Plaintiffs reserve the right to rely on subsequently discovered information.

14

Dated: June 25, 2021

LAW OFFICE OF JOSEPH S. MAY
and
GEARINGER LAW GROUP


*/s/ Joseph S. May*
By: JOSEPH S. MAY
Attorneys for Plaintiffs

# VERIFICATION

I, Aasylei Hardge-Loggervale, declare:

I am one of the Plaintiffs in this action. I am familiar with the contents of the

**PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESPONSES TO**

**INTERROGATORIES FROM DEFENDANT DEPUTY CAMERON GALLOWAY, SET**

**ONE.** The information supplied therein by me is based on my own personal knowledge and/or other agents and/or compiled from available documents and is therefore provided as required by law. The information contained in the document is true, except as to that the matters which were provided by other agents or compiled from available documents, including all contentions and opinions, and, as to those matters, I am informed and believe that they are true

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 25, 2021 at Santa Rosa, California.


Aasylei Hardge-Loggervale

# PROOF OF SERVICE

*Loggervale, et al., v. County of Alameda, et al.*
United States District Court for the Northern District of California
Case Number C20-4679-WHA

I declare that I am a United States citizen, over eighteen and not a party to this action. My business address is 740 Fourth Street, Santa Rosa, California 95404. On the below date I served:

**PLAINTIFF AASYLEI HARDGE-LOGGERVALE'S RESPONSES TO INTERROGATORIES FROM DEFENDANT DEPUTY CAMERON GALLOWAY, SET ONE**

on the interested party or parties as indicated below, addressed as follows:

Kevin E. Gilbert, Esq. kgilbert@ohshlaw.com
Christopher R. Creech, Esq. ccreech@ohshlaw.com
Orbach Huff Suarez & Henderson, LLP
6210 Stoneridge Mall Rd., Ste. 210
Pleasanton, CA 94588
*Attorneys for Defendants*

☐ **MAIL**[1]　　　　　☐ **CERTIFIED MAIL**[2]　　☐ **NEXT-DAY SERVICE**[3]
☐ **HAND DELIVERY**[4]　☐ **FACSIMILE**[5]　　　☒ **EMAIL**[6]

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed June 18, 2021, at Santa Rosa, California.

MIKE KECK

---

[1] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in the office's usual location for mailing with the USPS.

[2] I personally served the document(s) as mail described above, and certified it with return receipt requested.

[3] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in a regularly used drop box by an overnight delivery service.

[4] I personally sealed the document(s) in a package, addressed as indicated above. I caused such envelope to be hand-delivered by a same-day messenger service to the addressee(s) on this date.

[5] I personally faxed the document(s) addressed as indicated above. No error was reported by the sending machine. The transmission record for this facsimile complies with California Rule of Court 2003(6).

[6] I personally electronically served the document(s) to the electronic mailing address indicated above.

17

# EXHIBIT X

Joseph S. May   SBN 245924
LAW OFFICE OF JOSEPH S. MAY
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel: (415) 781-3333
Fax: (415) 707-6600
joseph@josephmaylaw.com

Brian Gearinger   SBN 146125
GEARINGER LAW GROUP
740 Fourth Street
Santa Rosa, CA 95404
Tel: (415) 440-3102
brian@gearingerlaw.com

Attorneys for Plaintiffs
AASYLEI LOGGERVALE,
AASYLEI HARDGE-LOGGERVALE, and
AAOTTAE LOGGERVALE

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; KEITH LEEPER; ANTHONY DeSOUSA; and DOES 1 to 50, inclusive,<br><br>Defendants. | CASE NO. C20-4679-WHA<br><br>**PLAINTIFF AAOTTAE LOGGERVALE'S RESPONSES TO INTERROGATORIES FROM DEFENDANT DEPUTY CAMERON GALLOWAY, SET ONE**<br><br><br>Action Filed:  July 14, 2020<br>Trial Date:    November 29, 2021 |

RESPONDING PARTY:          AAOTTAE LOGGERVALE

PROPOUNDING PARTY:        DEPUTY CAMERON GALLOWAY

SET NUMBER:                       ONE

1

1      Plaintiff Aaottae Loggervale responds to the first set of interrogatories propounded by

2 Defendant Deputy Cameron Galloway as follows:

3      Responding Party has not fully completed the investigation of the facts relating to this

4 case, has not completed discovery, and has not completed preparation for trial.

5      All of the responses contained herein are based only upon such information and

6 documents as are presently available and specifically known to Responding Party, and disclose

7 only those contentions presently known to Responding Party.

8      It is anticipated that further discovery, investigation, and legal research and analysis will

9 supply additional facts, add meaning to known facts, and establish entirely new conclusions and

10 legal contentions, all of which may lead to substantial additions to, changes in, and variations

11 from the responses set forth herein.

12      The following responses are provided without prejudice to Responding Party's right to

13 produce evidence of subsequently discovered facts which Responding Party may later recall.

14 Responding Party reserves the right to change any and all answers herein as additional facts are

15 ascertained. The responses contained herein are made in a good faith effort to supply as much

16 actual information and legal contentions as are presently known, but should in no way prejudice

17 Responding Party's right to further discovery, research and/or analysis.

18 <u>GENERAL OBJECTIONS</u>

19      1. Responding Party objects to each and every interrogatory to the extent that it seeks

20 information protected by the attorney-client privilege and/or work product doctrine. Responding

21 Party provides the following responses on the premise that the requests do not seek notes,

22 memoranda and research prepared by counsel for Responding Party or his consultants, and that

23 the requests do not seek communications between counsel for Responding Party and his clients

24 or consultants.

25      2. Responding Party objects to each and every interrogatory to the extent that it is

26 overbroad and/or does not include a specific period of time as a reference and therefore vague,

27 ambiguous or unduly burdensome.

28 / / /

2

3. Discovery and investigation are continuing in this matter, and Responding Party reserves the right to amend these responses should additional responsive information be discovered or obtained.

## RESPONSE TO INTERROGATORIES

### INTERROGATORY NO. 1:

State all facts that support YOUR contention that Defendant DEPUTY STEVEN HOLLAND is liable to you for the INCIDENT.

### RESPONSE TO INTERROGATORY NO. 1:

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Steven Holland. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

### INTERROGATORY NO. 2:

State all acts, omissions or failures to act during the INCIDENT by Defendant DEPUTY STEVEN HOLLAND that YOU contend caused or contributed to the injuries for which you seek recourse in this litigation.

### RESPONSE TO INTERROGATORY NO. 2:

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Steven Holland. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 3:**

If YOU contend Defendant DEPUTY STEVEN HOLLAND should have done something different during the INCIDENT, for each moment YOU contend Defendant DEPUTY STEVEN HOLLAND should have acted differently, state what Defendant DEPUTY STEVEN HOLLAND should have done.

**RESPONSE TO INTERROGATORY NO. 3:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Steven Holland. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 4:**

If YOU contend Defendant DEPUTY STEVEN HOLLAND is liable to you for failing to prevent another person from causing you harm during the INCIDENT, for each moment YOU contend Defendant DEPUTY STEVEN HOLLAND should have acted differently, state all facts that YOU contend Defendant DEPUTY STEVEN HOLLAND knew that should have caused him to act to prevent another person from causing you harm.

**RESPONSE TO INTERROGATORY NO. 4:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Steven Holland. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

4

**INTERROGATORY NO. 5:**

State all facts that support YOUR contention that Defendant DEPUTY MONICA POPE is liable to you for the INCIDENT.

**RESPONSE TO INTERROGATORY NO. 5:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Monica Pope. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 6:**

State all acts, omissions or failures to act during the INCIDENT by Defendant DEPUTY MONICA POPE that YOU contend caused or contributed to the injuries for which you seek recourse in this litigation.

**RESPONSE TO INTERROGATORY NO. 6:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Monica Pope. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 7:**

If YOU contend Defendant DEPUTY MONICA POPE should have done something different during the INCIDENT, for each moment YOU contend Defendant DEPUTY MONICA POPE should have acted differently, state what Defendant DEPUTY MONICA POPE should have done.

5

1 **RESPONSE TO INTERROGATORY NO. 7:**

2       Responding Party objects to this interrogatory on the grounds that it is vague,

3 ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

4 information protected by the attorney-client privilege and/or work product doctrine, and

5 seeks information not relevant to any claims or defenses of the propounding party,

6 Cameron Galloway, as the interrogatory asks about the liability of Monica Pope.

7 Responding Party further objects to this interrogatory on the ground that it is duplicative

8 of Interrogatory No. 5 propounded by Defendant County of Alameda.

9 **INTERROGATORY NO. 8:**

10       If YOU contend Defendant DEPUTY MONICA POPE is liable to you for failing

11 to prevent another person from causing you harm during the INCIDENT, for each

12 moment YOU contend Defendant DEPUTY MONICA POPE should have acted

13 differently, state all facts that YOU contend Defendant DEPUTY MONICA POPE knew

14 that should have caused her to act to prevent another person from causing you harm.

15 **RESPONSE TO INTERROGATORY NO. 8:**

16       Responding Party objects to this interrogatory on the grounds that it is vague,

17 ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

18 information protected by the attorney-client privilege and/or work product doctrine, and

19 seeks information not relevant to any claims or defenses of the propounding party,

20 Cameron Galloway, as the interrogatory asks about the liability of Monica Pope.

21 Responding Party further objects to this interrogatory on the ground that it is duplicative

22 of Interrogatory No. 5 propounded by Defendant County of Alameda.

23 **INTERROGATORY NO. 9:**

24       State all facts that support YOUR contention that Defendant DEPUTY KEITH

25 LEEPER is liable to you for the INCIDENT.

26 **RESPONSE TO INTERROGATORY NO. 9:**

27       Responding Party objects to this interrogatory on the grounds that it is vague,

28 ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

1 information protected by the attorney-client privilege and/or work product doctrine, and

2 seeks information not relevant to any claims or defenses of the propounding party,

3 Cameron Galloway, as the interrogatory asks about the liability of Keith Leeper.

4 Responding Party further objects to this interrogatory on the ground that it is duplicative

5 of Interrogatory No. 5 propounded by Defendant County of Alameda.

6 **INTERROGATORY NO. 10:**

7      State all acts, omissions or failures to act during the INCIDENT by Defendant

8 DEPUTY KEITH LEEPER that YOU contend caused or contributed to the injuries for

9 which you seek recourse in this litigation.

10 **RESPONSE TO INTERROGATORY NO. 10:**

11      Responding Party objects to this interrogatory on the grounds that it is vague,

12 ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

13 information protected by the attorney-client privilege and/or work product doctrine, and

14 seeks information not relevant to any claims or defenses of the propounding party,

15 Cameron Galloway, as the interrogatory asks about the liability of Keith Leeper.

16 Responding Party further objects to this interrogatory on the ground that it is duplicative

17 of Interrogatory No. 5 propounded by Defendant County of Alameda.

18 **INTERROGATORY NO. 11:**

19      If YOU contend Defendant DEPUTY KEITH LEEPER should have done

20 something different during the INCIDENT, for each moment YOU contend Defendant

21 DEPUTY KEITH LEEPER should have acted differently, state what Defendant

22 DEPUTY KEITH LEEPER should have done.

23 **RESPONSE TO INTERROGATORY NO. 11:**

24      Responding Party objects to this interrogatory on the grounds that it is vague,

25 ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

26 information protected by the attorney-client privilege and/or work product doctrine, and

27 seeks information not relevant to any claims or defenses of the propounding party,

28 Cameron Galloway, as the interrogatory asks about the liability of Keith Leeper.

7

1   Responding Party further objects to this interrogatory on the ground that it is duplicative

2   of Interrogatory No. 5 propounded by Defendant County of Alameda.

3   **INTERROGATORY NO. 12:**

4       If YOU contend Defendant DEPUTY KEITH LEEPER is liable to you for failing

5   to prevent another person from causing you harm during the INCIDENT, for each

6   moment YOU contend Defendant DEPUTY KEITH LEEPER should have acted

7   differently, state all facts that YOU contend Defendant DEPUTY KEITH LEEPER knew

8   that should have caused him to act to prevent another person from causing you harm.

9   **RESPONSE TO INTERROGATORY NO. 12:**

10      Responding Party objects to this interrogatory on the grounds that it is vague,

11  ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

12  information protected by the attorney-client privilege and/or work product doctrine, and

13  seeks information not relevant to any claims or defenses of the propounding party,

14  Cameron Galloway, as the interrogatory asks about the liability of Keith Leeper.

15  Responding Party further objects to this interrogatory on the ground that it is duplicative

16  of Interrogatory No. 5 propounded by Defendant County of Alameda.

17  **INTERROGATORY NO. 13:**

18      State all facts that support YOUR contention that Defendant LIEUTENANT

19  ANTHONY DeSOUSA is liable to you for the INCIDENT.

20  **RESPONSE TO INTERROGATORY NO. 13:**

21      Responding Party objects to this interrogatory on the grounds that it is vague,

22  ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

23  information protected by the attorney-client privilege and/or work product doctrine, and

24  seeks information not relevant to any claims or defenses of the propounding party,

25  Cameron Galloway, as the interrogatory asks about the liability of Anthony DeSousa.

26  Responding Party further objects to this interrogatory on the ground that it is duplicative

27  of Interrogatory No. 5 propounded by Defendant County of Alameda.

28

**INTERROGATORY NO. 14:**

State all acts, omissions or failures to act during the INCIDENT by Defendant LIEUTENANT ANTHONY DeSOUSA that YOU contend caused or contributed to the injuries for which you seek recourse in this litigation.

**RESPONSE TO INTERROGATORY NO. 14:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Anthony DeSousa. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 15:**

If YOU contend Defendant LIEUTENANT ANTHONY DeSOUSA should have done something different during the INCIDENT, for each moment YOU contend Defendant LIEUTENANT ANTHONY DeSOUSA should have acted differently, state what LIEUTENANT ANTHONY DeSOUSA should have done.

**RESPONSE TO INTERROGATORY NO. 15:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks information protected by the attorney-client privilege and/or work product doctrine, and seeks information not relevant to any claims or defenses of the propounding party, Cameron Galloway, as the interrogatory asks about the liability of Anthony DeSousa. Responding Party further objects to this interrogatory on the ground that it is duplicative of Interrogatory No. 5 propounded by Defendant County of Alameda.

**INTERROGATORY NO. 16:**

If YOU contend LIEUTENANT ANTHONY DeSOUSA is liable to you for failing to prevent another person from causing you harm during the INCIDENT, for each

9

1  moment YOU contend LIEUTENANT ANTHONY DeSOUSA should have acted

2  differently, state all facts that YOU contend LIEUTENANT ANTHONY DeSOUSA

3  knew that should have caused him to act to prevent another person from causing you

4  harm.

5  **RESPONSE TO INTERROGATORY NO. 16:**

6        Responding Party objects to this interrogatory on the grounds that it is vague,

7  ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

8  information protected by the attorney-client privilege and/or work product doctrine, and

9  seeks information not relevant to any claims or defenses of the propounding party,

10  Cameron Galloway, as the interrogatory asks about the liability of Anthony DeSousa.

11  Responding Party further objects to this interrogatory on the ground that it is duplicative

12  of Interrogatory No. 5 propounded by Defendant County of Alameda.

13  **INTERROGATORY NO. 17:**

14        State all facts that support YOUR contention that Defendant DEPUTY

15  CAMERON GALLOWAY is liable to you for the INCIDENT.

16  **RESPONSE TO INTERROGATORY NO. 17:**

17        Responding Party objects to this interrogatory on the grounds that it is vague,

18  ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

19  information protected by the attorney-client privilege and/or work product doctrine.

20  Without waiving the foregoing objections, and subject thereto, Responding Party states:

21  Defendant Cameron Galloway confiscated the cell phone of Plaintiff Aaottae Loggervale

22  without a warrant, without probable cause, without legal justification, and without any

23  other proper basis. Defendant Galloway knew that he had no right to take Aaottae

24  Loggervale's phone from her. Defendant Galloway took the phone for the purpose of

25  preventing Aaottae Loggervale from exercising her right to free speech, secured by the

26  California and Federal Constitutions and/or for the purpose of retaliating against Ms.

27  Loggervale for reporting the illegal behavior of Defendants Holland, Pope, and Leeper.

28

10

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFF AAOTTAE LOGGERVALE'S RESP. TO INTERROGATORIES FROM DEF'T DEPUTY GALLOWAY, SET ONE

**INTERROGATORY NO. 18:**

State all acts, omissions or failures to act during the INCIDENT by Defendant

DEPUTY CAMERON GALLOWAY that YOU contend caused or contributed to the

injuries for which you seek recourse in this litigation.

**RESPONSE TO INTERROGATORY NO. 18:**

Responding Party objects to this interrogatory on the grounds that it is vague,

ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

information protected by the attorney-client privilege and/or work product doctrine.

Without waiving the foregoing objections, and subject thereto, Responding Party states:

Defendant Cameron Galloway confiscated the cell phone of Plaintiff Aaottae Loggervale

without a warrant, without probable cause, without legal justification, and without any

other proper basis. Defendant Galloway knew that he had no right to take Aaottae

Loggervale's phone from her. Defendant Galloway took the phone for the purpose of

preventing Aaottae Loggervale from exercising her right to free speech, secured by the

California and Federal Constitutions and/or for the purpose of retaliating against Ms.

Loggervale for reporting the illegal behavior of Defendants Holland, Pope, and Leeper.

**INTERROGATORY NO. 19:**

If YOU contend Defendant DEPUTY CAMERON GALLOWAY should have

done something different during the INCIDENT, for each moment YOU contend

Defendant DEPUTY CAMERON GALLOWAY should have acted differently, state

what Defendant DEPUTY CAMERON GALLOWAY should have done.

**RESPONSE TO INTERROGATORY NO. 19:**

Responding Party objects to this interrogatory on the grounds that it is vague,

ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks

information protected by the attorney-client privilege and/or work product doctrine.

Without waiving the foregoing objections, and subject thereto, Responding Party states:

Defendant Cameron Galloway should have refrained from confiscating the cell phone of

11

1 Plaintiff Aaottae Loggervale or, if he believed there was just cause to confiscate the
2 phone, he should have obtained a warrant.

3 **INTERROGATORY NO. 20:**

4 If YOU contend Defendant DEPUTY CAMERON GALLOWAY is liable to you
5 for failing to prevent another person from causing you harm during the INCIDENT, for
6 each moment YOU contend Defendant DEPUTY CAMERON GALLOWAY should
7 have acted differently, state all facts that YOU contend Defendant DEPUTY CAMERON
8 GALLOWAY knew that should have caused him to act to prevent another person from
9 causing you harm.

10 **RESPONSE TO INTERROGATORY NO. 20:**

11 Responding Party does not contend Defendant Galloway is liable to Responding
12 Party for failing to prevent another person from causing Responding Party harm.

13 **INTERROGATORY NO. 21:**

14 State all facts upon which YOU contend Defendant COUNTY OF ALAMEDA
15 failed to properly screen, hire, train, instruct, monitor, supervise, evaluate, investigate,
16 discipline and/or terminate Defendants DEPUTY STEVEN HOLLAND, DEPUTY
17 MONICA POPE, DEPUTY KEITHER LEEPER, DEPUTY CAMERON GALLOWAY
18 and LIEUTENANT ANTHONY DeSOUSA.

19 **RESPONSE TO INTERROGATORY NO. 21:**

20 Responding Party objects to this interrogatory on the grounds that it is compound,
21 vague, ambiguous, overbroad, unduly burdensome, calls for a legal conclusion, seeks
22 information protected by the attorney-client privilege and/or work product doctrine, and
23 seeks information not relevant to any claims or defenses of the propounding party,
24 Cameron Galloway, as the interrogatory asks about the liability of County of Alameda.
25 Responding Party further objects to this interrogatory on the ground that it is duplicative
26 of Interrogatory No. 5 propounded by Defendant County of Alameda. Without waiving
27 the foregoing objections, and subject thereto, Responding Party states as follows: County
28 of Alameda trained its deputies, including Defendants, that it was permissible to detain

12

and/or arrest civilians for purpose of investigating crimes and for their failure/refusal to cooperate in consensual encounters, even without reasonable suspicion or probable cause. This is evidenced by the fact that all deputies on scene believed it was appropriate to detain/arrest Plaintiffs to investigate and because they failed to cooperate in a consensual encounter. County of Alameda also trained its deputies that it was permissible to detain and/or arrest Black people simply because suspects in previous crimes in the vicinity were committed by other Black people, even when the suspect description(s) does not otherwise match that of the person detained/arrested. County of Alameda trained its deputies that it was permissible to search vehicles for identification even when the vehicle was not pulled over for a traffic stop, even though such a search clearly violates the Fourth Amendment and relevant State and Federal cases. County of Alameda knew of all relevant facts surrounding the detention and/or arrest of Plaintiffs, knew that the detention, arrest, search, and use of force on Plaintiffs was unlawful, and nonetheless failed to discipline, terminate, retrain, or otherwise take steps to address the unlawful behavior of its deputies, including the named Defendants. Plaintiffs believe that County of Alameda failed to take such action to avoid admitting that it or its deputies are liable to Plaintiffs in this action. Discovery and investigation are ongoing and Plaintiffs have not had the chance to depose Defendant County of Alameda, despite diligent efforts to schedule the deposition. Plaintiffs reserve the right to rely on subsequently discovered information.

**INTERROGATORY NO. 22:**

If YOU contend that prior to being handcuffed and placed in a patrol vehicle, you or any of the other PLAINTIFFS provided any information to DEFENDANTS from which your identity could be ascertained, identify all information that was provided, including who it was provided to and when.

**RESPONSE TO INTERROGATORY NO. 22:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, confusing, burdensome, and harassing. Without waiving the foregoing

13

objections, and subject thereto, Responding Party states as follows: The entire incident between all Plaintiffs and all Defendants was captured on body cam video, so Responding Party is not sure what information Defendants are trying to seek from this interrogatory that they do not already have from the body cam footage.

**INTERROGATORY NO. 23:**

If YOU contend that during the INCIDENT, DEFENDANTS could have obtained your identification without having to obtain this information from your state issued driver's license or identification card, state how YOU contend DEFENDANTS should have obtained your identification.

**RESPONSE TO INTERROGATORY NO. 23:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, calls for speculation, lacks foundation, confusing, burdensome, and harassing, calls for a legal conclusion, and seeks information protected by the attorney-client privilege and/or work product doctrine. Further, the incident was captured on body cam video, so Responding Party is not sure what information Defendants are trying to seek from this interrogatory that they do not already have from the body cam footage. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party does not know, and would only be guessing at, how Defendants (or any of them) could learn Responding Party's identity; however, since there was no reasonable suspicion to detain, nor probable cause to arrest, Responding Party, Defendants had no right to demand such information. Responding Party further notes that none of the Defendants ever asked for Responding Party's identity or proof of identity prior to handcuffing her and placing her in the backseat of a police car.

**INTERROGATORY NO. 24:**

If YOU contend that any of the DEFENDANTS prolonged the INCIDENT past the point where DEFENDANTS believed they no longer had reasonable suspicion to further investigate you, state when this prolongation began, how long it lasted and what each of the DEFENDANTS did after this point which YOU contend caused you injury.

14

**RESPONSE TO INTERROGATORY NO. 24:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, compound, calls for a legal conclusion, and seeks information protected by the attorney-client privilege and/or work product doctrine. Without waiving the foregoing objections, and subject thereto, Responding Party states: Since there was no reasonable suspicion to detain, nor probable cause to arrest, Responding Party, Defendants had no right to detain her for any length of time. Discovery and investigation are ongoing and Plaintiffs have not had the chance to depose Defendant County of Alameda, despite diligent efforts to schedule the deposition. Plaintiffs reserve the right to rely on subsequently discovered information.

Dated: June 25, 2021

LAW OFFICE OF JOSEPH S. MAY
and
GEARINGER LAW GROUP


*/s/ Joseph S. May*
By: JOSEPH S. MAY
Attorneys for Plaintiffs

**VERIFICATION**

I, Aaottae Loggervale, declare:

I am one of the Plaintiffs in this action. I am familiar with the contents of the

**PLAINTIFF AAOTTAE LOGGERVALE'S RESPONSES TO INTERROGATORIES**

**FROM DEFENDANT DEPUTY CAMERON GALLOWAY, SET ONE**. The information

supplied therein by me is based on my own personal knowledge and/or other agents and/or

compiled from available documents and is therefore provided as required by law. The

information contained in the document is true, except as to that the matters which were provided

by other agents or compiled from available documents, including all contentions and opinions,

and, as to those matters, I am informed and believe that they are true

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed on June 25, 2021 at Santa Rosa, California.

Aaottae Loggervale

# PROOF OF SERVICE

*Loggervale, et al., v. County of Alameda, et al.*
United States District Court for the Northern District of California
Case Number C20-4679-WHA

I declare that I am a United States citizen, over eighteen and not a party to this action. My business address is 740 Fourth Street, Santa Rosa, California 95404. On the below date I served:

### PLAINTIFF AAOTTAE LOGGERVALE'S RESPONSES TO INTERROGATORIES FROM DEFENDANT DEPUTY CAMERON GALLOWAY, SET ONE

on the interested party or parties as indicated below, addressed as follows:

Kevin E. Gilbert, Esq. kgilbert@ohshlaw.com
Christopher R. Creech, Esq. ccreech@ohshlaw.com
Orbach Huff Suarez & Henderson, LLP
6210 Stoneridge Mall Rd., Ste. 210
Pleasanton, CA 94588
*Attorneys for Defendants*

☐ MAIL[1]             ☐ CERTIFIED MAIL[2]    ☐ NEXT-DAY SERVICE[3]
☐ HAND DELIVERY[4]    ☐ FACSIMILE[5]         ☒ EMAIL[6]

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed June 25, 2021, at Santa Rosa, California.

MIKE KECK

---

[1] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in the office's usual location for mailing with the USPS.

[2] I personally served the document(s) as mail described above, and certified it with return receipt requested.

[3] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following ordinary office practice, I placed it in a regularly used drop box by an overnight delivery service.

[4] I personally sealed the document(s) in a package, addressed as indicated above. I caused such envelope to be hand-delivered by a same-day messenger service to the addressee(s) on this date.

[5] I personally faxed the document(s) addressed as indicated above. No error was reported by the sending machine. The transmission record for this facsimile complies with California Rule of Court 2003(6).

[6] I personally electronically served the document(s) to the electronic mailing address indicated above.

# EXHIBIT Y

Joseph S. May   SBN 245924
LAW OFFICE OF JOSEPH S. MAY
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel: (415) 781-3333
Fax: (415) 707-6600
joseph@josephmaylaw.com

Brian Gearinger   SBN 146125
GEARINGER LAW GROUP
740 Fourth Street
Santa Rosa, CA 95404
Tel: (415) 440-3102
brian@gearingerlaw.com

Attorneys for Plaintiffs
AASYLEI LOGGERVALE,
AASYLEI HARDGE-LOGGERVALE, and
AAOTTAE LOGGERVALE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; KEITH LEEPER; ANTHONY DeSOUSA; and DOES 1 to 50, inclusive, <br><br> Defendants. | CASE NO. C20-4679-WHA <br><br> **PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO REQUESTS FOR ADMISSIONS FROM DEFENDANT COUNTY OF ALAMEDA, SET TWO** <br><br><br> Action Filed:  July 14, 2020 <br> Trial Date:     November 29, 2021 |

RESPONDING PARTY:        AASYLEI LOGGERVALE

PROPOUNDING PARTY:      COUNTY OF ALAMEDA

SET NUMBER:                     TWO

1

1      3. Discovery and investigation are continuing in this matter, and Responding Party

2  reserves the right to amend these responses should additional responsive information be

3  discovered or obtained.

4  **RESPONSE TO REQUESTS FOR ADMISSIONS**

5  **REQUEST FOR ADMISSION NO. 72:**

6      Admit that prior to being handcuffed and placed in the back of a patrol vehicle,

7  you did not provide the DEPUTIES with your driver's license or any other form of

8  identification.

9  **RESPONSE TO REQUEST FOR ADMISSION NO. 72:**

10     Admit.

11 **REQUEST FOR ADMISSION NO. 73:**

12     Admit that prior to being handcuffed and placed in the back of a patrol vehicle,

13 one or more of the DEPUTIES asked you to identify yourself.

14 **RESPONSE TO REQUEST FOR ADMISSION NO. 73:**

15     Deny that any deputy told Responding Party to identify herself. Admit that

16 Defendant Holland asked Responding Party, "Do you have your I.D. on you?"

17 **REQUEST FOR ADMISSION NO. 74:**

18     Admit that prior to being handcuffed and placed in the back of a patrol vehicle,

19 one or more of the DEPUTIES asked you to provide your driver's license or any other

20 form of state issued identification.

21 **RESPONSE TO REQUEST FOR ADMISSION NO. 74:**

22     Admit.

23 **REQUEST FOR ADMISSION NO. 75:**

24     Admit that prior to being handcuffed and placed in the back of a patrol vehicle,

25 you did not provide the DEPUTIES with any information from which they could identify

26 who you were.

27 //

28 //

**RESPONSE TO REQUEST FOR ADMISSION NO. 75:**

Responding Party objects to this request on the grounds that it is vague, ambiguous, and calls for speculation. Without waiving the foregoing objections, and subject thereto, Responding Party denies this Request because Responding Party did advise that the car she was seated in was a rental car, which was "information from which they could identify who you were."

**REQUEST FOR ADMISSION NO. 76:**

Admit that because of your refusal to identify yourself prior to being handcuffed and placed in the back of a patrol vehicle, the most direct way for the DEPUTIES to obtain your identification was by looking at your driver's license or any other form of state issued identification.

**RESPONSE TO REQUEST FOR ADMISSION NO. 76:**

Responding Party objects to this request on the grounds that it assumes facts, mis-states the record, is loaded, lacks foundation, and is vague and ambiguous and confusing. Without waiving the foregoing objections, and subject thereto, Responding Party states: Responding Party was not asked to identify herself. Instead, Defendant Holland asked Responding Party, "Do you have your I.D. on you?" Responding Party was not required to show Defendant Holland her ID. Responding Party does not know what other ways the Defendants could have obtained her identity, but imagines they could have looked up the license plate of the car she was driving and asked the rental company for it. Responding Party has no idea what the most "direct way" of obtaining her identification was, but knows they were not legally permitted to search her vehicle and belongings.

Dated: June 25, 2021

LAW OFFICE OF JOSEPH S. MAY
and
GEARINGER LAW GROUP

*/s/ Joseph S. May*
By: JOSEPH S. MAY
Attorneys for Plaintiffs

1

**PROOF OF SERVICE**

2

*Loggervale, et al., v. County of Alameda, et al.*
United States District Court for the Northern District of California
Case Number C20-4679-WHA

3

4

I declare that I am a United States citizen, over eighteen and not a party to this action. My
business address is 740 Fourth Street, Santa Rosa, California 95404. On the below date I served:

5

6

**PLAINTIFF AASYLEI LOGGERVALE'S RESPONSES TO REQUESTS FOR
ADMISION FROM DEFENDANT COUNTY OF ALAMEDA, SET TWO**

7

8

on the interested party or parties as indicated below, addressed as follows:

9

Kevin E. Gilbert, Esq. kgilbert@ohshlaw.com
Christopher R. Creech, Esq. ccreech@ohshlaw.com
Orbach Huff Suarez & Henderson, LLP
6210 Stoneridge Mall Rd., Ste. 210
Pleasanton, CA 94588
***Attorneys for Defendants***

10

11

12

13

14

☐ **MAIL[1]**          ☐ **CERTIFIED MAIL[2]**          ☐ **NEXT-DAY SERVICE[3]**

15

☐ **HAND DELIVERY[4]**    ☐ **FACSIMILE[5]**          ☒ **EMAIL[6]**

16

17

I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct. Executed June 25, 2021, at Santa Rosa, California.

18

19

MIKE KECK

20

21

_____

22

[1] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following
ordinary office practice, I placed it in the office's usual location for mailing with the USPS.

23

[2] I personally served the document(s) as mail described above, and certified it with return receipt requested.

24

[3] I personally sealed the document(s) in a postage paid package, addressed as indicated above. Following
ordinary office practice, I placed it in a regularly used drop box by an overnight delivery service.

25

[4] I personally sealed the document(s) in a package, addressed as indicated above. I caused such envelope to be
hand-delivered by a same-day messenger service to the addressee(s) on this date.

26

[5] I personally faxed the document(s) addressed as indicated above. No error was reported by the sending machine.
The transmission record for this facsimile complies with California Rule of Court 2003(6).

27

[6] I personally electronically served the document(s) to the electronic mailing address indicated above.

28

5

**EXHIBIT Z**

| | |
|---|---|
| **ALAMEDA COUNTY**<br><br>**SHERIFF'S OFFICE**<br><br>**GENERAL ORDER** | **NUMBER:** 1.15 |
| | **RELATED ORDERS:**<br>CALEA 1.2.4, 1.2.5<br>Penal Code Section 1535<br>CCR Section 2511<br>Senate Bill 1087 |
| | **ISSUE DATE:** March 1, 1996 |
| | **REVISION DATE:** *November 30, 2016* |
| **CHAPTER:** Law Enforcement Role, Responsibilities, and Relationships | **SUBJECT:** Search and Seizure |

I.   **PURPOSE:** To establish guidelines for all members of the Alameda County Sheriff's Office for conducting a legal search of a person or property with or without a search warrant.

II.  **POLICY:** This Agency will follow the guidelines of search and seizure of persons or property as set forth in the California Penal Code and all other state and federal statutes.

III. **ORDER:** Members of this Agency are required to follow federal, state and local laws when searching and/or seizing property for evidentiary value. The items a deputy may legally search and seize are dangerous weapons, fruits of a crime, instruments of a crime, contraband, suspects, additional victims, and physical evidence.  The types of searches and seizures and the conditions upon which they can be legally conducted are described below:

A.   SEARCHES CONDUCTED PURSUANT TO A WARRANT:

1.   Searches conducted pursuant to a warrant are searches authorized by a written order, signed by a magistrate, directing a peace officer to search a specific person or place for specific items and bring them before the magistrate.

2.   The warrant must particularly describe the items sought, the location, vehicle, or person to be searched, and must list the statutory grounds for issuing the warrant.

3.   A deputy serving the warrant must announce his/her presence, identify himself/herself as a deputy, state his/her purpose, & demand entry before forcibly entering a private dwelling.

4.   A copy of the warrant must be provided to the subject of the warrant upon service. Refer to Law Enforcement Services P&P's for details regarding the service of warrants.

5.   The use of a GPS tracking device mounted on a vehicle in order to track the movement of a subject requires a search warrant.

B.   PROBABLE CAUSE SEARCHES: Probable cause searches are warrantless searches. A deputy must be able to articulate the specific facts that lead to the belief the object of

his/her search is located in a specific area and the object is connected to that criminal activity.

C.    SEARCHES INCIDENT TO AN ARREST:

1.    Searches incident to an arrest are conducted contemporaneous to the arrest. They are limited to the suspect and areas in the suspect's immediate control. The purpose of these searches is to protect the deputy by locating weapons and to prevent the destruction of evidence or contraband.

2.    If a deputy is already lawfully inside or outside a house and has some basis for believing there may be others inside who may pose a danger to the deputy or who may destroy evidence, he/she may conduct a protective sweep, a brief (two or three minutes) search to look for these other individuals (People v. Guidi 10 Cal.3d 1).

3.    Warrantless entries by police into a residence are presumed illegal and can be justified only by consent or exigent circumstances (People v. Payton 445 U.S. 573, 590). "Exigent circumstances" means an emergency requiring swift action to prevent imminent danger to life, serious damage to property, imminent escape of a suspect, or the destruction of evidence (People v. Olson 110 S.Ct. 1684).

4.    If an expanded search at the scene of an arrest or any other crime scene cannot be justified pursuant to this order and current case law, a search warrant shall be obtained prior to the search. When in doubt, a deputy should obtain a search warrant prior to making the search to protect the admissibility of any evidence found.

D.    CONSENT SEARCHES: Consent searches are conducted after consent to search has been given freely and voluntarily. The person giving the consent must possess and exercise sufficient mental competence to make an intelligent choice and must have actual or apparent authority to give consent.

E.    SEARCHES UNDER EXIGENT CIRCUMSTANCES: Searches under exigent circumstances are emergency searches that allow a deputy to enter an area where there is an expectation of privacy for the purpose of protecting life, health or property. The necessity to enter must involve a substantial and immediate threat to life, health, property, or the fresh pursuit of a criminal suspect. Once the emergency abates, a warrant is required. A deputy cannot create the exigent circumstances.

F.    PLAIN VIEW SEIZURES: Plain view seizures are not searches. If a deputy observes items of evidence or contraband in plain view from a position in which he/she has a lawful right to be, he/she may seize the evidence without a search warrant if the evidence itself is also in a place where the deputy has a lawful right to be.

G.    PAT-DOWN OR FRISK SEARCHES: Pat-down or frisk searches are cursory searches of legally detained suspects to protect a deputy from an unexpected assault when the deputy, based on specific and articulate facts, reasonably believes that the person is armed with a weapon or a potentially dangerous instrument.

H.    PROBATION SEARCHES:

1.   Probation searches are made pursuant to consent given by the probationer as a condition of his/her grant of probation. Not all probationers have a search clause, not all search clauses are the same. The deputy will confirm the existing probation conditions prior to making the search.

2.   The deputy must conduct the search for a legitimate purpose and not for the purpose of harassment (People v. Bravo). When property belonging to the probationer is to be searched, it is not necessary for the probationer to be present at the time or place of the probation search (People v. Llienthal).

I.   PAROLE SEARCHES:

1.   Parole searches will be made in accordance with parole conditions set forth by the provisions of Title 15 of the California Code of Regulations, Section 2511. All parolees have the same search conditions. (i.e., 3067 PC - any prisoner who is eligible for release on parole pursuant to this chapter shall agree in writing to be subject to search and seizure [person, residence, or any property under his/her control] by a parole officer, or other peace officer at any time of the day or night, with or without a search warrant and with or without cause.) It is recommended that the deputy attempt to contact the parole agent prior to conducting the search.

2.   The deputy must conduct the search for legitimate purposes and not for the purpose of harassment. When property belonging to the parolee is to be searched, it is not necessary for the parolee to be present at the time of the parole search.

J.   SEARCHES OF MOTOR VEHICLES:

1.   Motor vehicles are defined as being any vehicle that is self-propelled. A motor home is considered a motor vehicle and may be searched as any other vehicle when it is being used on a highway, or is capable of such use and is found stationary at a place not regularly used for residential purpose (Calif v. Carney). Pursuant to a lawful search, a warrant should be produced, if one exists, whenever it is practical to do so or if the vehicle is no longer mobile. Vehicle searches fall under the same constraints as those listed in A thru I of this order.

2.   Motor vehicles have the capacity to be moved quickly to an unknown location or beyond the jurisdictional reach of a law enforcement officer thus making it impossible to obtain a warrant to search the vehicle. When the deputy has probable cause to believe that the vehicle contains items related to criminal activity, the deputy may make a warrantless search of any part of the vehicle where the item(s) searched for could reasonably be located, including the trunk (People v. Acevedo) (Carrol v. U.S.). Deputies are also permitted to search any containers found in the vehicle which may reasonably contain the item believed to be in the vehicle (U.S. v. Ross).

3.   Where a search incident to arrest occurs, the arrestee must have been a recent occupant of the vehicle and the arresting deputy must have a reasonable suspicion to believe that the "fruits" or evidence of the offense arrested for, exist within the vehicle and within the immediate control of the arrestee.

For example, a driver is arrested for an offense of 14601.1, driving on a suspended license. The "fruits" or evidence of the offense cannot reasonably be expected to be found within the vehicle. The arresting deputy cannot search the vehicle incident to the arrest.

4.   The use of a GPS tracking device mounted on a vehicle for the purpose of tracking the movement of a subject is considered a "search" under the 4th Amendment (United States v. Antoine Jones no. 10-1259).

K.   INVENTORY OF VEHICLES OR OTHER PROPERTY: Inventory of vehicles or other property are distinguishable from a conventional search in that the deputies are not looking with the express purpose of finding evidence, but are merely taking note of personal property. Evidence discovered during an inventory is admissible. A decision to tow a car and conduct an inventory based on a desire to "search" a towed car is unauthorized.

L.   RECEIPTS FOR EVIDENCE COLLECTED: Receipts for evidence seized must be prepared for all evidence seized during a search. Penal Code Section 1535 states that when a deputy takes property, he/she must give a detailed receipt for the property taken to the person from whom it was taken or in whose possession it was found. In the absence of any person, he/she must leave it in the place from which the property was recovered.

M.   CUSTODY SEARCHES: Custody searches will be conducted in accordance with Policy and Procedures currently in place at Santa Rita Jail along with all other applicable laws.

N.   OUT OF COUNTY WARRANTS: Out of county warrants issued by proper authority will be honored by this Agency as long as they are proper on their face and do not interfere with the operation of this Agency.

O.   PHONE, E-MAIL, AND INTERNET RECORDS:

1.   There are two types of information that can be obtained from electronic communications services: records and content. Content is the actual communication, typically the words spoken by the parties to a telephone conversation or the message contained in an e-mail. Records consist of raw data pertaining to the communication, such as the sender, recipient, e-mail addresses, date and time, duration of calls, last calls dialed, cell tower hits, and phone location.

2.   Stored records are not deemed private under the Fourth Amendment of the United States Constitution. However, the content of these types of communication does fall under the protection of the Fourth Amendment. In addition, Congress has determined both types of information fall under the Electronic Communications Privacy Act of 1986.

3.   There are four ways to obtain these types of information: (1) court order, (2) search warrant, (3) subpoena, and (4) emergency declaration.

4.   *Any business record search, conducted through the use of a search warrant and/or subpoena, must be signed by a magistrate, directing a peace officer to*

*search for specific records of a particular business, in relation to a specific criminal matter.*

5.   *The "custodian of records" for the business listed in the subpoena and/or search warrant, has five days after receiving the request, to deliver the requested documents to the clerk of court, magistrate, or designated person, to include the law enforcement agency or their representative who authored the search warrant.  Delivery of the business records to the clerk of court or magistrate is not a prerequisite.  An affidavit from the custodian of records shall accompany the requested documents or information.*

6.   Emergency Declaration: State and Federal Officers may obtain records data by means of an emergency declaration.  Under the Electronic Communications Privacy Act, the provider must furnish the records to a law enforcement officer if there is a "reasonable belief that an emergency involving immediate danger of death or serious physical injury to any person justifies disclosure of the information."

7.   Some electronic communication providers require the Emergency Declaration to be completed on their specific form.  However, most will accept a generic emergency declaration form.

8.   If records are obtained using an emergency declaration, the deputy shall subsequently seek a search warrant for the obtained records after the emergency has subsided.

9.   *Members should also keep in mind the warrant requirements and listed guidelines in the California Electronic Communications Privacy Act (Senate Bill 178) for obtaining electronic communications and information*

Attachments:

1.   ACSO Emergency Declaration

2.   LES Telephone Investigation Guide

| | |
|---|---|
| **ALAMEDA COUNTY**<br><br>**SHERIFF'S OFFICE**<br><br>**GENERAL ORDER** | **NUMBER:**   1.19<br><br>**RELATED ORDERS:**<br>General Order 5.23<br><br>**ISSUE DATE:** February 5, 2004<br><br>**REVISION DATE:** *April 17, 2018* |
| **CHAPTER:**  Law Enforcement Role,<br>   Responsibilities, and Relationships | **SUBJECT:**  Bias Based *Policing* |

I.  **PURPOSE:**  To ensure that all persons coming into contact with employees of the Agency receive fair and equitable treatment.

II.  **POLICY:**  Agency employees will engage only in those actions that are lawful and based on probable cause, reasonable suspicion, or some lawful articulable standard.

III.  **DEFINITION:**

    A.  BIAS BASED *POLICING*:  The unfair selection of individuals for law enforcement actions based solely on traits related to *the actual or perceived* race, *color,* ethnicity, *national origin,* age, *sex,* gender *identity or expression*, sexual orientation, *socioeconomic* status, religion, *physical or mental disability, political affiliation,* or group identity.

    B.  CRIMINAL PROFILING:  Is the legitimate practice based on articulable behaviors or characteristics that can be analyzed and evaluated.  Deputies must have individualized suspicion based on articulable behavior or characteristics to stop or detain anyone.

IV.  **ORDER:**  All Agency transactions will be based on legal and articulable standards.

    A.  Biased Based *Policing* in traffic *or pedestrian* contacts, field contacts, asset seizure and forfeiture, or any other activities performed by the Sheriff's Office is prohibited.

        1.  Any member who engages in the practice of bias based policing will be subject to disciplinary action, which may include termination from employment.

        2.  All personnel are required to immediately report incidents or complaints of bias based policing to their supervisors.

    B.  The *LES Contract Services* Division Commander *or his/her designee,* shall conduct an annual review of Agency practices, incidents, and trends and forward a report to the Sheriff.  The review and report   shall consist of an analysis of citizen complaints, internal complaints, and traffic study statistical survey reports.  The commander shall be watchful for indicators that give the appearance of, or might cause citizen concerns of bias based policing.  After having been reviewed by the Sheriff, this annual report will be reviewed at the Sheriff's Advisory Committee.  The *LES Contract Services* Division Commander shall be responsible for taking appropriate corrective action if bias based policing occurs, or gives the appearance or indication of occurring within the Agency.

C.     All personnel transacting business or enforcement activities with the public shall receive ***annual*** training, including the legal aspects of bias based policing, as provided for by the Commission on Peace Officer Standards and Training (POST).

D.     The Commanding Officer of the Regional Training Center (RTC) shall develop and provide training required by POST and any other training deemed relevant to ensure the fair and equitable treatment of the public.  In an effort to ensure that all aspects of bias based policing are addressed and current the RTC will consult with POST, the Sheriff's Office Training Committee, and the Alameda County Law Enforcement Training Managers Association (ACLETMA).

| | |
|---|---|
| **ALAMEDA COUNTY**<br><br>**SHERIFF'S OFFICE**<br><br>**GENERAL ORDER** | **NUMBER**: 5.45 |
| | **RELATED ORDERS**:<br>CALEA: *1.2.3, 40.1.1*<br><br><br>*Replaces LES P&P 5.02, APS P&P 5.02* |
| | **ISSUE DATE**: *September 22, 2017* |
| | **REVISION DATE**: *N/A* |
| **CHAPTER**: Law Enforcement Operations | **SUBJECT**: Field Interviews |

I.  **PURPOSE:** To establish procedures for utilization, accurate completion and routing of field interview cards.

II.  **POLICY:** *It is the policy of the Alameda County Sheriff's Office* to conduct field interviews to deprive actual and potential offenders of some of their initiative in selecting the time, place, and circumstances for committing crimes and to properly document those field interviews on Field Interview (FI) Cards.

III.  **PROCEDURE:**

   A.  FIELD INTERVIEWS: *Agency* personnel recognize the benefit of communicating with the public. Deputies are encouraged to make maximum use of field interviews for the following purposes:

   1.  Developing sector/beat information

   2.  Compiling information for Investigations

   3.  Tracking known criminal offenders and their criminal associates

   4.  Use as a Crime Prevention/Crime Analysis tool

   5.  Use for possible future identification of criminal offenders

   B.  Deputies shall respect the constitutional rights of the people they contact.

   1.  Deputies shall understand that people they contact may not be obligated to speak with him/her.

   2.  Deputies shall not *make* contacts or interviews *based solely on the person's* gender, race, national origin, *sexual orientation, economic or social status, age,* or religion.

   C.  Deputies encountering individuals under unusual or suspicious circumstances must have some reasonable suspicion to interview the person.

1. Reasonable suspicion must be based on objective circumstances which led the deputy to suspect possible criminal activity involving the person. Deputies should consider:

   a. Location

   b. Time

   c. Criminal activity in the area

   d. Actions of the individual

   e. Similarities of the person or vehicle to information concerning those involved in criminal activity in the area

2. Deputies may have knowledge that the individual has a past criminal history for criminal activities similar to those which may be occurring in the area.

3. Deputies observe the individual to be a hazard or creating a hazardous condition.

D. Deputies, who have reasonable suspicion to conduct a field interview, shall prepare an FI card, which in addition to identification information, documents the reason for the contact.

   1. FI cards are to be filled out completely during the interview.

   2. **_Each unit will determine whether physical FI cards will be stored and/or if the information gets inputted into the ILeads Report Writing System._**

# EXHIBIT AA













