Joseph S. May   SBN 245924
LAW OFFICE OF JOSEPH S. MAY
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel: (415) 781-3333
Fax: (415) 707-6600
joseph@josephmaylaw.com

Brian Gearinger   SBN 146125
GEARINGER LAW GROUP
740 Fourth Street
Santa Rosa, CA 95404
Tel: (415) 440-3102
brian@gearingerlaw.com

Craig M. Peters   SBN 184018
ALTAIR LAW
465 California Street, 5th Floor
San Francisco, CA 94104-3313
(415) 988-9828
cpeters@altairlaw.us

Attorneys for Plaintiffs AASYLEI
LOGGERVALE, AASYLEI HARDGE-
LOGGERVALE, and AAOTTAE
LOGGERVALE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; and DOES 1 to 50, inclusive,<br><br>Defendants. | CASE NO. C20-4679-WHA<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL**<br><br>Hearing:   May 11, 2023<br>Time:      8:00 a.m.<br>Place:     450 Golden Gate Ave.<br>           Courtroom 12, 19th Floor<br>           San Francisco, CA 94102<br><br>Action Filed:  July 14, 2020<br>Trial Date:    February 13, 2023 |

## TABLE OF CONTENTS

I.  INTRODUCTION ...............................................................................................1

II.  ARGUMENT ...................................................................................................1

    A.  The Court's Evidentiary Rulings and Jury Instructions Were Correct ..................1

        1.  Defendants Were Permitted to, and Did, Argue That They Knew About Other Auto Burglaries and the Big 5 Incident; Their Problem Was Not That the Court Excluded Evidence but that the Jury Rightfully Rejected Their Evidence .............................................................................1

        2.  The Court Correctly Found, as a Matter of Law, that Pope's Search of the Daughters' Belongings Was Unconstitutional ...........................................5

        3.  The Court Properly Instructed on the Law and Certainly Did Not Advocate for Plaintiffs ...........................................................................7

            a.  Instruction 23 Correctly Stated that Officers Must Have Reasonable Suspicion to Detain Someone Under the Vehicle Code ...........................................................................7

            b.  Instruction 34 Accurately States the Law ......................................7

            c.  Instructing the Jury that Search of the Daughters' Belongings Was a Constitutional Violation Was Not Advocacy.....................8

            d.  The Court's Instructions on Consent Were Accurate ...................9

            e.  The Court Correctly Instructed the Jury that Sheriff Ahern was the Final Policymaking Official for the County of Alameda with Respect to Ratification ..........................................10

        4.  Amendment of the Verdict Form Was Appropriate ................................11

    B.  The Jury's Damages Award Was Supported by the Evidence ...........................13

        1.  Plaintiff Presented Sufficient Evidence of Significant Damages .............13

        2.  Case Law, While Not Dispositive, Supports the Size of the Verdict .......19

        3.  The Cases Defendants Cite Are Inapposite ..............................................22

        4.  Large Scale Focus Grouping Supports the Size of the Verdict ................25

III.  CONCLUSION ...............................................................................................26

1

## <u>TABLE OF AUTHORITIES</u>

2

3      *Arizona v. ASARCO LLC*
            773 F.3d 1050 (9th Cir. 2014) ........................................................................11
4
       *Bandary v. Delta Air Lines, Inc.*
5           ____ F. Supp. ____, 2022 WL 18142540 (C.D. Cal. Aug. 26, 2022) ............................23

6      *Bashir v. County of Rockdale County, Ga.*
            445 F.3d 1323 (11th Cir. 2006) .........................................................................8
7

8      *Brown v. Texas*
            443 U.S. 47 (1979) ......................................................................................7
9
       *Carey v. Piphus,*
10          435 U.S. 247 (1978) ....................................................................................14

11     *Cervantes v. County of Los Angeles*
            C12-9889-DDP, 2015 WL 5163031 (C.D. Cal. Sep. 3, 2015) .................................22, 23
12

13     *Chalmers v. City of Los Angeles*
            762 F.2d 753 (9th Cir.1985) ......................................................................14, 20
14

15     *Cortez v. McCauley*
            478 F.3d 1108 (10th Cir. 2007) .........................................................................8
16

17     *Cruz-Santos v. Robertson*
            C16-2447-HSG, 2018 WL 3854894 (N.D. Cal. Aug. 10, 2018) .................................9

18     *Diaz v. Tesla, Inc.*
19          598 F. Supp. 3d 809 (N.D. Cal. 2022) ........................................................21, 22

20     *Francis v. City of New York*
            C15-7997-VSB-KHP, 2019 WL 8918743 (S.D.N.Y. Nov. 11, 2019) ...........................24
21

22     *Gasperini v. Ctr. for Humanities*
            518 U.S. 415 (1996) .....................................................................................19
23

24     *Graves v. City of Coeur D'Alene*
            339 F.3d 828 (9th Cir. 2003) ..........................................................................19

25     *Harper v. City of Los Angeles*
26          533 F.3d 1010 (9th Cir. 2008) ...................................................................19, 20

27     *Holzhauer v. Golden Gate Bridge Highway & Transp. Dist.,*
            C13-2862-JST, 2017 WL 3382316 (N.D. Cal. Aug. 7, 2017) .................................14
28

*Hunio v. Tishman Const. Corp. of Cal.*
    14 Cal. App. 4th 1010 (1993) ....................................................................21

*In re Arturo D.*
    27 Cal. 4th 60 (2002) ..................................................................................6

*Johnson v. Hale*
    13 F.3d 1351 (9th Cir.1994) ...............................................................14, 20

*Johnson v. Sartain*
    46 Haw. 112 (1962) ...................................................................................21

*Jorgensen v. Cassiday*
    320 F.3d 906 (9th Cir. 2003) ....................................................................13

*Lambert v. Ackerley*
    180 F.3d 997 (9th Cir. 1999) ......................................................................1

*Landes Const. Co., Inc. v. Royal Bank of Can.*
    833 F.2d 1365 (9th Cir. 1987) ..................................................................13

*Lytle v. Carl*
    382 F.3d 978 (9th Cir. 2004) ....................................................................11

*Mason and Dixon Intermodal, Inc. v. Lapmaster Intern. LLC*
    632 F.3d 1056 (9th Cir. 2011) ..................................................................19

*Mattschei v. United States*
    600 F.2d 205 (9th Cir. 1979) ....................................................................19

*Mendez v. County of San Bernardino*
    540 F.3d 1109 (9th Cir. 2008) ..................................................................11

*Merriweather v. Family Dollar Stores*
    103 F.3d 576 (7th Cir.1996) .....................................................................14

*Moreno v. Baca*
    431 F.3d 633 (9th Cir. 2005) ......................................................................3

*Mueller v. Hawaii Dept. of Public Safety*
    595 F. Supp. 3d 920 (D. Haw. 2022) ........................................................21

*Oracle Corp. v. SAP AG*
    7656 F.3d 1081 (9th Cir. 2014) ................................................................22

*Passantino v. Johnson & Johnson Consumer Products, Inc.*
    212 F.3d 493 (9th Cir. 2000) ....................................................................14

*People v. Lopez*
    8 Cal.5th 353 (2019) ...............................................................................6

*People v. Williams*
    43 Cal.4th 584 (2008) ...........................................................................9

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*
    251 F.3d 814 (9th Cir. 2001) ...............................................................13

*Smith v. City of Oakland*
    538 F. Supp. 2d 1217 (N.D. Cal. 2008) .......................................23, 24

*Smith v. Kmart Corp.*
    177 F.3d 19 (1st Cir. 1999) .................................................................13

*St. Louis v. Praprotnik*
    485 U.S. 112 (1988) ............................................................................11

*T.D.S. Inc. v. Shelby Mut. Ins. Co.*
    760 F.2d 1520 (11th Cir. 1985) ...........................................................19

*Terry v. Ohio*
    392 U.S. 1 (1968) .................................................................................7

*Tortu v. Las Vegas Metro. Police Dep't*
    556 F.3d 1075 (9th Cir. 2009) .............................................................13

*Union Oil Co. of Cal. v. Terrible Herbst, Inc.*
    331 F.3d 735 (9th Cir. 2003) ...............................................................21

*United States v. Eden*
    659 F.2d 1376 (9th Cir. 1981) .............................................................9

*United States v. Landeros*
    913 F.3d 862 (9th Cir. 2019) ...............................................................7

*United States v. Rodgers*
    656 F.3d 1023 (9th Cir. 2011) .............................................................6

*Velasquez v. City of Long Beach*
    793 F.3d 1010 (9th Cir. 2015) .............................................................8

*Western Fire Ins. Co. v. Univ. City*
    124 F.2d 698 (9th Cir. 1942) ...............................................................10

*Williamson v. Mills*
    65 F.3d 155 (11th Cir. 1995) ...............................................................8

*Zhang v. Am. Gem Seafoods, Inc.*
    339 F.3d 1020 (9th Cir. 2003) ........................................................................................20

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL

## I.   INTRODUCTION

This case involves an illegal stop and search of Plaintiffs by Defendants Holland and Pope. The Court gave Defendants every opportunity to present their defense to the claims and Defendants did, in fact, present every available defense (and many quite frivolous ones). The jury, armed with all of the relevant facts and accurate instructions as to the applicable law, found unanimously that Defendants violated Plaintiffs' rights and caused serious harm to Plaintiffs. The jury recognized the severity of the harm and awarded full compensation for all that Plaintiffs suffered and will likely suffer in the future, including the terror, fear, anxiety, emotional distress, humiliation, worry, indignity, embarrassment, and grief caused by being violently handcuffed and forced into the backseat of police cars because of the color of their skin.

There is no merit to Defendants' contention that the Court erred in evidentiary rulings or jury instructions. There is similarly no merit to Defendants' contention that the amount of the award (especially after factoring in the likely trebling of damages) was "grossly excessive or monstrous." *Lambert v. Ackerley*, 180 F.3d 997, 1011 (9th Cir. 1999) (*en banc*), cert. denied, 528 U.S. 1116, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000). Therefore, the Court should deny Defendants' motion for new trial in its entirety.

## II.   ARGUMENT

### A.   The Court's Evidentiary Rulings and Jury Instructions Were Correct

#### 1.   *Defendants Were Permitted to, and Did, Argue That They Knew About Other Auto Burglaries and the Big 5 Incident; Their Problem Was Not That the Court Excluded Evidence but that the Jury Rightfully Rejected Their Evidence*

Defendants' claim the Court erred in excluding evidence regarding their knowledge of facts that supported reasonable suspicion to detain Plaintiffs. They claim the deputies "knew that a series of auto burglaries had recently occurred, most of which involved theft of electronics out of vehicles in Starbucks parking lots during the early morning hours" and "were also aware that most of the auto burglaries in the area had involved African-American men, typically driving gray or silver 4-door sedans . . .." Def. Mot. for New Trial ("NTM") (Dkt. 258), 4:4-10.

1

1    Defendants also argue that the alleged shoplifting at a Big 5 Sporting Goods nearly three miles

2    away was relevant to their defense and improperly excluded.

3        First, Defendants' factual representations are *false*. Defendants Holland and Pope, as well

4    as Deputy Galloway and Captain DeSousa all testified about the alleged string of auto burglaries

5    by Black men in silver cars. TT 812:15-20 (Holland), 873:8-24 (DeSousa), 891:8-893:7

6    (Galloway[1]), 1125:8-1126:12 (Pope). Defense counsel extensively highlighted this testimony in

7    closing argument. TT 1227:24-1229:25. Despite all of the testimony about morning briefings,

8    muster meetings, radio traffic, APBs, Red Books, TRAK Flyers and the like, there was not a

9    shred of evidence that there were Black men in silver cars breaking into cars anywhere in

10   Alameda County (with the exception of the single Black man in a silver car identified as the

11   suspect in the July 10, 2019 break-in at 2720 Castro Valley Blvd.). The two incidents that the

12   Court excluded, aside from being approximately three miles from the subject Starbucks, did *not*

13   involve Black men in silver sedans. *See* Plaintiffs' Motion in Limine No. 1 (Dkt. 170). Thus, the

14   evidence would not have *helped* Defendants and thus its exclusion was not *prejudicial*.

15       Defendants also claim the Court erred in excluding evidence of an auto burglary that

16   occurred after the Loggervale incident. Defendants represent that this happened the day after the

17   Loggervale incident but that is not true; the subsequent incident the Court excluded happened on

18   September 25, 2019 – five days after the incident. Further, the narrative portion of the report

19   indicates that the suspects – two Black men – were in a silver or gray "larger vehicle," not a four-

20   door sedan. Defendants have never filed this record and Plaintiffs cannot do so publicly because

21   the report was designated as "confidential" by defendants. *See* Dkt. 49, 6:22-23. If the Court

22   believes this document is relevant, Plaintiffs are willing to file an administrative motion to file it

23   under seal.[2] At any rate, a subsequent auto burglary could not have played into the Defendants'

24

25   [1] Defense counsel was clearly trying to encourage Galloway to say there were burglaries at

26   locations other than the Castro Valley Starbucks but Galloway said he only remembered briefing
     on a string of burglaries in "[t]he parking lot associated to that Starbucks in Sector 3, Castro

27   Valley" (and he did not recall much other than that Black males were involved).
     [2] Plaintiffs are trying to avoid having to do unnecessary work in this case, especially in light of

28   Defendants' attack on the reasonableness of Plaintiffs' counsel's hours in the case.

1   reasonable suspicion analysis and it was proper for the Court to exclude this evidence. *See*

2   *Moreno v. Baca*, 431 F.3d 633, 639 (9th Cir. 2005).

3       Contrary to Defendants' representation, the Court did initially permit evidence of the Big

4   5 Sporting Goods shoplifting incident, and such evidence was actually presented at trial. While

5   Holland and Pope expressly represented under oath at deposition that the Big 5 incidents played

6   no role in their decision to detain Plaintiffs, Galloway was permitted to testify at trial about his

7   investigation of the Big 5 incidents and the actions he took during the Loggervale incident. TT

8   897:22-899:7, 904:23-908:3.

9       Initially, the Court prohibited the Parties from mentioning Big 5 in opening statement

10  because the Court was considering whether it should be admissible. Kevin Gilbert, counsel for

11  Defendants, attempted to persuade the Court to admit the Big 5 incident by making a factual

12  misrepresentation to the Court. This had to do with Sgt. Leeper, who told Aaottae Loggervale the

13  reason she was being detained is because there were three auto burglary suspects in that parking

14  lot the previous day. *See* Trial Exhibit 10, 04:22-04:48. Mr. Gilbert told the Court that the

15  "three people sitting in a car" was a reference to the Big 5 shoplifting incident. TT 209:20-23.

16  Gilbert told the Court that he "spoke with Deputy Leeper" and Leeper indicated he was

17  "referencing the Big 5 incident which had the three African-American women." TT 210:24-25.

18  This was obviously a lie since it was clear that Leeper was referencing the previous day's auto

19  burglary at Starbucks, not the Big 5 incident. Moreover, the defense never called Leeper to give

20  the false testimony as represented by Mr. Gilbert to the Court.

21      Later in the trial, the Court indicated to counsel that it planned on excluding the Big 5

22  incident from the case, but gave Defendants "an opportunity to make a real offer of proof, telling

23  me which witness, by name, will come in here and testify that Big 5 had some concrete role in

24  this case." TT 225:15-18. In response, Mr. Gilbert told the Court that Det. Galloway would

25  testify that he believed the Loggervales could possibly be the same African American women

26  identified in the Big 5 incident (despite the fact that the Big 5 suspects were all in their 20s and

27  fled in a red Toyota). Mr. Gilbert admitted, however, that based on Galloway's role, the deputies

28  "concluded that there was not enough information" and the detention was not prolonged by any

3

1  "specific time." TT 225:19-226:6. Mr. Gilbert also reiterated that Leeper would testify that his

2  reference on body cam to "three people sitting in a car" the day before was referring to Big 5.

3  Gilbert promised that Leeper is "going to come in here and testify" but the defense never called

4  him. TT 226:19-20. Finally, Mr. Gilbert told the court that the supervisor on scene, **_Lt. DeSousa_**

5  would testify that Big 5 played into the length of detention.

6      Before allowing Gilbert to make the final offer of proof, the Court stated: "This is an

7  offer of proof that, as an officer of the court, it better be a hundred percent accurate, unlike some

8  of your prior statements to me." TT 228:11-13. Mr. Gilbert responded as follows: "DeSousa will

9  come in and tell you that that was a factor that led to him continuing to discuss these incidents

10 with the plaintiffs and the continued detention while he interviewed them and the

11 documentation." TT 228:14-17. Based on this representation, and despite the Court's belief that

12 the attempt to bring in Big 5 was "ridiculous," "should not be part of this case," and "extremely

13 thin," the Court permitted the Defendants to put on the evidence for which they made the offer of

14 proof. TT 228:23-229:19 ("I'm going to let you hang yourself with this.").

15      During the charging conference, Plaintiffs' counsel asked the Court to revisit the issue of

16 the Big 5 evidence, pointing to Defense counsel's unfulfilled offers of proof, specifically the

17 promise that DeSousa would testify that Big 5 played into the length of detention. When asked to

18 respond, Mr. Gilbert lied yet again: "I confused Deputy Galloway with Deputy DeSousa – or

19 with Captain – Lieutenant DeSousa." TT 1009:15-16. Gilbert also lied about why he did not ask

20 DeSousa about Big 5: "But we did not ask DeSousa about the Big 5 because the Court had

21 instructed us not to go into the details of the Big 5." TT 1010:22-24. Of course, as noted above,

22 the Court very clearly _allowed_ Defendants to hang themselves with the Big 5 incident. TT

23 228:23-24. The Defendants' present attempt to suggest that the Court committed legal error in

24 excluding Big 5 (without explaining the actual history of events in the case) is not only improper

25 it is sanctionable. _See_ Cal. Rule of Prof. Conduct 3.3 (prohibiting attorneys from knowingly

26 making false statements of law or fact to a tribunal).

27 //

28 //

4

1

2

   **2.     *The Court Correctly Found, as a Matter of Law, that Pope's Search of***
   ***the Daughters' Belongings Was Unconstitutional***

3        Defendants claim that the Court failed to provide notice that it was intending on finding

4    Pope's searches of the daughters' belongings unconstitutional. This is incorrect. Plaintiffs moved

5    for partial summary judgment as to the illegality of the search. *See* Dkt. 75, 16:15-19:21. After

6    fulsome briefing by both sides, the Court granted partial summary judgment for Plaintiffs as to

7    the illegality of the search of the daughters' belongings. *See* Dkt. 106, pp. 6-8. The Court later

8    reconsidered its ruling only as to the automobile exception and stated that "all other issues

9    resolved by the order at Dkt. No. 106 remain unaffected." Dkt. 145, 2:21.

10        Despite the Court's ruling, Defendants attempted to elicit testimony at trial that

11    Defendant Pope believed she had consent that justified her search of Aaottae Loggervale's

12    belongings to retrieve her identification. TT, 733:20-735:7. The Court noted that this was a

13    surprise because "the only issue remaining was on – on the search was the automobile exception,

14    meaning *Lopez* . . .." TT, 772:14-23. Therefore, Defendants made an unauthorized decision to re-

15    raise the issue of consent for the search, despite the Court already having ruled there was no

16    valid consent as a matter of law. Defendants cannot then complain that the Court erred in

17    instructing the jury on this issue or that they were surprised by the Court's ruling.

18        Further, contrary to Defendants' contention, even aside from the summary judgment

19    ruling, the Court also advised the defense that it was intending on making a finding as to the

20    search of the daughters' belongings and gave the defense numerous opportunities to argue this

21    point orally and in writing. *See* TT 714:12-716:22, 722:17-21 ("And I do think that maybe I have

22    to instruct the jury that the search itself, as to the two daughters, was illegal. Now, I'm not there

23    yet, but you ought to be doing your research, because I feel like your own authority, *Arturo D*.,

24    requires that result. That's my tentative view."), *see also* Order re Rule 50 Briefing (Dkt. 208)

25    (requesting briefing on numerous specific questions related to the issue of the search); Request

26    for Critique on Jury Instructions (Dkt. 210) (proposing instruction to jury that search of

27    daughters' belongings was unconstitutional and inviting critique from counsel); Def. Response to

28

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL

1    Court's Request for Critique on Jury Instructions (Dkt. 214), 2:13-3:28. Defendants' contention

2    that they were surprised by the Court's finding on the search is disingenuous.

3         The Court correctly concluded that the search for the daughters' identifications was

4    unconstitutional as a matter of law. The only possible warrant exception is the automobile

5    exception, whereby the deputies would have needed probable cause to believe the search would

6    reveal contraband or evidence of a crime or pursuant to *Arturo D*.

7          *United States v. Rodgers*, 656 F.3d 1023 (9th Cir. 2011) held, in a case where

8    identification *could* be evidence of a crime (underage prostitution), that "the Fourth Amendment

9    does not permit the search of a car for a passenger's identification where state law does not

10   require passengers to carry identification and there is no basis in the record to believe that the

11   identification is located inside the car." *Rodgers* at 1030 n.7; *see also id*. at 1024 ("But the Court

12   has never sanctioned a vehicle search simply because there was probable cause to arrest a

13   passenger or because a passenger could not provide identification. The Fourth Amendment

14   requires more."). *In re Arturo D*., 27 Cal. 4th 60 (2002), overruled by *People v. Lopez*, 8 Cal.5th

15   353 (2019), the Court recognized a very narrow exception to the warrant requirement: to search

16   for a driver's license when driver is detained for Vehicle Code infraction and fails to produce

17   registration or identification. 27 Cal. 4th at 64-65. There is no authority that permits search for

18   *passengers'* identification even during a *valid* traffic stop of the driver.

19         Finally, Defendants claim the verdict form erroneously compelled the jury to find that

20   Holland violated the daughters' right to be free from an illegal search because the Court

21   instructed the jury that the search of the daughters' belongings was illegal. Def. NTM, 8:1-13.

22   But Holland did not search the daughters' belongings; he only searched the mother's (Ms.

23   Loggervale's) belongings. And despite Plaintiffs' request, the Court declined to instruct the jury

24   on the integral participant doctrine, which *would have* made Holland liable for the search of the

25   daughters' belongings. *See* Plaintiffs' Objections to Court's Proposed Final Charge to Jury (Dkt.

26   227), 8:1-9:3; Final Charge to Jury (Dkt. 231) (clearly limiting potential liability for search of

27   passengers' identifications to Defendant Pope and omitting any instruction on integral participant

28   liability). Thus, there was no way the jury could have been confused that question 1 permitted

1    them to find that Holland violated the daughters' right to be free from warrantless searches of

2    their belongings.

3              **3.       *The Court Properly Instructed on the Law and Certainly Did Not*

4                            *Advocate for Plaintiffs***

5              Without any apparent basis, Defendants claim that the Court committed judicial

6    misconduct in this trial, including by allegedly showing a clear bias towards Plaintiffs and

7    against Defendants. Defendants then go on to criticize a few of the jury instructions. None of

8    these arguments have merit.

9              *a.       Instruction 23 Correctly Stated that Officers Must Have*

10                       *Reasonable Suspicion to Detain Someone Under the Vehicle Code*

11             The Court's instruction is in line with a robust body of Supreme Court and Ninth Circuit

12   precedent. "*Brown* [*v. Texas*, 443 U.S. 47, 52-53 (1979)] held squarely that law enforcement may

13   not require a person to furnish identification if not reasonably suspected of any criminal

14   conduct." *United States v. Landeros*, 913 F.3d 862, 869 (9th Cir. 2019). To the extent *Lipton v.*

15   *United States*, 348 F.2d 591 (9th Cir. 1965), cited by Defendants, permitted vehicle stops without

16   reasonable suspicion, it is no longer good law in light of *Terry v. Ohio*, 392 U.S. 1 (1968) and its

17   progeny.

18             *b.       Instruction 34 Accurately States the Law*

19             Defendants claim that Instruction 34 requires the jury to consider evidence acquired after

20   the fact in evaluating whether an officer used excessive force. This is clearly not the case. The

21   very language Defendants challenge includes the clause "Whether officers are presented with

22   circumstances . . .," which means the evidence the officers know *at the time the force is used*.

23   The instruction simply informs the jury that if the information presented to the officers include

24   evidence that no crime was committed or was about to be committed, that "*Graham*" factor is

25   "necessarily diminished." This should not be controversial. There is no reason to believe the jury

26   misconstrued this clear instruction to permit them to analyze the use of force with after-acquired

27   evidence.

28

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL

1    Alternatively, even if the instruction was legally deficient, it is of no moment, as

2    Plaintiffs' only claim for excessive force is based on the illegality of the detention. In other

3    words, if there was reasonable suspicion to detain, then Plaintiffs would not have pursued any

4    claim for excessive force. The force used was, after all, the force necessary to effectuate the

5    detention. Thus, the excessive force claim was subsumed by the false arrest claim and no

6    separate instruction was even necessary. *Velasquez v. City of Long Beach*, 793 F.3d 1010, 1024

7    n.13 (9th Cir. 2015) (damages suffered because of force used *in effecting the arrest* are

8    recoverable on an unlawful arrest claim); *Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir.

9    2007) ("If the plaintiff can prove that the officers lacked probable cause, he is entitled to

10   damages for the unlawful arrest, *which includes damages resulting from any force reasonably

11   employed in effecting the arrest*." (emphasis added)); *Bashir v. County of Rockdale County, Ga.*,

12   445 F.3d 1323, 1332 (11th Cir. 2006) ("We reiterate, where an excessive force claim is

13   predicated solely on allegations the arresting officer lacked the power to make an arrest, the

14   excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest

15   claim."); *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995) (finding "damages recoverable

16   on Williamson's false arrest claim include damages suffered because of the use of force in

17   effecting the arrest.").

18                    *c.    Instructing the Jury that Search of the Daughters' Belongings Was*

19                           *a Constitutional Violation Was Not Advocacy*

20   Defendants take exception with the Court's instructing the jury that the search for the

21   daughters' identifications was unconstitutional. As noted above, this finding by the Court was

22   legally proper. As such, the Court was required to communicate this finding to the jury and limit

23   their consideration to two points: (1) Did Pope nonetheless enjoy qualified immunity for the

24   search, and (2) the damages that resulted from Pope's search. There is no basis whatsoever to

25   accuse the Court of trying to advocate for the Plaintiffs by giving these instructions to the jury in

26   this case. Nor do Defendants cite any legal authority that would require a new trial where the

27   Court instructs the jury on legal findings made by the Court, which are required for the jury's

28   determination of other questions.

1    Defendants claim that the judge's reading of an instruction twice was improper advocacy.

2  There was no authority given for this bold claim and Plaintiffs are aware of none. Further, the

3  Court clarified that the most likely reason for repeating the instruction (not that a reason was

4  required) was because the judge's voice may have cracked such that it did not come out clear the

5  first time. The fact that the court reporter heard the first iteration and correctly transcribed it, as

6  Defendants point out, does not necessarily mean the jury would have, especially in light of the

7  fact that the jury is further away from the judge than the court reporter is, and one juror indicated

8  he has a hearing impairment and was using a hearing aid. *See* TT 117:5-8.

9    Finally, the finding as to the illegality of the search of the daughters' belongings was

10  immaterial because there was sufficient evidence to support a finding that there was no

11  reasonable suspicion in the first place, which would invalidate the search as to all of the

12  Loggervales. Indeed, the evidence was overwhelming on this score: the defendants detained

13  three Black women for breaking into cars with absolutely no evidence that linked them to prior

14  crimes.

15            *d.*    *The Court's Instructions on Consent Were Accurate*

16    Defendants challenge the Court's instruction that there was no valid consent and only

17  allowing the jury to decide whether the law was clearly established such that qualified immunity

18  would apply. Plaintiffs challenged the instruction because (1) the Court had already ruled that

19  there was no consent as a matter of law and (2) qualified immunity is a question of law for the

20  Court. As to (1), the Court granted partial summary judgment for Plaintiffs as to the illegality of

21  the search of daughters' belongings because the undisputed facts showed that no warrant

22  exception applied. *See* Dkt. 106: 6-8. The ruling was correct and it was equally correct when the

23  Court instructed the jury that no valid consent was given as a matter of law. *See, e.g., United*

24  *States v. Eden*, 659 F.2d 1376, 1380 (9th Cir. 1981) (affirming district court instruction to jury

25  on issue that court could determine as a matter of law based on the undisputed facts); *Cruz-*

26  *Santos v. Robertson*, C16-2447-HSG, 2018 WL 3854894, at *15 (N.D. Cal. Aug. 10, 2018),

27  citing *People v. Williams*, 43 Cal.4th 584, 635-36 (2008) (court should instruct jury that a

28  witness is an accomplice as a matter of law where facts establishing witness's status as an

9

1    accomplice as "clear and undisputed"); *Western Fire Ins. Co. v. Univ. City*, 124 F.2d 698, 700

2    (9th Cir. 1942) (finding no error in district court instructing jury to find application of insurance

3    policy based on undisputed facts).

4          Here, the facts establishing an absence of a valid warrant exception are undisputed;

5    indeed, such facts are captured on the defendants' body cams. Ms. Aaottae Loggervale, a 17-

6    year-old at the time, was handcuffed and in the back of a patrol car and had repeatedly

7    complained of pain to her wrists due to the handcuffs when Defendant Pope told her that she

8    wanted to get her out of the handcuffs but needed to identify her first. In response, Aaottae told

9    her where her student identification card was located. *See* TT 571:15-572:6, 1147:22-1149:13.

10   The Court correctly found that this was not free and voluntary consent, as a matter of law.

11         Finally, even if it was erroneous to instruct the jury on qualified immunity, the error

12   prejudiced Plaintiffs, who had to overcome this additional hurdle, and not Defendants.

13                     e.    *The Court Correctly Instructed the Jury that Sheriff Ahern was the*

14                           *Final Policymaking Official for the County of Alameda with*

15                           *Respect to Ratification*

16         Defendants claim there was no evidence showing that Sheriff Ahern was the final policy

17   making official for the County. Defendants completely ignore testimony from Captain Brodie on

18   this issue. Brodie conducted the investigation into the Loggervale incident and then provided

19   information directly to Sheriff Ahern. TT 411:16-18, 413:19-21. In general, the Internal Affairs

20   unit is tasked with "ensur[ing] that the members of the Sheriff's Office are following the policies

21   and the laws as necessary, that they are responsible." TT 412:10-18.

22         Captain Brodie testified about his memorandum detailing his investigation and

23   conclusions in the Loggervale incident, and how he addressed the memo to the Sheriff. TT

24   425:7-427:13. According to Brodie, Sheriff Ahern indicated on the memorandum that he was

25   briefed and that no further action was required. TT 435:7-19. Captain Brodie testified that Sheriff

26   Ahern has the sole authority to administer discipline. TT 417:6-8.

27         Defendants did not offer any additional testimony on the issue of whether Sheriff Ahern

28   is the final policymaking official with regard to the investigation into the Loggervale incident or

1   the administering of any discipline, retraining, policy changes, or any other action. Indeed, the

2   only evidence in this case is that Sheriff Ahern made the decision that no further action was

3   required. There can be no reasonable dispute that Sheriff Ahern, the one with final authority in

4   reviewing and responding to the Internal Affairs complaint and the one with *sole discretion*

5   regarding discipline, was the final policymaking official for purposes of Plaintiffs' *Monell*

6   ratification claim. *See Lytle v. Carl*, 382 F.3d 978, 984 (9th Cir. 2004) (quoting *St. Louis v.*

7   *Praprotnik*, 485 U.S. 112, 127 (1988) (to determine whether official has final policymaking

8   authority, "courts consider whether the official's discretionary decisions are 'constrained by

9   policies not of that official's making' and whether the official's decisions are 'subject to review

10  by the municipality's authorized policy-makers.'").

### 4.      Amendment of the Verdict Form Was Appropriate

12          Defendants claim that it was improper for the Court to amend the verdict form during

13  deliberations. A similar argument was raised in *Mendez v. County of San Bernardino*, 540 F.3d

14  1109, 1119 (9th Cir. 2008), overruled on other grounds by *Arizona v. ASARCO LLC*, 773 F.3d

15  1050, 1058 n.1 (9th Cir. 2014). There, the district court had "recalled the jury in the midst of

16  deliberations" to issue a new instruction, specifically one directing a finding against the plaintiff.

17  The plaintiff argued that the timing of the instruction, coming after closing arguments, deprived

18  her of due process since she was not able to frame her closing argument in light of the

19  instructions. *Mendez*, 540 F.3d at 1117-18. The Ninth Circuit held that even if it accepted the

20  "dubious proposition" that there is a right in civil cases to have the jury instructed before

21  summation, the plaintiff could not show she was substantially misled in formulating her

22  arguments nor otherwise prejudiced. *Id*. at 1118. Similarly, and relevant to this case, there is no

23  right to a final verdict form before summation.

24          Further, the Court's decision to allow the jury to consider Plaintiffs' *Monell* claim based

25  on ratification of Pope's conduct was proper and did not result in any prejudice to Defendants.

26  First, as Plaintiffs proved to the Court's satisfaction, the Plaintiffs had never waived their *Monell*

27  claim based on ratification of Pope's conduct. Second, the facts and law governing the *Monell*

28  claim based on ratification of the deputies' conduct applies equally to both Holland and Pope.

11

1   Indeed, Captain Brodie specifically testified that he investigated the search and concluded it was

2   "appropriate and within policy." *See* TT 433:11-434:3. There was no differentiation between the

3   search conducted by Holland of the mother's belongings or by Pope of the daughters'

4   belongings. The County ultimately ratified the searches because, according to Brodie, the County

5   policy permitted search of the passenger compartment "to locate identification when detaining

6   individuals who refuse to identify or are not complying with orders and are essentially refusing."

7   TT 433:15-22. This evidence fully supported a finding that along with all of the other

8   unconstitutional actions by the deputies, the County also reviewed, analyzed, and approved

9   (through the Sheriff) as "within policy" the warrantless search of the vehicle to find

10  identifications for the daughters, who were only passengers. This would suggest that the *Monell*

11  claim based on ratification of Pope's search was even more clear than the *Monell* claim based on

12  ratification of Holland's search. But since the detention was illegal ab initio, all searches were

13  clearly illegal and Alameda made a conscious decision to ratify the unconstitutional conduct and

14  the bases for the conduct, which is all that is required to prove *Monell* liability.

15          For these reasons, there was ample legal ground to revise the verdict form during

16  deliberations in order to permit the jury to make a finding on a claim that Plaintiffs had always

17  pursued, and which was fully supported by the evidence. Defendants have not shown that the

18  decision to amend the verdict form caused any prejudice or that they were deprived of a fair trial

19  as a result. The jury still had to deliberate unanimously to answer that additional question in the

20  affirmative, which they did. The Defendants have certainly failed to meet their burden of

21  showing that this one change in the verdict form was tantamount to "advocacy for Plaintiffs,"

22  much less that this was part of a course of conduct of "obvious partiality [that] revealed such a

23  high degree of favoritism for Plaintiffs, and antagonism for Defendants, that a fair judgment was

24  impossible." *See* Def. NTM, 16:27-17:2.

25          Finally, there is no merit to Defendants' claim that the verdict form suggested the County

26  would pay the judgment. The Court explicitly advised and emphasized to the jury that they

27  should *not* consider who will be paying the judgment. TT 1329:14 ("It is irrelevant to your

28  consideration as to who will pay"), 1330:23-24 ("Who would pay is a different question that is

1  irrelevant to your consideration. It should be decided on the merits."), 1331:19-22 ("Now, who

2  pays is irrelevant. You should decide that against Officer Pope based on the merits and not on the

3  theory that somebody else is going to be paying the bill or not paying the bill. Decide it on the

4  merits.").

5       Defendants claim it was error to remove a line for damages against the County. But

6  Defendants proposed a verdict form with only one line for damages for each Plaintiff without

7  breaking out the damages against any particular defendant. See Dkt. 129, 17:2-10. So Defendants

8  cannot claim error in the Court bringing the verdict form more in line with Defendants' own

9  requested form.

10      **B.**    **The Jury's Damages Award Was Supported by the Evidence**

11       When the movant claims that a verdict was against the clear weight of the evidence at

12  trial, a new trial should be granted "[i]f, having given full respect to the jury's findings, the judge

13  . . . is left with the definite and firm conviction that a mistake has been committed." *Landes*

14  *Const. Co., Inc. v. Royal Bank of Can.*, 833 F.2d 1365, 1371-72 (9th Cir. 1987). However, a

15  "district court may not grant a new trial simply because it would have arrived at a different

16  verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir.

17  2001); *see also Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1084 (9th Cir. 2009)

18  (holding that a "district court cannot substitute its evaluations for those of the jurors") (internal

19  citation omitted). Courts should be cognizant that "in cases involving intangible, non-economic

20  losses," determining damages "is a matter peculiarly within a jury's ken." *Smith v. Kmart Corp.*,

21  177 F.3d 19, 30 (1st Cir. 1999) (internal quotations omitted). A district court "enjoys

22  considerable discretion in granting or denying the motion." *Jorgensen v. Cassiday*, 320 F.3d 906,

23  918 (9th Cir. 2003).

24      ***1.***    ***Plaintiff Presented Sufficient Evidence of Significant Damages***

25       Defendants claim that Plaintiffs "failed to present any evidence to support the jury's

26  award of compensation for the *de minimus* injuries that they allegedly suffered." NTM, 19:3-4.

27  Defendants suggest that some sort of documentation is required beyond the Plaintiffs' own

28  testimony about their non-economic damages. This is not the law.

13

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL

1

> CPI also appears to suggest that emotional damages awards must be
> supported by some kind of "objective" evidence. While objective evidence
> requirements may exist in other circuits, such a requirement is not imposed
> by case law in either Washington, the Ninth Circuit, or the Supreme Court.
> *See Herring*, 914 P.2d at 77–83 (upholding damage award in excess of
> $1,000,000, including $550,000 for emotional damages, in disability
> discrimination and retaliation case based on testimonial evidence of
> emotional harm); *Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th
> Cir.1985) (upholding emotional damages based solely on testimony);
> *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir.1994) (noting that emotional
> damages may be awarded based on testimony alone or appropriate inference
> from circumstances); *Carey v. Piphus*, 435 U.S. 247, 264 n. 20, 98 S.Ct.
> 1042, 55 L.Ed.2d 252 (1978) (noting that emotional distress damages are
> "essentially subjective" and may be proven by reference to injured party's
> conduct and observations by others). *See also Merriweather v. Family
> Dollar Stores*, 103 F.3d 576, 580 (7th Cir.1996) (noting that plaintiff's
> testimony can be enough to support emotional damages).

*Passantino v. Johnson & Johnson Consumer Products, Inc*., 212 F.3d 493, 513 (9th Cir. 2000).

This Court has held that "[t]he intangible nature of [noneconomic damages] makes it difficult for any court to reach a 'firm conviction' that a jury made a mistake evaluating such questions. That is why, when evaluating intangibles such as these, courts recognize the process is a matter 'peculiarly within a jury's ken.'") (cleaned up). *Holzhauer v. Golden Gate Bridge Highway & Transp. Dist*., C13-2862-JST, 2017 WL 3382316, at *2 (N.D. Cal. Aug. 7, 2017), aff'd, 743 F. App'x 843 (9th Cir. 2018).

Here, the evidence concerning damages came from the body cam videos showing the extreme distress that Plaintiffs went through during the incident itself, and from the testimony of the three Plaintiffs, who describe the effect this incident has had, and continues to have, on their lives. Defendants, of course, have failed to acknowledge any such evidence, perhaps hoping that no one remembers it or brings it up.

The videos show the three Plaintiffs extremely worried, upset, frustrated, anxious, fearful, emotionally distressed, and experiencing physical pain to varying degrees. The Plaintiffs, for no reason other than their race, are handcuffed and locked up in police cars for well over an hour. Defendants also furthered the indignity and humiliation by rummaging through the Plaintiffs vehicle, including the trunk, and looking through their purses and pocketbooks. Plaintiffs testified about their damages very clearly and persuasively.

14

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL

1    Aasylei Loggervale testified that she was so nervous about the initial stage of the

2    encounter she asked her daughters to start recording. She even stated that she needed protection

3    because she did not know where it could lead. In light of the numerous media reports of deaths

4    of African Americans at the hands of police, it is logical to conclude that Ms. Loggervale must

5    have been terrified for her own safety as well as the safety of her daughters. This is especially so

6    once her daughters were taken away from the car in handcuffs, where Ms. Loggervale did not

7    know what was happening to them. Indeed, all three Loggervales were separated, likely

8    exacerbating the anxiety and fear. The deputies told Ms. Loggervale that they did not have to call

9    a supervisor, further causing fear and anxiety. Plaintiffs Aasylei Loggervale and Aaottae

10   Loggervale even called 911, another sign of how desperate and terrified they were.

11   Ms. Loggervale also testified that she was embarrassed and sick to her stomach over the

12   situation. Ms. Loggervale testified that at trial, more than three years later, she still gets anxious a

13   lot and very sad thinking about the incident and when seeing certain Starbucks. She also

14   described the injury to her wrists due to the handcuffing and the numbness she felt (which she

15   complained about on scene). The Loggervales also testified that this incident soured a family

16   vacation to San Diego to celebrate Aaottae's 18th birthday, a huge milestone in her life. It also

17   kept Aasylei Hardge-Loggervale from making it to her statistics test on time, resulting in the

18   only "B" she received (she was otherwise a straight A student).

19   Aaottae Loggervale, 17 at the time, testified that she was scared and had never been in

20   handcuffs before. She described injuries she suffered when she was handcuffed and then pulled

21   into the back of the police car. The body cam videos show that while she initially had her cell

22   phone and was able to call 911, the phone was taken from her, leaving her with no recourse. She

23   also is heard on video complaining of pain many times but none of the deputies did anything to

24   alleviate her pain or distress. She was also lied to by Pope, who told her she would get her out of

25   the handcuffs once Aaottae identifies herself. In response, Aaottae told Pope where her student

26   ID was, but Pope did not let her out of the handcuffs. This could reasonably be expected to cause

27   additional fear and distress. Aaottae also testified that she had bad asthma and felt like she could

28   not breath and that when she asked the deputies to roll the windows down, they actually rolled

1 them up, further increasing her distress. She also complained repeatedly that the handcuffs were

2 too tight but nobody loosened them.

3       At the time of trial – over three years after the incident – Aaottae still is reminded of the

4 incident when she sees a police officer, goes to Starbucks, or is simply sitting in a car. She feels

5 scared because she believes that she could possibly be targeted as a suspected criminal while

6 simply minding her own business. She is now more aware of everything she does because she

7 never thought she would ever have an altercation with police and the incident has changed that.

8 She is afraid that even if she is innocent, police can simply turn her into a criminal if they wish.

9 As the Court will recall, Aaottae was crying and very emotional while watching some of the

10 body cam videos on the witness stand.

11       Aasylei Hardge-Loggerale testified that she was on her menstrual cycle and needed to use

12 the restroom to change her sanitary pad. But she was not permitted to use the restroom; instead,

13 she was handcuffed and put in a police car like her mother and sister. She also had to get to a

14 statistics exam and was very concerned about missing it. She testified about feeling isolated, and

15 the first time she had been arrested or detained or in a patrol car. She suspected she was being

16 targeted because of her race and she felt further isolated because of that. While in the patrol car

17 she was afraid blood was going to ruin her pants.

18       She was told by Sgt. Leeper (falsely) that the auto burglary suspects had Nevada plates,

19 which would have clearly created more fear in Aasylei that she could be arrested and go to jail

20 for a crime she did not commit. Like her sister, Aasylei also had her phone with her in the squad

21 car but it was later confiscated. She described being upset and frustrated. Because she was late to

22 the statistics test, she got a C+ on the test, which brought her grade down to a B. The trip to San

23 Diego the family took was "sorrowful" for Aasylei. She went to sleep later than usual and had

24 high levels of stress and anxiety. At the time of trial, she still feels upset, confused, and

25 frightened. She has to be more conscious about her actions, including just sitting in a parking lot.

26 She relives the incident when she seeks Starbucks.

27       Before being released, Lt. DeSousa spoke with each Plaintiff and repeatedly told them

28 that he could formally arrest them and take them to jail if he wanted to.

1    Subjecting Plaintiffs to this type of treatment is extremely damaging. This is especially so

2    in light of the history of slavery and, later, *de facto* and *de jure* segregation and discrimination

3    faced by African Americans. The notion that in this day and age you can be arrested,

4    manhandled, searched, and otherwise violated simply for being parked in your car while Black is

5    devastating. The Defendants' actions essentially communicated to the Plaintiffs that they are not

6    welcome members of our society. Now Plaintiffs have to worry that if they are waiting in a

7    vehicle, or on a sidewalk, or anywhere else, for too long, whether a passing officer might deem

8    them criminal suspects.

9    For white people, it is almost impossible to know exactly how harmful the Defendants'

10   conduct was. Luckily, our system allows the decision on damages to be made by a racially and

11   ethnically (and otherwise) diverse cross-section of our community. The jurors deliberated for

12   more than two days and came to the careful and thoughtful conclusion that the damages

13   Plaintiffs proved in this case were significant. There is no basis for second-guessing this jury and

14   reducing any of the damages that they awarded. Further evidence that this verdict was based on a

15   carefully considered deliberation, and not due to any passion or prejudice, is the fact that the jury

16   awarded slightly more than Plaintiffs' counsel suggested in closing argument. *See* TT 1221:2-5.

17   Further, the jury is presumed to have followed the Court's instructions on damages. This

18   includes the following instruction:

> If you find for one or more of plaintiffs on any of the claims we've
> discussed, you must determine each plaintiff's damages resulting from the
> violations. Plaintiffs have the burden of proving damages resulting from any
> violation by a preponderance of the evidence. Damages means the amount
> of money that will reasonably and fairly compensate the plaintiffs for any
> injury you find were caused by defendants. In determining the measure of
> damages, you should consider (1) the loss of enjoyment of life experienced;
> (2) the mental and emotional pain and suffering experienced and the
> reasonable probability that it will be continued in the future; and (3) the
> nature and extent of any of their injuries.

Final Charge to the Jury (Dkt. 231), 17:15-22.

Defendants even admit that the jury followed this instruction. *See* Def. Opp. to Motion

for Interest and Penalty (Dkt. 256), 1:22-23 ("Further, it must be presumed that the jury followed

the Court's instruction to "reasonably and fairly" compensate Plaintiffs . . .."). Thus, the jury was

1  capable of awarding (and likely did award) damages to compensate Plaintiffs for the separate

2  items listed in the jury instruction. That is, an amount to compensate for past and future loss of

3  enjoyment of life and a separate amount to compensate for the past and future mental and

4  emotional pain and suffering. Had the Court given the instruction Plaintiffs requested (CACI

5  3905A), the jury would have been explicitly advised to consider many other categories of harm.

6  However, even without the instruction, the jury could have considered all the ways in which the

7  Defendants' actions harmed Plaintiffs. This includes the terror they felt in the moment (not an

8  insignificant event in their lives, especially in light of the absence of any evidence that any

9  Plaintiff had ever been arrested or handcuffed before), the humiliation they felt being handcuffed

10  and put in police cars in a public place in broad daylight, the indignity of having their rights so

11  flagrantly violated for no reason other than their race (indeed, Defendants could come up with no

12  valid reasons for the detention either at the scene or since), and the invasion of their privacy

13  when the Defendants went into the Plaintiffs' purses and wallets.

14      The Court also instructed the jury that if they find for Plaintiffs on the Bane Act claim

15  (which they did), the jury could award, in addition to actual damages, "any amount up to a

16  maximum of three times the amount of actual damage." Dkt. 231, 17:12-14. Without a separate

17  line for Bane Act damages, it must be presumed that the large award was the product of

18  combining the actual damages with an additional award of treble damages. Defendants have

19  agreed in a recent filing that the jury did, in fact, award treble damages. Dkt. 256, 1:21 (arguing

20  that the Court should not award prejudgment interest because, based on the size of the verdict, "it

21  can only be presumed that Plaintiffs were awarded treble damages").

22      Because the jury presumably awarded treble damages in addition to actual damages, the

23  compensatory damages component of the award against Holland may be presumed to be one

24  quarter of the total amount awarded (i.e., the amount of the verdict is comprised of actual

25  damages plus three times actual damages). Thus, as explained further below, the compensatory

26  award for Ms. Loggervale in the amount of $687,500 (plus $2,062,500 in treble damages) and

27  for each daughter in the amount of $500,000 (plus $1,500,000 each in treble damages) was not

28  grossly excessive. Nor was the award of $750,000 for each daughter against Pope for violating

1   their Fourth Amendment rights by searching their belongings without a warrant or other

2   justification.

3                    **2.      *Case Law, While Not Dispositive, Supports the Size of the Verdict***

4           "While analogies to, and comparisons with, other cases may be helpful on many types of

5   issues, their usefulness on questions of damages is extremely limited." *Mattschei v. United*

6   *States*, 600 F.2d 205, 209 (9th Cir. 1979). Nonetheless, district courts appear to frequently look

7   to other cases to guide their evaluation of remittitur motions. When a party argues the verdict on

8   a state law claim is excessive, the district court should apply state law in evaluating the motion.

9   *See Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 426-31, 116 S.Ct. 2211, 135 L.Ed.2d 659

10  (1996); *see also Mason and Dixon Intermodal, Inc. v. Lapmaster Intern. LLC*, 632 F.3d 1056,

11  1060 (9th Cir. 2011) (explaining that the court applies state substantive law to state law claims

12  based on supplemental jurisdiction); *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1530

13  (11th Cir. 1985) (explaining that review of the excessiveness of a jury's verdict on a state law

14  claim is governed by the State's substantive law, but if excessiveness is found, it is federal law

15  that determines if a new trial should be granted). Here, Plaintiff prevailed on both state and

16  federal claims, so Plaintiffs rely on both federal and state precedent.

17          *Harper v. City of Los Angeles*, 533 F.3d 1010 (9th Cir. 2008) involved Section 1983

18  claims by three officers with the Los Angeles Police Department who had been wrongfully

19  prosecuted in connection with the Rampart scandal. The jury found the Defendants liable and

20  awarded each plaintiff $5,000,001 in compensatory damages, for a total of $15,000,003. [3]

21  *Harper*, 533 F.3d at 1015. The district court denied the defendants' motion for new trial. The

22  Ninth Circuit found that the damages were supported by substantial evidence. *Id.*, quoting

23  *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 844 (9th Cir. 2003) ("[W]e do not lightly cast

24  aside the solemnity of the jury's verdict."). The testimony from the officers about the adverse

25  physical and emotional effects of the media attention and loss of reputation was "substantial

26  _____

27  [3] This equates to more than $6.8 million each ($20.4 million total) in today's dollars. *See*

28  https://www.bls.gov/data/inflation_calculator.htm

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL

1    evidence from which the jury could find that the harm to each officer justified an identical

2    damage award." *Id*. at 1029. The Court also found that the "jury's refusal to find that Chief Parks

3    acted with malice, fraud, or oppression belies the argument that the jury was unduly inflamed."

4    *Id*. at 1030.

5           Here, the evidence similarly supports the jury's finding of significant non-economic

6    damages to each of the three Plaintiffs from the arrest, use of force, search, and resultant harms.

7    Like *Harper*, the identical award to all three Plaintiffs is justified by the similarity in harm they

8    suffered. Further, like *Harper*, the refusal to award punitive damages shows the jury was not

9    unduly influenced by passion or prejudice. *See* Dkt. 237 (declining to find Holland guilty of

10   malice). Also like *Harper*, the Plaintiffs did not need to support their claim with economic

11   damages. 533 F.3d at 1030, citing *Zhang v. Am. Gem Seafoods, Inc*., 339 F.3d 1020, 1040 (9th

12   Cir. 2003) (plaintiff's testimony sufficient to support jury's award), *Chalmers v. City of Los

13   Angeles*, 762 F.2d 753, 761 (9th Cir. 1985) (same), and *Johnson v. Hale*, 13 F.3d 1351, 1353 (9th

14   Cir. 1994) (same).

15          While the physical symptoms of the emotional distress and other harms may have been

16   arguably greater in *Harper*, that case did not involve long term feelings of anxiety, fear,

17   humiliation, and worry of the sort that Plaintiffs discussed at trial, based on their race-based

18   arrest and search. For Plaintiffs, their safety, comfort, privacy, and security have been thrown

19   into doubt simply for being Black. In this way, the Loggervales arguably suffered harm even

20   more severe than the police officers in *Harper*. Nonetheless, Plaintiffs are not arguing that $5

21   million each is appropriate, which was the verdict in *Harper* over 15 years ago. Ms. Loggervale

22   only needs to justify the award of $687,500 against Holland, and the daughters only need to each

23   justify the award of $500,000 against Holland and $750,000 against Pope, which is far less than

24   the amount awarded in *Harper*.[4]

25

26

27   _____

28   [4] *Harper* did not involve Bane Act claims or any other claims that provide for treble damages.

1    In *Mueller v. Hawaii Dept. of Public Safety*, 595 F. Supp. 3d 920 (D. Haw. 2022), the

2    plaintiff was illegally strip searched and improperly touched by a male officer. The jury awarded

3    a total of $7,050,000 in damages arising out of the incident. The district court denied the

4    defendants' motion for new trial, finding that the evidence "clearly support[ed] the jury verdict."

5    *Id*. at 927. Among the facts recounted by the district court were that the defendant entity engaged

6    in an untimely delay in investigating the incident (there was similar evidence in the present case),

7    that the department kept inaccurate records of the investigation and provided false information to

8    the plaintiff (similar to the present case), and that the State's continued negligence over a period

9    of years caused additional trauma (also like the instant case). *Id*. Like in the present case, the

10    mistreatment while in jail caused the plaintiff to "mistrust authority and caused her to have

11    continued fear of law enforcement." *Id*. at 931. The district court concluded by noting: "It is not

12    for the Court to alter the credibility determinations of the jury or to substitute its own opinions as

13    to the value of Plaintiff's pain or emotional distress." *Id.*, citing *Johnson v. Sartain*, 46 Haw. 112,

14    375 P.2d 229, 231 (1962) and *Union Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743

15    (9th Cir. 2003).

16    In *Hunio v. Tishman Const. Corp. of Cal.*, 14 Cal. App. 4th 1010 (1993), *review granted*

17    *and opinion superseded on other grounds*, 882 P.2d 248 (1994) (*In Bank*), the court of appeal

18    upheld the trial court's grant of a remittitur of a $4 million emotional distress award to $2

19    million. The plaintiff there was constructively terminated from employment due to his age,

20    suffering severe emotional distress and psychiatric injury as a result. While the psychiatric

21    injuries appear to have been more severe than Plaintiffs' in the instant case, the $2 million award

22    referenced in the 1993 opinion is worth more than $4.2 million in today's dollars, which is far

23    more than the compensatory damages awarded by the jury to Plaintiffs. By way of illustration,

24    the compensatory portion of Ms. Loggervale's award ($687,500) is more than six times less than

25    the non-economic emotional distress award upheld in *Hunio*.

26    In *Diaz v. Tesla, Inc.*, 598 F. Supp. 3d 809 (N.D. Cal. 2022), the district court reduced a

27    non-economic compensatory damages award based on workplace racial harassment from $6.9

28    million to $1.5 million. Like the instant case, the damages to Mr. Diaz consisted of being

1   mistreated due to his race. The court found that one reason to reduce the jury's award for future

2   damages was the fact that the evidence showed Mr. Diaz's harm was greatly reduced after

3   stopping work at Tesla. *Id.* at 836. By contrast, the jury in the instant case was presented with

4   clear evidence from the Plaintiffs that they are still suffering from fear, anxiety, and emotional

5   distress and will likely continue to suffer such distress indefinitely into the future. Whenever

6   Plaintiffs see a Starbucks, or see law enforcement, or are simply waiting somewhere in public,

7   they are reminded of the incident and feel fear and distress. The extreme distress was evident in

8   the daughters' testimony, coming more than three years after the incident, where they broke

9   down crying heavily discussing the events in question. Notably, the $1.5 compensatory damages

10   award (after remittitur) in *Diaz* is far more than the compensatory amounts (not including

11   trebling) that the jury awarded here. The amount awarded in the instant case is not beyond "the

12   maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 7656 F.3d 1081, 1094

13   (9th Cir. 2014).

14   **3.    The Cases Defendants Cite Are Inapposite**

15   Defendants rely on *Cervantes v. County of Los Angeles*, C12-9889-DDP, 2015 WL

16   5163031 (C.D. Cal. Sep. 3, 2015), an unpublished district court case, which actually supports the

17   *denial* of a remittitur. There, the plaintiff alleged emotional distress damages from being

18   punched in the face and neck by sheriff deputies and taken to jail for a few hours. *Cervantes*, at

19   *1. Regarding the physical injuries, the evidence was that the plaintiff's treating physician told

20   him several times that he "was fine." *Id*. While the plaintiff claimed he was still suffering from

21   pain in his eye and "floaters" in his field of vision, he admitted on cross-examination that

22   following the incident, he had been struck in the head by a falling chimney while on the job. *Id*.

23   Regarding the emotional harm, the evidence showed that while the plaintiff said it pained him to

24   tell his family he had been incarcerated, he had actually been in jail prior to the incident. *Id*.

25   Further, despite claiming he was having nightmares about the incident, he continued to visit the

26   billiards hall where the incident took place every day after the incident. *Id*. The district court,

27   clearly skeptical about the extent of the plaintiff's claimed damages, reduced the $900,000 award

28   to $500,000, which is the equivalent of $634,000 in today's dollars. *See* CPI Inflation Calculator,

1   available at https://www.bls.gov/data/inflation_calculator.htm . *Cervantes* did not involve Bane

2   Act claims or treble damages.

3       Unlike in *Cervantes*, there was no evidence that the Plaintiffs were exaggerating their

4   injuries or emotional distress. Further, there was no evidence that the Loggervales were ever

5   handcuffed or arrested before or that any other incident contributed to their harms. Also unlike in

6   *Cervantes*, the harm in this case included being racially profiled, which has devastating effects

7   on the Plaintiffs' psyches. They were brutalized and confined simply because of their race, and

8   this has changed their entire belief system. They are now constantly vigilant and mindful that

9   even if they are doing nothing wrong, they still may be deemed suspicious. It is hard to overstate

10  the harm an episode like this causes a person of color in our society. We are told that we are all

11  created equal and entitled to equal treatment under the law. But once officers violate a citizen

12  simply for having a darker complexion, the entire notion of equality is taken away from the

13  person. This is what the evidence showed happened to the Loggervales. It is also why, as

14  discussed below, hundreds of mock jurors awarded an *average* of $3.5 – $4.6 million for such

15  harm (with many individual mock jurors awarding far more), not including treble damages.

16      *Bandary v. Delta Air Lines, Inc*., _____ F. Supp. _____, No. C17-1065-DSF, 2022 WL

17  18142540 (C.D. Cal. Aug. 26, 2022) does not support a remittitur here. In *Bandary*, the plaintiff

18  was restrained on an airplane after becoming aggressive with the flight attendant. *Bandary*, at *1.

19  The plaintiff allegedly suffered injuries to his wrists, pain in his shoulders, and emotional

20  distress. *Id*. The jury returned a verdict but the court had to correct the verdict form, resulting in

21  a second verdict awarding non-economic damages of $2.5 million for "bodily injury" and $6

22  million for emotional distress. *Id*. at *2. The district court granted the defendant's motion for

23  new trial, finding the damages were excessive, without providing much analysis. However, the

24  $8.5 million in compensatory damages in *Bandary* is many times more than the compensatory

25  portion of the award in this case. The facts are also much different, making *Bandary* of little

26  utility in assessing the instant matter.

27      *Smith v. City of Oakland*, 538 F. Supp. 2d 1217 (N.D. Cal. 2008) is also inapposite.

28  There, the plaintiff, a parolee, was arrested and prosecuted for illegal possession of a firearm

1   after police planted a gun in his residence. Mr. Smith spent 4.5 months in jail before being

2   released. The district court remitted the jury's verdict from $5 million to $3 million ($4.24

3   million in today's dollars). The Court also remitted the damages awarded to Ms. Gray, Mr.

4   Smith's girlfriend, from $750,000 to $300,000 ($424,000 in today's dollars). The facts

5   surrounding this incident are very different from the facts of this case. Further, the girlfriend's

6   emotional distress claim was based almost entirely on the fact that the police entered and

7   searched her home and made her wait outside while they arrested her boyfriend. The Plaintiffs

8   here suffered far greater damages than Ms. Gray in *Smith*. Unlike Ms. Gray, each Plaintiff was

9   handcuffed, placed in a separate police car and held for well over an hour. The Plaintiffs here

10  also had their personal belongings searched by the Defendants. All of the actions taken against

11  Plaintiffs were the result of racial profiling, as there were no facts connecting them to the

12  previous auto burglaries except for the fact that they are Black and two of the prior suspects (one

13  on September 19, 2019 and one on July 10, 2019) were Black. The type of harm Plaintiffs

14  suffered is far greater than the harm suffered by Ms. Gray, and supports the jury's award of

15  compensatory damages (not including trebling) to each Plaintiff in the amount of $687,500 for

16  Ms. Loggervale and $1,250,000 for each daughter ($500,000 in compensatory damages against

17  Holland and $750,000 against Pope for the search). The jury's award in the instant case is not

18  grossly excessive, monstrous, shocking, or beyond the maximum amount supported by the

19  evidence.

20         Finally, *Francis v. City of New York*, C15-7997-VSB-KHP, 2019 WL 8918743 (S.D.N.Y.

21  Nov. 11, 2019) did not involve a jury verdict at all, but rather a magistrate's recommended

22  damages award after default by the defendant. There, the plaintiff only requested a modest

23  amount in damages, suggesting that the harms were somewhat insignificant. Indeed, the

24  magistrate found that "plaintiff has offered little evidence of emotional distress besides the

25  single-paragraph statement in his affidavit. While being falsely arrested understandably caused

26  Mr. Francis distress, as it would anyone, the Court finds that Plaintiff has proved no more than

27  minimal damages." *Francis*, at *9. This case has no bearing on the issues involved here.

28

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL

1

### 4. *Large Scale Focus Grouping Supports the Size of the Verdict*

2      Plaintiffs suggest that another reason to decline to remit the damages award is because it

3  is consistent with the large-scale focus group Plaintiffs conducted prior to trial. Plaintiffs hired

4  Trial Survey Group ("TSG") to perform what is often referred to as a "big data" focus group.

5  Plaintiffs' counsel worked with Mr. Denove, President of TSG, to make an online presentation to

6  mock jurors, who would then answer questions about the case. Denove Decl., ¶¶ 10-13. This

7  process tends to be far more accurate and predictive about damages awards than the traditional

8  mock juries, which usually consist of no more than a few dozen participants. Denove Decl., ¶ 10.

9      The focus group in this case involved 221 participants made up of similar demographics

10 as a potential jury would comprise. Denove Decl., ¶¶ 20-21. To help expose any weakness in

11 Plaintiffs' case, counsel are encouraged to put on an even stronger defense case, and weaker

12 plaintiffs' case, than would be expected at trial. Denove Decl., ¶ 15. The mock jurors were also

13 shown relevant portions of the body cam videos of the actual incident. Denove Decl., ¶ 20. In

14 responding to the presentation, the jurors finding a lack of reasonable suspicion at some point in

15 the incident awarded Plaintiffs an average of $3,522,883. Denove Decl., ¶ 23. Among the

16 participants that responded that Holland never had reasonable suspicion to detain the Plaintiffs,

17 the average award was $4,663,465. Denove Decl., ¶ 24. The research participants were not

18 informed about the potential for trebling damages, so the amount awarded was purely for

19 compensatory damages. Denove Decl., ¶ 26. The participants were not asked to award separate

20 amounts for each Plaintiff but instead they were asked to award one lump sum for all three

21 Plaintiffs. Denove Decl., ¶ 23.

22     The results of the research played a significant role in counsel's request for $2.5 million

23 in damages for each Plaintiff. The focus group result also shows that even if the Court remits the

24 verdict or force Plaintiffs to re-try the damages, the result in a second trial is likely to be similar

25 to the first trial, if not greater. In other words, the focus group evidences that this result was not a

26 fluke or an outlier, nor the result of passion, prejudice, or other improper motives. Further, had

27 Defendants conducted their own research, they may not be asking for a retrial for fear of an even

28 larger verdict the next time.

### III.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion for new trial under Rule 59 in its entirety.


Dated: April 12, 2023                              LAW OFFICE OF JOSEPH S. MAY
                                                   and
                                                   GEARINGER LAW GROUP
                                                   and
                                                   ALTAIR LAW LLP


                                                   */s/ Joseph S. May*
                                                   By: JOSEPH S. MAY
                                                   Attorneys for Plaintiffs