Joseph S. May   SBN 245924
LAW OFFICE OF JOSEPH S. MAY
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel: (415) 781-3333
Fax: (415) 707-6600
joseph@josephmaylaw.com

Brian Gearinger   SBN 146125
GEARINGER LAW GROUP
740 Fourth Street
Santa Rosa, CA 95404
Tel: (415) 440-3102
brian@gearingerlaw.com

Craig M. Peters   SBN 184018
ALTAIR LAW
465 California Street, 5th Floor
San Francisco, CA 94104-3313
(415) 988-9828
cpeters@altairlaw.us

Attorneys for Plaintiffs
AASYLEI LOGGERVALE,
AASYLEI HARDGE-LOGGERVALE, and
AAOTTAE LOGGERVALE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AASYLEI LOGGERVALE; AASYLEI HARDGE-LOGGERVALE; and AAOTTAE LOGGERVALE,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF ALAMEDA; STEVEN HOLLAND; MONICA POPE; and DOES 1 to 50, inclusive,<br><br>Defendants. | CASE NO. C20-4679-WHA<br><br>**DECLARATION OF CHRIS DENOVE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, FOR REMITTITUR PURSUANT TO FRCP RULE 59**<br><br>Date: May 11, 2023<br>Time: 8:00am<br>Dept.: Courtroom 12, 19th Floor<br>Judge: Hon. William Alsup |

1

I, Chris Denove, declare:

1. I am an attorney at law duly licensed to practice before all the Courts of the State of California. I have personal knowledge of the following facts, and if called as a witness can and will competently testify to them under oath.

2. This declaration is made in support of Plaintiffs' Opposition to Defendants' Motion for New Trial or, in the Alternative, for Remittitur Pursuant to FRCP 59.

**EDUCATION AND EXPERIENCE**

3. From 1986 through 1989, I worked as an analyst for the preeminent opinion research firm of J.D. Power and Associates.

4. I began attending law school in 1992 and graduated from The University of California, Davis School of Law in 1995, and was admitted to the California Bar in December 1995.

5. From 1995 through 1998, I practiced law full time as a civil attorney in private practice. I then rejoined J.D. Power and Associates in 1999 and spent the next ten years as a research director and later as a Partner and Vice President.

6. I initially focused much of my time at J.D. Power and Associates on franchise laws and other legal issues involved in the changing role of automobile dealerships in the burgeoning "Internet Age."

7. My overall tenure at J.D. Power and Associates is generally defined as serving as the firm's de facto head of product development where I would develop a new product or division for the firm, and then manage that new division past the "proof of concept" phase for two years before turning it over to someone else to manage. I would then move on to developing the next revenue stream; a process that repeated itself numerous times over my tenure. One of the first product areas I developed at J.D. Power and Associates related to how both consumers and businesses could use the then relatively new concept of the Internet for both research and commerce.

8. While at J.D. Power and Associates I became one of the public faces of the company and appeared numerous times as an on-air analyst on the subject of consumer opinions on

2

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
DECLARATION OF CHRIS DENOVE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO NEW TRIAL MOTION

networks such as CNBC, CNN, and Fox Business News. I also authored a best-selling book on the subject: *SATISFACTION: How Every Great Company Listens to the Voice of the Customer.* That synthesized everything the company had learned about how consumers form opinions and then use those opinions to direct their behavior.

## TRIAL SURVEY GROUP

9. In 2011, I merged my two careers of being a trial attorney and opinion researcher to form Trial Survey Group ("TSG"), which I continue to serve as its President. At TSG, I basically do the same thing I did at J.D. Power and Associates, except that instead of listening to the "voice of the customer," we listen to the "voice of the jury," and we set up this listening post in advance of trial.

10. TSG builds upon the latest methodologies being employed by consumer research firms for testing products and advertising. TSG begins by recruiting a jury panel ranging from 100 to 300 mock jurors who agree to hear the case online. Panelists are provided with detailed facts and evidence from the case in written or video form. This process often is referred to as a "big data" focus group. This process is far more accurate and predictive about liability determinations and damage awards than traditional focus groups or mock juries, which usually consist of no more than 10-20 participants.

11. After hearing all the evidence, we first test the panelists to ensure they understand the case in sufficient detail to be allowed to issue a verdict. Those that pass are then asked a battery of carefully crafted questions that not only accurately measure overall perceptions of the case, but also quantify jury opinions about each individual element and piece of evidence. Because TSG is presenting the case to hundreds of jurors the results are statistically valid and free from the dangers of focus groups where one vocal participant can sway the ultimate results.

12. In sum, trial surveys help attorneys prepare winning strategies including (1) measuring the impact of individual facts or pieces of evidence, and (2) assessing potential damage awards. Our goal is to provide the information our client attorneys need to make the changes necessary to obtain results at trial that exceed the results from our trial survey.

## PREPARATION OF THE SURVEY IN THE LOGGERVALE CASE

13. On December 9, 2022, counsel for Plaintiffs retained me to prepare a trial survey on various aspects of the trial then scheduled for February 13, 2023. I worked primarily with Brian Gearinger of the Gearinger Law Group in preparing the survey.

14. The survey addressed both liability and damages.

15. Mr. Gearinger provided me with an objective chronology of the entire incident as well as relevant body camera videos. He also provided me with both Plaintiffs' arguments as to why the actions of Deputy Holland were unlawful, and Defendants' arguments as to why Holland's actions were lawful. Mr. Gearinger agreed to our recommendation to purposefully skew the arguments in favor of Defendants; that is, he presented a stronger case for the Defendants and a weaker case for the Plaintiffs. I encourage this type of pro-Defendants presentation as it is the best way to reveal the weaknesses in Plaintiffs' case.

16. This was an iterative process in that Mr. Gearinger provided me with information and evidence, then I would ask questions and make suggestions. Then, Mr. Gearinger would provide answers to my questions and responses to my suggestions. I put on my "defense lawyer hat" and pushed Mr. Gearinger to address issues that I perceived as potential weaknesses. This back and forth took place both by many emails and several telephone conferences.

17. On January 16, 2023, I provided counsel for Plaintiffs with my comprehensive draft of the case presentation for the survey participants.

18. On January 18, 2023, Joseph May provided me with edits to my draft case presentation, and he also included Plaintiffs' closing argument to be included in the survey.

19. I then requested clarification on several details of the incident, which I used to revise the presentation. I also asked for some family photos of Plaintiffs to include in the presentation.

20. On January 22, 2023, I submitted the final presentation to the 221 survey participants ("jurors"). This included body cam video of the significant parts of encounter between the deputies and the Plaintiffs.

21. The jurors were profiled to match the demographics and socioeconomic backgrounds of potential jurors from the geographic region encompassed by the United States District Court

for the Northern District of California; that is, from larger cities and suburban areas (not small rural areas). The jury was divided equally by gender and evenly balanced across ages. TSG also attempted to match education so that our sample included on the high end 42% college graduates, and on the lower education end we had 30% falling into what we define as high school or less. Race was 44% White, 23% Asian, 21% Hispanic, and 10% African American. In terms of political affiliation, 74% said they identified more closely with the Democratic party, with 26% saying they identified more closely with the Republican party.

## THE LOGGERVALE MOCK TRIAL SURVEY RESULTS

22. I provided counsel for Plaintiffs with a comprehensive summary, entitled "Mock Trial Survey Results", on January 29, 2023.

23. As to the question, did Holland have reasonable suspicion necessary to detain Plaintiffs, the cohort that responded that Holland's detention of Plaintiffs was not justified awarded Plaintiffs a combined average of **$3,522,883**. (The jurors were only asked to award a lump sum for all three Plaintiffs, rather than separate awards for each Plaintiff.)

24. As to the narrower question, did Holland have the right to detain Plaintiffs at any point during the encounter, the cohort that responded that Holland *never* had the right to detain Plaintiffs even after the daughters exited the car and the mother started the engine awarded Plaintiffs a combined average of **$4,663,465**.

25. Several of the jurors awarded far more than these averages. For example, 16% of the jurors siding with Plaintiffs awarded $10 million or more and 11% awarded $15 million or more.

26. The jurors were not told about the Bane Act or the possibility that they could award any additional sum beyond the compensation for Plaintiffs' harms. The amounts mentioned above included only compensatory damages.

/ / /

/ / /

/ / /

/ / /

/ / /

1  I declare under penalty of perjury under laws of the State of California and the United
2  States that the foregoing is true and correct.
3  Executed on April 12, 2023 at Camarillo, California.

*[signature]*

CHRIS DENOVE

6

Loggervale v. County of Alameda et al., Case No. C20-4679-WHA
DECLARATION OF CHRIS DENOVE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO NEW TRIAL MOTION