UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

AAOTTAE LOGGERVALE, et al,      )
                                )
                                )
            Plaintiffs.         )
                                )
    vs.                         ) No. C 20-4679 WHA
                                )
COUNTY OF ALAMEDA, et al,       )
                                ) San Francisco, California
            Defendants.         ) Thursday
                                ) May 11, 2023
_____) 1:30 p.m.

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiffs:**      LAW OFFICE OF JOSEPH S. MAY
                         1388 Sutter Street
                         Suite 810
                         San Francisco, California 94109
                    BY:  **JOSEPH S. MAY, ESQ.**


                         ALTAIR LAW
                         465 California Street
                         5th Floor
                         San Francisco, California 94104
                    BY:  **CRAIG M. PETERS, ESQ.**


                         GEARINGER LAW GROUP
                         740 Fourth Street
                         Santa Rosa, California 95404.
                    BY:  **BRIAN GEARINGER, ESQ.**


     **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

**APPEARANCES:    (CONTINUED)**

For Defendants:          ORBACH, HUFF & HENDERSON, LLP
                         6200 Stoneridge Mall Road
                         Suite 225
                         Pleasanton, California 94588
                 BY:  **KEVIN E. GILBERT, ESQ.**


Also Present:            **Kristy van HERICK**
                         - Assistant County Counsel
                           County of Alameda

| | |
|---|---|
| 1 | <u>**Thursday - May 11, 2023**</u>                                    <u>**1:45 p.m.**</u> |

2                              P R O C E E D I N G S

3                                  ---oOo---

4          **THE CLERK:**  Calling Civil Action 20-4679.  Loggervale,

5    et al versus County of Alameda, et al.

6       Counsel, please approach the podium and state your

7    appearances for the record, beginning with counsel for

8    plaintiffs.

9          **MR. MAY:**  Good afternoon, Your Honor.  Joseph May for

10   plaintiffs.

11         **THE COURT:**  Welcome.

12         **MR. GEARINGER:**  Good afternoon, Your Honor.  Brian

13   Gearinger.

14         **THE COURT:**  Welcome.

15         **MR. PETERS:**  Good afternoon, Your Honor.  Craig Peters

16   on behalf of plaintiffs.

17         **THE COURT:**  Welcome.

18         **MR. GILBERT:**  Good afternoon, Your Honor.  Kevin

19   Gilbert for defendants.

20      Also joined by Kristy van Herick from the County.

21         **THE COURT:**  Thank you.  Ms. Herick, your position

22   there is what?

23         **MS. HERICK:**  I'm assistant county counsel.

24         **THE COURT:**  Okay.  Thank you for coming today.  Have a

25   seat, please.

1      All right.  We're here on a motion for new trial and a

2  motion for -- under Rule 50 after a verdict in favor of

3  plaintiffs.

4      We can't possibly go through every issue here.  I have one

5  issue I want to bring up, and -- but I want to start with your

6  issues.  I'm going to give each side a chance to make one

7  important point.  Then we'll get a rebuttal.  And then -- then

8  the other side gets to make their most important point and then

9  you get a rebuttal.  And then, time permitting, I'm going to

10  bring up the point that concerns me the most.  And then you all

11  get to respond.

12      So that will -- I don't know.  That will probably take an

13  hour, maybe more.  And I have been studying the briefs quite a

14  lot.

15      Okay.  Since you are the moving party, Mr. Gilbert, you

16  get to go first.  What is your important point you would like

17  to bring up?

18          **MR. GILBERT:**  Your Honor, we will be referencing --

19          **THE COURT:**  If you can come up here, please.

20          **MR. GILBERT:**  Your Honor, are you referencing all the

21  motions together?  Individually?  One specific?

22          **THE COURT:**  All of them together.  A lot of it

23  overlaps, but I -- I feel like -- we can't relitigate

24  everything.  It's been relitigated in the briefs.

25      But for purpose of oral argument, I would like for you to

1     focus on one major point.

2          **MR. GILBERT:** Your Honor, I think that the totality of

3     the circumstances in the case is troubling and problematic, and

4     focusing on one is difficult.

5          There are so many issues in this trial where there was

6     incorrect statements of law, incorrect evidentiary rulings,

7     incorrect conclusions and, in fact, judicial advocacy where we

8     see time and again where they are perpetuated and they compound

9     on each another.

10         For example, we started with totality of the

11    circumstances, which is what the officers should have been

12    allowed to introduce.  The Court entered its own geographic

13    limitations on what evidence within what proximity could be

14    allowed, which was not what the officers actually considered.

15         The Court then precluded them from introducing other

16    evidence.

17         And then on top of that it compounded the error by

18    allowing plaintiffs to introduce evidence that was not known to

19    the officers, which was not considered, which only became known

20    after the incident.  Once that compounded error was made and

21    the incorrect evidence elicited submitted to the jury, the Jury

22    Instructions and the issues in the case were then further

23    complicated, and I believe there is error on those.

24         For example, Your Honor, there was points where the judge

25    changed the instructions as we went through the proceedings,

1   and not only the instructions --

2           **THE COURT:**  Say what?

3           **MR. GILBERT:**  The instructions, as we went through

4   proceedings progressed, as did the causes of action.

5       For example, the *Monell* claim was dismissed.  There was an

6   express ruling on that.  It was dismissed.  The parties

7   proceeded through trial.  The county defendants made their

8   closing arguments.

9       Only after that point did the Court change the evidence --

10  excuse me, change the standard in the case and add back in a

11  *Monell* claim and amended the verdict form after the jury had

12  been out, I believe it's either a day and a half or two days,

13  to add in a claim that was previously adjudicated and been

14  dismissed, which defendants had not focused on in evidence nor

15  in their closing arguments.

16      Then, to compound the matters even further, the Court

17  introduced Jury Instructions that interjected the Court's

18  personal opinion, advising the jury on what the Court found;

19  that the Court believed certain things had happened, that

20  certain constitutional violations had occurred.

21      But it wasn't just that the Court did that once.  The

22  Court not only included the instruction, but then it stopped

23  and it repeated the instruction to emphasize that point to the

24  jury.

25      Then when the jury had been out for at least two days, the

1 Court went one step further and it included that advocacy on

2 the verdict form and sent it into the jury room where the jury

3 was to read the Court's advocacy while it's in the room.

4     Now, Your Honor, the appearance -- whether the Court is

5 biased or an advocate is not the question.  The question, as

6 the Court of Appeal and the Supreme Court have stated, is:

7         "Whether the appearance of advocacy and whether

8     the judge's remarks in questioning of witnesses

9     projected to the jury an appearance of advocacy or

10     partiality."

11     Now, that is quoted Page 9 of our brief.

12     **THE COURT:**  Just focus on that one for a second.

13     I wish I had the right document here, but I have it from

14 memory.

15     And I want your boss to listen carefully to this.  In your

16 brief, Mr. Gilbert, you say that I engaged in judicial advocacy

17 by reading to the jury the statement that the search for the

18 daughter's I.D. was unconstitutional.  It is true I read that

19 twice.

20     You left out something very important in your brief.  Do

21 you know what it was?

22     **MR. GILBERT:**  No, sir.

23     **THE COURT:**  Okay.  All right.  Here is what it was.

24 Just before that, I had read twice that the search for the

25 driver's I.D. was constitutional.

1    Now, this had been a heavily litigated point during the

2    case, and I wanted the jury to have no doubt as to what the

3    rule was under or *Arturo D.* with respect to the searches.  And

4    there was a search for the driver's I.D., which I said, in your

5    favor, was lawful and I read that twice.

6    And then a few lines later I get to the daughter's I.D.,

7    and I had decided that was not constitutional and I read that

8    twice.

9    Both times twice on an important point in the case so the

10   jury would not be confused that one part of it favored you and

11   one part of it favored the other side.  This was for purposes

12   of clarity.

13   Now, in your brief, and this -- I want your boss to know

14   this, very characteristically of how you treated this case -- I

15   have the whole list here -- of misrepresentations you've made

16   to me and the jury in this case.

17   What you just said about me and judicial advocacy

18   repeating it twice, it's a half-baked half story.  You didn't

19   put in the other half where I told the part that favored you

20   and read it twice as well.

21        **MR. GILBERT:**  Your Honor --

22        **THE COURT:**  Do you disagree that I read it twice on

23   both sides of the coin?

24        **MR. GILBERT:**  Your Honor, I do not have the

25   transcript, so I cannot agree or disagree right now.  I will

1   happily look at it when I sit down.

2        My point is one step further.  The comments about the list

3   of comments, repeatedly the Court had questioned us on:  Is

4   this accurate?  And the Court did not give us the opportunity

5   to sit down and go through the issues and to give a full

6   explanation.

7        For example, Your Honor --

8        **THE COURT:**  Of what?  Of what did I not give you a

9   full chance to do?

10       **MR. GILBERT:**  Whenever you questioned us on a specific

11  issue, you would make accusations about it was half truth.

12       For example, there was an issue of the big five and there

13  was a discussion about:  Well, you told me in the offer of

14  proof, counsel, that you were going to introduce X, Y and Z.

15  That was true.

16       But what happened in between the time we presented the

17  witness and that was the Court came in in subsequent days and

18  amended its rulings and said:  I'm excluding this or I'm

19  limiting it.

20       So there was continual progression of issues where the

21  Court would never give us the opportunity to set a full record.

22  And, in fact, the record is clear on that.

23       But turning back to the Court's reading instructions, it's

24  not just the reading of the instructions twice.  It's putting

25  it on a verdict form and sending in to the jury room a specific

1   finding.

2         Now, the Court also referenced *Arturo D*.  *Arturo D*. is

3   very clear, Your Honor.  And this goes to whether qualified

4   immunity applies.  A search of someone's identification --

5         **THE COURT:**  Oh, no.  The driver's identification.  It

6   says the driver.  I've read it many times.  It never says the

7   passengers.

8         So it's another misrepresentation by Attorney Gilbert.

9         **MR. GILBERT:**  Your Honor, the Court of Appeal --

10  excuse me, the appellate opinion in *Arturo D*. does not say that

11  it's limited to a driver.  It says that the search for

12  someone's I.D. who is going to be cited is appropriate.

13        So, and then on top of that, we gave the Court the *Wyoming*

14  case, where a passenger's presence was searched and where the

15  United States Supreme Court found in *Wyoming* that that search

16  was appropriate, which would be in harmony with *Arturo D*.

17        And as this circuit, the Ninth Circuit has held, Your

18  Honor, in order to be clearly established there needs to be a

19  case not necessarily factually identical, but so on point that

20  every reasonable officer would understand what they are doing

21  was unlawful.

22        And in this case, we asked plaintiff's own expert,

23  Mr. DeFoe, if it was trained and if a reasonable officer would

24  have believed that under those circumstances they could search

25  that vehicle for identification, including the trunk, and

1    Mr. DeFoe agreed.

2         That is a principle that every single law enforcement

3    officer came in this courtroom and testified to, said that law

4    enforcement would understand.

5              **THE COURT:**  I wish I could believe you.  When I go

6    through the list, you'll see why I don't trust almost --

7    anything you say.

8              **MR. GILBERT:**  Your Honor --

9              **THE COURT:**  If you tell me things happened at the

10   trial in black and white right now, I would be willing to bet

11   ten dollars to one dollar what you told me is misleading.

12        I want to read to you what *Arturo* says itself.  The

13   question in *Arturo* was, quote:

14             "When a driver who has been detained for a

15        citation, for a vehicle code infraction, fails to

16        produce a vehicle code registration, et cetera,

17        et cetera, the officer may conduct a warrantless

18        search."

19        The "driver."

20             **MR. GILBERT:**  In other words, when reasonable

21   suspicion exists for a citation, the 148 citation, again,

22   undisputed that the daughters admitted to refusing to get back

23   into the car, to violating the directives from the deputies,

24   Your Honor.

25        Now, going back to the discussions on the factual from

1  Mr. DeFoe.  We've cited the evidence, his testimony, in the

2  motion.  It's available for the Court to read.  The Court can

3  read it.

4      It doesn't have to believe me or trust me.  We've given

5  the Court of evidentiary citation --

6      **THE COURT:**  There's so many things -- when I finally

7  do this order, I want your boss to read it, because there are

8  so many things you said in your brief that turned out to be

9  false.  I'm going to flag as many as I can.  I'm going to cite

10  to the record.  I'm going to do -- I'm going to do the -- so...

11     I don't want to get carried away here because I -- there

12  are issues that you -- all right.  I'm not going to try to -- I

13  just want your boss to read it when it comes out.

14     **MR. GILBERT:**  Your Honor, we have --

15     **THE COURT:**  Because the quality of -- no, not the

16  quality.

17     What you have done to the Court is to have great

18  disrespect for the Court and try to pull the wool over my eyes

19  and make misrepresentations.

20     I'm going to tell your boss what -- when this case started

21  on summary judgment, on summary -- now, this is not the trial,

22  but this is -- this is where it started.  We were on summary

23  judgment and Mr. Gilbert almost had me persuaded.  And he told

24  me that Ms. Loggervale, when they rolled down the window, she

25  -- and asked for the I.D., that she said that -- to the

1   officer -- now, this is all supposedly on tape.  She said to

2   the officer, "I'm African-American and African-Americans don't

3   have to show their I.D."

4        Well, of course, that would make anybody mad to hear that.

5   Everybody has got to show their I.D. in the right circumstance.

6   Being African-American, being white, being whatever, it doesn't

7   -- I said:  That's unbelievable.

8        And then, I think it was Mr. May said:  That never

9   happened.

10       Now, I had a one side says yes, one side says no.

11  Mr. Gilbert stuck to his guns.  Anyway, we went and got the

12  videotape from the officers.  It did not say that.  It did not

13  come close.

14       Now, I almost was going to rule for Mr. Gilbert and grant

15  summary judgment because that -- that -- and he knew it would

16  make me mad to hear somebody say that because of their race,

17  they didn't have to comply with something.  That's just -- no.

18  But Ms. Loggervale never said that.

19       Do you deny any of what I just said?

20            **MR. GILBERT:**  Yes.

21            **THE COURT:**  Okay.

22            **MR. GILBERT:**  Your Honor, what I deny is that I would

23  misrepresent this Court intentionally.  I misspoke on that.  I

24  referenced a different piece of evidence that was inappropriate

25  in time and sequence and I made a mistake --

1          **THE COURT:**  There was never anything in this whole
2    case that came close to that.  But what you told me was way
3    beyond the pale.

4          **MR. GILBERT:**  Your Honor --

5          **THE COURT:**  How could you have possibly misspoken on
6    that?

7          **MR. GILBERT:**  If you want to sit down and spend the
8    time to go through the other evidence where I can show you
9    where those comments and those type of information is in the
10   record, that's fine.  But it was not from the driver.  It was
11   not from the driver at that point.

12        But the insinuation that I intentionally misrepresented
13   or --

14          **THE COURT:**  This has happened so many times,
15   Mr. Gilbert.  So many times.  The order is going to lay them
16   all out.

17        I've got another thing I want your -- your -- this case,
18   quite a large verdict was rendered in this case.
19   Ms. Loggervale and her two daughters were completely innocent,
20   completely innocent of any crime.

21        Now, I also understand the case from the point of view of
22   the officers.  They are out there trying to protect the public.

23        This case was tried by Mr. Gilbert without any apology,
24   without even a statement of regret that a completely innocent
25   family was detained, handcuffed in the back of a car for 91

1    minutes.  No statement of regret by the lawyer.  No statement

2    of regret by any of the officers.  Completely innocent.

3           And Mr. Gilbert, in his closing argument -- in fact,

4    during the trial itself in examining the witnesses, but it's

5    represented best by the closing argument.  He said:  She lied

6    about needing to go to the bathroom.  She didn't go to the

7    bathroom at the MacDonald's.  She lied about that.  What else

8    is she lying about in this case?

9           So not only did the Loggervales, were they innocent and

10   never got an apology and never got a statement of regret, they

11   had to go through the third degree from Mr. Gilbert at the

12   trial.

13          Now, I've -- for almost 50 years I either tried cases or

14   I've done this job.  It's quite clear to me that it was the way

15   in which this case was tried that led to this big verdict.

16          **MR. GILBERT:**  Your Honor --

17          **THE COURT:**  If there had been a statement of regret,

18   something like:  You know, these guys were just trying to do

19   their job.  They made a mistake.  We're sorry.  Yes, they

20   were -- yes, and we tried to explain that to them.  Yes, we

21   made a -- we made a mistake, ladies and gentlemen.

22          But that never came out.  No.  Mr. Gilbert said these

23   police officers were right.

24          Now, the Court of Appeals could say:  Mr. Gilbert, you're

25   right.  The judge misstated the law in some way.  And if so,

1   that's fine. I -- I tried my best in a case where I got very

2   little help from the county. I got slightly more help from the

3   plaintiffs, but not -- only slightly more, and I had to do the

4   homework myself and my Law Clerk. I did the best I could with

5   these instructions.

6           **MR. GILBERT:** Your Honor --

7           **THE COURT:** Wait. I'm not quite done. But the size

8   of this verdict was Mr. Gilbert.

9       All right. Now you can speak.

10           **MR. GILBERT:** Your Honor, the notion that -- I have

11   been appearing before Your Honor for over 20 years, almost 23

12   years at this point. If I have offended this Court or Your

13   Honor, I am truly sorry.

14           **THE COURT:** Not me.

15           **MR. GILBERT:** But Your Honor has been holding it

16   against the county for what it perceives is my actions.

17           **THE COURT:** Your what?

18           **MR. GILBERT:** Your Honor has been holding it against

19   the county for what it perceives is my actions.

20           **THE COURT:** No, no. I -- yes, I am in a way. I am in

21   a way, but -- but don't say that the jury couldn't hold it --

22   the county hired you to come in and make these inflammatory

23   statements. The county hired you to come in here and call them

24   liars.

25           **MR. GILBERT:** Your Honor --

**THE COURT:** And the jury can react to that. That is evidence. And they can hold it against you.

**MR. GILBERT:** Your Honor, I met with one of the jurors afterwards and spoke to them about the case. Their comment -- that juror's comments to me were specific.

They did not agree with the Court's conclusion and Court's language, but it felt that the Court's language told them they had to adopt plaintiff's position because the Court was so --

**THE COURT:** I don't believe a word you're saying. Is that under oath somewhere?

**MR. GILBERT:** No, Your Honor.

**THE COURT:** I don't believe -- if this was some other lawyer that I could trust, I might believe you. But I don't believe what you're telling me.

**MR. GILBERT:** Your Honor, look at how long the jury was out, and it was only after the Court wrote in and said on the verdict form: I want to remind you they violated the Constitution.

If this was such an easy case and I enraged the jury, this would have been a very fast verdict. But it was only when the Court changed the rules, changed the verdict form and added causes of action in that it went back, your Honor.

**THE COURT:** All right. I am going to -- all of those points that you have made, you have misrepresented how it came down.

1    I'm going to -- I have gone to a lot of trouble, it's

2  going to be a long order, to set forth the true record.

3  Because on appeal, I believe you will do the same thing to the

4  Court of Appeals that you have done to me, which is

5  misrepresent the record, just like you've done today, and they

6  -- and I'm going to have an order that blows that out of the

7  water.

8    I'm going to say to the Court, maybe I've got this wrong.

9  Maybe there are some issues that I got wrong.  That's okay.  I

10  don't mind being reversed for that.  But I don't want to be

11  reversed for something where I am -- I did it right and you

12  have misrepresented the record.

13    All right.  I've heard your point.

14    All right.  What does the plaintiff want to say?  What's

15  your main point.

16    **THE COURT REPORTER:**  Counsel, please state your name

17  for the record.

18    **MR. MAY:**  Yes.  Joseph May for the plaintiffs.

19    Your Honor, would you like me to rebut or respond to the

20  defense?

21    **THE COURT:**  Yes.  You get a rebuttal, that's right.

22  As I said you did.  Go ahead, you get a rebuttal.

23    **MR. MAY:**  And I will be fairly brief.  The points

24  Mr. Gilbert raised are largely in the papers.

25    **THE COURT:**  All right.  Give me one good point though.

1   Please help me out here.  Explain why it's not true.

2          **MR. MAY:**  As to the claim that the Court excluded

3   relevant evidence on reasonable suspicion, this seemed to be

4   one of the first points the defense made, and they seemed to

5   brief it extensively.

6          They point -- well, first of all, they don't identify

7   where the Court actually excluded the evidence.  The only thing

8   I recall, and I scoured the record as well, is the Court did

9   exclude evidence regarding auto burglaries that were about

10  three miles away from the subject incident.  That would be at

11  15600 Hesperian Boulevard in San Lorenzo, California.

12         And I just want to point out the defense cited to

13  Exhibit A to their opposition to plaintiff's first Motion in

14  Limine.  Mr. Gilbert prepared his own table where he said we

15  have 11 other incidents and we could only rely on two.  That

16  was one of their misrepresentations in the papers.

17         There aren't 11 incidents.  There are several that are the

18  same incident, just with different descriptors.

19         Most of these are at the subject lotion, 2720 Castro

20  Valley Boulevard, which they've never been prohibited from

21  referencing during the trial and, in fact, they extensively

22  discussed the prior auto burglaries there.

23         15600 Hesperian Boulevard, they list three incidents.

24  Only two were properly produced in discovery.  And not only are

25  those three miles away, one of them had no victim -- or, sorry.

1    Yeah, no suspect identified whatsoever.  So that's unhelpful to

2    their claim.  Even if it was admitted, it wouldn't do any good.

3         One of them was black male adult 25 to 40 years old,

4    5 foot 5 with face tattoos, and along with a heavyset black

5    female with blue twisted hair driving an SUV, not a sedan.  And

6    that was back in May, more than four and a half months prior to

7    the subject --

8              **THE COURT:**  How far away was that one?

9              **MR. MAY:**  Three miles away.

10        So this is what they are complaining about; that they

11   should have been able to bring in evidence about these

12   burglaries that had nothing to do with our case.  It wouldn't

13   have helped them --

14             **THE COURT:**  And they weren't in the -- or were they,

15   in Officer Holland's -- Deputy Holland's report, same-day

16   report?

17             **MR. MAY:**  That's correct.  The only thing he listed in

18   the report for this incident were the other burglaries --

19             **THE COURT:**  Six, I think.

20             **MR. MAY:**  -- at the subject location, was all he

21   referenced in his report.

22             **THE COURT:**  I thought he had some that were nearby,

23   but not --

24             **MR. MAY:**  No.  No, sir.  No, sir.

25             **THE COURT:**  All right.

1           **MR. MAY:**  So that's -- I mean, I could go on and on.

2    But I think the papers, we set forth --

3           **THE COURT:**  Well, I -- thank you.  I want you to know

4    I've gone back to -- I'm going to set forth the real record

5    here.

6           Here is the argument Mr. Gilbert made.  They were only

7    allowed to discuss two -- count them, one, two -- two prior

8    incidents at Starbucks parking lots within a mile of the

9    subject incident.  And so -- and those were the two the day

10   before and the day before that at the very same location.

11          Well, that's actually not true.  They were allowed to

12   discuss those two, but they were allowed to discuss a lot more.

13          Now, on the very same day of the incident, Deputy Holland

14   went back to his office and he wrote a pretty good memo.  And

15   he said:  Here is why I did it.  And there were six prior

16   events, and all six of those came into evidence.  All six of

17   them came into evidence.

18          And, in fact, the underlying police report for those I

19   allowed into evidence as well, and then -- but there was more.

20   There was more.

21          And so what happened was that Mr. Gilbert asked Officer

22   Holland about other incidents beyond that, but being vague

23   about where they were.  Actually, those got into evidence, too,

24   without objection.

25          So there was that.  There was also the six.  And at some

1  point under Rule 403 it becomes cumulative -- not cumulative,

2  but it becomes so lengthy and non-probative that I -- what good

3  does it do to prove, okay, there was a seventh, an eighth and a

4  ninth months earlier three miles away, whenever we've got six

5  very close by, at the very same Starbucks.  At some point you

6  have to say -- it's got to be a very powerful showing for

7  something that remote in time.  That's what I ruled.  I think

8  any judge would have ruled that.

9       And -- but no.  Mr. Gilbert says he was only allowed to

10  discuss two prior incidents.  It's just not true.

11      And I -- it -- because he's talking about -- it upsets me

12  that somebody would put in writing and take up to the Court of

13  Appeals that I just allowed two.  And it's just not true.  It's

14  just not true.

15      All right.  So --

16          **MR. MAY:**  I'm sorry.  Just to follow that up.

17      It wasn't just the incidents at Castro Valley Starbucks.

18  This is from Pope's testimony, Page 913, Lines 11 through 13 of

19  the trial transcript.

20      Sergeant Pope testified:

21      "**ANSWER:**  The part that I remembered was that we were

22      having auto burglaries, typically early in the

23      morning, oftentimes at Starbucks.  And it wasn't just

24      one Starbucks, because I have Starbucks in my sector

25      also, and they would be, like, a smash and grab," end

1   quote.

2       So not only were they not limited.  They went ahead and

3   they asked their witnesses about other locations as well.

4       **THE COURT:**  All right.  Okay.  What did you want to

5   bring up that would be your most grievous point, if you have

6   one.

7       **THE COURT REPORTER:**  Counsel, please state your name

8   again.

9       **MR. PETERS:**  Thank you.  Craig Peters appearing on

10  behalf of the plaintiffs.

11      Your Honor, I don't know if it's our biggest point, but

12  it's actually in reaction to something you mentioned just

13  earlier today.

14      You mentioned that this was a big verdict, I think is the

15  word you used, "big."  And I guess what we want to talk to the

16  Court about is how --

17      **THE COURT:**  I don't think you should get into your

18  jury survey.  That's attorney -- otherwise I -- I'm going to

19  let them take your deposition and get into all of the work

20  product.  I think it was wrong for you to bring that up.

21      It's -- you gave me a selective look inside what your jury

22  consultant did, and the jury -- by all rights I ought to let

23  them take the deposition of the -- and find out all the rest of

24  the stuff.  So that was -- that was out of line for you to

25  selectively waive your work product.

1       Now, it may be that if you want to cite to other big

2   verdicts, that's okay.  But to cite to something in your own

3   work product behind the scenes, I don't know.  I'm not going to

4   place any weight on that.  If that's what you were about to get

5   into, I want to head it off.

6       **MR. PETERS:**  It wasn't, but it's good to know the

7   Court's opinion on that.

8       My concern is more with the Court's characterization of

9   the verdict as "big."  I have real concerns about that.  I

10  think that this is a fair and reasonable --

11      **THE COURT:**  I don't need to call it "big."  I'm not

12  going to -- I don't need to call it "big" in my order, but I

13  will call it by what -- it's 7.5 million or whatever it comes

14  out to be.  And how did the -- how did the jury get there?

15      I think the Court of Appeals will think of it as large.

16  And I think most of the judges on my court think of it as

17  large.

18      So, and can you tell me some comparable verdicts for 91

19  minutes of detention?

20      **MR. PETERS:**  Well, that would be pretty disappointing

21  if most people on the bench think that this verdict is somehow

22  large for the facts.

23      Every case is tried on its own individual facts and as

24  this Court is well aware, having presided over jury trials and

25  having tried cases yourself, all the facts are different.

1  Every single one.

2      **THE COURT:**  That's true.  That's very true.

3      **MR. PETERS:**  And time matters.  What time we're in

4  socially, economically, politically, that matters, too.  That

5  matters in the way in which we evaluate things.

6      And I point out to this Court that until very recently

7  this very state, the State of California, often considered a

8  very liberal state that tries to protect people who have

9  historically been disenfranchised and marginalized, until very

10 recently allowed past economic data by disenfranchised and

11 marginalized groups to be used in jury trials to establish

12 their lost wages.

13     Said slightly differently, a Hispanic woman who was

14 injured, the defense could come in and talk about the

15 historical data for Hispanic women to try and establish

16 economic loss.  Why is that wrong?

17     **THE COURT:**  Of course I can see that argument, but

18 what's that got to do with this case?

19     **MR. PETERS:**  Because what Courts have frequently done

20 is they've looked at the relationship between economic damages

21 and non-economic damages in determining whether they think the

22 non-economic damages are appropriate or not.  That's wrong.

23     And that's wrong because if we look historically backwards

24 in time at verdicts, the Court has endorsed the systemic racism

25 that's been part of our system because we take people who have

1  been disenfranchised and marginalized.  We know that they have

2  earned lower wages.  They've had fewer housing opportunities,

3  employment opportunities.  The whole panoply.  Medical

4  opportunities for that matter; right?

5       We've taken that and now we have put it into the system

6  and said not only are we going to reduce your economic damages,

7  but now we're going to look at a proportionality between

8  economic damages and non-economic damages to potentially reduce

9  your non-economic damages as well.  Essentially they are

10  punished twice for something that is race based, gender based,

11  other discriminatory basis.

12       **THE COURT:**  Well, all right.  I'm thinking -- I see

13  your point.  That's a good point, and I have sympathy to that.

14       But even if this had been three white women, this verdict,

15  I think, most judges would think of as large.

16       **MR. PETERS:**  And I'm sorry for that, because I think

17  what it does is it undervalues the power of systemic racism.

18       And to the extent that the Court that we have now said

19  that we don't think that systemic racism and specifically how

20  the Loggervales experienced that in this case is such that it

21  is --

22       **THE COURT:**  That's not true.  That is not true.  What

23  you're saying is just wrong.  That's a jury speech.

24       This Court does sympathize with African-Americans and what

25  they've been subjected to and the systemic problems in America.

1    It's wrong for you to say that.  But the law -- look at it.

2    Think of it.  What would be --

3         **MR. PETERS:**  Is the Court's position that if this was

4    three white women, that they should get the same exact award?

5    Because if that's the Court's position --

6         **THE COURT:**  No, that's not my position.

7         **MR. PETERS:**  Okay.

8         **THE COURT:**  My position is that regardless of who the

9    people are involved, even African-Americans, even white people,

10   this is a large verdict.  And in my view, the reason it's a

11   large verdict is the way Mr. Gilbert tried the case and not

12   because of what actually happened.

13        However, in your defense, what he -- how he tried the case

14   is part of what they were subjected to.  They not only had to

15   go through insult -- injury, but they went through insult

16   through this trial.  They were insulted throughout the trial by

17   Mr. Gilbert and the way he treated them.  And I think the jury

18   could take that into account.  That is what accounts for the

19   large verdict, in my humble opinion.

20        However, I don't have to say that to -- in an order.  But

21   that's -- that is the way I feel and that's what I want the

22   county to know, is that my own humble opinion from trying 50

23   years' worth of cases is -- that's what I believe happened

24   here.

25        All right.  I don't want to hear any more jury speeches.

1    Please.

2         All right.  Time is short.  I want to raise the point that

3    bothers me the most here, and that concerns the Bane Act.  Now,

4    I want to start by saying there was no objection made to that

5    part of the Jury Instructions.  Zero.  So maybe that's the

6    short answer and that's the end of it.

7         But here is what I think happened.  I think the jury --

8    and they could have done this.  They could have said:  All

9    right.  We can treble damages and so -- or quadruple damages,

10   according to plaintiff, and, therefore, they found damages more

11   in the range of 400,000.  Do the math.  I haven't done it.  And

12   then they trebled it.

13        Well -- or 600,000 and then they trebled it, or quadrupled

14   it.

15        If the law is that that's a penalty and the Supreme Court

16   has held that you have to have guidelines for the jury when

17   you -- when they impose a penalty, otherwise it's a taking

18   without due process of law, then the -- we didn't give them any

19   of those guidelines in how to exercise their discretion, which

20   would have happened if they had gone to the punitive damages

21   phase.  So I'm troubled -- I'm troubled that I didn't do that.

22        Now, in my defense nobody had an objection to the way

23   those were worded, and you had from that Friday all the way

24   through Monday.  Other points were raised, but that -- that

25   particular point was not raised.  And I -- so they -- maybe the

1    easy answer is:  Okay, it wasn't raised.  End of story.

2        It's complicated further by the fact that this statute is

3    just one of the worst pieces of trying to piece it together

4    I've ever seen in the California -- so you've got 52.1.  That's

5    the Bane Act.  And it refers to damages that you can award

6    under, let me see, Section 52.  Not limited to damages under

7    Section 52.

8        All right.  So then you come to what does Section 52 say?

9    Well, Section 52(a) is the one that says -- adds up to a

10   maximum of three times the amount of actual damage.

11       But the actual lead-in to it says:  Whoever denies, aids,

12   incites a denial or makes any discrimination or distinction

13   contrary to Section 51, 51.5 or 51.6, is liable for...

14       So it doesn't pick up 51-point -- 52.1, which is the Bane

15   Act.

16       Now, this piece I think we did discuss before, but I'm

17   revisiting it.  And then 52-point -- 52(b) has punitive

18   damages, but does not have the treble damages.  But even it

19   says:  Whoever denies the right provided by 51.7 or 51.9 or

20   aids or conspires is liable.

21       So which is it that should apply to the Bane Act?  Is it

22   52(a) or 52(b)?  Well, if you were strictly going by how it's

23   written, none of them do because 52.1 is not mentioned in 52(a)

24   or (b).

25       However, to go back to the Bane Act, it does mention -- it

says Section 52.  So which one is it (a) or (b)?

Well, then you come to this -- and this is one place I'm going to say, Mr. Gilbert, you were of assistance to the Court in responding to that order that I sent out asking for more briefing.  You pointed out that the legislative history in 1991 has the following statement in the amendment in 1991:

"This bill would delete the award of three times the amount of actual damages and instead would provide merely for an award of exemplary damages.  The bill would increase a civil penalty 25,000."

That was for 52 -- I'm sorry.  52(b), I believe.  So they are deleting -- '91, it was deleted.  Treble damages were deleted from one part, but not for the other.

And -- and I can't -- what I'm still struggling with is in 1991 what did the legislature intend and what did it say it intended with respect to which one the Bane Act would fit under?

So, again, I'm going to let you start, Mr. Gilbert, and then I'll hear from the plaintiffs.  52 -- my question is:  In the legislative history of the amendment in 1991, there was a deletion of treble damages and a -- but allowing for exemplary damages.  But was that the one that the Bane Act applied to?

So I -- I would like for you -- to give you a chance to check with what happened in '91 and help me understand the -- that sequence of events.

1          Actually, you can help me with something else that even

2   precedes that.  Before this amendment, which part of the -- how

3   did it read in the Bane Act?  Maybe the Bane Act read

4   differently then so I could -- it would make more sense to me.

5   Do you have the actual language of the Bane Act prior to this

6   amendment?

7          **MR. GILBERT:**  I do not have it, Your Honor.

8          **THE COURT:**  Okay.  All right.  Well, if --

9          **MR. GILBERT:**  I'm trying to pull it up --

10          **THE COURT:**  If you can pull it up, that would be

11   great.

12          But come on up here and tell me -- what can you say that

13   would definitively help me sort out this legislative history?

14          **MR. GILBERT:**  Your Honor, we have nothing further to

15   add to what was in the briefing, the legislative intent.

16          The legislative intent is very clear on the intent of

17   deleting these provisions and then --

18          **THE COURT:**  Well, where is the Bane Act mentioned in

19   any of the legislative history?

20          **MR. GILBERT:**  I'm sorry?

21          **THE COURT:**  The Bane Act, 52.1, where is that actually

22   mentioned anywhere in this legislative history?

23          **MR. GILBERT:**  I thought it was discussed in concept,

24   and then it says about the amendment when you look at the

25   entirety of the legislative history, Your Honor.

1            **THE COURT:**  Well --

2            **MR. GILBERT:**  The statutes are very clear.  52 and

3    52.1 are two different statutes.  The language has been

4    removed.  We can see the legislative intent in removing it and

5    saying the trebling of whatever the damages are are absolutely

6    being stricken from the Bane Act.  You can see in the statute

7    language --

8            **THE COURT:**  Where does it say that?  Where does it

9    call out Bane Act and says we're removing the trebling?

10           **MR. GILBERT:**  It's the -- we've shown the specific

11   legislative intent, Your Honor.  I believe we gave it to the

12   Court.  And I don't have copies --

13           **THE COURT:**  Help me find -- you did give me something.

14   I have too many pieces of paper up here now.

15       (Brief pause.)

16           **THE COURT:**  All right.  Now, I'm going to read from

17   what you've said.  And it goes part of the way toward what

18   you're saying, but it doesn't go as far.

19       I'm reading from your brief, Page 3.  You say:

20           "The legislative counsel's digest accompanying

21       the bill explained the changes in a series of numbered

22       clauses.  The explanation for these two changes

23       appears in clauses three and four."

24       And I'll read number three:

25           "Under existing law, i.e." -- now, this is

1          something you inserted -- "i.e. Section 52(b)" before

2          the amendment."

3      Then continuing:

4          "All persons within this state have the right to

5          be free from any violence committed against their

6          persons or property because of their race, color,

7          religion ancestry, et cetera, et cetera.  Existing law

8          provides that whoever denies, et cetera, et cetera, is

9          liable for each and every offense for actual damages

10         suffered, and, in addition, an amount to be determined

11         by the trier of fact up to a maximum of three times

12         the amount of actual damages, et cetera."

13     And then the -- skipping slightly ahead:

14         "Under existing law in the case of multiple

15         offenders, the $10,000 penalty is prorated."

16     Then in -- then you put it in in italics.  I don't think

17     it's in italics in the original, but that doesn't matter.

18         "This bill would delete the award of three times

19         the amount of actual damages and instead provide

20         merely for an award of exemplary damages."

21     So, yes, but that's talking about 52(b).

22     Now, where -- what I'm trying to figure out is, okay, does

23     the Bane Act tie in to 52(b) or 52(a)?  And did it -- and

24     before the amendment, did it tie into 52(b) or 52(a)?  So help

25     me with that part.

1          **MR. GILBERT:** So, Your Honor, part of your question is

2    if there is an amendment, I believe, after what we've shown

3    here, that I don't have in front of me.

4          The purpose of showing this was the purpose of showing

5    that there was a specific legislative intent to remove the

6    trebling because the 52.1 in its entirety is the Bane Act. And

7    then you have the different subsections that address who can

8    prosecute, what the scope of the damages are.

9          So there has been a progression of that. And that's what

10   we are showing through the earlier amendment of the specific

11   legislative intention of removing the trebling of the damages.

12         There is discussion of exemplary damages, but I believe --

13   no. There's an amendment -- unfortunately, I don't have it

14   here today -- that may have removed it. I can't speak to it

15   intelligently today.

16         **THE COURT:** All right.

17         **MR. GILBERT:** I can tell you the current language --

18         **THE COURT:** Do you know any case law? Does it tell

19   us -- even under the very current law, there's one section,

20   (a), that -- that allows for trebling to be amended and one

21   section (b) which does not. So --

22         **MR. GILBERT:** Your Honor, I can tell you --

23         **THE COURT:** Does the Bane Act apply, invoke (b) or

24   does it invoke (a)? It says both -- neither of them -- both of

25   them call out some sections, but none of them are the Bane Act.

1    And so is there case law that tells us, do we use (a) or

2 do we use (b)?

3         **MR. GILBERT:**  Well, Your Honor, I think you need to

4 look at the statute by itself because (a) is just the name of

5 the statute.

6    (B) is if -- who can bring a cause of action and that

7 authorizes the City Attorney, Attorney General and so on.

8    (c) is a different section that allows a private

9 individual to prosecute a claim.

10    So each of them specifically has a right to action, who

11 can prosecute it, and what the remedies are under that specific

12 section.  So each of them is very clear and self contained.

13    And I think going one step further, looking at how the

14 judicial counsel of the State of California interpreted it

15 in the -- the approved CACI instructions are very clear that

16 there is not treble damages awarded or competence compensable

17 on this issue.

18         **THE COURT:**  Just a minute.

19    (Brief pause.)

20         **THE COURT:**  Well, (c), as is now written:

21         "...creates a private right of action by the

22    Attorney General, District Attorney, City Attorney, or

23    any person agreed by the conduct may bring a civil

24    action in an appropriate court."

25    And then:

1          "The Complaint shall list the following," and it

2     does.

3          **MR. GEARINGER:**  (b) and (c) --

4          **THE COURT:**  Wait a minute.  Let me finish.  Thinking

5     out loud.

6          All right.  (d) gives the right to intervene.

7          (c) says:

8          "Any individual that has been interfered with may

9          institute, prosecute in their own name and on their

10         own behalf a civil action for damages, including but

11         not limited to damages under Section 52.  Injunctive

12         relief and any other appropriate equitable relief to

13         protect the peaceable exercise," et cetera.

14         You can file that in Superior Court.

15         But what I'm not seeing is, where does it say you get

16    the benefit -- it does say under -- "damages under Section 52,"

17    but we have two different provisions under 52, one with

18    trebling, one without.

19         So how do we know which one it is?

20         **MR. GILBERT:**  Because, Your Honor, if you read 51, 51

21    expressly says in Subsection (a) the --

22         **THE COURT:**  51 or 52.1?

23         **MR. GILBERT:**  52.

24         **THE COURT:**  Point 1.

25         **MR. GILBERT:**  No.  52 specifically starts out and

says:

        "Whoever denies, aid or incites a denial or makes

    any discrimination or distinction contrary to" -- and

    then it lists out the statutes -- "is liable..."

It goes through.  And under 52 every paragraph goes

through and says the specific statute it applies to.

It self limits.  It does not ever reference 52.1 as being

applicable --

        **THE COURT:**  Well, then what is -- what is 52.1(c)

referring to when it says "damages under Section 52"?

        **MR. GILBERT:**  Damages under Section 52, Your Honor.

But then you have the injunctive relief.  You have the

attorney's fees.  And you have the $25,000 penalty, which would

be applicable potentially.

But, Your Honor, when you look at the legislative intent

and you look at the plain language of 52, 52 does not invoke or

apply by its own terms to 52.1.

        **THE COURT:**  It doesn't by its own terms, correct, but

it does refer to Section 52.  And Section 52, in turn, has two

different -- overlapping, but two different provisions.  And in

this particular case it makes a difference as to which one we

should have applied.  And that is, to me -- it has to apply to

one or the other.  But neither of them are called out.  It

calls out other statutes.

        **MR. GILBERT:**  That's where we interpret the

1  legislative intent with the specific intent of removing the

2  treble damages and the language that confirms that treble

3  damages are not compensable against a public entity.

4       **THE COURT:**  Is there case law that addresses this

5  conundrum?

6       **MR. GILBERT:**  The answer is none that we can find

7  because when we looked at California law and the CACI Jury

8  Instructions, it's very clear that under CACI it does not

9  believe that there is treble damages under the Bane Act.

10       **THE COURT:**  Well, I don't remember the -- do you have

11  the CACI right here?

12       **MR. GILBERT:**  No, Your Honor, I don't.  But I can pull

13  it up.

14       **THE COURT:**  I don't remember that detailed point now.

15      But CACI is not law, by the way.  CACI is just a bunch of

16  lawyers, a committee that comes up with instructions and that

17  are proposed.  They are not the law.

18       **MR. GILBERT:**  But they are adopted and approved by the

19  judicial council, Your Honor.

20       **THE COURT:**  Well, be that as it may, it's still not

21  the law.

22       **MR. GILBERT:**  CACI number 3066 is the instructional

23  elements.  And then 3035 is the verdict form.

24       **THE COURT:**  What does it say about trebling?

25       **MR. GILBERT:**  There is no reference to trebling in the

1    CACI instructions.

2              **THE COURT:**  In either of them.

3         All right.  Let's see if the plaintiff's can help me.

4              **MR. MAY:**  Thank you, Your Honor.  Joseph May again.

5         Since we're on the CACI, we cited this to the Court.  This

6    is the verdict form.  The verdict form itself doesn't have room

7    for trebling, but the directions for use specifically address

8    the question that Your Honor has been struggling with.

9         And I just want to point out, this is appellate court

10   judges, trial court judges on a committee to do their best --

11             **THE COURT:**  I used to be on committees like that and

12   that's why I know it's not the law.

13             **MR. MAY:**  It's not the law, but --

14             **THE COURT:**  It's almost the law.

15             **MR. MAY:**  We cited a Ninth Circuit case that says it's

16   persuasive.  So it's not binding, but Courts should consider

17   it.

18             **THE COURT:**  That's the way I view it.

19             **MR. MAY:**  It can be helpful.

20             **THE COURT:**  What does the comment say?

21             **MR. MAY:**  Okay.

22              "Neither subsection of Section 52 mentions the

23        Bane Act or Civil Code Section 52.1.  Nevertheless the

24        the Bane Act refers to Section 52.  See Civil Code

25        Section 52.1(c).  This reference would seem to

1      indicate that damages may be recovered under both

2      Subsections (a) and (b) of Section 52."

3          And I think that's the better approach, and I'll tell

4  you why --

5              THE COURT:  (a) and (b)?

6              MR. MAY:  Well, it says "damages available under 52."

7  It doesn't limit it to (a) or (b).  I think that the most

8  logical reading is all of them.  Whatever is under 52, you get

9  it because it's referenced in the Bane Act.

10         Why wouldn't they say only (a) or only (b)?

11             THE COURT:  Well, then what was the reference to

12 eliminating treble damages in the '91 -- what was that?

13             MR. MAY:  Happy to explain, because Your Honor was

14 wondering what did the previous version say.

15             THE COURT:  Yeah.

16             MR. MAY:  Right.

17         So what happened in 1991 was that the Subsection (b)

18 that -- I think that applies to the Ralph Act.  It's California

19 Civil Code Section 51.7 and 51.9 claims.

20         They said:  You're no longer going to get treble damages

21 acknowledge we're going to increase the penalty to $25,000.

22         At the same exact time in the same legislative session,

23 the legislature also amended the Bane Act, Section 52.1, to add

24 the reference to Section 52.

25         So the same legislature that said:  If you win on the Bane

1    Act, you get damages under 52, also did some -- some

2    reconfiguring inside of 52.

3         But they must have had knowledge that they are pointing

4    the reader to another statute; right?

5              THE COURT:  But before -- before the amendment, the --

6    the Bane Act did exist.  It came around in the 80's.

7              MR. MAY:  Yeah.  The Bane Act didn't say:  You also

8    get damages under 52.  It just was the damages listed in 52.1

9    itself.

10        I think -- I could be wrong.  I think back then it also

11   didn't -- at some point I don't think it applied to bright

12   citizens, I think that was added maybe before '91.  So

13   different things have changed.

14             THE COURT:  In your brief did you point all this out?

15             MR. MAY:  Most of it.

16             THE COURT:  I'm interested in what it was like prior

17   to the amendment.  Did you point that out?

18             MR. MAY:  No.

19             THE COURT:  Can you -- can you submit something to me

20   today or tomorrow that lays that out?

21        How about the CACI instructions?  Did you point that out?

22             MR. MAY:  We cited it.  Throughout the case we've been

23   citing this instruction.

24             THE COURT:  So what I hear you saying is that the Bane

25   Act, where it says "including but not limited to damages under

1   Section 52," the reference to "Section 52" was not in there

2   prior to '91.  It had its own damages.

3          **MR. MAY:**  That's correct.  That's correct.  It added

4   the reference to 52, at the same time that it took away the

5   treble damages from 52(b) and upped the penalty to $25,000.

6       There is also -- we did cite cases, by the way.  There are

7   cases that -- they don't do the analysis that we're currently

8   doing, but they said:

9              "The Bane Act allows for recovery of actual

10          damages and treble damages."

11      That's Ninth Circuit case Klein versus City of Laguna

12  Beach, we cited.  810  F.3d --

13         **THE COURT:**  Wasn't -- I read that back when we were

14  doing this.  It seemed to me to be tentative and conditional or

15  assumed arguendo.  I can't -- is that right or not?  What am I

16  remembering?

17         **MR. MAY:**  That I don't know.  It was a footnote and I

18  don't have all the facts of that case.  But, you know,

19  California -- it was the California statute.

20      We've got California Court of Appeal cases *Grassilli*

21  *versus Barr*, 142 Cal. App. 4th, 1216 --

22         **THE COURT:**  Tell me this.  What does -- okay.  You

23  cite those in your brief?

24         **MR. MAY:**  They're all in the brief.

25         **THE COURT:**  All right.  I have a different question.

1   51, 51.5, 51.6, which are where the treble damages are

2   expressly authorized, what do those sections deal with?

3        **MR. MAY:**  No idea.  No idea, Your Honor.  But the

4   legislature clearly only wanted some prevailing parties on some

5   statutes to get some damages.  They are saying if you prevail

6   on these, you're going to get these damages.  If you prevail on

7   those, you're going to get those damages.  And if you prevail

8   on 52.1, you get everything under 52, or else they would have

9   limited it in some way.

10       And that's what the CACI counsel said, and that's -- I

11  think that's why we have the --

12       **THE COURT:**  I --

13       **MR. MAY:**  Here is the thing.  We've never seen a case

14  -- I've never heard an argument that you don't get treble

15  damages under the Bane Act, quite frankly, and I've been doing

16  Bane Act cases many, many years.  I've spoken at the Consumer

17  Attorneys of California on the Bane Act.  I've probably filed

18  more Bane Act cases in state court than anybody I know.

19       I've never heard the argument you don't get treble damages

20  under the Bane act.  Every case says you do, and there's not a

21  single case that says you don't.

22       Sorry for speaking so fast.

23       **THE COURT:**  Mr. Gilbert, is that true?  Every case

24  says you do and no case says you don't?

25       **MR. GILBERT:**  No, Your Honor.

**THE COURT:** It's true or -- I'm sorry. It's not true?

**MR. GILBERT:** I don't agree with that statement.

**THE COURT:** Have you given me the authorities that say you don't get treble damages?

**MR. GILBERT:** Your Honor, we've given you the legislative intent. We've given you the cases that address it.

And we note that in none of the cases that have addressed treble damages was the question of whether they were properly compensable or available was ever adjudicated.

And we've also given the Court a legal discussion that issues that are not raised or briefed for adjudication in a published case are not law and are not precedential.

So the fact that a party may not have objected to the issuance of treble damages or may not have challenged it as being legal or appropriate does not mean that any Court has ever adjudicated that it was lawful and appropriate. In fact, we found no authority whatsoever that has ever resolved or addressed this issue, Your Honor.

And as to one quick other point --

**THE COURT:** Okay. But help me out here while I've got you.

Look. Do you have the -- do you have the code book there right now? Let's just -- tell me what 51 is, Section 51.

**MR. MAY:** That's the Unruh Act, I believe.

**THE COURT:** All right. And that deals with race

1    discrimination; right?

2          **MR. MAY:**  Right.  In places of public accommodation.

3    You can't discriminate --

4          **THE COURT:**  All right.  51.5, what does it deal with?

5          **MR. MAY:**  Business discrimination.

6          "No business establishment of any kind whatsoever

7     shall discriminate against, boycott, blacklist or

8     refuse to buy from, contract with, sell to or trade

9     with any person in the state on account of any

10    characteristic listed or defined in subdivision (b) or

11    (e) of Section 51."

12    It goes on.  It sounds like a counterpart to 1981.

13          **THE COURT:**  So that's an extension of Unruh.

14    51.6, what is that?

15          **MR. MAY:**  Prohibits -- this is a summary.  Let me pull

16    up the actual statute.

17    Okay.  Apparently, gender discrimination.

18          "This section shall be known and may be cited as

19    the Gender Tax Repeal Act of 1995."

20    Subsection (b):

21          "No business establishment of any kind whatsoever

22    may discriminate with respect to the price charged for

23    services of similar or like kind against a person

24    because a person's gender."

25    And it goes on.

1     THE COURT:  Okay.  What is 51.7 and 51.9?

2     MR. MAY:  51.7 is the Ralph Act.  That has to do with

3  violence based on somebody's protected class.  We initially had

4  a Ralph Act claim in this case and abandoned it at some point.

5  If you want --

6     THE COURT:  Ralph what?

7     MR. MAY:  Ralph Act.

8     THE COURT:  So that's violence based on race?

9     MR. MAY:  Protected class.

10    THE COURT:  Well, that would include race.

11    MR. MAY:  Including race.

12    THE COURT:  All right.  What is 51.9?

13    MR. MAY:  Subsection (a):

14       "A person is liable in a cause of action for

15    sexual harassment under this section when the

16    plaintiff proves all of the following elements."

17    It's a long list of elements, if the Court wants all of

18  them.  It sounds like it's a sexual harassment civil action.

19    THE COURT:  I'm sorry.  I was reading it.  Repeat what

20  you just said.

21    MR. MAY:  51.9 has to do with -- it provides a right

22  of action for a sexual harassment civil claim, and it lists the

23  elements.  I can read the whole thing if the Court wants.

24    THE COURT:  Read to me again what the CACI instruction

25  says.

1          **MR. MAY:**  The directions for use?

2          **THE COURT:**  Yeah.

3          **MR. MAY:**  Yeah.  Okay.

4          "Neither subsection of Section 52 mentions the

5     Bane Act or Civil Code Section 52.1.  Nevertheless,

6     the Bane Act refers to Section 52.  See Civil Code

7     Section 52.1(c).  This reference would seem to

8     indicate that damages may be recovered under both

9     Subsections (a) and (b) of Section 52."

10    And then it goes on.

11    Right after that it says:

12         "The Court should compute the damage under

13    Section 52(a) by multiplying the actual damages by

14    three and awarding $4,000 if the amount is less."

15         **THE COURT:**  So you treble actuals to the maximum or

16    you can quadruple?

17         **MR. MAY:**  Again, the Bane Act says you get actual

18    damages and an award up to three times.

19         **THE COURT:**  I know, but you were reading the -- the

20    guide.  What does it -- what does the note say?

21         **MR. MAY:**  It says this -- yeah.  It says -- well,

22    right before that it says:

23         "This reference would indicate damages may be

24    recovered under both Subsections (a) and (b).  The

25    Court should compute the damages under Section 52(a)"

1          -- so the treble portion -- "by multiplying actual

2     damages by three."

3          **THE COURT:**  All right.  Are you adding in a word or

4     two or did you read it exactly?

5          Read that sentence exactly.

6          **MR. MAY:**  Okay.  And I quote:

7           "The Court should compute the damages under

8     Section 52(a) by multiplying actual damages by three

9     and awarding $4,000 if the amount is less."

10         I just want to point out, though, that 52(a) is the treble

11    damage thing.  So damages plus treble.

12         And before --

13         **THE COURT:**  Wait, wait.  That's a minor point in this

14    case, whether it's quadrupled or trebled.

15         You know, when you get to be as old as I am, you realize

16    that trebling is the maximum under many statutes, starting with

17    the Sherman Act, and the -- the idea of quadrupling is

18    something out of step with that.

19         So I -- that's what gives me pause on that, but that's a

20    minor issue in the scheme of things here.

21         **MR. MAY:**  Could I address?  The Court raised something

22    else just now as a concern, which is that there might be some

23    criteria that are required.  Because if this is punitive, then

24    we need to give the jury criteria.

25         And we cited some cases in our brief.  This is the most

1　recent brief in reply to the defense brief.

2　　　　　　　**THE COURT:** Yeah.

3　　　　　　　**MR. MAY:** But there are cases here. This is *Overnight*

4　*Motor Transportation Company versus Missel*, which is

5　M-I-S-S-E-L, 316 U.S. 572. It's a 1942 case. It was

6　superseded by statute. I think because of this holding the

7　Congress amended the statute.

8　　　　But the case held that the version of the Fair Labor

9　Standards Act then in effect -- and there was a provision

10　awarding employees double damages for unpaid overtime without

11　any regard to whether it was good faith or reasonable by the

12　employer to withhold the wages. And they said that's not a

13　violation of due process.

14　　　　　　　**THE COURT:** Well, that would not be that. That would

15　not be. Nor would trebling under the Sherman Act be because

16　you don't -- under the Sherman Act it's automatically three

17　times. Because.

18　　　　　　　**MR. MAY:** Again --

19　　　　　　　**THE COURT:** In our case it's up to.

20　　　　　　　**MR. MAY:** Right.

21　　　　　　　**THE COURT:** So there's discretion by the jury. And

22　the Supreme Court has said that where there is discretion by

23　the jury on a punitive, you're supposed to give them

24　guidelines.

25　　　　Now, but in a trebling under the Sherman Act, there's no

1   discretion that that -- if it's a million dollars in actuals,

2   you get 3 million automatically.  It's statutorily required.

3       So I -- and the doubling thing is the same thing.  I'm

4   familiar with that concept.

5           **MR. MAY:**  Right.  And we have other cases, but I think

6   they also apply to statutes that have an automatic trebling.

7   But I don't know that the rationale would be much different.

8   So the jury has discretion.  There's still going to be up to

9   three -- there's notice.

10      You know, we cited a Ninth Circuit case that says the

11  defendant's notice of the fact that there's a statute like this

12  gives them some due process protection.

13      They know that if they act really poorly and take away

14  somebody's right through threat, intimidation or coercion, they

15  are facing up to three times.  It could be less.  You know,

16  that's in their favor, but it could be three times.

17          **THE COURT:**  All right.  This has helped me some.

18  Thank you.

19      I am most of the way through writing an order, but I

20  haven't finished it.  And I -- I need to do this while it's

21  fresh in my memory.  I need to get an order out.

22      But tell me -- I don't want to know any of the substance.

23  I just want to know time-wise when is the earliest you -- you

24  say you're mediating this with the -- with somebody and -- but

25  then I didn't like to hear that mid-June date.  That sounds too

1    far out.

2        So what -- where does that part stand?

3        **MR. GILBERT:**  Your Honor, we met with the Court of

4    Appeal.  The defendants offered to mediate, said they are

5    willing.  Plaintiffs indicated they were not interested, so the

6    Court of Appeal has released us from the mediation program and

7    there is nothing scheduled.

8        **THE COURT:**  So there's no program going?  I thought

9    you said did you want to mediate.

10       **MR. MAY:**  Yeah.  There's more to the story.

11       The reason we ultimately said we don't want to schedule it

12   now with the Ninth Circuit is because the defendant said they

13   wouldn't even have somebody with authority until at least mid

14   June, which, to me, would suggest a July mediation date.  And

15   we wanted -- we would rather have a ruling on these motions.

16       **THE COURT:**  I can't wait until July.  I would love to

17   see you settle this case, but if I wait til July, at my age I

18   will not be able to do a responsible job.  I'm sorry, I can't

19   just wait that long.  I will do a responsible job now and in

20   the next few weeks, but that's too long.

21       So I should have referred you both to a magistrate judge

22   back whenever I wanted to do that, and then a magistrate judge

23   would have been effective in getting -- and you, Mr. May, were

24   the one that talked me out of that, saying, no, you wanted to

25   go to the Ninth Circuit.  Now that's slipped away from me too.

**MR. MAY:** It wouldn't have mattered. They don't have somebody who can put any money on the table.

**THE COURT:** Well, the county could do it. That's just a -- that's just a -- I don't know. That's not a good reason.

What?

**MR. PETERS:** So we shouldn't believe them? They told us that they couldn't.

**THE COURT:** No, no. You should -- if they refuse to do it. But I know from other cases if the county wanted to, if it really turned on it, they could make -- move things faster. They could. I believe that that's what they told you.

**MR. PETERS:** No.

**THE COURT:** I'm not denying that they told you that. You're too sensitive. You take offense at things that were not intended in an offense.

**MR. PETERS:** We have constantly tried to accommodate, but there is a point at which we have to take them at their word. And when they say: We can't do anything until July. Unless the new people here say something differently, in which case we're happy to change our position. But I just -- it just feels like --

**THE COURT:** All right. Okay. Okay. I don't want to get in the middle that.

**MR. GILBERT:** To be really clear --

**THE COURT:** If I was in your position, I would try to

settle this case within the next couple weeks.

      **MR. GILBERT:**  Your Honor, I want to be really clear.
Mr. Peters was not on the scheduling call, nor was Mr. May.
The assessment call with the Court of Appeal was Mr. Gearinger
and Mr. Gearinger alone on behalf of the plaintiffs.

    If they appeared, then I don't remember -- actually, were
you on the phone?

      **MR. MAY:**  I was on the call, Your Honor.

      **MR. GILBERT:**  Okay, I'm sorry.  But Mr. Peters was
absolutely not.

    Was that you --

      **THE COURT:**  Was that what you said, that you couldn't
do it til mid July or mid June?

      **MR. GILBERT:**  No.  We explained the timing of the
approvals process.  We explained that the best result would be
to do it late June.

    The mediator from the Ninth Circuit indicated that he
would make sure and schedule someone with priority to have it
done during that time period.

    They scheduled a further follow-up call with plaintiff's
counsel.  The report that came back from the Court of Appeal
was that plaintiff's counsel indicated that they do not have a
desire to sit down and participate in a mediation.

      **THE COURT:**  Well, I see probably what happened here,
and I'm not going to point any fingers at the -- if the

1  plaintiffs say that's too late, I can understand that.

2      If they -- if it was a matter of a couple weeks, I would

3  say they should wait a couple weeks.  But waiting a -- a month

4  and a half is -- is -- and you know that would be the soonest.

5      Now, if I was the county, I would make things happen

6  faster, but I -- and if you told me you could -- you hold up

7  two weeks and there's a 50/50 chance you would have a deal, I

8  would hold up.  But I am not going to hold up a month.  I will

9  have an order out within a month, maybe sooner.  So as soon as

10 I can get it ready.

11     I'm in a big trial right now.  I don't have much time to

12 work on this case, but I will starting in about -- I am working

13 on it.  You know, about 5:00 a.m. every morning.  5:00 a.m.

14 I'm in here, and my dedicated Law Clerk comes in at 6:00

15 o'clock.  And then I go into the trial at 7:30.

16     So I am working on your case, but I can't work on it as

17 fast as I would like to work on it because I've got other

18 things to do.

19     All right, my friends.  I believe -- I believe I've got

20 everything.  Thank you, and motions are under submission.

21         **MR. MAY:**  Thank you, Your Honor.

22         **MR. GILBERT:**  Your Honor, that --

23         **THE COURT:**  There was something you were going to give

24 me, but I've forgotten.  Please give it to me, not now, but

25 send it to me by tomorrow.  I've forgotten what it was now.

1          **MR. MAY:**  Thank you.

2          **THE COURT:**  Thank you.

3      (Proceedings adjourned.)

## CERTIFICATE OF REPORTER


    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Debra L. Pas*

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, May 16, 2023