United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AASYLEI LOGGERVALE, AAOTTAE
LOGGERVALE, and AASYLEI
HARDGE-LOGGERVALE,

Plaintiffs,

v.

STEVEN HOLLAND, MONICA POPE,
and COUNTY OF ALAMEDA,
Defendants,

Defendants.

No. C 20-04679 WHA

**ORDER RE DEFENDANTS'
MOTIONS FOR NEW TRIAL
AND RENEWED MOTION
FOR JUDGMENT AS A
MATTER OF LAW**

## INTRODUCTION

In this Section 1983 and Bane Act case involving unlawful detention of three African American women, defendants County of Alameda and two deputies move for a new trial or in the alternative for remittitur as well as for renewed judgment as a matter of law. Except to the limited extent that follows, their motions are **DENIED**.

## STATEMENT

In September 2019, a mother and two teenage daughters, the Loggervales, drove through the night from Las Vegas, where the mother lived, to the East Bay, where the older daughter Aasylei was to take a college test the next morning. They stopped at a McDonald's in Castro Valley, then continued on to a strip mall with a Starbucks, also in Castro Valley, arriving just before dawn. They pulled into a disabled parking stall (and the mother displayed

United States District Court
Northern District of California

1  the required placard), then tried to nap, having arrived a few hours before the test at Berkeley

2  City College.  The Loggervales were completely innocent of any crime.

3      Soon after the Loggervales pulled into the parking stall, Alameda County Deputy Steven

4  Holland saw their car as he patrolled through the parking lot.  He was aware of prior auto

5  burglaries in that very lot, including in both of the last two mornings.  He met up with Deputy

6  Monica Pope at a nearby location, where he learned that she too had driven through the lot

7  and noticed the car.  Since most traffic in the lot at that time of day was short-term (to

8  facilitate quick dashes in and out for commuter coffee), they both wondered whether the car

9  had any connection to the recent auto burglaries.

10     The time of day (early morning) and location (the same Starbucks lot) suggested a

11 possible connection.  A prior getaway vehicle had been a gray hatchback.  The car now under

12 observation was a silver four-door Cadillac sedan with Nevada plates.  They decided to

13 investigate and returned to the lot.  They ran the plates and learned that the car belonged to a

14 rental car company at the Oakland airport.  They approached the Cadillac.  Taking the lead,

15 Deputy Holland tapped on the driver's window.  Ms. Loggervale, the mother, who had been

16 napping, drew down the driver's window.  He greeted her, advised her that there had been

17 auto burglaries in the very same lot, and asked to see her identification.  As she dug into her

18 purse, she evidently realized that Deputy Holland suspected her of being involved in the prior

19 auto burglaries (rather than, as she had first thought, warning her of the theft danger in that

20 lot).  She began to ask what his purpose was and why she was being questioned.  The two

21 daughters did likewise.  It is fair to say that, soon, all three vigorously but nonviolently set up

22 a continuous protest as to why they were being investigated.

23     By this point, Deputy Holland knew the car contained only women.  No prior incident in

24 that lot or at any other Castro Valley Starbucks had identified women suspects.  Any

25 reasonable suspicion to detain (or probable cause to arrest) had evaporated and the only

26 proper course was for Deputy Holland to bid them a good day — or so a reasonable jury could

27 have found on our trial evidence.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Instead, Deputy Holland ordered them detained.  Part of his suspicion anchored in their race, African American.  That factor did correspond with the description of at least one of the prior suspects (another suspect had been described as Latino).  But those suspects had been men.  The Loggervales were women.  Deputy Holland ordered them out of the Cadillac, ordered them into handcuffs behind their backs, had them separated and stowed in the backseat of squad cars, then held for what turned out to be 91 minutes.  Other deputies arrived and assisted.  The deputies searched the car for the identifications of all three and eventually found all three identifications.  One daughter said she needed to use the restroom, but she was never allowed to do so during the detention.  After a supervisor came to the scene, the three were questioned further but eventually released.  No medical attention was needed or sought.

Aasylei arrived forty minutes late for her test.  She received a C on the test, and an overall B in the course, the only B of her community college career, all other final grades being A's.  (She went on to the University of California at Los Angeles.)  Afterwards, the Loggervales drove to San Diego for Aaottae's pre-planned birthday celebration.

In our trial, the defense never made any apology or show of regret.  Instead, the defense, before the jury, impugned the credibility and integrity of plaintiffs.  For example, Attorney Kevin Gilbert for the defense argued Aasylei Hardge-Loggervale lied in her testimony that she had needed to use the bathroom at the Starbucks.  It was suspicious, his argument went, that she did not mention the earlier McDonald's stop and instead, had waited to use the bathroom at Starbucks (Tr. 1239:7–23).  On cross-examination, to take another example, Attorney Gilbert also asked Aasylei — in an effort to address the lower grade she'd made — whether she'd ever received a "B" in high school.  He further suggested to the jury that her poor performance on the test was not due to the 91-minute detention and lateness of her arrival for the test, but instead attributable to her having allegedly partied too much in Las Vegas the week prior (Tr. 627:24–629:9).  All of this added insult to injury or so a reasonable jury could have found.[1]

---

[1] This insult to injury would have been even worse had the defense been allowed to contend at trial that Ms. Loggervale (the mother) was engaged in out-of-state tuition fraud and that was the true reason she would not show

3

A reasonable jury could have found that the deputies had insufficient grounds on which to detain the three and that they had been racially profiled.  The jury awarded a total of $8.25 million, $2.75 million for each plaintiff.

**ANALYSIS**

Defendants' Rule 50 and Rule 59 motions will be addressed in this combined order. Under Rule 59(a), "[t]he court may, on motion, grant a new trial on all or some of the issues and to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Though the grounds on which a new trial may be granted are not specifically enumerated, historically recognized grounds include "claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the moving party." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (cleaned up).  "[T]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Ibid.*  Under Rule 50(b), a movant may file a renewed motion for judgment as a matter of law.  "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *See Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

Issues concerning the facts and evidence will be considered first, then the issues of law.

1.    **EXCLUDED STARBUCKS AUTO BURGLARIES.**

Defendants assert that they "were only allowed to discuss two prior incidents at Starbucks' parking lots within a mile of the subject incident" (Rule 59 Br. 5; Rule 59 Reply 2), stating that they were unfairly limited in showing that the deputies had reasonable grounds to detain.  Defendants, however, were free to and in fact *did* discuss seven specific incidents to make a showing of reasonable suspicion to the jury.  Here is the true record.

---

her driver's license, the defense's idea being that her daughter was attending a California state college, but the mother no longer lived in California (and instead lived in Nevada).  The offer of proof was exceedingly thin and this line of attack was excluded under Rule 403 on the first day of trial.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

At the final pretrial conference, defense counsel offered a chart listing ten prior incidents and one subsequent incident in an effort to show a trend of crimes that supported reasonable suspicion as to the Loggervales. This included <u>all</u> of the prior six burglaries listed in Deputy Holland's same-day report explaining why he had detained the Loggervales (TX 1). Of these eleven, four were ultimately excluded under Rule 403. Seven were allowed, not just two.

In response to a motion *in limine*, the Court ruled "[b]urglaries at various other Starbucks locations that occurred prior to the incident but are not in defendant Holland's report are allowed within reason, however it cannot become cumulative" (Final Pretrial Order 3). Additional Starbucks robberies "in the vicinity within a few blocks" should be fair game, as criminals would be unlikely to limit themselves to only one neighborhood Starbucks (Tr. 23:24–24:5).

On the first day of trial, however, it emerged (outside the presence of the jury) that one of the proffered Starbucks locations was 2.9 miles away in another city and involved three auto burglaries from May and June 2019. Under Rule 403, the judge ruled that these three were too remote in time and place and thus excluded them as too attenuated to support reasonable suspicion as to the Loggervales in Castro Valley in September 2019. To repeat, these three had <u>not</u> been cited in Deputy Holland's report as a basis for reasonable suspicion. If counsel had any more incidents within a closer distance that they wanted to admit, they were invited to raise them for further consideration. Referring to the Starbucks at 20663 Rustic Drive in Castro Valley, the judge stated "A few blocks away, I will allow; but three miles away, no . . . 0.6 is close enough. So that's what I'm going to [do] — and if you have any more, you'll have to let me pass on it" (Tr. 25:18–24).

One of the remote incidents had completely unknown descriptors, another involved an adult black male with face tattoos and a black female with blue hair in a silver Infinity SUV, and yet another involved an adult black male driving a white BMW, none of which read on the Loggervales. In light of the other burglaries already allowed, these remote occurrences added little and would have consumed jury time, so they were excluded under Rule 403.

The after-the-fact burglary, which occurred five days after the Loggervale detention, was also excluded under Rule 403 because "[b]urglaries that occurred after the incident are not relevant to what the officers or even the department had in mind when they approached plaintiffs" (Final Pretrial Order 3). This ruling comports with common sense that only information available at the time may be considered in a reasonable suspicion analysis.

The remaining incidents cited in defendants' chart were all allowed and occurred either at the location in question, or a few blocks away at the location 0.6 miles away. On direct examination, Defense Attorney Gilbert questioned Deputy Holland about each of these incidents (Tr. 747:5–23, April 1, 2019, incident); (Tr. 645:5–646:10, May 27, 2019 incident); (Tr. 747:24–748:10, July 10, 2019 incident); (Tr. 748:11–749:11, July 26, 2019 incident); (Tr. 749:9–11, September 18, 2019 incident); (Tr. 749:12–751:15, two September 19, 2019 incidents). Accordingly, it is simply untrue that defendants were limited to two prior incidents.

Defense Attorney Gilbert twice tried to assert that the excluded Starbucks' were within 1.8 miles away from each other, and thus all proffered instances should be included. Specifically, he stated "There's — and the three Starbucks are actually 1.8 miles apart, Your Honor, on the main thoroughfare over Castro Valley Boulevard. And I have the address of the three, if the Court would like it" (Tr. 42:24–43:2) and "There was two that were within 1.8 miles. We came and brought the Court a specific map" (Tr. 319:8–9).

This was and remains, however, untrue. The Court takes judicial notice that 15600 Hesperian Boulevard, San Lorenzo (the site of three incidents) is at least 2.9 miles away from 2720 Castro Valley Boulevard, Castro Valley. Accordingly, the three incidents at Hesperian Boulevard remained excluded throughout trial. Apart from the three locations discussed, no other Starbucks incidents were proffered by the defense for further consideration.

Defendants further argue that it was error to admit into evidence the underlying police reports of the crimes referenced in Deputy Holland's same-day report on the Loggervale detention, counsel stating, "Holland referenced those prior auto burglary reports in his report on the subject incident as background, but he only became aware of the specifics in those

United States District Court
Northern District of California

reports *after* the incident had occurred" (Rule 59 Br. 5).  This argument was rejected at the final pretrial conference and so too here.  In Deputy Holland's own same-day report of the Loggervale detention (TX 1), he detailed six prior instances at the Starbucks in question over the prior six months: four auto burglaries, one reported suspicious vehicle, and one strong-armed robbery.  Because Deputy Holland himself had placed those past crimes in his report, it was only fair to allow into evidence the underlying reports for these very crimes in order to test the accuracy of his explanation, a consideration that not only went to his credibility but also to the actual reported facts of the prior burglaries.  Indeed, such inconsistencies existed and were inquired into at trial.  It would have been unfair to let one side present a varnished version of the prior events while prohibiting the other side from revealing the unvarnished facts.

Lastly, the defense asserts error because they were "hamstrung" from eliciting testimony about the details of undocumented prior incidents that were "not written in formal incident reports" (Rule 59 Reply 2; Rule 59 Br. 4).  No such ruling was made.  The defense was allowed to and did freely elicit testimony during the trial that other incidents relied upon by Deputy Holland were not necessarily reported or documented elsewhere.  Here are some examples of what the jury heard:

> MR. GILBERT:  And did you also receive any information about crimes in these particular parking lots — these two parking lots from any other source?
>
> DEPUTY HOLLAND: Yes.  I mean, we receive information [sic] many different sources, whether it's the radio, our partners, dispatch, briefings.  In our — or muster.  Excuse me.  In our muster room, there's a corkboard on the wall that has APBnet TRAK flyers, and those get updated pretty consistently of the crime trends and what to look for.
>
> MR. GILBERT:  Now, through all the information you had from the briefings that we talked about, from the radio dispatch reports, would you also talk to other deputies as well?
>
> DEPUTY HOLLAND: Yes.
>
> [ .          .          . ]
>
> MR. GILBERT:  So based on the information you received . . . did there seem to be a trend that was developing regarding auto

7

United States District Court
Northern District of California

1
2
3
4
5
6
7

burglaries up until September 20th, 2019?

DEPUTY HOLLAND:  Yes.

MR. GILBERT:  Can you tell us about that, please.

DEPUTY HOLLAND:  It was auto burglaries throughout the vicinity.  But in my beat, that Starbucks on Castro Valley Boulevard was hit two days prior, the day before prior.  And every time you would drive through the parking lot, there's glass, people who were — there was unreported crime that had happened there.  All the Starbuckses [sic] in the area were seeing this, the ones in our other beats, but my responsibility was this section, this Starbucks.

8   (Tr. 647:7–648:17).

9
10

MR. GILBERT:  Now, are the incidents that are documented in this report the only incidents that you relied upon in determining whether reasonable suspicion existed?

11   DEPUTY HOLLAND:  No.

12
13

MR. GILBERT:  Why wouldn't you put all the other incidents that you relied upon in this particular incident?

14
15

DEPUTY HOLLAND:  I used these for the specific address.  But the information, while you're on patrol, flows at a constant level.  There — I mean, we're provided information by numerous sources non-stop.

16   (Tr. 741:9–180).

17          Attorney Gilbert has been unfair in inventing untrue limitations upon his defense at trial.

18   The only thing that comes remotely close was the Court's response to Attorney Gilbert's

19   question regarding opening statements, in which the judge ruled "I think you should stick in

20   your opening to auto burglaries for now.  I wouldn't get into other burglaries yet" (Tr. 60:10–

21   12).  Clearly, that limitation was expressly limited to the opening statements and eventually,

22   other crimes and sources of information were discussed in trial by the defense.

23          **2.    THE BIG 5 SHOPLIFTING INCIDENT.**

24          Defense Attorney Gilbert wanted to bolster the grounds for the Loggervales' detention

25   by eliciting testimony concerning a shoplifting that had occurred the day before at a Big 5

26   Sporting Goods store approximately two to three miles from the Starbucks in question.[2]  The

27

28          [2] The exact address of the Big 5 store did not come into evidence during trial, but the Court takes judicial notice that two Big 5 stores are located within three miles from the Starbucks in question according to Google Maps.

8

suspects from that theft were described as three young black females who stole goods from the store and fled the scene.  In post-trial briefing, the defense cites (for the first time) an incident report by Bates number that was neither marked for identification nor admitted into evidence, which supposedly stated the Big 5 suspects were "in their early 20's with black braids" (Rule 59 Br. 4).  Based on this same report, plaintiffs reply that the Big 5 suspects "were all in their 20s and fled in a red Toyota" (Rule 59 Opp. 3).  Some of its details were revealed during trial testimony and cross-examination (such as the color of the getaway car, Tr. 905:13–15), but other details never came out (such as the Big 5 suspects had braids).

Regardless, only the information provided to the judge during the actual offer of proof during trial will be analyzed here for purposes of determining whether the ruling at the time was in error or not.  Because these later descriptions were not presented at the time of the offer of proof, they cannot now be relied upon to strengthen the Big 5 offer of proof after the fact.  Here is the true sequence at trial.

Discussion began on whether or not the Big 5 incident should be admitted at the final pretrial conference.  Significantly, Deputy Holland and Deputy Pope had both admitted in depositions that the Big 5 incident had *not* been part of their calculus on the day in question.  So, at the time the detention began, no deputy on the scene took it into account.  When asked why it was relevant, Attorney Gilbert stated body camera footage showed that one of the deputies who later arrived on scene mentioned the Big 5 shoplifting, and asked whether the Loggervales could be those women, and thus prolonged their detention.  No final ruling was made.  Instead, both parties were instructed not to reference Big 5 in their opening statements, and the judge would wait and see how the evidence developed to decide its potential relevance.  The judge specifically stated "I want to be clear, Mr. May.  I'm not ruling out the [Big 5] testimony.  I'm ruling out the opening statement" (Tr. 61:21–22).  The tentative ruling was once Big 5 was mentioned on scene by the deputy that later arrived, it might be

1   admissible to show the potential justification of prolongment of the detention, but it played no

2   role in the original detention.[3]

3        As trial evidence developed, however, the Court became dubious of the relevance of the

4   Big 5 shoplifting and requested a solid offer of proof.  Attorney Gilbert then made several

5   misrepresentations:

> THE COURT:  Now, before I make a final decision on this, this is
> the way I'm probably going to rule, but I want to give you right
> now, Mr. Gilbert, an opportunity to make a real offer of proof,
> telling me which witness, by name, will come in here and testify
> that Big 5 actually had some concrete role in this case.  Go ahead.
>
> MR. GILBERT:  Two witnesses specifically.  Galloway will
> specifically tell you that during the investigation process, he pulled
> up the picture and looked at them; and there was discussion with —
> among the deputies, as a whole, including DeSousa, Holland, Pope,
> Leeper, all of them on-site, regarding the Big 5 incident.  Deputy
> —
>
> THE COURT:  What did they conclude?
>
> MR. GILBERT:  They concluded that there was not enough
> information; that they were going to document it and that was the
> extent of it.  But it was part of the process that continued and
> progressed with the detention to obtain the identification and
> document.
>
> THE COURT:  How long was that prolongment?
>
> MR. GILBERT:  There wasn't a specific time because it was part
> of the totality of the circumstances.  Deputy Leeper also referenced
> the Big 5 when he was putting one of the plaintiffs in the police car.
> He specifically referenced the three African-American women from
> the day before, which he believed further justified the detention of
> the plaintiffs.  There was a —
>
> THE COURT:  What is his name?
>
> MR. GILBERT:  Deputy Leeper.  When he — now, there is an
> ambiguity —
>
> THE COURT:  He's going to come in here and testify?
>
> MR. GILBERT:  Yes, sir.

---

[3] Attorney Gilbert agreed the fact that Big 5 played no role in the original detention was "not disputed" (Tr. 211:25).

United States District Court
Northern District of California

(Tr. 225:13–226:20). Deputy Leeper, as it turned out, did not even testify. Attorney Gilbert also stated a "supervisor" would testify that Big 5 played a role in his investigation of the Loggervales on scene. That exchange went as follows:

> THE COURT: Please. Did Holland say that Big 5 ever had any role in this case?
>
> MR. GILBERT: In his decision-making?
>
> THE COURT: Yes.
>
> MR. GILBERT: He did not consider Big 5, but he was not the supervisor on-site.
>
> THE COURT: Who was the supervisor?
>
> MR. GILBERT: DeSousa.
>
> [ .       .        . ]
>
> THE COURT: What is [DeSousa] going to say on the stand?
>
> MR. GILBERT: He's going to say that —
>
> THE COURT: This is an offer of proof that, as an officer of the court, it better be a hundred percent accurate, unlike some of your prior statements to me.
>
> MR. GILBERT: DeSousa will come in and tell you that [Big 5] was a factor that led to him continuing to discuss these incidents with the plaintiffs and the continued detention while he interviewed them and the documentation.

(Tr. 227:15–228:17). Based on the offer of proof, the Court reversed course against its better judgment and allowed the defense to elicit the testimony regarding the Big 5 incident. The offer of proof, however, proved to be riddled with error. As stated, Deputy Leeper never testified. When Lieutenant DeSousa, the supervisor, testified, he made no mention at all of Big 5. Attorney Gilbert later apologized, stating he had misremembered the witnesses and confused Lieutenant DeSousa with a lower-level officer, Deputy Galloway (Tr. 1009:15–20).

Thus, the only person produced by the defense who testified about Big 5 was Deputy Galloway, the officer who had responded to the Big 5 incident the day before. His body camera footage at the Starbucks was also admitted into evidence. As stated, the actual incident report of the Big 5 shoplifting was not offered or admitted, but it was referenced

during Deputy Galloway's testimony.  Despite defendants' contention that they "were not allowed to discuss the Big 5 robberies at all" (Rule 59 Br. 5), these items of evidence were shown to the jury, and the jury was never admonished or instructed to disregard the evidence from consideration.

In the body camera footage shown to the jury (TX 22), Deputy Galloway walked onto the scene and, upon learning the Loggervales were three black women, questioned "Is it one heavy-set and two skinny ones?"  He then took out his cellphone and pulled up a picture of the Big 5 suspects, stating "I mean, it's not the best photograph, but . . . . "  He zoomed in on the photo, which had been a still shot from video surveillance footage, showed it to two fellow officers, and stated, "Here's what I have."  One of the officers, Deputy Leeper, looked at the photo and jokingly replied "Oh geeze.  I mean, yeah.  I mean, based on that picture.  Could be them!"  Deputy Galloway responded with brief laughter and then headed toward each patrol car to compare his photo to each one of the Loggervale women.  He then asked Deputy Holland for their names and copied down the information from their identifications onto a notepad.  Deputy Galloway advised Deputy Holland he planned to conduct a records check on "CRIMS" to determine whether they were the Big 5 suspects (TX 22).

When questioned on direct about his investigation on scene while the suspects were detained, Deputy Galloway stated "I just took their names.  I did not continue an investigation to any point, no."  He further stated on cross-examination that "[b]y 'investigation,' all I wanted was their names to see if I could find anything in a record check that would corroborate my — my investigation the day before" and "I don't know if I ruled them out at that very moment, but I wanted — it was — it was a really grainy photo.  So I was just seeing if I had seen anything that would stand out to help me identify, but I know I couldn't identify them" (Tr. 899:6–7; 906:7–9; 907:19–22).  When asked if he had "at some point" ran the plaintiffs' names through CRIMS, Deputy Galloway responded "I don't believe I did" (Tr. 899:9–10).

As a result of Attorney Gilbert's misstatements on the offer of proof — specifically having said the supervisor on scene raised the question, and another officer (who was never

called to testify) also spoke to the Loggervales about it — the Court finally ordered that the defense could not further argue or suggest that the Big 5 shoplifting in any way provided support for the detention.  Under Rule 403, the event and the specifics were too remote to have justified the detention in question or any prolongment of the detention.

The Court then reminded Attorney Gilbert of his history of affirmatively misleading it. As only one example of several, Attorney Gilbert had argued during summary judgment that Ms. Loggervale had refused to provide her identification and had stated African Americans were not required to do so.  Specifically, he had stated:

> MR. GILBERT:  When the deputies walked up — and this is visible on the video — they were very pleasant, tried to engage in dialogue.  Hi, ma'am.  We're investigating burglaries.  What are you doing here?  Can you tell me your name?  At that point the plaintiff responds that, no, she doesn't need to provide her identification because she's black.  That is actually her statement. It is actually on the video.  The Court can see it itself.  And then she proceeds to provide inconsistent and conflicting answers to questions, that didn't make sense, in a rental car, no less, which according to published decisions, which we set forth in the brief, are another suspicious factor.  Based upon those facts, the officers clearly had reasonable suspicion.

> [    .        .      . ]

> THE COURT:  All right.  Just by way of rebuttal, let me ask the defense.  It's a lot of trouble for me to go back and tee up the video and all that.  Are you certain that she said, "I don't have to show identification because I'm black"?

> MR. GILBERT:  In that exact phrase, no, but at one point she does reference she doesn't have to show it to him and she makes comment that she's black and that she attributes it to the fact that she's not going to provide identification.

(Dkt. No. 105 at 6:3–16; 12:17–25).  No such statement, not even close, had ever been made by Ms. Loggervale.  Undoing this falsehood took considerable effort in reviewing body camera footage to learn the actual conversation.  This falsehood led to the denial in large part of the summary judgment motion.

### 3.   THE VEHICLE CODE AND *LIPTON*.

Even if the original detention was not supported by reasonable suspicion, the defense contended throughout trial that Deputies Holland and Pope still had an independent legal basis

United States District Court
Northern District of California

for detention under the California Vehicle Code.  Defendants argued certain provisions of the Vehicle Code did not require reasonable suspicion to enforce, such as Section 12951, which mandated a "licensee shall have the valid driver's license issued to [her] in [her] immediate possession at all times when driving a motor vehicle upon a highway" and the driver shall present her license for examination "upon demand of a peace officer enforcing the provisions of this code."

Another example was Section 22511.56, which stated "[a] person using a distinguishing placard . . . shall, upon request of a peace officer or person authorized to enforce parking laws . . . present identification and evidence of the issuance of that placard or plate to that person."

The phrase "upon demand of a peace officer *enforcing the provisions of this code*" in the statutory language was of significant dispute, as plaintiffs maintained the deputies had not approached Ms. Loggervale to enforce the Vehicle Code, but rather to investigate recent auto burglaries.  Thus, plaintiffs' argument went, the Vehicle Code provisions could not apply, because Deputy Holland explicitly told Ms. Loggervale the reason he was there had been due to the recent burglaries and he made no mention of verifying her disability placard.

Defendants countered that verifying Ms. Loggervale's placard had been a part of Deputy Holland's investigation, and Deputy Pope had mentioned seeing the placard and "running it" as she approached the Loggervale vehicle.  Further, deputies were under no duty to disclose the reasons for their investigation to a suspect, so, defendants argued, even if Deputy Holland had stated his reason was to investigate auto burglaries, that did not discount the possibility that he also was intending to enforce the Vehicle Code.  This became a separate factual dispute that was left for the jury to decide.  Even if jurors were convinced that Deputy Holland was enforcing the Vehicle Code, however, the question remained whether there needed to be reasonable suspicion to suspect Ms. Loggervale was violating the provisions.

Significantly, in addition to alleging Deputy Holland did not see Ms. Loggervale's disability placard when he first approached the vehicle, defendants also argued that, in any event, under the Vehicle Code's plain language, no additional facts tending to show a

suspected violation were required.  Citing *Lipton v. United States*, 348 F.2d 591, 594 (9th Cir. 1965), and *United States v. Carrizoza-Gaxiola*, 523 F.2d 239, 241 (9th Cir. 1975), defendants maintained that officers were permitted to simply check for a driver's compliance "to enforce laws susceptible of no other means of effective enforcement."  Because disability placard laws are subject to wide abuse and are difficult to enforce, defendants said, this Vehicle Code provision fell within the *Lipton* scope and required no reasonable suspicion.

This argument was rejected at trial.  Instead, the judge instructed the jury (Jury Instruction ¶ 23):

> These [Vehicle Code] provisions can be enforced even when a vehicle is parked in a private lot and off the highway, so long as the person is in the immediate control of the automobile.  An officer must first have reasonable suspicion that an individual has committed a traffic violation or some other crime before detaining the individual to enforce these Vehicle Code provisions.  Officers may not stop traffic or detain individuals, even if merely to ask for identification, without at least having reasonable suspicion.

Defendants now argue the last sentence was incorrect and constituted error.  They also move for renewed judgment as a matter of law on this basis (Rule 50 Br. 3).

*Lipton*, which was decided by our court of appeals three years before the Supreme Court's *Terry v. Ohio* decision, held that it was lawful for an officer to stop a car "to investigate the driver's possession of a license to drive the car on the California highway," because "[n]o other way was available to the officer to determine whether [the driver] possessed the required license" and "[a] contrary holding would render [the licensing requirement] unenforceable."  *Lipton*, 348 F.2d at 593.  *See generally Terry v. Ohio*, 392 U.S. 1 (1968).  In *Lipton*, a traffic control patrolman observed a youth driving on a city street and conducted a stop to see if the driver had a license.  The court of appeals reasoned that because no controlling federal law existed at the time which governed the conduct of inspecting traffic officers, "the law of the state where an arrest without warrant takes place determines its validity."  *Lipton*, 348 F.2d at 593.  The decision thus read the California Vehicle Code provisions to impliedly bestow a "right" on peace officers to stop a driver and make a demand to see their driver's license.

United States District Court
Northern District of California

Defendants argue that the Ninth Circuit has "repeatedly reaffirmed" *Lipton* "including *after Terry* was decided in 1968" (Rule 59 Reply 5). In the post-*Terry* decision *Carrizoza-Gaxiola*, our court of appeals "[a]ssum[ed] the vitality" of *Lipton* subsequent to *Terry*, without directly holding it was still valid law.[4] 523 F.2d at 241. Working under that assumption, *Carrizoza-Gaxiola* reasoned "[t]he rationale of *Lipton* is that laws requiring possession of drivers' licenses while driving could not otherwise be effectively enforced. We have limited *Lipton* to that rationale; it permits stops without founded suspicion only to enforce laws susceptible of no other means of effective enforcement." *Ibid.* (citation omitted).

In *Delaware v. Prouse*, 440 U.S. 648 (1979), the Supreme Court considered and flatly rejected a *Lipton*-like argument that advocated for random checks for compliance with Delaware's vehicle licensing and registration provisions. There, an officer admittedly stopped a vehicle without reasonable suspicion but maintained he should be permitted to conduct these random checks to verify whether the driver had a valid license and registration. The Supreme Court held "except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." *Id.* at 663. The Court rejected the notion that highway safety and enforcement justified the Fourth Amendment intrusion, reasoning:

> Given the alternative mechanisms available, both those in use and those that might be adopted, we are unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment.
>
> The foremost method of enforcing traffic and vehicle safety regulations, it must be recalled, is acting upon observed violations. Vehicle stops for traffic violations occur countless times each day; and on these occasions, licenses and registration papers are subject

---

[4] Defendants also cite a border-patrol checkpoint case, *United States v. Bowen*, 500 F.2d 960, 965 (9th Cir. 1974), as proof of *Lipton*'s post-*Terry* reaffirmation in our court of appeals. Because fixed checkpoints are treated differently for the purposes of constitutional analysis, *see Delaware v. Prouse*, 440 U.S. 648, 663 n.26, this case does not meaningfully add to the analysis and will not be discussed here.

16

> to inspection and drivers without them will be ascertained. Furthermore, drivers without licenses are presumably the less safe drivers whose propensities may well exhibit themselves . . . . The contribution to highway safety made by discretionary stops selected from among drivers generally will therefore be marginal at best.
>
> Furthermore . . . we find it difficult to believe that the unlicensed driver would not be deterred by the possibility of being involved in a traffic violation or having some other experience calling for proof of his entitlement to drive but that he would be deterred by the possibility that he would be one of those chosen for a spot check. In terms of actually discovering unlicensed drivers or deterring them from driving, the spot check does not appear sufficiently productive to qualify as a reasonable law enforcement practice under the Fourth Amendment.

*Id.* at 659–60 (footnote omitted).  Thus, for all intents and purposes, *Prouse* clearly overruled *Lipton* in 1979.  Defense Attorney Gilbert cited *Prouse* once during the course of the litigation for an irrelevant and miscellaneous point, but never brought its key holding to the attention of the judge (Dkt. 92 at 13).  Instead, he continued to insist *Lipton* was binding and good law.

Over a decade later, in *Whren*, the Supreme Court reiterated the point that traffic stops require reasonableness under the Fourth Amendment:

> Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of this provision.  See *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979); *United States v. Martinez–Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975).  An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances.  As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.  See *Prouse, supra*, at 659, 99 S.Ct., at 1399; *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (*per curiam*).

*Whren v. United States*, 517 U.S. 806, 809–10 (1996).  Thus, this order affirms Jury Instruction 23 as an accurate and clear statement of law as existed in 2019 and today.  Any post-trial motion based on *Lipton* is **DENIED**.

*                    *                    *

The defense argues even assuming the unlawfulness of Deputy Holland and Deputy Pope's actions, they were nonetheless entitled to qualified immunity. An officer is entitled to

qualified immunity under Section 1983 unless (1) the officer violated a federal statutory or constitutional right and (2) the unlawfulness of the conduct was clearly established at the time.  To be "clearly established," at the time of the officer's conduct, the law must have been "sufficiently clear" that every reasonable official would understand that what he is doing is unlawful.  This occurs when there is binding caselaw that places the statutory question "beyond debate," but, there need not be a case "directly on point."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The defense maintains because "there is no case that has ever declared that the demand for identification allowed under Vehicle Code Section 12951 and 22511.56 may *not* be posed to the driver of an already stopped vehicle (even without reasonable suspicion)" (Rule 50 Br. 16).  Because, however, the United States Supreme Court in *Prouse* declared unconstitutional the conduct of randomly stopping vehicles without reasonable suspicion, the law was clearly established.  There is no reasoned basis to believe it would be permissible to check compliance with licensing requirements merely because the vehicle is already stopped. *Prouse* is close enough to a case on point.  In a consensual encounter, the officer may ask to see identification, but the officer may not demand to see it absent reasonable suspicion, and a refusal to provide identification where reasonable suspicion is lacking cannot be bootstrapped into grounds for detention.

### 4.    *ARTURO D.* AND THE WARRANT REQUIREMENT.

In January 2002, the California Supreme Court established an exception to the search warrant requirement in its decision *In re Arturo D.*, 27 Cal. 4th 60 (2002), a ruling eventually overruled by *People v. Lopez*, 8 Cal. 5th 353 (2019), in November 2019.  Importantly, *Arturo D.* was still good law in California at the time of the Loggervale detention in September 2019.

The issue in *Arturo D.* was "whether, when a driver who has been detained for citation for a Vehicle Code infraction fails to produce vehicle registration or personal identification documentation upon the request of the citing officer, the officer may conduct a warrantless search for such documentation, and, if so, the permissible scope of such a search."  27 Cal. 4th at 64–65.  The court answered in the affirmative, stating "in these circumstances the Fourth

18

Amendment to the United States Constitution, which prohibits unreasonable searches and seizures, permits limited warrantless searches of areas within a vehicle where such documentation reasonably may be expected to be found." *Id.* at 65.  The case had consolidated two cases on appeal for analysis.  Both had similar fact scenarios.  Namely, both appellants were drivers who were stopped by police officers for a suspected traffic violation (*i.e.*, speeding and unsafe lane changes).  In each case, when the officer asked the driver for their identification, the driver stated they had no driver's license to give.  In response, the officers, who had planned to issue traffic citations, searched the vehicles in areas where wallets would commonly be hidden, such as under the driver's seat and in the glove compartment.  In both instances, the officers discovered drugs during their search.  The decision upheld the searches by distinguishing controlling United States Supreme Court precedent at the time and by repeatedly emphasizing the limited nature of the searches:

> It may be questioned whether a majority of the high court, or even the dissenters in *Class*, would have prohibited a limited warrantless search when, as in the cases before us, the driver, in response to a proper demand, professes to lack the required documentation needed for an officer to issue a proper citation.
>
> [  .        .        . ]
>
> [T]he search at issue in *Knowles*, unlike those at issue in *Webster* and related cases (and those before us today) was not a limited one conducted for the narrow purpose of discovering required documentation that the driver had failed to produce upon demand and that was needed for the officer to issue a citation.

*Id*. at 73–75.  Thus, the standard was summarized in the decision as "[l]imited warrantless searches for required registration and identification documentation are permissible when, following the failure of a traffic offender to provide such documentation to the citing officer upon demand, the officer conducts a search for those documents in an area where such documents reasonably may be expected to be found."  *Id*. at 86 (emphasis omitted).  The decision also noted "[u]nder this standard, an officer may not search for such documents on pretext."  *Ibid*.

　　Under the plain reading of *Arturo D*., the exception permitted a limited warrantless search for the *driver's* identification but not for the identification of the *passengers*.  This was

United States District Court
Northern District of California

1    evident given the decision's repeated use of "the driver," "the traffic offender," and "the

2    motorist," when summarizing its rule application, as well as the multiple references to the

3    "required documentation" of the driver's license and registration.  (A driver is required to

4    have a license and registration but not the passengers.)

5        Thus, in our case, if the jury found a valid traffic stop occurred on the basis of the

6    Vehicle Code, a limited search of the vehicle for *the mother's* identification would have been

7    permissible.  The jury was so instructed (Jury Instruction ¶ 38).  This ruling was in line with

8    the purpose that *Arturo D.* itself had stated existed behind the Vehicle Code, namely "[a]n

9    officer who has stopped a vehicle for a traffic infraction and who plans to issue a citation

10   needs to ascertain the true identity of the driver and the owner of the vehicle, in order to

11   include that information on the citation and the written promise to appear."  *Id.* at 67.  Nothing

12   in *Arturo D.*, however, stated its exception extended to a search of the *passengers'*

13   identifications and defense counsel never provided caselaw suggesting as much.

14       The foregoing is the background necessary to address the defense's next criticism.

15       Defense Attorney Gilbert argues that "[t]he Court also erred in sua sponte finding that

16   the Daughters' ID searches were unconstitutional" (Rule 59 Br. 7).  Nothing could be further

17   from the truth.  Yes, the Court instructed the jury that the search for the identifications of the

18   passengers (the daughters) was unconstitutional but there was nothing sua sponte about it.

19       Here is the actual sequence of events.  Before trial and during trial, considerable

20   discussion concerned the *Arturo D.* decision by the California Supreme Court and the extent

21   to which it permitted searches of automobiles for identification of its occupants.  As stated,

22   *Arturo D.* remained in effect at the time of the searches in question.  Eventually, after much

23   discussion with counsel, the instructions to the jury said that California law permitted the

24   search for the driver's identification (if there was a valid traffic stop) and that this constituted

25   an exception to the warrant requirement of the Fourth Amendment.  *This favored the defense*.

26   With respect to the passengers, however, there was nothing in *Arturo D.* that authorized such

27   an exception, so those searches remained unconstitutional, and so the charge stated.  *This*

28   *favored plaintiffs*.

20

There was nothing "sua sponte" about the process. This issue came up with counsel several times. Specifically, in briefing, Attorney Gilbert made the argument that *Arturo D.* also applied to passengers in:

    1.   Defendants' Motion for Judgment as a Matter of Law (Dkt. No. 211 at 8–10).

    2.   Defendants' Response to Court's Request for Critique on Jury Instructions (Dkt. No. 214 at 2–3).

    3.   Defendants' Reply to Plaintiffs' Critique on Jury Instructions (Dkt. No. 218 at 3–4).

    4.   Defendants' Response to Court's Requested Research Questions for Counsel (Dkt. No. 215 at 4). This was in response to a specific question regarding *Arturo D.* and its scope.

    5.   Defendants' Response to Court's Proposed Final Jury Instructions and Special Verdict Form (Dkt. No. 229 at 1, 4–5).

Further, this point was argued orally by the defense during the following proceedings:

    6.   Rule 50 arguments on February 16, 2023 (Tr. 712:11–716:23).

    7.   Argument for critique of the preliminary jury instructions on February 24, 2023 (Tr. 976:19–979:21).

    8.   The charging conference on February 27, 2023 (Tr. 1058:18–1061:11).

The Court repeatedly asked Attorney Gilbert for authority that *Arturo D.* had been extended to allow searches for identification of *passengers*. He was warned early on that he "ought to be doing [his] research" on the issue because the Court's tentative view was to instruct the jury that the passenger searches were illegal (Tr. 722:17–21). He never provided any such authority. Finally, near the end of the trial evidence, the Court issued a proposed final charge on Friday, February 24, and scheduled a charging conference for the following Monday. This proposed charge made exactly the same distinction, that if the jury found a valid traffic stop, the search for the driver's identification was lawful, but the search for the

passengers' identification was unlawful. Both sides were given the weekend to propose modifications and come on Monday with objections on why the instructions should be modified. As shown above, Attorney Gilbert did, in fact, object, both in writing and orally at the conference.

The Court overruled his objections, finding that *Arturo D.* had made an exception to the Fourth Amendment only as to the driver but as to the passengers the warrant requirement still applied. To repeat, Attorney Gilbert never provided any authority that *Arturo D.* had been extended to passengers.

Therefore, in light of this sequence of events, it is inconceivable that anyone could accuse the Court of a "sua sponte" holding. Attorney Gilbert has every right to appeal the holding that the searches for the daughters' identifications were unconstitutional, but it is unfair, even dishonest, for him to criticize this ruling as "sua sponte."

Attorney Gilbert goes on to criticize the manner in which the jury instructions regarding the passenger searches were read aloud, arguing that the judge engaged in judicial advocacy when he repeated the sentence that the searches for the daughters' identifications had been unconstitutional (Rule 59 Br. 11–12). This is another distortion. The Court read the instructions to the jury on Monday, February 27. On that day, no objection was lodged against the manner in which any instruction was read nor had there been any request for a curative instruction by either side. Two days later, on Wednesday, March 1, Attorney Gilbert raised a concern about the reading, stating (in relation to an entirely different objection) that "[d]uring the instructions, the Court actually paused and reread and emphasized certain instructions where it found violations" (Tr. 1343:9–13). This criticism caught the judge off-guard and was too vague to be addressed in any meaningful way. The judge simply replied the likely reason behind any repetition was that his reading voice "might have gotten caught and it wasn't clear, but it was never intended as any kind of advocacy" (Tr. 1345:7–10).

Having now had the opportunity to review the audio and transcripts, the actual reason for the repetition has become crystal clear. The repetition in question was done for clarification purposes, to aid the jury in keeping track of which of the three plaintiffs, three

22

detentions, and three searches were being addressed.  It is true that the sentence was read

twice *but so was the counterpart favoring the defense*:

> With respect to Officer Holland's search for the driver's
> identification, I instruct you that he acted lawfully in searching
> for the driver's identification and registration so long as the initial
> detention was supported by reasonable suspicion based on the
> Vehicle Code.  *I'll repeat that.  With respect to Officer Holland's
> search for the driver's identification, I instruct you that he acted
> lawfully in searching for the driver's identification and
> registration* so long as the initial detention was supported by
> reasonable suspicion based on the Vehicle Code.

(Tr. 1289:9–19) (emphasis added).

In other words, the Court read both key instructions twice — both sides of the equation

twice — to help the jury keep straight that the law permitted the search as to the *driver* but not

as to the *passengers*.  This "favored" the defense as to the driver, but "favored" plaintiffs as to

the passengers.  In a case with several alleged constitutional violations, three plaintiffs, three

defendants, three detentions, and three separate searches, such careful and even-handed

repetition was reasonable to achieving clarity.  Yet Attorney Gilbert completely has ignored

this even-handed repetition and made it seem as if only the sentence favoring plaintiffs got

read twice.

*             *             *

Regarding qualified immunity, the *Arturo D*. warrant exception applied to the search for

the driver's identification, which would have shielded defendants from liability on that point,

subject to this important caveat — this inquiry involved a mixed question of fact and law,

such as when the detention had begun, whether or not Deputy Holland had been "enforcing

the Vehicle Code," and whether Deputy Holland requested the mother's identification to

verify her disability placard.  The jury was accordingly instructed the following, which was

the entirety of the excerpted instruction repeated twice above (Jury Instruction ¶ 45):

> With respect to Officer Holland's search for the driver's
> identification, I instruct you that he acted lawfully in searching
> for the driver's identification and registration so long as the initial
> detention was supported by reasonable suspicion based on the
> Vehicle Code.  If it was not supported by reasonable suspicion
> based on the Vehicle Code, then that search too was unlawful.
> But, again, that would not be the end of the inquiry.  You would

1

2

> need to further determine whether all officers standing in his shoes and charged with all information known to him at the scene would have known that the detention was unconstitutional based on the clearly established law of detention I have given you.

3    This was a mixed question of fact and law and thus was permissibly submitted to the jury for

4    determination.  This order will respect the jury's outcome on this question.

5        **5.    THE AUTOMOBILE EXCEPTION.**

6        Separately from *Arturo D.*, defendants argued that the deputies had a legal basis to

7    search the vehicle for the passengers' identifications pursuant to the "automobile exception."

8        Under the automobile exception, an officer can search a vehicle when he or she has

9    probable cause to believe the vehicle contains evidence of a crime or contraband.  This

10   exception was established because the United States Supreme Court recognized that, when

11   searching for contraband goods in a vehicle — contrary to a dwelling or other permanent

12   structure — a search warrant oftentimes cannot practicably be obtained because of the distinct

13   risk that "the vehicle can be quickly moved out of the locality or jurisdiction in which the

14   warrant must be sought."  *See Carroll v. United States*, 267 U.S. 132, 153 (1925).

15   Elaborating on this exception, the Supreme Court has held "the true rule is that if the search

16   and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably

17   arising out of circumstances known to the seizing officer, that an automobile or other vehicle

18   contains that which by law is subject to seizure and destruction, the search and seizure are

19   valid."  *United States v. Ross*, 456 U.S. 798, 805 (1982) (cleaned up).

20       During trial, defendants argued that due to the daughters' conduct of protesting the

21   detention, there existed probable cause to believe the daughters were resisting the deputies in

22   violation of California Penal Code Section 148.  Additionally, they argued because one

23   daughter, Aasylei Hardge-Loggervale, allegedly struck Deputy Pope while opening her car

24   door, there had been cause to believe a violation of California Penal Code Section 243

25   (battery of an officer) had occurred.  These arguments, however, went to possible grounds for

26   their *arrests or detentions*, not for probable cause for the *vehicle searches*.  As to the searches,

27   defendants attempted to argue the deputies opted not to arrest the daughters and instead chose

28   to search the vehicle for their identifications to be able to cite them for their conduct.  Officers

United States District Court
Northern District of California

24

were legally justified in conducting this search, defendants maintained, because under the automobile exception, they had probable cause to believe the above crimes had occurred and to believe that the daughters' identifications were located in the vehicle.

This argument was rejected at trial. The judge ruled there was no basis to conclude the daughters' identifications should have been considered "contraband" or "evidence of a crime" such that the automobile exception could apply in this case. Accordingly, the searches for the daughters' identifications within the vehicle, being unsupported by any warrant requirement exception, were illegal.

In their renewed judgment as a matter of law, defendants now argue again that the automobile exception should have applied to the searches (Rule 50 Br. 9–10). As they did at trial, defendants principally rely on a few decisions to support the notion that plaintiffs' identifications should be considered "contraband" or "evidence of a crime" under the automobile exception.

*First*, referencing a footnote from *Messerschmidt v. Millender*, 565 U.S. 535 (2012), the defense argues "evidence of a crime" in the automobile exception context should be defined broadly as that which "aid[s] in the investigation" (Rule 50 Br. 9). In *Messerschmidt*, a search of a dwelling took place pursuant to a search warrant because the victim (the girlfriend of the defendant) reported to police that she had been threatened and assaulted by the defendant. She also told detectives that she believed the defendant had ties to the Mona Park Crips gang. On that basis, a search warrant was issued that allowed search of the premises for:

> Articles of evidence showing street gang membership or affiliation with any Street Gang to include but not limited to any reference to 'Mona Park Crips,' including writings or graffiti depicting gang membership, activity or identity [and] [a]rticles of personal property tending to establish the identity of person [*sic*] in control of the premise . . . .

*Id.* at 541–42. Officers searched the home and seized a shotgun, a California Social Services letter addressed to the defendant, and a box of ammunition. *Id.* at 543. When the contents of

the search were challenged as being too broad to fit within the bounds of the search warrant,

the Court noted in footnote seven the following:

> The Fourth Amendment does not require probable cause to believe evidence will *conclusively* establish a fact before permitting a search, but only "probable cause . . . to believe that the evidence sought *will aid* in a particular apprehension or conviction." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (emphasis added). Even if gang evidence might have turned out not to be conclusive because other members of the Millender household also had gang ties, see *post*, at 1256–1257 (opinion of SOTOMAYOR, J.); *post*, at 1251–1252 (opinion of KAGAN, J.), a reasonable officer could still conclude that evidence of gang membership would help show Bowen's connection to the residence. Such evidence could, for example, have displayed Bowen's gang moniker ("C Jay") or could have been identified by Kelly as belonging to Bowen.

*Id*. at 552 n.7. Relying on this footnote, the defense here argues that the daughters'

identifications would have *aided* in their investigation for the crimes of resisting an officer

or the alleged battery, and thus officers were justified in searching the automobile. This

argument was rejected at trial and again here.

*Messerschmidt* involved a search of a dwelling pursuant to an approved search warrant,

not the automobile exception. This distinction is important, because to apply the automobile

exception, there needs to be independent probable cause *to search for contraband or evidence*

*of a crime in the vehicle*, not merely probable cause to arrest. Where a search warrant is

issued, as in *Messerschmidt*, the probable cause determination is already made by a judge

beforehand. This probable cause determination was not at issue in *Messerschmidt*. *See id*. at

546 (stating "[t]he validity of the warrant is not before us"). Moreover, in *Messerschmidt*, the

defendant's identifying material had a direct correlation with the crime alleged. Specifically,

whether or not the defendant had membership in a gang was relevant to the girlfriend's

allegation of assault and the motive behind the assault. In our case, there is no such parallel.

Whether the daughters resisted an officer or whether one daughter in fact struck Deputy Pope

when she opened her car door was not relevant to determining their identifications.

Nowhere, even in *Arturo D.*, did the California Supreme Court authorize a search of a

vehicle for a passenger's identification to issue a citation for a crime the passenger committed

unrelated to a traffic violation absent the requisite probable cause.  Defendants' attempt to create a hybrid *Arturo D*. and federal automobile exception remains rejected.

*Second*, defendants cite to *United States v. Rodgers*, 656 F.3d 1023 (9th Cir. 2011), to support the argument that where there is sufficient indication that identification could be found in a car search, such a search is permissible under the automobile exception (Rule 50 Br. 9–10).  This, too, however, is too broad a reading of *Rodgers*.  There, in an area known for juvenile prostitution, an officer pulled over a 51-year-old male driver at 3:30 AM who had a 12-to-14-year-old female in the passenger seat.  The driver stated the young girl was "simply a friend," which raised the officer's suspicion that the driver was "pimping out" the female.  When asked for identification, the young female passenger told the officer she had none but gave a name and date of birth and stated that she was 19 years old.  The officer ran the name in the system and received a hit for an outstanding warrant, but given the passenger's young appearance, the officer had reason to believe she was lying about her identity and proceeded to search the vehicle for her identification.  The officer never found any identification but discovered drugs instead.  *Rodgers*, 656 F.3d at 1025–26.

Our court of appeals held the search was *not* justified by the automobile exception and highlighted "an important distinction between probable cause to search and probable cause to arrest," stating:

> [t]he focus of the arrest inquiry is different from that of the search inquiry.  *See Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir.1996).  Officers have probable cause for an arrest if at the time of the arrest, "the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent man in believing" that the defendant committed an offense. (citation omitted).  Officers have probable cause for a search when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). "[T]here may be probable cause to search without probable cause to arrest, and vice-versa."

*Id.* at 1028–29.  This distinction is key in our case as well, where our deputies' probable cause (if it existed) to arrest for alleged violation of California Penal Code Section 148 did not translate into probable cause to search the vehicle.

*Rodgers* went on to reason that "[w]hat is missing in the search of Rodgers' vehicle for [the young female passenger's] identification is any specific particularized fact indicating that [she] had identification and that such identification was located in Rodgers' car" and his "half-baked hunch" that most 19-year-olds have some form of identification was insufficient to establish probable cause.  *Id.* at 1029–30.  On this basis, defendants argue by contradistinction that had there been *more* facts indicating the young female's identification was in the car, application of the automobile exception would have been proper.  Thus, the argument goes, the vehicle searches in our case were proper, because there was ample evidence that the daughters' identifications were in the car.

Defendants miss a major distinction between *Rodgers* and our case.  The officer in *Rodgers* had suspected crimes that had a *direct relevance* to the young female passenger's identification.  Namely, the officer suspected she was an underage prostitute, that she had obstructed his investigation by giving him a false name and date of birth, and that she had made a false or misleading statement about her identity to law enforcement.  *Id.* at 1025, 1028.  Thus, had her identification been discovered during the search, it, standing alone, might have constituted "evidence" of those crimes, because the identification on its face would have proven or disproven her age and thus the veracity of her statements to the officer.  Again, no such parallel existed in our case, where the passengers' identifications had nothing to do with the suspected offenses of resisting an officer or battery.  Where the crime suspected has *nothing to do* with determining the identity of the suspect, identification cannot properly be considered contraband or evidence of a crime under the automobile exception.

Defendants similarly point to *Wyoming v. Houghton*, 526 U.S. 295, 306–07 (1999), arguing that it had "confirmed a search of a passenger's belongings . . . was lawful where law enforcement were performing a targeted search, despite reasonable suspicion existing for only the driver, not the passenger" (Rule 50 Br. 2).  *Wyoming*, however, involved a proper

automobile exception vehicle search because the search for contraband (drugs), was triggered by the requisite probable cause (an officer seeing a syringe in the driver's shirt pocket, and the driver blatantly admitting it was for drug use). The Supreme Court held in that case "[w]hen *there is probable cause to search for contraband* in a car, it is reasonable for police officers . . . to examine packages and containers without a showing of individualized probable cause for each one." *Wyoming*, 526 U.S. at 302 (emphasis added). Thus, the *Wyoming* decision only clarified that the allowance to search the entire vehicle and all containers within it is not limited by who might own what particular container inside the car. This holding does not alter our analysis here, where probable cause of the existence of contraband or criminal evidence in the vehicle itself is lacking.

In sum, the automobile exception did not and does not apply to our case. The renewed motion for judgment as a matter of law on this basis is **DENIED**.

*            *            *

The defense re-argues that even if Deputy Pope's conduct in searching the vehicle for the daughters' identifications was unlawful, she was nonetheless entitled to qualified immunity as a matter of law for the vehicle search on the basis of *Arturo D.*, the automobile exception, and implied consent because the law was not clearly established (Rule 50 Br. 16–17). "[E]very case addressing the reasonableness of a warrantless search" should begin with "the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Thus, this order analyzes each of defendants' proposed warrant exceptions for possible application of qualified immunity. The *Arturo D.* and automobile exceptions fail as to the passengers for the same reasons explained above.

The only remaining possibility for qualified immunity as to Deputy Pope was implied consent. This question, as discussed elsewhere below, was left to the jury as it was a mixed question of fact and law. This order will not disturb the jury's finding on this point.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**6.   EQUAL PROTECTION AND EXCESSIVE FORCE.**

In their renewed motion for judgment as a matter of law, defendants argue the excessive force claim must fail as a matter of law because there was "no evidence at all that Holland was ever aware that Mother's handcuffs were too tight, nor is there any evidence that would suggest he should have known" (Rule 50 Br. 12).  Additionally, the defense claims "Holland had no part in Daughters' handcuffing so cannot be held liable for any excessive force in regards to their handcuffing" (Rule 50 Br. 18).  "The issue of tight handcuffing is usually fact–specific and is likely to turn on the credibility of the witnesses." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000).

In our case, the jury saw video of Deputy Holland handcuffing the mother, Ms. Loggervale, and directing other officers to detain the two daughters (TX 37).  The mother testified that her handcuffs were too tight and, as a result, her wrists were swollen, and her hands started to go numb (Tr. 529:18; 560:17–19).  She also testified that during the detention she asked several times for deputies on scene to loosen the handcuffs, but they "never got to it" (Tr. 529:21–25).  Both daughters similarly testified.  Aaottae told the jury it took "a couple of days" for her wrists to heal and she had to put ice on them afterwards (Tr. 591:3–6).  Body camera video also depicted Aaottae crying in the back of a squad car, telling Deputy Holland (who was then seated in the driver's seat), "I just told them that these freakin' handcuffs hurt me and you still won't unloosen them" and "I can't stay calm I'm in pain!" (TX 38).  The older daughter, Aasylei, identified photos of injuries on her wrists (Tr. 626:4–627:17), and Deputy Leeper's body camera footage depicted her handcuffing (TX 10).  The jury also heard Deputy Holland testify that he was "in charge" and leading the investigation, and other officers on scene would share information with him on what they saw and were privy to (Tr. 736:10–737:8).

Viewing all the evidence in the light most favorable to the nonmoving party, a reasonable inference can be drawn that the jury concluded Deputy Holland placed the handcuffs on too tight and injured Ms. Loggervale, and he should have known it was too tight based on him being the lead deputy and being privy to the shared knowledge at the scene.  He

similarly should have known about the handcuffs being too tight on the daughters, or so a jury could have reasonably found. Because there existed sufficient facts during trial to lead a jury to reach these conclusions, defendants' motion for renewed judgment as a matter of law on the excessive force claim is **DENIED**.

A related question is whether there was any need at all for handcuffs. In some detentions, the detainee is simply not free to go and, for example, might (or might not) be directed to sit on a curb. There is no universal need to handcuff detainees or to stow them in the back of squad cars. A jury in this case could reasonably have concluded that there was no call to handcuff any Loggervale during this detention and that every reasonable officer would have known this.

The defense also argues judgment as a matter of law should be granted on the equal protection claim because there was no evidence of discriminatory animus as "[p]laintiffs never presented any evidence to support intentional or purposeful discrimination by Holland" (Rule 50 Br. 12–13). Similarly, the defense also argues there "was absolutely no evidence of specific intent by Holland" vis-à-vis the Bane Act claim, because he "never made any overt discriminatory comments or otherwise presented any unprofessionalism" (Rule 50 Br. 22).

Once again, the jury's determination of Deputy Holland's intent during the Loggervale detention was a fact-specific inquiry. The jury was instructed "race, standing alone, is never enough to establish reasonable suspicion" or else it would violate the Equal Protection Clause (Jury Instruction ¶ 19). They were also instructed Deputy Holland acted "intentionally" for purposes of the Bane Act if he specifically intended to violate the plaintiffs' rights or recklessly disregarded them (Jury Instruction ¶ 51). Although the defense repeatedly points to the lack of insult or overt discriminatory comments by Deputy Holland, such statements were not required to prove intent. The jury was instructed that evidence may be direct or circumstantial, and they should "give equal weight to both" (Jury Instruction ¶ 6).

Given the facts of the detention as described at the beginning of this order, it is reasonable that a jury could have concluded the Loggervales were detained solely on account of their race. This would constitute racial profiling and, under our instructions, would have

permitted our jury to find their right to equal protection was violated.  The same finding of intent would have satisfied the Bane Act *mens rea* element.  Accordingly, the renewed motion for a judgment as a matter of law on these grounds is **DENIED**.

### 7. ASSIGNMENTS OF INSTRUCTIONAL ERRORS.

Post-trial motions are not occasions to raise new criticisms of the jury instructions.  To the contrary, unless an objection has been preserved, jury instructions become the law of the case and cannot be challenged after the verdict.  To take a first example, when a verdict rests on a set of instructions fully stipulated to by all parties, no party can, after the fact, overturn the verdict by criticizing an instruction.  This is true even when the instruction misstated the applicable law in some respect.  Similarly, when a verdict rests on a set of instructions to which no party objected after opportunity to do so and admonition that failure to do so would be a waiver or consent (as here), the same result applies.  Likewise, when the losing side did not object, but the winning side did, the losing side cannot piggy-back on the other side's prior objection.  Finally, when a losing party did specify an objection to an instruction, it cannot raise a new and different objection to the accuracy of the instructions after the verdict.  The foregoing are scenarios where even incomplete or inaccurate instructions of law become the governing law of the case.  Post-trial motions are not an occasion to willy nilly raise points of law that could and should have been raised before the verdict.

In this case, the judge studied the way in which the case was actually being tried, crafted potential instructions along the way to address the points in contention, provided a proposed final charge on a Friday, scheduled a charging conference for the following Monday, admonished both sides that all objections or modifications must be raised at the charging conference on pain of waiver, then held the conference as scheduled.  The Court is satisfied that the final charge was an accurate statement of the law or, to the extent it was inaccurate, all objections now raised were waived.

\*            \*            \*

Defendants argue that jury instructions 34, 40, 44, and 47 were incorrect and constituted errors that require a new trial.  Timely objections to these instructions were also raised in

1   defendants' response to the Court's proposed final charge (Dkt. No. 229 at 3–4).

2   Accordingly, we address each alleged error in turn.

3        Jury Instruction 34 stated:

4            In this case there is a claim for excessive force.  The Fourth
             Amendment also covers the force used by officers during a
5            detention or arrest.  Law enforcement officers are allowed to use
             only such force as is "objectively reasonable" under the
6            circumstances.  Any force used to make a detention or arrest must
             be evaluated against and in proportion to *the need* for the force.
7            The circumstances include, among other things: (1) the severity of
             the alleged crime that triggered the detention or arrest; (2)
8            whether the detainee or arrestee posed an immediate threat to the
             safety of the officers or others; and (3) whether the detainee or
9            arrestee was actively resisting arrest or attempting to evade arrest
             by flight.  Where officers are presented with circumstances
10           indicating to them that no crime was in fact committed or about to
             be committed, the "severity of the crime" factor is necessarily
11           diminished.

12   Defendants take issue with the last sentence, arguing that it is confusing and incorrect as a

13   matter of law because it impermissibly "references the impact of after-acquired evidence in

14   determining whether an earlier use of force was reasonable" (Rule 59 Br. 10).  The plain

15   wording and syntax of the instruction, however, rejects this interpretation.  The qualifier of

16   "[w]here officers are presented with circumstances" references when, during a stop, the

17   officer becomes aware of additional facts tending to show the triggering crime was not in fact

18   committed or about to be committed.  As written, from that point onward, the "severity of the

19   alleged crime" factor is necessarily diminished.  The use of past tense shows that the

20   diminution would occur *after* the conduct described in the preceding phrase is realized.

21   There is no reason to suspect the jury was confused by this sentence.  Additionally, before this

22   instruction, another paragraph stated "[t]he actions of the officers must be judged by you

23   based on the information known to them at the time.  This is true even when some of the

24   information known to them later turns out to be untrue or incomplete" (Jury Instruction ¶ 27).

25   This order sustains the instruction as written.

26        Defendants further argue it was error to instruct the jury that "Sheriff Ahern acted under

27   color of law and had final policymaking authority from the County of Alameda concerning

28   the acts at issue" (Jury Instruction ¶ 47).  Specifically, the defense says "the Court did not

United States District Court
Northern District of California

33

United States District Court
Northern District of California

1   have any evidence on which to determine that Sheriff Ahern had such policy making

2   authority."  Notably, defendants concede that a trial court may make such a determination but

3   take issue with the finding here because there was an alleged "utter lack of evidence" (Rule 59

4   Br. 13–14).

5          Contrary to defendants' assertions, there *was* evidence in the record to reach such a

6   conclusion.  On the second day of trial, plaintiffs called defendants' person most

7   knowledgeable, Captain Daniel Brodie via deposition (Tr. 405:20–23).  The portion of the

8   deposition read to the jury revealed that Captain Brodie was in charge of internal affairs at the

9   time of the Loggervale detention.  He testified he held the highest position within that unit and

10  he reported "directly" to Sheriff Greg Ahern, who was the Sheriff at the time (Tr. 410:8–20).

11  Captain Brodie stated he was the only person doing the investigation into the Loggervale

12  detention, and he concluded that the allegations were unfounded because after a review of the

13  materials, he found the detention to be lawful (Tr. 413:19–21; 416:1–25).  Captain Brodie

14  affirmed that "the Sheriff ha[d] the sole authority to administrator [sic] discipline" (Tr. 417:6–

15  8), and that the Sheriff wrote on his memorandum "Briefed.  No further action required,"

16  which indicated that "the complaint being unfounded . . . is what stands" (Tr. 435:7–436:5).

17  From this testimony, there was ample evidence to conclude that Sheriff Ahern, who reviewed

18  and approved the conclusion of the finalized internal affairs report and who had the final say

19  as to any potential discipline for the deputies, had final policymaking authority.  The defense

20  does not once mention Captain Brodie's testimony on this point in its motion, and instead

21  repeatedly asserts there was an alleged gap in the record.  This is yet another instance of

22  defense counsel misrepresenting the record.

23         Citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986), defendants now argue

24  the Court's finding as to Sheriff Ahern's authority was contrary to applicable law, because

25  "[t]he fact that a particular official . . . has discretion in the exercise of particular functions

26  does not, without more, give rise to municipal liability" (Rule 59 Br. 14).  This case was not

27  cited, however, nor was this legal argument made in defendants' original objection.

28

Defendants originally only lodged an objection as to the Court's determination on factual basis, stating:

> Defendants object to the Court's statement that Sheriff Ahern "had final policymaking authority from the County of Alameda concerning the acts at issue." Any such factual determination must be made by the jury based upon the evidence in this case.

(Dkt. No. 229 at 5:9–12).  Defendants cannot now furnish a new objection using previously uncited authority to bolster this assertion of error.  Accordingly, this argument is rejected as waived.

Related to this point, defendants argue in their motion for renewed judgment as a matter of law that Sheriff Ahern's indication that "no further action" was required is insufficient to prove ratification, because this constituted mere acquiescence, which is generally insufficient (Rule 50 Br. 19).  To establish ratification, both parties correctly point out there must be approval of the subordinate's decision and the basis for it.  *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992).  Viewing the facts most favorable to the nonmoving party, there was sufficient evidence in the record for the jury to determine the County had ratified the deputies' conduct.  As described above, Captain Brodie testified that Sheriff Ahern's annotation meant that he had reviewed the factual basis of the investigation and affirmatively found that the allegations by plaintiffs of misconduct was "unfounded,"  meaning the County was able "to show that the allegations did not occur"  (Tr. 416:4–5).  When asked to elaborate on this finding, Captain Brodie stated it was a finding that indicated "[t]he detention was not a violation of policy or law.  It was a lawful detention" (Tr. 416:23–25).  This was evidence of a "conscious, affirmative choice" because it was a finding which considered not only the deputies' decision to detain, but also the basis for it as fully briefed in the investigative report.  *Gillette*, 979 F.2d at 1347.  Tellingly, this affirmative conclusion is different than the possibility of an alternative finding of "not sustained," which Captain Brodie testified meant the County "cannot determine if the allegation occurred, but [it] also can't determine if it didn't occur"  (Tr. 416:5–7).  Accordingly, the jury could have reasonably concluded this was

not a mere failure to overrule, but an affirmative stamp of approval by the County. The

renewed motion as a matter of law on this basis is **DENIED**.

Finally, defendants argue jury instructions 40 and 44 had conflicted "with the relevant

law and constituted inappropriate colloquy" (Rule 59 Br. 12–13). Jury Instructions 40 and 44

stated:

> Consent is another exception to the search warrant requirement
> when it is given freely and voluntarily. I instruct you that no valid
> consent was ever given to any of the searches in this case by the
> daughters. However, once again, there is more to your inquiry.
>
> [.       .       .]
>
> With respect to Officer Pope's searches for the identifications of
> the passengers, the question for you to decide is whether all
> reasonable officers standing in her shoes would have known that
> the consents, if any, were invalid under such facts as you find
> were known to her at the time. Even though the consents were
> invalid in the Court's view, the question for you, on which the
> Court expresses no opinion, is whether all reasonable officers
> standing in her shoes would have known, based on the
> information you find was known to her, that the consents of the
> passengers were invalid. If so, then Officer Pope is liable for the
> unconstitutional search for the identification of the two daughters.
> If not, then Officer Pope cannot be held liable for those searches.

The consent issue was ruled upon and foreclosed as a defense in the summary judgment order

before trial (Dkt. No. 106 at 8). Although the Court granted reconsideration as to the

automobile exception, the reconsideration order specified "[t]o be clear, all other issues

resolved by the order at Dkt. No. 106 remain unaffected" (Dkt. No. 145 at 2). During trial,

however, defense had raised the issue of consent in front of the jury through the questioning

of one of its witnesses. Outside the presence of the jury, the Court flagged the issue for

counsel, and later requested subsequent briefing on what had been decided in summary

judgment and what remained for the jury to decide regarding consent (Tr. 772:14–773:7; Dkt.

No. 208 at 1).

In their responses, the parties were unable to agree on whether or not plaintiffs had

specifically moved for summary judgment on consent (Dkt. Nos. 213, 215), but, after an

independent review of the record, the Court found the plaintiffs had addressed consent in

summary judgment and decided to stick to its prior ruling that no valid consent was given in

this case by the daughters, given that they had been handcuffed and locked in the back of squad cars (*See* Dkt. No. 75 at 18–19).

The question of qualified immunity based on consent, however, remained outstanding. Recognizing qualified immunity is usually decided by the Court prior to trial, in this case, the judge concluded it was necessary to send the question to the jury because here existed "a mixed question of fact and law," and given the many outstanding factual variables, only the jury could decide this question after first determining what the relevant facts were (*See* Tr. 1064:3–1066:10).

Thus, the language defendants criticize as "unnecessary and irrelevant colloquy" was in fact very necessary to distinguish between the validity of possible consent on the merits versus qualified immunity based on perceived consent, whether or not valid.  The reference to the Court's views in this instruction had been included to signal to the jury *it did not need to decide* the actual question of consent validity (which had been already decided for them) but rather, the only question left, which was wholly up to them to decide and upon which the Court explicitly "express[ed] no opinion," was whether a reasonable officer in Deputy Pope's position would have known the consents were invalid.  This separation was key in parsing out the nuanced issue of qualified immunity for the jury and was not impermissible colloquy. Judgment as a matter of law on this issue is **DENIED**.

### 8. AMENDMENT OF VERDICT FORM DURING DELIBERATION.

The defense argues it was error to amend the special verdict form while deliberations were underway.  The following is an accurate summary of the special verdict form's drafting, finalization, and amendment during deliberations.

On Friday, February 24, before closings and the charging conference, the Court provided a proposed special verdict form to the parties along with the proposed final charge (Dkt. No. 226-1).  This was the first time the parties had seen the Court's version of the proposed verdict form, and they were instructed to submit any and all objections in writing by Sunday, February 26 at noon (Dkt. No. 226 at 1).  This proposed verdict form had a damages question at number six, which stated:

1             As against each defendant found liable, what damages, if any, have
2  plaintiffs proven by a preponderance of the evidence by reason of
           unlawful conduct for which said defendant is liable?

3  Underneath this question, three vertical columns were displayed: one for Deputy Holland, one

4  for the County of Alameda, and one for Deputy Pope, as well as three horizontal rows for

5  each plaintiff with corresponding separate lines for damage amounts.  Here is a screenshot of

6  the proposed verdict form table:

7

8

9

10

11

12

13

14

| 6. | As against each defendant found liable, what damages, if any, have plaintiffs proven by a preponderance of the evidence by reason of unlawful conduct for which said defendant is liable? : | | |
| --- | --- | --- | --- |
| | Officer Holland | County of Alameda | Officer Pope |
| Mrs. Aasylei Loggervale | $_____ | $_____ | $_____ |
| Aaottae Loggervale | $_____ | $_____ | $_____ |
| Aasyeli Hardge-Loggervale | $_____ | $_____ | $_____ |

15  (Dkt. No. 226-1 at 4).  *Both* parties submitted written objections (Dkt. Nos. 228, 229).[5]

16  Plaintiffs objected to having separate lines for each defendant, arguing "no separate line

17  should be provided to the jury for the damages awarded to the County of Alameda," and

18  "there should only be one line for each of the Plaintiffs for the jury to award damages . . .

19  resulting from any unlawful conduct on the part of any of the defendants."  (Dkt. No. 228 at

20  3–4).  *Similarly, defendants made the same objection to the use of separate lines for the*

21  *damages amount, stating "Defendants contend that only one damages line should be*

22  *contained for each Plaintiff — the jury should not be asked to determine what damages are*

23  *attributable to what Defendant*" (Dkt. No. 229 at 5).

24             At the charging conference the following Monday, February 27, both counsel also orally

25  objected to the separate lines.  Both sides advocated for only one line per plaintiff to be

26  _____

27         [5] In this order, "proposed verdict form" refers to the draft verdict form sent by the Court to the parties prior to the charging conference for counsel's objections (Dkt. No. 226-1).  "Finalized verdict form" refers to the verdict form given to the jury at the outset of deliberations after the final charge was read (Dkt. No. 231-1).  "Amended

28  verdict form" refers to the amended verdict form given to the jury on the second day of their deliberations (Dkt. No. 235-1).

United States District Court
Northern District of California

attributable to all defendants due to the joint-and-several nature of the potential liability (Tr. 1066:11–1069:12). Attorney Joseph May for plaintiffs remarked "it's one of the few things we agree on" (Tr. 1068:17).

The Court was not convinced one damages line was appropriate for liability as to the two individual deputies. Given that Deputy Pope was only potentially liable for two unlawful search claims, her relative damages as compared to Deputy Holland had the potential of being significantly lower. So, the separate lines remained for the two deputies. *The Court acquiesced, however, to removing the column and corresponding lines attributable to the County of Alameda given both parties' arguments that the County was only potentially liable on a ratification theory and its damages would be completely coextensive.* To this end, defendants stated they would be willing to stipulate that the County's damages could be done on the backend after the jury filled out the verdict form. Specifically, during discussion on the issue, Attorney Gilbert stated, "[o]n the damages, Your Honor, we're willing to stipulate the Court can address it afterwards" (Tr. 1067:15–16). Thus, the Court removed the column for the County of Alameda. Below is the finalized verdict form table for question six that went to the jurors (Dkt. No. 231-1 at 4):

6. As against each defendant found liable, what damages, if any, have plaintiffs proven by a preponderance of the evidence by reason of unlawful conduct for which said defendant is liable? :

| | Deputy Holland | Deputy Pope |
|---|---|---|
| Ms. Aasylei Loggervale | $_____ | N.A. |
| Aaottae Loggervale | $_____ | $_____ |
| Aasyeli Hardge-Loggervale | $_____ | $_____ |

United States District Court
Northern District of California

Importantly, contrary to the defense (Rule 59 Br. 17), *the jury never saw a verdict form that asked them to attribute an amount of damages to the County of Alameda.* Rather, the jury was instructed to provide damages only for the two individual officers, and the Court would — depending on the jury's finding on liability and ratification — attribute damages for the County of Alameda afterwards as appropriate. Again, this County column deletion was done *prior to* submission to the jury of any verdict form whatsoever.

Given this background, it is necessary at this juncture to dispose of one of defendants' arguments regarding the finalized verdict form as compared to the amended verdict form. Specifically, Attorney Gilbert argues:

> In the initial Special Verdict Form, Question 6 asked the jury to determine the damages Plaintiffs had proven by a preponderance of the evidence and included a 3x3 table, with one row for each Plaintiff, and one column each for Officer Holland, Officer Pope, and the County. Dkt. 226-1, at 4:6–20. In the Amended Special Verdict Form, the Court removed the column for the County and added language stating, "Don't worry about a column for Alameda County." Id., at 4:17. *This is both confusing and misleading to the jury, who initially saw a column for the County and was then advised to "not worry" about the County, without explanation.* Additionally, these changes constitute further improper judicial advocacy for Plaintiffs . . . ."

(Rule 59 Br. 17) (emphasis added). *This description of the sequence of events is untrue.* As explained above, as a result of Attorney Gilbert's own objections, the jury *never* saw a damages column for the County of Alameda. Attorney Gilbert now claims that this change was made "in the middle of deliberations" and that "[t]he problem is that the jury initially saw a Special Verdict Form that asked them to allocate damages to each defendant, including the County," only to have the Court allegedly remove the County's line without "any explanation for these changes" (Rule 59 Reply 11). This argument is about as unfair as unfair can get.

Next, defendants argue the judge improperly advocated for plaintiffs because in the amended verdict form, "well after the jury had begun deliberating, the Court also added the following language to Question 5: 'Note: The Court has already told you the searches for the identifications of the two passengers violated the Fourth Amendment'" (Rule 59 Br. 17).

This, too, is wrong.  This identical sentence was already present in the first finalized verdict form given to the jury (Dkt. No. 231-1 at 4:2–3).

Defendants next argue because of the note referenced above, there was grave risk of the jury finding Deputy Holland liable, as "nothing in the Amended Special Verdict Form stated that the finding of unconstitutionality of the searches for Daughters' IDs was limited to Pope" (Rule 59 Reply 11).  This critique does not accurately account for the context of both the verdict forms.  For one thing, in both the finalized and amended verdict forms submitted to the jury, the note quoted by the defense always proceeded *directly after* question five, which solely concerned Deputy Pope (Dkt. No. 231-1 at 4; 235-1 at 4).  The sentence after it had also stated in both versions, "Deputy Pope did not search for Ms. Loggervale's identification," further indicating the blurb was only discussing Deputy Pope.  Thus, the note was positioned in a manner that indicated it was only referencing question five, which dealt with Deputy Pope's conduct alone.

This order will not try to cure all inaccuracies in defendants' briefing regarding what was on the finalized verdict form versus the amended verdict form, but a side-by-side comparison of the two documents would readily reveal any further untruths (*Compare* Dkt. No. 231-1 *to* Dkt. No. 235-1).

Now, let's turn to the amendment.  After the defense rested, but before closing arguments and before any instructions were read or given to the jury, the final charge and finalized verdict forms were provided to counsel.  Given counsel's feedback from the charging conference earlier that morning, further revisions had been made.  The Court orally pointed out the major changes to counsel, but also advised counsel to review the materials carefully as other smaller edits had been made too (Tr. 1165:5–1166:4).  At that time, plaintiffs' counsel raised an issue with the finalized verdict form stating, "I noticed on . . . the fourth page.  At the very top, the last line, it says 'To avoid confusion, note that the County of Alameda has no potential liability as to any of Deputy Pope's conduct.'  But they do under *Monell* under the same theory" (Tr. 1167:5–11).  This was an important issue that resulted in much discussion among the judge and counsel.

41

1   The main issue was whether plaintiffs had waived the *Monell* claim against Deputy

2   Pope.  The judge had been under the impression that plaintiffs' claims from outset had

3   contemplated only one *Monell* claim regarding Deputy Holland.[6]

4   The defense also claimed they were under the same impression.  The defense argued

5   plaintiffs had waived their *Monell* claim regarding Deputy Pope, because although the

6   language quoted by plaintiffs was added that morning, the proposed verdict form sent to the

7   parties the previous Friday had only one *Monell* question as to Deputy Holland, and there

8   existed no *Monell* question as to Deputy Pope (Tr. 1168:20–1170:5; Dkt. No. 226-1 at 3).

9   Because plaintiffs had not objected to the lack of a *Monell* claim for Deputy Pope on the

10   proposed verdict form in writing or at the charging conference earlier that morning, the

11   argument went, waiver had occurred.  When asked to respond to this point, plaintiffs admitted

12   "It's true that we did not specifically point that out to this Court" but maintained they never

13   affirmatively disavowed a *Monell* claim as to Deputy Pope during the trial (Tr. 1170:9–10,

14   13–18).

15   After a brief break to attempt to consider the problem, the judge decided it was most

16   prudent to leave the verdict form as-is because there was a likelihood of waiver by plaintiffs,

17   and it was too late in the process to attempt to revamp the finalized verdict form to account for

18   an additional *Monell* claim.  No change was made, counsel continued to closing arguments,

19   and, soon after, deliberations began.

20   On the second day of deliberations, however, the jury asked a question.  The question

21   asked "Your Honor, in the Special Verdict Form, page 4, Item #6 as to liability, where does

22   the money come from?  Does the County of Alameda pay for both Deputy Holland and

23   Deputy Pope?" (Dkt. No. 234).  This question showed the jurors were curious as to how the

24   liability determination would be paid.  After conferring with counsel on the appropriate

25

26

27   [6] The judge got this impression from an exchange early on in the trial during a conversation with counsel
where plaintiffs' counsel stated "We've dismissed all the claims against Deputy Pope except for the Fourth

28   Amendment search of the vehicle and belongings" and "She's only on for the Fourth Amendment search of the
vehicle and belongings" (Tr. 925:16–926:13).

response, the judge told the jury in open court to decide the question of liability "on the merits" without regard to who will pay any bill (Tr. 1329:14–20; 1331:19–22).

After this, the *Monell* issue was further discussed with counsel. Plaintiffs pointed to their proposed verdict form to show they always had taken the stance that Deputy Pope would be included in the *Monell* claim, not just Deputy Holland (Tr. 1315:11–25). It was true that plaintiffs' proposed verdict form had stated, "Did Defendant County of Alameda ratify any Constitutional violations by any of *the deputies*?" (Dkt. No. 178 at 4) (emphasis added). This was of note to the Court and further solutions were discussed, but ultimately the parties could not agree to any stipulated amendment to the verdict form.

On the third day of deliberations, the judge noticed a different, fundamental error of logic on the finalized verdict form. Specifically, the finalized verdict form stated, "If you have answered 'No' to all blanks in either Questions 1 or 2, **AND** 'No' to all blanks in Question 5, then you are done, go to the end and sign and date the special verdict form" (Dkt. No. 231-1 at 4). This instruction was a logical fallacy, however, as it did not account for various alternative possibilities and it ran the risk of misleading the jury to erroneously conclude their deliberations early. For example, had the jurors answered "Yes" to all blanks in Question 1 (finding that Deputy Holland had violated plaintiffs' rights) but "No" to Question 2 (finding that he was entitled to qualified immunity), and "No" to all blanks in Question 5 (finding the same as to Deputy Pope), there would still be a possibility that the County of Alameda had ratified their conduct, or that Deputy Holland was liable under the Bane Act. In that scenario, it would not have been correct to instruct the jurors "You are done, go to the end." Accordingly, the finalized verdict form had to be corrected to include the ratification question, no matter what.

Given that the form needed to be amended in any event, the judge decided to also include an additional question regarding ratification as to Deputy Pope, as well as address, indirectly, the apparent curiosity of the jury regarding the County of Alameda's potential liability. The changes between the finalized verdict form and the amended verdict form were as follows:

United States District Court
Northern District of California

1    The first five questions on both verdict forms (*i.e.*, the first three pages) went

2    unchanged.  The first change arose in the "Note" after question number five.  The amended

3    verdict form deleted the sentence "To avoid confusion, note that County of Alameda has no

4    potential liability as to any of Deputy Pope's conduct" and replaced that sentence with "If you

5    answered 'Yes' to this question, then you have found Deputy Pope liable.  Go to Question

6    5A."  The amended verdict form also deleted the incorrect logic instruction described above.

7    The new Question 5A covered the *Monell* ratification inquiry as to Deputy Pope, *i.e.*,

8    had the County of Alameda ratified Deputy Pope's search of the daughters' belongings (Dkt.

9    No. 235-1 at 4).  Following 5A, new language stated "If you answered 'Yes' to Question 5A

10   as to any plaintiffs then as to that plaintiff you have found the County of Alameda liable for a

11   Section 1983 constitutional violation by Deputy Pope.  Go to Question 6."  *Ibid.*  Finally,

12   Question 6 was reworded to state: "If you have found any defendant liable, what damages, if

13   any, have plaintiffs proven by a preponderance of the evidence by reason of unlawful

14   conduct?" and a new addition stated at the bottom, "Do not worry about a column for

15   Alameda County.  Fill in the blanks above, the judge will assess the amounts, if any, for

16   which Alameda County is liable based upon your answers to 1, 3, 4, and 5A."  *Id*. at 5.  These

17   were all the changes between the finalized verdict form initially submitted to the jury, and the

18   amended verdict form.  *Compare generally* Dkt. No. 231-1 *to* Dkt. No. 235-1.  After

19   explaining these proffered changes to counsel, the defense's objections were heard and denied

20   (Tr. 1338:18–1354:7).  The jury was brought in, the changes were explained in open court

21   with both sides present, and the jury returned to their deliberations.  Later that same day, a

22   unanimous verdict was rendered.

23   Given the circumstances, the changes made on the amended verdict form were

24   necessary to include all potential questions the jury needed to answer, to account for an

25   additional claim in dispute (the *Monell* claim concerning Deputy Pope), and to further address

26   a previously submitted juror question.  Although there had been an issue of plaintiffs'

27   potential waiver of the *Monell* claim, the Court ultimately concluded "[i]t's crazy to have to

28   retry this whole case just to get [the jury's answer on this claim] in case it should have been in

44

1    here" (Tr. 1339:2–4).  Any argument of waiver would be addressed afterwards by counsel

2    because it was "in the long run, better to get the verdict on this and argue over whether or not

3    there was some kind of waiver later" (Tr. 1342:13–15).

4    　　　　Defendants now criticize the language added in the amended verdict form that advised

5    the jurors not to worry about a column for the County of Alameda.  As described previously,

6    this criticism is choked with misrepresentation.  Most importantly, the instruction was not

7    error because it was advisable given the juror's submitted question directly on this point.

8    　　　　Further, inclusion of the *Monell* claim as to Deputy Pope did not prejudice defendants.

9    As described elsewhere above, the trial evidence showed that the County reviewed the actions

10   of both deputies by reviewing Captain Brodie's all-inclusive investigative report and

11   concluding the deputies' conduct was lawful.  No meaningful difference between Deputy

12   Pope's conduct versus Deputy Holland's conduct exists for this claim, because all conduct

13   was considered together as one incident.  Thus, the adjustment of the verdict form prejudiced

14   no one.  The motion for new trial on this basis is **DENIED**.

15   　　　　**9.　THE BANE ACT.**

16   　　　　Plaintiffs included a claim under California's Tom Bane Civil Rights Act, Cal. Civ.

17   Code § 52.1, which provides remedies for misconduct that interferes with federal or state

18   rights by "threat, intimidation, or coercion," whether or not state action is involved.  A

19   defendant must have specific intent to violate a plaintiff's rights — meaning a jury must find

20   the defendant committed the act in question with the particular purpose of depriving the

21   victim of her enjoyment of the interests protected by that right.  Our jury was further

22   instructed that a reckless disregard of constitutional rights satisfied this *mens rea* requirement.

23   *See Cornell v. City & Cnty. of San Francisco*, 225 Cal. Rptr. 3d 356, 382–84 (2017).

24   　　　　The current civil remedy provision of the Bane Act, Section 52.1(c), reads:

25   　　　　　　　(c) Any individual whose exercise or enjoyment of rights secured
　　　　　　　　by the Constitution or laws of the United States, or of rights
26   　　　　　　　secured by the Constitution or laws of this state, has been
　　　　　　　　interfered with, or attempted to be interfered with, as described in
27   　　　　　　　subdivision (b), may institute and prosecute in their own name
　　　　　　　　and on their own behalf a civil action for damages, including, but
28   　　　　　　　not limited to, damages under Section 52, injunctive relief, and

United States District Court
Northern District of California

> other appropriate equitable relief to protect the peaceable exercise
> or enjoyment of the right or rights secured, including appropriate
> equitable and declaratory relief to eliminate a pattern or practice
> of conduct as described in subdivision (b).

The problem is that this provision allows for damages as per "Section 52" but fails to call out whether subsection (a) versus (b) of Section 52 is intended. Those subsections provide two overlapping but different measures of recovery:

> (a) Whoever denies, aids or incites a denial, or makes any
> discrimination or distinction contrary to Section 51, 51.5, or 51.6, is
> liable for each and every offense for the actual damages, and any
> amount that may be determined by a jury, or a court sitting without
> a jury, up to a maximum of three times the amount of actual
> damage but in no case less than four thousand dollars ($4,000), and
> any attorney's fees . . .

> (b) Whoever denies the right provided by Section 51.7 or 51.9, or
> aids, incites, or conspires in that denial, is liable for each and every
> offense for the actual damages suffered by any person denied that
> right and, in addition . . . (1) An amount to be determined by a jury
> or a court sitting without a jury, for exemplary damages. (2) A civil
> penalty of twenty-five thousand dollars ($25,000) to be awarded to
> the person denied the right provided by Section 51.7 in any action
> brought by the person denied the right . . . (3) Attorney's fees as
> may be determined by the court.

As curious, although subsections (a) and (b) call out other statutory claims, neither calls out Section 52.1, the Bane Act. More on this below.

In our case, Jury Instruction 53 stated:

> If you find a violation of the Bane Act, you may award damages
> resulting from the Bane Act violation of (1) actual damages and
> (2) any amount up to a maximum of three times the amount of
> actual damage, but not less than four thousand dollars ($4,000).

This tracked the measure of damages in subsection (a) of Section 52. No objection was ever made against the inclusion of this instruction, but the defense says the judge preempted any objections.

Here is the actual sequence of events. On Friday, February 24, the proposed final charge was provided to counsel, but it did not yet include anything about an up-to-treble add-on as authorized by subsection (a) (Dkt. No. 226). Instead, it set forth the liability requirements under the Bane Act and it allowed the jury to decide actual damages and whether to impose punitive damages.

1    Counsel were requested to respond by Sunday, February 26 with any objections.

2    Plaintiffs filed their objections and proposed modifications a day early on Saturday, February

3    25.  They called for inclusion of an instruction specifying an up-to-treble add-on to actual

4    damages under the Bane Act.  They stated:

5          Plaintiffs believe the Bane Act instruction correctly states the
           requirement to prove liability.  However, neither the instructions
6          nor the verdict form contain any language pertaining to damages.
           Civil Code section 52.1(c) provides that the person whose rights
7          have been interfered with pursuant to section 52.1(b) may bring
           an action for civil action for damages, "including, but not limited
8          to, damages under Section 52 . . . ."  Section 52(a) list various
           items of damage, including "actual damages, and any amount that
9          may be determined by a jury, or a court sitting without a jury, up
           to a maximum of three times the amount of actual damage but in
10         no case less than four thousand dollars ($4,000), and attorney's
           fees . . . ."  (citations omitted).  The California Judicial Council's
11         Directions for Use for the Model Verdict Form (CACI VF-3035)
           confirms the availability of a potential treble damages award:
12         "Neither subsection of Section 52 mentions the Bane Act or Civil
           Code section 52.1.  Nevertheless, the Bane Act refers to section
13         52.  (See Civ. Code, § 52.1(c)).  This reference would seem to
           indicate that damages may be recovered under both subsections
14         (a) and (b) of section 52 . . . Therefore, the Court should instruct
           the jury on their ability to determine the appropriate multiplier,
15         and provide room on the verdict form for the jury to do so.

16   (Dkt. No. 227 at 7).  The defense was thus on notice of plaintiffs' submitted request to include

17   an instruction on the jury's power to award an up-to-treble add-on.  The defense was further

18   on notice of the issue of the statutory language ambiguity between Sections 52.1 and 52 and

19   the authorities cited by plaintiffs.  Defendants' submission the following day, however, made

20   no mention of whether defendants agreed or disagreed with the inclusion of the treble

21   damages instruction.  In fact, defendants' submission made no mention of the Bane Act at all

22   (Dkt. No. 229).

23         The charging conference took place Monday morning, February 27.  Due to lengthy

24   argument on *Arturo D.* and other major points, the up-to-treble add-on point was not reached.

25   Instead, the trial resumed with the last witness, after which discussion on the instructions

26   resumed, the jury being out on a lunch break.  At that time, the judge informed counsel of his

27   final rulings on the major points of law discussed earlier that day and passed out to counsel

28   the revised final instructions.  The judge advised counsel that other rulings on their submitted

47

objections were implemented into the final proposal, including some that went undiscussed at

the charging conference, including the up-to-treble add-on under the Bane Act. He specified:

> THE COURT: [ . . . ] And then throughout the instructions, there
> are some changes, so you need to identify them . . . But don't limit
> yourself to this. There are miscellaneous changes that I would —
> the major changes are the definition of a detention. . . . These are
> the current numbers. Definition of detention. The plaintiffs wanted
> that. I put it in. Paragraph 16. Also the concept of dissipation of
> reasonable suspicion, I put that in; but I also put in the
> countervailing point that as time goes on, greater information may
> come to the — supporting probable cause. That's Number
> 20. Vehicle Code 4461 was added, paragraph 22. *Arturo D.*
> applies when the stop is based on the Vehicle Code, paragraph 38
> and 44. *And I put in the thing about Bane Act treble damages,*
> *paragraph 52.* Now, that's all — there are others as well, but those
> were the main ones. I'm going to give you a chance to look at
> them.

(Tr. 1164:19–1165:19) (emphasis added). The Bane Act addition simply tracked Section

52(a) without embellishment. The judge stated:

> If you see something that you think I did not intend that is just an
> obvious mistake by me, you can bring it to my attention, but I do
> not want you to reargue any other point. You've made your
> record on those points, and you can go directly to the Court of
> Appeals with your points on those, but do not — I do not want
> re-argument. I'm not going to entertain re-argument. But I will
> entertain if you think I have made a goof, which is possible since
> I've been working on these while the evidence was coming in
> this morning. So, please, you're free to bring up goofs by the
> judge . . . .

(Tr. 1165:19–1166:4). No objection was ever made to the inclusion of the Bane Act damages

instruction, which, to repeat, tracked the statute. It's fair to add that any objection to the Bane

Act multiplier would not have been "re-argument" since the Bane Act point had not been

argued at all at the charging conference. The only objection raised after this point was by

plaintiffs and regarded Deputy Pope's omission from the *Monell* claim, discussed elsewhere

in this order.

Both sides now agree that given the amount of the verdict, the jury must have included

an up-to-treble add-on (Rule 59 Opp. 18; Rule 59 Reply 14–15). Plaintiffs, for example, have

conceded that, given the "large" award amount, the jury most likely included an add-on of

treble damages under the Bane Act, stating (Rule 59 Opp. 18):

48

The Court also instructed the jury that if they find for Plaintiffs on the Bane Act claim (which they did), the jury could award, in addition to actual damages, "any amount up to a maximum of three times the amount of actual damage." Dkt. 231, 17:12-14. Without a separate line for Bane Act damages, it must be presumed that the large award was the product of combining the actual damages with an additional award of treble damages. Defendants have agreed in a recent filing that the jury did, in fact, award treble damages. Dkt. 256, 1:21 (arguing that the Court should not award prejudgment interest because, based on the size of the verdict, "it can only be presumed that Plaintiffs were awarded treble damages").

Because the jury presumably awarded treble damages in addition to actual damages, the compensatory damages component of the award against Holland may be presumed to be one quarter of the total amount awarded (i.e., the amount of the verdict is comprised of actual damages plus three times actual damages). Thus, as explained further below, the compensatory award for Ms. Loggervale in the amount of $687,500 (plus $2,062,500 in treble damages) and for each daughter in the amount of $500,000 (plus $1,500,000 each in treble damages) was not grossly excessive.

Further, in subsequent briefing, both parties maintain that under the wording of Section 52(a), a grand total of *four times* actual damages is permissible (Dkt. No. 286 at 9; Dkt. No. 287 at 5). Thus, this order assumes the jury determined actual damages for Ms. Loggervale (the mother) to be $687,500 (one-fourth of her total award of $2.75 million); and actual damages for each daughter caused by Deputy Holland to be $500,000 (one-fourth of their two-million-dollar total award against Deputy Holland). The amount of $750,000 for each daughter against Deputy Pope was the actual damage amount inasmuch as Deputy Pope was not involved in the Bane Act claim.

Defendants now move for remittitur, arguing the award was grossly excessive and not supported by the proof of injury at trial. Citing examples of other jury awards from different cases and the fact that no medical care was required, defendants maintain plaintiffs' emotional damages here were not severe, and each plaintiff should instead be awarded $150,000 (Rule 59 Br. 20–21).

Is an award in the range of half a million dollars too high to compensate for the emotional distress at issue? There is no fixed standard for emotional distress, indignity, shame, or humiliation. We might as well look back a few decades and ask how much would compensate for the humiliation of being ordered to the rear of a municipal bus solely on

49

account of race?  Or how much would compensate for being doused in mustard and ketchup by a jeering mob solely on account of trying to integrate a lunch counter?  These involved no permanent or physical injury yet involved great indignity.  Our case involved separating, handcuffing, and stowing family members in the rear of squad cars for 91 minutes solely on account of race or so our jury could have found.  Our jury assessed the humiliation at issue and arrived at a number.  Given the lack of fixed standards for such indignity, it is hard to say the jury was wrong.

*      *      *

After the verdict was rendered and post-trial motions were ripe, the judge raised several questions on his own about the up-to-treble add-on under the Bane Act (Dkt. No. 276).

*First*, the judge asked for further explanation as to the apparent statutory discrepancy. The Bane Act, as stated, provides for damages "including, but not limited to, damages under Section 52," but fails to specify which subsection of Section 52 was intended.  Also as stated, Section 52 itself makes no mention of the Bane Act (§ 52.1), despite calling out five other statutes.  Section 52(a) provides for "up to" a treble add-on, and expressly applies that relief for claims arising under Section 51, 51.5, or 51.6 — yet completely omits the Bane Act. Section 52(b) provides for actual damages and for exemplary damages (but no up-to-treble add-on), and expressly applies it to Sections 51.7 or 51.9, yet again completely omits the Bane Act.  The judge asked for help in understanding this better.  (To repeat, defendants had never raised this statutory issue before nor objected to it at any point.)

*Second*, the judge asked whether any part of the up-to-treble add-on under the Bane Act is punitive in nature, and what criteria the jury should have considered when deciding whether to impose a multiplier against a defendant.  Specifically, the judge raised the issue whether a discretionary up-to-treble add-on by a jury was punitive in nature and might thus violate the federal Due Process Clause if imposed without requisite criteria or guidelines.  (Again, at no point had a request for criteria as to Bane Act damages been made by the defense, nor was there in any assignment of error on this ground in the post-trial briefing.)

In response, the defense replied that the Bane Act was amended in 1991 to eliminate any add-on but to allow for punitive damages without any three-times limit.  As will be shown, there is some force to this argument.

Because the Bane Act is increasingly used in Section 1983 cases in California, it may be of assistance to judges and counsel in other cases to lay out the entire legislative history to illuminate how the snafu in referring to only "Section 52" arose.[7]

Section 52 began in 1905 along with Sections 51, 53, and 54.  All four related to personal civil rights.  *See* Stat. 1905 c. 413.  Section 51 provided all citizens within California a right to "full and equal accommodations, advantages, facilities, and privileges of inns, restaurants, hotels, eating houses, barber shops, bath houses, theaters, skating rinks, and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law and applicable alike to all citizens."  Section 52 provided the civil remedy for violations of Section 51.  It stated "[w]hoever violates any of the provisions of the last preceding section . . . or whoever aids or incites such discrimination, distinction, or restriction, for each and every such offense is liable in damages in an amount not less than fifty dollars, which may be recovered in an action at law brought for that purpose."  *Id.* § 1–2.  Section 53 made it unlawful for any corporation, person, or association of any place of public amusement or entertainment "to refuse admittance to any person over the age of twenty-one years, who presents a ticket of admission acquired by purchase . . . and who demands admission to such place," with exclusions for those of boisterous conduct or under the influence of liquor.  Section 54 was the remedy for Section 53 violations.  It made violators liable for "actual damages, and one hundred dollars in addition  thereto."  *Id.* § 3–4.  None of these sections had any subsections.

Thus, Sections 51 and 52 comprised a pair, one setting out the right and the other setting out the remedy.

_____

[7] This order thanks the Louis E. Goodman Memorial Library of the Northern District of California for its excellent work of helping trace through the legislative history of Section 52 and the Bane Act.  This entailed providing all original statutory language and statute commentaries (if applicable) from 1905 to 1989, and the corresponding governor bill files for particular years of interest.

United States District Court
Northern District of California

United States District Court
Northern District of California

They were first amended in 1919.  Section 51 added language to include "public conveyances" as an additional place of entitlement to equal access and Section 52 increased the damages minimum for violations of Section 51 to "damages in an amount not less than one hundred dollars."  *See* Stat. 1919 c. 210 § 1–2.

A 1923 amendment added "places where ice cream or soft drinks of any kind are sold for consumption on the premises" to the list of regulated public places.  The damages amount in Section 52 remained the same.  *See* Stat. 1923 c. 235 § 1–2.

For the next thirty-plus years, the two statutes went undisturbed.  In 1959,  Section 51 was officially named the "Unruh Civil Rights Act," after California Assemblyman Jesse M. Unruh.  It was changed to read "All citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Section 52 was revised to state "Whoever denies, or who aids, or incites such denial, or whoever makes any discrimination, distinction or restriction on account of color, race, religion, ancestry, or national origin, contrary to the provisions of Section 51 of this code, is liable for each and every such offense for the actual damages, and two hundred fifty dollars ($250) in addition thereto, suffered by any person denied the rights provided in Section 51 of this code."  *See* Stat. 1959 c. 1866 § 1–2.  Significantly, Section 52 specified the $250 would be "in addition" to actual damages, whereas in prior years, the provision only provided minimums for the damage amount.  This amendment also repealed Sections 53 and 54.  *Id*. § 3.

In 1974, Sections 51 and 52 were amended to add "sex" to the list of protected classes.  The damages amount in Section 52 remained the same.  A new Section 53 introduced to read "Every provision in a written instrument relating to real property which purports to forbid or restrict the conveyance . . . of such real property to any person of a specified sex, race, color, religion, ancestry, or national origin, is void . . . ."  *See* Stat. 1974 c. 1193 § 1–3.

Two years later, in 1976, several amendments occurred.  Section 51.5 was created to provide: "No business establishment of any kind whatsoever shall discriminate against,

52

boycott or blacklist, refuse to buy from, sell to, or trade with any person in this state because of the race, creed, religion, color, national origin, or sex of such person . . . ."  According to the 1976 governor's chaptered bill file, proponents of this statute thought it necessary due to a growing concern that "acquisition of commercial interests by Arabs" would result in "business boycotts of Jews."

Significantly, the amendment also introduced for the first time an up-to-treble add-on. Section 52 was revised to specifically cross-reference Sections 51 and 51.5 and to include the add-on and attorney's fees.  As revised, Section 52 stated:

> Whoever denies, or who aids, or incites such denial, or whoever makes any discrimination, distinction or restriction on account of sex, color, race, religion, ancestry, or national origin contrary to the provisions of Section 51 or 51.5 of this code, is liable for each and every such offense for the actual damages, and such amount as may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than two hundred fifty dollars ($250), and such attorney's fees as may be determined . . . .

*See* Stat. 1976 c. 366 § 1–2.  (Note that the Bane Act, § 52.1, didn't yet exist.)

Another amendment in 1976 created Section 51.7, entitled the "Ralph Civil Rights Act of 1976," named after California Assemblyman Leon Ralph.  *See* Stat. 1976 c. 1293 § 2.  This new section provided that "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, or position in a labor dispute."  The bill file for this amendment indicated it was a response to an incident one year prior, whereby thirteen black students attending a college in Taft had been threatened with violence and chased out of town.  In his letter addressed to Governor Edmund G. Brown, Assemblyman Ralph referred to it as "badly needed Civil Rights legislation."

The same 1976 amendment split Section 52 into five subsections (a) through (e).  Before this point, Section 52 had had no subsections.  Subsection (a) expressly provided damages for Sections 51 and 51.5, and such damages remained unchanged from the earlier amendment that

year, including the up-to-treble add-on.  Subsection (b) provided damages for violation of

Section 51.7 (the Ralph Act), stating:

> Whoever denies the right provided by Section 51.7, or whoever
> aids, incites, or conspires in such denial, is liable for each and
> every such offense for the actual damages, and ten thousand
> dollars ($10,000) in addition thereto, suffered by any person
> denied such right.  In the case of multiple offenders, such ten-
> thousand-dollar ($10,000) fine shall be prorated between them.

The legislative commentary did not explain why damages should be different for Sections 51

and 51.5 versus 51.7.

After two other minor amendments in 1978 and 1981, Section 52 changed again in

1986.  That year, Section 52(b) was amended to also provide for an up-to-treble add-on and

attorney's fees for violation of the Ralph Act.  Specifically, after amended, it read:

> Whoever denies the right provided by Section 51.7, or whoever
> aids, incites, or conspires in that denial, is liable for each and
> every offense for the actual damages suffered by any person
> denied that right and, in addition, (1) an amount to be determined
> by a jury, or a court sitting without a jury, up to a maximum of
> three times the amount of actual damages; (2) a civil penalty of
> ten thousand dollars ($10,000); and (3) attorney fees as may be
> determined by the court.  In the case of multiple offenders, the ten
> thousand dollar ($10,000) civil penalty shall be prorated between
> them.

*See* Stat. 1986 c. 244 § 1.  Thus, starting in 1986, both Sections 52(a) and 52(b) provided for

an up-to-treble add-on.

The bill file showed various individuals advocated for this expansion due to an

increasing need for more severe punishment against hate crime.  For example, a submission

by the Finance Department stated "SB 1961 would increase the potential damage awards to

victims of violent acts.  These penalties may deter perpetrators of these crimes."  A Senate

Floor Analyses submission stated, "[t]estimony presented by civil rights groups, minority bar

associations, and prosecuting attorneys revealed the following significant deficiencies in the

Ralph Civil Rights Act:  (a) The Ralph Act failed to award attorney's fees to a plaintiff who

successfully filed suit under the Act; (b) The damages awarded under the Act were

inadequate; (c) The Act failed to notify victims of hate violence that they could avail

themselves of the . . .  remedies available under the FEHA."

54

The Bane Act came in 1987, named for Assemblyman Tom Bane.  It was designated as a new Section 52.1 and had eleven subsections (a) through (k).  Subsection (a) described the violation:

> Whenever a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured.

*See* Stat. 1987 c. 1277 § 3.  Subsection (b) gave "[a]ny individual whose exercise or enjoyment of rights . . . has been interfered with, or attempted to be interfered with, as described in subdivision (a)" a right to prosecute on his or her own behalf a civil action "for injunctive and other appropriate equitable relief."  Other subsections set forth jurisdiction and procedural rules, prohibitions on "[s]peech alone" being violative conduct, as well as criminal penalties for violating any issued temporary restraining order or injunction issued pursuant to the Section.  No damages were allowed by the Bane Act but injunctive relief was authorized.

Section 51.7 (the Ralph Act) was changed at the same time.  The summary digest explained the change to Section 51.7, stating "[t]his bill would recast those provisions [referencing quoted language from the Ralph Act] to, among other things, exempt speech alone from supporting such a civil action, as specified, and would provide that any action for such preventative relief be filed in the superior court . . ."  *See* 1987 Summary Digest c. 1277 (AB 63).

In 1990, Section 52.1, the Bane Act, was amended to add a damages remedy.  The summary digest informed "[t]his bill would expressly give persons aggrieved by such a denial of constitutional rights a cause of action for damages."  The statutory language updated Section 52.1(b) to state aggrieved individuals "may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or

United States District Court
Northern District of California

rights secured." *See* Stat. 1990 c. 392 § 1; 1990 Summary Digest c. 392 (AB 2683).  Note that the new damages provision for the Bane Act made no reference to any add-on.

Against the foregoing history, we finally come to the 1991 amendments most relevant to our case.  In 1991 both the Bane Act and Section 52 were amended as to damages.  The legislative summary digest stated reasons behind the amendments in comments numbered (1) through (11).  *See* 1991 Summary Digest c. 607 (SB 98).  These comments did not explicitly specify the code provisions in question but instead merely referenced "existing law" and what it provided and how the bill would change it.  Relevant to our analysis were comments (3) and (4) which explained the changes to subsections of Section 52 and 52.1.

The first sentence in comment (3) stated:

> Under existing law, all persons within this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute.

This sentence quoted directly from the Ralph Act.  The second sentence in comment (3) stated:

> Existing law provides that whoever denies these rights . . . is liable for each and every offense for the actual damages suffered by any person denied that right and in addition, an amount to be determined by the trier of fact up to a maximum of 3 times the amount of actual damages, a civil penalty of $10,000 to be awarded to the person denied these rights, and attorney fees as may be determined by the court.  Under existing law, in the case of multiple offenders, the $10,000 civil penalty is prorated between the offenders.

This sentence quoted directly from the then-existing Section 52(b), damages for the Ralph Act, which, as explained above, then authorized an up-to-treble add-on to actual damages.

The third sentence in comment (3) stated:

> This bill would delete the award of 3 times the amount of actual damages and, instead, would provide merely for an award of exemplary damages.  The bill also would increase the civil penalty to $25,000 and would delete the proration of this civil penalty between multiple offenders.

Thus, Section 52(b) was updated to replace the up-to-treble add-on with punitive damages for violations of the Ralph Act (§ 51.7).

United States District Court
Northern District of California

A summary in the bill file by California Senator Bill Lockyer described this amendment as "remov[ing] this arbitrary cap" on punitive damages, stating "existing law limits punitive damages in a hate crime case to three times the amount of actual damages.  SB 98 removes this arbitrary cap and permits the jury to set the amount of such damages.  The bill does not change the difficult standard of proof for punitive damages . . . ".  In his letter to Governor Pete Wilson, Senator Lockyer stated, "Sadly, there has been an alarming increase in hate crimes over the last couple of years.  Recent incidents in my own district include fire bombings of synagogues, violent and racially motivated attacks on Black, Hispanic, and Asian residents of our communities, vandalism of businesses owned by Arab-Americans, and violence, sometimes deadly, directed against gay persons."  Thus, this change was hailed as providing for "tougher penalties" under Section 52(b) for violations of the Ralph Act.

Now, we come to the Bane Act change.  Comment (4) of the 1991 amendment stated:

> Existing law authorizes the Attorney General, district attorneys, city attorneys, and aggrieved individuals to bring actions for damages, injunctive relief, and other appropriate equitable relief in order to protect the peaceable exercise and enjoyment of constitutional rights against interference or attempted interference by threats, intimidation, or coercion.

This sentence summarized the Bane Act.  The second sentence of comment (4) then stated (emphasis added):

> This bill would specify that the cause of actions for damages includes, but is not limited to, among other damages, those damages *set forth in (3)*.

The phrase "set forth in (3)" referred to comment (3), the Ralph Act change.  Thus, from this legislative history, it would appear damages available under the Bane Act (§ 52.1) were, by the 1991 amendment, meant to include without limitation those damages available under the Ralph Act.  The Bane Act as amended in 1991, however, did not call out a particular subsection of Section 52.  Instead, its statutory language (§ 52.1) was updated to read:

> Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with . . . may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, *including, but not limited to, damages under Section 52*, injunctive relief, and other

57

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured.

*See* Stat. 1991 c. 607 § 3 (emphasis added).  This simple reference to "damages under Section 52" remains today.

Note well, however, the phrase in comment (4) " . . . includes, but is not limited to, among other damages, those damages set forth in (3)."  This caveat supports the ultimate interpretation by this order that a Bane Act plaintiff can elect either Section 52(a) or 52(b), which seems to explain why the legislature referred simply to "Section 52" remedies in the statute itself.

\*         \*         \*

Little caselaw has addressed this point.  In *Grassilli v. Barr*, 142 Cal. App. 4th 1260, 1290 (2006), a California Court of Appeal said that trebled damages were authorized for statutory penalties for civil rights violations when applying Section 52.1 but did so without analysis or specifically calling attention to the lack of statutory support.  Our court of appeals has also stated "[t]he Bane Act allows recovery for 'actual damages' and treble damages, 'but in no case less than four thousand dollars,'" but, again, this came up in a footnote that did not refer at all to the statutory issue.  *See Klein v. City of Laguna Beach*, 810 F.3d 693, 696 n.2 (9th Cir. 2016).  Judge Marilyn Patel in our district noted the issue and concluded that "because Section 52.1 simply refers to damages under Section 52 without limiting its reference to either sections 52(a) or 52(b), all damages made available by Section 52 may be sought for a violation of Section 51.2 [sic]."  *Cuviello v. City of Oakland*, No. C 06-5517 MHP, 2010 WL 3063199, at \*5 (N.D. Cal. Aug. 3, 2010), *aff'd in part on different grounds*, 434 F. App'x 615 (9th Cir. 2011).  Commentary to the California model instruction for the Bane Act also concludes as much, stating "[n]either subsection of Section 52 mentions the Bane Act or Civil Code Section 52.1.  Nevertheless, the reference to Section 52 in subsection (b) of the Bane Act would seem to indicate that damages may be recovered under both subsections (a) and (b) of Section 52."  *Directions for Use*, CACI No. 3066.

Given the actual wording of the Bane Act and its general reference to "Section 52," this order finds the best way to harmonize all of the above is to hold that both avenues of damages

58

under Section 52 are options for Bane Act plaintiffs, giving them an election to seek damages either under subsection (a) or (b).  If a plaintiff further seeks punitive damages for a Section 1983 violation based on the same conduct, then a plaintiff must elect the punitive damages counterpart under Section 52(b).

We turn now to the due process issue.  Within this question lies another inquiry as to whether the add-on under the Bane Act is punitive in nature.  If the trebling is punitive, it is likely that guidelines are necessary to protect against unbridled jury discretion.  In our case, no guidelines were given.  Because the jury declined to expressly impose punitive damages against Deputy Holland, no supplemental hearing ever occurred to illuminate his financial capacity to pay punitive damages, nor were any punitive instructions given as per the usual supplemental proceeding.

The California Supreme Court, when analyzing the language in Section 52 in context of the Unruh Act (Section 51), has stated " the damages provision allowing for an exemplary award of up to treble the actual damages suffered with a stated minimum amount reveals a desire to punish intentional and morally offensive conduct."  *Harris v. Cap. Growth Invs. XIV*, 52 Cal. 3d 1142, 1172 (1991), *overruled on different grounds by Munson v. Del Taco, Inc.*, 46 Cal. 4th 661 (2009).  Many courts have relied on this decision to conclude that the up-to-treble add-on under Section 52 bears the hallmarks of punitive damages — including being awarded at the discretion of the factfinder in an unfixed amount — and they are thus unavailable against a governmental entity.  *See, e.g.*, *H.M. v. Cnty. of Kern*, 2022 WL 286614, at *5–6 (E.D. Cal. Jan. 31, 2022) (collecting cases).  Thus, it follows that the add-on under the Bane Act is punitive in nature.

Next, we ask, what does due process require in such circumstances?  With the benefit of hindsight, it would have been better, in light of *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 17–20 (1991), to have included guidelines for the exercise of discretion by our jury in determining whether, and if so, the extent to which a punitive award should be added to the Bane Act compensatory award.  In *Halsip*, the Supreme Court emphasized the constitutional importance of legal standards that provide "reasonable constraints" within which "discretion

is exercised," stating "[u]nlimited jury discretion — or unlimited judicial discretion for that matter — in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Id*. at 18, 20.

Had our jury expressly found in Question 7 that punitive damages should be imposed, as stated, there would have been a short, supplemental trial (with the same jury) to present the financial condition of Deputy Holland, to give instructions for the exercise of jury discretion and to allow further closing argument. The jury, however, found that plaintiffs had not proven that punitives should be imposed, so that further step was never reached. Nevertheless, adding a multiplier under the Bane Act allowed punitives to be added without any guidelines or supplemental proceedings.

With the benefit of hindsight, it now seems curious that our jury instructions permitted both punitive damages and a damages award of up to four times actual damages. In other words, when plaintiffs successfully asked for the up-to-treble add-on instruction, we should've taken out the punitive damages instruction since the Bane Act permits one or the other but not both. Our jury should've been instructed that the up-to-treble damages add-on was punitive in nature and the jury should've received guidance on the exercise of its discretion in determining whether and if so how much to add on.

But the defense made no objection to any of these problems. Nor was there any request to require the jury to deliberate further over the possible inconsistency between its using a Bane Act multiplier versus its finding punitives were not warranted. And both sides asked for a verdict form with the simplest damages number possible. The instruction tracked the language of the statute and was similar to the Judicial Council of California's model instruction, CACI 3066. This specific issue was not even mentioned in the defense post-trial motions. The verdict as rendered was consistent with a faithful following by the jury of the instructions. So, even though we could have done better, with the benefit of hindsight, and should have omitted the question on punitive damages (once the up-to-treble add-on was included), this order will not, at this late stage, set aside all the work of this jury in this case. But in the next case, under the Bane Act, this judge at least will do better.

The defense arguably did make one objection related to the Bane Act problem, (Tr. 1320:1–1322:9), namely that a government agency under Government Code Section 818 cannot be liable for punitive damages.  Therefore, the judgment against Alameda County for the punitive portion of the Holland-based award must be reduced by three-fourths to $1,687,500.  The full award against Deputy Holland will stand since he is not a government entity.  (No Bane Act claim was ever made against Deputy Pope.)  Nothing in this order is meant to prejudice either deputy's right of indemnification (by way of employment contract or collective bargaining agreement or anything else) against the County for the full portion of any judgment against them, whether punitive or not.

## CONCLUSION

For the following reasons, defendants' motion for a new trial or remittitur is **DENIED**, except that the County shall be liable only for the plaintiffs' compensatory damages, which amounts to **$1,687,500** as to Deputy Holland and **$1,500,000** as to Deputy Pope.  Defendants' renewed motion for judgment as a matter of law is **DENIED**.

**IT IS SO ORDERED.**

Dated:  June 12, 2023.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE