Pages 1 - 41

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

```
AASYLEI LOGGERVALE, AASYLEI    )
HARDGE-LOGGERVALE, AND AAOTTAE )
LOGGERVALE,                    )
                               )
          Plaintiffs,          )
                               )
   VS.                         )       NO. C 20-04679 WHA
                               )
COUNTY OF ALAMEDA, et al.,     )
                               )
          Defendants.          )
_____)
```

San Francisco, California
Wednesday, March 17, 2021

**TRANSCRIPT OF TELEPHONIC PROCEEDINGS**

**APPEARANCES BY TELEPHONE:**

For Plaintiffs:
                    LAW OFFICE OF JOSEPH S. MAY
                    1388 Sutter Street - Suite 810
                    San Francisco, California  94109
               BY:  **JOSEPH S. MAY, ATTORNEY AT LAW**

                    GEARINGER LAW GROUP-SR
                    740 Fourth Street
                    Santa Rosa, California 95404
               BY:  **BRIAN GEARINGER, ATTORNEY AT LAW**

For Defendants:
                    ORBACH, HUFF & HENDERSON LLP
                    6200 Stoneridge Mall Road - Suite 225
                    Pleasanton, California  94588
               BY:  **KEVIN E. GILBERT, ATTORNEY AT LAW**

Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

<u>**Wednesday - March 17, 2021**</u>                         <u>**9:20 a.m.**</u>

## <u>P R O C E E D I N G S</u>

---o0o---

**THE CLERK:**  Calling Civil matter 20-4679, Loggervale, et al. vs. County of Alameda, et al.

Starting with plaintiff, will counsel please state your appearances.

**MR. MAY:**  Good morning, Your Honor.  Joseph May for plaintiffs.

**THE COURT:**  Good morning.

**MR. GEARINGER:**  Good morning, Your Honor.  Brian Gearinger also for plaintiffs.

**THE COURT:**  Good morning.

**MR. GILBERT:**  Good morning, Your Honor.  Kevin Gilbert for the defendants.

**THE COURT:**  Good morning.

Anyone else?

(No response.)

**MR. MAY:**  No, Your Honor.  That's all of us.

**THE COURT:**  All right.

Okay.  I don't know how to proceed here.  I've spent a lot of time on your complaint.  It's not like I'm not prepared, but I have questions and I'm just not sure I know what to do.

Hang on a minute.  I've got to find the right -- I've got to find the right document.  Hang on.

1          (Pause in proceedings.)

2          **THE COURT:**  Here is -- let me give you my thinking,

3    and this is just thinking out loud, and then I -- so that I can

4    tee up the question.

5          First, we're dealing with a motion to dismiss, and I'm

6    stuck with the four corners of the complaint and I am not

7    supposed to veer outside the four corners of the complaint.

8    Plus, I'm required to liberally construe the complaint in favor

9    of the plaintiff at the Rule 12 stage.

10         All right.  So that's one body of law.  Another body of

11   law is that we -- on the issue of qualified immunity, the

12   Supreme Court wants us to resolve that sooner rather than

13   later.

14         Now, when you liberally construe the pleading, it seems

15   pretty easy to find a clear violation, constitutional

16   violation, at least at one point.  So that's the -- part of

17   this is:  Is there a clear-cut statement of Ninth Circuit or

18   Supreme Court law about how liberally you construe a pleading

19   when you're dealing with qualified immunity beyond Rule 12?

20         That's a procedural question I have.  Don't answer that

21   yet because I'm still talking out loud.

22         As I read this complaint, it says the officers were

23   investigating a car -- auto burglaries committed by black men

24   is the way the complaint phrases it.  And so up drives three

25   women, two teenagers and their mom, African American, and the

1   police officers go over to approach them and detain them

2   knowing, knowing that they could not possibly be the criminals

3   under investigation.

4        So let me just stop there.  So that sounds like racial

5   profiling, and to me that is enough to say that there would be

6   a clear-cut violation of the Constitution.

7        All right.  That's kind of step one.  However, step two

8   is -- this is where the lawyers have failed me and not given me

9   much help -- step two is the deputy asks for identification --

10  for a driver's license, not identification -- for a driver's

11  license and the driver refuses.  Now, she's not the driver but

12  she's in the driver's seat and she's parked in a public lot by

13  a Starbucks in a handicapped zone.

14       Now, she refuses.  So you both have cited to that Vehicle

15  Code section saying that when the police officer asks for your

16  ID, they're entitled to ask for it and you've got to give them

17  the ID, but she refuses to do so.

18       Now, is the law that -- the state court law that

19  absolutely every driver must give over their driver's license

20  under those circumstances or can they refuse?

21       My law clerk says there's a Cal Supreme Court case saying

22  that the request must be proper.  You only have to show it on a

23  proper request according to the Cal Supreme Court.

24       So if that's true, was this one a proper request?  Now,

25  again, realizing that we're only going off the four corners of

1    the complaint.  We're not going off what the officers are going
2    to testify to they actually did.  We're going off of what the
3    complaint says they did.  So was this a proper -- well, let's
4    say for the moment that it was a proper request and she refused
5    it.
6         Now, then the detention, which lasted an hour according to
7    the complaint, that detention, do we say that it would have --
8    if she had turned over her license, it might have been, we
9    could reasonably infer, a two-minute detention with no
10   handcuffs?  But because of her refusal, it turned into a
11   one-hour debacle and handcuffs and all the pain and suffering.
12        But then is it -- do you go back and say:  Well, it's all
13   the fruit of the poisonous tree of the illegal stop to begin
14   with and racial profiling to begin with?  Or, alternatively,
15   was the chain of causation broken and this was an intervening
16   act, meaning the refusal to show the ID?
17        Now, you lawyers have failed me because I can't tell from
18   your briefs whether every driver absolutely must always show
19   their driver's license.  My law clerk says, no, it has to be a
20   proper request, but maybe that word -- they didn't mean it when
21   the Supreme Court said that.
22        But in my mind, part of this whole problem, once the
23   initial racial profiling has occurred, it then gets very
24   complicated very quickly, and most of what happened that went
25   wrong in this scenario happened after she refused to show her

1    driver's license.

2         So that's -- okay.  I don't have an answer for you on this

3    because you lawyers have let me down and not given me case law

4    exactly on point and worked your way through these problems.

5    But this is why we're having the hearing today because I would

6    like to sort it out today, but not with what you just think is

7    the law.  I need to have exactly cases on point instead of

8    blather by both sides.  It won't do me any good to get blather.

9         All right.  So first we're going -- it's your motion.  I'm

10   going to let the defense go first, and you get to -- you now

11   know not where I stand on it, because I don't know the full

12   answer on this set of problems, but how I've tried to think my

13   way through this scenario as laid out by the complaint.

14        All right.  Please go ahead on the defense side.

15        **MR. GILBERT:**  Thank you, Your Honor.  This is Kevin

16   Gilbert for the defendants.

17        Turning to those points, if I could break them down one

18   step further.  The allegations in the complaint are different

19   and very distinct as against Deputies Holland and Pope, who had

20   the initial contact with plaintiffs and interacted with them,

21   and Deputy Holland was the one who actually asked for the ID,

22   and then the three other deputies who arrived later and those

23   were Deputies Leeper, Sergeant DeSousa, and Deputy Galloway.

24   Those three individuals only came on site after Deputy Holland

25   and Pope had made the decision to take the plaintiffs into

1   custody and after the discussion about the idea had occurred.

2       So each of those has a different analysis slightly; and I

3   think that the -- as to the latter three, there are not facts

4   that meet the pleading standards under *Iqbal* to establish that

5   they were engaged in wrongful conduct or even racial profiling

6   even accepting the legal or the liberal pleading

7   interpretations that's given to the complaint.

8       So as to defendants Leeper, DeSousa, and Galloway, there

9   simply are not facts in the complaint that support a valid

10   claim against them.  And, in fact, if you read the complaint in

11   and of itself and you go to the sequence, paragraphs up to 26

12   talk about Deputy Holland and Pope and all the interaction, and

13   then paragraph 26 concludes with Deputy Holland making the

14   decision to detain and place the three plaintiffs in handcuffs.

15       Continuing on in paragraph 27 and thereafter talk about

16   and then Deputy Leeper arrived and then Deputy DeSousa arrived;

17   and Deputy DeSousa, the allegation against him is simply he did

18   not release the plaintiffs fast enough.  And that is set forth,

19   Your Honor, I believe in paragraph 29.

20       Deputy Galloway is mentioned in paragraph 28, and the

21   reference to Deputy Galloway is he arrived after the plaintiffs

22   had been taken into custody and that he observed one of the

23   plaintiffs with her cell phone and she was on the phone to 911,

24   and that Deputy Galloway took the phone away from her and hung

25   up the call to 911.

1      And although it doesn't say specifically in the complaint,

2   the complaint raises a question regarding Penal Code,

3   Section 653y.  That provision makes it a crime to make a

4   nonemergency call to 911.  So as to Leeper, DeSousa and

5   Galloway, the pleadings are simply insufficient to satisfy any

6   claim on them.

7      Turning back to the other two deputies, Deputy Holland and

8   Pope, Your Honor, we struggled with the same thing that the

9   Court did in trying to find case law on point, and what we were

10  able to find were cases that addressed similar situations or

11  statutory violations but not something that addressed this

12  specific context, which is why I think the qualified immunity

13  doctrine is especially apt here.

14      Because as the *Mullenix* court -- as the Supreme Court in

15  *Mullenix* stated, qualified immunity provides protections all

16  but for the plainly incompetent and it must be -- rights and

17  contours of the rights must be so clearly established that

18  every reasonable officer, not a reasonable officer but every

19  single reasonable officer would understand that the conduct

20  that they were engaged in violated the law.

21          **THE COURT:**  Wait a minute.  What --

22          **MR. GILBERT:**  Turning to the law here --

23          **THE COURT:**  Wait.  Wait.  Wait.  Wait.  What decision

24  is that?

25          **MR. GILBERT:**  The *Mullenix*, Your Honor.

1            THE COURT:  What's the cite?

2            MR. GILBERT:  And if you give me just a moment, I'm

3    pulling it up right now to give it to you.  I believe we had

4    that in our briefs, and let me see if I can find it very

5    quickly for you.

6            THE COURT:  Well, it should be in your brief if you're

7    citing it now.

8            MR. GILBERT:  Yes, Your Honor.  I just can't remember

9    if it's in the -- which brief it was, whether it was in the

10   original or the other one.

11        And *Mullenix* decided the culmination.  I think I actually

12   cited the *Saucier vs. Katz* and the *Easley vs. Riverside*

13   matters, but *Mullenix* --

14           THE COURT:  Well, give me the *Mullenix*.

15           MR. GILBERT:  Give me just a minute, I'll get that.

16   Yes, Your Honor.  I'm trying to find it right now.  Forgive me.

17                     (Pause in proceedings.)

18           MR. GILBERT:  *Mullenix*, Your Honor, is at 136

19   Supreme Court 305 and specifically is at 308, page --

20           THE COURT:  U.S. Reports?  Give me U.S. Reports.

21           MR. GILBERT:  The U.S. Reports, just a moment and I'll

22   give it to you, Your Honor.

23                     (Pause in proceedings.)

24           MR. GILBERT:  Sorry, Your Honor.  I don't have that

25   one handy.  I'm pulling it up right now.

1              (Pause in proceedings.)

2        **THE COURT:**  See, this is the kind of help I don't get.

3   Here you've taken five minutes and you can't even give me the

4   cite to the case that you say is the best one on point.

5        **MR. GILBERT:**  Your Honor, it's 577 U.S. 7.

6        And, Your Honor, continuing on then, the question then is:

7   What does the California law provide?  And under California

8   law, there are two statutes that are directly on point.

9        **THE COURT:**  Wait.  Wait.  Wait.  I've got *Mullenix*.

10  Wait.  Don't go.  I finally got *Mullenix* off my shelf.

11       All right.  Now, what page is that language that you want

12  me to read?  I'm going to read it out loud.

13       **MR. GILBERT:**  It is at -- it's under -- it is at

14  page 308 in the report.  It looks like page --

15       **THE COURT:**  How does the paragraph begin?

16       **MR. GILBERT:**  The paragraph begins "The doctrine of

17  qualified immunity..."

18       **THE COURT:**  All right.  I got it right here.  I'm

19  going to read it out loud.  This is at page 11 (as read):

20            "The doctrine of qualified immunity shields officials

21       from civil liability so long as their conduct does not

22       violate clearly established statutory or constitutional

23       rights of which a reasonable person would have known.

24            "A clearly established" --

25  I'm going to leave out the citations (as read):

1          "A clearly established right is one that is

2     sufficiently clear that every reasonable official would

3     have understood that what he is doing violates that right.

4     We do not require a case directly on point but existing

5     precedent must have placed the statutory or constitutional

6     question beyond debate, but simply qualified immunity

7     protects all but the plainly incompetent or those who

8     knowingly violate the law."

9     And then the next paragraph says (as read):

10          "We have repeatedly told courts not to define clearly

11     established law at a high level of generality.  The

12     dispositive question is whether the violative nature of

13     particular conduct is clearly established.  The inquiry

14     must be undertaken in light of the specific context of the

15     case, not as a broad general proposition; but specificity

16     is especially important in the Fourth Amendment context

17     where the court has recognized that it is sometimes

18     difficult for an officer to determine how the relevant

19     legal doctrine, here excessive force, will apply to the

20     factual situation the officer confronts."

21     All right.  So that's the two paragraphs from where you

22     are, and it does have the language (as read):

23          "A clearly established right is one that is

24     sufficiently clear that every reasonable official would

25     have understood what he is doing violates that right."

```
 1          All right.  So what was your point as to how that applies
 2    here?
 3                 MR. GILBERT:  Here there's two statutes.
 4                 THE COURT:  Yeah.
 5                 MR. GILBERT:  I'm sorry, Your Honor.
 6                 THE COURT:  Well, okay.  Go ahead.  No, finish your
 7    point and then I'll ask more questions.  Go ahead.
 8                 MR. GILBERT:  Thank you, sir.
 9          Here there are two statutes that are directly implicated
10    by plaintiffs' allegations.  One is Vehicle Code,
11    Section 12951.  The other is Vehicle Code, Section 22511.56.
12    The first, 12951, requires individuals to provide drivers'
13    licenses when they are not in control or operation of the
14    vehicle.
15          Expanding on that, People vs. Redd, which is at
16    48 Cal.4th 691, addresses that that requirement applies equally
17    to those in control of an automobile even if they're in an
18    off-street parking lot.  Under that authority, an officer is
19    entitled to demand that a driver of a vehicle produce
20    identification upon request and, in fact, they're required to
21    do so.  And we've cited the cases, such as Lipton and Trotter,
22    in our brief -- and they're at page 7 of our opening brief,
23    Your Honor -- that go through and provide that under California
24    law where a driver fails to present his or her driver's
25    license, an officer has broad discretion to effectuate a
```

custodial arrest.

    Now, although the officers did not do an arrest here --

        **THE COURT:**  Wait.  But, see -- all right.  I grant you
that -- all right.  Yes, but what if it's racial profiling and
the only reason that they're asking for the ID is on account of
the race of the driver?  What -- does the law say that that's
okay too?

        **MR. GILBERT:**  In fact, there -- that was addressed in
a later amendment after this arrest.  There was a -- and the
answer is, there is no clear law specifically on that.  If
there -- that was addressed in the seat belt cases, Your Honor.
If you'll remember correctly, there was a statute previously
that authorized officers to conduct traffic stops just to see
if people were seat belted and if they were arrested, and that
was ultimately struck down based upon allegations that officers
were misusing that statute by only pulling over people of
certain races or certain genetic backgrounds.  Unfortunately, I
do not have that cite handy.  I apologize.

    Instead what we have focused on was the authority that
would have provided the officers with reasonable basis to
believe their actions were right.  And based upon the
allegations in the complaint, the complaint allegations confirm
that the officers told the plaintiffs they were investigating a
string of burglaries, that the officers advised them of all the
situations.

1       And significantly the next statute, which I'll mention, is

2   directly implicated because the plaintiffs admit that they were

3   parked in a handicapped parking space at the time.  And under

4   Vehicle Code, Section 22511.56, that expressly requires an

5   individual who's using a handicapped placard to present

6   identification to the officers upon request.

7       So they admit in the complaint that they were parked in a

8   handicapped space and that they had a handicapped placard.

9   That by itself is sufficient to justify the officers' conduct.

10      The fact that plaintiffs question the motives and say that

11  it was racial profiling, that's a contention.  That is not a

12  factually supported basis, Your Honor.  And, in fact, the

13  plaintiffs' allegations further confirm that the officers told

14  them "We're investigating a string of burglaries where the

15  suspects are reported as being African American."

16      So based upon plaintiffs' own admission, we have two

17  specific statutory violations and we have the officers engaged

18  in the investigation of a crime where the plaintiffs, arguably

19  at least, meet the prerequisites to have an encounter and to

20  find out, "Hey, who are you?  Why are you in this place?"

21      Based upon that --

22      **THE COURT:**  Where does the complaint say that the

23  officers told the occupants of the car that they were

24  investigating burglaries by African Americans?  Where is that?

25      **MR. GILBERT:**  I'm trying to find the specific

1   provision right now, Your Honor.

2                       (Pause in proceedings.)

3          **MR. MAY:**  This is Joseph May.  I believe it's

4   paragraph 20 to save some time.

5          **THE COURT:**  20?  All right.  Let's look at that.

6                       (Pause in proceedings.)

7          **THE COURT:**  It says (as read):

8            "Defendant Holland indicated that there had been car

9         break-ins in the area and asked Ms. Loggervale for her

10        identification."

11     It doesn't say anything about African Americans there.

12     Paragraph 1 says in general that that's what is being

13  investigated, but it doesn't -- you said that the defendant

14  told the people in the car that they were investigating car

15  break-ins by African Americans.  That doesn't quite go that

16  far.

17         **MR. GILBERT:**  Yes, Your Honor.  Yeah, and I have to

18  concede that.  I had interpreted paragraph 1 and 20 together,

19  and I'll accept that concession.

20     Excuse me, Your Honor.

21     Then, Your Honor, the other thing that must be remembered

22  is that --

23         **THE COURT:**  But paragraph 1 says "African American

24  men."  It doesn't say "women."  So if we're going by what's in

25  the complaint, when the officer realizes that there's no men

inside that car, I don't -- I don't see the basis for any

investigation.

     **MR. GILBERT:**  Well, Your Honor, let's go back one step

if we could.

    First of all, the encounter begins as a consensual

encounter.  Deputy Holland approaches the window and asks for

the identification before she refuses to do it.  So legally

he's entitled to ask for the identification under a consensual

encounter.  Under the Vehicle Code statutes, he's still then

entitled to request the identification and continue even if

it's only to verify the parking placard.

    So at a minimum he has legal support to ask for that

parking -- to ask for identification because the vehicle is

parked in a handicapped place with a placard.  State law is

very clear on that.  And no reasonable officer would have

assumed that they're precluded from doing so simply because of

an individual's race.

    Now, admittedly had there been a series of claims where

officers had only checked parking placards of African

Americans, that would be a different story, but that is not the

allegation here.  The allegation is they were parked taking a

nap in the Starbucks parking lot when Deputy Holland approached

and asked for identification, and they admit to being in that

parking space.

    Now, on top of that then, case law further confirms that

once the officers had started their encounter with the

individuals, they're authorized to order the passengers to

remain in the vehicle and that's also set forth in the

Ninth Circuit published established precedent, specifically

*United States vs. Williams*, which is addressed on page 10 of

our brief, Your Honor.

And, furthermore, when a passenger fails to comply with

those orders, they're subject to arrest for violating

Penal Code 148, and that is, again, authorized by *Young vs.*

*County of L.A.*, which is addressed on page 11 of our brief,

Your Honor.

Based upon these facts -- and keep in mind in the first

amended complaint, the plaintiffs admit that the two daughters

both attempted to leave the vehicle and were directed to get

back in by the deputies -- when they refused to do so, that is

when all three of them were taken into custody and placed in

handcuffs, Your Honor.

Any reasonable officer would have assumed that they had

authority under the Vehicle Code provisions to take them into

custody and check for identification.  So because of that, at a

minimum, the deputies are entitled to qualified immunity as to

plaintiffs' claims.

Furthermore, as I stated before, the other three deputies

that are --

**THE COURT:**  Just a second.

1          **MR. GILBERT:**  Yes, sir.

2          **THE COURT:**  You said "furthermore" about 14 times.

3   I'm still stuck back on -- yes, let's say that everybody in the

4   car was white and the same race as the officers, let's say.

5   Okay.  Then there's no race motive.  So, yeah, we would all

6   agree, I think, that they could do -- officers would reasonably

7   assume that they had the authority to take all of those steps

8   even though maybe it would be excessive.

9          Nevertheless, but if the entire sequence of events were

10  motivated by race as is alleged here, don't I have to readily

11  construe the complaint and indulge that assumption for purposes

12  of Rule 12?

13          **MR. GILBERT:**  No, Your Honor, because conclusory --

14          **THE COURT:**  No.  On summary judgment you would have a

15  better shot, but on Rule 12, no, it's not conclusory.  It's

16  flat-out said that what their race was and what the race was of

17  the other -- the suspects, and so I don't know.  I don't think

18  it's conclusory.  How much more would they be able -- they

19  can't -- they can't dissect what's in the brain of each

20  individual at this point.  I think they've pled as much as they

21  can on the race issue at this point.

22          So you're not coming to grips with -- what you need is a

23  decision that says even on motion to dismiss, even where you

24  liberally construe the complaint, an officer could have assumed

25  in these circumstances blah, blah, blah.  That -- and I don't

1   know.  I question whether you have that.

2          MR. GILBERT:  Your Honor, I would respectfully point

3   the Court to the case of *Bingham vs. City of Manhattan Beach*.

4   It's discussed on page 22 of our brief.  And in that matter the

5   court found that in quoting African American -- actually, I

6   can't quote it in context; but in essence, the fact that a

7   plaintiff was African American and the officer is white and

8   they disagree about the reasonableness of the traffic stop was

9   not sufficient to raise an inference of racial discrimination.

10       And that was also addressed in --

11         THE COURT:  Wait.  There you go, you go with that

12  "furthermore" thing again.

13       All right.  Was that -- what was the name of that

14  decision?

15         MR. GILBERT:  That is in *Bingham*, B-I-N-G-H-A-M, *vs.*

16  *City of Manhattan Beach*.

17         THE COURT:  Okay.  Is that a Ninth Circuit?

18         MR. GILBERT:  Yes, sir, it is.  341 F.3d 939.

19         THE COURT:  Did that arise on motion to dismiss or

20  motion for summary judgment?

21         MR. GILBERT:  I'm pulling it up as we speak to give

22  you that specific answer.

23                      (Pause in proceedings.)

24         MR. GILBERT:  Summary judgment, Your Honor.

25         THE COURT:  Well, that's a different standard, summary

1   judgment.  It sounds like there the district judge ruled for

2   the police officer after there was full and fair discovery and

3   said that the motive was not racial profiling, but here we're

4   at the threshold of the case and we're confronted with Rule 12

5   limitations.

6        **MR. GILBERT:**  And, Your Honor, this is where the

7   balancing of the qualified immunity doctrine comes in because

8   the police officer is entitled to rely on the Ninth Circuit

9   precedent and shouldn't have to act in accordance and

10  differentiate cases based upon whether they were decided on

11  motion to dismiss, summary judgment, or an opposed trial

12  proceeding.

13       This case has specifically held that the fact that there's

14  a difference in race by itself is not enough, and that the fact

15  that a suspect is a certain color does not trigger support in

16  allegation or inference of racial profiling.  There has to be

17  more, especially in light of the *Iqbal* standard for pleading,

18  Your Honor.

19       **THE COURT:**  All right.  Let me give the other side a

20  chance to speak.

21       **MR. MAY:**  Thank you, Your Honor.  Joseph May for

22  plaintiffs.

23       The first issue that we raised and the Court hasn't

24  discussed it yet, but we argue in our opposition that you

25  cannot attack a complaint under Rule 12(b) after you've filed

1    an answer to that complaint, and we've cited several district

2    court cases that rely on cases from other circuits and other

3    districts.  It seems to be the consensus that once you've

4    answered, you've waived the 12(b) defenses, and so that's our

5    first argument.

6            **THE COURT:**  Wait.  Wait.  Wait.  Wait.  But after the

7    answer -- the answer was to the original complaint; right?

8            **MR. MAY:**  Yes.

9            **THE COURT:**  All right.  And then you somehow got leave

10   to file an amended complaint --

11           **MR. MAY:**  Yes.

12           **THE COURT:**  -- right?

13           **MR. MAY:**  Correct.

14           **THE COURT:**  Okay.  All right.  This one is so easy I'm

15   going to rule from the bench.  You're totally wrong on that.

16   No answer has been filed to this amended complaint, has it?

17           **MR. MAY:**  No, Your Honor, but --

18           **THE COURT:**  Okay.  They're still -- so now that you

19   got a new crack at it, so they get a new crack at Rule 12 even

20   though they have waived it.  They can't move -- they couldn't

21   have moved against the original complaint, but the original

22   complaint is ancient history because you yourself amended it.

23   So that's -- listen, that one is easy.  That one you lose on.

24       So go to the merits.  Please, come on.

25           **MR. MAY:**  Your Honor, I do have to say, though, you

1  know, we cited several cases that held exactly the opposite.

2  So --

3      THE COURT:  I'm sure that if you look at them closely,

4  they would not be our scenario, but I disagree with -- unless

5  it's the U.S. Supreme Court, I don't agree with that.  So you

6  go to your next point.

7      MR. MAY:  Okay.  The next issue is this idea that

8  there are two statutes that required the plaintiffs to show ID.

9  I think it's actually a lot simpler than -- and I will get to

10  the race discrimination issue; but, first, if there's no

11  reasonable suspicion, you cannot demand that somebody provide

12  the ID.  And so these two Vehicle Code sections that the

13  defendants cite to simply don't apply, and we've set that forth

14  in our opposition.

15      THE COURT:  Okay.  Wait.  Help me on that one.

16      MR. MAY:  Yes.

17      THE COURT:  Okay, wait.  I just want -- don't go so

18  fast.

19      Many, many times in my life I've been stopped when I have

20  done absolutely nothing wrong and the officer wanted to see my

21  driver's license, and of course I always let him see it.  So

22  where does it say that there must be reasonable suspicion

23  before the officer can ask for your ID?  Where does that come

24  from?

25      MR. MAY:  So if you've been stopped with no basis at

all, that's a *Terry* violation, and I'm sorry to hear that they
did that to you, Your Honor.

Officers cannot stop a vehicle without any reasonable
suspicion whatsoever.  That's *Terry v. Ohio*, Supreme Court
case, that we all know very well.

An officer can ask questions when it's a consensual
encounter, but they cannot take no -- they can't refuse to take
no for an answer.  And this is a case called *United States vs.*
*Landeros*, L-A-N-D-E-R-O-S, 913 F.3d 862.  It's a Ninth Circuit
case from 2019.

It basically says that while the first request may have
been lawful, it says, quote, "law enforcement's refusal to take
no for an answer was not," and they cite to Supreme Court case
*Brown vs. Texas,* 443 U.S. 47, a 1979 case.  And *Landeros* said,
quote (as read):

    "Brown held squarely that law enforcement may not
    require a person to furnish identification if not
    reasonably suspected of any criminal conduct," closed
    quote.

    **THE COURT:**  That's the Court of Appeals talking or
some district judge?

    **MR. MAY:**  That was the Court of Appeals.  That was
*U.S. v. Landeros*, Ninth Circuit case, citing to *Brown*, *Brown v.*
*Texas*, Your Honor.

    **THE COURT:**  All right.  So the times -- I can kind of

1   bring this to mind.  I was driving along.  There was a long

2   line of cars stopped.  The Highway Patrol was checking every

3   single car to see that the driver had a driver's license.

4   You're telling me that was illegal?

5       **MR. MAY:**  I don't know what the circumstances were.

6   Sobriety checkpoints are governed by a different body of case

7   law.  That's not what we had here.  We don't even have people

8   who are operating a motor vehicle, Your Honor, so the

9   Vehicle Code doesn't even apply, and that's what I was about to

10  get to.

11      Section 12951 that says that a driver must present his

12  driver's license, if you read the rest of that section, it says

13  that (as read):

14          "The driver of a motor vehicle shall present his or

15          her license for examination upon demand of a peace officer

16          enforcing the provisions of this code."

17      And that's subsection (b) of Vehicle Code 12951.

18      Two problems with the defendants' arguments, Your Honor.

19  Number one, plaintiff was not a driver of a motor vehicle.

20  They never witnessed her driving the vehicle.  They approached

21  as she was already parked.  They never saw her in motion.

22      And then, secondly, they weren't enforcing any provisions

23  of the Vehicle Code.  By the allegations in the complaint, they

24  were ostensibly investigating car burglaries.  And so this

25  section just simply doesn't apply, and it wouldn't be

reasonable for an officer to rely on this when it clearly by its terms doesn't apply to the situation here.

The second section that they cite is Vehicle Code 22511.56.  This has to do with the disabled placard.  What it says is that (as read):

> "A person using that placard shall, upon request of a
> peace officer or person authorized to enforce parking
> laws" -- et cetera -- "present identification and evidence
> of the issuance of that placard or plates to that person."

And this makes perfect sense, Your Honor.  If you go up to somebody who's got a placard and you just say "Give me your ID," that person would have no idea why you're asking for ID and they might say, "Well, I didn't do anything.  You can't just ask me for ID for no reason."

And that's why the Vehicle Code says that you have to produce your ID and evidence of issuance of your disabled placard when the officer asks for those things.  It says that, you know --

**THE COURT:**  Well, wait.  Wait.  You're saying an officer couldn't ask for them one at a time?  What if he said, "Let me see your ID," and then you see the ID; "Now let me see the issuance of that placard to you"?  To me, that's demanding too much that an officer has got to ask for both in one fell swoop.

**MR. MAY:**  You know, Your Honor, I think that the big

 1   problem here is:  How is the person supposed to know what the

 2   purpose of the request is?  And that's what the statute is

 3   designed for.

 4        So, for example, if the person says, "No, I don't want to

 5   show you my ID," shouldn't the officer then say, "Well, you

 6   must show it to me because you have a disabled placard and I'm

 7   next going to ask you for that certificate"?

 8        That didn't happen here.  He just said, "Give me your ID."

 9   And you know why it is, is because he wasn't worried about the

10   placard.  This is a *post hoc* justification for arresting black

11   women when black men were the -- well, black men were

12   ostensibly the suspect.  If you read the complaint, and we cite

13   this in the papers, those allegations by the deputies of who

14   committed these crimes, that was fabricated.  We use the word

15   "fabricated" in our complaint.  There were no multiple

16   burglaries committed by black men.  And now that we have

17   discovery, I can confirm that what we put in that complaint was

18   absolutely true.

19        There was one black man two months prior who was allegedly

20   connected with a burglary.  Two months before.  One black man.

21   And they're going to use that as the justification.  The two

22   other burglaries were not committed by black people at all as

23   far as the deputies know.

24        Although, what we found out later, it's not in the

25   complaint; but if we need to amend for any reason, we'll add

1    this.  What the deputy learned -- what the deputy put in his

2    report to justify this arrest is that the day before two young

3    black men were involved in a burglary.  We did some further

4    investigation.  We received the incident report for that other

5    incident.  It turned out nobody told the deputy that those

6    people were black.  He made that up to justify this arrest.

7         And, like I said, we're happy to add that if we're

8    required to amend, which I don't think that we are.

9         And so the way -- you know, I think the only reasonable

10   reading of this statute is that you at some point need to

11   request both of those things; and if the person refuses, then

12   you can arrest them for violating the statute.  You can't --

13   you can't trap them by saying "Give me your ID," not giving

14   them any indication whatsoever of why you're even asking for

15   it, and then later claiming, "Well, you know, they didn't give

16   us the ID so now we can arrest them for a placard violation."

17        I think it also unfairly prejudices people who have

18   disabilities because they're the only ones who might be subject

19   to this law enforcement trap.

20             **THE COURT:**  Well, let me go to -- so you have, to me,

21   it's a remarkable proposition, but it could be correct and I'm

22   just trying to take in the breadth of it.

23        You're saying that when a police officer comes up to you

24   and asks for your ID without any reasonable grounds for

25   suspicion of a crime, you are perfectly within your rights to

say, "Forget it.  I've done nothing wrong.  You don't get to

see my ID," and that refusal in and of itself cannot be held

against the person as the basis for suspecting some crime has

been committed?

        **MR. MAY:**  That's absolutely the law, Your Honor.

        **THE COURT:**  Is there -- let me ask the other side.

    Just say "yes" or "no."  Do you agree with that?

        **MR. GILBERT:**  No, sir.

        **THE COURT:**  All right.  We'll come back to why you

disagree in a minute.

    All right.  So one says it's absolutely the law.  The

other says it's not the law.  This is why I -- this is why I'm

pulling my hair out, and I don't know how -- I don't know

how -- it's so hard to do this job because you can't even get

the lawyers to agree on what the law is.

    All right.

        **MR. MAY:**  Your Honor, I'm sorry.

        **THE COURT:**  Give me the decision -- on the plaintiffs'

side, give me the decision that says it's absolutely the law.

        **MR. MAY:**  Let's see here, I believe we...

                  (Pause in proceedings.)

        **MR. MAY:**  I'm looking for it.

    You know, the cases that I just cite basically say what I

just told you, and that would be the *Landeros* case and the

*Brown* case.

1          **THE COURT:**  All right.

2          **MR. MAY:**  Yeah.  It's *Brown* squarely held law

3    enforcement may not require a person to furnish identification

4    if not reasonably suspected of any criminal conduct.

5          So I would amend my answer to Your Honor's question.  The

6    person can say, "Yeah, I don't want to give you my ID.  I've

7    done nothing wrong."  They do so at a small risk because if the

8    officer does have reasonable suspicion, now that person could

9    be guilty of a crime.

10         And it turns out in our case there was no reasonable

11   suspicion, certainly not for burglary and not for violation of

12   Vehicle Code sections that weren't even being enforced at the

13   time.

14         **THE COURT:**  What do you say to the point that some of

15   these officers arrived after the fact and that they -- you

16   know, they didn't know how the original racial profiling came

17   down.  They arrived and the argument was already underway, and

18   so they assisted.

19         But isn't that what officers are supposed to do?  They try

20   to bring things under control?  And they assisted, but they

21   were not the original perpetrator and what they assisted in was

22   they did not know was a racial profiling equal protection

23   violation.  So what do you say to that point?

24         **MR. MAY:**  I say that that would be fine if they didn't

25   truly know what was going on.  Here we allege that they all did

1  know what was -- well, I want to break these people up as well.

2       Leeper was the next one on scene after the first two

3  deputies.  Leeper -- I don't think we alleged this, but just so

4  the Court knows, Leeper was involved in some of the previous

5  investigations so he would have known that women were never

6  suspects in this case.  Yet, when he got to the scene, he was

7  the one who handcuffed and placed both of the daughters, if I

8  recall, in the backseats of police cars.  And so he knew what

9  he was doing and he was at least an integral participant in the

10  Fourth Amendment violation, and we allege that.

11       We don't allege the part about him knowing the previous

12  investigations, but we say that he did know there was no

13  reasonable suspicion, which is true.  He knew there was no

14  reasonable suspicion.

15       Next on scene -- well, I don't know --

16       **THE COURT:**  Wait.  Wait.  Wait.  Was he under the

17  impression that the only -- I'm talking about Leeper now, the

18  guy that comes later.  Was he under the impression that the

19  only reason they were being detained was on account of those

20  burglaries or did he even know about them?  He may have known

21  about the burglaries, but did he know that that was the reason

22  for the original approach in the first place?

23       **MR. MAY:**  Yeah, he knew the circumstances is what we

24  allege and what we will prove.  He also lied.  I think we

25  alleged this here.  He was involved -- we allege that he was

```
 1    involved -- well, we don't -- I think we didn't know the
 2    identity of whoever conducted the search.
 3         I'm trying to find something specific to Leeper in the
 4    complaint.  Let's see...
 5                    (Pause in proceedings.)
 6         MR. MAY:  Yeah, we make the same allegations as to all
 7    the defendants in a lot of these causes of action, and what we
 8    do know is Leeper basically lied to the plaintiffs when they
 9    asked about why they were being arrested, which would suggest a
10    consciousness of guilt.  He said that there had been break-ins
11    that all involved rental cars and the plaintiffs had a rental
12    car.  That's not true we know.  He made some other comments
13    that showed that he understood this to be a pretextual stop and
14    potentially racially motivated.
15         I can't find exactly where we put everything about Leeper.
16    We do -- we do include him with Holland and Pope and make
17    allegations against all of them, although now with discovery
18    we've learned a little bit more.  If we need to amend to
19    clarify Leeper's role, we can do that, but we're confident that
20    he is a proper defendant.
21         Another deputy on scene, Galloway, there's a separate
22    allegation about Galloway.  In fact, he's the only person that
23    we -- the whole purpose for amending the complaint was to add
24    Galloway.  So there are no new claims or changes to any of the
25    claims against the other defendants.
```

1          And as to Galloway, it's just that he removed the cell

2     phone from the hand of the minor plaintiff while she was

3     calling 911 to get help.  She was desperate and afraid, and

4     that's what people call 911 for, and they didn't like that.

5     She was in the back of the police car and she had her cell

6     phone, and Galloway essentially tricked her, told her that the

7     supervisor was there to talk to her.  And he opened the door

8     and then snatched the phone out of her hand, hung up the 911

9     call, and then confiscated the phone.  And so the only claims

10    against him are related to seizure of the phone without a

11    warrant, without probable cause.

12         Finally, the supervisor DeSousa came to the scene, and we

13    allege very clearly, and this is contained in our opposition,

14    DeSousa was fully aware of all the facts.  He spoke with the

15    deputies.  He understood exactly what was going on and had all

16    the information he needed, and then continued to keep the

17    plaintiffs -- in fact, he spoke with them while they were

18    handcuffed in police cars and continued to keep them in custody

19    for quite a long time.  We didn't allege the exact amount of

20    time.

21         But this isn't just a claim that he didn't remove them

22    quick enough or didn't complete his investigation quickly

23    enough.  It's a claim that he knew full well that they were

24    innocent, just like the other deputies did, and he didn't

25    direct his subordinates to release them immediately.

1       And it looks like based on the evidence we did uncover,

2    again, if we need to amend, we can add even more detail now,

3    but it appears that he was on scene fairly early in the

4    process, earlier than we assumed.  I think within 15 or 20

5    minutes of the incident starting.  So that meant they were in

6    police cars for about 45 minutes after he was there and got the

7    information from the deputies.

8       So that's to address the issue about these other

9    claimants.

10       I just want to respond to defense counsel's reference to

11   some of these cases that he says supports defendants' position.

12   He cited a case *People vs. Redd* he says justifies a police

13   officer demanding ID even from a parked vehicle notwithstanding

14   the Vehicle Code section talking about only a driver can be

15   demanded to provide ID.

16       *People vs. Redd* was a very different case.  It's a

17   California case.  Very different situation.  You had a vehicle

18   who had expired registration and one of the bases for the

19   arrest was Vehicle Code, Section 400, which says that you can't

20   leave a vehicle in off-street parking unless it's registered.

21       So there was a specific statute that the plaintiff -- or

22   that the defendant in that case -- the criminal defendant in

23   that case violated.  It did not say that you can walk up to

24   somebody who's just sitting in a car and demand their ID.

25   There's no case that says that.  That's not the law.

And there's a good quote from -- defendants cite this case *In Re Arturo D.* They cite that in the brief even though it's been now overruled. It was a case that had a limited exception for officers to search for an identification. But what *Arturo D.* said about the Vehicle Code sections that we're talking about, it said, quote (as read):

"The reasons for these provisions are plain. An officer who has stopped a vehicle for a traffic infraction and plans to issue a citation needs to ascertain the true identity of the driver and the owner of the vehicle in order to include that information on the citation and the witness promise to appear."

And they cite to a case called *People vs. McGaughran* -- I can't pronounce it -- M-c G-A-U-G-H-R-A-N, 25 Cal.3d 577.

So, you know, the Vehicle Code sections they're relying on, that's fine. If you pull over a driver for a traffic infraction, which is really the only time you can pull somebody over, you have to have reasonable suspicion. Then you're allowed to demand their ID; and if they refuse, you can arrest them.

You can't just walk up to somebody sitting in a car, especially if it's just because they're black, but setting that issue aside, and just say, "Hey, you have to give me your ID," and not tell them that it's to check a handicapped placard, which it wasn't. But you have to -- you have to put them on

1   notice somehow that if they refuse, there's some violation

2   because otherwise there's no requirement to provide your ID,

3   and a lot of people don't understand that.  I don't think I

4   understood that until I started getting into this case.

5            **THE COURT:**  All right.  Let's hear from -- okay.  Make

6   one more point, then I'm going to --

7            **MR. MAY:**  Yeah.  I mean, there was more as well.

8       So the qualified immunity issue, this rarely comes up on a

9   12(b)(6).  I personally haven't dealt with it.

10      I just want to note for the Court that the entire argument

11  on qualified immunity in the actual motion was extremely

12  truncated, and I think the only contention was that this

13  wasn't -- this wasn't plainly incompetent or a knowing

14  violation of the law.  And that's what the *Malley vs. Briggs*

15  and subsequent cases have said and so, therefore, there's

16  qualified immunity.

17      There's a much more robust argument on qualified immunity

18  in the reply, and so we haven't had an opportunity to address

19  the real meat of the defendants' arguments on QI.

20      If the Court is interested, I'd be more than happy to

21  provide supplemental briefing that would respond to all of the

22  new arguments that the defense raises in their reply on

23  qualified immunity.

24            **THE COURT:**  Well, wait a second.  I've got their

25  opening brief and -- all right.  Page 23.

1          (Pause in proceedings.)

2          **THE COURT:**  So there's about a page and a half in the

3     opening on qualified immunity.

4          **MR. MAY:**  Right.  They don't cite the *Mullenix* case

5     that they've cited.  They didn't cite it in the reply even and

6     now they've raised that.

7          They're talking about meeting clearly established case

8     law.  They don't mention that.  It just says a reasonable

9     officer would have thought it was okay to arrest these people.

10         And, you know, I've cited a couple of cases.  I've cited

11    *Brown* and *Landeros*, but if the Court would prefer a full

12    briefing on what cases we believe clearly establish that you

13    can't arrest somebody for not showing an ID absent reasonable

14    suspicion, which I think would be the way to phrase the right

15    at issue -- I think that's a sufficiently narrow

16    characterization -- then we're happy to provide additional

17    briefing.

18         Finally, I think -- and I don't know the answer to the

19    Court's -- to the Court's first question about if race was a

20    motivating factor, is it okay to initiate this what started as

21    a consensual encounter, but I think that would only be relevant

22    to the Fourth Amendment claim.

23         I think under the equal protection claim, the

24    Fourteenth Amendment claim, intent is relevant; and here I

25    think there's more than enough pleaded to show that these

officers were not intending to investigate a handicapped
placard or a driving without a license issue.

These officers were looking at the plaintiffs because
they're black and because they heard black people had broken
into cars before, or at least that's what they're claiming.  It
turns out two months ago there was one -- potentially one black
person.  And so under the Fourteenth Amendment equal protection
context, I think the Court is correct, that this -- the facts
that we pleaded are clearly enough to show that this was
racially motivated.

**THE COURT:**  Let's go back to the defendant.

You said you disagreed with the statement of law that the
police cannot stop someone and ask for ID or if they do, the
person is entitled to say "no" unless there is some grounds for
reasonable suspicion of violation of law.

**MR. GILBERT:**  Yes, sir.

**THE COURT:**  You said that was not the law.

**MR. GILBERT:**  Yes, sir.

**THE COURT:**  So what do you think the law is?

**MR. GILBERT:**  Your Honor, the Vehicle Code,
Section 12951, expressly authorizes officers to stop to check
identification, and that was thereafter confirmed by the
Ninth Circuit in *Lipton vs. United States*, which is discussed
in our brief, and holds that the -- in relevant part, that the
necessary implication of the code provisions -- and it was

 1    referencing Vehicle Code, Section 12500 and 12951 -- is that a

 2    peace officer has a right to stop a driver and make such

 3    demand; in other words, make demand for identification.

 4         That was later addressed by the Ninth Circuit in

 5    *United States vs. Carrizoza-Gaxiol* -- and I'm certain I

 6    butchered that pronunciation -- that's at 523 F.2d 239 where

 7    that court addressed the *Lipton* ruling; and although it did

 8    reference that *Terry* had some impact on it, confirmed that.

 9    And in reading that opinion, it reads, quote, (reading):

10              "We have limited *Lipton* to the rationale; it permits

11         stops without founded suspicion only to enforce laws

12         susceptible of no other means of effective enforcement."

13         And then it cites to other cases, for example,

14    *United States vs. Bowen* at 500 F.2d 960.  Since that time, no

15    case has ever held that an officer does not have authority to

16    stop a vehicle to check for ID.

17         Now, obviously, and the authorities confirm, if the stop

18    was for the sole purpose of harassing someone because of the

19    color of their skin or something such as that where it's

20    discriminatory, that would not be lawful, but individually the

21    officers have authority to do the stop.

22              **THE COURT:**  Well, but that --

23              **MR. GILBERT:**  Now --

24              **THE COURT:**  What's alleged here, though, is it is

25    alleged here that it was racially motivated.

1       **MR. GILBERT:**  Your Honor, the allegation of being

2   racially motivated still has to be backed up by facts.  It's a

3   conclusory allegation; and even if those allegations were made,

4   those are only made that Deputy Holland and Pope had the

5   initial discussions.  The other three deputies were not on

6   scene at the time and didn't arrive until later.

7       So even if that limited claim is allowed to proceed, it

8   still triggers, first of all, whether the other three

9   defendants should be dismissed; and, second, qualified

10   immunity.  Because under this context, you still had clear

11   legal authority that told the officers they had the right to

12   check for identification, and qualified immunity would be

13   invalidated if a plaintiff need only say, "Well, the color of

14   my skin is why this happened," without anything else.  The

15   pleading standard is not so bare and simple.

16       And, in fact, we did -- turning to the qualified immunity

17   discussion, our opening brief had a very, very detailed

18   discussion of the legal authorities; and rather than recite

19   those again under the qualified immunity provision, on page 24,

20   line 25, we referenced that "As discussed here above and

21   incorporated herein, established law provides," and then we

22   address the law that we'd already addressed above regarding

23   application of qualified immunity.

24       And while we may not have cited *Mullenix* specifically, we

25   did cite *Pearson vs. Callahan*, which is what was quoted by the

Supreme Court in *Mullenix* and what the *Mullenix* court relied

upon.  So we did have the same legal authorities and precedents

that are set forth in detail within our opening brief,

Your Honor.

          **THE COURT:**  Okay.  I don't know the answer here.  I

can tell you what I think the practical thing to do is, and

that is for you-all to raise this issue of what actually

happened on summary judgment.  That is, there would be a

summary judgment motion for the various officers at various

stages and they would say what they knew or didn't know or what

their motives were, and then there would be an opposition, and

it could turn out that there will be fact issues that only a

jury could determine.  But it also could turn out that there

are points that -- on which the plaintiff has no proof and,

therefore, maybe the officers would win qualified immunity.

     To me, that's the practical way to do this rather than do

this through the lens of Rule 12.  But, you know, these

defendants feel like -- or defense lawyers feel like they've

got to make a Rule 12 motion, and so that we now have to go

through all these contortions of indulging in allegations that

are -- that the defense is ultimately going to say are not

true.

     All right.  I am going to just take it under submission.

I don't have an answer for you.  So keep taking depositions,

keep going while we're -- I'll do my best to get an order out

1    within a couple weeks.

2        All right?

3            **MR. MAY:**  Your Honor, thank you for your time.

4            **MR. GILBERT:**  Thank you, Your Honor.

5            **THE COURT:**  Yeah.  Bye-bye.

6                (Proceedings adjourned at 10:22 a.m.)

7                        ---oOo---

8

9

10                   **CERTIFICATE OF REPORTER**

11           I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14   DATE:   Wednesday, August 9th, 2023

15

16

17

18   _____

19        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   U.S. Court Reporter
20

21

22

23

24

25